UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------X
                                             :
INDEPENDENT POWER TANZANIA LTD.,             :
                                             :
                    Plaintiff,               :
                                             :
          - against -                        :        07 CV 10366 (AKH)
                                             :
THE GOVERNMENT OF THE REPUBLIC               :        **DECLARATION**
OF TANZANIA,                                 :
                                             :
                    Defendant.               :
                                             :

-----------------------------------------------------------X

### **DECLARATION OF SAZI B. SALULA**

Sazi B. Salula hereby deposes and states the following pursuant to 28 U.S.C.§ 1746:

1.      I currently serve as the Deputy Attorney General for the United Republic of Tanzania and Permanent Secretary of the Ministry of Justice and Constitutional Affairs. I have also served as a member of the Board of Directors of the Tanzanian Electric Supply Company ("TANESCO"). I ceased to be a Director in October 2006.

2.      I received from the Tanzanian Embassy in the United States documents concerning the above suit. I have made enquiries in the office of Ministry of Foreign Affairs and International Cooperation of the Government of Tanzania if any documents in connection with the above suit had been delivered at the Ministry by the clerk of the court or by plaintiff. I have learnt that no documents concerning the above suit had been delivered at the office of the Ministry.

3.      Independent Power Tanzania Limited ("IPTL") entered into a Power Purchase Agreement ("PPA") with the Tanzanian Electric Supply Company ("TANESCO") dated 26 May

1995. In conjunction with the PPA, the Government of Tanzania ("GOT") entered into an Implementation Agreement ("IA") dated 8 June 1995, which IA incorporated a Guarantee by GOT of certain obligations of TANESCO under the PPA. The PPA and the IA provided that the law applicable was the law of Tanzania. Under the Guarantee, liability of the Government of Tanzania was limited to amounts that were payable by TANESCO. Copies of the PPA, the IA and the Guarantee are attached to this declaration as Exhibits A, B and C.

4.      Pursuant to the PPA, IPTL constructed a 100 MW diesel-powered generating station ("Facility") in Tegeta, Dar es Salaam, Tanzania to produce electricity for TANESCO. There were disputes in relation to the cost of the Facility, which disputes were the subject of an arbitration between IPTL and TANESCO that commenced in 1999 and concluded in July 2001, about 6 months before the plant started commercial operations. Among other issues, TANESCO contended in the arbitration that IPTL had grossly inflated the price of the power station.

5.      GOT was not a party to the arbitration. The Guarantee by GOT of TANESCO's payment obligations was not at issue in the arbitration.

6.      GOT's Guarantee respecting TANESCO's payment obligations was entered pursuant to Article 22 of the IA with IPTL. In Article 21.2 of the IA, IPTL agreed to resolve "any dispute or difference between the Parties" by arbitration in London, England "in accordance with the Rules of Procedure for Arbitration Proceedings (the "ICSID Rules) of the International Centre for the Settlement of Investment Disputes. . . ."

7.      The Guarantee incorporates the binding arbitration provision of the IA. Article 7.2 of the Guarantee provides: "Any dispute or difference between the Parties arising out of or in connection with this Agreement shall be arbitrated in accordance with Article 21.2 of the Implementation Agreement."

8.      TANESCO has issued Invoice Dispute Notices disputing substantial portions of the amounts invoiced by IPTL. Under the PPA and under the applicable law viz. the law of Tanzania, TANESCO has the right to set off the amounts that are found to have been collected by IPTL in excess of its entitlement. Disputes raised by TANESCO have not yet been resolved. Amounts, if any, payable by TANESCO after setting off amounts that are determined as erroneously invoiced and paid by TANESCO has not yet been ascertained.

9.      The procedure prescribed under the PPA for resolution of disputes raised by TANESCO has not been completed. IPTL has not commenced any proceedings, by way of

ICSID arbitration or otherwise, against TANESCO for non-payment of capacity charges, either with respect to capacity charges IPTL admits are disputed, or with respect to those charges that IPTL claims TANESCO has not disputed. IPTL has also not commenced proceedings, by way of ICSID arbitration or otherwise, against GOT in respect of amounts that it claims as are due and owing under the Guarantee. Had such proceedings been initiated, the objections to the amounts claimed would have been adjudicated upon.

10.    GOT denies any suggestion by IPTL in the Complaint that the July 12, 2001 final Award of ICSID addresses GOT's obligations under the Guarantee or that IPTL is merely seeking to enforce the ICSID Award.

11.    At the time of the final Award, IPTL was not generating power under the PPA, and as such IPTL had not sent any invoices for capacity payments to TANESCO. Therefore, TANESCO had not incurred any payment obligations that were the subject of GOT's Guarantee. IPTL's Complaint references amounts invoiced to TANESCO after TANESCO had set in motion the procedure provided under the PPA for resolution of disputes.

12.    The GOT had not provided the guarantee in the course of any commercial activity. As borne out by the narrative recital of the IA, the GOT was acting in pursuance of its policy. A government policy is made in the interests of the nation and is not a commercial activity. Even assuming that a policy of the government can at all be construed as a "commercial activity," the commercial activity that gives rise to IPTL's claims has absolutely no nexus with the United States. IPTL is a company organized under the laws of Tanzania and maintains its offices in Dar es Salaam. TANESCO is the state-owned utility of Tanzania, with its principal offices in Ubungo, Tanzania. The power station is located in Tanzania, and the electricity it generates is distributed within Tanzania. The PPA, IA and Guarantee are governed by the law of Tanzania. IPTL's invoices to TANESCO for capacity and energy charges are prepared in Tanzania, and delivered to TANESCO in Tanzania. The PPA requires any payments by TANESCO to be made in Tanzania in Tanzanian shillings. In short, the transactions between TANESCO and IPTL related to the power station have no relation to New York or the United States and there will be absolutely no effect in the United States on account of the GOT Guarantee.

13.    The same is true with respect to GOT's obligations to IPTL under the IA and the Guarantee. The demands that IPTL is required to make under the Guarantee to TANESCO and

to GOT must be made in Tanzania. IPTL is not authorized by the IA or the Guarantee to require any performance under those agreements in New York or elsewhere in the United States.

14.    Further, GOT does not maintain substantial contacts with the United States aside from its diplomatic and governmental functions with the United States government and international organizations such as the United Nations and the World Bank.

15.    GOT maintains an Embassy in Washington, D.C. GOT's Ambassador to the United States and other diplomats are resident at this Embassy. Additionally, GOT has a Permanent Mission to the United Nations that is located in New York. GOT's Ambassador and Permanent Representative to the United Nations and other diplomats are resident at the Mission. The Embassy in Washington and the Permanent Mission in New York are in direct support of Tanzania's governmental functions, including its diplomatic relations with the United States and the United Nations. They have no involvement in the PPA, the IA, the Guarantee, or the performance of any obligations arising under those agreements.

16.    GOT maintains bank accounts in Washington, DC. and New York for the purpose of supporting the functions of its Embassy and Permanent Mission, including paying the salaries of Tanzanian diplomats. GOT has not waived sovereign immunity for assets that are protected by diplomatic and consular privileges under the State Immunity Act of England or the Foreign Sovereign Immunities Act of the United States or any analogous legislation. Such accounts are defined as "Protected Assets" in the IA and Guarantee and are immune from attachment, execution or other act of seizure to satisfy the obligations arising under the Guarantee and/or the IA.

17.    Further, the amounts in these accounts are funded to meet the maintenance needs of the diplomatic operations of Tanzania's Embassy and Permanent Mission and are inadequate to cover the amounts sought by IPTL. An attempted attachment or lien on these accounts would totally cripple the diplomatic operations of Tanzania's Embassy and Permanent Mission.

18.    The real estate owned in the United States by Tanzania is used for housing the Tanzanian Ambassador to the United States in Washington, D.C., the Tanzanian Ambassador and Permanent Representative to the Permanent Mission to the United Nations in New York, and other senior diplomats of the Embassy and Permanent Mission. GOT does not own any property in the United States that is used for a business, including any business related to IPTL, TANESCO, or the power plant.

- 4 -

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on January 17, 2008.

_____

Sazi B. Salula

**Exhibit A, PART 1 to Declaration of Sazi B. Salula**

DATED THIS 26TH DAY OF MAY 1995


BETWEEN


TANZANIA ELECTRIC SUPPLY COMPANY LIMITED


and


INDEPENDENT POWER TANZANIA LIMITED


POWER PURCHASE AGREEMENT

# POWER PURCHASE AGREEMENT

## DATED 26TH MAY, 1995

## BETWEEN

## INDEPENDENT POWER TANZANIA LIMITED

## AND

## TANZANIA ELECTRIC SUPPLY COMPANY LIMITED

## ADDENDUM NO. 1 DATED 9TH DAY OF JUNE, 1995

This Addendum No. 1 to the Power Purchase Agreement dated 26th May, 1995 between INDEPENDENT POWER TANZANIA LIMITED (" THE SELLER") and TANZANIA ELECTRIC SUPPLY COMPANY LIMITED (TANESCO) amends the main agreement as below:-  The capitalised terms used herein bear the same meaning as defined in the Power Purchase Agreement dated 26th day of May, 1995.

1.    Before commencement of commercial operations the Reference Tariff mentioned in Table I of Appendix B will be adjusted upwards or downwards depending on the effect of changes that will have taken place on any or all the underlying assumptions stated in the Power Purchase Agreement.

2.    Article VI (6.6) is amended to read the Escrow Account opened by Government of Tanzania on behalf of TANESCO.

IN WITNESS WHEREOF, the Parties hereto have set their hands and seals the day and year above written.

**THE COMMON SEAL OF**
**TANZANIA ELECTRIC SUPPLY COMPANY LIMITED**
was hereunto affixed in the presence of:

S. L. Mhaville
Managing Director

M. S. Masanja
Company Secretary

**THE COMMON SEAL OF**
**INDEPENDENT POWER TANZANIA LIMITED**
was hereunto affixed in the presence of:

------------------------
**D I R E C T O R**

------------------------
**DIRECTOR/SECRETARY**

2

**INDEX**

**ARTICLE I**

**DEFINITIONS**

1.1    Defined Terms


**ARTICLE II**

**TERM**

2.1    Initial Term
2.2    Extension of Term
2.3    Force Majeure Extension


**ARTICLE III**

**SALE AND PURCHASE OBLIGATIONS**

3.1    Sale and Purchase of Test Energy
3.2    Sale and Purchase of Electrical Energy
3.3    Sale and Purchase of Dependable Capacity
3.4    The Seller's Obligation to Provide Power During System Emergencies
3.5    Exceptions to TANESCO's Obligation to Accept Electrical
       Energy
3.6    Prudent Utility Practices


**ARTICLE IV**

**CONDITIONS PRECEDENT**

4.1    Conditions Precedent to Purchase Obligations
4.2    Conditions Precedent to the Seller's Obligations


**ARTICLE V**

**PURCHASE PRICE AND OTHER CHARGES**

5.1    Purchase Price : Capacity and Energy
5.2    Supplemental Tariff
5.3    Supplemental Charges
5.4    Penalty and Bonus Payments


**ARTICLE VI**

**COMPENSATION, READING, BILLING AND PAYMENT**

6.1    Reading of Meters for Energy Payment
6.2    Capacity Payment
6.3    Supplemental Tariff Payments
6.4    Supplemental Charges
6.5    Penalty and Bonus Payments





6.6     TANESCO or GOT Security
6.7     Payment
6.8     Payment Disputes
6.9     No Set-Off
6.10    Currency and Timing of Payment
6.11    Records


ARTICLE VII

PRE-OPERATIONS PERIOD AND OPERATIONS PROCEDURE

7.1     Facility Construction and Start-Up
7.2     Initial Operations Date
7.3     Commercial Operations Date
7.4     Operating Procedure


ARTICLE VIII

Despatch

8.1     Control and Operation of the Facility: Despatch
8.2     Scheduling and Despatch
8.3     Operating Guidelines


ARTICLE IX

OPERATION AND MAINTENANCE

9.1     Operation and Maintenance of Facility
9.2     Dependable Capacity : Testing of Capacity Rating
9.3     Scheduled Outages
9.4     Maintenance Outages
9.5     Forced Outage
9.6     TANESCO Maintenance Schedule


ARTICLE X

INTERCONNECTION

10.1    Interconnection Facilities
10.2    Protective Devices
10.3    Title and Risk of Loss


ARTICLE XI

METERING

11.1    Metering Device
11.2    Inspection of Metering Device
11.3    Adjustments of Inaccurate Meters
11.4    Metering Readings
11.5    Records

### ARTICLE XII

### REPRESENTATIONS AND WARRANTIES OF THE SELLER AND TANESCO; ADDITIONAL COVENANTS OF THE SELLER

12.1     The Seller's Status and Authorization
12.2     TANESCO's Status and Authorization
12.3     Permits Licenses, Approvals and Compliance with Laws
12.4     Continuity of Existence
12.5     Operating and Maintenance Standards
12.6     Qualified Personnel
12.7     Testing
12.8     Access to Operation Records
12.9     Easements and Rights-of-Way
12.10    Sale of Energy to Third Parties
12.11    Interconnection Facilities
12.12    GOT Guarantee

### ARTICLE XIII

### TAXES, FINES

13.1     Taxes Applicable to THE SELLER
13.2     Taxes Applicable to TANESCO

### ARTICLE XIV

### INSURANCE

14.1     Insurance Required
14.2     Substitute Coverage
14.3     Evidence of Insurance
14.4     Application of Proceeds

### ARTICLE XV

### FORCE MAJEURE EVENT

15.1     Definitions
15.2     Notification
15.3     Duty to Mitigate
15.4     Delay Caused by Force Majeure
15.5     Payments During Force Majeure Event

### ARTICLE XVI

### TERMINATION AND DEFAULT

16.1     The Seller Events of Default - Termination by TANESCO
16.2     TANESCO Events of Default - Termination by THE SELLER
16.3     Termination Notices
16.4     Notice to the GOT of TANESCO's Default
16.5     Notice to the Lenders of THE SELLER's Default
16.6     Obligations Upon Termination
16.7     Reimbursement
16.8     Other Remedies

## ARTICLE XVII

## INDEMNIFICATION AND LIABILITY

17.1    Limitation of liability
17.2    Indemnification
17.3    Indemnification for Fines and Penalties
17.4    Notice of Proceedings
17.5    Assertion of Claims to Exceed Minimum Indemnification Amount
17.6    Defence of Claims
17.7    Double Jeopardy

## ARTICLE XVIII

## DISPUTE RESOLUTION

18.1    Resolution by Parties
18.2    Mediation by Expert
18.3    Arbitration
18.4    Commercial Acts

## ARTICLE XIX

## MISCELLANEOUS

19.1    Transfers
19.2    Assignment
19.3    Notices
19.4    Choice of Law
19.5    Entire Agreement
19.6    Further Assurances
19.7    Waiver
19.8    Modification or Amendment
19.9    Severability
19.10   Counterparts
19.11   Confidential Information
19.12   Independent Contractors
19.13   Third Parties
19.14   Headings
19.15   Language



**APPENDICES**

**APPENDIX A**        Description of the Facility and Site

**APPENDIX B**        Reference of Tariff
                      Tariff Schedule

**APPENDIX C**        Performance Standards

**APPENDIX D**        Energy Accounting and Metering Equipment

**APPENDIX E**        Interconnection and Communication

**APPENDIX F**        Fuel Details

**APPENDIX G**        Electricity Characteristics

**APPENDIX H**        Tax Assumptions

**APPENDIX I**        Testing Procedures for Determining Net Capacity

**EXHIBITS**

## POWER PURCHASE AGREEMENT

This Agreement, dated as of 26th day of May, 1995, by and between  Independent Power Tanzania Ltd. (hereinafter referred to as "THE SELLER") of the one part and  Tanzania Electric Supply Company Limited (hereinafter referred to as "TANESCO") of the other part (each, a "Party" and, collectively, the "Parties").

Recitals :

1.        THE SELLER proposes to design, construct, own, operate and maintain an electricity generating Facility with a nominal Net Capacity of 100 megawatts at Site Conditions (as hereinafter defined) to be located in Tegeta, Dar es Salaam for the generation of electrical energy and the sale of electrical energy and capacity  to TANESCO which facility will be designed and constructed in Units. Such Units to be collectively known as the "Facility" and described more specifically in Appendix A.

2.        TANESCO desires to encourage and promote the development of low cost and reliable power options for generating electricity to meet the needs of its customers.

3.        THE SELLER desires to sell to TANESCO and TANESCO desires to purchase from THE SELLER all the electricity required to be generated by the Facility for the period specified in Article II of this Agreement after the Commercial Operations Date as hereinafter defined at the rates and in accordance with the terms and conditions set forth herein.

4.        Simultaneously herewith, THE SELLER is entering into an Implementation Agreement with the Government of the United Republic of Tanzania ("GOT").

NOW THEREFORE, in consideration of these premises and the mutual covenants set forth herein, the Parties hereby  agree that the following terms and conditions shall govern THE SELLER's sale and delivery of electricity from the Facility to TANESCO and the purchase and receipt by TANESCO of such electricity from THE SELLER:





1

## ARTICLE I - DEFINITIONS

### 1.1    Defined Terms

Unless otherwise defined herein or in any appendix or exhibit hereto, the following Terms when used herein or in any appendix or exhibit hereto shall have the meanings set forth below.

"**Agent**" :  The meaning ascribed thereto in Article 16.5.

"**Agreement**" : This Power Purchase Agreement, including all appendices, exhibits, amendments and supplements that may be entered into by the Parties and in effect from time to time.

"**Back-up Metering Device**" : Any meters and metering device installed by THE SELLER and owned by TANESCO and used for backup purposes to measure Dependable Capacity, and payment purposes, the delivery and receipt of Net Electrical Output.

"**Base Lending Rate**" :  The one month London Interbank Offering Rate, as adjusted from time to time, plus two percent (2%) per annum.

"**Bonus Payment**" :  The meaning ascribed thereto in Article 6.5(b).

"**BTU**" : British Thermal Unit.

"**Business Day**" :  Any day on which commercial banks are not authorised or required to be closed in Dar es Salaam, Tanzania.

"**Capital Component**" :    The meaning ascribed thereto in Appendix B.

"**Capacity Billing Period**" : The period (i) commencing on the Commercial Operations Date of the first Unit and ending on the last calendar day of the following month, and (ii) between the respective last calendar day of any two consecutive calendar months thereafter.

"**Capacity Damages Amount**" : The amount expressed in Shillings equal to the total Capacity Payment paid by TANESCO to THE SELLER during the relevant Contract Year.

"**Capacity Payment**" : For any Capacity Billing Period, the payment to be made by TANESCO to THE SELLER  as  ascribed thereto in Article 5.1(a).

"**Capacity Purchase Price**" : For each Contract Year, the amount expressed in Shillings per kW per Month and shown in Appendix B, as such amount is adjusted from time to time in accordance with Appendix B.

"**Change in Law**" : Any of the following events occurring after the Effective Date as a result of, or in connection with, any action or inaction by any Governmental Authority:

(i)       a change in or repeal of an existing Law;

(ii)      an enactment or making of a new Law;

(iii)     a cancellation or non-renewal or a change in the conditions applicable to any permit, licenses approval or governmental authorisation from a Governmental Authority granted to THE SELLER or relating to the Facility;

(iv)      change in the manner in which a Law is applied or in the application or interpretation thereof (including any interpretation of best available control technology or other environmental standard that is materially different from that which THE SELLER

2

utilised in preparing its capital and operating cost assumptions) under this Agreement; or

(v)      any other change in, or other alteration of the application to THE SELLER or its shareholders of tax rates, depreciation schedules or assumptions set forth in Appendix H.

"**Closing Date**" : The date of the closing for the Financing Documents for the construction financing for the Facility.

"**Commencement Date**" :  The date on which construction work on the Facility is to begin and notice of such date shall be given not less than 30 Days prior by THE SELLER to TANESCO.

"**Commercial Operations Date**" :  As to each  Unit, the first date on which (i) all of the conditions set forth in Article IV shall have been satisfied, and (ii) the conditions set forth in Articles 7.3 and 9.2(a) shall have been satisfied.

"**Consents**" :  All such approvals, consents, authorisations, notifications, concessions, acknowledgements, agreements, licenses, permits, decisions or similar item required to be obtained from, any Governmental Authority for THE SELLER for the construction, financing, ownership, operation and maintenance of the Facility.

"**Contract Year**" : The 12-month period commencing on the Commercial Operations Date of the first Unit and each 12-month period thereafter.

"**Construction Contractor**" : The firm or firms retained by THE SELLER to provide services in connection with the design, engineering, procurement, construction, testing   and commissioning of the Facility.

"**Construction Contracts**" : All contracts to be entered into between THE SELLER and the Construction Contractor in connection with the design, engineering, procurement, construction, installation, testing and commissioning of the Facility and the Interconnection Facilities, as amended from time to time.

"**Consumables**"      : Consumables are oil, grease, diesel fuel, chemicals, ink, paper, water treatment and the like required for the proper operation of the Facility.

"**Contractors**".     : The Construction Contractor and the Operation and Maintenance Contractor.

"**Conversion**"      : The addition or modification to, or change in, or replacement or renewal (otherwise than in the ordinary course in accordance with Prudent Utility Practices) of the Units, equipment, machinery or facilities used by THE SELLER for the purposes of, or incidental to, the production of electricity at the Facility or the receipt, storage, treatment and transmission to the Facility of the Fuel at or from the Fuel storage facility.

"**Conversion Period**" : The period required for the Conversion with an additional testing period of 3 months.

"**Day**"     : The 24-hour period beginning and ending at 12.00 midnight Tanzania Time

"**Debt Component**"  :   The meaning ascribed thereto in Appendix B.

"**Dependable Capacity**" : The capacity of the Facility  (and measured in kilowatts at the applicable Interconnection Point) to be made available by THE SELLER to TANESCO as provided for in Article 9.2.

"**Derated Hour**" : For any period, any hour during such period when any portion (but not all



3

of the Dependable Capacity of the Facility is not available due to a Forced Outage, Maintenance Outage or Scheduled Outage.

"**Description of the Facility**" : The description of the Facility as described in Appendix A.

"**Despatch**" : Instructions, in accordance with Prudent Utility Practices, from the Grid Control Centre, directing the Facility to commence, increase, decrease or cease the delivery of electricity into the TANESCO System.

"**Dispute**" : Any dispute or disagreement of any kind whatsoever between TANESCO and THE SELLER in connection with or arising out of this Agreement.

"**Effective Date**" : The date of the execution and delivery of this Agreement by THE SELLER and TANESCO.

"**Emergency Condition**" : A condition or situation that in TANESCO's and THE SELLER'S reasonable judgement presents an imminent physical threat of danger to life, health or property, or could reasonably be expected to cause a significant disruption on the TANESCO System and could reasonably be expected to adversely affect TANESCO's ability to meet its obligations to provide safe, adequate and reliable electric service to its customers including other utilities with which TANESCO is interconnected.

"**Energy Billing Period**" : The period between (i) the Initial Operations Date and the first monthly meter reading used for billing purposes pursuant to Article VI, and (ii) any two consecutive monthly meter readings used for billing purposes pursuant to Article VI.

"**Energy Payment**" : For each Energy Billing Period, the Energy Purchase Price to be paid by TANESCO to THE SELLER for each kWh of Net Electrical Output subject to Minimum Quantity, as ascribed thereto in Article 5.1(b).

"**Energy Purchase Price**" : The amount expressed in Shillings per kWh subject to Minimum Quantity, identified as the Energy Purchase Price in Appendix B, as such amount is adjusted from time to time in accordance with the provisions of Appendix B or (b) the amount nominated by THE SELLER pursuant to Article 5.1(b).

"**Equivalent Availability Factor**" : For any period, the availability of the Facility to produce electrical energy (measured in kilowatt-hours at the applicable Interconnection Points) during such period for delivery to TANESCO at the Interconnection Points, as determined by the following equation and expressed as a percentage:

$$EAF = ((PH - EDH)/PH) * 100$$

where,

| | | |
|---|---|---|
| EAF | = | Equivalent Availability Factor for such period. |
| EDH | = | Equivalent Derated Hours for such period. |
| PH | = | Period Hours in such period. |
| * | = | Multiply |





4

Equivalent Derated Hours shall be calculated in accordance with the following formula :

$$EDH = \sum_{x=1}^{n} \frac{(DC-NGC) \cdot t_x}{DC}$$

where :

| | | |
|---|---|---|
| EDH | = | Equivalent Derated Hours for such period |
| DC | = | Dependable Capacity (kW) for such period |
| n | = | Total number of sub-periods in such period where DC differs from NGC |
| NGC | = | net generating capacity (kW) of each sub-period where DC differs from NGC |
| t | = | number of Derated Hours of each sub-period where NGC is less than DC or number of hours of each sub-period where NGC is more than DC. |
| x | = | each sub-period where DC differs from NGC |
| * | = | multiply |

"**Escrow Account**" : The account established by TANESCO or GOT pursuant to Article 6.6.

"**Escrow Agreement**" : The agreement between TANESCO or GOT, THE SELLER and the Escrow Bank in Tanzania controlling the disposition of funds deposited in the Escrow Account by TANESCO or GOT.

"**Escrow Bank**" : A bank in Tanzania with which TANESCO or GOT establishes the Escrow Account.

"**Facility**" : The electricity generating facility described in Recital 1, with the exception that prior to the Commercial Operations Date of any such Unit(s), the Facility shall refer expressly to such Units where the Commercial Operations Date has been declared.

"**Financial Closing**" : The date on which the Financing Documents relating to the construction financing for the Facility shall have been entered into by THE SELLER and the other parties thereto, and all conditions for the initial borrowing by THE SELLER under such Financing Documents shall have been satisfied by THE SELLER or waived by the Financing Parties thereunder.

"**Financing Documents**" : The loan agreements (including agreements for any subordinated debt), notes, bonds, indentures, security agreements and any other documents relating to the financing or refinancing for the construction, ownership, operation and maintenance of the Facility by THE SELLER.

"**Financing Parties**" : Lenders providing financing or refinancing to THE SELLER for the design, construction, ownership, operation and maintenance of the Facility by THE SELLER.

"**FM Ratio**" : As provided in Article 15.

"**Force Majeure Events**" : The Force Majeure Events described in Article 15.1.



"**Forced Outage**" : Any interruption (excluding an interruption due to a Force Majeure Event during the Conversion Period, a request by TANESCO in accordance with this Agreement, or a condition caused by TANESCO or the TANESCO System) or reduction of the electricity generating capability of the Facility that is not the result of a Scheduled Outage or Maintenance Outage.

"**Fuel**" : Fuel Oil and Natural Gas with the proposed fuel specifications set forth in Appendix F for the generation of electrical energy, the type of which may be changed from time to time upon the consent of both Parties.

"**Fuel Oil**" : Fuel oil and Industrial Diesel Oil.

"**Fuel Supplier**" : The parties with whom contracts are or to be entered into by THE SELLER for the supply and transportation of fuel for the Facility.

"**Fuel Supply Contract(s)**" : The contracts entered into or to be entered into by THE SELLER for the supply and transportation of fuel for the Facility.

"**Grid Control Centre**" : The Grid Control Centre of TANESCO as designated in writing by TANESCO from time to time as being the primary TANESCO Grid Control Centre for the Facility.

"**GOT**" : The Government of the United Republic of Tanzania and its successors.

"**Governmental Authority**" : Any state, municipal or local government or regulatory department, body, political subdivision, commission, instrumentality, agency, ministry, court, judicial or administrative body, taxing authority or other relevant authority having jurisdiction over either Party, the Facility.

"**Guarantee**" : The guarantee by the GOT for the payment obligations of TANESCO under this Agreement, in substantially the form provided in Schedule 1 of the Implementation Agreement, as maybe amended from time to time.

"**Implementation Agreement**" : The Implementation Agreement dated 8th June 1995 between GOT and THE SELLER, as maybe amended from time to time.

"**Invoice for Bonus Payments**" : A written invoice for Bonus Payment provided to TANESCO by THE SELLER pursuant to Article 6.5.

"**Invoice for Penalty Payments**" : A written invoice for Penalty Payment provided to THE SELLER by TANESCO pursuant to Article 6.5.

"**Invoice Dispute Notice**" : The meaning ascribed thereto in Article 6.8.

"**Independent Engineer**" : The internationally reputable consulting engineering firm or professional engineer retained by THE SELLER and approved by the Financing Parties as the independent engineer of THE SELLER in connection with the design and construction of the Facility.

"**Initial Operations Date**" : The first date on which electrical energy is generated by the Facility and metered in accordance with Article XI at any of the Interconnection Points.

"**Interconnection Facilities**" : All of the facilities determined by TANESCO and THE SELLER to be necessary (in accordance with Prudent Utility Practices) to enable TANESCO to receive electrical energy from the Facility and to maintain the stability of the TANESCO System as more specifically described in Appendix E.

"**Interconnection Point**" : Any of the physical points where the Facility and the TANESCO

6

System are connected as shown in Appendix E or such other point or points as the Parties may agree.

| "kJ" | : | Kilojoule |
| "kV" | : | Kilovolt |
| "kVAr" | : | Kilovolt Ampere Reactive |
| "kVArh" | : | Kilovolt Ampere Reactive hour |
| "kW" | : | Kilowatt |
| "kWh" | : | Kilowatt-hour |

"Lapse of Consent" : Any Consent (a) ceasing to remain in full force and effect or (b) not being issued or renewed upon application having been properly and timely made and diligently pursued or (c) being made subject, subsequent to its grant, to any terms or conditions that, in each case, materially and adversely affects THE SELLER's ability to perform its obligations under any document included within the Security Package, in each of the above instances through no fault of THE SELLER.

"Law" : Includes the State, Municipal and local laws of the United Republic of Tanzania, and all orders, rules, regulations, decrees, Policies, judgments and notifications made pursuant thereto, as such orders, rules, regulations, decrees, Policies, judgments and notifications as maybe amended from time to time.

"Lenders"    : The lenders party to the Financing Documents, together with their successors and assigns.

"Licence" : The licence required by THE SELLER pursuant to Section 4 of the Electricity Ordinance 1931 to enable THE SELLER to own, operate and maintain the Facility and supply energy to TANESCO therefrom.

"Loss" : Any and all loss, damage, liability, payment and obligation (excluding any indirect or consequential loss, damage, liability, payment or obligation), and all expenses (including without limitation reasonable legal fees).

"Maintenance Outage" : An interruption or reduction of the electricity generating capability of the Facility that (i) is not a Scheduled Outage, (ii) not during the Conversion Period, (iii) has been coordinated with TANESCO in accordance with Article 9.4 and (iv) is for the purpose of performing work on specific components of the Facility.

"Maintenance Schedule" : The meaning ascribed in Article 9.6.

"Metering Device" : All meters and metering devices (including remote terminal units) installed by THE SELLER and owned by TANESCO and used to measure Dependable Capacity, and payment purposes, the delivery and receipt of Net Electrical Output.

"Minimum Indemnification Amount" : The amount, equal to USD100,000 that a Party's claim for indemnification pursuant to Article 17.

"Minimum Quantity" : Following the generation of electrical energy on Natural Gas, for each Energy Billing Period or such other period as maybe determined by the Parties TANESCO shall purchase or deemed to have purchased from THE SELLER such energy in kilowatt-hour or the equivalent Natural Gas which THE SELLER is required to purchase under the Fuel Supply Contracts.

7

"**Month**" : A calendar month according to the Gregorian calendar beginning at 12.00 midnight on the last day of the preceding month and ending at 12.00 midnight on the last day of that month.

"**MMBTU**"  :  One million British Thermal Units.

"**MW**"  :  Megawatt.

"**MWh**"  :  Megawatt-hours or 1000 kilowatt-hours.

"**Natural Gas**" : Natural gas to be supplied by GOT or any entity authorised by GOT.

"**Net Capacity**" : With respect to the Facility, the net generating capacity (on a continuous rating basis) of such Facility (measured in kilowatts at the applicable Interconnection Points), as the case may be, to be determined as set forth in Appendix I (as adjusted from time to time to take account of any reduction in the net generating capacity of such Facility). Provided always that in the event of TANESCO System constrain in establishing the Net Capacity of all the Units simultaneously at the Interconnection Point, the Net Capacity of the Facility will be obtained through the summation of the net generating capacity of the Units.

"**Net Electrical Output**" : With respect to the Facility for any period, the electrical energy output of such Facility (measured in kilowatt-hours at the applicable Interconnection Points), net of station use.

"**Notice of Intent to Terminate**" : A notice delivered by THE SELLER or TANESCO, as the case maybe, of it's intent to terminate this Agreement pursuant to Article 16.3 due to default of the other Party.

"**Operating Procedures**" : The meaning ascribed thereto in Article 7.4(c).

"**Parties**" : Both TANESCO and THE SELLER.

"**Party**" : One of the parties defined in the first paragraph of the Agreement.

"**Pass-Through Items**" : Certain costs or charges identified as Pass-Through Items in Appendix B.

"**Penalty Payments**" : The meaning ascribed thereto in Article 6.5(a).

"**Period Hours**" : With respect to any period, the number of hours during such period (including any Force Majeure Event hours).

"**Person**" : Any individual, corporation, partnership, joint venture, trust, unincorporated organization or government agency.

"**Policies**" : Such policies adopted by the GOT, Governmental Authority, as have been published.

"**Prescribed Fee**" : With respect to any Consent, the charge or fee, if any, prescribed by the Law.

"**Project Contracts**" : The engineering, procurement and Construction Contracts, Fuel Supply Contracts, operations and maintenance agreement, and any material contract including but not limited to contracts relating to the development, construction, operations or maintenance of the Facility.

"**Prudent Utility Practices**" : The practices generally followed by the electric utility industry including independent power producers as changed from time to time, which generally include, but are not limited to, engineering and operating considerations, the use of equipment practices, methods and adherence to applicable industry codes, standards and regulations.

8

"**Scheduled Commercial Operations Date**" :  The date that is 28 months after Financial Closing, as such date is extended for Force Majeure Events in accordance with provisions of Article XV.

"**Scheduled Outage**" :  A planned interruption of the electricity generating capability of the Facility that (i) is not a Maintenance Outage, (ii) is not during the Conversion Period, (iii) has been coordinated in advance with TANESCO with a mutually agreed start date and duration pursuant to Article 9.3 and (iv) that is required for the inspection, preventive maintenance or corrective maintenance, repair or improvement of the Facility.

"**Security Package**" : The following: (a) Implementation Agreement; (b) this Agreement; (c) Fuel Supply Contracts; (d) Operation and Maintenance Agreement, if any; (e) Construction Contracts; (f) Financing Documents; (g) Insurance Policies; (h) Guarantee; and (j) Instruments conveying title to the Site.

"**Site**" : The parcel of land upon which the Facility is to be constructed and located as more specifically described in Appendix A.

"**Site Conditions**" : The following assumed ambient conditions:

| | |
|---|---|
| Ambient Air Temperature | 35deg Dry bulb |
| Atmospheric Pressure | 1013 mbar |
| Ambient Relative Humidity | 85 % |
| Power Factor Level | 0.85 lagging |
| Site Altitude | 28m above MSL |

"**Shillings**"    : The lawful currency of the United Republic of Tanzania.

"**Supplemental Tariff**" : Additional compensation payable by TANESCO to THE SELLER pursuant to Articles 5.2.

"**Supplemental Tariff Payments**" : The payments for the Supplemental Tariff in accordance with the payment schedule agreed by THE SELLER and TANESCO, which shall be designed to permit THE SELLER to the recover the Supplemental Tariff over the Term.

"**Supplemental Charges**" : Certain costs or charges identified as Supplemental Charges in Appendix B.

"**TANESCO**" :     Tanzania Electric Supply Company Limited or any successors thereto.

"**TANESCO Letter of Credit**" : The revolving, unconditional and irrevocable direct pay letter of credit issued by a first class Bank  in Tanzania reasonably acceptable in form to THE SELLER, in an amount equal to an aggregate of two (2) Months of Capacity Payments and Energy Payments (each as adjusted in accordance with Appendix B) computed on the basis of the declared Dependable Capacity.

"**TANESCO System**" : The power network controlled or used by TANESCO for the purpose of generating, transmitting, and distributing electricity to TANESCO's customers.

"**Tanzania**": The United Republic of Tanzania.

"**Term**" : The period of this Agreement as specified in Article 2.1 and any extension thereof in accordance with Articles 2.2 and 2.3.

"**Test Energy**" : The electrical energy associated with the start-up and commissioning of the

9

Facility and metered in accordance with Article XI at the Interconnection Points.

"**Test Energy Payment**" : The meaning ascribed thereto in Article 5.1(c).

"**THE SELLER**" : Independent Power Tanzania Ltd., a limited liability company incorporated under the laws of Tanzania, its successors and permitted assigns.

"**Unit**" : Refers to each Unit of electricity generating engine, its, auxillary and generator.

"**USD**", "**Dollars**" : The lawful currency of the United States of America.

"**Week**" : Each period of seven (7) consecutive Days beginning at 12.00 midnight Tanzania time falling between a Sunday and Monday.

1.2    **Construction of Certain Terms and Phrases:**

(i)    words of any gender include every other gender;

(ii)    words using the singular or plural number also include the plural or singular number, respectively;

(iii)    the Terms "hereof", "herein", "hereby" and similar words refer to this entire Agreement and not any particular Article, Section, Subsection, Exhibit, Appendix or Schedule or any other subdivision of this Agreement;

(iv)    references to "Article", "Section", "Subsection", "Exhibit", "Appendix" or "Schedule" are to this Agreement;

(v)    the words "include" or "including" shall be deemed to be following by "without limitation" or "but not limited to" whether or not they are followed by such phrases or words of like import;

(vi)    reference to any statute or statutory provision shall be construed as a reference to the same as it may have been, or may from time to time be, amended, modified or re-enacted; and

(vii)    references to "this Agreement" or any other agreement or document shall be construed as a reference to this Agreement or such document as amended, modified or supplemented from time to time and shall include a reference to any document which amends, modifies or supplements it or is entered into, made or given pursuant to or in accordance with its Terms;

(viii)    unless stated otherwise all references to MW output, heat rate and or efficiency are at Site Conditions.

(ix)    unless otherwise provided herein, whenever a consent or approval is required by one Party from the other Party, such consent or approval shall not be unreasonably withheld or delayed.

All accounting terms used herein and not expressly defined herein shall have the meanings given to them under generally accepted accounting principles of the United Republic of Tanzania applied on a consistent basis with those used in the preparation of the latest financial statement of THE SELLER.

**END OF ARTICLE**

10

## ARTICLE II - TERM

### 2.1    Initial Term

This Agreement shall become effective as of the Effective Date and shall continue in effect for an initial period ending on the date that is 20 years from the last Commercial Operations Date unless otherwise extended or terminated in accordance with the provisions of this Agreement.

### 2.2    Extension of Term

The initial term of this Agreement or subsequent extension periods may be extended for a further term of 5 years if either TANESCO or THE SELLER requests an extension of this Agreement. The parties shall promptly enter into good faith negotiations to reach an agreement on the extension of this Agreement, on terms and conditions mutually acceptable to both parties, provided always that the agreement on such extension is reached at least 1 year prior to the end of the initial term or subsequent extension periods, as the case may be. If the Parties cannot agree to the terms and conditions for the extension of this Agreement, THE SELLER will be permitted to contract with any other party for the sale of dependable capacity and electrical energy from the Facility and TANESCO shall deliver to the SELLER any necessary Consents for such sale, provided, however, that TANESCO shall have no obligation to assist in such sale unless otherwise required by law.

### 2.3    Force Majeure Extension

The Term shall automatically be extended by the aggregate of Days all Force Majeure Events declared by THE SELLER were in existence. During each Month of such extension, THE SELLER shall be paid the Debt Component of the Capacity Purchase Price as in existence during such Force Majeure Event plus the Capital Component of the Capacity Purchase Price applicable to the 20th Contract Year (as shall be further escalated pursuant to the provisions of Appendix B) multiplied by the then prevailing Dependable Capacity. The Term shall automatically be extended by the aggregate of Days all Force Majeure Events declared by TANESCO were in existence. During each Month of such extension, THE SELLER shall be paid the Capital Component of the Capacity Purchase Price applicable to the 20th Contract Year (as shall be further escalated pursuant to the provisions of Appendix B) multiplied by the then prevailing Dependable Capacity. During any such extensions, THE SELLER shall also receive the Energy Purchase Price,

**END OF ARTICLE**





## ARTICLE III - SALE AND PURCHASE OBLIGATIONS

**3.1    Sale and Purchase of Test Energy**

As to each Unit, subject to the terms and conditions of this Agreement, THE SELLER shall sell and deliver, and TANESCO shall purchase and accept, all Test Energy beginning on the Initial Operations Date and continuing until earlier of either (A) the date this Agreement is terminated or (B) the date immediately preceding the Commercial Operations Date of that Unit.

**3.2    Sale and Purchase of Electrical Energy**

Subject to the terms and conditions of this Agreement THE SELLER shall sell and deliver, and TANESCO shall purchase and accept, on and after, the Commercial Operations Date for each Unit and for the Term, the Net Electrical Output from the Facility as the Facility is Despatched by TANESCO from time to time pursuant to Article VIII provided always that if electrical energy is generated on Natural Gas, TANESCO shall purchase or deemed to have purchased from THE SELLER the Net Electrical Output or the Minimum Quantity, whichever shall be the greater for each Energy Billing Period or such other period as may be determined by the Parties.

**3.3    Sale and Purchase of Dependable Capacity**

Except as provided in this Agreement, including Article 3.4, THE SELLER shall sell and make available, and TANESCO shall purchase and pay for, from and after, the Commercial Operations Date for each    Unit and for the Term of this Agreement, a level of Dependable Capacity up to but not exceeding the Net Capacity of the Facility as established pursuant to Article 9.2.

**3.4    THE SELLER's Obligation to Provide Power During System Emergencies**

Notwithstanding any other provision of this Article III,  THE SELLER agrees that, during Emergency Condition and situations where the safety, reliability, or security of the TANESCO System is threatened, THE SELLER shall, at TANESCO's request, use reasonable efforts to provide electrical energy or capacity consistent with Prudent Utility Practices and/or  use reasonable efforts to delay or to accelerate any Scheduled Outage and Maintenance Outage of the Facility.  TANESCO shall reimburse THE SELLER for any additional costs incurred by THE SELLER as a result of its reasonable efforts to provide electrical energy referred to in this Article 3.4.

**3.5    Exceptions to TANESCO's Obligation To Accept Electrical Energy**

Notwithstanding the above provisions and in addition to the provisions of Article XV, TANESCO shall not be obligated to accept electrical energy from the Facility if any of the events described below occur:

(a)        an Emergency Condition occurs on the part of the TANESCO System that is interconnected with the Facility such that there would be no means of delivering electrical  energy from the Facility to the remainder of the TANESCO System provided that such failure of means is not attributable to omission on the part of TANESCO. Such refusal to purchase may occur on an instantaneous basis, provided that TANESCO shall give THE SELLER advance notice of such occurrence(s) and duration of the Emergency Condition to the extent practicable under the circumstance then prevailing and shall give THE SELLER an explanation of such occurrence(s) after the fact where advance notice is impractical.

12

(b)    TANESCO intentionally interrupts the acceptance of electrical energy from the Facility to conduct necessary maintenance of TANESCO's Interconnection Facilities, metering equipment or adjacent transmission and distribution facilities pursuant to TANESCO's schedule of planned maintenance under Article 9.6. In such instances, TANESCO shall give THE SELLER as much advance notice as possible with duration of the interruption but in no event less than 7 Business Days prior to any such planned maintenance under Article 9.6.

(c)    In the reasonable opinion of TANESCO, the Facility produces electrical energy of a character inconsistent with that described in Appendix G or that may adversely affect the safety, reliability or security of TANESCO's equipment, facilities, personnel or system, or the safety, reliability or security of those of any other supplier of electricity to TANESCO or to TANESCO's customers. TANESCO shall notify THE SELLER of this condition and allow THE SELLER reasonable time to correct it. If THE SELLER fails to correct the condition within 15 Days, TANESCO may physically interrupt the flow of electrical energy from the Facility until the condition is corrected or until THE SELLER demonstrates to the reasonable satisfaction of TANESCO that THE SELLER is operating in accordance with the operating standards set forth in Article IX.

For the purposes of this Article 3.5 the occurrence of any such events shall not relieve TANESCO from its obligation to make any payment due under this Agreement, including Energy Payments and Capacity Payments and shall reimburse THE SELLER for any additional costs reasonably incurred by THE SELLER due to the occurrence of any such events, except where the occurrence of any of the foregoing events set forth above is the result of a breach by THE SELLER of its material obligations under this Agreement.

### 3.6.    Prudent Utility Practices

All action required or taken under this Agreement by either Party including this Article III shall be consistent with Prudent Utility Practices.

END OF ARTICLE

13

## ARTICLE IV - CONDITIONS PRECEDENT

### 4.1    Conditions Precedent to Purchase Obligations

The obligations of TANESCO under this Agreement to purchase electrical energy and capacity from THE SELLER are contingent upon THE SELLER's compliance with the following conditions.

(a)    Prior to the Commencement Date, THE SELLER shall, at its own expenses, (i) make or cause to be made all applications (whether initial applications or renewal applications) for Consents to the appropriate Governmental Authority, shall diligently pursue all such applications and shall use all reasonable efforts to maintain in effect the Consents once obtained; (ii) give all required notices and allow all required inspections under all Consents obtained by it in connection with the Facility; and (iii) pay all Prescribed Fee in connection with such Consents. The information supplied in the applications shall be complete and accurate and shall satisfy the substantive and procedural requirements of the applicable Law. TANESCO shall cooperate with THE SELLER in connection with, and support THE SELLER's applications for Consents as THE SELLER may reasonably request from time to time.

(b)    Not less than 30 Days prior to the Commencement Date, THE SELLER shall submit to TANESCO the general layout drawings of the Facility, which submission shall be accompanied by a certificate from the Independent Engineer stating that (i) the Facility, when constructed in accordance with such general layout drawings, will (A) conform with the Description of the Facility, (B) meet any requirement for supplying reactive power at the Facility within the rated power factor capability of the generators, and (C) meet the guidelines and performance standards for parallel operation set forth in Appendix C, (ii) it is technically and financially feasible for the Commercial Operations Date to occur on or before the Scheduled Commercial Operations Date and (iii) the Facility has a useful life no shorter than the initial Term.

(c)    As soon as available, but in any event prior to the Initial Operations Date of each Unit, THE SELLER shall provide to TANESCO a certificate from the Independent Engineer stating that the Facility has been designed and constructed in accordance with Prudent Utility Practices, and in all material respects with the terms of this Agreement and the general layout drawings submitted to TANESCO pursuant to Article 4.1(b).

### 4.2    Conditions Precedent to the Seller's Obligations

Notwithstanding anything in this agreement to the contrary, it is a condition precedent to the obligations of THE SELLER hereunder that :

(a)    THE SELLER shall have received the Guarantee by the GOT for the payment obligations of TANESCO under this Agreement.

(b)    THE SELLER shall have received any necessary easements, rights-of-way or wayleave directly related to the Facility, as necessary for THE SELLER to perform its obligations under this Agreement and the Project Contracts.

(c)    THE SELLER shall have received all Consents required to commence and complete construction of the Facility and to own the Facility on or prior to the Commencement Date.



14

(d)    The Fuel Supply Contract shall have been executed prior to the Initial Operatio Date.

(e)    The Financial Closing shall have occurred.

**END OF ARTICLE**



## ARTICLE V - PURCHASE PRICE AND OTHER CHARGES

**5.1**    **Purchase Price : Capacity and Energy**

TANESCO agrees to pay THE SELLER the following amounts from and after the Init Operations Date of the first Unit:

(a)    <u>Capacity Payment</u>

    For each Capacity Billing Period commencing on and after the Commerc Operations Date for the Facility, TANESCO shall pay the Capacity Payment to TI SELLER. The Capacity Payment shall be equal to the product of the Capac Purchase Price and the Dependable Capacity in effect during such Capacity Billi Period.

(b)    <u>Energy Payment</u>

    For each Energy Billing Period commencing on and after the Commercial Operatic Date of the first Unit, TANESCO shall pay THE SELLER the Energy Purchase Pr for each kWh Net Electrical Output.

(c)    <u>Test Energy Payment</u>

    For each kWh of Test Energy generated from the Facility and metered by t TANESCO-owned metering equipment at the Interconnection Points before t applicable Commercial Operations Date, TANESCO shall pay THE SELLER amount equal to the (aa) Fuel Costs Component less the costs of Fuel stored in t Fuel storage tank prior to the Initial Operations Date of the first Unit (bb) lubricati oil and (cc) Consumables, it being understood that no Capacity Payment shall be pa by TANESCO to THE SELLER under this Article 5.1(c).

**5.2**    **Supplemental Tariff**

(a)    **Change in Law**

    In the event of the occurrence of a Change in Law that requires a mater modification or a material capital addition to the Facility, which is completed by TI SELLER, and the Implementation Agreement is not terminated pursuant to Artic 17.8(a) or Article 17.8(b) thereof, THE SELLER will be entitled to recei Supplemental Tariff Payments from TANESCO in accordance with the procedures : forth in Appendix B. Such Supplemental Tariff Payments will allow THE SELLE to recover the costs of complying with the Change in Law, including (i) the cost any material modifications or material capital additions to the Facility that a necessary for THE SELLER to come into compliance with the Change in Law a are approved in accordance with Article 17.7(d) of the Implementation Agreement a (ii) the cost of consumable or additional quantities of consumable that can be direc attributed to compliance by THE SELLER with the Change in Law.

(b)    **Force Majeure Events**

    In the event that a Force Majeure Events results in damage to, or other adver effects on, the Facility which is repaired or otherwise remedied by THE SELLE and the Implementation Agreement is not terminated pursuant to Article 17.8(a) Article 17.8(b) thereof THE SELLER shall be entitled to receive Supplemental Ta Payments from TANESCO in accordance with the procedures set forth in Appen B to recover the difference between the restoration costs approved in accordance w

16

Article 17.7(d) of the Implementation Agreement and any insurance proceeds by THE SELLER as a result of the occurrence of the Force Majeure Event.

### 5.3 Supplemental Charges

In addition to the Capacity Payment and Energy Payment, THE SELLER shall be entitled to Supplemental Charges as identified in Appendix B.

### 5.4 Penalty and Bonus Payments

(a) If in any Contract Year the Equivalent Availability Factor shall be less than 85%, THE SELLER shall pay TANESCO, as penalty, the Penalty Payment, calculated in accordance with the following formula:

$$PP = (0.85 - EAF) * Y$$

(b) If in any Contract Year the Equivalent Availability Factor shall be more than 90%, TANESCO shall pay THE SELLER, as bonus, the Bonus Payment, calculated in accordance with the following formula:

$$BP = (EAF - 0.90) * Y$$

| PP | = | Penalty Payment. |
| BP | = | Bonus Payment. |
| EAF | = | Equivalent Availability Factor. |
| Y | = | Capacity Damages Amount. |
| * | = | Multiply. |

**END OF ARTICLE**



17

## ARTICLE VI - COMPENSATION, READING, BILLING AND PAYMENT

**6.1     Reading of Meters for Energy Payment**

TANESCO and THE SELLER shall jointly read the Metering Device at the Interconnection
Points on the last day of each Month in accordance with Article 11.4.  TANESCO and THE
SELLER shall agree on a mutually convenient time for such reading.

(a)      Billing for Test Energy Payment and Energy Payment

THE SELLER  shall prepare and render to TANESCO within 10 Business Days after
the end of each Energy Billing Period a statement detailing the meter reading and
THE SELLER's calculation of the Test Energy Payment and Energy Payment due to
THE SELLER for such Energy Billing Period.

(b)      Payment for Test Energy Payment and Energy Payment

Payment for the Test Energy Payment and Energy Payment for each Energy Billing
Period shall be made within 30 Days of the date of the invoice for such Energy
Billing Period sent by THE SELLER to TANESCO.

**6.2     Capacity Payment**

(a)      Billing for Capacity Payment

THE SELLER shall prepare and render to TANESCO  within 10 Business Days after
the end of each Capacity Billing Period a statement detailing the calculation of the
Capacity Payment due to THE SELLER for such Capacity Billing Period.

(b)      Payment for Capacity Payment

Payment for the Capacity Payment for each Capacity Billing Period shall be made
within 30 Days from the date of invoice from THE SELLER for such Capacity
Billing Period.

**6.3     Supplemental Tariff Payments**

If there shall be have occurred a Force Majeure Event or a Change in Law, then upon the
termination of the Force Majeure Event or compliance with the Change in Law, as the case may
be, and the completion of restoration or modification of the Facility and the resumption of
normal operations at the Facility, THE SELLER will be entitled to invoice TANESCO and
TANESCO shall pay to THE SELLER in addition to the Capacity Payment and the Test Energy
Payment and Energy Payment pursuant to Article 5.1(a), 5.1(b) and 5.1(c), the Supplemental
Tariff Payments. Invoices for Supplemental Tariff Payments shall be delivered by THE SELLER
and paid by TANESCO in the same manner as invoices for Capacity Payments as provided in
Article 6.2. Except for the return on equity on any additional equity contributions made by THE
SELLER and any portions of the Supplemental Tariff to cover the cost of additional consumable,
the Supplemental Tariff shall be escalable under Appendix B.

**6.4     Supplemental Charges**

Unless specifically provided otherwise in Appendix B any amounts or portions of amounts that
are Supplemental Charges may be invoiced by THE SELLER on a Monthly basis at any time
after the first Day of the Month following the Month in which any such Supplemental Charge:

18

are incurred by THE SELLER and shall state that the due date for payment of such invoice by TANESCO which shall be the date 10 Business Days following the date of delivery of such invoice. With respect to invoices for Pass-Through Items, such invoices from THE SELLER to TANESCO shall be accompanied by the invoice to THE SELLER for which recovery from TANESCO is being sought.

### 6.5    Penalty and Bonus Payment

(a)    Penalty Payment

(i)    Within 30 Days after the end of the Contract Year, subject to THE SELLER's review, TANESCO shall compute and advise THE SELLER in the Invoice for Penalty Payments of the amount of Penalty Payments due to TANESCO pursuant to this Agreement for the preceding Contract Year. Disputes regarding payments of any amount specified in an Invoice for Penalty Payments shall be resolved pursuant to the terms of Article 6.8.

(ii)   THE SELLER shall pay the invoice amount to TANESCO by no later than 30 Days after delivery by TANESCO of the Invoice for Penalty Payments. Late payments shall bear interest at a rate per annum equal to the Base Lending Rate plus two percent per annum (or at the Base Lending Rate in the event that THE SELLER has notified TANESCO within such 30 Day period that it disputes such payment and pays within such 30 Day period all undisputed amounts) compounded semi-annually and shall be computed for the actual number of Days on the basis of a three hundred sixty-five (365) day year.

(b)    Bonus Payment

(i)    Within 30 Days after the end of the Contract Year, subject to TANESCO's review, THE SELLER shall compute and advise TANESCO in the Invoice for Bonus Payments of the amount of Bonus Payment due to THE SELLER pursuant to this Agreement for the preceding Contract Year. Disputes regarding payments of any amount specified in an Invoice for Bonus Payments shall be resolved pursuant to the terms of Article 6.8.

(ii)   TANESCO shall pay the invoice amount to THE SELLER by no later than 30 Days after delivery by THE SELLER of the Invoice for Bonus Payments. Late payments shall bear interest at a rate per annum equal to the Base Lending Rate plus two percent per annum (or at the Base Lending Rate in the event that TANESCO has notified THE SELLER within such 30 Day period that it disputes such payment and pays within such 30 Day period all undisputed amounts) compounded semi-annually and shall be computed for the actual number of Days on the basis of a three hundred sixty-five (365) day year.

### 6.6    TANESCO or GOT Security

(a)    On the Commercial Operations Date, TANESCO shall provide to THE SELLER the TANESCO Letter of Credit, which shall have a term of twelve (12) Months from the Commercial Operations Date. Not less than ten (10) Days prior to the expiration of the TANESCO Letter of Credit and any subsequent TANESCO Letter of Credit TANESCO shall provide a replacement TANESCO Letter of Credit which shall have a term of twelve (12) Months from the expiration of the immediately preceding TANESCO Letter of Credit. The TANESCO Letter of Credit shall provide for draws by THE SELLER on a Monthly basis in immediately available funds, upon presentation of a certificate of an authorized officer of THE SELLER, stating that (1 amounts shown in the invoice accompanying the certificate are due and payable by



19

TANESCO to THE SELLER under this Agreement and (2) an invoice for such amount has been delivered to TANESCO at least 10 Business Days prior to the presentation of the certificate and either (aa) no amount shown in such invoice have been disputed by TANESCO or (bb) a portion of the amount shown in the invoice has been disputed by TANESCO, identifying such disputed amount. The certificate shall be accompanied by the relevant invoice delivered to TANESCO and any Invoice Dispute Notice to THE SELLER by TANESCO. THE SELLER shall not be entitled to draw any amount shown in the invoice to TANESCO that have been disputed by TANESCO. The TANESCO Letter of Credit provided pursuant to this Article 6.6(a) shall be maintained in the required amount throughout the Term. The TANESCO Letter of Credit shall be reinstated to the full required amount within 30 Days of any draw therein by THE SELLER.

(b)     Notwithstanding the provisions of Article 6.6(a) above, in lieu of delivering the TANESCO Letter of Credit or any replacement TANESCO Letter of Credit, TANESCO or GOT may in its sole discretion establish with the Escrow Bank an Escrow Account equal to the then-required amount of the TANESCO Letter of Credit from which only amounts due and payable by TANESCO to THE SELLER under this Agreement may be withdrawn. The Escrow Agreement governing this account shall provide for withdrawals from the account upon presentation of a draft executed by THE SELLER, for any amount due and payable by TANESCO under this Agreement and shall be accompanied by (1) a certificate executed by an authorized officer of THE SELLER stating that (aa) amounts due and payable by TANESCO to THE SELLER under this Agreement have been invoiced to TANESCO in accordance with this Agreement at least 10 Business Days prior to the presentation of the certificate and (bb) either (xx) no amount shown in such invoice have been disputed by TANESCO or (yy) a portion of the amount shown in the invoice has been disputed by TANESCO, identifying such disputed amount, (2) the relevant invoice delivered to TANESCO and (3) the Invoice Dispute Notice delivered to THE SELLER by TANESCO, if any. THE SELLER shall not be entitled to draw any amount shown in the invoice to TANESCO that have been disputed by TANESCO. If and for so long as TANESCO or GOT maintains the Escrow Account in lieu of the TANESCO Letter of Credit, the Escrow Accounts shall be reinstated to the full required amount within 30 Days of any draw therein by THE SELLER. For so long as TANESCO or GOT maintains the Escrow Account in lieu of the TANESCO Letter of Credit, THE SELLER shall draw or collect all amounts due and payable by TANESCO under this Agreement directly from the Escrow Account established by TANESCO or GOT.

(C)     If TANESCO is required by the provisions of this Article VI to pay Capacity Payments, Energy Payments, Supplemental Tariff Payments and Charges and Bonus Payment, THE SELLER may draw or collect such amounts directly from the TANESCO Letter of Credit or, if TANESCO or GOT has established the Escrow Account pursuant to Article 6.6(b), the Escrow Account.

## 6.7     Payment

(a)     THE SELLER shall draw on the TANESCO Letter of Credit pursuant to Article 6.6(a) or the Escrow Account pursuant to Article 6.6(b), for the amount due to THE SELLER under Articles 6.1, 6.2, 6.3 and 6.4 as the case maybe, less any disputed amounts, on or after the tenth (10) Business Day following the Day the invoice is delivered to TANESCO.

(b)     If any undisputed payment from TANESCO shall not be paid when due, there shall be due and payable to THE SELLER interest therein, calculated at the rate of 2% above the Base Lending Rate, from the date on which such payment became overdue to and until such payment is paid in full.



### 6.8 Payment Disputes

**(a)** In the event of any disputes on the accuracy of a bill, either party may serve notice (an "Invoice Dispute Notice") within five (5) Business Days from the date of the invoice on the other Party that the amount or part thereof of the invoice submitted to a Party is in dispute. Each Invoice Dispute Notice shall specify the invoice concerned, the amount of the dispute and the basis therefore. A copy of any Invoice Dispute Notice delivered by TANESCO to THE SELLER shall also be delivered to the TANESCO Letter of Credit issuing bank or the Escrow Bank, as appropriate. Until a copy of the Invoice Dispute Notice delivered by TANESCO to THE SELLER is received by the TANESCO Letter of Credit issuing bank or the Escrow Bank, as appropriate, such bank shall be entitled to assume that no amount shown in the relevant invoice delivered by THE SELLER for payment is disputed by TANESCO.

**(b)** If either Party disputes the accuracy of a bill, the Parties shall use their best efforts to resolve the dispute in accordance with Article 18.1. Any adjustments which the parties may subsequently agree to make with respect to any such billing dispute shall be made by a credit or additional charge on the next bill rendered. If the Parties are unable to resolve the dispute in this manner, any amounts disputed on subsequent bills for the same reason may thereafter be withheld and deposited in the Escrow Account pending final resolution of the dispute in accordance with the procedures described in Article 18.2 but the undisputed amount shall be promptly paid in accordance with this Article VI where applicable.

**(c)** Upon resolution of a disputed amount, the amount shall be due and payable to the appropriate Party, with interest therein from the date on which such amount would otherwise have first become overdue hereunder if no dispute had arisen, calculated at the rate of 2% above the Base Lending Rate. The existence of a dispute as to any bill shall not relieve either Party of complying with any other provision of this Agreement.

### 6.9 No Set-Off

Any amounts, other than those specified in Articles 6.1 and 6.2, due to either Party under this Agreement shall be paid without set-off against any amounts due under Article 6.1 and 6.2.

### 6.10 Currency and Timing of Payment

Notwithstanding anything contained in this Agreement, (i) all payments to be made by either Party under this Agreement shall be made in lawful currency of the United Republic of Tanzania, and (ii) any payment that becomes due and payable on a day that is other than a Business Day shall be paid on the succeeding Business Day.

### 6.12 Records

Each Party shall keep properly stored and maintained at its offices, for a minimum of 5 years and for such additional time period as may be required by this Agreement to be maintained and all data, documents and other materials relating to or substantiating any charges to be paid by or to THE SELLER. Each Party and its authorized employees, agents or representatives and auditors shall with prior notice in writing given to the other Party have the right at all reasonable times, to inspect, examine, and copy any such records, data, documents and other materials.

**END OF ARTICLE**

21

## ARTICLE VII - PRE-OPERATIONS PERIOD AND OPERATIONS PROCEDURE

**7.1**      **Facility Construction and Start-Up**

(a)      The Facility is intended to be constructed in two phases.

        (i)   The first phase requires the construction of the Facility to operate and generate electrical energy on Fuel Oil. Upon an appropriate supply of Natural Gas made available by GOT, as the second phase the Facility is to be converted to operate and generate electrical energy on Natural Gas.

        (ii)   The second phase requires the Seller to conduct Conversion to enable the Facility to operate and generate electrical energy using Natural Gas, subject to the following conditions precedent:

            (A)   appropriate supply of Natural Gas being made available by GOT or any entity authorised by GOT

            (B)   any Consents of the Lenders

            (C)   the Fuel Supply Contract for the supply of Natural Gas having been executed

(b)      THE SELLER shall provide TANESCO with (i) at least 60 Days prior notice of the proposed Commencement Date, and (ii) written confirmation that the Commencement Date has occurred within 60 Days after the occurrence thereof. Not less than 60 Days prior to the Initial Operations Date, THE SELLER shall submit to TANESCO the commissioning, start-up and testing schedules of the Facility.

(c)      From and after the Commencement Date until the Scheduled Commercial Operations Date of all the Units, THE SELLER shall provide TANESCO with copies of reports describing construction progress.

(d)      From and after the Commencement Date until the Commercial Operations Date of all the Units, TANESCO upon 30 days notice from THE SELLER shall provide the Facility with supply of electricity and THE SELLER shall pay TANESCO for the supply of electricity at TANESCO's prevailing tariff.

(e)      TANESCO shall have the right to have a copy of the general layout drawings of the Facility and upon reasonable prior notice to THE SELLER to observe the progress of the construction, start-up and testing of the Facility, including physical inspections at the Site for the purpose of ensuring that the Facility can operate safely and successfully in parallel with the TANESCO System. THE SELLER shall cooperate with TANESCO to ensure that the Facility's power generation equipment and switch-gear are designed and installed in a manner that will permit the Facility to operate safely and successfully in parallel with the TANESCO System.

(f)      Without the prior written consent of TANESCO (which consent shall not be unreasonably withheld or delayed), THE SELLER shall not make, or permit to be made, any material modification to the design or construction of the Facility if such modification could reasonably be expected to have a material adverse effect on TANESCO's rights under this Agreement or the TANESCO System.

**7.2**      **Initial Operations Date**

(a)      THE SELLER shall provide TANESCO with at least 60 Days prior notice of the

22

proposed Initial Operations Date, which notice shall be accompanied by the proposed hourly delivery schedule of Test Energy from the Facility. TANESCO shall have the right to delay the Initial Operations Date if it reasonably determines that parallel operation of the Facility with the TANESCO System could adversely affect the TANESCO System; provided always that any such delay shall not extend beyond the Scheduled Commercial Operations Date and shall not exceed 5 Days after such proposed Initial Operations Date and provided also that in such event, TANESCO shall within 7 Days of receipt of THE SELLER's notice of the proposed Initial Operations Date give THE SELLER notice of the reason for delaying the Initial Operations Date, and the applicable Party shall proceed promptly to rectify any identified problems, it being understood that if TANESCO exercises its right to delay, unless such delay of the Initial Operations Date is directly attributable to a breach of THE SELLER'S obligations pursuant to this Agreement, TANESCO shall compensate THE SELLER an amount equal to the carrying cost on the debt related to the Facility incurred under the Financing Documents plus fifty percent (50%) of the Capital Component of the Capacity Purchase Price. In the event TANESCO exercises its right under this Article 7.2(a) to delay the Initial Operations Date THE SELLER will be entitled to reschedule the Scheduled Commercial Operations Date. The rescheduled new Scheduled Commercial Operations Date shall take into account the delay of the Initial Operations Date pursuant to this Article and be extended by such length of time that the Initial Operations Date has been delayed.

(b)     No generation of electrical energy from the Facility in a parallel mode with the TANESCO System, whether for testing purposes or otherwise, may take place and the Initial Operations Date may not occur, until (i) all Interconnection Facilities pursuant to Appendix E shall have been installed and (ii) TANESCO has confirmed in writing that parallel operation of the Facility with the TANESCO System may commence pursuant to Article 9.1. Such inspection, and confirmation in writing by TANESCO shall take place not less than 14 Days prior to such proposed Initial Operations Date pursuant to Article 7.2(a) above, provided that the Parties shall have installed all applicable interconnection protective device required for the Facility 30 Days before the proposed Initial Operations Date.

(c)     THE SELLER shall provide TANESCO with written confirmation that the Initial Operations Date has occurred within five (5) Days after the occurrence thereof.

## 7.3     Commercial Operations Date

THE SELLER shall notify TANESCO in writing 14 Days in advance of any proposed Commercial Operations Date, which notice shall also set forth the anticipated Net Capacity of the applicable Unit. The Commercial Operations Date of such Unit shall be deemed to have occurred on the day immediately following the date of expiry of the 14 Days' notice referred to in this Article 7.3 and further subject to Article 9.2(a). The applicable Capacity Billing Period shall commence on such date.

## 7.4     Operating Procedures

THE SELLER shall develop written operating procedures for the Facility no later than thirty (30) Days prior to the then-existing Initial Operations Date. The operating procedures shall be based on the designs of the Metering Device, the Interconnection Facilities and TANESCO System and shall be consistent with the Prudent Utility Practices. The operating procedures shall deal with all operational interfaces between TANESCO and THE SELLER, including, but not limited to, the method of day-to-day communication, and switching practices, outages scheduling, capacity and energy reporting. The operating procedures are to be developed in accordance with the following process:

23

(a) Not later than 60 Days before the first Initial Operations Date THE SELLER shall give TANESCO the proposed operating procedures;

(b) Within 15 Days after TANESCO's receipt of the proposed operating procedures TANESCO shall notify THE SELLER if it is satisfied with the proposed operating procedures. If TANESCO wishes certain reasonable amendments to be made to the proposed operating procedures, it shall notify THE SELLER within such 15 Day period of the amendments and its reasons for them. THE SELLER shall make any such amendments reasonably requested by TANESCO.

(c) If TANESCO notifies THE SELLER that it is satisfied with the proposed operating procedures or fails to notify THE SELLER within the 15 Day period referred to in clause (ii) above or if THE SELLER makes any amendments pursuant to clause (ii) above to the proposed operating procedures or refuses to make such amendments, then the proposed operating procedures, as amended (if appropriate), shall become the Operating Procedures.

**END OF ARTICLE**





## ARTICLE VIII - Despatch

**8.1**    Control and Operation of the Facility : Despatch

(a)    Prior to each Operating Day (at such time as defined in Operating Procedures developed by the Operations Committee pursuant to Article 8.3(a)) THE SELLER shall inform by telephone confirmed in writing the Grid Control Centre as to the daily operating availability and expected maximum net generating capability of the Facility, including, without limitation, any anticipated outage.

(b)    Subject to Article III, THE SELLER agrees to control and operate the Facility consistent at all times with TANESCO's Despatch of the Facility and the terms of this Agreement.

(c)    The Grid Control Centre shall have the sole discretion to Despatch (up to the then current declared generating capacity of the Facility) the generation of the electricity from the Facility and the delivery thereof to the Interconnection Points. When the Grid Control Centre elects to Despatch the Facility, it shall do so above the minimum despatchable load of 20 MW, it being understood that except for TANESCO's rights pursuant to Article 3.4, the Facility shall have no obligation to generate electrical energy if the load is below the minimum despatchable load.

(d)    TANESCO shall have the right to Despatch the Facility in accordance with the terms of this Agreement subject to TANESCO providing THE SELLER with at least 120 minutes prior notice of changes in operating levels to be achieved by the Facility.

**8.2**    Scheduling and Despatch

In order to assist with scheduling of the Facility to meet the requirements of TANESCO, the Parties agree that, from and after ninety (90) Days prior to the Scheduled Commercial Operations Date, the following procedures will be adhered to:

(a)    Year Ahead Notifications. Not less than ninety (90) Days before the Scheduled Commercial Operations Date, and thereafter not less than ninety (90) Days before the beginning of each Year, TANESCO shall provide to THE SELLER estimated requirements on a Monthly basis for Net Electrical Output for the remainder of the Year in which the Commercial Operations Date is scheduled to occur, and thereafter for each subsequent Year, but TANESCO shall not be bound by these figures.

(b)    Month Ahead Notification. Not less than fourteen (14) Days before the beginning of each Month, TANESCO shall provide to THE SELLER estimated requirements on a day-by-day basis, for Net Electrical Output during the Month and also, provisionally, for the following Month, but TANESCO shall not be bound by these figures.

(c)    Week Ahead Notification. Not less than forty-eight (48) hours before the beginning of each Week TANESCO shall provide to THE SELLER estimated requirements, on a hour-by-hour basis, for Net Electrical Output during that Week and also, provisionally, during the following Week, but TANESCO shall not be bound by these figures.

(d)    Day Ahead Notification. Not less than seven (7) hours before the start of each Day, TANESCO shall provide to THE SELLER firm requirements, on an hour by hour basis, for Net Electrical Output, during that Day and also provisionally, during the following Day.



25

**8.3**    **Operational Guidelines**

(a)    Operations Committee

On or before 180 Days prior to the Scheduled Commercial Operations Date, the Parties shall establish an Operations Committee comprising six (6) members. Each Party shall designate three (3) members to represent it on the Operations Committee, and either Party may remove or replace any of its Operations Committee members at any time upon notice to the other Party. The chairmanship of the Operations Committee shall rotate each six (6) months between the Parties and the Parties agree that the first chairman shall be nominated by TANESCO. Decisions of the Operations Committee shall require the approval of a majority of members of the Operations Committee.

The Operations Committee shall coordinate the operations of the Facility according to the Operating Procedures to be developed pursuant to Article 7.4;

(b)    Normal Operation : During normal operating conditions THE SELLER should provide continuous information as is reasonably practicable under prevailing circumstances about the conditions of the Facility, such as its load, generation, voltage and reactive schedule, safety-related and emergency procedures, fuel supply, personnel status, and other conditions that could affect system reliability.

(c)    Emergency Operation : In preparation for and during an Emergency Condition, THE SELLER should observe the following requirements :

(i)    At the Grid Control Centre's requests, THE SELLER shall make all reasonable efforts to deliver power.

THE SELLER is required to use reasonable efforts to comply with instructions under the direction of the Grid Control Centre until the TANESCO System has returned to normal.

THE SELLER shall cooperate with the Grid Control Centre in establishing emergency plans including but not limited to recovery from a local or widespread electrical blackout; voltage reduction to effect load curtailment and other plans which may arise.

(A)    Restoration procedures - Restoration requires an orderly plan for safe and rapid restoration of the electric network. Generation must be carefully regulated to maintain the supply/demand balance.

(B)    Generation - if THE SELLER has been isolated from the TANESCO System, it will be allowed to reconnect only under the direction of the Grid Control Centre. THE SELLER should be ready to pick up load as soon as possible.

(C)    Transmission - To assure personnel safety and provide rapid restoration, THE SELLER's Interconnection Facilities shall be reconnected to the TANESCO System only under the direction of the Grid Control Centre.

(ii)    THE SELLER should consult the Grid Control Centre before changing its generation schedule. This is to assure that generation/demand balance is maintained, and inadvertent inter-utility interchange is minimized. If this is not possible, THE SELLER shall notify the Grid Control Centre as soon as practicable after changing its schedule.



26

(iii)    THE SELLER shall maintain contact with the Grid Control Centre.

(iv)    Automatic voltage regulators must be maintained in operation unless the Grid Control Centre asks that manual adjustments be made.

**END OF ARTICLE**





**Exhibit A, PART 2 to Declaration of Sazi B. Salula**

## ARTICLE IX - OPERATION AND MAINTENANCE

**9.1**    **Operation and Maintenance of Facility**

**(a)**    THE SELLER shall design, construct, operate and maintain the Facility in accor. with Prudent Utility Practices and otherwise in accordance with this Agreement. Not less than 90 Days prior to the Scheduled Commercial Operations Date, THE SELLER shall enter into an operations and maintenance agreement for the Facility.

**(b)**    The operation of the intertie and/or synchronizing circuit breaker shall occur under the direction of the Grid Control Centre in accordance with the procedures set forth in Appendix E.

**(c)**    THE SELLER shall operate the Facility in parallel with the TANESCO System during the Term of this Agreement. The Facility shall be designed, constructed, operated and maintained in accordance with Prudent Utility Practices and the performance standards set forth in Appendix C including the guidelines and standards relating to synchronization, voltage control and generation of harmonic frequencies so that operation of the Facility will not have an adverse impact on the voltage level or wave form of the TANESCO System.

**(d)**    THE SELLER shall notify TANESCO in a timely manner of any limitations, restrictions or outages affecting the Facility.

**(e)**    All electricity delivered by THE SELLER to TANESCO from the Facility shall have, at the Interconnection Points, the electrical characteristics set forth in Appendix G.

**(f)**    In addition to the Facility's back-up electricity supply, TANESCO shall provide, if available, the Facility with supply of back-up and start-up electricity during scheduled, unscheduled or emergency outages of the Facility at TANESCO's prevailing tariffs.

**(g)**    THE SELLER shall only be entitled to carry out any Conversion to the Facility if:

   **(i)**    the Conversion does not contravene Prudent Utility Practices;

   **(ii)**    the Conversion will not result in the Facility being unable to operate within TANESCO System;

   **(iii)**    (in the case of Conversion capable of having a material adverse effect on the safety or security of all or part of the TANESCO System), TANESCO has received full details of the proposed Conversion in advance and THE SELLER has established to TANESCO's reasonable satisfaction that the design of the Conversion incorporates sufficient safeguards in accordance with Prudent Utility Practices so as to prevent, insofar as reasonably practicable, that effect arising; or

   In any event TANESCO shall not be relieved from its obligations to make Energy Payment and Capacity Payment during the Conversion Period.

**(h)**    Following the Conversion:

   **(i)**    THE SELLER shall use Natural Gas as the sole Fuel for the Facility except:

      **(A)**    that THE SELLER shall (subject to sub-paragraph (ii) below) be entitled to burn Fuel Oil at such times as may be consistent with Prudent Utility Practices in order to turn over the stocks of Fuel Oil maintained by THE SELLER in the Fuel Oil storage tank;



28

   (B) at any time when Natural Gas is unavailable to the Facility.

 (ii) TANESCO shall be entitled by notice to THE SELLER to require electrical energy to be generated using Fuel Oil, subject only to:

   (A) compliance with Prudent Utility Practices including environmental regulations;

   (B) a notice period of 60 days in the case of generation using Fuel Oil in any one month period of more than 36,500 MWh;

   (C) prior consent of THE SELLER.

and provided, further, that at the time of the giving of TANESCO's notice it can reasonably be anticipated that compliance with such requirement by THE SELLER will not give rise to an obligation on the part of THE SELLER under the Fuel Supply Contract to pay for a quantity of Natural Gas in excess of the quantity consumed by THE SELLER.

Any notice served by TANESCO under this sub-paragraph (ii) shall state the period for which TANESCO requires electrical energy to be generated using Fuel Oil, and any such notice shall be irrevocable without the consent of THE SELLER.

**9.2** **Dependable Capacity : Testing of Capacity Rating**

(a) Prior to or on the Commercial Operations Date for each Unit, THE SELLER shall establish a Net Capacity for such Unit under Site Conditions and otherwise in accordance with the test procedures for "Net Capacity" set forth in Appendix I. Upon so establishing the Net Capacity of the Facility, THE SELLER shall declare the Dependable Capacity of the Facility to TANESCO. The Dependable Capacity of the Facility so declared shall be effective until the Dependable Capacity of the Facility is next determined or established pursuant to this Article 9.2. The Facility shall thereafter be tested annually during each Contract Year in accordance with the procedures set forth in Appendix I to demonstrate the Net Capacity of such Facility. THE SELLER shall, upon completing any such test for such Facility, declare a new Dependable Capacity of the Facility up to the Net Capacity of the Facility so demonstrated. The costs and expenses of such annual test shall be borne by THE SELLER. Prior to the Commercial Operations Date of each Unit, if THE SELLER is unable to carry out the test procedures for determining the Net Capacity of such Unit as provided under this Article 9.2 due to reasons not attributable to THE SELLER, then THE SELLER shall have the right to declare the Dependable Capacity of the Facility up to its full load site test rating adjusted for Site Conditions less auxiliary power which shall be deemed to be the Dependable Capacity for the Facility for the purpose of calculating the Capacity Payment.

(b) TANESCO upon reasonable notice, shall be entitled to effect within the period of any Contract Year one (1) test on the Facility for which costs and expenses shall be borne by THE SELLER for the purpose of the determination or re-determination of the Dependable Capacity of the Facility, provided always that in such event where TANESCO exercises its rights in this Article 9.2(b), THE SELLER shall be entitled to effect a retest on the Facility within 7 Business Days of the receipt by THE SELLER of the results of the test so effected by TANESCO and referred to herein and the results obtained from such retest by THE SELLER shall be deemed to be the new Dependable Capacity of the Facility. In no event shall TANESCO have the right to require THE SELLER to determine or redetermine the Dependable Capacity of the Facility during a Force Majeure Event, a Forced Outage, a Maintenance Outage, Schedule Outage or during the Conversion Period.

(c)     THE SELLER shall have the right to establish a new Dependable Capacity of the Facility by re-determining the Net Capacity of such Facility at any time upon 7 Days' prior written notice to TANESCO. If THE SELLER shall exercise such right, and the Net Capacity of the Facility re-determined in the manner set forth in Appendix I is greater than the Dependable Capacity of such Facility in effect immediately prior to such re-determination, then THE SELLER shall have the right to declare a new Dependable Capacity for such Facility up to the Net Capacity of such Facility so re-determined. If THE SELLER shall exercise such right, and the Net Capacity of the Facility re-determined in the manner set forth in Appendix I is less than the Dependable Capacity of such Facility in effect immediately prior to such redetermination, then the new Net Capacity of such Facility will automatically and immediately become the new Dependable Capacity of such Facility until the Dependable Capacity of such Facility is next so determined or established pursuant to this Article 9.2 or Appendix I. All costs and expenses for such redetermination shall be borne by THE SELLER.

(d)     THE SELLER shall immediately declare to the Grid Control Centre any interruption in the availability of the Facility or any reduction in the net generating capacity of the Facility available at the Interconnection Points for despatch, which declaration shall state the type and expected duration of the outage or derating causing such interruption or reduction. If for any reason any change to such declaration is necessary, THE SELLER shall notify TANESCO immediately by telephone and promptly thereafter in writing by facsimile.

## 9.3     Scheduled Outages

At least 45 Days prior to the Commercial Operations Date of the first Unit and thereafter (i) TANESCO and THE SELLER shall mutually agree on the Scheduled Outages for the Facility for such calendar year, and (ii) THE SELLER shall submit a proposed schedule of Scheduled Outages for the following five calendar years, which schedule shall include the estimated times of operation, amounts of electricity production, number of Scheduled Outages, and reductions of output and the reasons therefore, and the earliest and latest start dates, times and durations of Scheduled Outages, including a specification of the maintenance requiring shutdown or reduction in output of the Facility. TANESCO may, upon not less than 30 Days prior written notice, request THE SELLER to revise its proposed schedule for the timing and duration of any Scheduled Outages or reduction of output of the Facility to accommodate the requirements of TANESCO in accordance with Prudent Utility Practices. TANESCO shall reimburse THE SELLER for any costs reasonably incurred by THE SELLER if the maintenance is delayed or accelerated to suit TANESCO's requirements. THE SELLER shall notify the Grid Control Centre 24 hours prior to the commencement of any Scheduled Outage.

## 9.4     Maintenance Outages

In accordance with the requirements of the TANESCO System and Prudent Utility Practices, THE SELLER agrees to coordinate Maintenance Outages with TANESCO, including providing TANESCO with at least 24 hours notice prior to removing the Facility from service for a Maintenance Outage which notice shall include the scheduled start date and time and estimated duration of such Maintenance Outage.

## 9.5     Forced Outage

THE SELLER shall be permitted to interrupt the flow of electrical energy from the Facility for Forced Outage.



**9.6**     **TANESCO's Maintenance Schedule**

At least 45 Days prior to the Commercial Operations Date of the first Unit and thereafter (i) TANESCO and THE SELLER shall mutually agreed on TANESCO's schedule for maintenance of TANESCO's Interconnection Facilities, metering equipment or adjacent transmission and distribution facilities ("Maintenance Schedule") for such calendar year, and (ii) shall submit a proposed Maintenance Schedule for the following five calendar years, which schedule shall include the earliest and latest start dates, times and durations of maintenance, including a specification of the maintenance requiring shutdown or reduction in output of the Facility.

**END OF ARTICLE**



## ARTICLE X - INTERCONNECTION

### 10.1    Interconnection Facilities

THE SELLER shall design, construct and install the Interconnection Facilities at its expense in accordance with Prudent Utility Practices and the requirements set forth in Appendix E. THE SELLER shall complete the construction and installation of the Interconnection Facilities no later than 30 days prior to the Initial Operations Date. TANESCO shall at all times co-operate with THE SELLER to ensure that the Interconnection Facilities are constructed and installed in the manner and by the date set out in this Article 10.1. Upon completion and installation of the Interconnection Facilities, THE SELLER shall provide and transfer to TANESCO all operating and maintenance manuals, spares, rights, title and interest to that portion of the Interconnection Facilities identified in Appendix E to be transferred to TANESCO so that TANESCO shall become the owner thereof. Upon such transfer all property and risk therein shall pass to TANESCO and TANESCO shall thereafter be responsible for the operation and maintenance of the same. The portion of the Interconnection Facilities identified in Appendix E that is not intended to be transferred to TANESCO shall continue to be owned by THE SELLER and shall be operated and maintained by THE SELLER at its sole cost and expense. TANESCO shall operate and maintain the Interconnection Facilities in accordance with (i) the operating and maintenance standards recommended by the Interconnection Facilities' equipment suppliers and (ii) Prudent Utility Practices.

### 10.2    Protective Device

Except as otherwise provided in Appendix E each Party shall be responsible for protecting its own facilities from possible damage caused by electrical disturbances.

### 10.3    Title and Risk of Loss

Title to and the risk of loss on any electrical energy generated from the Facility and transmitted to TANESCO in accordance with this Agreement shall pass to TANESCO at the applicable Interconnection Point.

**END OF ARTICLE**



## ARTICLE XI - METERING

**11.1**    **Metering Device**

(a)    The electrical energy generated from the Facility and transmitted to TANESCO pursuant to this Agreement shall be measured by Metering Device located adjacent to the Interconnection Points to be installed by THE SELLER in accordance with Prudent Utility Practices. All such Metering Device shall be owned, operated, maintained and controlled solely by TANESCO.

(b)    The number, type and general location of such Metering Device shall be as set forth in Appendix D and shall include main metering and check Metering Device owned by TANESCO. All TANESCO Metering Device shall be sealed and the seal shall be broken only by TANESCO when such Metering Device are to be inspected and tested or adjusted in accordance with Articles 11.2 and 11.3.

(c)    Upon reasonable notice by THE SELLER, TANESCO will, consistent with Prudent Utility Practices, provide THE SELLER with reasonable access to pulse initiating contacts for the utilization of THE SELLER, such pulse initiating contacts to be purchased by THE SELLER.

**11.2**    **Inspection of Metering Device**

(a)    TANESCO shall inspect and test all Metering Device at its own expense on a regular schedule. TANESCO shall provide THE SELLER with reasonable advance notice of and permit a representative of THE SELLER to witness and verify, such inspection and tests and shall test any adjustments to be made thereto in accordance with Articles 11.2 and 11.3.

(b)    Upon two weeks prior written notice by THE SELLER, TANESCO shall perform additional inspections or tests of any TANESCO Metering Device. THE SELLER and TANESCO shall agree on a mutually convenient time for such inspections or tests and TANESCO shall permit a qualified representative of THE SELLER to inspect or witness such testing of any Metering Device. The actual expense of any such requested additional inspection or testing shall be borne by THE SELLER unless upon such inspections or testing a Metering Device is found to register inaccurately by more than +/- 0.5 % in which event the expense of the requested additional inspection or  testing shall be borne by TANESCO.

(c)    If any TANESCO Metering Device is found to be defective or inaccurate, it shall be adjusted, repaired, replaced and/or re-calibrated by TANESCO. Subject to the requirements set forth in Appendix D, THE SELLER may elect to install and maintain, at its own cost and expense, as part of the Facility, back-up metering including separate current and potential transformers in addition to those installed and maintained by TANESCO. At all times, THE SELLER agrees to keep all meter locations associated with the Facility clean, clear and, upon reasonable advance notice, accessible to TANESCO and its authorized agents.

**11.3**    **Adjustments for Inaccurate Meters**

If the Metering Device fails to register, or if the measurement made by a Metering Device is found upon testing to be inaccurate by more than +/-0.5%, an adjustment shall be made correcting all measurements by the inaccuracy and the period of the inaccuracy, in the following manner :



33

(a)    In the event that the Parties cannot agree on the amount of the adjustment necessary to correct the measurements made by any inaccurate or defective Metering Device, the Parties shall use the Back-up Metering Device, to determine the amount of such inaccuracy, provided that in the event that the Back-up Metering Device also are found upon testing to be inaccurate by more than the allowable limits applicable to Metering Device under Article 11.3 and the Parties cannot agree on the amount of the adjustment necessary to correct the measurements made by such inaccurate or defective Back-up Metering Device, the Parties shall estimate the amount of the necessary adjustment on the basis of deliveries of electrical energy from the Facility to the TANESCO System during periods of similar operating conditions (e.g. based on the Facility's Fuel use records) when the Metering Device was registering accurately;

(b)    In the event that the Parties cannot agree on the actual period during which the inaccurate measurements were made, the period during which the measurements are to be adjusted shall be the shorter of (i) one half of the period from the last test of the Metering Device, or (ii) the current month and the month immediately preceding the test that found the Metering Device to be defective or inaccurate; and

(c)    To the extent that the adjustment period covers a period of deliveries for which payments has already been made by TANESCO, TANESCO shall use the corrected measurements as determined in accordance with this Article 11.3 to re-compute the amount due for the period of the inaccuracy and shall subtract the previous payments by TANESCO for such period from such re-computed amount. If the difference is a positive number, that difference shall be paid by TANESCO to THE SELLER; if the difference is a negative number, that difference shall be paid by THE SELLER to TANESCO. Payment of such difference by the owing Party shall be made within the time period in accordance with Article 6.2.

## 11.4    Metering Readings

The Metering Device shall be read monthly on the last day of each Month for the purpose of determining the Net Electrical Output of the Facility since the preceding reading. THE SELLER shall read the Metering Device during normal business hours, and unless otherwise decided by the Operations Committee, shall give TANESCO at least 48 hours notice of the time THE SELLER shall read the Metering Device. TANESCO shall have the right to have a representative present during any such reading. In the event that a TANESCO representative is present at such reading of the Metering Device for the purpose of measuring Net Electrical Output, then such reading shall be jointly taken and recorded. In the event that a TANESCO representative is not present at a reading of Net Electrical Output, then THE SELLER representatives shall take and record such reading together with a photographic record thereof. THE SELLER shall maintain a log of all such meter readings. In the event that the Metering Device is faulty or not in service as a result of maintenance, repairs or testing, then the Back-up Metering device, shall be used during the period that the main Metering Device is faulty or not in service and the foregoing provisions of this Article 11.4 shall apply to the reading of the Back-up Metering Device. At each reading of the Metering Device, the Parties shall read the Back-up Metering Device to ensure that the Metering Device is not faulty.

## 11.5    Records

Each Party shall maintain for a period of not less than 5 years all records relating to or produced by its Metering Device (including, without limitation, all meter reading and test data and results) and shall, promptly upon request by the other Party, provide to such other Party copies of any and all such records and other information in its possession or custody relating to or produced by its Metering Device.

**END OF ARTICLE**

## ARTICLE XII - REPRESENTATIONS AND WARRANTIES OF THE SELLER AND TANESCO: ADDITIONAL COVENANTS OF THE SELLER

### 12.1    THE SELLER'S Status and Authorization

THE SELLER represents and warrants to TANESCO as follows :

(a)    THE SELLER is a limited liability company duly organized, validly existing and good standing under the laws of Tanzania and is qualified in good standing in each other jurisdiction where the failure so to qualify would have a material effect upon the business or financial condition of THE SELLER of the Facility, and THE SELLER has all requisite power and authority to conduct its business, to own its properties and to execute to deliver, and perform its obligations under the Agreement.

(b)    The execution, delivery and performance by THE SELLER of this Agreement has been duly authorised by all necessary corporate action and does not and will not (i) require any consent or approval of THE SELLER's Board of Directors or shareholders, other than those that have been obtained (evidence of which shall be if it has not already been delivered to TANESCO), or (ii) result in a breach of, or constitute a default under, any provisions of THE SELLER's constitution or incorporation documents, any indenture, contract or agreement to which it is a Party or by which it or its assets may be bound, or violate any law, rule, regulation, order, writ, judgment, injunction, decree, determination or award presently in effect having applicability to THE SELLER.

(c)    THE SELLER will obtain or apply for all Consents, necessary for the due execution delivery and performance by THE SELLER of this Agreement and THE SELLER will maintain in full force and effect all Consents, referred to in Article 4.1 during the Term of this Agreement.

(d)    This Agreement constitutes a legal, valid and binding obligation of THE SELLER and is enforceable against THE SELLER in accordance with its terms.

(e)    There is no pending or threatened action or proceeding affecting THE SELLER before any court, governmental authority or arbitrator that could reasonably be expected to materially and adversely affect the financial conditions hereunder, or that purports to affect the legality, validity or enforceability of this Agreement.

### 12.2    TANESCO's Status and Authorization

TANESCO represents and warrants to THE SELLER as follows :

(a)    TANESCO is a public limited company duly organised, validly existing and in good standing under the Laws of Tanzania with perpetual succession, capable of suing and being sued in its corporate name and with power to purchase or otherwise acquire, hold and exchange or alienates or otherwise deal with in any lawful manner whatsoever, any property movable and immovable, and to enter into contracts and generally to do such act and things as a body corporate may do by law and as are necessary for, or incidental to, the carrying out of its objects and the exercise of its powers as set out in the Memorandum and Articles of Association including but not limited to the execution, delivery and performance of its obligations under this Agreement.

(b)    The execution, delivery and performance by TANESCO of this Agreement has been duly authorised by all necessary corporate action of TANESCO's Board of Directors,



35

and does not and will not (i) require any further consent or approval of TANESCO's Board of Directors other than those that have been delivered to THE SELLER, or (ii) result in a breach of or constitute a default under any provisions of TANESCO's constitution or enabling documents, any indenture, contract or agreement to which it is a party or by which it or its assets may be bound, or violate any law, rule, regulation, order, writ, judgement, injunction, decree, determination or award presently in effect having applicability of TANESCO.

(c) No authorization or approval by any governmental authority or other official agency is necessary for the due execution, delivery and performance by TANESCO of this Agreement as in effect on the date hereof.

(d) This Agreement constitutes a legal, valid and binding obligation of TANESCO and is enforceable against TANESCO in accordance with its terms.

(e) There is no pending or threatened action or proceeding affecting TANESCO before any court, governmental authority or arbitrator that could reasonably be expected to materially and adversely affect the financial condition or operations of TANESCO or the ability of TANESCO to perform its obligations hereunder, or that purports to affect the legality, validity or enforceability of this Agreement.

(f) TANESCO has obtained or will obtain all necessary consents, authorisations, licences and approvals for the purchase and receipt of the electricity to be delivered to it hereunder and for the generation and delivery of the electricity to be delivered by it hereunder.

(g) Prior to the expiry of TANESCO's current licence under Section 4 of the Electricity Ordinance 1931, TANESCO undertakes to extend or renew the licence for at least the Term of this Agreement.

## 12.3  Permits Licenses, Approvals and Compliance with Laws

(a) THE SELLER shall, at its expense, acquire and maintain in effect, from any and all agencies, commissions and authorities with jurisdiction over THE SELLER and/or the Facility, all Consents, and complete or have completed all inspections and environmental impact studies, in each case necessary (i) for the operation and maintenance of the Facility, and (ii) for THE SELLER to perform its obligations under this Agreement.

(b) THE SELLER shall, at all times, comply with the terms and conditions of the Licence and all applicable laws, ordinances, rules and regulations applicable to it and/or to the Facility including (i) all environmental laws in effect at any time during the Term, and (ii) all such laws, ordinances, rules and regulations relating to fuel security storage or back-up or otherwise concerning any type of facility used for the generation of electric power.

(c) TANESCO shall, at its own expenses, (i) use all reasonable efforts to obtain and maintain in effect all permits, licenses, approvals and other governmental authorisation required by all applicable government agencies and authorities with jurisdiction over TANESCO, the Interconnection Facilities, and the Metering Device in order to enable it to perform its obligations under this Agreement; (ii) give all required notices and allow all required inspections under all consents, permits, licenses and approval obtained by it in connection with the Facility; and (iii) pay all Prescribed Fees in connection with such consents, permits, licenses and approvals.



36

**12.4    Continuity of Existence**

THE SELLER agrees to preserve and keep in force and effect its corporate existence and all franchises, licenses and permits necessary to the proper conduct of its business including the business of owning and operating the Facility.

**12.5    Operating and Maintenance Standards**

THE SELLER covenants that the Facility will be operated and maintained in accordance with (i) the operating and maintenance standards recommended by the Facility's equipment suppliers, (ii) Prudent Utility Practices including synchronizing, voltage and reactive power control, (iii) the operating procedures described under Article VIII, and (iv) the performance standards and requirements of the TANESCO System set forth in Appendix C.

**12.6    Qualified Personnel**

THE SELLER shall, during the Term, only employ appropriately qualified personnel for the purposes of operating and maintaining the Facility and coordinating operations with the TANESCO System.

**12.7    Testing**

All tests to be carried out by THE SELLER pursuant to Article 9.2 will be in accordance with Prudent Utility Practices.

**12.8    Access to Operation Records**

Each Party upon reasonable notice shall have access to the other Party's operations records (not including maintenance and financial documents), such operations records to be used without prejudice to the other Party and for the sole purpose of ensuring proper operations and coordination of electrical supply to the TANESCO System.

**12.9    Easements and Rights-of-Way**

Each Party shall grant to the other Party all necessary easements and right-of-way, including adequate and continuing access rights on such Party's properties, to construct, install, operate, maintain, replace and/or remove any of the Facility and Interconnection Facilities located on such Party's properties. All such easements and rights-of-way shall survive termination or expiration of this Agreement.

**12.10    Sale of Energy to Third Parties**

THE SELLER shall not without the prior written consent of TANESCO, sell any electrical energy or capacity from the Facility to any person other than TANESCO.

**12.11    Interconnection Facilities**

THE SELLER shall not, and shall not permit any of its employees, agents, contractors or subcontractors of any tier, to operate, maintain, or tamper with the Interconnection Facilities on TANESCO's side of the Interconnection Points or any of TANESCO's metering equipment without the prior written consent of TANESCO, except in situations where such actions are taken



37

to prevent immediate injury, death or property damage, and THE SELLER uses its reasonable efforts to provide TANESCO with advance notice of the need of such actions.

## 12.12    GOT Guarantee

TANESCO will use its best efforts to assist THE SELLER in the procurement of the Guarantee by the GOT for the Term of this Agreement or such extension thereto to cover all payment obligations of TANESCO under this Agreement.

**END OF ARTICLE**



## ARTICLE XIII - TAXES, FINES

### 13.1    Taxes Applicable to THE SELLER

Subject to the terms of the Implementation Agreement, all present and future State, municipal or other local government lawful taxes, duties, levies or other impositions applicable to THE SELLER, the Facility and THE SELLER's other assets shall be paid by THE SELLER in a timely fashion. Nothing herein, however, shall in any way limit or override any provisions of Appendix B and H and Articles 5.2 and 5.3 which allow certain taxes and charges to be treated as "pass-through" items.

### 13.2    Taxes Applicable to TANESCO

All present and future state, provincial, municipal or other lawful taxes, duties, levies, or other impositions applicable to TANESCO arising from or in connection with its rights and obligations under this Agreement shall be paid by TANESCO in a timely fashion.

**END OF ARTICLE**



## ARTICLE XIV - INSURANCE

### 14.1    Insurance Required

THE SELLER undertakes to TANESCO that so long as the same is available on commercially acceptable terms it will itself or it will procure its contractors to:-

(i)    take out all insurance required by law or regulation;

(ii)    take out such insurance as is appropriate and customary for an independent generating company; and

(iii)    without prejudice to clause (ii) above, take out all insurance required pursuant to the terms of any Financing Documents entered into by it to enable it to finance the construction and/or operation of the Facility.

THE SELLER to procure that the insurance providing the cover in respect of THE SELLER's general third party liability on the operation of the Facility shall name TANESCO as an additional insured.

### 14.2    Substitute Coverage

(a)    If the coverages required under Article 14.1, or relatively comparable coverage, are unavailable, including unavailable at reasonable commercial terms for any reason whatsoever, from insurance companies in Tanzania or elsewhere, THE SELLER may procure an alternative coverage.

(b)    Following a Force Majeure Event, to the extent that the insurance required by Article 14.1 above, is not available to THE SELLER at commercially reasonable rates due to the occurrence of the Force Majeure Event, upon notice to TANESCO by THE SELLER the additional cost of such insurance attributable to the occurrence of the Force Majeure Event as determined by an expert in conformity with the provisions of Article 18.2, shall be recoverable by THE SELLER from TANESCO and treated as a Pass-Through Item. The additional compensation provided under this Article 14.2 shall cease as soon as THE SELLER's insurance rates are no longer affected by the Force Majeure Event. From time to time, at the request of TANESCO, the expert will determine the extent to which THE SELLER's insurance rates are then affected by the Force Majeure Event.

### 14.3    Evidence of Insurance

THE SELLER shall cause such insurers of or the agents thereof to provide TANESCO with certificates of insurance evidencing the policies and endorsements described in Article 14.1. Failure to provide such certificates shall not relieve THE SELLER of its obligation or liability imposed on THE SELLER elsewhere in this Agreement. Not less than 7 Days prior to the Commencement Date, THE SELLER shall provide to TANESCO certificates of insurance coverage or insurance policies for the construction period as required by this Article XIV. Not less than 7 Days prior to the Initial Operations Date, THE SELLER shall provide to TANESCO certificates of insurance coverage or insurance policies for the operation period as required by this Article XIV.

### 14.5    Application of Proceeds

For the Term of this Agreement, and subject to the requirements of the Financing Document



40

and the rights or remedies of the Financing Parties thereunder, THE SELLER shall apply the proceeds of any such insurance policies received for damages to the Facility to the repair of the Facility.

**END OF ARTICLE**



## ARTICLE XV - FORCE MAJEURE EVENT

## FORCE MAJEURE

### 15.1    Definition

A "Force Majeure Event" shall mean any event or circumstance or combination of events or circumstances beyond the reasonable control of a Party occurring on or after the Effective Date that materially and adversely affects  the performance by such affected Party of its obligations under or pursuant to this Agreement (including a Party's ability to deliver or receive energy from the Facility); provided, however, that such material and adverse effect could not have been prevented, overcome, or remedied in whole or in part by the affected  Party through the exercise of diligence and reasonable care,  it being understood and agreed that reasonable care includes the expenditure of sums of money to protect the Facility from a casualty event, which sums are reasonable in light of the likelihood of such event occurring, the probable effect of such event if it should occur and the likely efficacy of such preventive measures. "Force Majeure Events" shall include the following events and circumstances, but only to the extent that each satisfies the above requirements:

(a)     Change in Law which adversely affects the other Party

(b)     Events beyond the control of the affected Party including, but not limited to:

     (i)     lightning, fire, earthquake, tsunami, flood, storm, cyclone, typhoon, or tornado;

     (ii)     explosion or chemical contamination (other than resulting from an act of war);

     (iii)     epidemic or plague;

     (iv)     a Lapse of Consent, for the first twenty-five (25) Days of its occurrence;

     (v)     prior to the Commercial Operations Date, a delay beyond the tenth (10th) Day after the scheduled receipt date of the receipt at the Site of a major piece of equipment that has been timely ordered and must be manufactured expressly for a Party to perform its obligations under this Agreement, when such delay is caused solely by an accident in transportation or a strike.

     (vi)     any act of war (whether declared or undeclared), invasion, armed conflict or act of foreign enemy, blockade, embargo, revolution, riot, insurrection, civil commotion, act of terrorism, or sabotage;

     (vii)     radioactive contamination or ionizing radiation

     (viii)     strikes, works to rule or go-slows that are widespread or nationwide;

     (vix)     unavailability or interruption in the supply of Fuel as the result of the Fuel Supplier having failed to perform its obligations under the Fuel Supply Contract due to the occurence of a Force Majeure Event under the Fuel Supply Contract;

Force Majeure Events shall expressly not include the following conditions, except and to the extent they result directly from a Force Majeure Event;

     (i)     late delivery to a Party of machinery, equipment (except as provided in Article 15.1(b)(v)) materials spare parts or consumables;



(ii)    a delay in the performance of any Contractor; and

(iii)   normal wear and tear or random flaws in materials and equipment or breakdowns in equipment.

**15.2    Notification**

(a)    If by reason of a Force Majeure Event a Party is wholly or partially unable to carry out its obligations under this Agreement, the affected Party shall

(i)    give the other Party notice of the Force Majeure Event(s) as soon as practicable, but in any event, not later than the later of forty-eight (48) hours after the affected Party becomes aware of the occurrence of the Force Majeure Event(s) or forty-eight (48) hours after the resumption of any means of providing notice between THE SELLER and TANESCO, and;

(ii)   give the other Party a second notice, describing the Force Majeure Event(s) in reasonable detail and, to the extent that can be reasonably determined at the time of the second notice, providing a preliminary evaluation of the obligations affected, a preliminary estimate of the period of time that the affected Party will be unable to perform the obligations, and other relevant matters as soon as practicable, but in any event, not later than seven (7) Days after the initial notice of the occurrence of the Force Majeure Event(s) is given by the affected Party When appropriate or when reasonably requested to do so by the other Party, the affected Party shall provide further to the other Party more fully describing the Force Majeure Event(s) and its cause(s) and providing or updating information relating to the efforts of the affected Party to avoid and/or to mitigate the effect(s) thereof and estimates, to the extent practicable, of the time that the affected Party reasonably expects it will be unable to carry out any of its affected obligations due to the Majeure Event(s).

(b)    The affected Party shall also provide notice to the other Party of (i) the cessation of the Force Majeure Event, and (ii) the affected Party's ability to recommence performance of its obligations under this Agreement by reason of the cessation of the Force Majeure Event as soon as possible, but in any event, not later than seven (7) Days after the occurrence of each of (i) and (ii) above.

(c)    Failure by the affected Party to give notice of a Force Majeure Event to the other Party within the forty eight (48) hour period required by Article 15.2(a) shall not prevent the affected Party from giving such notice at a later time; provided, however, that in such case, the affected Party shall not be excused pursuant to Article 15.4 for any failure or delay in complying with its obligations under or pursuant to the Agreement until the notice required by Article 15.2(a)(i) has been given. If such notice is given within the forty-eight (48) hour period as required by Article 15.2(a)(i), the affected Party shall be excused for such failure or delay pursuant to Article 15.4 from the date of commencement of the relevant Force Majeure Event

**15.3    Duty to Mitigate**

The effected Party shall use all reasonable efforts to mitigate the effects of a Force Majeure Event, including, but not limited to, the payment of all reasonable sums of money by or on behalf of the affected Party.



43

### 15.4    Delay Caused by Force Majeure

So long as the affected Party has at all times since the occurrence of the Force Majeure Event complied with the obligations of Article 15.3 and continues to so comply, then:

(a)    the affected Party shall not be liable for any failure or delay in performing its obligations (other than an obligation to make a payment) under or pursuant to this Agreement during the existence of a Force Majeure Event and;

(b)    any performance deadline that the affected Party is obligated to meet under this Agreement shall be extended; provided, however, that no relief, including without limitation, the extension of performance deadlines, shall be granted to the affected Party pursuant to this Article 15.4 to the extent that such failure or delay would have nevertheless been experienced by the affected Party had the Force Majeure Event not occurred; provide, however, that in no event shall the obligations of the affected Party under this Agreement to meet performance deadlines be extended beyond a period equal to the period during which the Force Majeure Event continued or in the case of a Force Majeure Event which damages the Facility beyond the end of the Restoration Period (as defined in the Implementation Agreement) determined in accordance with Article XVII of the Implementation Agreement. Other than for breaches of this Agreement by the other Party, and without prejudice to the affected Party's right to indemnification pursuant to Article XVII or for payment pursuant to this Article V or Article VI, the other Party shall not bear any liability for any loss or expense suffered by the affected Party as a result of a Force Majeure Event.

### 15.5    Payments During Force Majeure Event

(a)    Upon the occurrence of any Force Majeure Event after the Commercial Operations Date, then during the pendency of a Force Majeure Event, TANESCO shall pay to THE SELLER Energy Payments delivered during the pendency of such Force Majeure Events plus Capacity Payments in an amount equal to the amount due to THE SELLER pursuant to Article 5.1 immediately prior to such Force Majeure Event multiplied by the FM Ratio. For the purposes of this Article 15.5, the FM Ratio shall be :

(i)    in the case of a Force Majeure Event declared by THE SELLER, a fraction, the numerator of which is the Dependable Capacity as determined by testing in accordance with Article IX as soon as practicable after the declaration of such Force Majeure Event, and the denominator of which is the Dependable Capacity determined by the most recent test prior to the Force Majeure Event conducted pursuant to Article IX;

(ii)    in the case of a Force Majeure Event declared by TANESCO the FM Ratio shall be one (1).

(b)    During the pendency of a Force Majeure Event, either Party may request that a Dependable Capacity or gross capacity test, as the case may be, be performed in order to determine the FM Ratio applicable in Article 15.5(a)(i), and thereafter such new FM Ratio shall be used to compute the payments to be made by TANESCO to THE SELLER; provided, however, that no more than two (2) tests may be requested by a Party within any thirty (30) Day period during the pendency of the Force Majeure Event.

**END OF ARTICLE**



## ARTICLE XVI - TERMINATION AND DEFAULT

### 16.1    THE SELLER Events of Default - Termination by TANESCO

Each of the following events shall be an event of default by THE SELLER (each a "SELLER Event of Default"), which, if not cured within the time period permitted (if any), with the prior written consent of the GOT, a copy of which consent shall be provided to THE SELLER with any notice provided under Article 16.3 shall give rise to the right on the part of TANESCO to terminate this Agreement pursuant to Article 16.3; PROVIDED, HOWEVER, that no such event shall be an Event of Default by THE SELLER (i) if it results solely from a breach by TANESCO of this Agreement or by the GOT of the Implementation Agreement; or (ii) if it results from a breach by the Fuel Supplier of the Fuel Supply Contract and THE SELLER have taken all reasonable steps to procure the supply of Fuel from other fuel suppliers; or (iii) if it occurs as a result of or during a Force Majeure Event for the period provided pursuant to Article 15.4:

(a)     the failure of THE SELLER to achieve Commencement Date within ninety (90) Days after Financial Closing;

(b)     the failure of THE SELLER to achieve the Commercial Operations Date within twenty four (24) months after the Scheduled Commercial Operations Date;

(c)     the failure of THE SELLER to comply with any of its material obligations under this Agreement and such failure shall continue uncured for 90 Days after notice thereof by TANESCO, provided that if such failure cannot be cured within a period of 90 Days with the exercise of reasonable diligence, then such cure period shall be extended for an additional period of 90 Days so long as THE SELLER is exercising reasonable diligence to cure such failure;

(d)     THE SELLER shall (i) apply for or consent to the appointment of or taking of possession by a receiver, custodian, trustee or liquidator of itself or of all or a substantial part of its property, (ii) admit in writing its inability to pay its debts as such debts become due (iii) make a general assignment or an arrangement or composition with if for the benefit of its creditors (iv) commence a voluntary case or file a petition seeking to take advantage of any law relating to bankruptcy, insolvency, winding-up or composition or readjustment of debts (v) fail to controvert in a timely and appropriate manner, or acquiesce in  writing to, any petition filed against such Party in an involuntary case under any bankruptcy or similar law, or (vi) take any action for the purpose of effecting any of the foregoing;

(e)     a proceeding or case shall be commenced against THE SELLER, without the application or consent of THE SELLER, in any court of competent jurisdiction, seeking (i) its liquidation, reorganization, dissolution or winding-up, or the composition or readjustment of its debts (ii) the appointment of a trustee, receiver, custodian, liquidator or the like of such Party or of all or any substantial part of its assets, or (iii) similar relief under any law relating to bankruptcy, insolvency, winding-up, composition or adjustment of debts and such proceeding or case shall continue not defended or dismissed or an order, judgment or decree approving or ordering any of the foregoing shall be entered and continue  not stayed and in effect, for a period of 90 Days, or an order for relief against THE SELLER shall be entered in an involuntary case under any bankruptcy or similar law;

### 16.2    TANESCO Events of Default - Termination by THE SELLER

Each of the following events shall be an event of default by TANESCO (each a "TANESCO Event of Default"), which, if not cured within the time period permitted (if any) to cure shall



45

give rise to the right on the part of THE SELLER to terminate this Agreement pursuant to Article 16.2; PROVIDED, HOWEVER, that no such event shall be an Event of Default by TANESCO (i) if it results from a breach by THE SELLER of this Agreement; or (ii) if it occurs as a result of a Force Majeure Event during the period provided pursuant to Article 15.4:

(a)    the dissolution, pursuant to law, of TANESCO, except for :

    (i)    the privatization of TANESCO's power stations; or

    (ii)   an amalgamation, reorganization, reconstruction, or further privatization of TANESCO where the GOT without interruption guarantees the performance of the succeeding entity on the same terms and conditions as the Guarantee or such commercial security is provided for the obligation of the succeeding entity that in the reasonable business judgment of THE SELLER provides an adequate alternative to the Guarantee;

(b)    any default or defaults by TANESCO in the making of any payment or payments required to be made by it within sixty (60) Days of the due date therefore and then, upon notice to the GOT, any default or defaults by the GOT in the making of any payment in accordance with the terms of the Guarantee which exceed, in the aggregate at any one time, the sum equivalent to one (1) month of Capacity Payments;

(c)    the failure of TANESCO to comply with any of its material obligations under this Agreement and such failure shall continue uncured for 90 Days after notice thereof by THE SELLER, provided that if such failure cannot be cured within a period of 90 Days with the exercise of reasonable diligence, then such cure period shall be extended for an additional period of 90 Days so long as TANESCO is exercising reasonable diligence to cure such failure;

(d)    TANESCO shall (i) apply for or consent to the appointment of or taking of possession by a receiver, custodian, trustee or liquidator of itself or of all or a substantial part of its property; (ii) admit in writing its inability to pay its debts as such debts become due; (iii) make a general assignment or an arrangement or composition with if for the benefit of its creditors; (iv) commence a voluntary case or file a petition seeking to take advantage of any law relating to bankruptcy, insolvency, winding-up or composition or readjustment of debts; (v) fail to controvert in a timely and appropriate manner, or acquiesce in writing to, any petition filed against such Party in an involuntary case under any bankruptcy or similar law; or (vi) take any action for the purpose of effecting any of the foregoing;

(e)    a proceeding or case shall be commenced against TANESCO, without the application or consent of TANESCO, in any court of competent jurisdiction, seeking (i) its liquidation, reorganization, dissolution or winding-up, or the composition or readjustment of its debts; (ii) the appointment of a trustee, receiver, custodian, liquidator or the like of such Party or of all or any substantial part of its assets; or (iii) similar relief under any law relating to bankruptcy, insolvency, winding-up, composition or adjustment of debts and such proceeding or case shall continue not defended or dismissed or an order, judgment or decree approving or ordering any of the foregoing shall be entered and continue not stayed and in effect, for a period of 90 Days, or an order for relief against TANESCO shall be entered in an involuntary case under any bankruptcy or similar law;

16.3    Termination Notices

(a)    Upon the occurrence of a TANESCO Event of Default or a SELLER Event of Default, as the case may be, that is not cured within the applicable period (if any) for

46

cure, the non-defaulting Party may, at its option, initiate termination of this Agreement by delivering a notice (a "Notice of Intent to Terminate") of its intent to terminate this Agreement to the defaulting Party. The Notice of Intent to Terminate shall specify in reasonable detail THE SELLER Event of Default or TANESCO Event of Default, as the case may be, giving rise to such notice.

(b)   Following the delivery of a Notice of Intent to Terminate, the Parties shall consult for a period of up to thirty (30) Days in case of a failure by either Party to make payments or provide security when due, and up to sixty (60) Days with respect to any other Event of Default (or such longer period as the Parties may mutually agree), as to what steps shall be taken with a view to mitigating the consequences of the relevant Event of Default taking into account all the circumstances. During the period following the delivery of the Notice of the Intent to Terminate, the Party in default may continue to undertake efforts to cure the default, and if the default is cured at any time prior to the delivery of a Termination Notice in accordance with Article 16.3(c), then the non-defaulting Party shall have no right to terminate this Agreement in respect of such cured default.

(c)   Upon expiration of the consultation period described in Article 16.3(b) and unless the Parties shall have otherwise agreed or unless the Event of Default giving rise to the Notice of Intent to Terminate shall have been remedied, the Party having given the Notice of Intent to Terminate may terminate this Agreement by delivering a Termination Notice to the other Party, whereupon this Agreement shall immediately terminate.

(d)   In the event that the Facility is transferred to the GOT under the terms of the Implementation Agreement, this Agreement shall immediately terminate and THE SELLER shall have no obligations to TANESCO hereunder except those obligations which arose prior to or upon the termination of this Agreement.

16.4   **Notice to the GOT of TANESCO's Default**

(a)   Anything in this Agreement notwithstanding, THE SELLER shall not seek to terminate this Agreement as a result of any default of TANESCO, without first giving a copy of any notices required to be given to TANESCO under Article 16.2 and 16.3 to the GOT, such notices to include a request to the GOT to cure any such default within the same cure period as provided to TANESCO hereunder and such cure period to commence upon delivery of each such notice to the GOT. Each such notice shall be deemed to have been delivered (i) when presented personally to the GOT, (ii) when transmitted by facsimile, or (iii) five (5) Days after being deposited in a regularly maintained receptacle for the Postal Service in Tanzania, postage prepaid, registered or certified, return receipt requested, addressed to the GOT, at the address indicated in Article 23.1 of the Implementation Agreement (or such other address as the GOT may have specified by written notice delivered in accordance therewith).

(b)   No rescission or termination of this Agreement, by THE SELLER shall be effective without such notice and expiration of such cure period. Except as provided by the terms of the Guarantee, the GOT may, but shall be under no obligation to perform any act required of TANESCO hereunder with the same effect as if the payment or act had been made or performed by TANESCO. If the GOT fails to cure or is unable or unwilling to cure a default of TANESCO within the cure periods provided to TANESCO under this Agreement, THE SELLER shall have all of its rights and remedies with respect to such default as set forth in this Agreement; PROVIDED, HOWEVER, that if the GOT is diligently attempting to cure such default of TANESCO and, demonstrable progress toward affecting such cure is being made, the GOT shall be granted an additional period not exceeding ninety (90) Days to affect such cure before THE SELLER may exercise its rights and remedies with respect to such default set forth in this Agreement.

47

**16.5**  **Notice to the Lenders of THE SELLER's Default**

(a)    Anything in this Agreement notwithstanding, from and after the occurrence of the Financial Closing, TANESCO shall not seek to terminate this Agreement as the result of any default of THE SELLER without first giving a copy of any notices required to be given to THE SELLER under Articles 16.1 and 16.3 to the Lenders, such notice to be coupled with a request to the Lenders to cure any such default within the same cure period as provided to THE SELLER in this Agreement and such cure period to commence upon delivery of each such notice to the Lenders. If there is more than one Lender, the Lenders will designate in writing to TANESCO an agent (the "Agent") and any notice required hereunder shall be delivered to such Agent, such notice to be effective upon delivery to the Agent as if delivered to each of the Lenders. Each such notice shall be in writing and shall be deemed to have been delivered (a) when presented personally to the Lender or the Agent, (b) when transmitted by facsimile to the number specified in accordance with the procedure set forth below, or (c) five (5) Days after being deposited in a regularly maintained receptacle for the Postal Service in Tanzania, postage prepaid, registered or certified, return receipt requested, addressed to the Lender at the address indicated at Financial Closing ( or such other address or to the Agent at such address as the Lenders may have specified by written notice delivered in accordance herewith). Any notice given by facsimile under this Article 16.5 shall be confirmed in writing delivered personally or sent by prepaid post, but failure to so confirm shall render not void or invalidate the original notice if it is in fact received by the Lender or the Agent. If the address of the Lender or Agent is outside Tanzania, any notice delivered to the Lender or Agent pursuant to this Article 16.5 shall be sent by international courier or facsimile, and if sent by facsimile, confirmed by international courier. The address and facsimile number for Lender or Agent shall be provided to TANESCO by THE SELLER at Financial Closing and thereafter may be changed by the Lender or the Agent by subsequent delivery of a notice to TANESCO at the address or facsimile number for TANESCO provided in Article 19.3 (or at such other address or facsimile number subsequently delivered to the Lender or the Agent in accordance with this Article 16.5) and otherwise in accordance with the requirements of Article 19.3.

(b)    No rescission or termination of this Agreement by TANESCO shall be valid or binding upon the Lenders without such notice and the expiration of such cure period. The Lenders may make, but shall be under no obligation to make, any payment or perform any act required to be made or performed by THE SELLER, with the same effect as if made or performed by THE SELLER. If the Lenders fail to cure or are unable or unwilling to cure a default within the cure period as provided to THE SELLER in this Agreement, TANESCO shall have all its rights and remedies with respect to such default as set forth in this Agreement; provided, however, that if the Lenders are diligently attempting to cure such default of THE SELLER and demonstrable progress toward affecting such cure is being made, the Lenders shall be granted an additional period not exceeding ninety (90) Days to affect such cure before TANESCO may exercise its rights and remedies with respect to such default set forth in this Agreement.

**16.6**    **Obligations Upon Termination**

Upon expiration or termination of this Agreement, the Parties shall have no further obligations hereunder except for obligations that arose prior to such expiration or termination and obligations that expressly survive such expiration or termination pursuant to this Agreement, including without limitation, the obligation to pay expenses under Article 16.7 and Penalty and Bonus Payments under Article VI.



48

**16.7    Reimbursement**

In the event of a termination of this Agreement prior to the Commercial Operations Date for any reason other than (i) a TANESCO Event of Default; (ii) a GOT Event of Default under the Implementation Agreement; (iii) a Force Majeure Event or (iv) a Change in Law, THE SELLER shall reimburse TANESCO for all costs and expenses (including reasonable attorney's fees) relating to the project herein incurred by TANESCO prior to such termination, which amount in any event shall not exceed USD100,000

**16.8    Other Remedies**

The exercise of the right of a Party to terminate this Agreement, as provided herein, does not preclude the Party from exercising other remedies that are provided herein or are available at Law. Remedies are cumulative, and the exercise of, or failure to exercise, one or more remedy by a Party shall not limit or preclude the exercise of, or constitute a waiver of, other remedies by that Party; PROVIDED HOWEVER, that the remedies provided in Article 6.7 and 16.2 are exclusive remedies available to THE SELLER'.

**END OF ARTICLE**



## ARTICLE XVII - INDEMNIFICATION AND LIABILITY

### 17.1    Limitation of liability

Except as provided in Article 17.2, neither Party shall be liable to the other Party in contract, tort, warranty, strict liability, or any other legal theory for any indirect, consequential, incidental, punitive, or exemplary damages. Neither Party shall have any liability to the Party except pursuant to, or for breach of, this Agreement; PROVIDED, HOWEVER, that this provision is not intended to constitute a waiver of any rights of one Party against the other with regard to matters unrelated to this Agreement or to any activity not contemplated by this Agreement.

### 17.2    Indemnification

**(a)    TANESCO**

Except as specifically provided elsewhere in this Agreement, TANESCO shall indemnify THE SELLER against, and hold THE SELLER harmless from, at all times after the date hereof, any and all Losses incurred, suffered, sustained, or required to be paid, directly or indirectly, by or sought to be imposed upon, THE SELLER, to personal injury or death to persons or damage to property arising out of the negligent or intentional act or omission of TANESCO in connection with this Agreement. Notwithstanding anything to the contrary contained in the preceding sentence, nothing in this Article 17.2(a) shall apply to any loss in respect of which THE SELLER receives, indemnification in full pursuant to the terms of the Implementation Agreement.

**(b)    THE SELLER**

THE SELLER shall indemnify TANESCO against, and hold TANESCO harmless from, at all times after the date hereof, any and all Losses incurred, suffered, sustained, or required to be paid, directly or indirectly, by, or sought to be imposed upon, TANESCO for personal injury or death to persons or damage to property arising out of the negligent or intentional act or omission of THE SELLER in connection with this Agreement.

**(c)    Joint Negligence**

In event that injury or damage results from the joint or current negligent or intentional acts or omissions of the Parties, each Party shall be liable under this indemnification in proportion to its relative degree of fault.

**(d)    Indemnification to Survive**

The provisions of this Article 17.2 shall survive for a period of five (5) years following the termination of this Agreement.

### 17.3    Indemnification for Fines and Penalties

Any fines or other penalties incurred by a Party for non-compliance with the Law shall not be reimburse by the other Party but shall be the sole responsibility of the non-complying Party.





**17.4    Notice of Proceedings**

Each Party shall promptly notify the other Party of any Loss or proceeding in respect of which it is or may be entitled to indemnification under Article 17.2. Such notice shall be given as soon as reasonably practicable after the relevant Party becomes aware of the Loss or proceeding.

**17.5    Assertion of Claims to Exceed Minimum Indemnification Amount**

Each Party shall be solely liable, and shall not be entitled to assert any claim for indemnification under this Agreement, for any Loss that would otherwise be the subject of indemnification under this Agreement until all such Losses of such Party arising during the then-current Year exceed, in the aggregate, USD100,000. For purposes of this Article 17.5, a loss (or claim for indemnification) shall be deemed to arise in the Year the event giving rise to the Loss (or claim for indemnification) occurred or, if the event is continuing in more than one Year, in the Year during which the event ends.

**17.6    Defence of Claims**

(a)     The indemnifying Party shall be entitled, at its option, to assume and control the defence of such claim, action, suit or proceeding at its expenses and counsel of its selection, subject to the prior approval of the indemnified Party, PROVIDED it gives prompt notice of its intention to do so to the indemnified Party and reimburses the indemnified Party for the reasonable costs and expenses incurred by the indemnified Party prior to the assumption by the indemnifying Party of such defence.

(b)     Unless and until the indemnifying Party acknowledges in writing its obligations to indemnify the indemnified Party and assumes control of the defence of a claim, suit, action or proceeding in accordance with Article 17.6(a), the indemnified Party shall have the right, but not the obligation, to contest, defend and litigate, with counsel of its own selection, any claim, actions, suit or proceeding by any third party alleged or asserted against such Party in respect of, resulting from, related to or arising out of any matter for which it is entitled to be indemnified hereunder, and the reasonable costs and expenses thereof shall be subject to the indemnification obligations of the indemnifying Party hereunder.

(c)     Upon assumption by the indemnifying Party of the control of the defence of a claim, suit, action or proceeding, the indemnifying Party shall reimburse the indemnified Party for the reasonable costs and expenses of the indemnified Party in the defence of the claim, suit, action or proceeding prior to the indemnifying Party's acknowledgement of the indemnification and assumption of the defence.

(d)     Neither Party shall be to entitled settle or compromise any such claim, action, suit or proceeding without the prior written consent of the other Party; provided, however, that after agreeing in writing to indemnify the indemnified Party, the indemnifying Party may settle or compromise any claim without the approval of the indemnified Party.

(e)     Following the acknowledgement of the indemnification and the assumption of the defence by the indemnifying Party, the indemnified Party shall have the right to employ its own counsel and such counsel may participate in such actions, but the fees and expenses of such counsel shall be at the expense of such indemnified Party, when and as incurred, unless (i) the employment of counsel by such indemnified Party has been authorized in writing by the indemnifying Party, (ii) the indemnified Party shall have reasonably concluded that there may be a conflict of interest between the indemnifying Party and the indemnified Party in the conduct of the defence of such action, (iii) the indemnifying Party shall not in fact have employed independent



51

contributions, times a fraction. the numerator of which is the number of years remaining in the initial term of the Power Purchase Agreement and the denominator of which is two times the number of years remaining in the initial term of the Power Purchase Agreement at the time of such contribution or approval for each such additional equity amount.

counsel reasonably satisfactory to the indemnified Party to assume the defence of such action and shall have been so notified by the indemnified Party, or (iv) the indemnified Party shall have reasonably concluded and specifically notified the indemnifying Party either that there may be specific defence available to it that are different from or additional to those available to the Party or that such claim, action, suit or proceeding involves or could have a material adverse effect upon it beyond the scope of this Agreement. If clauses (ii), (iii) or (iv) of the preceding sentence shall be applicable, then counsel for the indemnified Party shall have the right to direct the defence of such claim, action, suit or proceeding on or behalf of the indemnified Party and the reasonable fees and disbursements of such counsel shall constitute legal or other expenses hereunder.

### 17.7    Double Jeopardy

A final, non-appealable order issued in a proceeding initiated by the GOT and based upon a claim of breach of the Implementation Agreement shall be with prejudice to any proceedings against THE SELLER based upon the same claim that TANESCO could otherwise bring for breach by THE SELLER of its obligations under this Agreement. Nothing in this Article shall prevent TANESCO and the GOT from separately initiating proceedings to terminate this Agreement and the Implementation Agreement, respectively, pursuant to Articles 16.1 and 16.3 of this Agreement and Article 19.1 and 19.3 of the Implementation Agreement.

**END OF ARTICLE**



## ARTICLE XVIII - DISPUTE RESOLUTION

**18.1    Resolution by Parties**

(a)    In the event that a Dispute arises, the Parties shall attempt in good faith to settle such Dispute by mutual discussion, which may include referring the Dispute to the Operations Committee, provided that any matters that are described in Article 7.4 shall be referred to the Operations Committee for its review and recommendations or attempted resolution, where appropriate.

(b)    In the event that the Dispute is not resolved by discussion in accordance with Article 18.1(a) or, if either party does not agree with the recommendation of or resolution proposed by the Operations Committee or the Operations Committee has not made a recommendation or proposed a resolution within thirty (30) Days of the Dispute being referred to it; either Party may refer the Dispute to the chief executive officer or chief operating officer of THE SELLER and the Chief Executive Officer of TANESCO for further consideration. In the event the such individuals are unable to reach agreement within fifteen (15) Days, or such longer period as they may agree, then either Party may refer the matter to an expert in accordance with Article 18.2 hereof or, if the Dispute is not of a type required to be referred to an expert under Article 18.2, commence arbitration of the Dispute in accordance with Article 18.3.

**18.2    Mediation by Expert**

(a)    In the event that the Parties are unable to resolve a Dispute in accordance with Article 18.1, then either Party, in accordance with this Article 18.2, may refer the Dispute to an expert for consideration of the Dispute and to obtain a recommendation from the expert as to the resolution of the Dispute.

(b)    The Party initiating submission of the Dispute to the expert shall provide the other Party with a notice stating that it is submitting the Dispute to an expert and nominating the person it proposes to be the expert. The other Party shall, within fifteen (15) Days of receiving such notice, notify the initiating Party whether such person is acceptable. If the Party receiving such notice fails to respond or notifies the initiating Party that the person is not acceptable, the Parties shall meet and discuss in good faith for a period of ten (10) Days to agree upon a person to be the expert. If the Parties are unable to agree, the responding Party shall by the end of such ten (10) day period nominate a person to be an expert, whereupon the two nominated experts shall meet and agree upon a third person who shall be expert.

(c)    (i)    Consideration of the Dispute by an expert shall be initiated by the Party who is seeking consideration of the Dispute by the expert submitting to both the expert and the other Party written materials setting forth:

        (A)    a description of the Dispute;

        (B)    a Statement of the Party's position; and

        (C)    copies of records supporting the Party's position.

    (ii)    Within ten (10) Days of the date that a party has submitted the materials described in Article 18.2(c)(i), the other Party may submit to the expert:

        (A)    a description of the Dispute;

        (B)    a Statement of the Party's position; and





(C)    copies of any records supporting the Party's position.

The expert shall consider any such information submitted by the responding Party within the period provided in Article 18.2(c)(ii) and, in the expert's discretion, may consider any additional information submitted by either Party at a later date.

(d)    The Parties shall not be entitled to apply for discovery of documents, but shall be entitled to receive copies of the records submitted by the other Party.

(e)    Each Party shall designate one person knowledgeable about the issues in Dispute who shall be available to the expert to answer question and provide any additional information requested by the expert. Except of such person, a Party shall not be required to, but may, provide oral statements or presentations to the expert or make any particular individuals available to the expert.

(f)    Except as provided in Article 18.2(h) with respect to the payment of costs, the proceedings shall be without prejudice to any Party and any evidence given or statements made in the course of this process may not be used against a Party in any other proceedings. The process shall not be regarded as an arbitration and the laws relating to commercial arbitration shall not apply. Unless the Parties agree in a writing signed by both Parties at the time the expert is selected stating that the decision of the expert will be binding, determination of the expert shall not be binding.

(g)    When consideration of the Dispute by an expert is initiated, the expert shall be requested to provide a recommendation within fifteen (15) Days after the tenth (10) day response period provided in Article 18.2(c)(ii) above has run. If the expert's recommendation is given within such fifteen (15) Days period, of if the expert's recommendation is given at a later time and neither Party has at such time initiated any other proceeding concerning the Dispute, the parties shall review and discuss the recommendation with each other in good faith for a period of ten (10) Days following delivery of the recommendation before proceeding with any other actions.

(h)    If a Party does not accept the recommendation of the expert with respect to the Dispute, it may initiate arbitration proceedings in accordance with Article 18.3. provided, however, that prior to initiating the arbitration proceedings it shall have paid all costs of the expert (including the reimbursement of any costs paid to the other expert by the other Party) and all out-of-pocket costs of the other Party. Similarly if the expert has not submitted its recommendation within the time period provided in Article 18.2(g), a Party may initiate arbitration proceedings in accordance with Article 18.3, provided that prior to initiating the arbitration proceedings it shall have paid all costs of the expert (including the reimbursement of any costs paid to the expert by the other Party).

(i)    Except as provided in Article 18.2(h), the costs of engaging an expert shall be borne equally by the Parties and each Party shall bear its own costs in preparing materials for and making presentations to the expert.

If any Dispute shall arise between TANESCO and THE SELLER, the Parties shall attempt to settle such Dispute by mutual discussion or by resolution by the Operations Committee within thirty (30) Days of the date the disputing Party gives written notice of the Dispute to the non-disputing Party.

## 18.3    Arbitration

(a)    Any Dispute arising out of or in connection with this Agreement shall be settled by arbitration in accordance with the Rules of Procedures for Arbitration Proceedings (the "ICSID Rules") of the International Centre for the Settlement of Investment

Disputes (the "Centre") established by the Convention on the Settlement of Investment Disputes between States and Nationals of other States (the "Convention"). For purposes of consenting to the jurisdiction of the Convention, the Parties agree that THE SELLER is a foreign controlled entity unless the amount of the voting stock in THE SELLER held by foreign investors should decrease to less than fifty percent (50%) of the outstanding voting stock of THE SELLER.

(b)     If for any reason the Dispute cannot be settled in accordance with the ICSID Rules, whether due to any failure to implement the Convention, or THE SELLER should not be agreed to be a foreign controlled entity, or the request for arbitration proceedings is not registered by the Centre, or the Centre fails or refuses to take jurisdiction over such Dispute, or otherwise, such Dispute shall be finally settled by arbitration under the Rules of Arbitration of the International Chamber of Commerce (the "ICC Rules") by one or more arbitrators appointed in accordance with the ICC Rules.

(c)     The arbitration shall be conducted in London, England and, unless otherwise agreed by the Parties, the number of arbitrators shall be three, one arbitrator nominated by THE SELLER, one arbitrator nominated by TANESCO and one arbitrator nominated by the arbitrators appointed by THE SELLER and TANESCO provided that if the arbitrators appointed by THE SELLER and TANESCO fail to nominate an arbitrator or agree on the nomination of the arbitrator within 28 days of either both being appointed either party may apply to the High Court of the England and Wales to appoint the third arbitrator.

(d)     No arbitrator appointed pursuant to Article 18.3(b) or Article 18.3(c) shall be a national of the jurisdiction of either Party to this Agreement or of the jurisdiction of any shareholder or group of shareholders holding more than thirty (30) percent of THE SELLER nor shall any such arbitrator be an employee or agent or former employee or agent of any such person.

(e)     The Law governing the procedure and administration of any arbitration instituted shall be the English Law.

## 18.4    Commercial Acts

TANESCO unconditionally and irrevocably agrees that the execution, delivery and performance by it of this Agreement and those agreements included in the Security Package to which it is a party constitute private and commercial acts.

**END OF ARTICLE**

## ARTICLE XIX - MISCELLANEOUS

### 19.1    Transfers

Except as required by the Financing Parties under the Financing Documents, THE SELLER may not sell, convey, transfer or otherwise dispose of the Facility and the Site or any material part or any interest therein to any Party without the prior written consent of TANESCO, which consent shall not be unreasonably withheld or delayed.

### 19.2    Assignment

Neither this Agreement nor any of the rights or obligations hereunder, may be assigned, transferred or delegated by either Party without the express prior written consent of the other party, which consent shall not be unreasonably withheld or delayed provided that THE SELLER may assign its rights and/or obligations under this Agreement to the Financing Parties and their successors and assigns as required for financing and refinancing purposes, and provided further that, unless expressly agreed to by the other Party, no assignment, whether or not consented to, shall relieve the assignor of its obligations hereunder in the event its assignee fails to perform.

### 19.3    Notices

Except for Despatch orders and as otherwise specified in this Agreement, any notice, demand for information or documents required or authorised by this Agreement to be given to a Party shall be given in writing. All Notices shall be deemed delivered:

(a) when presented personally;

(b) if received on a Business Day for the receiving Party, when transmitted by facsimile to the receiving Party's facsimile number specified herein and, if received on a Day that is not Business Day for the receiving Party, on the first Business Day following the date transmitted by facsimile to the receiving Party's facsimile number specified herein,;

(c) one (1) Day after being delivered to a courier for overnight delivery, addressed to the receiving Party, at the address indicated above (or such other address as such Party may have specified by Notice delivered to the delivering Party at its address or facsimile number specified herein) or

(d) five (5) Days after being deposited in a regularly maintained receptacle for the postal service in Tanzania, postage prepaid, registered or certified, return receipt requested, addressed to the receiving Party, at the address indicated above (or such other address as the receiving Party may have specified by written Notice delivered to the delivering Party at its address or facsimile number specified herein). Any notice given by facsimile shall be confirmed in writing delivered personally or sent by registered or certified mail, but the failure to so confirm shall not void or invalidate the original notice if it is in fact received by the Party to which it is addressed.

The address for the delivery of notices and bills to each Party and the respective telephone and facsimile numbers are as follows :



| (a) | For THE SELLER | : | Independent Power Tanzania Ltd. |
| | Attention | : | Managing Director |
| | Address | : | 5th Floor, Extelcoms, Samora Avenue, P O Box 1461, Dar-es-Salaam, United Republic of Tanzania |
| | Telephone | : | 51-46017 |
| | Facsimile | : | 51-46017 |
| (b) | For TANESCO | : | Tanzania Electric Supply Company Limited |
| | Attention | : | Managing Director |
| | Address | : | P O Box 9024, Dar-es-Salaam, United Republic of Tanzania |
| | Telephone | : | 51-46242 |
| | Facsimile | : | 51-44668/36427/26704 |

**19.4    Choice of Law**

This Agreement shall be governed by, and construed in accordance with, the laws of Tanzania.

**19.5    Entire Agreement**

This Agreement constitutes the entire understanding between the Parties and supersedes any and all previous understandings between the Parties with respect to the subject matter hereof. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.

**19.6    Further Assurances**

If either Party determines in its reasonable discretion that any further instruments or other things are necessary or desirable to carry out the terms of this Agreement, the other Party shall execute and deliver all such instruments and assurances and do all things reasonable necessary or desirable to carry out the terms of this Agreement.

**19.7    Waiver**

No waiver by either Party of the performance of any obligation under this Agreement or with respect to any default or any other matter arising in connection with this Agreement shall be deemed a waiver with respect to any subsequent performance, default or matter.

**19.8    Modification or Amendment**

This Agreement may be modified or amended, and any provision hereof may be waived, by an instrument in writing and signed by both Parties.

**19.9    Severability**

If any term or provision of this Agreement or the application thereof to any Person or circumstances shall to any extent be declared invalid or unenforceable by any governmental authority or court of competent jurisdiction, the remainder of this Agreement or the application of such term or provision to Persons or circumstances other than those as to which it is declared invalid or unenforceable shall not be affected thereby, and each other term and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by Law.

**19.10    Counterparts**

This Agreement may be executed in counterparts all of which shall constitute one agreement binding on both Parties and shall have the same force and effect as an original instrument, notwithstanding that both Parties may not be signatories to the same original or the same counterpart.

**19.11    Confidential Information**

Any information provided by either Party to the other Party pursuant to this Agreement and labelled "CONFIDENTIAL" shall be utilized by the receiving Party solely in connection with the purpose of this Agreement and shall not be disclosed by the receiving Part to any third Party, except with the providing Party's consent, and upon request of providing Party shall be returned thereto. Notwithstanding the above, the Parties acknowledge and agree that such information may be disclosed to the Financing Parties, suppliers and potential suppliers of Fuel and major equipment to the Facility and other third parties as may be necessary for TANESCO and THE SELLER to perform their obligations under this Agreement. To the extent that such disclosures are necessary, the Parties also agree that they shall endeavour in disclosing such information to seek to preserve the confidentiality of such disclosures. This provision shall not prevent either Party from providing any confidential information received from the other Party to any court or governmental authority as may be required by such court or governmental authority, provided that, if feasible, the disclosing Party shall have given prior notice to the other Party of such required disclosure and, if so requested by such other Party, shall have used all reasonable efforts to oppose the requested disclosure, as appropriate under the circumstances, or to make other such disclosures pursuant to a protective order or other similar arrangement for confidentiality.

**19.12    Independent Contractors**

The Parties are independent contractors. Nothing contained herein shall be deemed to create an association, joint venture, partnership or principal/agent relationship between the Parties or to impose any partnership obligation or liability on either Party. Neither Party shall have any right, power or authority to enter into any agreement or commitment, act on behalf of, or otherwise bind the other Party in any way.

**19.13    Third Parties**

This Agreement is intended solely for the benefit of the Parties. Nothing in this Agreement shall be construed to create any duty or liability to or standard of care with reference to any other Person.

**19.14    Headings**

The headings contained in this Agreement are solely for the convenience of the Parties and

58

should not be used or relied upon in any manner in the construction or interpretation of this Agreement.

### 19.15   Language

(a)   The official text of this Agreement shall be in the English languages.

(b)   All documents, notices, waivers and all other communications, written or otherwise, between the Parties in connection with this Agreement shall be in the English language.

**END OF ARTICLE**





**IN WITNESS WHEREOF**, the Parties hereto have hereunto affixed their hands and seals the day and year above written.


THE COMMON SEAL OF
TANZANIA ELECTRIC SUPPLY COMPANY LTD.
was hereunto affixed
in the presence of :

.........................
Director

.........................
Secretary


THE COMMON SEAL OF
INDEPENDENT POWER TANZANIA LTD.
was hereunto affixed
in the presence of :

.........................
Director

.........................
Secretary

S. Abubaker

60

APPENDIX A

DESCRIPTION OF FACILITY AND SITE

# APPENDIX A

The following section describes the top level specification from which the electrical system shall be designed. Deviations to the specification as a result of design work shall be agreed between TANESCO and SELLER.

**Exhibit A, PART 3 to Declaration of Sazi B. Salula**

SSD Plant Specs
61 — 1.1
66 — 1.5.2
(p.10 observations)

**APPENDIX A**

**DESCRIPTION OF FACILITY AND SITE**

## 1.0 FACILITY DESCRIPTION

### 1.1 Introduction

The electrical generation facility will be designed and constructed consisting o multiple generating units. The total generating capacity shall be 100MW (nominal). Each generating unit shall be slow speed diesel generating sets and shall include all auxiliary equipment, waste heat recovery boiler systems, control and instrumentation, indoor electrical plant installation as well as 33kV and 132kV outdoor switchgear equipment.

The facility shall have a nett nominal output to the TANESCO grid of 100MW and the Seller shall in not less than 30 days prior to the Initial Operations Date inform the TANESCO the nett heat rate of the plant at the delivery point based on the following conditions:-

(a)    Lower calorific value of fuel oil at site conditions

(b)    TANESCO grid frequency with 50Hz $\pm$ 1.0% or below

(c)    Overall load power factor at HV terminals of the 132/33kV interbus transformers at 0.85 or higher

### 1.2 General Description

The proposed facility incorporates diesel generating sets. Each unit can run independently or in combination with the other diesel generators.

Each diesel engine drives its own generator. The main fuel considered to operate the diesel engines is fuel oil (FO) having a viscosity of 180 centistokes at a temperature of 50°C. In order to protect the engines, the fuel oil will be treated in a separation system and heated up to approximately 120°C before fuel injection pumps. The diesel engine will be started and stopped on fuel oil.

Industrial Diesel Oil (IDO) is also provided as a back-up fuel.

### 1.3 Electrical System

(a)    General Specification

The following section describes the top level specification from which the electrical system shall be designed. Deviations to the specification as a result of design work shall be agreed between TANESCO and the SELLER.



The diesel generator electrical system is equipped with a 33kV outdoor busbar which interconnects to the TANESCO 132kV busbar via two 132/33kV 125MVA interbus transformers.

To start the Facility, the starting power will be delivered from the TANESCO grid through the 132/33kV interbus transformers and the station service transformers. Common and unit auxiliaries for the diesel sets are energized.

An alternative "black start" facility is provided by an appropriately sized standby diesel generator connected to the power station 415V switchboard.

Each diesel engine will be started with pressurised air and be kept at adequate low speed. The unit speed shall be raised up to the rated speed automatically and put into parallel operation with the existing generating sets and 33kV system by an automatic synchroniser. The units shall be loaded by manual operation up to the system power demand.

Shut down of the diesel generator shall be done automatically by gradually decreasing the load at an adjustable pre-determined rate and after adequate period the 33kV generator transformer circuit breaker shall be tripped automatically.

The electrical auxiliary system operate at the following voltage levels:-

(i)     11kV feeding 11/0.415kV auxiliary transformers for the power station.

(ii)    415/240V low voltage distribution feeding power to the various smaller panel boards.

(iii)   110 V d.c. distribution 2 x 100% battery system, 2 x 100 chargers including the distribution system for control and protection.

(iv)    24 V d.c. distribution 2 x 100% battery system, 2 x 100% chargers for controls and instrumentation, Data Acquisition and Logging System.

(v)     240 V a.c. un-interruptable power supply system (UPS). The system shall include the following components:-

        Rectifier/battery charger, invertor, batteries and common distribution system.

### 1.4    Operating Limits

When the facility operates pursuant to TANESCO's Despatch rights in accordance with this Agreement, it is capable of operation over the continuous Minimum Operating Level 20MW. After the facility has been off line due to a Scheduled Outage, Forced Outage, or Maintenance Outage or in response to TANESCO's



Despatch of the Facility, it can achieve the levels of operation within the duration as indicated by the SELLER.

In not less than 30 days prior to the Initial Operations Date, the SELLER shall provide TANESCO the following information:-

(a)    Maximum Operating Level in MW

(b)    The duration to resynchronized and to achieve its Maximum Operating Level for start-up, if the facility has been off line for less than 60 minutes (hot start)

(c)    The duration to resynchronized and to achieve its Maximum Operating Level for start-up, if the facility has been off line for more than 12 hours (cold start) in standby and preheated conditions

(d)    Its rates of increase of Net Electrical Output from (cold condition) and from hot condition, once the facility has been synchronized with TANESCO's system and brought to its Minimum Operating Level

(e)    Its rate of decrease in Net Electrical output, if the facility, is operating above its Minimum Operating Level

The electrical operating limits for the power station generation are as follows:-

(i)    Voltage levels limits - $\pm$ 5.0% at the power station 132kV delivery points.

(ii)    Power factor limits - 0.85 pf lagging and unity pf at the power station 132kV delivery points.

(iii)    Frequency limits - $\pm$ 0.50Hz at the power station 132kV delivery points.

1.5    <u>Specific List of Equipment</u>

(a)    The facility shall comprise the scope of items required for the safe and efficient commercial operation as listed below.

1.5.1    <u>Diesel Generating Set and Auxiliary Equipment</u>

(a)    Each unit is a turbo-charged, compression ignition type diesel generating sets each with turbo charger, exhaust system, control system, protection devices and auxiliary equipment.

(b)    <u>Lube Oil Centrifuge</u>

Lube oil separator with preheater and associate ancillary equipment.

(c)    <u>Cooling System</u>

Radiator system for each diesel engine with pumps, piping and other



63

ancillary equipment.

**(d)    Compressed Air Starting System**

Each diesel engine is provided with individual starting air receiver with piping, valves and gauges.

**(e)    Fuel Service and Buffer Tanks**

Fuel service and buffer tanks comprising two FO service tanks, two IDO service tanks and adequate capacity of buffer tank.

**(f)    Fuel Oil Treatment System**

A fuel oil treatment system with separators, heating system, sludge tanks, drain tank, pipe work and flowmeter.

**(g)    Exhaust Gas Waste Heat Recovery System**

Exhaust gas waste heat recovery boilers together with silencers and auxiliary equipment.

**(h)    Water Treatment Plant and Ancillary Equipment**

    (i)    Softening filter plant

    (ii)    Raw water supply system

    (iii)    Water storage and pumping facilities

    (iv)    Chemical storage tanks and systems

    (v)    Regeneration facilities

**(i)    Sludge Discharge System**

Sludge from the fuel oil system, lubricating oil system and fuel oil treatment plant will be collected in a sludge tank with transfer pumping system.

**(j)    Engine Special Tools**

Special tools for maintenance of diesel engines and other auxiliaries and ancillaries equipment.

**(k)    Engine Spare Parts**

One lot of spare parts for two(2) years commercial operation.





**1.5.2    Electrical Plant and Installations**

(a)    Generator and Associated Equipment

Air-cooled Salient-Pole Generators each of 11kV, 0.80 power factor lagging rating comprising:-

(i)    Generator and Brushless Excitation Systems with Ancillary Equipment.

(ii)    AVR Systems with under and over excitation limiters and compensating signal devices.

(b)    TANESCO 132kV Outdoor Switchgear at Existing Kunduchi Substation

The existing TANESCO 132kV outdoor substation switchyard busbars shall be extended for the connection of the two new 132/33kV interbus transformers incomers feeders.

Single-Bus TANESCO 132kV substation extension of 132kV, 31.5kA 3 seconds rating, comprising of:-

(i)    Two(2) sets of 132kV single-Bus switchgear equipment with SF$_6$ circuit breakers and associated equipment.

(ii)    132kV voltage transformers

(iii)    132kV current transformers

(c)    11kV Indoor Metal Clad Switchgear Located at
Power Station Switchgear Room

11kV single-bus indoor switchgear of 12kV, 630A continuous, 12.5kA 3 second rating comprising of:

(i)    11kV switchgear from generator terminals to generator transformer connections.

(ii)    11kV switchgear with vacuum circuit breakers for 11/0.415kV auxiliary transformer feeders.

(d)    33kV Outdoor Switchgear

33kV single bus outdoor switchgear of 36kV 2500A continuous, 25kA 3 second rating comprising of:

(i)    33kV Switchgear complete with circuit breakers for generator transformer feeders.

(ii)    33kV switchgear complete with circuit breakers for outgoing feeders to 132/33kV interbus transformers.

(iii)  33kV switchgear complete with circuit breaker for bus section.

(iv)  33kV switchgear complete with circuit breakers for station transformers.

(e)  <u>Low Voltage Distribution Board and Auxiliary Motors</u>

415V 3000A 50kA 1 sec LV boards consisting of the following:-

(i)  LV Essential Services switchboard section comprising incoming and outgoing feeders and includes incoming feeder from start-up diesel genset.

(ii)  Three(3) Auxiliary LV Switchboards with motor starters, control, metering and protection devices.

(iii)  Required local motor starter panels.

(iv)  Required auxiliary motors.

(f)  <u>Control, Protection and Metering Panels</u>

(i)  Mimic control/panels for 33/11kV generator transformer circuits

(ii)  Control desk for five(5) engines and generators.

(iii)  Two(2) metering panels for 33kV interbus transformer feeders (to be installed in Central Control Room).

(iv)  Five(5) diesel engines local control panels.

(v)  Five(5) generator AVR panels.

(g)  <u>Data Acquisition and Logging Equipment</u>

(i)  One(1) control and monitoring system capable of monitoring the diesel engines, HV and LV electrical systems and ancillary services. The system shall be fully comprehensive incorporating screen displays for start-up, shut-down, services, trend monitoring, condition monitoring, alarm and event monitoring.

(ii)  Operator VDU display screens (VGA colour monitor) and operators console and necessary furniture.

(iii)  Graphics quality printers.

(iv)  One unit of uninterruptable power supply 240V a.c., 50Hz for the display screens.

(v)  One 24V d.c. power supply system.





(h)    <u>Communication Equipment</u>

    (i)    Telephone network incorporations PABX.

    (ii)    Public address system for normal daily paging inside all buildings and at external operations areas.

    (iii)    Radio paging system to page receivers at any location within the Power Station boundary.

    (iv)    Eight(8) sets of walkie talkie of different frequencies for operation independent of all other communication systems.

    (v)    One communication network for connection to the TANESCO Kunduchi substation SCADA system.

(i)    <u>Interconnection Facility, Power, Auxiliary Power and Control Cables</u>

    (i)    132kV interconnection facility to the TANESCO 132/33kV substation.

    (ii)    33kV and 11kV copper power cables including necessary cable terminations, gland plates and accessories.

    (iii)    415V copper power cables including necessary cable terminations, gland plates and accessories.

    (iv)    Control protection and instrumentation cables.

    (v)    Required cable trays/ladders, ducts, trenches, etc. with supporting steelwork.

(j)    <u>Earthing System, Electrodes and Connections</u>

    (i)    One complete earthing network for Power Station and Power Station equipment, including ancillary equipment, buildings, structures, fences, cable trenches, risers, etc.

    (ii)    One complete earthing network for indoor equipment with ancillary equipment.

    (iii)    Test links and portable earths.

(k)    <u>Transformers and Earthing Resistors</u>

    (i)    Two(2) interbus transformers 132/33kV 80/125MVA, ONAN/ONAF cooling, with on load tap changers.

    (ii)    Generator transformers, 33/11kV ONAN cooling, with off-load tap changers and each rated to match the generator rating.

(iii)  Generator neutral earthing resistor with neutral disconnection switches.

(iv)  Two(2) 33/11kV 2.5/4.0MVA ONAN/ONAF station transformers each of 100% capacity.

(v)  Four(4) 11/0.415kV 2MVA ONAN station auxiliary transformers each rated for 50% of the total unit auxiliary loads.

(vi)  Required ancillary equipment and insulating oil for above transformers.

(vii)  Necessary oil purification works during installation.

(l)  **DC Systems and Batteries**

(i)  D.C. Systems

(ii)  Batteries and battery charger

(iii)  UPS system

### 1.5.3  Engine Room Ventilation System

(a)  Ventilation fans and ancillary equipment

### 1.5.4  Fuel Oil Supply Installations

Power Station Fuel Oil Supply Installation

(a)  Fuel oil storage tanks

(b)  Road tanker unloading facilities and pumping facilities

(c)  Fuel forwarding pumps

### 1.5.5  Chimney Stack

Chimney stack of appropriate height.

### 1.5.6  Black Start Facility

(a)  One(1) black start 415V diesel engine with necessary auxiliaries.

(b)  One(1) engine/generator control panel with control, metering and protection facilities.

(c)  One outgoing ACB and synchronising panel with synchronising facilities.

(d)  One daily fuel service tank with pipework, pumps, valves, gauges and filters.





68

### 1.5.7 Overhead Travelling Crane

One electric overhead travelling crane of sufficient capacity to carry out scheduled maintenance works with crane control system, wire rope slings, etc.

### 1.5.8(a) Civil and Structural Works (General)

- Site preparation

- Buried pipeline excavations, backfilling and road crossings

- Stormwater, sanitary wastewater and industrial wastewater drainage

- Roadworks

- Miscellaneous civil works

- Landscaping

### 1.5.8(b) Civil and Structural Works

- Power house

- Maintenance workshop

- Maintenance bay and unloading bay

- Required ancillary buildings with finishings

- Engine foundations

- Chimney stack foundations

- Indoor and outdoor engine auxiliaries plinths

- Switchgear/control room/store/office

- 132kV and 33kV outdoor switchyard equipment foundations and power transformers plinths

- Fuel and water tank foundations, concrete bund walls and road tanker unloading facility

- Oily water interceptor

- New paved area and car parking

### 1.5.9 Building Mechanical and Electrical Services

    (a)   Building M&E services




    (b)    Internal and external lighting systems, street lighting and small power installation

    (c)    Building ventilation system

    (d)    Air conditioning system for offices and Central Control Room.

### 1.5.10 Fire Protection Systems

    (a)    Mechanical fire protection installations, including transformer deluge system, $CO_2$ system, hydrants, fixed hose reels.

    (b)    Electrical fire protection systems including fire alarm system, detection systems, smoke alarms, call points and heat sensor.

    (c)    Portable fire extinguishes.

    (d)    Foam for tank farm.

### 1.5.11 Noise Attenuation and Acoustic Treatment (If Required)

    (a)    Acoustic treatment for power station building

    (b)    Indoor noise control and attenuation equipment

    (c)    Outdoor noise control and attenuation equipment

    (d)    Acoustic doors

### 1.5.12 Miscellaneous Items

Workshop tools and basic equipment including electric crane.

### 1.5.13 General

All specifications referred to the above are indicative only and may be changed, modified and/or altered as THE SELLER deem fit to carry out the performance requirements. Such changes, modifications and/or alternations shall be mutually agreed with TANESCO.

## 2.0 SITE DESCRIPTION

### 2.1 Location and Access

The proposed power station site is located at Tegeta, approximately 25km north of Dar es Salaam. It lies inland from the coastline and access is by a 1.4km dirt road west, off the main Bogomoyo Road. The site is located less than one(1) km from the TANESCO Kunduchi Substation.





# APPENDIX B

**APPENDIX B**

## PART I : THE REFERENCE TARIFF

### A - ESTABLISHMENT OF THE REFERENCE TARIFF $\overline{VI}$

1.   **Introduction and Definitions**

1.1   This Appendix B shall be read in conjunction with, and is subject to, the provisions of Article V and IV of the Power Purchase Agreement of which this Appendix B is a part. To the extent that any provision of this Appendix B is inconsistent with any provision of Article V and IV, the provision of Article V and IV shall prevail. References to Articles and Sections are to Articles and Sections of this Appendix B. References to Tables and Annexes are to the tables and annexes to this Appendix B.

1.2   Payments to be made to THE SELLER under the Power Purchase Agreement shall be calculated in accordance with Articles V and VI, and adjusted from time to time as provided herein.

1.3   The procedures for the presentation and payment of invoices as set out in Article VI of the Power Purchase Agreement shall apply to all invoices referred to in this Appendix B.

1.4   Definitions

Capitalized terms used and not defined herein are used herein as defined in the Power Purchase Agreement. Without prejudice to the generality of paragraph 1.1, for the purposes of this Appendix B the following words and phrases shall bear the meanings ascribed thereto:

"Customs Duties" :   Has the meaning ascribed thereto in the Implementation Agreement;

"IE" : The Inflation and Exchange Rate Indexation Factor, as calculated pursuant to Section 15;

"Interest Rate" : For the purposes of this schedule means the interest rate and bank charges, after grossing up of withholding taxes, if any, chargeable by the Lenders from time to time.

"Loans" : Means the loans given by any of the Lenders to THE SELLER;

"Reference Date" : 1 January 1995; and

"Reference Tariff" : the Capacity Purchase Price and the Energy Purchase Price for each Contract Year during the Term as each would be computed as of the Reference Date and according to the assumptions stated herein.

2.   **Establishment**

2.1   The reference tariff (the "Reference Tariff") and each component thereof, computed on the basis of the assumptions stated in Appendix H, for each Contract Year during the Term is shown in this Appendix B.

2.2    The actual tariff (the "Tariff") payable in any Billing Period shall be determined by applying the provisions of this Appendix B to the Reference Tariff.

## B - DESCRIPTION OF REFERENCE TARIFF

**3.    Capacity Purchase Price**

The Capacity Purchase Price shall comprise the following components:

3.1    Capital Component as set out in Section 8.1;

3.2    Debt Component as set out in Section 8.2.

**4.    Energy Purchase Price**

The Energy Purchase Price shall comprise the following components:

4.1    The Fuel Cost Component as set out in Section 9.1(a); and

4.2    The Variable Operations and Maintenance Costs Component as set out in Section 9.1(b).

**5.    Supplemental Charges and Tariff**

5.1    Supplemental Charges

In addition to the Capacity Purchase Price and the Energy Purchase Price, THE SELLER shall be entitled to submit an invoice to TANESCO and receive payment for Supplemental Charges, for any Pass-Through Items identified in Section 14.1 that have been incurred in the immediately preceding Month.

5.2    Supplemental Tariff

(a)    If due to a Force Majeure Event or a Change in Law a Supplemental Tariff is due and payable to THE SELLER from TANESCO as provided in Article 5.2 of the Power Purchase Agreement, THE SELLER shall invoice TANESCO for payment of the Supplemental Tariff. When any necessary restoration or modification to the Facility is complete and the Facility has returned to operation, the Supplemental Tariff will be payable to THE SELLER by TANESCO.

(b)    Supplemental Tariff payments will be structured to permit THE SELLER to recover costs of restoration or modification of the Facility over the term of the Power Purchase Agreement and to recover in each Contract Year the cost of any increases in consumable directly attributable to a Change in Law. Any Supplemental Tariff Payment amounts to recover the return on additional equity contributions made in connection with the restoration or modification of the Facility shall be escalable in accordance with Section 13.2(a).

**6.    Change in Assumptions**

If and to the extent that any of the Assumptions in Appendix H shall be or shall become invalid or inapplicable or shall vary, adjustments to the Reference Tariff shall



72



be calculated in accordance with the following provisions:

To the extent that changes in the assumptions set out in Appendix H give rise to variations in expenditure, or withholding tax payable by THE SELLER, such variations in expenditure or such amounts paid by way of withholding tax (net of any tax refunds or rebates received by THE SELLER) shall be Pass-Through Items and, on and after the Commercial Operations Date, shall be reimbursed by an exact payment equal to the relevant variation in expenditure or withholding tax from TANESCO to THE SELLER and vice versa. These changes shall be effected as described in Section 10. Changes in such assumptions occurring prior to the Commercial Operations Date shall earn interest at the Base Lending Rate from the date paid by THE SELLER through the Commercial Operations Date, and shall be recovered through a Supplemental Tariff Payment over the term of the Power Purchase Agreement.

## C - CAPACITY PURCHASE PRICE

**7.    Payment of Capacity Purchase Price**

The Capacity Purchase Price will be payable by TANESCO to THE SELLER for each Capacity Billing Period and each Capacity Billing Period invoice delivered pursuant to Article 6.2 of the Power Purchase Agreement shall include the Capacity Billing Period amounts for the components set out in Section 8 below and all adjustments made thereto from the Reference Tariff in sufficient detail to allow TANESCO to confirm the accuracy of such adjustments.

**8.    Capacity Purchase Price Components**

**8.1    Capital Component**

This component includes the fixed operations and maintenance cost, the insurance cost, the administrative cost and the return on equity, etc. The Capital Component will be escalated in accordance with the procedure in Section 13.

**8.2    Debt Component**

This component covers the debt servicing charges including payments of principal, interest and other fees to THE SELLER's Lenders. This component will decline with the passage of time as the loans related to the Project are repaid and shall be adjusted for Exchange Rate and Interest Rate fluctuation according to Section 13.

## D - ENERGY PURCHASE PRICE

**9.    Energy Purchase Price**

**9.1    Once determined at the time of Financial Close, the components of the Energy Purchase Price shall only be adjusted as specifically provided herein. The Energy Purchase Price comprises of two components, each relating to the energy output of the Facility, as follows:**



73



(a)     Fuel Cost Component

Escalation in Fuel Cost will be provided over the term of the Power Purchase Agreement on the basis of changes in the fuel prices, maintaining the Guaranteed Heat Rate (thermal efficiency) as constant, as stated in Appendix A.

(b)     Variable Operation and Maintenance Costs Component

This component includes the costs of operation and maintenance that are attributable to the operation of the Facility and are recoverable on a per kWh basis. Escalation of the Variable Operation and Maintenance Costs component will be provided over the term of the Power Purchase Agreement as provided in Section 13.1(b).

9.2     Each invoice submitted to TANESCO pursuant to Article 6.1 of the Power Purchase Agreement in respect of the Energy Purchase Price shall include the amount per kWh for the Energy Purchase Price components multiplied by the number of kWh's delivered or deemed delivered by THE SELLER in the Energy Billing Period to which the relevant invoice rates.

## E - SUPPLEMENTAL CHARGES

### 10.     Supplemental Charges

THE SELLER may submit to TANESCO, on a Monthly basis, invoices for Supplemental Charges as THE SELLER shall have incurred in the immediately preceding Month. With respect to the Supplemental Charges invoices may be submitted by THE SELLER to TANESCO at any time after the first Day of the Month following the Month in which any such Supplemental Charges are incurred and shall show the due date to be 14 Days after the delivery of the invoices.

"Pass-Through Items" pursuant to Part III of this Appendix B shall be treated as Supplemental Charges for the purpose of invoicing and payment on the basis of the actual cost or charge incurred by THE SELLER therefor as agreed between the Parties or, failing agreement, as determined by an expert pursuant to Articles 18.2 and 18.3 of the Power Purchase Agreement. Unless otherwise provided in Section 14, THE SELLER shall present an invoice to TANESCO for a Pass-Through Item on the first Day of the Month following the Month in which the cost, charge, or other liability was incurred by THE SELLER and shall show the due date of the invoice to be 14 Days after its delivery.





74

## PART II : INDEXATION/ADJUSTMENT PROVISIONS

**11.    Indexation Factors**

11.1    Pursuant to this Appendix B, certain items as specified herein shall be indexed in accordance with the provisions of this Part II of the Appendix B.

11.2    If, at any time, an index shall be applied under this Part II to any element of the Reference Tariff, either Party may seek to verify the application of the relevant index and may require the other Party, where appropriate, to provide to it calculations, with reasonable supporting information for the application of the relevant index, to enable the Party to verify the result of applying the relevant index to the relevant component of the Reference Tariff.

11.3    The Capital and Debt Components of the Reference Tariff shall be adjusted upward or downward, as appropriate, to reflect changes in the indexation or adjustment formula, as the case may be, according to which each such component is to be indexed or adjusted, as specified below.

**12.    Methodology to be used for Indexation**

Except as provided in Section 12.1 to 12.3, the base date from which all values are to be indexed pursuant to this Appendix B is the Reference Date.

The methodology applicable to the calculation of each of the indices listed below shall be in accordance with this Section 12.

12.1    Fuel Price Factor

The Fuel Price Factor is the index to be used to calculate variations in those elements of the Fuel Cost Component or the Supplemental Charges with respect to variations in the price per tonne as established pursuant to the Fuel Supply Contract at any date "p", and is calculated as follows:

$$\text{Fuel Price Factor} = \text{Fuel Price}_p \div \text{Fuel Price}_{REF}$$

where:

Fuel Price$_p$ = the price per tonne of fuel as established pursuant to the Fuel Supply Contract (after correction for standard temperature and expressed in Shillings), at date "p", and

Fuel Price$_{REF}$ = USD2.50 per MMBTU (after correction for standard temperature and expressed in Dollars).

If the Fuel is fuel oil, in calculating the price of fuel oil, the accounting convention of first-in/first-out shall be employed.

The Fuel Price Factor shall be applied to those elements stated to be subject to indexation for Fuel Price from the date when the price of fuel as established pursuant to the Fuel Supply Contract is changed.





12.2    **Inflation and Exchange Rate Indexation Factors**

The elements of the Tariff stated to be subject to indexation for inflation and
exchange rate movements in Section 15 below shall be adjusted with effect from the
Reference Date in accordance with the Inflation and Exchange Rate Indexation
Factors (as defined in Section 15) on the Commercial Operations Date and on each
1 January and 1 July thereafter using the most current exchange rate and inflation rate
information available on the date. No retroactive adjustments will be permitted in the
event that an index figure is subsequently revised. The adjusted Tariff payable to
THE SELLER in any Period, p, will be calculated by multiplying the Reference
Tariff elements subject to indexation for inflation and exchange rate movements by
the Inflation and Exchange Rate Factors from the Reference Date through the
calculation date, t, immediately preceding Period, p.

12.3    **Inflation Factors**

The source indices for the calculation of the impact of inflation shall be the Consumer
Price Index (IFS CPI), reported in the publication of the International Monetary Fund
entitled "International Financial Statistics" for the USA and Tanzania.

12.4    **Exchange Rates**

The source for exchange rates for the Foreign Currencies against Shillings shall be
the quotation by the Bank of Tanzania in the most recently published Exchange Rates
Bulletin issued by the Foreign Exchange Rates Committee of the Authorised Dealers'
Spot T.T & O.D Selling Rate (as defined in the Bank of Tanzania Exchange Control
Manual)

12.5    **Replacement of the Index**

In this Appendix B, where an element is stated to be subject to indexation by
reference to a specified index or factor and at any time such index is withdrawn,
becomes unavailable for any reason or becomes, in the reasonable opinion of
TANESCO or THE SELLER, inappropriate as a basis for indexation pursuant to this
Appendix, then upon written notice from either Party, TANESCO and THE SELLER
shall use their best endeavours to identify a mutually acceptable alternative index.

If after fourteen (14) Days the Parties are unable to agree on an alternative index to
be substituted for the index that requires replacement pursuant to this Section 12.5,
the Parties shall appoint an expert pursuant to Article 18.1 of the Power Purchase
Agreement who shall nominate an index that in his sole opinion most adequately
replaces the withdrawn, unavailable, or inappropriate index within fourteen (14) Days
after his appointment. The Parties shall be bound by the determination of the expert
as to the alternative index.

Pending the substitution of an alternative index, no indexation adjustment shall be
made with respect to the relevant index. Upon the substitution of an alternative index,
the Parties shall make the indexation adjustment with the alternative index
retrospectively to the date when the relevant adjustment would otherwise have been
made.

13.    **Application of Indices to Variables**

All of the Capital and Debt Components of the Tariff shall be indexed in accordance
with the formulae set out in this Section 13.



76



13.1    Energy Purchase Price

(a)    The Fuel Cost Component ("FCC") of the Energy Purchase Price.

Variations to the FCC shall be calculated as provided in the following formula with respect to the components shown and as at the times indicated in Sections 13.1 to 13.2 for each of the Fuel Price Factor.

$$FCC_c = FCC_{(REF)} * \text{Fuel Price Factor,}$$

where :

$FCC_c$    =    the Fuel Cost Component on the relevant calculation date, c

$FCC_{(REF)}$    =    the value for FCC for the relevant Contract Year given in Table 1.

Fuel Price Factor has the meaning set out in Section 12.1.

(b)    Variable Operations and Maintenance Component

This component is directly escalable against exchange rate variations of Shillings to Dollars and US inflation rate. For determining the Exchange Rate. Bank of Tanzania's TT&OD selling rate will apply. For determining the inflation rate the Consumer Price Index (CPI) of the United States of America as published by the International Monetary Fund (IMF) in the International Financial Statistics (IFS) will be applied.

The base date for application of indexation will be the Reference Date. The indexation will apply prospectively on the Commercial Operations Date and on each 1 January and 1 July thereafter.

The variable operations and maintenance costs element shall be indexed as follows:

$$O\&M_c = O\&M_{(REF)} * IE_t$$

where :

$O\&M_c$    =    the value of the Variable Operations and Maintenance Component of the Tariff per kWh as adjusted at the relevant calculation date, c,

$O\&M_{(REF)}$    =    the value of the Variable Operations and Maintenance Costs Component of the Reference Tariff per kWh in the relevant Contract Year, as shown in Table 1, and

$IE_t$    =    the value of the Indexation and Exchange Rate factor ("IE") as calculated in Section 15 at the indexation date, t, immediately preceding the calculation date.

77

### 13.2 Capacity Purchase Price

(a)   Capital Component

The Capital Component ("CC") of the Capacity Purchase Price is directly escalable against exchange rate variations of Shillings to USD and US inflation rate. For determining the Exchange Rate, Bank of Tanzania's TT&OD selling rate will apply. For determining the inflation rate the Consumer Price Index (CPI) of the United States of America as published by the International Monetary Fund (IMF) in the International Financial Statistics (IFS) will be applied.

The base date for application of indexation will be the Reference Date. The indexation will apply prospectively on the Commercial Operations Date of the first Unit and on each 1 January and 1 July thereafter.

The Capital Component of the Capacity Purchase Price shall be indexed as follows:

$$CC_c = CC_{(REF)} * IE_t$$

where :

$CC_c$        =    the value of the Capital Component of the Tariff, as adjusted at the relevant calculation date, c,

$CC_{(REF)}$   =    the value of the Capital Component of the Reference Tariff in the relevant Contract Year, as shown in Table 1, and

$IE_t$        =    the value of the Indexation and Exchange Rate Factor ("IE") as calculated in Section 15 at the indexation date, t, immediately preceding the calculation date.

(b)   Debt Component

(i)   The Debt Component of the Capacity Purchase Price will be adjusted at the Financial Close, for variation in exchange rates of Shillings to Dollar, using a base value of the exchange rate of the Dollar against the Shilling at the Reference Date. The adjustment factor this component will be equal to 1% for each 1% variation in Dollar to Shillings exchange rate.

The Debt Component ("DC") of the Capacity Purchase Price is directly escalable against exchange rate variations of Shillings to Dollar. For determining the Exchange Rate, Bank of Tanzania's TT&OD selling rate will apply.

The base date for application of indexation will be the Reference Date. The indexation will apply prospectively on the Commercial Operations Date of the first Unit and on each 1 January and 1 July thereafter.





78

The Debt Component of the Capacity Purchase Price shall be indexed as follows:-

$$DC_c = DC_{(REF)} * IE_t$$

$DC_c$ = the value of the Debt Component of the Tariff, as adjusted at the relevant calculation date, c,

$DC_{(REF)}$ = the value of the Debt Component of the Reference Tariff in the relevant Contract Year, as shown in Table 1, and

$IE_t$ = the value of the Exchange Rate Factor ("IEfx") as calculated in Section 15 at the indexation date, t, immediately preceding the calculation date.

(ii)   The provisions of this schedule shall apply if at any time the Interest Rate shall exceed $(X+0.5)\%$ per annum or shall be less than $(X-0.5)\%$ per annum. X is the sum of (a) 10.94% per annum (the assumed interest rate applicable under the Financing Documents and used to determine the Reference Tariff as set out in Table 1) and (b) any applicable withholding tax.

(A)   <u>Increase in Interest Rate</u>

If at any time the Interest Rate shall exceed $(x+0.5)\%$ per annum. then for each month there shall be calculated an additional sum payable by TANESCO to THE SELLER (the "Interest Rate Payment") in accordance with the following formula:-

$$A = B - C$$

where:

$A$ = the Interest Rate Payment (expressed in USD);

$B$ = the amount of interest which would have accrued in respect of the Loans during that month at the Interest Rate; and

$C$ = the amount of interest which would have accrued in respect of the Loans during that month at an interest rate of $(x+0.5)\%$ per annum.

(B)   <u>Decrease in Interest Rate</u>

If at any time the Interest Rate shall be less than $(x-0.5)\%$ per annum, then for each month there shall be calculated a sum to be paid or credited by THE SELLER to TANESCO (the "Interest Rate Reimbursement") in accordance with the following formula:-



79



$$A = B - C$$

where :

A =      the Interest Rate Reimbursement (expressed in USD);

B =      the amount of interest which would have accrued in respect of the Loans during that month at an interest rate of $(x-0.5)\%$ per annum; and

C =      the amount of interest which would have accrued in respect of the Loans during that month at the Interest Rate.

(iii)    General

If in any month there shall be one or more changes in the Interest Rate during that month the calculations in Section 13.2(b)(ii)A or (as the case may be) Section 13.2(b)(ii)B shall be carried out for each period in the Billing Period pertaining to a particular Interest Rate Payment or (as the case may be) Interest Rate Reimbursement for that month shall be the sum of the product of each such calculation.

A and C in each of Section 13.2(b)(ii)A and 13.2(b)(ii)B shall be determined by the Lender's certificate signed by an authorised officer of the Lenders, whose determination shall be final, conclusive and binding in the absence of manifest error.



80



## PART III: PASS-THROUGH ITEMS

**14.    Items Payable on the Basis of Actual Cost**

14.1    The items contained in this Part III of this Appendix B to the extent attributable to the Project ("Pass-Through Items") shall be payable by TANESCO to THE SELLER on the basis of the actual cost incurred by THE SELLER, and shall be invoiced by THE SELLER and paid by TANESCO as Supplemental Charges. Unless otherwise provided in this Appendix B, THE SELLER shall invoice TANESCO for obligations incurred by THE SELLER with respect to such Pass-Through Items at such time as THE SELLER incurs the liability for such Pass-Through Item, and any invoice presented by THE SELLER to TANESCO for these purposes shall show the due date of such invoice to be 14 Days after the delivery of the invoice to TANESCO. TANESCO shall pay any such invoice in accordance with Article VI of the Power Purchase Agreement.

14.2    Pass-Through Items

The costs and charges constituting Pass-Through Items hereunder shall be :

(a)    payments into workers' welfare fund;

(b)    reasonable costs approved by TANESCO incurred by THE SELLER after Commercial Operations Date for modifications or expansion of the requirements for protective devices required by TANESCO;

(c)    those taxes and duties referred to in Appendix H; and

(d)    any other taxes or duties not listed in Appendix H, coming into effect during the term of this Agreement.

(e)    additional insurance costs pursuant to Article 14.2(b) of the Power Purchase Agreement.

81



## PART IV : ADJUSTMENT FORMULAE

**15** **Calculation of Inflation and Exchange Rate Factors**

15.1 The Inflation and Exchange Rate Indexation Factors for adjustment as at the Commercial Operations Date and every 1 January and 1 July thereafter are as follows:

$$IE_t = \frac{P_{(US)t}}{P_{(RD)}} * \frac{FX_{(US/T)t}}{FX_{(RD)}}$$

<span style="font-style:italic">current / Reference Date    see (15.6)</span>

where:

$IE_t$    =    the Inflation and Exchange Rate Indexation Factor applicable for the Period following date of calculation, t.

$P_{(US)t}$    =    the average value of the end of Month values for the IFS CPI index for the United States over the six months immediately prior to the date of calculation; provided that if values for any of the months are not available, then the average of the values of the most recent six months for which figures are available shall be used.

$P_{(RD)}$    =    the value of the IFS CPI index for the United States at the Reference Date.

$FX_{(US/T)t}$    =    the average exchange rate of the Dollar against the Shillings over the six months prior to the date of calculation. This average will be calculated as the sum of the exchange rates (as described in Section 12.5) for each of the last days of the six months prior to date of calculation divided by six.

$FX_{(RD)}$    =    the exchange rate of the Dollar against the Shillings at the Reference Date.





82

15.2  The Exchange Rate Indexation Factors for adjustment as at the Commercial Operations Date and avery 1 January and 1 July thereafter are as follows:

$$IE_{fx} = \frac{FX_{(US/Tx)}}{FX_{(RD)}}$$

where:

IE$_{fx}$  =  the Inflation and Exchange Rate Indexation Factor applicable for the Period following date of calculation.

FX$_{(US/Tx)}$  =  the average exchange rate of the Dollar against the Shillings over the six months prior to the date of calculation. This average will be calculated as the sum of the exchange rates (as described in Section 12.5) for each of the last days of the six months prior to date of calculation divided by six.

FX$_{(RD)}$  =  the exchange rate of the Dollar against the Shillings at the Reference Date.



83





**Table 1**

**REFERENCE TARIFF**



| Contract Year | Capital Component (USD/kW/Month) | Debt Component (USD/kW/Month) | Capacity Purchase Price (USD/kW/Month) | Fuel Cost Component (US cents/kWh) | Variable Operations and Maintenance Component (US cents/kWh) | Energy Purchase Price (US cents/kWh) |
|---|---|---|---|---|---|---|
| 1 | 17.44 | 24.43 | 41.88 | 2.23 | 1.02 | 3.25 |
| 2 | 17.96 | 23.91 | 41.88 | 2.23 | 1.02 | 3.25 |
| 3 | 18.59 | 23.28 | 41.88 | 2.23 | 1.02 | 3.25 |
| 4 | 19.33 | 22.55 | 41.88 | 2.23 | 1.02 | 3.25 |
| 5 | 20.17 | 21.71 | 41.88 | 2.23 | 1.02 | 3.25 |
| 6 | 24.50 | 17.37 | 41.88 | 2.23 | 1.02 | 3.25 |
| 7 | 36.31 | 5.57 | 41.88 | 2.23 | 1.02 | 3.25 |
| 8 | 41.88 | 0 | 41.88 | 2.23 | 1.02 | 3.25 |
| 9 | 41.88 | 0 | 41.88 | 2.23 | 1.02 | 3.25 |
| 10 | 41.88 | 0 | 41.88 | 2.23 | 1.02 | 3.25 |
| 11 | 41.88 | 0 | 41.88 | 2.23 | 1.02 | 3.25 |
| 12 | 41.88 | 0 | 41.88 | 2.23 | 1.02 | 3.25 |
| 13 | 41.88 | 0 | 41.88 | 2.23 | 1.02 | 3.25 |
| 14 | 41.88 | 0 | 41.88 | 2.23 | 1.02 | 3.25 |
| 15 | 41.88 | 0 | 41.88 | 2.23 | 1.02 | 3.25 |
| 16 | 41.88 | 0 | 41.88 | 2.23 | 1.02 | 3.25 |
| 17 | 41.88 | 0 | 41.88 | 2.23 | 1.02 | 3.25 |
| 18 | 41.88 | 0 | 41.88 | 2.23 | 1.02 | 3.25 |
| 19 | 41.88 | 0 | 41.88 | 2.23 | 1.02 | 3.25 |
| 20 | 41.88 | 0 | 41.88 | 2.23 | 1.02 | 3.25 |





# APPENDIX C

## APPENDIX C

## PERFORMANCE STANDARDS

### 1.0    INTRODUCTION

A.    Parallel operation of the Facility on the TANESCO System requires that TANESCO and THE SELLER meet certain minimum requirements for performance, operation and safety. While the specific circumstances of each of the Facility's installation must be taken into account, this document attempts to describe minimum design requirements so that THE SELLER will be guided by this document when planning such an installation. It is stressed that the proper coordination between THE SELLER owned generation system and the TANESCO System should be reviewed early in the design stage. TANESCO's personnel will work closely with THE SELLER, from an early stage of the project, to ensure that these guidelines are met.

B.    The Facility must adhere to all applicable national and local codes, rules and regulations as well as Prudent Utility Practices in connection with the design, construction, operation and maintenance of the Facility.

### 2.0    FACILITY PERFORMANCE STANDARDS

### 2.1    <u>Facility Design Features</u>

The Facility should have the following features :-

A.    **Protection System** - The Facility should have sufficient protection systems to prevent or limit damage to its generation and auxiliary equipment. The protection systems should provide for contingencies both within and external to the Facility.

THE SELLER shall ensure that the Facility's protective apparatus are in service whenever the Facility is connected to or is operated in parallel with the TANESCO System. Any deviation for brief periods of time for an emergency or maintenance shall be by mutual agreement only.

B.    **Black Start** - THE SELLER is to have start capabilities to cater for Emergency Conditions.

C.    **Quality of Service** - The interconnection of the Facility with the TANESCO System shall not cause any reduction in the quality of service which TANESCO provides to other customers.

D.    **Power Factor** - The power factor as measured at the Interconnection Point, must be within the capability of the generators.

### 3.0    MISCELLANEOUS

### 3.1    <u>General Protection System</u>

A.    Protective, devices at the Interconnection Point between THE SELLER's Facility and the TANESCO System shall be provided by THE SELLER. The

85



protection of the Facility beyond the Interconnecting Points belonging to THE SELLER is the sole responsibility of THE SELLER, provided that the design shall conform with Prudent Utility Practices.

B.     If underfrequency relays are used, the generator under frequency trip setting should not be before the TANESCO last stage of load shedding relay setting. These underfrequency relays should be compatible with load shedding scheme of TANESCO within the allowable underfrequency range of proposed diesel generator set. Occurrences outside of the range 48.5 Hz shall be limited in the lifetime of the prime mover.

C.     The protection applied at the Interconnection Point shall be designed to separate the Facility from the TANESCO System for the following conditions:-

    1)     For faults or other disturbances on the system within the zone of protection encompassing the Interconnection Point which produce infeed from THE SELLER's generation equipment into the fault.

    2)     For faults or other disturbances on the Facility.

D.     Sufficient redundancy must be included in the protection system so that failure of any single component in the protection system or communication channel that form part of the protection system, will not prevent proper isolation of faults from the system within the required time.

E.     Protection schemes and equipment for the Interconnection Facilities must be consistent and compatible with the TANESCO local system configuration and existing protection schemes.

F.     All protection relay settings calculations and coordination for the interconnector will be done by TANESCO. THE SELLER shall supply TANESCO with all pertinent data to allow setting of the relays.

    Protection and relay settings for the other equipment at the Interconnection Point shall be done by THE SELLER and shall be coordinated to ensure effective disconnection of faulty equipment. The settings must be approved by TANESCO.

G.     The initial check out and commissioning of all the protection schemes and equipment at the Interconnection Point must be witnessed, agreed upon and approved by TANESCO.

H.     TANESCO reserves the right to inspect, at any time, all the protective equipment including relays and circuit breakers at the Interconnection Point.

I.     For all tripping involving the interconnection circuit breakers, an investigation to determine the cause of the relay operation will be carried out and coordinated between TANESCO and THE SELLER. Where tripping at the Facility, including the Interconnection Point, contribute major disturbances to the TANESCO System, a joint investigation by TANESCO and THE SELLER shall also be done.

J.     Maintenance on the protection equipment at the Interconnection Point shall be coordinated between TANESCO and THE SELLER. Maintenance test procedures shall be consistent with maintenance standard of TANESCO.

K.    The requirements for the provision of protection equipment for the Interconnection Facilities will be specified by TANESCO during the design stage.



## APPENDIX D

## ENERGY ACCOUNTING AND METERING EQUIPMENT

1.0    **ENERGY ACCOUNTING**

1.1    <u>Metering Location & Arrangement</u>

The net electrical output (kW & kWh) delivered to TANESCO shall be measured by metering devices. The meter locations delivered to TANESCO shall be at Interconnection Point.

A summated energy reading (kWh) for both Interconnection points shall be provided at the metering location via programmable telecounting units specified in Section 3.0 herein.

1.2    <u>Metering Equipment</u>

The meters and metering transformers shall be in accordance with TANESCO's specifications. THE SELLER shall supply and install and TANESCO shall maintain the meters, backup and related equipment to be utilized for the measurement of electric power and energy in determining TANESCO's payments to THE SELLER. The meters shall be sealed and the seals shall be broken by TANESCO in the presence of THE SELLER's personnel when the meters are to be inspected, tested or adjusted.

2.0    **METERING EQUIPMENT**

2.1    <u>Scope</u>

Revenue metering and the associated custody transfer information system for generation power purchases as specified in this Appendix shall be supplied and installed by THE SELLER.

The metering system shall consist of one main and one back-up system which shall have the same configuration.

2.2    Current transformers ("CT") and voltage transformers ("VT") shall be furnished and installed by THE SELLER as close as possible to the Interconnection Point.

2.3    The metering devices and software required to operate the full metering system has the follow features:-

1.    <u>kWh and kVarh METERS</u>

| | | |
|---|---|---|
| Accuracy Class | : | 0.2 |
| Quantity | : | Two (2) for each circuit, one (1) each for the main and back-up system. |

**Features**

(i)    3 phase 4 wire type and operate in the positive phase sequence i.e. R-Y-B.

(ii)    The meter ratio shall follow the CT and VT ratio accordingly.

(iii)   Bi-directional with two indicators, one indicating import and the other export of energy flow.

(iv)    Minimum of two independent output contacts per energy direction for energy value pulses.

(v)     The mounting shall be of the flush type with terminal blocks for wiring connections.

## 2.    TELECOUNTING UNITS

Quantity                 :      Two (2), one (1) each for the main and back-up system.

### Programmable Features

i)      CT and VT ratio normalisation.

ii)     Time of use energy calculations.

iii)    Time of use maximum demand calculations.

iv)     Summation of all inputs or any chosen sub-totals.

v)      KVAh calculations.

vi)     Power factor calculations.

vii)    Import/Export calculations.

### Hardware Features

i)      Internal timing as well as synchronisation.

ii)     Printing function (built in modular printer).

iii)    Retransmitting output contacts for input, results, timing, signals and tariff signals.

iv)     Communication facilities to transfer metering data to a data logging station within the Facility.

v)      RS 232 serial port for retrieval of data for IBM compatible PC.

vi)     Datacard for storage of required data for load profiling.

## 3.    TELECOUNTING UNIT PROGRAMMING SOFTWARE

### Features

i)      Programming of the parameters of telecounting unit.





89

ii)    Extracting/loading parameter data from/to telecounting unit with an IBM PC computer.

4.    ## CUSTODY TRANSFER METERING INFORMATION SYSTEM

THE SELLER shall supply and install a main and back-up meter information system. TANESCO shall maintain custody of the systems which shall be required for determining parameters for use in calculating TANESCO's payment to THE SELLER.

A marshalling cubicle shall be provided for the CT and VT connections complete with terminal blocks and fuses. The cubicle shall be sealed by TANESCO.

All the cables, cable routing, marshalling cubicle, metering panel, and related metering accessories such as fuses and terminal blocks shall be provided by THE SELLER.

The final metering setup shall be agreed upon by TANESCO prior to actual installation.



## APPENDIX E

## INTERCONNECTION AND COMMUNICATION

### 1.0    INTERCONNECTION FACILITIES

#### 1.1    Coordination and Planning

A.    THE SELLER shall submit to TANESCO a Facility Site plan indicating component layout and a one-line electrical diagram of the Facility. This diagram should include the generating plant and associated equipment and the proposed Interconnection Facilities.

B.    An Interconnecting Facility conceptual plan will be prepared jointly by TANESCO and THE SELLER. This plan will conform to TANESCO's planning and operating reliability criteria, construction standards and practices, guidelines on the TANESCO Supply Rules, Technical Instructions and System Operations Instructions, and any other applicable codes.

C.    Design, purchase and installation of the Interconnection Facilities shall be in accordance with the Interconnection Facilities plan.

#### 1.2    Design Criteria

A.    The interconnection facilities shall be designed to provide effective and reliable operation under all reasonably expected system conditions.

B.    TANESCO shall have the right to review the design of the Interconnection Facilities to ensure that the reliability of electric service being provided by the Interconnection will be adequate.

C.    The design of the Interconnection Facilities shall be capable of operation over the Facility's normal operating range, voltage, stability and loading limits. The capability of the Interconnecting Facility must be consistent with the Interconnecting Facilities plan.

D.    If TANESCO wishes to inspect the Interconnection Facilities before they are placed in service, TANESCO shall give sufficient notice to THE SELLER. THE SELLER shall notify TANESCO at least 30 days before initial energisation.

#### 1.3    Operation and Maintenance

A.    Once the Interconnection Facilities are placed in service, TANESCO may wish to regularly inspect the facilities owned, operated, and maintained by THE SELLER to ensure they are being operated safely and reliably.

B.    In the event the Facility ceases to operate, TANESCO shall be allowed to continue to use those components of the Interconnection Facility that are required for reliable operation of the TANESCO's System.

C.    Operation of the intertie and/or synchronizing circuit breaker shall be restricted to specific direction of the TANESCO's Load Despatch Centre, except for automatic tripping operation resulting from protective systems. Procedures governing operation of these breakers shall be developed by TANESCO/THE SELLER Operations Committee.



### 1.4  Ownership

Not less than 30 days prior to the Initial Operations Date the SELLER will provide TANESCO with a design drawing specifying and demarking the portion of the interconnection facilities to be transferred to TANESCO.

## 2.0  COMMUNICATIONS REQUIREMENT

The following communication equipment is to be provided and maintained by THE SELLER.

### 2.1  Telecommunication Equipment

Communication channels are required to be installed and maintained between the TANESCO's Grid Control Centre and the Facility. The following comprises the minimum requirements for communications links between the Facility and the TANESCO's Grid Control Centre:

i)   a dedicated telephone link to the TANESCO's Grid Control Centre from the Facility.

ii)  a dial-up facsimile system at both the Facility and TANESCO's Grid Control Centre.

The availability of power line carrier facilities in the TANESCO Kunduchi substation nearby permits the use of facilities for telecommunication and load despatching. It is proposed that the power line carrier facilities be extended from the TANESCO substation to the Facility via an extension of the current facilities. The extension should incorporate two frequency bands; one for voice communication and the other for facsimile which would serve to record load despatching instructions in writing. For reliability, two external communication (exchange) lines from the PABX shall be allocated as back-up between the Facility and TANESCO's Grid Control Centre for the purpose of voice and facsimile communication.





92

## APPENDIX F

## FUEL SPECIFICATIONS

Not less than 30 days after the execution of the Fuel Supply Contract, the SELLER shall provide TANESCO the Fuel specifications of such the main Fuel as to be supplied under the Fuel Supply Contract to operate the diesel engine.



93



## APPENDIX G

## ELECTRICITY CHARACTERISTIC

1.  Three Phase Alternating Current

2.  Frequency
    Nominal Declared          50.0Hz  ± 1.0%

3.  Voltage at Interconnection Point
    Operating Limits          ± 10.0% of nominal voltage

94



## APPENDIX H

## TAX ASSUMPTIONS

The Capacity Purchase Price and the Energy Purchase Price for this project has been calculated using the assumptions set forth below.

### 1.0    IMPORT DUTY

| Items | Rate(%) |
|---|---|
| Machinery, Equipment, spare parts and supplies | 0.0 |
| Fuel Oil | 0.0 |
| Lubrication oil | 0.0 |

### 2.0    EXCISE DUTY

| Items | Rate(%) |
|---|---|
| Fuel Oil | 0.0 |
| Lubrication Oil | 0.0 |

### 3.0    SALES TAX

| Items | Rate(%) |
|---|---|
| Machinery, Equipment, spare parts and supplies | 0.0 |
| Fuel Oil | 0.0 |
| Lubrication Oil | 0.0 |

### 4.0    CORPORATE INCOME TAX

| Commercial Operation Year | Rate(%) |
|---|---|
| One to five | 0.0 |
| Six to twenty | 35.0 |



**5.0    WITHHOLDING TAX**

| <u>Withholding Tax on Dividends</u> | <u>Rate(%)</u> |
|---|---|
| Commercial operations year one to five | 0.0 |
| Commercial operations year six to twenty | 20.0 |

| <u>Withholding Tax on Interest on Foreign Loan</u> | <u>Rate(%)</u> |
|---|---|
| Commercial operations year one to five | 0.0 |
| Commercial operations year six to twenty | 20.0 |

**6.0    CAPITAL ALLOWANCE (TAX DEPRECIATION)**

| <u>Items</u> | <u>Rate(%)</u> |
|---|---|
| Utility Equipment | 12.5 annual |
| Industrial buildings | 4.0  annual |

**7.0    ENVIRONMENTAL TAX** rate assumed at          0.0%





96

**Exhibit A, PART 4 to Declaration of Sazi B. Salula**

**APPENDIX I**

**TESTING PROCEDURES FOR DETERMINING NET CAPACITY**

The quidelines set forth in this Appendix I shall be subject to revision, which may be made from time to time to the guidelines as mutually agreed by the Parties.

1.0    **GUIDELINES**

1.1    The Net Capacity of the Facility is the quantity of kilowatts of electric power which can be delivered on a continuous rating basis by the Facility as measured at the relevant Interconnection Points, without restriction, under the conditions and criteria specified herein.

1.2    During the performance of any test of the Facility, the Facility shall be operated (i) within the Operating Limits in accordance with Prudent Utility Practices, (ii) with all normal auxiliaries in service, and (iii) in compliance with all applicable Laws.

1.3    When the Dependable Capacity of the Facility can meet continuous despatch by the TANESCO's Grid Control Centre, it shall be considered for purposes of calculating the availability of the Facility.

1.4    The Dependable Capacity of the Facility shall be made available to TANESCO without restriction. "Without restriction" means that the values of Dependable Capacity so declared are available for use at the request of TANESCO for the supply of generating capacity and electric energy during the declared period.

1.5    The Dependable Capacity shall be used as the reference for determining the occurrence of Forced Outages, Scheduled Outages and Maintenance Outages, and for determining the Derated Hours and Equivalent Derated Hours.

1.6    The Net Capacity and the Dependable Capacity shall be based and referenced on the following conditions (the "Site Conditions") :

| | | |
|---|---|---|
| - | Ambient Air Temperature | 33deg C Dry bulb |
| - | Atmospheric Pressure | 1013 mbar |
| - | Ambient Relative Humidity | 85 % |
| - | Power Factor Level | 0.85 lagging |
| - | Facility Site Altitude | 28m above MSL |

The actual power factor during tests shall be within the range of 0.85 lagging to unity power factor. The frequency shall be within the normal frequency range of 49.5 Hz to 50.5 Hz.

97

## 2.0    TESTING PROCEDURE

2.1    The periods for the annual test specified in Article 9.2(a) of this Agreement are as follows (or as otherwise agreed)

Test Period : March, April or May

Such annual test shall be performed as early as possible in the relevant period to allow time for repair and retesting if required.

Subject to the requirements of this Agreement, including paragraph 2.3 below, all other tests specified in Article 9.2 of this Agreement may be carried out at any time.

2.2    Upon completion of any test contemplated under Article 9.2 of this Agreement, THE SELLER shall notify TANESCO and the TANESCO's Grid Control Centre within 24 hours of its acceptance or rejection of such test. If THE SELLER accepts such test, THE SELLER shall include in such notification a declaration of the Dependable Capacity of the Facility, which may be set at any level up to the Net Capacity of such Facility. If THE SELLER rejects such test, THE SELLER may request additional tests. THE SELLER may request such additional tests upon 24 hours' notice the TANESCO's Grid Control Centre. Upon completion of each additional test, if any, THE SELLER shall notify the TANESCO's Grid Control Centre within 24 hours of its acceptance or rejection of such additional tests. If THE SELLER accepts the additional tests, THE SELLER shall include in such notification a declaration of the Dependable Capacity of such Facility, which may be set any level up to the Net Capacity achieved during such additional test.

2.3    Subject to Article 9.2(b) of this Agreement and the requirements specified in paragraph 2.1 and 2.2 above, THE SELLER and TANESCO shall mutually agree on when testing will take place. THE SELLER shall allow TANESCO representatives to witness the test pursuant to Section 2.1 herein. TANESCO representatives shall upon prior notice have access to the Facility Site and shall be allowed to review the test data.

2.4    Prior to each test, THE SELLER, TANESCO and the TANESCO's Grid Control Centre shall agree on the technical content of a "Capacity Verification Report".

2.5    Prior to each test, THE SELLER and the TANESCO's Grid Control Centre shall agree on the data which relate to the unit electric energy output on Site Conditions.

2.6    Site Conditions existing during any test shall be recorded and used to adjust the net generating capacity of the relevant Facility (in MW) recorded to the Site Conditions.

2.7    Prior to each test, THE SELLER, TANESCO and the TANESCO's Grid Control Centre shall agree on the duration of such test and the operating procedures to be followed.

98

2.8    For each test, the Unit of the Facility shall be operated at its Net Capacity according to internationally accepted standards (ISO 3046/1) for continuous operation, but in no case less than one hour or until steady state condition as otherwise agreed.

2.9    The Net Capacity of the Facility shall be determined as the average kilowatts of electric power measured by the TANESCO owned metering equipment during the test period.

2.10    The meters to be used for testing shall be the TANESCO owned metering equipment.

2.11    All tests shall be conducted in accordance with Prudent Utility Practices and this Appendix I. The Parties shall mutually agree upon an internationally acceptable performance test codes to be adopted for the tests.





99

RH
Wer Kulg

# Implementation Agreement

19 - Termination
20 - Rts Upon Termination

THIS IMPLEMENTATION AGREEMENT (the "Agreement") is made at Dar es Salaam, United Republic of Tanzania as of 8th day of June 1995:

**BETWEEN**

(1)     THE GOVERNMENT OF THE UNITED REPUBLIC OF TANZANIA acting through its Ministry of Water, Energy and Minerals (hereinafter referred to as the "GOT") of the one part; and

(2)     Independent Power Tanzania Ltd, a limited liability company incorporated under the laws of Tanzania whose registered office is located at 5th Floor, Extelcoms House, Samora Avenue, P O Box 1461, Dar-es-Salaam, Tanzania (hereinafter referred to as the "Company") of the other part.

**WHEREAS:**

(1)     The GOT as a matter of policy has decided to involve the private sector in the generation of electricity for  sale to the national grid.

(2)     Consistent with the GOT's policy and guidelines, the Company has proposed to design, insure, finance, acquire, construct, complete, own, operate and maintain an electric power plant (the "Facility") at Tageta, Dar es Salaam, Tanzania, to supply electric power to the Tanzania Electric Supply Company Limited ("TANESCO")

(3)     Simultaneously herewith, the Company is entering into a Power Purchase Agreement with TANESCO.

(4)     The GOT and the Company are entering into this Agreement so that the Company's proposal to build the Facility may be implemented in a manner that reflects the close cooperation between the public and private sectors in the generation of electricity for sale on the national grid.

NOW THEREFORE, IT IS HEREBY AGREED as follows:

## ARTICLE I

### DEFINITIONS

"Bank of Tanzania" means the Central Bank of the United Republic of Tanzania and its successors.

"Contract Year" bears the meaning attributable thereto in the Power Purchase Agreement.

"Change In Law" means (a) the adoption, promulgation, or modification after the date of this Agreement by any Governmental Authority of any Law of Tanzania, or (b) the imposition by a Governmental Authority of any material condition in connection with the issuance, renewal, extension, replacement or modification of any Consent after the date of this Agreement, that in either case establishes requirements for the operation or maintenance of the Facility that are materially more restrictive than the most restrictive requirements (i) in effects as of the date of this Agreement, (ii) specified in any applications, or other documents filed in connection with such applications, for any Consent filed by the Company on or before the Commercial Operations Date of this Agreement or (iii) agreed to by the Company in any agreement in the Security Package.

"Commencement Date" bears the meaning attributable thereto in the Power Purchase Agreement.

"Commercial Operations Date" bears the meaning attributable thereto in the Power Purchase Agreement.

"Company" means Independent Power Tanzania Ltd, a limited liability company incorporated under the Laws of Tanzania with its principal office located in Dar-es-Salaam, Tanzania and its permitted successors and assigns.

"Consents" means all such approvals, consents, authorisations, notifications, concessions, acknowledgements, agreements, licenses, permits, decisions or similar item required to be obtained from, any Governmental Authority for the Company for the construction, financing, ownership, operation, and maintenance of the Facility.

"Construction Contracts" means contracts entered into between the Company and the Construction Contractor in connection with the design, engineering, procurement, construction, installation, testing, and commissioning of the Facility and the Interconnection Facilities, as amended from time to time.

"Construction Contractor" means the firm or firms retained by the Company to provide services in connection with the design, engineering, procurement, construction, testing and commissioning of the Facility.

"Contractors" means the Construction Contractor and the O&M Contractor and any other direct sub-contractor integrally involved in the Project.

"Customs Duties" includes customs duty levied under the EA Customs and Transfer Tax Management Act,1967 , as amended from time to time, and a surcharge levied under the Finance Act, 1972, as amended from time to time, sales tax and License Fees and charges for services of a commercial nature associated with the importation of goods.

"Day" means each twenty-four (24) hour period beginning and ending at 12:00 midnight East African time.

"Dollars" and "USD" means the lawful currency of the United States of America.

"Environmental Liabilities" means all losses, damages, and expenses (including, without limitation, the reasonable costs of investigation, testing, containment, removal, cleanup, abatement or remediation and reasonable attorneys' fees and costs), whether or not quantified in amount, relating to the presence in the environment of Hazardous Materials attributable to the Facility from and after the earlier of the date of acquisition by the Company of any immovable property portion of the Facility or the date of Financial Closing to the date of transfer of the Facility to the GOT or its designee, or the violation by the Company, its agents or employees of any environmental Laws of Tanzania or other standard by which the Company is bound.

"Escrow Account" means the account or accounts to be established by the Company under the Escrow Agreement as required by the Lenders.

"Escrow Agreement" means the escrow agreement to be executed by and between the Company and the Lenders pursuant to the terms of the Financing Documents.

"Facility" bears the meaning attributed thereto in the Power Purchase Agreement.

"Financial Closing" means the date on which the Financing Documents relating to the construction financing for the Facility shall have been entered into by the Company and other parties thereto, and all conditions for the initial borrowing by the Company under such Financing Documents shall have been satisfied by the Company or waived by the Financing Parties thereunder.

"Financing Documents" means the loan agreements, (including agreements for any subordinated debt) notes, bonds, indentures, security, agreements, and any other documents relating to the financing or refinancing for the construction, ownership, operation and maintenance of the Facility by the Company.

"Force Majeure Events" bears the meaning attributable thereto in Article 17.1.

"Foreign Currency" means Dollars.

"Foreign Investors" means shareholders of the Company who are foreigners or non-residents of Tanzania as defined under the Immigration Act 1972.

"Fuel Supplier" means the parties with whom contracts are or are to be entered into by the Company for the supply and transportation of fuel for the Facility.

"Fuel Supply Contracts" means the contracts entered or to be entered into by the Company for the supply and transportation of fuel for the Facility.

"GOT" means the government of the United Republic of Tanzania, and its successors.

"Governmental Authority" bears the meaning attributable thereto in the Power Purchase Agreement.

"Guarantee" means the guarantee by the GOT of the payment obligations arising out of the breach, default or non-performance of TANESCO under the Power Purchase Agreement.

"Hazardous Material" means any pollutant, contaminant, solid waste, hydrocarbon product, toxic or hazardous substance or waste, any flammable, explosive or radioactive materials regulated under, or subject to, any Laws of Tanzania.

"IDC" bears the meaning attributable thereto in Article 17.5(b).

"Investor" means the holders from time to time of Ordinary Share Capital, as well as the holders of any securities that are convertible at the option of the holder into Ordinary Share Capital.

"Lapse of Consent" means any Consent (a) ceasing to remain in full force and effect or (b) not being issued or renewed upon application having been properly and timely made and diligently pursued or (c) being made subject, subsequent to its grant, upon renewal or otherwise, to any terms or conditions that materially and adversely affect the Company's ability to perform its obligations under any document included within the Security Package, in each of the above instances through no fault of the Company.

"Laws of Tanzania" includes written law, the common law in so far as it is in operation in the United Republic of Tanzania or any part thereof, and all orders, rules, regulations, executive orders, decrees, Policies, judgments, notifications or other similar directives made pursuant thereto, as such laws, rules, regulations, decrees, Policies, judgments and notifications may be amended from time to time.

"Lenders" means the lenders party to the Financing Documents, together with their successors and assigns.

"Lien" means any encumbrance, lien, charge or security interest upon or in the Facility.

"Loss" means any loss, damage, liability, payment and mitigation including any indirect or consequential loss, damage, liability, payment or obligation, and all expenses (including without limitation reasonable legal fees).

"Month" means a month according to the Gregorian calendar beginning at 12.00 midnight on the last day of the preceding month and ending at 12.00 midnight on the last day of that month.

"O&M Agreement" means the contracts entered into or to be entered into by the Company for the operation and maintenance of the Facility, as amended or superseded from time to time.

"O&M Contractor" means the firm or firms retained by the Company to provide services in connection with the operation and maintenance of the facility.

"Ordinary Share Capital" means any shares of the Company with voting or other rights of management and control and any securities of the Company that are convertible into such shares at the option of the holder.

"Parties" means the GOT and the Company.

"Party" means either the GOT or the Company, as the case maybe.

"Permitted Liens" means minor imperfections of title and encumbrances that in the aggregate are not substantial in amount; do not detract from the value of the property subject thereto or impair the Facility, and have arisen only in the ordinary course of business and consistent with normal utility practices.

"Policies" means such policies adopted by the GCT, and any Governmental Authority as have been published in writing.

"Policy Framework" means the GOT's Policy Framework and package of Incentives for investments including private power generation projects, in Tanzania, if any.

"Power Purchase Agreement" means the agreement dated as of May 26, 1995 entered into between TANESCO and the Company for the purchase and sale of electric power generated by the Facility as amended from time to time.

"Preliminary Estimate" bears the meaning attributable thereto in Article 17.5 (a).

"Prescribed Fee" means, with respect to a particular Consent, the charge or fee, if any, prescribed by the Laws of Tanzania.

"Prescribed Form" means, with respect to a particular Consent, the form, if any, (including all information and details) prescribed by the Laws of Tanzania for the application for, or renewal of, such Consent.

5

"Project" means the development, design, engineering, manufacture, financing, construction, completion, commissioning, insurance, ownership, operation and maintenance of the Facility and all activities incidental thereto.

"Relevant Authority" means the department, authority, instrumentality or agency from which a Consent is to be obtained and any authority, body or other person having jurisdiction under the Laws of Tanzania with respect to the Company, the Facility or the financing, construction, operation or maintenance of the Facility.

"Report" bears the meaning attributable thereto in Article 17.6(a).

"Scheduled Commercial Operations Date" bears the meaning attributable thereto in the Power Purchase Agreement.

"Restoration" bears the meaning attributable thereto in Article 17.5(a).

"Restoration Cost Estimate" bears the meaning attributable thereto in Article 17.5(a).

"Restoration Schedule" bears the meaning attributable thereto in Article 17.5(a).

"Shillings" mean the lawful currency of the United Republic of Tanzania.

"Security Package" consists of:

Implementation Agreement;

Power Purchase Agreement;

Fuel Supply Contracts;

O&M Agreement, if any;

Construction Contracts, if any;

Financing Documents;

Escrow Agreement;

Insurance Policies;

Site Agreement;

Guarantee; and

Instruments conveying title to the Site.

"Site" means the parcel of land upon which the Facility is to be constructed and located.

"TANESCO" means the Tanzania Electric Supply Company Limited

and its successors and permitted assignees.

"Tanzania" means the United Republic of Tanzania.

"Termination Notice" means a written notice of termination of this Agreement issued by the GOT or the Company, as the case may be, pursuant to Article 19.2(c) hereof.

"Threshold Amount" bears the meaning attributable thereto in Article 17.5(e).

"Year" means a year according to the Gregorian calendar.

## ARTICLE II

### INTERPRETATION

In this Agreement:

capitalised terms defined in Article I shall be used herein as defined therein;

the headings are for convenience only and shall be ignored in construing this Agreement;

the singular includes the plural and vice versa;

references to Articles, Clauses, and Schedules are, unless the context otherwise requires, references to Article and Clauses of, and Schedules to, this Agreement; and

unless otherwise provided herein, whenever a consent or approval is required by one Party from the other Party, such consent or approval shall not be unreasonably withheld or delayed.

8

## ARTICLE III

### TERM

This Agreement shall commence and be effective on the date hereof, and shall, unless terminated earlier in accordance with the terms of this Agreement, continue in full force and effect for a period of the initial term of the Power Purchase Agreement, including any extension caused by the occurrence of a Force Majeure Event thereunder; provided, however, that in the case of any other extension of the Power Purchase Agreement, this agreement may be extended as mutually agreed at that time.

## ARTICLE IV

### IMPLEMENTATION OF THE PROJECT BY THE COMPANY

The Company shall design, insure, finance, acquire, construct, complete, own, operate, and maintain the Facility in accordance with all applicable Laws of Tanzania, the Consents, the Power Purchase Agreement.

13

## ARTICLE V

### GRANT OF RIGHTS TO THE COMPANY

The GOT hereby grants to the Company the exclusive right to design, finance, insure, construct, complete, own, operate, and maintain the Facility in accordance with the terms and conditions contained in this Agreement and the Laws of Tanzania until the expiration or earlier termination of this Agreement pursuant to its terms.

## ARTICLE VI

### ACQUISITION OF SITE, TRANSPORTATION, AND CONSENTS

6.1    Acquisition by the Company of Site and Transportation

The company has identified a suitable Site. The company shall obtain adequate water supplies for the Facility, make arrangements for delivery and receipt at the Site or port facilities in Tanzania of equipment and materials necessary to construct the Facility, and make arrangements for transport to the Site of all such equipment and materials from the port facilities. The Company shall complete these activities in compliance with the terms of this Agreement and the Power Purchase Agreement.

6.2    Applications by the Company for Consents

(a)    The Company shall make or cause to be made, in a timely fashion, all applications (whether initial or renewal applications) for the Consents in the Prescribed Form and with the Prescribed Fee to the appropriate Relevant Authorities and shall diligently pursue all such applications. The information supplied in the applications shall be complete and accurate and shall satisfy the substantive and procedural requirements of the applicable Laws of Tanzania.

(b)    In the event the Company propose to sell dependable capacity and electrical energy from the Facility to a third party, other than TANESCO, under Article 2.2 of the Power Purchase Agreement, the GOT shall grant the Company any consent required by Section 4 of the Electricity Ordinance 1931 for the sale and generation of electricity.

(c)    The Company shall make application for all Consents within six (6) months of the execution of this Agreement. If the application for such Consents are timely made and any of such Consents is not received within four (4) months following the filing of the application and the failure to receive such Consent is not the fault of the Company (or its Contractors), then, notwithstanding anything else contained in this Agreement to the contrary, the date by which Financial Closing is required to occur shall be extended on a day-for-day basis for each day that any of such Consents remains outstanding following the expiration of the four (4) month period. If such outstanding Consent or Consents have not been issued by the end of six (6) months beginning on the last day of the aforesaid four (4) months period, such unobtained Consents shall constitute a default by GOT, permitting the Company to terminate this Agreement, the Power Purchase Agreement with no further obligations to the GOT and TANESCO, and GOT shall compensate the Company the compensation amount determined in accordance with Article 20.1(b).

12

## ARTICLE VII

### SUPPORT OF THE GOT

**7.1    Support to Obtain Site and Transportation**

The Company may advise the GOT from time to time of any difficulties encountered in the activities it is required to perform under Article 6.1. If any such difficulties create a significant possibility that the Company will be prevented or materially impaired in meeting its obligations hereunder, then, upon the request of the Company, the GOT shall take such actions as are reasonable and appropriate under the circumstances to enable the Company to secure the necessary property or services; provided, however, that if the GOT reasonably determines that the Company has failed to comply with its obligations under this Agreement and that such failure is the principal cause of the Company's difficulties in performing such activities, the GOT may advise the Company of such determination and the GOT shall not be obligated to take any actions to assist the Company pursuant to this Article 7.1 until such time as the Company has fully complied with its obligations under this Agreement.

**7.2    Support to Obtain Consents**

Upon request of the Company, the GOT shall support and use all reasonable efforts to expedite the consideration of the Company's applications for the Consents filed pursuant to Article 6.2 and the timely issuance thereof by the Relevant Authorities. Any request for support under this Article shall be accompanied by the application for the Consent, any notice that the Consent was denied or deferred, and a statement of the Company's efforts in obtaining the Consent to date.

**7.3    Conditions to Consents**

The GOT or any Relevant Authority may attach such non-discriminatory (except where rationally related to the purpose of the Consent) terms and conditions to the issuance or renewal of any of the Consents as are in accordance with the Laws of Tanzania, and the attachment of such terms and conditions shall not in and of itself constitute a breach of this Agreement by the GOT, a Force Majeure Event under Article XVII (unless it constitutes a Change in Law), or a GOT Event of Default under Article 19.1(b). The Company and the Contractors shall abide by all such terms and conditions.

**7.4    Support for Obligations**

Upon reasonable request by the Company, the GOT shall use its good offices to support the Company's performance of its obligations to design, finance, insure, construct, own, operate, and maintain the Facility. By agreeing to use its good offices to support the Company's efforts, the GOT has not relieved, and

does not relieve in any way, the Company of its obligations or potential liability under this Agreement, the Power Purchase Agreement, and the other documents comprising the Security Package.

**7.5    Policy Framework**

The GOT shall take such actions as are reasonable and appropriate under the circumstances to ensure that the Company receives the fiscal incentives, concessions, financial arrangements and any other benefits provided under the Policy Framework, upon application for the same by the Company.

### ARTICLE VIII

#### CONSTRUCTION, OPERATION AND MAINTENANCE

The Company shall design, construct, install, commission, operate and maintain the Facility; provided, however, that the Company may contract with the Construction Contractor to design, construct, install , and commission the Facility and the O&M Contractor to operate and maintain the Facility; provided, further,. that the appointment of the Construction Contractor and the O&M Contractor by the Company shall not relieve the Company of any of its obligations or potential liability regarding the design, insuring, acquisition, construction, completion, operation, or maintenance of the Facility. The Company shall ensure that reasonable training, as required under the O&M Agreement, on the operation and maintenance of the Facility is provided to Tanzanian residence.

## ARTICLE IX

## LIABILITY

**9.1    Limitation of liability**

Except as provided in Article 9.2, neither Party shall be liable to the other Party in contract, tort, warranty, strict liability, or any other legal theory for any indirect, consequential, incidental, punitive, or exemplary damages. Neither Party shall have any liability to the Party except pursuant to, or for breach of, this Agreement or the Guarantee; provided, however, that this provision is not intended to constitute a waiver of any rights of one Party against the other with regard to matters unrelated to this Agreement or to any activity not contemplated by this Agreement.

**9.2    Indemnification**

(a)    The GOT

The GOT shall defend and indemnify the Company and its directors, officers and employees against, and hold the Company and its directors, officers and employees harmless from, at all times after the date hereof, any and all Losses incurred, suffered, sustained, or required to be paid, directly or indirectly, by or sought to be imposed upon, the Company and its directors, officers and employees for personal injury or death to persons or damage to property arising out of the negligent or intentional act or omission of the GOT in connection with this Agreement.

(b)    The Company

The Company shall defend, indemnify the GOT and its ministers, officers and employees against, and hold the GOT and its ministers officers and employees harmless from, at all times after the date hereof, any and all Losses incurred, suffered, sustained, or required to be paid, directly or indirectly, by, or sought to be imposed upon, the GOT and its ministers, officers and employees for personal injury or death to persons or damage to property arising out of the negligent or intentional act or omission of the Company in connection with this Agreement.

(c)    Joint Negligence

In event that any Loss result from the joint or current negligent or intentional acts or omissions of the Parties, each Party shall be liable under this indemnification in proportion to its relative degree of fault.

16

(d)    Indemnification to Survive

The provisions of this Article 9.2 shall survive for a period of five (5) years following the termination of this Agreement.

## 9.3    Indemnification for Fines and Penalties

Any fines or other penalties incurred by the Company for non-compliance with applicable Laws of Tanzania or other governmental actions taken pursuant thereto or the Consents shall not be reimbursed by the GOT but shall be the sole responsibility of the Company.

## 9.4    Notice of Proceedings

Each Party shall promptly notify the other Party of any Loss or proceeding in respect of which it is or may be entitled to indemnification under Article 9.2. Such notice shall be given as soon as reasonably practicable after the relevant Party becomes aware of the Loss or proceeding.

## 9.5    Limitation on Indemnification

Each Party shall be solely liable, and shall not be entitled to assert any claim for indemnification under this Agreement, for any Loss that would otherwise be the subject of indemnification under this Agreement until all such Losses of such Party arising during the then-current Year exceed, in the aggregate, USD100,000. For purposes of this Article 9.5, a Loss (or claim for indemnification) shall be deemed to arise in the Year during which the event giving rise to the Loss (or claim for indemnification) occurred or, in the case where the event is continuing in more than one Year, in the Year during which the event ends.

Neither Party shall be entitled to indemnity under Article 9.2 if and to the extent that a Party has received payment in full in respect of a Loss or proceeding under the indemnities contained in the Power Purchase Agreement, the Fuel Supply Contracts, or any other document comprising the Security Package in respect of the relevant act or omission.

## 9.6    Defence of Claims

(a)    The indemnifying Party shall be entitled, at its option, and expense and with counsel of its selection, to assume and control the defence of any claim, action, suit or proceeding in respect of, resulting from, relating to or arising out of any matter for which it is obligated to indemnify the other Party hereunder, subject to the prior approval of such counsel by the indemnified Party, provided it gives prompt notice of its intention to do so

to the indemnified Party and reimburses the indemnified Party for the reasonable costs and expenses incurred by the indemnified Party prior to the assumption by the indemnifying Party of such defence.

(b) Notwithstanding the provisions of Article 9.6(a), unless and until the indemnifying Party acknowledges in writing its obligations to indemnify the indemnified Party and assumes control of the defence of a claim, suit, action or proceeding in accordance with Article 9.6(a), the indemnified Party shall have the right, but not the obligation, to contest, defend and litigate, with counsel of its own selection, any claim, actions, suit or proceeding by any third party alleged or asserted against such Party in respect of, resulting from, related to or arising out of any matter for which it is entitled to be indemnified hereunder, and the reasonable costs and expenses thereof shall be subject to the indemnification obligations of the indemnifying Party hereunder.

(c) Upon assumption by the indemnifying Party of the control of the defence of a claim, suit, action or proceeding, the indemnifying Party shall reimburse the indemnified Party for the reasonable costs and expenses of the indemnified Party in the defence of the claim, suit, action or proceeding prior to the indemnifying Party's acknowledgement of the indemnification and assumption of the defence.

(d) Neither Party shall be entitled to settle or compromise any such claim, action, suit or proceeding without the prior written consent of the other Party; provided, however, that after agreeing in writing to indemnify the indemnified Party, the indemnifying Party may settle or compromise any claim without the approval of the indemnified Party. Except where such consent is unreasonably withheld, if a Party settles or compromises any claim, action, suit or proceeding in respect of which it would otherwise be entitled to be indemnified by the other Party without the prior written consent of the other Party, the other Party shall be excused from any obligation to indemnify the Party making such settlement or compromise in respect of such settlement or compromise.

(e) Following the acknowledgement of the indemnification and the assumption of the defence by the indemnifying Party, the indemnified Party shall have the right to employ its own counsel and such counsel may participate in such actions, but the fees and expenses of such counsel shall be at the expense of such indemnified Party, when and as incurred, unless (i) the employment of counsel by such indemnified Party has been authorised in writing by the indemnifying Party, or (ii) the indemnified Party shall have reasonably concluded that there may be a conflict of interest between the indemnifying Party and the indemnified Party in the conduct of the defence of such action, or (iii) the indemnifying Party shall not in fact

18

have employed independent counsel reasonably satisfactory
to the indemnified Party to assume the defence of such
action and shall have been so notified by the indemnified
Party, or (iv) the indemnified Party shall have
reasonably concluded and specifically notified the
indemnifying Party either that there may be specific
defences available to it that are different from or
additional to those available to the Party or that such
claim, action, suit or proceeding involves or could have
a material adverse effect upon it beyond the scope of
this Agreement. If Clauses (ii) or (iii) or (iv) of the
preceding sentence shall be applicable, then counsel for
the indemnified Party shall have the right to direct the
defence of such claim, action, suit or proceeding on or
behalf of the indemnified Party and the reasonable fees
and disbursements of such counsel shall constitute legal
or other expenses hereunder.

## 9.7    Double Jeopardy

Settlement or waiver in writing by TANESCO of any dispute or
breach under the Power Purchase Agreement shall be binding on the
GOT with respect to the identical issue or claim, as the case may
be.

## ARTICLE X

### INSURANCE

The Company shall obtain and maintain insurance from financially strong and internationally reputable insurance companies in accordance with Article XIV of the Power Purchase Agreement. If and to the extent that the GOT can be named as an additional insured on all fire, perils, casualty and liability insurance policies covering the Facility, the GOT shall be so named by the Company.

## ARTICLE XI

### IMMIGRATION CONTROLS

Provided the Company and the Contractors comply with all applicable Laws of Tanzania, the GOT will expeditiously grant applications of the Company and the Contractors for work permits, employment passes, visas and other permits, as necessary, for individuals involved in the Project. Notwithstanding the foregoing, however, the GOT may, in any individual case, decline to grant an application, or expel a person previously admitted, to protect the national security interests and public health and safety of Tanzania, as reasonably determined by the GOT.

ARTICLE XII

SECURITY PROTECTION

The Company shall provide security personnel for the
protection and security of the Site. In the event of a threat
of harm to the Site, the Company may request additional
security forces from the GOT to meet unusual security
requirements. All such additional security forces shall remain
under the exclusive control and direction of the GOT.

## ARTICLE XIII

### IMPORT CONTROLS

**13.1    Right to Import**

The GOT encourages the Company and its Contractors to incorporate as much locally produced material, equipment and supplies as possible, in the construction and operation of the Facility. Nonetheless, the Company and its Contractors shall be entitled to import without restriction all items required for the design, construction, completion, operation and maintenance of the Facility. All items not consumed or incorporated into the Facility may be freely re-exported by the Company in accordance with established procedures in Tanzania.

**13.2    Export and Reimport**

The Company shall be entitled to export without restriction all items of plant and machinery imported by it under Article 13.1 for permanent installation in the Facility for the purpose of repair or refurbishment outside Tanzania and to re-import the same without payment of Customs Duties, and the GOT shall, at the request of the Company, use reasonable measures to expedite the issuance of any Consent required for the export of such plant and machinery.

ARTICLE XIV

FOREIGN CURRENCY EXCHANGE AND TRANSFER OF FUNDS

14.1    Foreign Exchange Regulation

The foreign currency exchange and transfer abroad of all funds
related to the Project shall be governed by the Foreign Exchange
Act 1992 of Tanzania, as amended from time to time.

14.2    Use of Tanzania Bank Accounts: Exceptions

All of the Company's transactions related to the Project that
require foreign exchange, including debt servicing and
repatriation of earnings, will be initiated through bank accounts
in Tanzania; provided, however, that foreign exchange provided
by foreign Lenders and used to pay foreign Contractors or vendors
in respect of services provided or equipment or materials
purchased outside of Tanzania may be  paid directly to such
persons and not conducted through bank accounts in Tanzania.

14.3    Consent to Foreign Currency Accounts

The GOT shall ensure that the Bank of Tanzania gives the Company
and its Contractors consent for the opening, operation, and
retention of earnings of foreign currency bank accounts inside
Tanzania (including, without limitation, the payment of all
foreign exchange received under the Financing Documents or
otherwise by the Company into such accounts and withdrawals
therefrom). The GOT shall ensure that the Bank of Tanzania gives
the Company permission to maintain bank accounts outside
Tanzania, and transfer funds from its accounts in Tanzania to its
accounts maintained outside Tanzania as are necessary to
implement and carry out the Project in accordance with this
Agreement, the Power Purchase Agreement, and the Fuel Supply
Contracts; provided, however, that nothing in this Agreement
shall prevent the Company from opening, operating and retaining
moneys in foreign currency bank accounts outside Tanzania from
time to time after the date of this Agreement if and to the
extent that it is or becomes otherwise permitted under the Laws
of Tanzania.

14.4    Availability of Foreign Exchange

(a)     The GOT shall make available to the Company through the
        Bank of Tanzania, sufficient additional Shillings funds
        for buying Foreign Currency for the Company to purchase
        through normal commercial banking channels, Foreign
        Currency for the TANESCO's payments with respect under or
        in connection with the Power Purchase Agreement or GOT's
        payments under this Agreement. Notwithstanding the
        foregoing, to the extend that Foreign Currency is not
        available  through commercial banking channels, the GOT

shall cause the Bank of Tanzania to provide foreign exchange in the Foreign Currency required.

(b) The GOT shall make available to the Company through the Bank of Tanzania, to the extent that Foreign Currency is not available through normal commercial banking channels, Foreign Currency in the requested amount to the extent necessary for (i) meeting the Company's obligation under this Agreement, (ii) the repatriation by the Company of dividends to Foreign Investors and repatriation upon conversion of Shillings proceeds of sales of Ordinary Share Capital purchased with foreign currency, which sales are made in accordance with the terms of this Agreement, (iii) after the Commercial Operations Date, the Foreign Currency expenses of the Project as permitted in Appendix B of the Power Purchase Agreement (including, without limitation, remuneration of the O&M Contractor, where applicable, fees, salaries and other monetary emoluments and the purchase of spare parts), (iv) the payment of premiums to off-shore insurers, (v) all payments into, or out of, the Escrow Account that require foreign currency in accordance with the terms of the Escrow Agreement, and (vi) any compensation payments to be made by the GOT pursuant to Article 20.1 in the event of a termination. The rate applicable to such conversion shall be the Bank of Tanzania's rate for Foreign Currency at 11.00 a.m. on the banking Day on receipt of payment by the Company from TANESCO under the Power Purchase Agreement or GOT under this Agreement, and the GOT shall ensure that the Company shall, upon receipt, be entitled to immediately remit or cause the remittance of any and all Foreign Currency received.

14.5    **Free Transfer of Necessary Funds**

The GOT shall permit the free transfer of all funds and financial settlements necessary to implement and carry out the Project or the implementation of this Agreement or any other agreement forming part of the Security Package.

25

## ARTICLE XV

### ASSIGNMENT AND SECURITY

**15.1    Assignment**

No assignment or transfer by a Party of this Agreement or such Party's rights or obligations hereunder shall be effective without the prior written consent of the other Party.

**15.2    Creation of Security**

(a)    Notwithstanding the provisions of Article 15.1, for the purpose of financing the construction and operation of the Facility, the Company may, upon prior written approval of the GOT, whose consent shall not be unreasonably withheld, assign or create a security interest to the Lenders pursuant to the Financing Documents in, its rights and interests under or pursuant to :

  (i)        this Agreement;

  (ii)       any agreement included within the Security Package;

  (iii)      the Facility;

  (iv)       the Site;

  (v)        the movable property and intellectual property of the Company; or

  (vi)       the revenues or any of the rights or assets of the Company;

(b)    The Lenders shall have no obligation to the GOT under this Agreement until such time as the Lenders' agent ("Agent") notifies the GOT in writing of the Lenders' election to exercise their rights granted hereunder and to perform the Company's obligations under this Agreement. Upon notification by the Lenders or the Agent to the GOT of the occurrence and continuance of an event of default under the Financing Documents, the Lenders shall have the right, among others, to:

  (i)        the possession of the Facility and, prior to commercial operation of the Facility, complete construction of the Facility and operate the same and, after commercial operation of the Facility, operate the same;

  (ii)       cure any continuing Company Event of Default as provided under Article 19.1 of this Agreement; provided, however, that the Lenders shall have no obligation to cure any Company

Event of Default under Article 19.1(a) after delivery of the notice to the GOT as provided above, and no right will exist for the GOT to terminate this Agreement based upon such Company Events of Default occurring prior to the Lenders' notice, and;

(iii)    with the consent of the GOT, which consent shall not be unreasonably withheld, sell the Facility to a Transferee (as defined below) and such Transferee at such sale shall succeed to the Company's rights hereunder. If the Agent notifies the GOT of a default under the Financing Documents, the GOT shall, at the request (and expense) of the Agent, cooperate with the Lenders in the Lender's exercise of such rights.

As used herein, a "Transferee" shall be a person who:

(A)    either is an experienced power plant operator or shall have agreed to engage the services of a person who is an experienced power plant operator;

(B)    shall have paid all amounts, if any, then due and payable to the GOT under this Agreement, and;

(C)    shall have expressly assumed in writing for the benefit of the GOT the obligations of the Company under this Agreement (including the obligation of the Company to maintain and operate the Facility in accordance with the requirements of the Power Purchase Agreement).

### 27.3    GOT Security

In the event TANESCO fails to provide the security for payment required by Article 6.6 of the Power Purchase Agreement, the GOT shall within 10 Days after receipt of a notice from the Company to GOT, that states that TANESCO have failed to provide the security for payment required by Article 6.6 of the Power Purchase Agreement, provide directly to the Company the security for payment on the same terms and conditions as required under the Power Purchase Agreement. Obligations under Article 6.6 of the Power Purchase Agreement are deemed to be restated in full in this Agreement, as if the GOT were TANESCO and the Company as the other party having the benefit of the obligations of TANESCO under the Power Purchase Agreement and must be read in conjunction with the relevant clause of the Power Purchase Agreement which applies equally in this Agreement mutatis mutandis as an obligation of the GOT, and is not to be used as an aid to interpretation of this Agreement.

## ARTICLE XVI

### RESTRICTIONS ON ACQUISITIONS OF SHARES AND ASSETS

**16.1    Assurance Against Discriminatory Action**

The GOT shall not take any discriminatory action which materially and adversely affects the Project or the performance of the Company's obligations or the enjoyment of its rights or the interests of the Investors under the Security Package or expropriate or, except as hereinafter provided, acquire the Facility or the Company, whether in whole or in part. Nothing in the foregoing shall apply to any actions taken by the GOT, TANESCO, or any Governmental Authority pursuant to their respective rights and obligations arising under this Agreement, the Power Purchase Agreement and the other documents comprising the Security Package.

**16.2    Acquisition of Shares or Assets**

Subject to Article 20.1, the GOT undertakes to the Company that neither it nor TANESCO or any Governmental Authority will expropriate, compulsorily acquire, nationalise, or otherwise compulsorily procure any Ordinary Share Capital or assets of the Company. The GOT further undertakes to the Company that during the term of this Agreement neither it nor TANESCO or any Governmental Authority nor any corporation or company directly or indirectly owned or controlled by the GOT and/or any Governmental Authority will, otherwise than as mentioned in the preceding sentence, acquire any Ordinary Share Capital.

## ARTICLE XVII

### FORCE MAJEURE

**17.1   Definition**

A "Force Majeure Event" shall mean any event or circumstance or combination of events or circumstances beyond the reasonable control of a Party occurring on or after the date the Power Purchase Agreement that materially and adversely affects  the performance by such affected Party of its obligations under or pursuant to this Agreement (including a Party's ability to deliver or receive energy from the Facility); provided, however, that such material and adverse effect could not have been prevented, overcome or remedied in whole or in part by the affected Party through the exercise of diligence and reasonable care,  it being understood and agreed that reasonable care includes the expenditure of sums of money to protect the Facility from a casualty event, which sums are reasonable in light of the likelihood of such event, the probable effect of such event if it should occur and the likely efficacy of the preventive measures. "Force Majeure Events" hereunder shall include each of the following events and circumstances but not limited to, but only to the extent that each satisfies the above requirements:

(a)     Change in Law which adversely affects the other Party

(b)     Events beyond the control of the affected Party, including but not limited to:

    (i)     any act of war (whether declared or undeclared), invasion, armed conflict or act of foreign enemy, blockade, embargo, revolution, riot, insurrection, civil commotion, act of terrorism, or sabotage;

    (ii)    radioactive contamination or ionizing radiation;

    (iii)   strikes, works to rule or go-slows that extend beyond the Facility or are widespread or nationwide;

    (iv)    lightning, fire, earthquake, flood, storm, cyclone, typhoon, or tornado;

    (v)     explosion or chemical contamination (other than resulting from an act of war);

    (iv)    epidemic or plague;

    (vi)    a Lapse of Consent, for the first twenty-five (25) Days of its occurrence;

    (vii)   prior to the Commercial Operations Date, a delay beyond the thirtieth (30th) Day after the scheduled receipt date of the receipt at the Site of a major piece of equipment that has been timely ordered and must be manufactured expressly for the Party to perform its Obligations under

the Power Purchase Agreement when such delay is caused solely by an accident in transportation or strike.

Force Majeure Events shall expressly not include the following conditions, except and to the extent they result directly from a Force Majeure Event;

(i)    late delivery a Party of machinery, equipment (except as provided in Article 17.1(b)(vii)) materials spare parts or consumables;

(ii)    a delay in the performance of any Contractor; and

(iii)    normal wear and tear or random flaws in materials and equipment or breakdowns in equipment.

**17.2    Notification**

(a)    If by reason of a Force Majeure Event a Party is wholly or partially unable to carry out its obligations under this Agreement, the affected Party shall

(i)    give the other Party notice of the Force Majeure Event(s) as soon as practicable, but in any event, not later than the later of forty-eight (48) hours after the affected Party becomes aware of the occurrence of the Force Majeure Event(s) or forty-eight (48) hours after the resumption of any means of providing notice between the Company and the GOT, and;

(ii)    give the other Party a second notice, describing the Force Majeure Event(s) in reasonable detail and, to the extent that can be reasonably determined at the time of the second notice, providing a preliminary evaluation of the obligations affected, a preliminary estimate of the period of time that the affected Party will be unable to perform the obligations, and other relevant matters as soon as practicable, but in any event, not later than seven (7) Days after the initial notice of the occurrence of the Force Majeure Event(s) is given by the affected Party., When appropriate or when reasonably requested to do so by the other Party, the affected Party shall provide further notices to the other Party more fully describing the Force Majeure Event(s) and its cause(s) and providing or updating information relating to the efforts of the affected Party to avoid and/or to mitigate the effect(s) thereof and estimates, to the extent practicable, of the time that the affected Party reasonably expects it will be unable to carry out any of its affected obligations due to the Force Majeure Event(s).

(b) The affected Party shall also provide notice to the other Party of (i) the cessation of the Force Majeure Event, and (ii) the affected Party's ability to recommence performance of its obligations under this Agreement by reason of the cessation of the Force Majeure Event as soon as possible, but in any event, not later than seven (7) Days after the occurrence of each of (i) and (ii) above.

(c) Failure by the affected Party to give notice of a Force Majeure Event to the other Party within the forty eight (48) hour period required by Article 17.2(a) shall not prevent the affected Party from giving such notice at a later time; provided, however, that in such case, the affected Party shall not be excused pursuant to Article 17.4 for any failure or delay in complying with its obligations under or pursuant to this Agreement until the notice required by Article 17.2(a)(i) has been given. If such notice is given within the forty-eight (48) hour period as required by Article 17.2(a)(i), the affected Party shall be excused for such failure or delay pursuant to Article 17.4 from the date of commencement of the relevant Force Majeure Event.

17.3    Duty to Mitigate

The affected Party shall use all reasonable efforts to mitigate the effects of a Force Majeure Event, including, but not limited to, the payment of all reasonable sums of money by or on behalf of the affected Party, which sums are reasonable in light of the likely efficacy of the mitigation measures.

17.4    Delay Caused by Force Majeure

So long as the affected Party has at all times since the occurrence of the Force Majeure Event complied with the obligations of Article 17.3 and continues to so comply, then:

(i) the affected Party shall not be liable for any failure or delay in performing its obligations (other than an obligation to make a payment) under or pursuant to this Agreement and;

(ii) any performance deadline that the affected Party is obligated to meet under this Agreement shall be extended; provided, however, that no relief, including without limitation, the extension of performance deadlines, shall be granted to the affected Party pursuant to this Article 17.4 to the extent that such failure or delay would have nevertheless been experienced by the affected Party had the Force Majeure Event not occurred. Other than for breaches of this Agreement by the other Party, and without prejudice to the affected Party's right to indemnification pursuant to Article IX or for payment pursuant to this Article XVII or Article XX, the other Party shall not bear any liability for any loss or expense suffered by the affected Party as a result of a Force Majeure Event.

Notwithstanding the foregoing, the GOT shall not be entitled to claim for itself, and shall not be relieved of its obligations hereunder by the occurrence of, a Force Majeure Event or a Change in Law.

17.5    Restoration; Compensation

(a)    In the event that a Force Majeure Event results in damage to the Facility or that compliance by the Company with a Change in Law requires a material modification or a material capital addition to the Facility (each such event referred to as "Restoration"), the Company shall, within twenty-eight (28) Days after the date by which it was first required to provide notice to the GOT under - Article 17.2(a), develop and deliver to the GOT a preliminary written estimate (the "Preliminary Estimate") of:

(A)    the projected range of cost to effect the Restoration, less any insurance proceeds available or likely to become available to the Company (the "Restoration Cost Estimate"); and

(B)    a preliminary schedule for the completion of the Restoration ("Restoration Schedule").

The Company shall make the Preliminary Estimate as comprehensive and as complete as possible under the circumstances. The GOT and the Company shall meet within fifteen (15) Days of the delivery of the Preliminary Estimate to discuss the conclusions set forth therein.

(i)    If the Company concludes that the Restoration Cost Estimate will be less than the Threshold Amount (as defined in Article 17.5(e)) and the GOT, within fifteen (15) Days of its receipt of the Preliminary Estimate, agrees with the Restoration Cost Estimate and with the Restoration Schedule, then the Company shall, subject to Article 17.5(e), proceed with the Restoration in accordance with the Restoration Schedule and the GOT shall pay to the Company, within twenty-five (25) Days of its demand, for each Month (or portion thereof) of the Carrying Cost Period (as defined below) an amount equal to:

(A)    the interest accruing under the Financing Documents (the "IDC") if the Force Majeure Event or the Change in Law occurred prior to the Commercial Operations Date, and;

(B)    the full Capacity Payment if the Force Majeure Event or the Change in Law occurred after the Commercial Operations Date (but only to the extent that the

Capacity Payment is not paid to the Company by TANESCO).

**The term "Carrying Cost Period" shall mean the period beginning on :**

(aa) the date of the occurrence of the Force Majeure Event or the Change in Law if the Company provided the GOT with a timely notice under Article 17.2(a)(i) or

(bb) if such notice was not given in a timely manner, the date of the actual notice given by the Company to the GOT under Article 17.2(a)(i) and ending the earlier to occur of (x) the completion of the Restoration and (y) the last day of the Restoration Schedule.

(ii)    If:

(A)    the Company concludes that the Restoration Cost Estimate will be less than the Threshold Amount and the GOT, within fifteen (15) Days of its receipt of the Preliminary Estimate, notifies the Company that the GOT disagrees with the Company's conclusion and/or that it disagrees with the Restoration Schedule; or

(B)    the Company concludes that the Restoration Cost Estimate will be greater than the Threshold Amount and the GOT, within fifteen (15) Days of its receipt of the Preliminary Estimate, agrees with such conclusion,

then the Company shall proceed with the preparation of a Report (as defined in Article 17.6(a)) and the provisions of Article 17.5(b) shall apply.

(iii)    If the Company concludes that the Restoration Cost Estimate will be greater than the Threshold Amount and the GOT, within fifteen (15) Days of its receipt of the Preliminary Estimate, disagrees with the Preliminary Estimate, such matter (and any disagreement regarding the Restoration Schedule) shall be referred to an expert for resolution pursuant to Article 17.6(c). If the expert concludes that the Restoration Cost Estimate is less than the Threshold Amount, the provisions of Article 17.5(a)(i) shall apply. If the expert concludes that the Restoration Cost Estimate is greater than the Threshold Amount, then the Company shall proceed with the preparation of a Report and the provisions of Article 17.5(b) shall apply.

(b)    If a Report is required to be prepared, then at the conclusion of the meetings of the Parties to discuss the Report (as contemplated by Article 17.6(b)), the Parties shall either agree or disagree with respect to the Restoration Cost Estimate and the Restoration Schedule. If the Parties reach agreement on such matters, or, in the case of a disagreement, after resolution by an expert pursuant to Article 17.6(c), the GOT shall, within fifteen (15) Days of such agreement or resolution, provide the Company with a written notice of its election to either (i) terminate this Agreement pursuant to Article 17.7(a) and pay the applicable compensation pursuant to Article 20.1(e)(i) or (ii) authorise the Company to proceed with Restoration, in which case the following provisions shall apply:

(i)    the Company shall proceed in good faith to try to secure financing for the cost of Restoration on terms satisfactory to the Company and the GOT. If the Company is unable to arrange such financing, then, unless the GOT arranges or agrees to provide financing for the Restoration, the failure to secure financing shall be treated as an election by the GOT to terminate the Agreement pursuant to Article 17.7(a), in which case the GOT will be required to pay the applicable compensation pursuant to Article 20.1(e)(iii);

(ii)   if financing for the Restoration has been secured, then the Company shall proceed Restoration in accordance with the Restoration Schedule and, upon completion of Restoration, the Company shall be entitled to special compensation pursuant to Article 17.7(b) or 17.7(c), as the case may be;

(iii)  if the Restoration is to be made prior to the Commercial Operations Date and the Restoration causes a delay in the achievement of the Commercial Operations Date, then the GOT shall pay to the Company, within twenty-five (25) Days of its demand, for each Month of such delay (or portion thereof) an amount equal to the IDC for such Month; provided, however, that the GOT shall not be required to pay such amount to the Company for any period following the end of the Restoration Schedule (as such Restoration Schedule may be extended by an intervening Force Majeure Event) if the Company has failed to complete the Restoration by the end of the Restoration Schedule. If the Restoration is to be made following the achievement of the Commercial Operations Date, then the GOT shall be responsible to pay to the Company each Month (or portion thereof) an amount equal to the Capacity Payment for such Month under the Power Purchase Agreement to the extent the Capacity Payment is not being paid to the Company by TANESCO;

<u>provided, however,</u> that the GOT shall not be required to pay such amount to the Company for any period following the end of the Restoration Schedule (as such Restoration Schedule may be extended by an intervening Force Majeure Event) if the Company has not completed the Restoration by the end of the Restoration Schedule; and

(iv)   the Company shall provide the GOT with a summary of all costs actually incurred in implementing the Restoration, together with copies of all invoices for such work. During any extension of the term of the Power Purchase Agreement pursuant to Article 2.3 of the Power Purchase Agreement resulting from a Force Majeure Event, the Company shall pay to the GOT an amount equal to the aggregate of the debt component of the Capacity Payments paid to the Company by the GOT under this Article 17.5, Dollar for Dollar, without interest or indexation, as and when received by the Company pursuant to Article II of the Power Purchase Agreement.

(c)   (i)   In the event of the occurrence of a force majeure event under (i) the Power Purchase Agreement, that prevents the operation of the Facility for more than thirty (30) Days following the occurrence of such force majeure event because TANESCO is unable to receive power from the Facility or (ii) the Fuel Supply Contract that prevents the operation of the Facility for more than thirty (30) Days following the occurrence of such force majeure event because the Fuel Supplier is not capable of providing fuel to the Facility, the GOT shall prepare and deliver, or cause to be prepared and delivered, a Report pursuant to Article 17.6.

(ii)   If the GOT concludes that the force majeure event under the Power Purchase Agreement or under the Fuel Supply Contract, as the case may be, can be resolved within one hundred eighty (180) Days of its occurrence such that operation of the Facility can be restored to enable the Company to continue to meet its obligations under the Power Purchase Agreement, then the GOT shall work with TANESCO or the Fuel Supplier, as the case may be, to resolve such force majeure event. If such force majeure event has not been resolved within Five Hundred and Forty Six (546) Days of its occurrence, then the Company or the GOT shall have the option to terminate this Agreement after such Five Hundred and Forty Six (546) Day period and, upon such termination, the GOT shall be required to pay to the Company the appropriate level of compensation as provided in Article 20.1(f).

(iii)    If the GOT concludes that the force majeure event cannot be resolved within 546 Days of its occurrence, it shall be deemed an election by the GOT to terminate this Agreement pursuant to Article 17.8(a) and the GOT shall be required to pay to the Company the amount of compensation provided in Article 20.1(f).

(d)    Notwithstanding any provision of this Article XVII to the contrary, the Company shall not be obligated hereunder to proceed with any Restoration unless and until the Company has received all necessary Consents therefor. The Company shall use good faith efforts to obtain such Consent as soon as reasonably practicable. If, despite the Company's good faith efforts, the Company is unable for any reason other than its own fault to obtain any such Consents within a reasonable period of time not to exceed six (6) months after the date that the Company becomes obligated to proceed with any Restoration, then either Party shall have the right to terminate this Agreement. Upon any such termination which is due to the Company's inability to obtain any Consents, GOT shall be required to pay to the applicable compensation pursuant to Article 20.1(g).

(e)    (i)    Upon the occurrence of, and during the continuance of, any Force Majeure Event or Change in Law that, in either case, does not require a Restoration, but, prior to the Commercial Operations Date, results in an extension of the Scheduled Commercial Operation Date or, after the Commercial operation Date, results in a decrease of the Capacity Payment (a "Non-Restoration Event"), then the GOT shall pay to the Company for each Month (or portion thereof) of the Carrying Cost Period (as defined below) (i) the IDC if the Force Majeure Event or the Change in Law occurred prior to the Commercial Operations Date and (ii) the full Capacity Payment if the Force Majeure Event or the Change in Law occurred after the Commercial Operations Date but only to the extent that the Capacity Payment is not paid to the Company by TANESCO. The term "Carrying Cost Period" for purpose of this Article 17.5(e) shall mean the period beginning on the date of the occurrence of the Non-Restoration Event if the Company provided GOT with a timely notice under Article 17.2(a), if such notice was not given in a timely manner, the date of the actual notice given by the Company to GOT under Article 17.2(a) and ending on the date of cessation of the Non-Restoration Event.

(ii)    For purposes of this Article XVII, the term "Threshold Amount" shall mean an amount equal to: (i) 25% of the Construction Contract price through the fifth (5th) anniversary of the Commercial Operations Date; (ii) 20% of the Construction

36

**Exhibit A, PART 5 to Declaration of Sazi B. Salula**

Contract price after the fifth (5th) anniversary of the Commercial Operations Date through the tenth (10th) anniversary of the Commercial Operations Date; and (iii) 15% of the Construction Contract price after the tenth (10th) anniversary of the Commercial Operations Date through the end of the initial term of the Agreement.

17.6 **Appraisal Report and Use of Expert**

(a) When required by Article 17.5(a) or 17.5(c), the Company or the GOT, as the case may be, shall commence the preparation of an appraisal report (the "Report") within thirty (30) Days after the date it was required to provide a notice under Article 17.2(a)(i) (and deliver a copy of such Report to the other Party within fifty-eight (58) Days after it was required to provide such notice). The Report shall address, in such details as is practicable under the circumstances and accompanied by reasonable supporting data, the following matters (to the extent applicable):

(i) in the case of a Force Majeure Event covered by Article 17.5(a);

(A) describe the Force Majeure Event and the damage to, and/or the other effects or impacts on, the Facility;

(B) estimate in good faith the time it will take to restore the Facility (as much as it may be possible to do so) to its condition immediately prior to the Force Majeure Event or to bring the Facility into compliance with the Change in Law and;

(C) propose a Restoration Schedule; or

(D) provide a statement and explanation in good faith regarding whether restoration or modification of the Facility or necessary capital additions are technically feasible and financially viable, including the Company's good faith estimate of:

(aa) the costs to restore the Facility to its condition immediately prior to the Force Majeure Event and the associated delay costs or the costs to come into compliance with the Change In Law;

(bb) a revised cash flow forecast for the Facility;

(cc) the insurance proceeds, if any, that may be recovered, the date or dates on which such proceeds may be received, and the particular purposes for which such proceeds are required to be applied;

(E) described the plan to finance the costs of the Restoration, how such financing will be coordinated with the current loans under the Financing Documents, and any special requirements of the Lenders for the Restoration;

(F) the projected modification to the tariff in the Power Purchase Agreement that would be required to pay special compensation under Article 17.7; and

(G) provide certificates and reports of the Company's financial and technical advisers, as appropriate or as reasonably requested by the GOT, in support of the applicable matters referred to in this Article 17.6(a).

(ii) in the case of a Force Majeure Event covered by Article 17.5(c);

(aa) describe the Force Majeure Event and the damage to, and/or the effects or impacts on (TANESCO) or the Fuel Supplier as the case may be, and

(bb) estimate in good faith the time it will take to restore the system of TANESCO or the Fuel Supplier to service such that the Facility can resume its normal operations.

(b) Within fifteen (15) Days of the delivery of a Report to a Party or such further time as the Parties may agree, the Parties shall meet to discuss the Report and any action(s) to be taken. In connection with the review by the GOT of a Report prepared by the Company, the Company shall provide promptly to the GOT such additional financial and related information pertaining to the Report and the matters described therein as the GOT may reasonably request.

(c) The following disputes between the GOT and the Company shall be submitted to an expert for resolution within the time periods specified:

(i) with respect to disputes regarding any matter set forth in a Report, no later than ten (10) Days after expiration of the period for review and consultation provided by Article 17.6(b);

(ii) with respect to disputes pursuant to Article 17.5, within the applicable period provided for in Article 17.5; and (iii) with respect to whether an item of cost incurred by the Company should be recovered as provided in Article 17.7(d), within ten (10) Days following the delivery of a written request to do so by either Party.

(d)   The expert shall be an engineer with extensive experience in the construction and operation of electric power plants similar to the Facility. The expert shall be chosen by the Parties or, failing agreement between the Parties, by the Institution of Electrical Engineers, United Kingdom. Unless the Parties otherwise agree, the expert shall not be an officer, employee or agent or former officer, employee or former agent of either Party, nor a national of Tanzania.

(e)   If the Company or the GOT reasonably believes that the cost of a Restoration is likely to exceed two-third (2/3) of the Threshold Amount, then the Parties shall cooperate in good faith to select an expert each time that a Preliminary Estimate is to be prepared pursuant to Article 17.5 and engage such expert to be available in case a dispute will need to be resolved. The expert shall be provided with a copy of the Preliminary Estimate and any other written materials prepared by Party and asked to read all materials that are provided. These initial costs to have the expert available and prepared to resolve a dispute quickly shall be shared equally by the Parties.

(f)   Once a dispute is referred to the expert, each Party shall provide all materials in support of its position to the expert and to the other Party within ten (10) Days of the expert's selection and may, within five (5) Days of the date it receives information from the other Party, submit such additional information to the expert in response to the information submitted. Each party shall use its best efforts to provide the expert with any additional information the expert requests. The expert shall be charged with the responsibility to use his best efforts to render his decision regarding any referred matter within thirty (30) Days of the date of the referral. Each Party shall be responsible to pay fifty percent (50%) of the costs of the expert and to pay for its own costs; provided, however, that if the expert determines that the position of a Party had substantially no merit, the expert, as part of his decision, may require one Party to pay for all of the costs of the other Party.

(g)   Notwithstanding any other provision in this Agreement to the contrary regarding the role of experts in resolving disputes, the decision of the expert as to any matter referred under Article 17.5 and 17.6 shall be final and binding on both Parties and shall not be subject to appeal. The Parties expressly waive, to the fullest extent permitted by the Laws of Tanzania, any and all rights that they may now have or may have in the future to contest the decision of the expert before any court or other adjudicatory or administrative body.

17.7   Special Compensation for Force Majeure Events

(a)   In the case of a Force Majeure Event that is covered by Article 17.5(c), the GOT shall determine whether to

proceed with the Restoration (subject to the obligation to pay special compensation pursuant to Articles 17.7(b) or 17.7(c), as the case may be), or terminate this Agreement. The Company acknowledges that the GOT may delegate the review of a Report to TANESCO, or any Relevant Authority and agrees to cooperate with TANESCO, or any such Relevant Authority as if it were the GOT. In the case of a Force Majeure Event covered Article 17.5(c), the determination required to be made by the GOT under this Article 17.7(a) shall be made no later than ten (10) Days after the earlier to occur of:

(i)  the delivery of the Report by the GOT and

(ii) the due date of the Report:

(b)  In the case of a Force Majeure Event covered by Article 17.5(a), the Company shall, unless this Agreement has been terminated by the GOT pursuant to Article 17.7(a) or 17.8(b), be entitled to an increase in the tariff pursuant to Article 5.2 of the Power Purchase Agreement to recover the costs incurred in effecting the Restoration as provided in Article 17.7(d).

(c)  In the case of a Change in Law covered by Article 17.5(a), the Company shall, unless this Agreement has been terminated by the GOT pursuant to Articles 17.8(a) or 17.8(b), be entitled to an increase in the tariff pursuant to Article 5.2 of the Power Purchase Agreement to the costs incurred in effecting the Restoration as provided in Article 17.7(d).

(d)  The costs to be recovered by the Company pursuant to Article 5.2 of the Power Purchase Agreement shall be the costs that are actually incurred by the Company to effect the Restoration (including IDC incurred in connection therewith), to the extent those costs exceed any insurance proceeds; provided, however, that each such item of cost shall have been reasonable and necessary for the Company to effect such Restoration. The Company shall deliver a schedule of such costs to the GOT, together with copies of the invoices, for review by the GOT. If the GOT contests any item of cost and the GOT and the Company cannot agree, the issue of whether such item of cost should be recovered under the Power Purchase Agreement shall be referred to an expert pursuant to Article 17.6(c).

(e)  If there is any Dispute as to whether any payment is due and payable to the Company pursuant to this Article 17.7 or any Dispute as to the amount or timing of any such payment, then pending resolution of the Dispute, GOT or TANESCO, as the case may be, shall be obligated to pay to the Company the undisputed amount and pay any disputed amount into an escrow account established for that purpose.

17.8    Termination as a Result of a Force Majeure Event

(a)    If this Agreement is terminated as a result of a Force Majeure Event or Change in Law covered then the provisions of Article 20.1(e) or 20.1(f) shall be applied to determine whether compensation is to be paid by the GOT to the Company.

(b)    If the Company is required to proceed with a Restoration pursuant to Article 17.5 and the Restoration has not been completed by the end of the Restoration Schedule (as such Restoration Schedule may have been extended due to an intervening Force Majeure Event), then the Company shall be required to develop a plan to complete the Restoration as soon as possible and use its best efforts to implement such plan. Notwithstanding the foregoing, if the Restoration has not been completed by the end of the Extended Period (as defined in the next sentence), then, unless the Company is diligently attempting to complete the Restoration, the GOT shall be entitled to terminate this Agreement upon ninety (90) Days notice, whereupon Article 20.1(e), as the case may be, shall apply. The Extended Period shall commence on the first Day following the end of the Restoration Schedule (as such Restoration Schedule may have been extended due to an intervening Force Majeure Event) and will end on the last Day of a period equal to fifty .(50) percent of the number of Days in the Restoration Schedule; provided, however, that the Extended Period may be extended for the full period of any intervening Force Majeure Event.

ARTICLE XVIII

TAXATION

18.1    Taxation of the Company

(a)    The Company shall not be subject to taxation in Tanzania
on its income from Capacity Payments and Energy Payments
(each as defined in the Power Purchase Agreement) for the
term of the Power Purchase Agreement, including any
extension thereof; provided, that the Company complies
with the conditions specified in the Income Tax Act,
1973, as amended at the time this Agreement was signed
and became effective.

(b)    On the application by the Company for import or customs
tax exemption, the Company and its Contractors shall be
exempted from import or customs taxation in Tanzania, and
shall be allowed to import plant and equipment and spare
parts prior to the Commercial Operations Date without
payment of Customs Duties, sales taxes, and other
surcharges, as well as without payment of Import License
fees.

(c)    The Company shall be allowed to register anywhere in
Tanzania, and may change its registration from time to
time, in order to avail itself of favourable stamp tax
and/or registration fees rates for registration of loan
documents and similar documents.

18.2    Foreign Investors

Foreign Investors will be governed by the bilateral tax
treaties with their respective countries. If there is no
bilateral tax treaty between Tanzania and any Foreign
Investor's country of residence, the Foreign Investor
will be taxed in accordance with the Laws of Tanzania.

18.    Confirmation on Taxation

The GOT hereby confirms that as of the date of the
execution of this Agreement the following tax exemptions
are granted to the Company:

IMPORT DUTY

| Items | Rate(%) |
|---|---|
| Machinery, Equipment, spare parts and supplies | 0.0 |
| Fuel Oil | 0.0 |
| Lubrication oil | 0.0 |

42

EXCISE DUTY

| Items | Rate (%) |
|---|---|
| Fuel Oil | 0.0 |
| Lubrication Oil | 0.0 |

SALES TAX

| Items | Rate (%) |
|---|---|
| Machinery, Equipment, Spare pasts and Supplies | 0.0 |
| Fuel Oil | 0.0 |
| Lubrication Oil | 0.0 |

CORPORATE INCOME TAX

| Commercial Operation Year | Rate (%) |
|---|---|
| One to five | 0.0 |
| Six to twenty, not more than | 35.0  see 14.1 |

WITHHOLDING TAX

| Withholding Tax on Dividends | Rate (%) |
|---|---|
| Commercial operations year one to five | 0.0 |
| Commercial operations year Six to twenty, not more than | 20.0 |

| Withholding Tax on Interest on Foreign Loan | Rate (%) |
|---|---|
| Commercial operations year one to five | 0.0 |
| Commercial operations year Six to twenty, not more than | 20.0 |

CAPITAL ALLOWANCE (TAX DEPRECIATION)

| Items | Rate (%) |
|---|---|
| Utility Equipment | 12.5 annual |
| Industrial buildings | 4.0 annual |

ENVIRONMENTAL TAX rate assumed at 0.0%

## ARTICLE XIX

### TERMINATION

19.1 Termination for Default

(a) Termination by the GOT

Each of the following events shall be an event of default by the Company (each a "Company Event of Default"), which, if not cured within the time period permitted (if any) to cure, shall give rise to the right on the part of the GOT to terminate this Agreement pursuant to Article 19.2; provided, however, that no such event shall be an Event of Default by the Company: (aa) if it results from a breach by the GOT of this Agreement or the Guarantee; (bb) if it results from a breach by TANESCO of the Power Purchase Agreement; (cc) if it results from a breach by the Fuel Supplier of the Fuel Supply Contract; or (dd) if it occurs as a results of or during a Force Majeure Event for the period provided pursuant to Article 17.4:

(i)   the failure of the Company to achieve the Commencement Date within ninety (90) Days after Financial Closing;

(ii)  the failure of the Company to achieve the Commercial Operations Date within twenty four (24) months after the Scheduled Commercial Operations Date; as extended from the initial Scheduled Commercial Operation Date for the Facility pursuant to Article XVII.

(iii) unless such breach is caused solely by a breach of the Power Purchase Agreement by TANESCO, any material breach by the Company of this Agreement, the Power Purchase Agreement, that is not remedied within ninety (90) Days after notice from the GOT or TANESCO, stating that a material breach of such agreement has occurred that could result in the termination of the agreement, identifying the material breach in question in reasonable detail, and demanding remedy thereof.

(b) Termination by the Company

Each of the following events shall be an event of default by the GOT (each a "GOT Event of Default"), which, if not cured within the time period permitted (if any) to cure shall give rise to the right on the part of the Company to terminate this Agreement pursuant to Article 19.2; provided, however, that no such event shall be an Event of Default by the GOT (aa) if it results from a breach by the Company of the Power Agreement or this Agreement or; (bb) if it occurs as a result of a Force Majeure Event during

the period provided pursuant to Article 17.4:

(i)    The expropriation, compulsory acquisition, or nationalization by the GOT or any Governmental Authority of (i) any Ordinary Share Capital, or (ii) any material asset or right of the Company (except as contemplated by the Security Package);

(ii)   The failure by the Company to obtain the Consents under Article 6.2(b) or within the six (6)-month period as provided in Article 6.2(c), so long as such failure is not the result of the fault of, or delay by, the Company;

(iii) Any procurement by the GOT or any Governmental Authority of (i) any Ordinary Share Capital if the result would be for the GOT and/or any Governmental Authority to acquire control of the Company or its management, or (ii) any material asset or right of the Company (except as contemplated by the Security Package);

(iv)  The dissolution, pursuant to law, of TANESCO, except for :

    (A)    the privatization of TANESCO's power stations or any port of its transmission or distribution facilities

    (B)    an amalgamation, reorganization, reconstruction, or further privatization of TANESCO where the GOT without interruption guarantees the performance of the succeeding entity on the same terms and conditions as the Guarantee or such commercial security is provided for the obligation of the succeeding entity that in the reasonable business judgment of the Company provides an adequate alternative to the Guarantee;

(v)    Any default or defaults by the GOT in the making of any payment or payments required to be made by it under the Guarantee referred to in Article XXII on the due date for payment that exceed, in the aggregate at any one time, a sum equivalent to one (1) month of Capacity Payments under the Power Purchase Agreement;

(vi)  Any material breach by the GOT of this Agreement that is not remedied within ninety (90) Days after notice from the Company to the GOT stating that a material breach of the Agreement has occurred that could result in the termination of this Agreement, identifying the material breach in reasonable detail, and demanding remedy thereof;

(vii) Any material breach by TANESCO of the Power Purchase Agreement including but not limited to the failure by

TANESCO to provide the security for payment required by Article 6.6 of the Power Purchase Agreement, that is not remedied within thirty (30) Days after the receipt of a notice from the Company to TANESCO that states that a material breach of the applicable agreement has occurred that could result in the termination of that agreement, identifies the breach in reasonable detail, and demands remedy thereof or the failure of the GOT to provide the security for payment required under Article 15.3;

(viii) Any change in any applicable Laws of Tanzania (including the Constitution of Tanzania ) making

(A) unenforceable, invalid or void any material undertaking of the GOT or TANESCO, under this Agreement, the Guarantee, the Power Purchase Agreement; provided, however, that for so long as the GOT or TANESCO, as the case may be, continues to perform each such material undertaking that has been made unenforceable, invalid, or void, and provides adequate assurance to the Lenders that it will continue to perform or will be able to perform its undertakings under the affected agreement for the remaining balance of the term of this Agreement, no GOT Event of Default shall exist hereunder; or

(B) unlawful for the Company, the Lenders or the Investors to make or receive any payment, to perform any obligation or to enjoy or enforce any material right under this Agreement or any other document in the Security Package, or any such payment, the perform of any such material obligation or the enjoyment or enforcement of any such material right unenforceable, invalid or void as a result of any such change in law; or

(vix) Any change in any of the Laws of Tanzania placing any material restrictions or limitations (beyond those restrictions or limitations that are in existence on the date of the execution of this Agreement) on the ability of the Foreign Investors to repatriate any dividends (or other distributions not arising in connection with a breach of this Agreement) from the Company to the Foreign Investors which restrictions or limitations remain in place for more than sixty (60) Days without an arrangement being provided to exempt the Company or its Foreign Investors from all such restrictions and limitations.

19.2    Termination Notices

(a) Upon the occurrence of a GOT Event of Default or a Company Event of Default, as the case may be, that is not cured within the applicable period (if any) for cure, the non-defaulting Party may, at its option, initiate termination of this Agreement by delivering a notice (a

46

"Notice of Intent to Terminate") of its intent to terminate this Agreement to the defaulting Party. The Notice of Intent to Terminate shall specify in reasonable detail the Company Event of Default or the GOT Event of Default, as the case may be, giving rise to such notice.

(b) Following the delivery of a Notice of Intent to Terminate, the Parties shall consult for a period of up to thirty (30) Days in case of a failure by either Party to make payments when due, and up to sixty (60) Days with respect to any other Event of Default (or such longer period as the Parties may mutually agree), as to what steps shall be taken with a view to mitigating the consequences of the relevant Event of Default taking into account all the circumstances. During the period following the delivery of the Notice of the Intent to Terminate, the Party in default may continue to undertake efforts to cure the default, and if the default is cured at any time prior to the delivery of a Termination Notice in accordance with Article 19.2(c), then the non-defaulting Party shall have no right to terminate this Agreement in respect of such cured default.

(c) Upon expiration of the consultation period described in Article 19.2(b) and unless the Parties shall have otherwise agreed or unless the Event of Default giving rise to the Notice of Intent to Terminate shall have been remedied, the Party having given the Notice of Intent to Terminate may terminate this Agreement by delivering a Termination Notice to the other Party, whereupon this Agreement shall immediately terminate and Article XX shall apply.

## 19.3 Notice to the GOT of TANESCO's Default

(a) Anything in this Agreement notwithstanding, the Company shall not seek to terminate this Agreement, the Power Purchase Agreement, without first giving a copy of any notices required to be given to the GOT under Articles 19.1 and 19.2 to the GOT, such notices to include a request to the GOT to cure any such default within the same cure period as provided to TANESCO under the Power Purchase Agreement and such cure period to commence upon delivery of each such notice to the GOT. The Company shall give to the GOT copies of any notice that the Company delivers to TANESCO pursuant to Article 16.4 of the Power Purchase Agreement. Each such notice shall be deemed to have been delivered (i) when presented personally to the GOT, (ii) when transmitted by facsimile, or (iii) five (5) Days after being deposited in a regularly maintained receptacle for the Postal Service in Tanzania, postage prepaid, registered or certified, return receipt requested, addressed to the GOT, at the address indicated in Article XXIII (or such other address as the GOT may have specified by written notice delivered in accordance herewith).

(b) No rescission or termination of this Agreement, the Power Purchase Agreement, by the Company shall be effective without such notice and expiration of such cure period. The GOT may make, any payment or to perform any act required of

TANESCO under the Power Purchase Agreement with the same effect as if the payment or act had been made or performed by TANESCO. If the GOT fails to cure or is unable or unwilling to cure a default of TANESCO within the cure periods provided to TANESCO under the Power Purchase Agreement, the Company shall have all of its rights and remedies with respect to such default as set forth in this Agreement, the Power Purchase Agreement, as the case may be; **provided, however,** that if the GOT is diligently attempting to cure such default of TANESCO and, demonstrable progress toward affecting such cure is being made, the GOT shall be granted an additional period not exceeding ninety (90) Days to affect such cure before the Company may exercise its rights and remedies with respect to such default set forth in this Agreement and the Power Purchase Agreement.

### 19.4 Notice to the Lenders of the Company's Default

(a) Anything in this Agreement notwithstanding, from and after the occurrence of the Financial Closing, the GOT shall not seek to terminate this Agreement as the result of any default of the Company without first giving a copy of any notices required to be given to the Company under Articles 19.1 and 19.2 to the Lenders, such notice to be copied with a request to the Lenders to cure any such default within the same cure period as provided to the Company in this Agreement and such cure period to commence upon delivery of each such notice to the Lenders. If there is more than one Lender, the Lenders will designate in writing to the GOT an agent (the "Agent") and any notice required hereunder shall be delivered to such Agent, such notice to be effective upon delivery to the Agent as if delivered to each of the Lenders. Each such notice shall be in writing and shall be deemed to have been delivered (a) when presented personally to the Lender or the Agent, (b) when transmitted by facsimile to the number specified in accordance with the procedure set forth below, or (c) five (5) Days after being deposited in a regularly maintained receptacle for the Postal Service in Tanzania, postage prepaid, registered or certified, return receipt requested, addressed to the Lender at the address indicated at Financial Closing ( or such other address or to the Agent at such address as the Lenders may have specified by written notice delivered in accordance herewith). Any notice given by facsimile under this Article 19.4 shall be confirmed in writing delivered personally or sent by prepaid post, but failure to so confirm shall not void or invalidate the original notice if it is in fact received by the Lender or the Agent. If the address of the Lender or Agent is outside Tanzania, any notice delivered to the Lender or Agent pursuant to this Article 19.4 shall be sent by international courier or facsimile, and if sent by facsimile, confirmed by international courier. The address and facsimile number for Lender or Agent shall be provided to the GOT by the Company at Financial Closing and thereafter may be changed by the Lender or the Agent by subsequent delivery of a notice to the GOT at the address or facsimile number for

the GOT provided in Article 23.1 (or at such other address or facsimile number subsequently delivered to the Lender or the Agent in accordance with this Article 19.4) and otherwise in accordance with the requirements of Article 23.1.

(b)    No recision or termination of this Agreement by the GOT shall be valid or binding upon the Lenders without such notice and the expiration of such cure period. The Lenders may make, but shall be under no obligation to make, any payment or perform any act required to be made or performed by the Company, with the same effect as if made or performed by the Company. If the Lenders fail to cure or are unable or unwilling to cure a default within the cure period as provided to the Company in this Agreement, the GOT shall have all its rights and remedies with respect to such default as set forth in this Agreement; _provided, however_, that if the Lenders are diligently attempting to cure such default of the Company and demonstrable progress toward affecting such cure is being made, the Lenders shall be granted an additional period not exceeding ninety (90) Days to affect such cure before the GOT may exercise its rights and remedies with respect to such default set forth in this Agreement.

## 19.5 Other Remedies

The exercise of the right of a Party to terminate this Agreement, as provided herein, does not preclude the Party from exercising other remedies that are provided herein or are available at law. Remedies are cumulative, and the exercise of, or failure to exercise, one or more remedy by a Party shall not limit or preclude the exercise of, or constitute a waiver of, other remedies by that Party.

## ARTICLE XX

### RIGHTS AND OBLIGATIONS OF PARTIES UPON TERMINATION

2.  Compensation Upon Termination

(a)  Company Event of Default

In the event the GOT terminates this Agreement pursuant to Article 19.1 (a) as a result of a Company Event of Default, the GOT or its designee shall have the right, but shall not be required, to acquire of all the Company's rights, title and interests in and to the Facility: provided, that the GOT or its designee, upon such acquisition, pays the Company the compensation amount set forth in Row 1 of the Compensation Table in Schedule 2. If the GOT does not elect to purchase the Facility upon the effective date of the termination, the GOT shall have no further rights or interest in, or obligations to, the Facility.

(b)  GOT Event of Default

In the event the Company terminates this Agreement pursuant to Article 19.1 (b) as a result of GOT Event of Default, the Company may elect to transfer the Facility to the GOT or its designee and, upon such transfer, the GOT or its designee shall pay the Company the compensation amount set forth in Row 2 of Schedule 2.

(c)  Termination Following Change in Law

In the event of a termination of this Agreement following a Change in Law, the GOT shall pay the Company the compensation amount set forth in Row 3 of the Compensation Table in Schedule 2. Upon payment of such compensation amount, the Company shall transfer the Facility to the GOT.

(d)  Termination Following Acquisition of Shares and Assets

In the event the GOT or TANESCO expropriate, compulsorily acquire, nationalise, or otherwise compulsorily procure any Ordinary Share capital or assets of the Company, the GOT shall pay the Company the compensation account set forth in Row 4 of the Compensation Table in schedule 2.

(e)  Termination Following Force Majeure Event:

(i)   If following a Force Majeure Event, the Parties agree or an expert determines that Restoration is feasible, but the GOT elects to terminate this Agreement, the GOT shall pay the Company the compensation amount set forth in Row 5 of the Compensation Table in Schedule 2. Upon payment of such the Company shall transfer the Facility to the GOT.

(ii)    If following a Force Majeure Event, the Parties agree or an expert determines that Restoration is not feasible, the GOT shall pay the Company the compensation amount set forth in Row 6 of the Compensation Table in Schedule 2. Upon payment of such compensation amount, the Company shall transfer the Facility to the GOT.

(iii)   If following a Force Majeure Event, the Parties agree or an expert determines that Restoration is feasible, but the Company is unable to obtain financing for the Restoration the GOT shall pay the Company the compensation amount set forth in Row 7 of the Compensation Table in Schedule 2. Upon payment of such compensation amount, the Company shall transfer the Facility to the GOT.

(iv)    If following a Force Majeure Event, the GOT terminates this Agreement in accordance with Article 17.8(b) as a result of a failure to timely complete a Restoration, the GOT shall, so long as the Company has made demonstrable good faith effort to effect the Restoration, pay the Company the compensation amount set forth in Row 8 of the Compensation Table in Schedule 2. Upon payment of such compensation amount, the Company shall transfer the Facility to the GOT.

(f)   **Termination Following Force Majeure Event Under the Power Purchase Agreement or Fuel Supply Contract**

If following a force majeure event affecting TANESCO or a force majeure event under the Fuel Supply Contract, the GOT pursuant to Article 17.5(c) elects to terminate this Agreement, the GOT shall pay the Company the compensation amount set forth in Row 9 of the Compensation Table in Schedule 2. Upon payment of such compensation amount, the Company shall transfer the Facility to the GOT.

(g)   **Termination Following Company's Inability to Obtain Permits**

If this Agreement is terminated pursuant to Article 17.5(d) as a result of the Company's inability to obtain a necessary Consent, GOT shall pay the Company the compensation amount set forth in Row 10 of the Compensation Table in Schedule 2. Upon payment of such compensation amount, the Company shall transfer the Facility to GOT.

(h)   **Use of Certain Insurance Proceeds**

Whenever this Agreement is terminated pursuant to Article XVII following a Force Majeure Event, and the GOT is obligated to pay compensation to the Company pursuant to Article 20.1 and insurance proceeds are available in connection with the Force Majeure Event, the total amount of the net proceeds made available under the insurance policies to which the Company is entitled with respect to the Facility shall, if not used to effect a Restoration or

make repairs to the Facility, be used to pay the following items in the following order of priority;

* to the payment of all indebtedness secured by the Facility;

* then to the other compensation, if any, payable by the GOT to the Company as set forth in Schedule 2; and

* then to the Company.

## 20.2 Reimbursement

In the event of a termination of this Agreement for any reason other than a GOT Event of Default, a Force Majeure Event, or a Change in Law, prior to the Commercial Operations Date, the Company shall reimburse the GOT for all costs and expenses (including reasonable attorneys' fees and expenses) relating to the Project incurred by the GOT prior to the termination, which amount in any event shall not exceed USD100,000.

## 20.3 Obligations Upon Termination

Upon the expiration or earlier termination of this Agreement, the Parties shall have no further obligations hereunder except for obligations that arise prior to or arise upon such expiration or termination and obligations that expressly survive such expiration or termination pursuant to this Agreement, provided, however, that notwithstanding anything to the contrary in the Agreement, the rights and obligations set out in Article XIV (Foreign Currency Exchange and Transfer of Funds) and Article XXI (Resolution of Disputes) shall survive any termination or expiration of this Agreement until all provisions are fulfilled and all funds payable hereunder by GOT are received by the Company or the Lenders upon the sale or other disposal of the assets related to the Project, including without limitation, proceeds from the enforcement by the Lenders of the security created by the Company under or pursuant to the Security Package have been repatriated and, if the Company or the Foreign Investors so desire in the case of Shilling funds, converted by the Company or the Foreign Investors into Foreign Currency by Bank of Tanzania in accordance with the terms of this Agreement and repatriated.

52

## ARTICLE XXI

### RESOLUTION OF DISPUTES

**21.1 Procedural Law**

The Law governing the procedure and administration of any arbitration instituted shall be the English Law.

**21.2 Arbitration**

Any dispute or difference between the Parties arising out of or in connection with this Agreement (each a "Dispute") shall be settled by arbitration in accordance with the Rules of Procedure for Arbitration Proceedings (the "ICSID Rules") of the International Centre for the Settlement of Investment Disputes (the "Centre") established by the Convention on the Settlement of Investment Disputes between States and Nationals of other States (the "Convention"). For purposes of consenting to the jurisdiction of the Convention, the Parties agree that the Company is a foreign controlled entity unless the amount of the voting stock in the Company held by Foreign Investors should decrease to less than thirty-five (35) percent of the outstanding voting stock of the Company.

If for any reason the Dispute cannot be settled in accordance with the ICSID Rules, whether if the GOT fails to implement the Convention, or if the Company should not be agreed to be a foreign controlled entity, or if the request for arbitration proceedings is not registered by the Centre, or if the Centre fails or refuses to take jurisdiction over such Dispute, or otherwise, any Dispute shall be finally settled by arbitration under the Rules of Arbitration of the International Chamber of Commerce (the "ICC Rules") by one or more arbitrators appointed in accordance with the ICC Rules.

The arbitration shall, unless otherwise agreed by the Parties, be conducted in London, England. Unless otherwise agreed by the Parties, the number of arbitrators shall be three (3), one arbitrator nominated by the Company, one arbitrator nominated by GOT and one arbitrator nominated jointly by the arbitrators appointed by the Company and GOT provided that if the arbitrators appointed by the Company and GOT fail to nominate an arbitrator or agree on the nomination of the arbitrator within 28 days of either both being appointed either party may apply to the High Court of the England and Wales to appoint the third arbitrator.

For the purpose of Article 25(3) of the Convention, the GOT hereby approves TANESCO's consents in the Power Purchase Agreement to arbitration under the ICSID Rules.

No arbitrator appointed pursuant to this Article 21.2 shall be a national of the jurisdiction of either Party or of the jurisdiction of any shareholder or group of shareholders owning thirty (30) percent or more of the Ordinary Share Capital, nor shall any arbitrator be an employee or agent or former employee or agent of any such person.

21.3 Commercial Acts

Subject to Article 24.7, the GOT unconditionally and irrevocably agrees that the execution, delivery, and performance by it of this Agreement and those agreements included in the Security Package to which it is a party constitute private and commercial acts.

54

## ARTICLE XXII

### GUARANTEE

The GOT shall, simultaneously with this Implementation Agreement, execute and deliver to the Company the Guarantee as per schedule 1 to this Agreement.

## ARTICLE XXIII

### NOTICES

### 23.1 Address for Notice

All notices, communications, or other documents (together "Notices") to be given or made by one Party to the other Party pursuant to this Agreement shall be in writing, shall be addressed for the attention of the person indicated below, and shall either be delivered personally or sent by telegram, registered or certified mail, or facsimile. The addresses for service of the Parties and their respective facsimile numbers shall be:

* For the GOT        :    MINISTRY OF WATER ENERGY AND MINERALS
* Attention          :    PRINCIPAL SECRETARY
* Address            :    SOKOINE DRIVE/MKWEPU STREET
                          P.O. Box 2000, Dar es Salaam
* Facsimile          :    51-44071
* For the Company    :    Independent Power Tanzania Ltd
* Attention          :    Mr. James Rugemalira
* Address            :    5th Floor, Extelcoms House,
                          Samora Avenue, P.O. Box 1461
                          Dar es Salaam
                          United Republic of Tanzania
* Facsimile          :    51-46017
* With a copy to Counsel for the Company: LONG & COMPANY
* Attention          :    Ms. Joanne C. F. Long
* Address            :    9B Bukit Ceylon
                          50200 Kuala Lumpur
                          Malaysia
* Facsimile          :    603-201 4832
* or such other addresses and facsimile numbers as either Party may have notified to the other Party in accordance with this Article 23.1

### 23.2 Delivery

All Notices shall be deemed delivered:

(a)  when presented personally;

(b)  if received on a business Day for the receiving Party, when transmitted by facsimile to the receiving Party's

56

facsimile number specified above and, if received on a Day that is not business Day for the receiving Party, on the first business Day following the date transmitted by facsimile to the receiving Party's facsimile number specified above;

(c)   one (1) Day after being delivered to a courier for overnight delivery, addressed to the receiving Party, at the address indicated above (or such other address as such Party may have specified by Notice delivered to the delivering Party at its address or facsimile number specified above); or

(d)   five (5) Days after being deposited in a regularly maintained receptacle for the postal service in Tanzania, postage prepaid, registered or certified, return receipt requested, addressed to the receiving Party, at the address indicated above (or such other address as the receiving Party may have specified by written Notice delivered to the delivering Party at its address or facsimile number specified above). Any notice given by facsimile shall be Notice confirmed in writing delivered personally or sent by registered or certified mail, but the failure to so confirm shall not void or invalidate the original notice if it is in fact received by the Party to which it is addressed.

ARTICLE XXIV

MISCELLANEOUS PROVISIONS

24.1 Variations in Writing

All additions, amendments and variations to this Agreement shall be binding only if in writing and signed by duly authorized representatives of the Parties.

24.2 Entire Agreement

This Agreement, the Power Purchase Agreement, and together with their attached schedules, incorporate the entire understanding between the Parties in relation to the Project and supersede all previous oral and written representations, agreements or arrangements between the Parties in respect of the Project.

24.3 Waivers

No waiver by either Party of any default by the other in the performance of any of the provisions of this Agreement:

(i)    shall operate or be construed as a waiver of any other or further default whether of a like or different character; or

(ii)   shall be effective unless in writing duly executed by an authorized representative of the Party.

The failure by either Party to insist on any occasion upon the performance of the terms, conditions, and provisions of this Agreement, or time or other indulgence granted by one Party to the other shall not thereby act as a waiver of the breach, as acceptance of any variation, or as the relinquishment of any such right hereunder, which shall remain in full force and effect.

24.4 Confidentially

(a) Each of the Parties shall, and shall ensure that their Contractors, subcontractors, consultants, and agents, and each of their respective permitted successors and assigns, hold in confidence all documents and other information whether technical or commercial, which is of a confidential nature supplied to it by or on behalf of the other Party relating to the Project and shall not (save as required by law or appropriate regulatory authorities or prospective lenders to, or investors in, the Company or the respective professional advisers of the Parties or of such lenders or investors as aforesaid) publish or otherwise disclose or use the same for its own purposes, otherwise than as may be required to perform its obligations under this Agreement.

The provisions of this Article 24.4 shall survive the termination of this Agreement, but shall expire and be of no further effect upon the fifth (5th) anniversary of the date of termination of this Agreement.

(b)  The provisions of Article 24.4(a) above shall not apply to:

(i)  information in the public domain otherwise than by breach of this Agreement;

(ii)  information in the possession of the receiving Party thereof before divulgence that was not obtained under any obligation of confidentiality; and

(iii)  information obtained from a third party who the receiving Party believes, after reasonable inquiry, is free to divulge the same so long as the information was not obtained by the receiving Party under any obligation of confidentiality to the third party.

(iv)  Nothing herein shall preclude the use of provisions similar to those contained in this and the other agreements referred to herein in any agreements prepared and issued in connection with other projects.

## 24.5 Successors and Assignees

This Agreement shall inure to the benefit of, and be binding upon, the permitted successors and permitted assignees of the Parties.

## 24.6 No Third Party Beneficiaries

This Agreement shall not confer any right of suit or action whatsoever on any third party, except for the specific rights granted to the Lenders pursuant to Articles 15.2, 18.2 and 19.4.

## 24.7 Sovereign Immunity

The GOT hereby irrevocably and unconditionally agrees that: (i) should any proceedings be brought against the GOT or its assets, or other than its aircraft, naval vessels and other defence related assets or assets protected by the diplomatic and consular privileges under the State Immunity Act of England or the foreign Sovereign Immunities Act of the United States or any analogous legislation (the "Protected Assets") in any jurisdiction in connection with this Agreement or any of the transactions contemplated by this Agreement, no claim of immunity from such proceedings will be claimed by or on behalf of the GOT on behalf of itself or any of its assets (other than the Protected Assets); (ii) it waives any right of immunity which it or

any of its assets (other than the Protected Assets) now has or may in the future have in any jurisdiction in connection with any such proceedings; and (iii) consents generally in respect of the enforcement of any judgment against it in any such proceedings in any jurisdiction to the giving of any relief or the issue of any process in connection with such proceedings (including without limitation, the making, enforcement or execution against or in respect of any of its assets whatsoever (other than the Protected Assets) regardless of its use or intended use.

## 24.8 Governing Law

This Agreement and the (rights and obligations of the Parties hereunder shall be governed by and construed in accordance with the Laws of Tanzania.

## 24.9 Consent to Jurisdiction

Each Party hereby consents to the jurisdiction of the courts of London, England for any action filed by other Party to enforce a judgment entered by the courts of England and Wales recognizing any award or decision of any arbitrator(s) or experts who were duly appointed under this Agreement to resolve any Dispute between the Parties. With respect to any such proceedings for the enforcement of any such award against the assets of a Party (other than the Protected Assets in the case of proceedings against the GOT):

* The GOT appoints the Commercial Counsellor of The United Republic of Tanzania in London (or, in his absence, a responsible officer in the High Commission) whose address is presently [          ], London, England to receive for and on its behalf service of process in such jurisdiction in any such enforcement proceeding;

* The Company appoints MR. AHMED DAYA whose address is presently 212, Station Road, Edgware, Middless HA87AR, England to receive for and on its behalf service of process in such jurisdiction in any such enforcement proceeding;

* Each Party shall maintain in England a duly appointed agent for the receipt of service of process and shall notify the other Party of the name and address of such agent and any change in such agent and/or the address of such agent; and

* Each party agrees that the failure by any such agent for the receipt of service of process to give it notice of any process that has been served on such agent shall not impair the validity of such service or of any judgment based thereon.

24.10    Most Favoured Nation

If the GOT grants any concessions, incentives or more favourable terms and conditions (other than those that granted to the project company because of technical limitations of, or fuel used by, or location of, the project) in an implementation agreement entered into between the GOT and a project company that has prior to the date of this Agreement entered into a memorandum of understanding for an implementation agreement related to such project, the GOT agrees to amend this Agreement to include such concessions, incentives or more favourable terms and conditions that are requested in writing in a notice from the Company to the GOT.

IN WITNESS WHEREOF, the Parties have entered into this Agreement as of the date first above written.

THE UNITED REPUBLIC OF TANZANIA

By:        RAPHAEL MOLLEL
Title:     PRINCIPAL SECRETARY, MINISTRY OF WATER, ENERGY
           AND MINERALS

INDEPENDENT POWER TANZANIA LTD.

By:        JAMES B. RUGEMALIRA
Title:     DIRECTOR

[SEAL]

61

SCHEDULE 1

FORM OF GUARANTEE

THIS GUARANTEE is made at Dar es Salaam, United Republic of Tanzania the 8th of June, 1995

BETWEEN:

THE GOVERNMENT OF THE UNITED REPUBLIC OF TANZANIA acting through its Ministry of Water, Energy and Minerals (hereinafter referred to as the "Guarantor") of the one part; and

Independent Power Tanzania Ltd. a private limited Company incorporated under the laws of Tanzania, whose registered office is located at 5th Floor, Extelcoms House, Samora Avenue, P.O. Box 1461, Dar es Salaam, United Republic of Tanzania (hereinafter referred to as the "Company").

WHEREAS:

(A)   The Guarantor and the Company have entered into an Implementation Agreement (the "Implementation Agreement") dated 8th June, 1995.

(B)   The Tanzania Electric Supply Company Limited ("TANESCO") has entered into a Power Purchase Agreement with the Company (the "Power Purchase Agreement") dated 26th may, 1995.

(C)   In accordance with Article XXII of the Implementation Agreement, the Guarantor has agreed to enter into this Guarantee of the payment obligations of TANESCO under the Power Purchase Agreement.

NOW IT IS HEREBY AGREED as follows:

1        GUARANTEE

1.1  Guarantee

In consideration of the Company entering into the Power
Purchase Agreement with TANESCO the Guarantor hereby
irrevocably and unconditionally guarantees and promises to
pay the Company any and every sum of money TANESCO is
obligated to pay to the Company pursuant to the Power
Purchase Agreement TANESCO has failed to pay in accordance
with the terms of those agreements.

1.2  Waiver of Defence

The obligations of the Guarantor under this Guarantee shall
be absolute and unconditional and shall remain in full
force and effect until all the covenants, terms, and
agreements set forth in the Power Purchase Agreement, shall
have been completely discharged and performed, unless
waived by the Company in writing. The obligations of the
Guarantor shall not be modified or impaired upon the
happening from time to time of any event, including the
following:

1.2.1    The extension of time for payment of any amounts
         due or of time for performance of any of the
         covenants, terms, or agreements of TANESCO, set
         forth in the Power Purchase Agreement.

1.2.2    Amendments to the Power Purchase Agreement that
         do not affect in any material way the rights or
         obligations of TANESCO,  or the Company under
         those agreements.

1.2.3    The failure, omission, or delay by the Company to
         enforce, ascertain, or exercise any right, power
         or remedy under or pursuant to the terms of the
         Power Purchase Agreement, Insurance, or this
         Guarantee;

1.2.4    The bankruptcy, insolvency, or other failure or
         financial disability of TANESCO, or the Company;
         or

1.2.5    The addition, or partial or entire release of any
         guarantor, maker, or other Party (including
         TANESCO) primarily or secondarily responsible for
         the performance of any of the covenants, terms,
         or agreements set forth in the Power Purchase
         Agreement or by any extension, waiver, amendment,
         or thing whatsoever that may release or create a
         defence for a guarantor (other than performance
         in accordance with the terms of the Power
         Purchase Agreement).

1.3  Continuing Guarantee

1.3.1    This Guarantee shall be a continuing security
         and, accordingly, shall extend to cover the

63

balance due to the Company at any time from TANESCO under the Power Purchase Agreement. No demand made by the Company hereunder shall prejudice or restrict the right of the Company to make further or other demands.

### 1.4  Additional Security

1.4.1    This Guarantee shall be in addition to, and not in substitution for or derogation of, any other security that the Company may at any time hold in respect of the obligations of TANESCO under the Power Purchase Agreement.

1.4.2    The Company may enforce this Guarantee notwithstanding that it may hold any other guarantee, lien, or security of or for the obligations of TANESCO under the Power Purchase Agreement or have available to it any other remedy at law or equity.

### 1.5  Preliminary Recourse

1.5.1    Before taking steps to enforce this Guarantee and demanding payment from the GOT, the Company shall be obliged only to make demand in writing for payment from TANESCO. After 30 Days (during which time the Company shall make further requests for payment, with a copy to the GOT of each request, from TANESCO) from the date payment was due, the Company may notify the GOT in writing that payment from TANESCO is past due and make a demand for payment from the GOT under this Guarantee, and the GOT shall make payment within five (5) Days. Late payments hereunder shall bear mark-up at an annual rate equal to the then applicable one-year LIBOR rate plus three (3) percentage points. Amounts in dispute under the Power Purchase Agreement shall be deemed not to be due and owing for purposes of this Guarantee until expiration of any dispute resolution procedures provided in each of the respective Agreements.

1.5.2    Except as provided in Article 1.4.1, the Company shall not be obliged before taking steps to enforce this Guarantee to exercise any other remedies that may be available to it under or in respect of the Power Purchase Agreement or to obtain judgment against TANESCO thereon.

### 1.6  Certification

Any demand for payment made pursuant to this Guarantee shall be made in person by a duly authorized officer of the

Company at the Guarantors offices at [identify location] and shall be accompanied by a certificate signed by a duly authorised officer of the Company stating that:

"We hereby certify that (1) [specify Company], (the "Company") is making this demand on the Government of the Republic of Tanzania (the "Guarantor") in the amount of United States Dollars [insert amount] in accordance with Article 1 of the Guarantee dated 8th June, 1995, between the Guarantor and the Company; (2) the amount specified above is due and payable by the Tanzania Electric Company Limited ("TANESCO") under the Power Purchase Agreement between the Company and TANESCO and no part of the amount specified above is the subject of a dispute between the Parties; (3) demand in writing for payment from TANESCO has been made; (4) for a period of not less than 30 Days from the date payment was due, further request for payment have been made to TANESCO or to obtain the payment of such amount; and (5) such amount, on the date hereof, remains unpaid by TANESCO.

## 1.7  Subordination

Any right that the Guarantor may at any time have to be indemnified by TANESCO in respect of sums paid out by the Guarantor in performance of this Guarantee shall be subordinated to the rights of the Company to recover from TANESCO in full all sums that may at any time become due from TANESCO under the Power Purchase Agreement.

## 1.8  No Set-off

No set-off, counterclaim, reduction, or diminution of any obligation that the Guarantor has or may have against the Company shall be available to the Guarantor against the Company in connection with any obligation of the Guarantor to the Company under this Guarantee; provided, however, that notwithstanding the foregoing the Guarantor shall have the benefit of all rights of set-off, counterclaim, reduction, or diminution of any obligations that are available to TANESCO, pursuant to the Power Purchase Agreement or that are otherwise directly related to the Project.

## 1.9  Consent to Jurisdiction

Each Party hereby consents to the jurisdiction of the courts of London, England for any action filed by the Party to enforce any award or decision of any arbitrator (s) or expert (s) who were duly appointed under this Agreement to resolve any Dispute between the Parties.  With respect to any such proceedings for the enforcement of any such award against that assets of a Party (other than the Protected Assets in the case of enforcement proceedings against the GOT) :

(a)  The GOT appoints the Commercial Counsellor of the Republic of Tanzania in London (or, in his absence, a responsible officer in the Tanzania High Commission) whose address is presently 43 Hertford Street, London, WIY7 TF, England to receive for and on its behalf service of process in such jurisdiction in any such enforcement proceeding;

(b)  The Company appoints Mr. Ahmed Daya whose address is presently 212, Station Road, Edgware, Middlesex HA8 7AR, England to receive for and on its behalf service of process in such jurisdiction in any such enforcement proceeding;

(c)  Each Party shall maintain in England a duly appointed agent for the receipt of service of process and shall notify the other Party of the name and address of such agent and any change in such agent and/or the address of such agent; and

(d)  Each Party agrees that the failure by any such agent for the receipt of service of process to give it notice of any process that has been served on such agent shall not impair the validity of such service or of any judgement based thereon.

2    REPRESENTATIONS AND WARRANTIES

The Guarantor represents and warrants that, as of the date hereof:

2.1  Power and Authority

The Guarantor has full power, authority, and legal right to incur the obligation, to execute and deliver, and to perform and observe the terms and provisions of this Guarantee.

2.2  Legal Validity

This Guarantee constitutes legal, valid, binding, and enforceable obligations of the Guarantor in accordance with its terms.

2.3  Approvals

All necessary action has been taken, and all approvals required have been obtained, under the Laws of Tanzania to authorise the execution, delivery, and performance of this Guarantee.

2.4  Tax

In addition to any amount then due and payable to the

56

Company by TANESCO under the Power Purchase Agreement respectively, and payable by the Guarantor under the terms of this Guarantee, the Guarantor shall be liable for any duty, impost, levy, charge, fee or tax or whatsoever nature ("Tax") levied or imposed by a Governmental Authority or any political subdivision or authority thereof on or with regard to any payment hereunder unless the payment, if made by TANESCO would itself have been subject to the Tax. If under applicable law the Guarantor is unable to pay the Tax and the Company is required to pay the Tax, the amount to be paid to the Company hereunder shall be increased by an amount sufficient so that such payment, net of the Tax, would equal the payment the Company would have received from TANESCO net of any Taxes applicable to payment from TANESCO to the Company.

## 2.5 Full Faith and Credit

The obligations and covenants of the Guarantor in this Guarantee constitute unconditional obligations of the Guarantor, for the performance of which the full faith and credit of the Guarantor is pledged.

## 2.6 Sovereign Immunity

that it is subject to suit in England with respect to its obligations hereunder, and that the execution, delivery, and performance of this Guarantee constitute private and commercial acts of the Guarantor. The GOT hereby irrevocably and unconditionally agrees: (i) that should any proceedings be brought against the GOT or its assets, other than its aircraft, naval vessels and other defence related assets or assets protected by the diplomatic and consular privileges under the State Immunity Act of England or the Foreign Sovereign Immunities Act of the United States or any analogous legislation (the "Protected Assets"), in any jurisdiction in connection with this Guarantee or any of the transactions contemplated by this Guaranty, no claim of immunity from such proceedings will be claimed by or on behalf of the GOT on behalf of itself or any of its assets (other than the Protected Assets); (ii) it waives any right of immunity which it or any of its assets (other than the Protected Assets) now has or may in the future have in any jurisdiction in connection with any such proceedings; and (iii) it consents generally in respect of the enforcement of any judgement against it in any such proceedings in any jurisdiction to the giving of any relief or the issue of any process in connection with such proceedings (including without limitation, the making, enforcement, or execution against or in respect of any of its assets whatsoever (other than the Protected Assets) regardless of the use or intended use of the asset.

3    UNDERTAKING



### 3.1  Duration

This Guarantee shall remain in full force and effect from and after the date hereof until the termination of the initial term of the Power Purchase Agreement and for so long thereafter as any amount owed the Company by the Guarantor, TANESCO, in connection with such initial term is or may be outstanding.

### 3.2  Performance of Agreements

The Guarantor shall not take any action that would prevent or interfere with the performance by TANESCO of any of its obligations under the Power Purchase Agreement (except, in the case of any unintentional action, where the Guarantor promptly remedies such action).

### 4    NO WAIVER; REMEDIES CUMULATIVE

### 4.1  No Waiver

No failure or delay by the Company to exercise any right or remedy under this Guarantee shall constitute a waiver of that right or remedy.  No single or partial exercise of any right or remedy shall preclude any other or further exercise thereof or the exercise of any other right or remedy.  No waiver by the Company shall be effective unless it is in writing.

### 4.2  Remedies Cumulative

The rights and remedies of the Company provided by this Guarantee are cumulative and not exclusive of any rights or remedies provided by law.

### 5    NOTICES

### 5.1  Address for Notice

All notices or other communications (together "Notices") to be given or made hereunder shall be in writing, shall be addressed for the attention of the person indicated below and shall be delivered personally or sent by registered or certified mail or facsimile.  All Notices shall be deemed delivered (a) when presented personally, (b) if received on a business Day of the receiving party, when transmitted by facsimile to the receiving party's facsimile number specified above and, if received on a Day that is not a business Day of the receiving Party, on the first business Day of the receiving Party following the date transmitted by facsimile to the receiving party's facsimile number specified above, (c) one (1) Day after being delivered to a courier for overnight delivery, addressed to the receiving Party, at the address indicated above or such

other address as such party may have specified by notice delivered to the delivering Party at its address or facsimile number specified above or id five (5) Days after being deposited in a regularly maintained receptacle for the postal service in Tanzania, postage prepaid, registered or certified, return receipt requested, addressed to the receiving Party, at the address indicated above (or such other address as the receiving Party may have specified by written Notice delivered to the delivering Party at its address or facsimile number specified above). Any notice given by facsimile shall be confirmed in writing delivered personally or sent by registered or certified mail, but the failure to do so confirm shall not void or invalidate the original notice if it is in fact received by the Party to which it is addressed. The address for service of earth Party and its respective facsimile number shall be:

| | | |
|---|---|---|
| 5.1.1 | For the Guarantor: | The Government of United Republic of Tanzania |
| • | Attention: | The Principal Secretary Ministry of Water, Energy and Minerals |
| • | Address: | Sokoine Drive/Mkwepu Street P.O. BOX 2000 Dar es Salaam |
| • | Facsimile: | 51-44071 |
| 5.1.2. | For the Company: | Independent Power Tanzania Ltd. |
| • | Attention: | Mr. James Rugemalira |
| • | Address: | 5th Floor, Extelcoms House, Samora Avenue, P O Box 1461, Dar es Salaam, United Republic of Tanzania |
| • | Facsimile: | 51-46017 |
| • | with a copy to the Company's counsel: LONG & COMPANY | |
| • | Attention: | Ms. Joanne Long |
| • | Address: | 9B Bukit Ceylon, 50,200 Kuala Lumpur, Malaysia |
| • | Facsimile: | 603-201 4832 |

or such other addresses or facsimile numbers as either Party may have notified to the other Party in accordance  with this Article 5.1.

5.2    Effectiveness of Service

Each Notice under this Guarantee shall be effective only upon actual receipt thereof.

6        ASSIGNMENT

6.1    Assignment by the Guarantor

The Guarantor may not assign or transfer all or any part of its rights or obligations hereunder without the prior written consent of the Company.

6.2    Assignment by the Company

The Company may not assign or transfer all or any part of its rights or obligations hereunder without the prior written consent of the Guarantor. Notwithstanding the provision of the immediately preceding sentence, for the purpose of construction or permanent financing of the GOT, the Company may assign or create a security interest over its rights and interests in and to this Guarantee.

6.3    Successors

This Guarantee shall be binding upon and inure to the benefit of the Guarantor and the Company and the respective successors and permitted assigns of each.

7        GOVERNING LAW AND ARBITRATION

7.1    Governing Law

The rights and obligations of the Parties under or pursuant to this Guarantee shall be governed by and construed according to the Laws of Tanzania.

7.2    Arbitration

Any dispute or difference between the Parties arising out of or in connection with this Agreement shall be arbitrated in accordance with Article 21.2 of the Implementation Agreement.

8        MISCELLANEOUS

8.1    Severability

If one or more provisions contained in this Guarantee is held or found to be invalid, illegal, or unenforceable in any respect, the provision(s) shall be given effect to the extent permitted by law and the invalidity, illegality, or unenforceability of any provision shall not affect the validity of the remaining provisions of this Guarantee.

8.2    Definitions

The capitalised terms used but not defined in this Guarantee shall have the meanings given to them in the Implementation Agreement.

IN WITNESS WHEREOF, this Guarantee has been executed the day first above written.

THE UNITED REPUBLIC OF TANZANIA

By    :    RAPHAEL MOLLEL

Title :    PRINCIPAL SECRETARY MINISTRY OF WATER, ENERGY AND MINERALS

INDEPENDENT POWER TANZANIA LTD.

By    :    JAMES B. RUGEMALIRA

Title :    DIRECTOR

(SEAL)

## SCHEDULE 2

### COMPENSATION AMOUNTS

This Schedule 2 consists of two parts. Part 1 is a Compensation Table showing in a matrix format the amounts payable in accordance with Article 19.1. The tables refers to various compensation elements, labelled as a, b, c, d, e and f, which are set forth in Part 2.

### PART 1 OF SCHEDULE 2 - COMPENSATION TABLE

| | TERMINATION EVENT | COMPENSATION PAYABLE BY GOT |
|---|---|---|
| 1 | Termination for a Company Event of Default (other than a Restoration Schedule Default) where the GOT elects to purchase the Complex - Article 20.1(a). | a - c |
| 2 | Termination for a GOT Event of Default - Article 20.1(b). | a + b + d + e |
| 3 | Termination following a Change in Law - Article 20.1(c) | a + b + d + e |
| 4 | Termination following Acquisition of Shares and Assets - Article 20.1(d). | a + b + e |
| 5 | Termination following a Force Majeure Event where the Report concludes that Restoration is feasible but the GOT elects to terminate - Article 20.1(e)(i). | a + b + d + e |
| 6 | Termination following a Force Majeure Event where the Report concludes that Restoration is not feasible - Article 20.1(e)(ii) | a + b + e |
| 7 | Termination following a Force Majeure Event where the Report concludes that Restoration is feasible but financing is not available - Article 20.1(e)(iii) | a + b + (d/2) + e |
| 8 | Termination for a Restoration Schedule Default following a Force Majeure Event - Article 20.1(e)(iv) | a + f - c |

## PART 2 OF SCHEDULE 2 - COMPENSATION ELEMENTS

In this Schedule 2, the letters a, b, c, d, e and f are used to signify different elements of compensation to be paid upon the occurrence of the events described in Article 20 and this Schedule 2. The letters shall represent the following amounts:

a =   Sum of (i) the total amount outstanding to the Lenders under the Financing Documents (including interest during the original construction period through the earlier of the date of termination of this Agreement or the Scheduled Commercial Operations Date) plus (ii) the total amount outstanding under any loan agreements for capital improvements to the Facility that are required under the Power Purchase Agreement, as approved by the GOT, plus (iii) the total amount of any other outstanding debt incurred by the Company that was approved by the GOT, less any insurance proceeds available to the Company following a Force Majeure Event and not spent for Restoration.

b =   The initial equity investment by the shareholders of the Company multiplied by a fraction, the numerator of which is the number of years remaining in the initial term of the Power Purchase Agreement and the denominator of which is the initial term of the Power Purchase Agreement.

c =   The capital expenditures (including interest) required by the GOT or its designee, if any, to make the Facility operable following a transfer of the Facility.

d =   For a period equal to the lesser of (i) five (5) years and (ii) the remainder of the initial term of the Power Purchase Agreement (as such initial term may have been extended under the terms of the Power Purchase Agreement), an amount equal to the "Net Cash Flow" for such period, discounted to its present value by applying a discount rate equal to twenty and one tenth of one percent (20.10%) to the base case pro forma that is agreed to by the Lenders at Financial Closing. The term "Net Cash Flow" shall mean the net profits of the Company after depreciation with respect to the Facility less all principal repayment amounts, all as projected in such base case pro forma.

e =   The summation of the products of (i) any additional equity amounts that are contributed by the shareholders of the Company for any of the events that are described under Article 17.5 plus any such equity contributions approved by the GOT, times (ii) a fraction, the numerator of which is the number of years remaining in the initial term of the Power Purchase Agreement and the denominator of which is the number of years remaining in the initial term of the Power Purchase Agreement at the time of such contribution or approval for each such additional equity amount.

f =   The summation of the products of (i) any additional equity amounts that are contributed by the shareholders of the Company for any of the events that are described under Article 17.5 prior to the Force Majeure Event giving rise to the restoration which led to the Restoration Schedule Default plus (ii) other equity contributions approved by the GOT, including the original equity

contributions, times a fraction. the numerator of which is the number of years remaining in the initial term of the Power Purchase Agreement and the denominator of which is two times the number of years remaining in the initial term of the Power Purchase Agreement at the time of such contribution or approval for each such additional equity amount.

**Exhibit B, PART 1 to Declaration of Sazi B. Salula**

# Implementation Agreement

THIS IMPLEMENTATION AGREEMENT (the "Agreement") is made at Dar es Salaam, United Republic of Tanzania as of $8th$ day of June 1995:

BETWEEN

(1)      THE GOVERNMENT OF THE UNITED REPUBLIC OF TANZANIA acting through its Ministry of Water, Energy and Minerals (hereinafter referred to as the "GOT") of the one part; and

(2)      Independent Power Tanzania Ltd, a limited liability company incorporated under the laws of Tanzania whose registered office is located at 5th Floor, Extelcoms House, Samora Avenue, P O Box 1461, Dar-es-Salaam, Tanzania (hereinafter referred to as the "Company") of the other part.

WHEREAS:

(1)      The GOT as a matter of policy has decided to involve the private sector in the generation of electricity for sale to the national grid.

(2)      Consistent with the GOT's policy and guidelines, the Company has proposed to design, insure, finance, acquire, construct, complete, own, operate and maintain an electric power plant (the "Facility") at Tageta, Dar es Salaam, Tanzania, to supply electric power to the Tanzania Electric Supply Company Limited ("TANESCO")

(3)      Simultaneously herewith, the Company is entering into a Power Purchase Agreement with TANESCO.

(4)      The GOT and the Company are entering into this Agreement so that the Company's proposal to build the Facility may be implemented in a manner that reflects the close cooperation between the public and private sectors in the generation of electricity for sale on the national grid.

NOW THEREFORE, IT IS HEREBY AGREED as follows:

# ARTICLE I

## DEFINITIONS

"Bank of Tanzania" means the Central Bank of the United Republic of Tanzania and its successors.

"Contract Year" bears the meaning attributable thereto in the Power Purchase Agreement.

"Change In Law" means (a) the adoption, promulgation, or modification after the date of this Agreement by any Governmental Authority of any Law of Tanzania, or (b) the imposition by a Governmental Authority of any material condition in connection with the issuance, renewal, extension, replacement or modification of any Consent after the date of this Agreement, that in either case establishes requirements for the operation or maintenance of the Facility that are materially more restrictive than the most restrictive requirements (i) in effects as of the date of this Agreement, (ii) specified in any applications, or other documents filed in connection with such applications, for any Consent filed by the Company on or before the Commercial Operations Date of this Agreement or (iii) agreed to by the Company in any agreement in the Security Package.

"Commencement Date" bears the meaning attributable thereto in the Power Purchase Agreement.

"Commercial Operations Date" bears the meaning attributable thereto in the Power Purchase Agreement.

"Company" means Independent Power Tanzania Ltd, a limited liability company incorporated under the Laws of Tanzania with its principal office located in Dar-es-Salaam, Tanzania and its permitted successors and assigns.

"Consents" means all such approvals, consents, authorisations, notifications, concessions, acknowledgements, agreements, licenses, permits, decisions or similar item required to be obtained from, any Governmental Authority for the Company for the construction, financing, ownership, operation, and maintenance of the Facility.

"Construction Contracts" means contracts entered into between the Company and the Construction Contractor in connection with the design, engineering, procurement, construction, installation, testing, and commissioning of the Facility and the Interconnection Facilities, as amended from time to time.

"Construction Contractor" means the firm or firms retained by the Company to provide services in connection with the design, engineering, procurement, construction, testing and commissioning of the Facility.

"Contractors" means the Construction Contractor and the O&M Contractor and any other direct sub-contractor integrally involved in the Project.

"Customs Duties" includes customs duty levied under the EA Customs and Transfer Tax Management Act,1967 , as amended from time to time, and a surcharge levied under the Finance Act, 1972, as amended from time to time, sales tax and License Fees and charges for services of a commercial nature associated with the importation of goods.

"Day" means each twenty-four (24) hour period beginning and ending at 12:00 midnight East African time.

"Dollars" and "USD" means the lawful currency of the United States of America.

"Environmental Liabilities" means all losses, damages, and expenses (including, without limitation, the reasonable costs of investigation, testing, containment, removal, cleanup, abatement or remediation and reasonable attorneys' fees and costs), whether or not quantified in amount, relating to the presence in the environment of Hazardous Materials attributable to the Facility from and after the earlier of the date of acquisition by the Company of any immovable property portion of the Facility or the date of Financial Closing to the date of transfer of the Facility to the GOT or its designee, or the violation by the Company, its agents or employees of any environmental Laws of Tanzania or other standard by which the Company is bound.

"Escrow Account" means the account or accounts to be established by the Company under the Escrow Agreement as required by the Lenders.

"Escrow Agreement" means the escrow agreement to be executed by and between the Company and the Lenders pursuant to the terms of the Financing Documents.

"Facility" bears the meaning attributed thereto in the Power Purchase Agreement.

"Financial Closing" means the date on which the Financing Documents relating to the construction financing for the Facility shall have been entered into by the Company and other parties thereto, and all conditions for the initial borrowing by the Company under such Financing Documents shall have been satisfied by the Company or waived by the Financing Parties thereunder.

"Financing Documents" means the loan agreements, (including agreements for any subordinated debt) notes, bonds, indentures, security, agreements, and any other documents relating to the financing or refinancing for the construction, ownership, operation and maintenance of the Facility by the Company.

"Force Majeure Events" bears the meaning attributable thereto in Article 17.1.

"Foreign Currency" means Dollars.

"Foreign Investors" means shareholders of the Company who are foreigners or non-residents of Tanzania as defined under the Immigration Act 1972.

"Fuel Supplier" means the parties with whom contracts are or are to be entered into by the Company for the supply and transportation of fuel for the Facility.

"Fuel Supply Contracts" means the contracts entered or to be entered into by the Company for the supply and transportation of fuel for the Facility.

"GOT" means the government of the United Republic of Tanzania, and its successors.

"Governmental Authority" bears the meaning attributable thereto in the Power Purchase Agreement.

"Guarantee" means the guarantee by the GOT of the payment obligations arising out of the breach, default or non-performance of TANESCO under the Power Purchase Agreement.

"Hazardous Material" means any pollutant, contaminant, solid waste, hydrocarbon product, toxic or hazardous substance or waste, any flammable, explosive or radioactive materials regulated under, or subject to, any Laws of Tanzania.

"IDC" bears the meaning attributable thereto in Article 17.5(b).

"Investor" means the holders from time to time of Ordinary Share Capital, as well as the holders of any securities that are convertible at the option of the holder into Ordinary Share Capital.

"Lapse of Consent" means any Consent (a) ceasing to remain in full force and effect or (b) not being issued or renewed upon application having been properly and timely made and diligently pursued or (c) being made subject, subsequent to its grant, upon renewal or otherwise, to any terms or conditions that materially and adversely affect the Company's ability to perform its obligations under any document included within the Security Package, in each of the above instances through no fault of the Company.

"Laws of Tanzania" includes written law, the common law in so far as it is in operation in the United Republic of Tanzania or any part thereof, and all orders, rules, regulations, executive orders, decrees, Policies, judgments, notifications or other similar directives made pursuant thereto, as such laws, rules, regulations, decrees, Policies, judgments and notifications may be amended from time to time.

"Lenders" means the lenders party to the Financing Documents, together with their successors and assigns.

"Lien" means any encumbrance, lien, charge or security interest upon or in the Facility.

"Loss"   means  any  loss,  damage,  liability,  payment  and
obligation (excluding  any  indirect  or  consequential  loss,
damage,  liability,  payment  or  obligation),  and  all  expenses
(including without limitation reasonable legal fees).

"Month"  means  a  month  according  to  the  Gregorian  calendar
beginning  at  12.00  midnight  on  the  last  day  of  the  preceding
month  and  ending  at  12.00  midnight  on  the  last  day  of  that
month.

"O&M Agreement"    means  the  contracts  entered  into  or  to  be
entered into by  the Company for the operation and maintenance of
the Facility, as amended or superseded from time to time.

"O&M Contractor"   means  the  firm  or  firms  retained  by  the
Company to provide services in connection with the operation and
maintenance of the facility.

"Ordinary Share Capital" means  any  shares  of  the  Company with
voting  or  other  rights  of  management  and  control  and  any
securities  of  the  Company  that  are  convertible  into  such  shares
at the option of the holder.

"Parties" means the GOT and the Company.

"Party"   means  either  the  GOT  or  the  Company,  as  the  case
maybe.

"Permitted Liens"   means  minor  imperfections  of  title  and
encumbrances  that  in  the  aggregate  are  not  substantial  in
amount; do not detract from the  value of the property subject
thereto  or  impair  the  Facility,  and  have  arisen  only  in  the
ordinary  course  of  business  and  consistent  with  normal  utility
practices.

"Policies"    means  such  policies  adopted  by  the  GOT,  and  any
Governmental Authority as have been published in writing.

"Policy Framework" means the GOT's Policy Framework and package
of Incentives for investments including private power generation
projects, in Tanzania, if any.

"Power Purchase Agreement"   means  the  agreement  dated  as  of
May 26, 1995 entered into between TANESCO and the Company for
the  purchase  and  sale  of  electric  power  generated  by  the
Facility as amended from time to time.

"Preliminary Estimate"   bears  the  meaning  attributable  thereto
in Article 17.5 (a).

"Prescribed Fee"   means, with respect to a particular Consent,
the charge or fee, if any, prescribed by the Laws of Tanzania.

"Prescribed Form"   means, with respect to a particular Consent,
the  form,  if  any,  (including  all  information  and  details)
prescribed by the Laws of Tanzania for the application for, or
renewal of, such Consent.

"Project" means the development, design, engineering, manufacture, financing construction, commissioning, insurance, ownership, operation and maintenance of the Facility and all activities incidental thereto.

"Relevant Authority" means the department, authority, instrumentality or agency from which a Consent is to be obtained and any authority, body or other person having jurisdiction under the Laws of Tanzania with respect to the Company, the Facility or the financing, construction, operation or maintenance of the Facility.

"Report" bears the meaning attributable thereto in Article 17.6(a).

"Scheduled Commercial Operations Date" bears the meaning attributable thereto in the Power Purchase Agreement.

"Restoration" bears the meaning attributable thereto in Article 17.5(a).

"Restoration Cost Estimate" bears the meaning attributable thereto in Article 17.5(a).

"Restoration Schedule" bears the meaning attributable thereto in Article 17.5(a).

"Shillings" mean the lawful currency of the United Republic of Tanzania.

"Security Package" consists of:

    Implementation Agreement;

    Power Purchase Agreement;

    Fuel Supply Contracts;

    O&M Agreement, if any;

    Construction Contracts, if any;

    Financing Documents;

    Escrow Agreement;

    Insurance Policies;

    Site Agreement;

    Guarantee; and

    Instruments conveying title to the Site.

"Site" means the parcel of land upon which the Facility is to be constructed and located.

"TANESCO" means the Tanzania Electric Supply Company Limited

and its successors and permitted assignees.

"**Tanzania**" means the United Republic of Tanzania.

"**Termination Notice**" means a written notice of termination of this Agreement issued by the GOT or the Company, as the case may be, pursuant to Article 19.2(c) hereof.

"**Threshold Amount**" bears the meaning attributable thereto in Article 17.5(e).

"**Year**" means a year according to the Gregorian calendar.

7

## ARTICLE II

### INTERPRETATION

In this Agreement:

capitalised terms defined in Article I shall be used herein as defined therein;

the headings are for convenience only and shall be ignored in construing this Agreement;

the singular includes the plural and vice versa;

references to Articles, Clauses, and Schedules are, unless the context otherwise requires, references to Article and Clauses of, and Schedules to, this Agreement; and

unless otherwise provided herein, whenever a consent or approval is required by one Party from the other Party, such consent or approval shall not be unreasonably withheld or delayed.

8

## ARTICLE III

### TERM

This Agreement shall commence and be effective on the date hereof, and shall, unless terminated earlier in accordance with the terms of this Agreement, continue in full force and effect for a period of the initial term of the Power Purchase Agreement, including any extension caused by the occurrence of a Force Majeure Event thereunder; provided, however, that in the case of any other extension of the Power Purchase Agreement, this agreement may be extended as mutually agreed at that time.

9

## ARTICLE IV

### IMPLEMENTATION OF THE PROJECT BY THE COMPANY

The Company shall design, insure, finance, acquire, construct, complete, own, operate, and maintain the Facility in accordance with all applicable Laws of Tanzania, the Consents, the Power Purchase Agreement.

10

## ARTICLE V

### GRANT OF RIGHTS TO THE COMPANY

The GOT hereby grants to the Company the exclusive right to
design, finance, insure, construct, complete, own, operate,
and maintain the Facility in accordance with the terms and
conditions contained in this Agreement and the Laws of
Tanzania until the expiration or earlier termination of this
Agreement pursuant to its terms.

11

## ARTICLE VI

### ACQUISITION OF SITE, TRANSPORTATION, AND CONSENTS

**6.1**    Acquisition by the Company of Site and Transportation

The company has identified a suitable Site. The company shall obtain adequate water supplies for the Facility, make arrangements for delivery and receipt at the Site or port facilities in Tanzania of equipment and materials necessary to construct the Facility, and make arrangements for transport to the Site of all such equipment and materials from the port facilities. The Company shall complete these activities in compliance with the terms of this Agreement and the Power Purchase Agreement.

**6.2**    Applications by the Company for Consents

(a)    The Company shall make or cause to be made, in a timely fashion, all applications (whether initial or renewal applications) for the Consents in the Prescribed Form and with the Prescribed Fee to the appropriate Relevant Authorities and shall diligently pursue all such applications. The information supplied in the applications shall be complete and accurate and shall satisfy the substantive and procedural requirements of the applicable Laws of Tanzania.

(b)    In the event the Company propose to sell dependable capacity and electrical energy from the Facility to a third party, other than TANESCO, under Article 2.2 of the Power Purchase Agreement, the GOT shall grant the Company any consent required by Section 4 of the Electricity Ordinance 1931 for the sale and generation of electricity.

(c)    The Company shall make application for all Consents within six (6) months of the execution of this Agreement. If the application for such Consents are timely made and any of such Consents is not received within four(4) months following the filing of the application and the failure to receive such Consent is not the fault of the Company (or its Contractors), then, notwithstanding anything else contained in this Agreement to the contrary, the date by which Financial Closing is required to occur shall be extended on a day-for-day basis for each day that any of such Consents remains outstanding following the expiration of the four (4) month period. If such outstanding Consent or Consents have not been issued by the end of six (6) months beginning on the last day of the aforesaid four (4) months period, such unobtained Consents shall constitute a default by GOT, permitting the Company to terminate this Agreement, the Power Purchase Agreement with no further obligations to the GOT and TANESCO, and GOT shall compensate the Company the compensation amount determined in accordance with Article 20.1(b).

## ARTICLE VII

### SUPPORT OF THE GOT

**7.1    Support to Obtain Site and Transportation**

The Company may advise the GOT from time to time of any difficulties encountered in the activities it is required to perform under Article 6.1. If any such difficulties create a significant possibility that the Company will be prevented or materially impaired in meeting its obligations hereunder, then, upon the request of the Company, the GOT shall take such actions as are reasonable and appropriate under the circumstances to enable the Company to secure the necessary property or services; provided, however, that if the GOT reasonably determines that the Company has failed to comply with its obligations under this Agreement and that such failure is the principal cause of the Company's difficulties in performing such activities, the GOT may advise the Company of such determination and the GOT shall not be obligated to take any actions to assist the Company pursuant to this Article 7.1 until such time as the Company has fully complied with its obligations under this Agreement.

**7.2    Support to Obtain Consents**

Upon request of the Company, the GOT shall support and use all reasonable efforts to expedite the consideration of the Company's applications for the Consents filed pursuant to Article 6.2 and the timely issuance thereof by the Relevant Authorities. Any request for support under this Article shall be accompanied by the application for the Consent, any notice that the Consent was denied or deferred, and a statement of the Company's efforts in obtaining the Consent to date.

**7.3    Conditions to Consents**

The GOT or any Relevant Authority may attach such non-discriminatory (except where rationally related to the purpose of the Consent) terms and conditions to the issuance or renewal of any of the Consents as are in accordance with the Laws of Tanzania, and the attachment of such terms and conditions shall not in and of itself constitute a breach of this Agreement by the GOT, a Force Majeure Event under Article XVII (unless it constitutes a Change in Law), or a GOT Event of Default under Article 19.1(b). The Company and the Contractors shall abide by all such terms and conditions.

**7.4    Support for Obligations**

Upon reasonable request by the Company, the GOT shall use its good offices to support the Company's performance of its obligations to design, finance, insure, construct, own, operate, and maintain the Facility. By agreeing to use its good offices to support the Company's efforts, the GOT has not relieved, and

does not relieve in any way, the Company of its obligations or potential liability under this Agreement, the Power Purchase Agreement, and the other documents comprising the Security Package.

7.5    **Policy Framework**

The GOT shall take such actions as are reasonable and appropriate under the circumstances to ensure that the Company receives the fiscal incentives, concessions, financial arrangements and any other benefits provided under the Policy Framework, upon application for the same by the Company.

## ARTICLE VIII

### CONSTRUCTION, OPERATION AND MAINTENANCE

The Company shall design, construct, install, commission, operate and maintain the Facility; provided, however, that the Company may contract with the Construction Contractor to design, construct, install , and commission the Facility and the O&M Contractor to operate and maintain the Facility; provided, further,, that the appointment of the Construction Contractor and the O&M Contractor by the Company shall not relieve the Company of any of its obligations or potential liability regarding the design, insuring, acquisition, construction, completion, operation, or maintenance of the Facility. The Company shall ensure that reasonable training, as required under the O&M Agreement, on the operation and maintenance of the Facility is provided to Tanzanian residence.

## ARTICLE IX

### LIABILITY

**9.1    Limitation of liability**

Except as provided in Article 9.2, neither Party shall be liable to the other Party in contract, tort, warranty, strict liability, or any other legal theory for any indirect, consequential, incidental, punitive, or exemplary damages. Neither Party shall have any liability to the Party except pursuant to, or for breach of, this Agreement or the Guarantee; provided, however, that this provision is not intended to constitute a waiver of any rights of one Party against the other with regard to matters unrelated to this Agreement or to any activity not contemplated by this Agreement.

**9.2    Indemnification**

**(a)    The GOT**

The GOT shall defend and indemnify the Company and its directors, officers and employees against, and hold the Company and its directors, officers and employees harmless from, at all times after the date hereof, any and all Losses incurred, suffered, sustained, or required to be paid, directly or indirectly, by or sought to be imposed upon, the Company and its directors, officers and employees for personal injury or death to persons or damage to property arising out of the negligent or intentional act or omission of the GOT in connection with this Agreement.

**(b)    The Company**

The Company shall defend, indemnify the GOT and its ministers, officers and employees against, and hold the GOT and its ministers officers and employees harmless from, at all times after the date hereof, any and all Losses incurred, suffered, sustained, or required to be paid, directly or indirectly, by, or sought to be imposed upon, the GOT and its ministers, officers and employees for personal injury or death to persons or damage to property arising out of the negligent or intentional act or omission of the Company in connection with this Agreement.

**(c)    Joint Negligence**

In event that any Loss result from the joint or current negligent or intentional acts or omissions of the Parties, each Party shall be liable under this indemnification in proportion to its relative degree of fault.

16

(d)    Indemnification to Survive

The provisions of this Article 9.2 shall survive for a period of five (5) years following the termination of this Agreement.

## 9.3    Indemnification for Fines and Penalties

Any fines or other penalties incurred by the Company for non-compliance with applicable Laws of Tanzania or other governmental actions taken pursuant thereto or the Consents shall not be reimbursed by the GOT but shall be the sole responsibility of the Company.

## 9.4    Notice of Proceedings

Each Party shall promptly notify the other Party of any Loss or proceeding in respect of which it is or may be entitled to indemnification under Article 9.2. Such notice shall be given as soon as reasonably practicable after the relevant Party becomes aware of the Loss or proceeding.

## 9.5    Limitation on Indemnification

Each Party shall be solely liable, and shall not be entitled to assert any claim for indemnification under this Agreement, for any Loss that would otherwise be the subject of indemnification under this Agreement until all such Losses of such Party arising during the then-current Year exceed, in the aggregate, USD100,000. For purposes of this Article 9.5, a Loss (or claim for indemnification) shall be deemed to arise in the Year during which the event giving rise to the Loss (or claim for indemnification) occurred or, in the case where the event is continuing in more than one Year, in the Year during which the event ends.

Neither Party shall be entitled to indemnity under Article 9.2 if and to the extent that a Party has received payment in full in respect of a Loss or proceeding under the indemnities contained in the Power Purchase Agreement, the Fuel Supply Contracts, or any other document comprising the Security Package in respect of the relevant act or omission.

## 9.6    Defence of Claims

(a)    The indemnifying Party shall be entitled, at its option, and expense and with counsel of its selection, to assume and control the defence of any claim, action, suit or proceeding in respect of, resulting from, relating to or arising out of any matter for which it is obligated to indemnify the other Party hereunder, subject to the prior approval of such counsel by the indemnified Party, provided it gives prompt notice of its intention to do so

to the indemnified party and reimburses the indemnified Party for the reasonable costs and expenses incurred by the indemnified Party prior to the assumption by the indemnifying Party of such defence.

(b) Notwithstanding the provisions of Article 9.6(a), unless and until the indemnifying Party acknowledges in writing its obligations to indemnify the indemnified Party and assumes control of the defence of a claim, suit, action or proceeding in accordance with Article 9.6(a), the indemnified Party shall have the right, but not the obligation, to contest, defend and litigate, with counsel of its own selection, any claim, actions, suit or proceeding by any third party alleged or asserted against such Party in respect of, resulting from, related to or arising out of any matter for which it is entitled to be indemnified hereunder, and the reasonable costs and expenses thereof shall be subject to the indemnification obligations of the indemnifying Party hereunder.

(c) Upon assumption by the indemnifying Party of the control of the defence of a claim, suit, action or proceeding, the indemnifying Party shall reimburse the indemnified Party for the reasonable costs and expenses of the indemnified Party in the defence of the claim, suit, action or proceeding prior to the indemnifying Party's acknowledgement of the indemnification and assumption of the defence.

(d) Neither Party shall be entitled to settle or compromise any such claim, action, suit or proceeding without the prior written consent of the other Party; provided, however, that after agreeing in writing to indemnify the indemnified Party, the indemnifying Party may settle or compromise any claim without the approval of the indemnified Party. Except where such consent is unreasonably withheld, if a Party settles or compromise any claim, action, suit or proceeding in respect of which it would otherwise be entitled to be indemnified by the other Party without the prior written consent of the other Party, the other Party shall be excused from any obligation to indemnify the Party making such settlement or compromise in respect of such settlement or compromise.

(e) Following the acknowledgement of the indemnification and the assumption of the defence by the indemnifying Party, the indemnified Party shall have the right to employ its own counsel and such counsel may participate in such actions, but the fees and expenses of such counsel shall be at the expense of such indemnified Party, when and as incurred, unless (i) the employment of counsel by such indemnified Party has been authorised in writing by the indemnifying Party, or (ii) the indemnified Party shall have reasonably concluded that there may be a conflict of interest between the indemnifying Party and the indemnified Party in the conduct of the defence of such action, or (iii) the indemnifying Party shall not in fact

18

have employed independent counsel reasonably satisfactory to the indemnified Party to assume the defence of such action and shall have been so notified by the indemnified Party, or (iv) the indemnified Party shall have reasonably concluded and specifically notified the indemnifying Party either that there may be specific defences available to it that are different from or additional to those available to the Party or that such claim, action, suit or proceeding involves or could have a material adverse effect upon it beyond the scope of this Agreement. If Clauses (ii) or (iii) or (iv) of the preceding sentence shall be applicable, then counsel for the indemnified Party shall have the right to direct the defence of such claim, action, suit or proceeding on or behalf of the indemnified Party and the reasonable fees and disbursements of such counsel shall constitute legal or other expenses hereunder.

## 9.7    Double Jeopardy

Settlement or waiver in writing by TANESCO of any dispute or breach under the Power Purchase Agreement shall be binding on the GOT with respect to the identical issue or claim, as the case may be.

## ARTICLE X

### INSURANCE

The Company shall obtain and maintain insurance from financially strong and internationally reputable insurance companies in accordance with Article XIV of the Power Purchase Agreement. If and to the extent that the GOT can be named as an additional insured on all fire, perils, casualty and liability insurance policies covering the Facility, the GOT shall be so named by the Company.

## ARTICLE XI

### IMMIGRATION CONTROLS

Provided the Company and the Contractors comply with all applicable Laws of Tanzania, the GOT will expeditiously grant applications of the Company and the Contractors for work permits, employment passes, visas and other permits, as necessary, for individuals involved in the Project. Notwithstanding the foregoing, however, the GOT may, in any individual case, decline to grant an application, or expel a person previously admitted, to protect the national security interests and public health and safety of Tanzania, as reasonably determined by the GOT.

## ARTICLE XII

### SECURITY PROTECTION

The Company shall provide security personnel for the protection and security of the Site. In the event of a threat of harm to the Site, the Company may request additional security forces from the GOT to meet unusual security requirements. All such additional security forces shall remain under the exclusive control and direction of the GOT.

## ARTICLE XIII

### IMPORT CONTROLS

**13.1    Right to Import**

The GOT encourages the Company and its Contractors to incorporate as much locally produced material, equipment and supplies as possible, in the construction and operation of the Facility. Nonetheless, the Company and its Contractors shall be entitled to import without restriction all items required for the design, construction, completion, operation and maintenance of the Facility. All items not consumed or incorporated into the Facility may be freely re-exported by the Company in accordance with established procedures in Tanzania.

**13.2    Export and Reimport**

The Company shall be entitled to export without restriction all items of plant and machinery imported by it under Article 13.1 for permanent installation in the Facility for the purpose of repair or refurbishment outside Tanzania and to re-import the same without payment of Customs Duties, and the GOT shall, at the request of the Company, use reasonable measures to expedite the issuance of any Consent required for the export of such plant and machinery.

ARTICLE XIV

FOREIGN CURRENCY EXCHANGE AND TRANSFER OF FUNDS

14.1    Foreign Exchange Regulation

The foreign currency exchange and transfer abroad of all funds
related to the Project shall be governed by the Foreign Exchange
Act 1992 of Tanzania, as amended from time to time.

14.2    Use of Tanzania Bank Accounts: Exceptions

All of the Company's transactions related to the Project that
require foreign exchange, including debt servicing and
repatriation of earnings, will be initiated through bank accounts
in Tanzania; provided, however, that foreign exchange provided
by foreign Lenders and used to pay foreign Contractors or vendors
in respect of services provided or equipment or materials
purchased outside of Tanzania may be  paid directly to such
persons and not conducted through bank accounts in Tanzania.

14.3    Consent to Foreign Currency Accounts

The GOT shall ensure that the Bank of Tanzania gives the Company
and its Contractors consent for the opening, operation, and
retention of earnings of foreign currency bank accounts inside
Tanzania (including, without limitation, the payment of all
foreign exchange received under the Financing Documents or
otherwise by the Company into such accounts and withdrawals
therefrom). The GOT shall ensure that the Bank of Tanzania gives
the Company permission to maintain bank accounts outside
Tanzania, and transfer funds from its accounts in Tanzania to its
accounts maintained outside Tanzania as are necessary to
implement and carry out the Project in accordance with this
Agreement, the Power Purchase Agreement, and the Fuel Supply
Contracts; provided, however, that nothing in this Agreement
shall prevent the Company from opening, operating and retaining
moneys in foreign currency bank accounts outside Tanzania from
time to time after the date of this Agreement if and to the
extent that it is or becomes otherwise permitted under the Laws
of Tanzania.

14.4    Availability of Foreign Exchange

(a)     The GOT shall make available to the Company through the
        Bank of Tanzania, sufficient additional Shillings funds
        for buying Foreign Currency for the Company to purchase
        through normal commercial banking channels. Foreign
        Currency for the TANESCO's payments with respect under or
        in connection with the Power Purchase Agreement or GOT's
        payments under this Agreement. Notwithstanding the
        foregoing, to the extend that Foreign Currency is not
        available through commercial banking channels, the GOT

shall cause the Bank of Tanzania to provide foreign exchange in the Foreign Currency required.

(?  The GOT shall make available to the Company through the Bank of Tanzania, to the extent that Foreign Currency is not available through normal commercial banking channels, Foreign Currency in the requested amount to the extent necessary for (i) meeting the Company's obligation under this Agreement, (ii) the repatriation by the Company of dividends to Foreign Investors and repatriation upon conversion of Shillings proceeds of sales of Ordinary Share Capital purchased with foreign currency, which sales are made in accordance with the terms of this Agreement, (iii) after the Commercial Operations Date, the Foreign Currency expenses of the Project as permitted in Appendix B of the Power Purchase Agreement (including, without limitation, remuneration of the O&M Contractor, where applicable, fees, salaries and other monetary emoluments and the purchase of spare parts), (iv) the payment of premiums to off-shore insurers, (v) all payments into, or out of, the Escrow Account that require foreign currency in accordance with the terms of the Escrow Agreement, and (vi) any compensation payments to be made by the GOT pursuant to Article 20.1 in the event of a termination. The rate applicable to such conversion shall be the Bank of Tanzania's rate for Foreign Currency at 11.00 a.m. on the banking Day on receipt of payment by the Company from TANESCO under the Power Purchase Agreement or GOT under this Agreement, and the GOT shall ensure that the Company shall, upon receipt, be entitled to immediately remit or cause the remittance of any and all Foreign Currency received.

**14.5    Free Transfer of Necessary Funds**

The GOT shall permit the free transfer of all funds and financial settlements necessary to implement and carry out the Project or the implementation of this Agreement or any other agreement forming part of the Security Package.

25

ARTICLE XV

ASSIGNMENT AND SECURITY

**15.1    Assignment**

No assignment or transfer by a Party of this Agreement or such Party's rights or obligations hereunder shall be effective without the prior written consent of the other Party.

**15.2    Creation of Security**

(a)    Notwithstanding the provisions of Article 15.1, for the purpose of financing the construction and operation of the Facility, the Company may, upon prior written approval of the GOT, whose consent shall not be unreasonably withheld, assign or create a security interest to the Lenders pursuant to the Financing Documents in, its rights and interests under or pursuant to :

    (i)        this Agreement;

    (ii)       any agreement included within the Security Package;

    (iii)     the Facility;

    (iv)      the Site;

    (v)       the movable property and intellectual property of the Company; or

    (vi)      the revenues or any of the rights or assets of the Company;

(b)    The Lenders shall have no obligation to the GOT under this Agreement until such time as the Lenders' agent ("Agent") notifies the GOT in writing of the Lenders' election to exercise their rights granted hereunder and to perform the Company's obligations under this Agreement. Upon notification by the Lenders or the Agent to the GOT of the occurrence and continuance of an event of default under the Financing Documents, the Lenders shall have the right, among others, to:

    (i)        the possession of the Facility and, prior to commercial operation of the Facility, complete construction of the Facility and operate the same and, after commercial operation of the Facility, operate the same;

    (ii)       cure any continuing Company Event of Default as provided under Article 19.1 of this Agreement; provided, however, that the Lenders shall have no obligation to cure any Company

26

Event of Default under Article 19.1(a) after delivery of the notice to the GOT as provided above, and no right will exist for the GOT to terminate this Agreement based upon such Company Events of Default occurring prior to the Lenders' notice, and;

(iii)    with the consent of the GOT, which consent shall not be unreasonably withheld, sell the Facility to a Transferee (as defined below) and such Transferee at such sale shall succeed to the Company's rights hereunder. If the Agent notifies the GOT of a default under the Financing Documents, the GOT shall, at the request (and expense) of the Agent, cooperate with the Lenders in the Lender's exercise of such rights.

As used herein, a "Transferee" shall be a person who;

(A)    either is an experienced power plant operator or shall have agreed to engage the services of a person who is an experienced power plant operator;

(B)    shall have paid all amounts, if any, then due and payable to the GOT under this Agreement, and;

(C)    shall have expressly assumed in writing for the benefit of the GOT the obligations of the Company under this Agreement (including the obligation of the Company to maintain and operate the Facility in accordance with the requirements of the Power Purchase Agreement).

## 17.3    GOT Security

In the event TANESCO fails to provide the security for payment required by Article 6.6 of the Power Purchase Agreement, the GOT shall within 10 Days after receipt of a notice from the Company to GOT, that states that TANESCO have failed to provide the security for payment required by Article 6.6 of the Power Purchase Agreement, provide directly to the Company the security for payment on the same terms and conditions as required under the Power Purchase Agreement. Obligations under Article 6.6 of the Power Purchase Agreement are deemed to be restated in full in this Agreement, as if the GOT were TANESCO and the Company as the other party having the benefit of the obligations of TANESCO under the Power Purchase Agreement and must be read in conjunction with the relevant clause of the Power Purchase Agreement which applies equally in this Agreement mutatis mutandis as an obligation of the GOT, and is not to be used as an aid to interpretation of this Agreement.

## ARTICLE XVI

### RESTRICTIONS ON ACQUISITIONS OF SHARES AND ASSETS

### 16.1    Assurance Against Discriminatory Action

The GOT shall not take any discriminatory action which materially and adversely affects the Project or the performance of the Company's obligations or the enjoyment of its rights or the interests of the Investors under the Security Package or expropriate or, except as hereinafter provided, acquire the Facility or the Company, whether in whole or in part. Nothing in the foregoing shall apply to any actions taken by the GOT, TANESCO, or any Governmental Authority pursuant to their respective rights and obligations arising under this Agreement, the Power Purchase Agreement and the other documents comprising the Security Package.

### 16.2    Acquisition of Shares or Assets

Subject to Article 20.1, the GOT undertakes to the Company that neither it nor TANESCO or any Governmental Authority will expropriate, compulsorily acquire, nationalise, or otherwise compulsorily procure any Ordinary Share Capital or assets of the Company. The GOT further undertakes to the Company that during the term of this Agreement neither it nor TANESCO or any Governmental Authority nor any corporation or company directly or indirectly owned or controlled by the GOT and/or any Governmental Authority will, otherwise than as mentioned in the preceding sentence, acquire any Ordinary Share Capital.

ARTICLE XVII

FORCE MAJEURE

17.1    Definition

A "Force Majeure Event" shall mean any event or circumstance or combination of events or circumstances beyond the reasonable control of a Party occurring on or after the date the Power Purchase Agreement that materially and adversely affects the performance by such affected Party of its obligations under or pursuant to this Agreement (including a Party's ability to deliver or receive energy from the Facility); provided, however, that such material and adverse effect could not have been prevented, overcome or remedied in whole or in part by the affected Party through the exercise of diligence and reasonable care,   it being understood and agreed that reasonable care includes the expenditure of sums of money to protect the Facility from a casualty event, which sums are reasonable in light of the likelihood of such event, the probable effect of such event if it should occur and the likely efficacy of the preventive measures. "Force Majeure Events" hereunder shall include each of the following events and circumstances but not limited to, but only to the extent that each satisfies the above requirements:

(a)    Change in Law which adversely affects the other Party

(b)    Events beyond the control of the affected Party, including but not limited to:

    (i)    any act of war (whether declared or undeclared), invasion, armed conflict or act of foreign enemy, blockade,   embargo,   revolution,   riot, insurrection, civil commotion, act of terrorism, or sabotage;

    (ii)    radioactive contamination or ionizing radiation;

    (iii)    strikes, works to rule or go-slows that extend beyond the Facility or are widespread or nationwide;

    (iv)    lightning,  fire,  earthquake,  flood,  storm, cyclone, typhoon, or tornado;

    (v)    explosion or chemical contamination (other than resulting from an act of war);

    (iv)    epidemic or plague;

    (vi)    a Lapse of Consent, for the first twenty-five (25) Days of its occurrence;

    (vii)    prior to the Commercial Operations Date, a delay beyond the thirtieth (30th) Day after the scheduled receipt date of the receipt at the Site of a major piece of equipment that has been timely ordered and must be manufactured expressly for the Party to perform its Obligations under

the Power Purchase Agreement when such delay is caused solely by an accident in transportation or strike.

Force Majeure Events shall expressly not include the following conditions, except and to the extent they result directly from a Force Majeure Event;

(i)    late delivery a Party of machinery, equipment (except as provided in Article 17.1(b)(vii)) materials spare parts or consumables;

(ii)    a delay in the performance of any Contractor; and

(iii)   normal wear and tear or random flaws in materials and equipment or breakdowns in equipment.

**17.2    Notification**

(a)    If by reason of a Force Majeure Event a Party is wholly or partially unable to carry out its obligations under this Agreement, the affected Party shall

(i)    give the other Party notice of the Force Majeure Event(s) as soon as practicable, but in any event, not later than the later of forty-eight (48) hours after the affected Party becomes aware of the occurrence of the Force Majeure Event(s) or forty-eight (48) hours after the resumption of any means of providing notice between the Company and the GOT, and;

(ii)    give the other Party a second notice, describing the Force Majeure Event(s) in reasonable detail and, to the extent that can be reasonably determined at the time of the second notice, providing a preliminary evaluation of the obligations affected, a preliminary estimate of the period of time that the affected Party will be unable to perform the obligations, and other relevant matters as soon as practicable, but in any event, not later than seven (7) Days after the initial notice of the occurrence of the Force Majeure Event(s) is given by the affected Party. When appropriate or when reasonably requested to do so by the other Party, the affected Party shall provide further notices to the other Party more fully describing the Force Majeure Event(s) and its cause(s) and providing or updating information relating to the efforts of the affected Party to avoid and/or to mitigate the effect(s) thereof and estimates, to the extent practicable, of the time that the affected Party reasonably expects it will be unable to carry out any of its affected obligations due to the Force Majeure Event(s).

(b)    The affected Party shall also provide notice to the other Party of (i) the cessation of the Force Majeure Event, and (ii) the affected Party's ability to recommence performance of its obligations under this Agreement by reason of the cessation of the Force Majeure Event as soon as possible, but in any event, not later than seven (7) Days after the occurrence of each of (i) and (ii) above.

(c)    Failure by the affected Party to give notice of a Force Majeure Event to the other Party within the forty eight (48) hour period required by Article 17.2(a) shall not prevent the affected Party from giving such notice at a later time; provided, however, that in such case, the affected Party shall not be excused pursuant to Article 17.4 for any failure or delay in complying with its obligations under or pursuant to this Agreement until the notice required by Article 17.2(a)(i) has been given. If such notice is given within the forty-eight (48) hour period as required by Article 17.2(a)(i), the affected Party shall be excused for such failure or delay pursuant to Article 17.4 from the date of commencement of the relevant Force Majeure Event.

17.3    Duty to Mitigate

The affected Party shall use all reasonable efforts to mitigate the effects of a Force Majeure Event, including, but not limited to, the payment of all reasonable sums of money by or on behalf of the affected Party, which sums are reasonable in light of the likely efficacy of the mitigation measures.

17.4    Delay Caused by Force Majeure

So long as the affected Party has at all times since the occurrence of the Force Majeure Event complied with the obligations of Article 17.3 and continues to so comply, then:

(a)    the affected Party shall not be liable for any failure or delay in performing its obligations (other than an obligation to make a payment) under or pursuant to this Agreement and;

(b)    any performance deadline that the affected Party is obligated to meet under this Agreement shall be extended; provided, however, that no relief, including without limitation, the extension of performance deadlines, shall be granted to the affected Party pursuant to this Article 17.4 to the extent that such failure or delay would have nevertheless been experienced by the affected Party had the Force Majeure Event not occurred. Other than for breaches of this Agreement by the other Party, and without prejudice to the affected Party's right to indemnification pursuant to Article IX or for payment pursuant to this Article XVII or Article XX, the other Party shall not bear any liability for any loss or expense suffered by the affected Party as a result of a Force Majeure Event.

Notwithstanding the foregoing, the GOT shall not be entitled to claim for itself, and shall not be relieved of its obligations hereunder by the occurrence of, a Force Majeure Event or a Change in Law.

17.5    Restoration; Compensation

(a)    In the event that a Force Majeure Event results in damage to the Facility or that compliance by the Company with a Change in Law requires a material modification or a material capital addition to the Facility (each such event referred to as "Restoration"), the Company shall, within twenty-eight (28) Days after the date by which it was first required to provide notice to the GOT under Article 17.2(a), develop and deliver to the GOT a preliminary written estimate (the "Preliminary Estimate") of:

(A)    the projected range of cost to effect the Restoration, less any insurance proceeds available or likely to become available to the Company (the "Restoration Cost Estimate"); and

(B)    a preliminary schedule for the completion of the Restoration ("Restoration Schedule").

The Company shall make the Preliminary Estimate as comprehensive and as complete as possible under the circumstances. The GOT and the Company shall meet within fifteen (15) Days of the delivery of the Preliminary Estimate to discuss the conclusions set forth therein.

(i)    If the Company concludes that the Restoration Cost Estimate will be less than the Threshold Amount (as defined in Article 17.5(e)) and the GOT, within fifteen (15) Days of its receipt of the Preliminary Estimate, agrees with the Restoration Cost Estimate and with the Restoration Schedule, then the Company shall, subject to Article 17.5(e), proceed with the Restoration in accordance with the Restoration Schedule and the GOT shall pay to the Company, within twenty-five (25) Days of its demand, for each Month (or portion thereof) of the Carrying Cost Period (as defined below) an amount equal to:

(A)    the interest accruing under the Financing Documents (the "IDC") if the Force Majeure Event or the Change in Law occurred prior to the Commercial Operations Date, and;

(B)    the full Capacity Payment if the Force Majeure Event or the Change in Law occurred after the Commercial Operations Date (but only to the extent that the

Capacity Payment is not paid to the
Company by TANESCO).

**The term "Carrying Cost Period" shall mean the
period beginning on :**

(aa) the date of the occurrence of the Force
Majeure Event or the Change in Law if the
Company provided the GOT with a timely
notice under Article 17.2(a)(i) or

(bb) if such notice was not given in a timely
manner, the date of the actual notice
given by the Company to the GOT under
Article 17.2(a)(i) and ending the earlier
to occur of (x) the completion of the
Restoration and (y) the last day of the
Restoration Schedule.

(ii)    If:

(A) the Company concludes that the
Restoration Cost Estimate will be less
than the Threshold Amount and the GOT,
within fifteen (15) Days of its receipt
of the Preliminary Estimate, notifies the
Company that the GOT disagrees with the
Company's conclusion and/or that it
disagrees with the Restoration Schedule;
or

(B) the Company concludes that the
Restoration Cost Estimate will be greater
than the Threshold Amount and the GOT,
within fifteen (15) Days of its receipt
of the Preliminary Estimate, agrees with
such conclusion,

then the Company shall proceed with the
preparation of a Report (as defined in Article
17.6(a)) and the provisions of Article 17.5(b)
shall apply.

(iii)   If the Company concludes that the Restoration
Cost Estimate will be greater than the Threshold
Amount and the GOT, within fifteen (15) Days of
its receipt of the Preliminary Estimate,
disagrees with the Preliminary Estimate, such
matter (and any disagreement regarding the
Restoration Schedule) shall be referred to an
expert for resolution pursuant to Article
17.6(c). If the expert concludes that the
Restoration Cost Estimate is less than the
Threshold Amount, the provisions of Article
17.5(a)(i) shall apply. If the expert concludes
that the Restoration Cost Estimate is greater
than the Threshold Amount, then the Company shall
proceed with the preparation of a Report and the
provisions of Article 17.5(b) shall apply.

(b)  If a Report is required to be prepared, then at the conclusion of the meetings of the Parties to discuss the Report (as contemplated by Article 17.6(b)), the Parties shall either agree or disagree with respect to the Restoration Cost Estimate and the Restoration Schedule. If the Parties reach agreement on such matters, or, in the case of a disagreement, after resolution by an expert pursuant to Article 17.6(c), the GOT shall, within fifteen (15) Days of such agreement or resolution, provide the Company with a written notice of its election to either (i) terminate this Agreement pursuant to Article 17.7(a) and pay the applicable compensation pursuant to Article 20.1(e)(i) or (ii) authorise the Company to proceed with Restoration, in which case the following provisions shall apply:

(i)  the Company shall proceed in good faith to try to secure financing for, the cost of Restoration on terms satisfactory to the Company and the GOT. If the Company is unable to arrange such financing, then, unless the GOT arranges or agrees to provide financing for the Restoration, the failure to secure financing shall be treated as an election by the GOT to terminate the Agreement pursuant to Article 17.7(a), in which case the GOT will be required to pay the applicable compensation pursuant to Article 20.1 (e)(iii);

(ii)  if financing for the Restoration has been secured, then the Company shall proceed Restoration in accordance with the Restoration Schedule and, upon completion of Restoration, the Company shall be entitled to special compensation pursuant to Article 17.7(b) or 17.7(c), as the case may be;

(iii)  if the Restoration is to be made prior to the Commercial Operations Date and the Restoration causes a delay in the achievement of the Commercial Operations Date, then the GOT shall pay to the Company, within twenty-five (25) Days of its demand, for each Month of such delay (or portion thereof) an amount equal to the IDC for such Month; provided, however, that the GOT shall not be required to pay such amount to the Company for any period following the end of the Restoration Schedule (as such Restoration Schedule may be extended by an intervening Force Majeure Event) if the Company has failed to complete the Restoration by the end of the Restoration Schedule. If the Restoration is to be made following the achievement of the Commercial Operations Date, then the GOT shall be responsible to pay to the Company each Month (or portion thereof) an amount equal to the Capacity Payment for such Month under the Power Purchase Agreement to the extent the Capacity Payment is not being paid to the Company by TANESCO;

_provided, however,_ that the GOT shall not be required to pay such amount to the Company for any period following the end of the Restoration Schedule (as such Restoration Schedule may be extended by an intervening Force Majeure Event) if the Company has not completed the Restoration by the end of the Restoration Schedule; and

(iv)   the Company shall provide the GOT with a summary of all costs actually incurred in implementing the Restoration, together with copies of all invoices for such work. During any extension of the term of the Power Purchase Agreement pursuant to Article 2.3 of the Power Purchase Agreement resulting from a Force Majeure Event, the Company shall pay to the GOT an amount equal to the aggregate of the debt component of the Capacity Payments paid to the Company by the GOT under this Article 17.5, Dollar for Dollar, without interest or indexation, as and when received by the Company pursuant to Article II of the Power Purchase Agreement.

(c)  (i)   In the event of the occurrence of a force majeure event under (i) the Power Purchase Agreement, that prevents the operation of the Facility for more than thirty (30) Days following the occurrence of such force majeure event because TANESCO is unable to receive power from the Facility or (ii) the Fuel Supply Contract that prevents the operation of the Facility for more than thirty (30) Days following the occurrence of such force majeure event because the Fuel Supplier is not capable of providing fuel to the Facility, the GOT shall prepare and deliver, or cause to be prepared and delivered, a Report pursuant to Article 17.6.

(ii)   If the GOT concludes that the force majeure event under the Power Purchase Agreement or under the Fuel Supply Contract, as the case may be, can be resolved within one hundred eighty (180) Days of its occurrence such that operation of the Facility can be restored to enable the Company to continue to meet its obligations under the Power Purchase Agreement, then the GOT shall work with TANESCO or the Fuel Supplier, as the case may be, to resolve such force majeure event. If such force majeure event has not been resolved within Five Hundred and Forty Six (546) Days of its occurrence, then the Company or the GOT shall have the option to terminate this Agreement after such Five Hundred and Forty Six (546) Day period and, upon such termination, the GOT shall be required to pay to the Company the appropriate level of compensation as provided in Article 20.1(f).

(iii)   If the GOT concludes that the force majeure event cannot be resolved within 546 Days of its occurrence, it shall be deemed an election by the GOT to terminate this Agreement pursuant to Article 17.8(a) and the GOT shall be required to pay to the Company the amount of compensation provided in Article 20.1(f).

(d)   Notwithstanding any provision of this Article XVII to the contrary, the Company shall not be obligated hereunder to proceed with any Restoration unless and until the Company has received all necessary Consents therefor. The Company shall use good faith efforts to obtain such Consent as soon as reasonably practicable. If, despite the Company's good faith efforts, the Company is unable for any reason other than its own fault to obtain any such Consents within a reasonable period of time not to exceed six (6) months after the date that the Company becomes obligated to proceed with any Restoration, then either Party shall have the right to terminate this Agreement. Upon any such termination which is due to the Company's inability to obtain any Consents, GOT shall be required to pay to the applicable compensation pursuant to Article 20.1(g).

(e)   (i)   Upon the occurrence of, and during the continuance of, any Force Majeure Event or Change in Law that, in either case, does not require a Restoration, but, prior to the Commercial Operations Date, results in an extension of the Scheduled Commercial Operation Date or, after the Commercial operation Date, results in a decrease of the Capacity Payment (a "Non-Restoration Event"), then the GOT shall pay to the Company for each Month (or portion thereof) of the Carrying Cost Period (as defined below) the IDC if the Force Majeure Event or the Change in Law occurred prior to the Commercial Operations Date and (ii) the full Capacity Payment if the Force Majeure Event or the Change in Law occurred after the Commercial Operations Date but only to the extent that the Capacity Payment is not paid to the Company by TANESCO. The term "Carrying Cost Period" for purpose of this Article 17.5(e) shall mean the period beginning on the date of the occurrence of the Non-Restoration Event if the Company provided GOT with a timely notice under Article 17.2(a), if such notice was not given in a timely manner, the date of the actual notice given by the Company to GOT under Article 17.2(a) and ending on the date of cessation of the Non-Restoration Event.

(ii)   For purposes of this Article XVII, the term "Threshold Amount" shall mean an amount equal to: (i) 25% of the Construction Contract price through the fifth (5th) anniversary of the Commercial Operations Date; (ii) 20% of the Construction

**Exhibit B, PART 2 to Declaration of Sazi B. Salula**

Contract price after the fifth (5th) anniversary of the Commercial Operations Date through the tenth (10th) anniversary of the Commercial Operations Date; and (iii) 15% of the Construction Contract price after the tenth (10th) anniversary of the Commercial Operations Date through the end of the initial term of the Agreement.

17.6    Appraisal Report and Use of Expert

(a)    When required by Article 17.5(a) or 17.5(c), the Company or the GOT, as the case may be, shall commence the preparation of an appraisal report (the "Report") within thirty (30) Days after the date it was required to provide a notice under Article 17.2(a)(i) (and deliver a copy of such Report to the other Party within fifty-eight (58) Days after it was required to provide such notice). The Report shall address, in such details as is practicable under the circumstances and accompanied by reasonable supporting data, the following matters (to the extent applicable):

(i)    in the case of a Force Majeure Event covered by Article 17.5(a);

    (A)    describe the Force Majeure Event and the damage to, and/or the other effects or impacts on, the Facility;

    (B)    estimate in good faith the time it will take to restore the Facility (as much as it may be possible to do so) to its condition immediately prior to the Force Majeure Event or to bring the Facility into compliance with the Change in Law and;

    (C)    propose a Restoration Schedule; or

    (D)    provide a statement and explanation in good faith regarding whether restoration or modification of the Facility or necessary capital additions are technically feasible and financially viable, including the Company's good faith estimate of:

        (aa)    the costs to restore the Facility to its condition immediately prior to the Force Majeure Event and the associated delay costs or the costs to come into compliance with the Change in Law;

        (bb)    a revised cash flow forecast for the Facility;

        (cc)    the insurance proceeds, if any, that may be recovered, the date or dates on which such proceeds may be received, and the particular purposes for which such proceeds are required to be applied;

(E) described the plan to finance the costs of the Restoration, how such financing will be coordinated with the current loans under the Financing Documents, and any special requirements of the Lenders for the Restoration;

(F) the projected modification to the tariff in the Power Purchase Agreement that would be required to pay special compensation under Article 17.7; and

(G) provide certificates and reports of the Company's financial and technical advisers, as appropriate or as reasonably requested by the GOT, in support of the applicable matters referred to in this Article 17.6(a).

(ii) in the case of a Force Majeure Event covered by Article 17.5(c);

(aa) describe the Force Majeure Event and the damage to, and/or the effects or impacts on [TANESCO] or the Fuel Supplier as the case may be, and

(bb) estimate in good faith the time it will take to restore the system of TANESCO or the Fuel Supplier to service such that the Facility can resume its normal operations.

(b) Within fifteen (15) Days of the delivery of a Report to a Party or such further time as the Parties may agree, the Parties shall meet to discuss the Report and any action(s) to be taken. In connection with the review by the GOT of a Report prepared by the Company, the Company shall provide promptly to the GOT such additional financial and related information pertaining to the Report and the matters described therein as the GOT may reasonably request.

(c) The following disputes between the GOT and the Company shall be submitted to an expert for resolution within the time periods specified:

(i) with respect to disputes regarding any matter set forth in a Report, no later than ten (10) Days after expiration of the period for review and consultation provided by Article 17.6(b);

(ii) with respect to disputes pursuant to Article 17.5, within the applicable period provided for in Article 17.5; and (iii) with respect to whether an item of cost incurred by the Company should be recovered as provided in Article 17.7(d), within ten (10) Days following the delivery of a written request to do so by either Party.

(d)  The expert shall be an engineer with extensive experience in the construction and operation of electric power plants similar to the Facility. The expert shall be chosen by the Parties or, failing agreement between the Parties, by the Institution of Electrical Engineers, United Kingdom. Unless the Parties otherwise agree, the expert shall not be an officer, employee or agent or former officer, employee or former agent of either Party, nor a national of Tanzania.

(e)  If the Company or the GOT reasonably believes that the cost of a Restoration is likely to exceed two-third (2/3) of the Threshold Amount, then the Parties shall cooperate in good faith to select an expert each time that a Preliminary Estimate is to be prepared pursuant to Article 17.5 and engage such expert to be available in case a dispute will need to be resolved. The expert shall be provided with a copy of the Preliminary Estimate and any other written materials prepared by Party and asked to read all materials that are provided. These initial costs to have the expert available and prepared to resolve a dispute quickly shall be shared equally by the Parties.

(f)  Once a dispute is referred to the expert, each Party shall provide all materials in support of its position to the expert and to the other Party within ten (10) Days of the expert's selection and may, within five (5) Days of the date it receives information from the other Party, submit such additional information to the expert in response to the information submitted. Each party shall use its best efforts to provide the expert with any additional information the expert requests. The expert shall be charged with the responsibility to use his best efforts to render his decision regarding any referred matter within thirty (30) Days of the date of the referral. Each Party shall be responsible to pay fifty percent (50%) of the costs of the expert and to pay for its own costs; provided, however, that if the expert determines that the position of a Party had substantially no merit, the expert, as part of his decision, may require one Party to pay for all of the costs of the other Party.

(g)  Notwithstanding any other provision in this Agreement to the contrary regarding the role of experts in resolving disputes, the decision of the expert as to any matter referred under Article 17.5 and 17.6 shall be final and binding on both Parties and shall not be subject to appeal. The Parties expressly waive, to the fullest extent permitted by the Laws of Tanzania, any and all rights that they may now have or may have in the future to contest the decision of the expert before any court or other adjudicatory or administrative body.

17.7  Special Compensation for Force Majeure Events

(a)  In the case of a Force Majeure Event that is covered by Article 17.5(c), the GOT shall determine whether to

proceed with the Restoration (subject to the obligation to pay special compensation pursuant to Articles 17.7(b) or 17.7(c), as the case may be), or terminate this Agreement. The Company acknowledges that the GOT may delegate the review of a Report to TANESCO, or any Relevant Authority and agrees to cooperate with TANESCO, or any such Relevant Authority as if it were the GOT. In the case of a Force Majeure Event covered Article 17.5(c), the determination required to be made by the GOT under this Article 17.7(a) shall be made no later than ten (10) Days after the earlier to occur of:

(i)  the delivery of the Report by the GOT and

(ii) the due date of the Report:

(b)    In the case of a Force Majeure Event covered by Article 17.5(a), the Company shall, unless this Agreement has been terminated by the GOT pursuant to Article 17.7(a) or 17.8(b), be entitled to an increase in the tariff pursuant to Article 5.2 of the Power Purchase Agreement to recover the costs incurred in effecting the Restoration as provided in Article 17.7(d).

(c)    In the case of a Change in Law covered by Article 17.5(a), the Company shall, unless this Agreement has been terminated by the GOT pursuant to Articles 17.8(a) or 17.8(b), be entitled to an increase in the tariff pursuant to Article 5.2 of the Power Purchase Agreement to the costs incurred in effecting the Restoration as provided in Article 17.7(d).

(d)    The costs to be recovered by the Company pursuant to Article 5.2 of the Power Purchase Agreement shall be the costs that are actually incurred by the Company to effect the Restoration (including IDC incurred in connection therewith), to the extent those costs exceed any insurance proceeds; provided, however, that each such item of cost shall have been reasonable and necessary for the Company to effect such Restoration. The Company shall deliver a schedule of such costs to the GOT, together with copies of the invoices, for review by the GOT. If the GOT contests any item of cost and the GOT and the Company cannot agree, the issue of whether such item of cost should be recovered under the Power Purchase Agreement shall be referred to an expert pursuant to Article 17.6(c).

(e)    If there is any Dispute as to whether any payment is due and payable to the Company pursuant to this Article 17.7 or any Dispute as to the amount or timing of any such payment, then pending resolution of the Dispute, GOT or TANESCO, as the case may be, shall be obligated to pay to the Company the undisputed amount and pay any disputed amount into an escrow account established for that purpose.

17.8    **Termination as a Result of a Force Majeure Event**

(a)    If this Agreement is terminated as a result of a Force Majeure Event or Change in Law covered then the provisions of Article 20.1(e) or 20.1(f) shall be applied to determine whether compensation is to be paid by the GOT to the Company.

(b)    If the Company is required to proceed with a Restoration pursuant to Article 17.5 and the Restoration has not been completed by the end of the Restoration Schedule (as such Restoration Schedule may have been extended due to an intervening Force Majeure Event), then the Company shall be required to develop a plan to complete the Restoration as soon as possible and use its best efforts to implement such plan. Notwithstanding the foregoing, if the Restoration has not been completed by the end of the Extended Period (as defined in the next sentence), then, unless the Company is diligently attempting to complete the Restoration, the GOT shall be entitled to terminate this Agreement upon ninety (90) Days notice, whereupon Article 20.1(e), as the case may be, shall apply. The Extended Period shall commence on the first Day following the end of the Restoration Schedule (as such Restoration Schedule may have been extended due to an intervening Force Majeure Event) and will end on the last Day of a period equal to fifty (50) percent of the number of Days in the Restoration Schedule; provided, however, that the Extended Period may be extended for the full period of any intervening Force Majeure Event.

## ARTICLE XVIII

### TAXATION

18.1    Taxation of the Company

(a)    The Company shall not be subject to taxation in Tanzania on its income from Capacity Payments and Energy Payments (each as defined in the Power Purchase Agreement) for the term of the Power Purchase Agreement, including any extension thereof; provided, that the Company complies with the conditions specified in the Income Tax Act, 1973, as amended at the time this Agreement was signed and became effective.

(b)    On the application by the Company for import or customs tax exemption, the Company and its Contractors shall be exempted from import or customs taxation in Tanzania, and shall be allowed to import plant and equipment and spare parts prior to the Commercial Operations Date without payment of Customs Duties, sales taxes, and other surcharges, as well as without payment of Import License fees.

(c)    The Company shall be allowed to register anywhere in Tanzania, and may change its registration from time to time, in order to avail itself of favourable stamp tax and/or registration fees rates for registration of loan documents and similar documents.

18.2    Foreign Investors

Foreign Investors will be governed by the bilateral tax treaties with their respective countries. If there is no bilateral tax treaty between Tanzania and any Foreign Investor's country of residence, the Foreign Investor will be taxed in accordance with the Laws of Tanzania.

18.3    Confirmation on Taxation

The GOT hereby confirms that as of the date of the execution of this Agreement the following tax exemptions are granted to the Company:

IMPORT DUTY

Items

| | Rate(%) |
|---|---|
| Machinery, Equipment, spare parts and supplies | 0.0 |
| Fuel Oil | 0.0 |
| Lubrication oil | 0.0 |

42

EXCISE DUTY

| Items | Rate (%) |
|---|---|
| Fuel Oil | 0.0 |
| Lubrication Oil | 0.0 |

SALES TAX

| Items | Rate (%) |
|---|---|
| Machinery, Equipment, Spare parts and Supplies | 0.0 |
| Fuel Oil | 0.0 |
| Lubrication Oil | 0.0 |

CORPORATE INCOME TAX

| Commercial Operation Year | Rate (%) |
|---|---|
| One to five | 0.0 |
| Six to twenty, not more than | 35.0 ~~sel~~ 18.1 |

WITHHOLDING TAX

| Withholding Tax on Dividends | Rate (%) |
|---|---|
| Commercial operations year one to five | 0.0 |
| Commercial operations year Six to twenty, not more than | 20.0 |

| Withholding Tax on Interest on Foreign Loan | Rate (%) |
|---|---|
| Commercial operations year one to five | 0.0 |
| Commercial operations year Six to twenty, not more than | 20.0 |

CAPITAL ALLOWANCE (TAX DEPRECIATION)

| Items | Rate (%) |
|---|---|
| Utility Equipment | 12.5 annual |
| Industrial buildings | 4.0  annual |

ENVIRONMENTAL TAX rate assumed at 0.0%

ARTICLE XIX

TERMINATION

19.1  Termination for Default

(a)  Termination by the GOT

Each of the following events shall be an event of default
by the Company (each a "Company Event of Default"), which,
if not cured within the time period permitted (if any) to
cure, shall give rise to the right on the part of the GOT
to terminate this Agreement pursuant to Article 19.2;
provided, however, that no such event shall be an Event of
Default by the Company: (aa) if it results from a breach by
the GOT of this Agreement or the Guarantee; (bb) if it
results from a breach by TANESCO of the Power Purchase
Agreement; (cc) if it results from a breach by the Fuel
Supplier of the Fuel Supply Contract; or (dd) if it occurs
as a results of or during a Force Majeure Event for the
period provided pursuant to Article 17.4:

(i)   the failure of the Company to achieve the
Commencement Date within ninety (90) Days after
Financial Closing;

(ii)  the failure of the Company to achieve the Commercial
Operations Date within twenty four (24) months after
the Scheduled Commercial Operations Date; as extended
from the initial Scheduled Commercial Operation Date
for the Facility pursuant to Article XVII.

(iii) unless such breach is caused solely by a breach of
the Power Purchase Agreement by TANESCO, any material
breach by the Company of this Agreement, the Power
Purchase Agreement, that is not remedied within
ninety (90) Days after notice from the GOT or
TANESCO, stating that a material breach of such
agreement has occurred that could result in the
termination of the agreement, identifying the
material breach in question in reasonable detail, and
demanding remedy thereof.

b)  Termination by the Company

Each of the following events shall be an event of default
by the GOT (each a "GOT Event of Default"), which, if not
cured within the time period permitted (if any) to cure
shall give rise to the right on the part of the Company to
terminate this Agreement pursuant to Article 19.2;
provided, however, that no such event shall be an Event of
Default by the GOT (aa) if it results from a breach by the
Company of the Power Agreement or this Agreement or; (bb)
if it occurs as a result of a Force Majeure Event during

44

the period provided pursuant to Article 17.4:

(i)   The expropriation, compulsory acquisition, or nationalization by the GOT or any Governmental Authority of (i) any Ordinary Share Capital, or (ii) any material asset or right of the Company (except as contemplated by the Security Package);

(ii)  The failure by the Company to obtain the Consents under Article 6.2(b) or within the six (6)-month period as provided in Article 6.2(c), so long as such failure is not the result of the fault of, or delay by, the Company;

(iii) Any procurement by the GOT or any Governmental Authority of (i) any Ordinary Share Capital if the result would be for the GOT and/or any Governmental Authority to acquire control of the Company or its management, or (ii) any material asset or right of the Company (except as contemplated by the Security Package);

(iv)  The dissolution, pursuant to law, of TANESCO, except for :

  (A)   the privatization of TANESCO's power stations or any port of its transmission or distribution facilities

  (B)   an amalgamation, reorganization, reconstruction, or further privatization of TANESCO where the GOT without interruption guarantees the performance of the succeeding entity on the same terms and conditions as the Guarantee or such commercial security is provided for the obligation of the succeeding entity that in the reasonable business judgment of the Company provides an adequate alternative to the Guarantee;

(v)   Any default or defaults by the GOT in the making of any payment or payments required to be made by it under the Guarantee referred to in Article XXII on the due date for payment that exceed, in the aggregate at any one time, a sum equivalent to one (1) month of Capacity Payments under the Power Purchase Agreement;

(vi)  Any material breach by the GOT of this Agreement that is not remedied within ninety (90) Days after notice from the Company to the GOT stating that a material breach of the Agreement has occurred that could result in the termination of this Agreement, identifying the material breach in reasonable detail, and demanding remedy thereof;

(vii) Any material breach by TANESCO of the Power Purchase Agreement including but not limited to the failure by

TANESCO to provide the security for payment required by Article 6.6 of the Power Purchase Agreement, that is not remedied within thirty (30) Days after the receipt of a notice from the Company to TANESCO that states that a material breach of the applicable agreement has occurred that could result in the termination of that agreement, identifies the breach in reasonable detail, and demands remedy thereof or the failure of the GOT to provide the security for payment required under Article 15.3;

(viii) Any change in any applicable Laws of Tanzania (including the Constitution of Tanzania ) making

(A) unenforceable, invalid or void any material undertaking of the GOT or TANESCO, under this Agreement, the Guarantee, the Power Purchase Agreement; provided, however, that for so long as the GOT or TANESCO, as the case may be, continues to perform each such material undertaking that has been made unenforceable, invalid, or void, and provides adequate assurance to the Lenders that it will continue to perform or will be able to perform its undertakings under the affected agreement for the remaining balance of the term of this Agreement, no GOT Event of Default shall exist hereunder; or

(B) unlawful for the Company, the Lenders or the Investors to make or receive any payment, to perform any obligation or to enjoy or enforce any material right under this Agreement or any other document in the Security Package, or any such payment, the perform of any such material obligation or the enjoyment or enforcement of any such material right unenforceable, invalid or void as a result of any such change in law; or

(vix) Any change in any of the Laws of Tanzania placing any material restrictions or limitations (beyond those restrictions or limitations that are in existence on the date of the execution of this Agreement) on the ability of the Foreign Investors to repatriate any dividends (or other distributions not arising in connection with a breach of this Agreement) from the Company to the Foreign Investors which restrictions or limitations remain in place for more than sixty (60) Days without an arrangement being provided to exempt the Company or its Foreign Investors from all such restrictions and limitations.

19.2  Termination Notices

(r)  Upon the occurrence of a GOT Event of Default or a Company Event of Default, as the case may be, that is not cured within the applicable period (if any) for cure, the non-defaulting Party may, at its option, initiate termination of this Agreement by delivering a notice (a

46

"Notice of Intent to Terminate") of its intent to terminate this Agreement to the defaulting Party. The Notice of Intent to Terminate shall specify in reasonable detail the Company Event of Default or the GOT Event of Default, as the case may be, giving rise to such notice.

(b)   Following the delivery of a Notice of Intent to Terminate, the Parties shall consult for a period of up to thirty (30) Days in case of a failure by either Party to make payments when due, and up to sixty (60) Days with respect to any other Event of Default (or such longer period as the Parties may mutually agree), as to what steps shall be taken with a view to mitigating the consequences of the relevant Event of Default taking into account all the circumstances. During the period following the delivery of the Notice of the Intent to Terminate, the Party in default may continue to undertake efforts to cure the default, and if the default is cured at any time prior to the delivery of a Termination Notice in accordance with Article 19.2(c), then the non-defaulting Party shall have no right to terminate this Agreement in respect of such cured default.

(c)   Upon expiration of the consultation period described in Article 19.2(b) and unless the Parties shall have otherwise agreed or unless the Event of Default giving rise to the Notice of Intent to Terminate shall have been remedied, the Party having given the Notice of Intent to Terminate may terminate this Agreement by delivering a Termination Notice to the other Party, whereupon this Agreement shall immediately terminate and Article XX shall apply.

## 19.3 Notice to the GOT of TANESCO's Default

(a)   Anything in this Agreement notwithstanding, the Company shall not seek to terminate this Agreement, the Power Purchase Agreement, without first giving a copy of any notices required to be given to the GOT under Articles 19.1 and 19.2 to the GOT, such notices to include a request to the GOT to cure any such default within the same cure period as provided to TANESCO under the Power Purchase Agreement and such cure period to commence upon delivery of each such notice to the GOT. The Company shall give to the GOT copies of any notice that the Company delivers to TANESCO pursuant to Article 16.4 of the Power Purchase Agreement. Each such notice shall be deemed to have been delivered (i) when presented personally to the GOT, (ii) when transmitted by facsimile, or (iii) five (5) Days after being deposited in a regularly maintained receptacle for the Postal Service in Tanzania, postage prepaid, registered or certified, return receipt requested, addressed to the GOT, at the address indicated in Article XXIII (or such other address as the GOT may have specified by written notice delivered in accordance herewith).

(b)   No rescission or termination of this Agreement, the Power Purchase Agreement, by the Company shall be effective without such notice and expiration of such cure period. The GOT may make, any payment or to perform any act required of

TANESCO under the Power Purchase Agreement with the same effect as if the payment or act had been made or performed by TANESCO. If the GOT fails to cure or is unable or unwilling to cure a default of TANESCO within the cure periods provided to TANESCO under the Power Purchase Agreement, the Company shall have all of its rights and remedies with respect to such default as set forth in this Agreement, the Power Purchase Agreement, as the case may be; provided, however, that if the GOT is diligently attempting to cure such default of TANESCO and, demonstrable progress toward affecting such cure is being made, the GOT shall be granted an additional period not exceeding ninety (90) Days to affect such cure before the Company may exercise its rights and remedies with respect to such default set forth in this Agreement and the Power Purchase Agreement.

### 19.4 Notice to the Lenders of the Company's Default

(a) Anything in this Agreement notwithstanding, from and after the occurrence of the Financial Closing, the GOT shall not seek to terminate this Agreement as the result of any default of the Company without first giving a copy of any notices required to be given to the Company under Articles 19.1 and 19.2 to the Lenders, such notice to be copied with a request to the Lenders to cure any such default within the same cure period as provided to the Company in this Agreement and such cure period to commence upon delivery of each such notice to the Lenders. If there is more than one Lender, the Lenders will designate in writing to the GOT an agent (the "Agent") and any notice required hereunder shall be delivered to such Agent, such notice to be effective upon delivery to the Agent as if delivered to each of the Lenders. Each such notice shall be in writing and shall be deemed to have been delivered (a) when presented personally to the Lender or the Agent, (b) when transmitted by facsimile to the number specified in accordance with the procedure set forth below, or (c) five (5) Days after being deposited in a regularly maintained receptacle for the Postal Service in Tanzania, postage prepaid, registered or certified, return receipt requested, addressed to the Lender at the address indicated at Financial Closing ( or such other address or to the Agent at such address as the Lenders may have specified by written notice delivered in accordance herewith). Any notice given by facsimile under this Article 19.4 shall be confirmed in writing delivered personally or sent by prepaid post, but failure to so confirm shall not void or invalidate the original notice if it is in fact received by the Lender or the Agent. If the address of the Lender or Agent is outside Tanzania, any notice delivered to the Lender or Agent pursuant to this Article 19.4 shall be sent by international courier or facsimile, and if sent by facsimile, confirmed by international courier. The address and facsimile number for Lender or Agent shall be provided to the GOT by the Company at Financial Closing and thereafter may be changed by the Lender or the Agent by subsequent delivery of a notice to the GOT at the address or facsimile number for

48

the GOT provided in Article 23.1 (or at such other address or facsimile number subsequently delivered to the Lender or the Agent in accordance with this Article 19.4) and otherwise in accordance with the requirements of Article 23.1.

(b) No recision or termination of this Agreement by the GOT shall be valid or binding upon the Lenders without such notice and the expiration of such cure period. The Lenders may make, but shall be under no obligation to make, any payment or perform any act required to be made or performed by the Company, with the same effect as if made or performed by the Company. If the Lenders fail to cure or are unable or unwilling to cure a default within the cure period as provided to the Company in this Agreement, the GOT shall have all its rights and remedies with respect to such default as set forth in this Agreement; provided, however, that if the Lenders are diligently attempting to cure such default of the Company and demonstrable progress toward affecting such cure is being made, the Lenders shall be granted an additional period not exceeding ninety (90) Days to affect such cure before the GOT may exercise its rights and remedies with respect to such default set forth in this Agreement.

## 19.5 Other Remedies

The exercise of the right of a Party to terminate this Agreement, as provided herein, does not preclude the Party from exercising other remedies that are provided herein or are available at law. Remedies are cumulative, and the exercise of, or failure to exercise, one or more remedy by a Party shall not limit or preclude the exercise of, or constitute a waiver of, other remedies by that Party.

## ARTICLE XX

### RIGHTS AND OBLIGATIONS OF PARTIES UPON TERMINATION

2.   Compensation Upon Termination

(a)  <u>Company Event of Default</u>

In the event the GOT terminates this Agreement pursuant to Article 19.1 (a) as a result of a Company Event of Default, the GOT or its designee shall have the right, but shall not be required, to acquire of all the Company's rights, title and interests in and to the Facility: <u>provided,</u> that the GOT or its designee, upon such acquisition, pays the Company the compensation amount set forth in Row 1 of the Compensation Table in Schedule 2. If the GOT does not elect to purchase the Facility upon the effective date of the termination, the  GOT shall have no further rights or interest in, or obligations to, the Facility.

(b)  <u>GOT Event of Default</u>

In the event the Company terminates this Agreement pursuant to Article 19.1 (b) as a result of GOT Event of Default, the Company may elect to transfer the Facility to the GOT or its designee and, upon such transfer, the GOT or its designee shall pay the Company the compensation amount set forth in Row 2 of Schedule 2.

(c)  <u>Termination Following Change in Law</u>

In the event of a termination of this Agreement following a Change in Law, the GOT shall pay the Company the compensation amount set forth in Row 3 of the Compensation Table in Schedule 2. Upon payment of such compensation amount, the Company shall transfer the Facility to the GOT.

(d)  <u>Termination Following Acquisition of Shares and Assets</u>

In the event the GOT or TANESCO expropriate, compulsorily acquire, nationalise, or otherwise compulsorily procure any Ordinary Share capital or assets of the Company, the GOT shall pay the Company the compensation account set forth in Row 4 of the Compensation Table in schedule 2.

(e)  <u>Termination Following Force Majeure Event:</u>

(i)     If following a Force Majeure Event, the Parties agree or an expert determines that Restoration is feasible, but the GOT elects to terminate this Agreement, the GOT shall pay the Company the compensation amount  set forth in Row 5 of the Compensation Table in Schedule 2. Upon  payment of such the Company shall transfer the Facility to the GOT.

    (ii)    If following a Force Majeure Event, the Parties agree or an expert determines that Restoration is not feasible, the GOT shall pay the Company the compensation amount set forth in Row 6 of the Compensation Table in Schedule 2. Upon payment of such compensation amount, the Company shall transfer the Facility to the GOT.

    (iii)    If following a Force Majeure Event, the Parties agree or an expert determines that Restoration is feasible, but the Company is unable to obtain financing for the Restoration the GOT shall pay the Company the compensation amount set forth in Row 7 of the Compensation Table in Schedule 2. Upon payment of such compensation amount, the Company shall transfer the Facility to the GOT.

    (iv)    If following a Force Majeure Event, the GOT terminates this Agreement in accordance with Article 17.8(b) as a result of a failure to timely complete a Restoration, the GOT shall, so long as the Company has made demonstrable good faith effort to effect the Restoration, pay the Company the compensation amount set forth in Row 8 of the Compensation Table in Schedule 2. Upon payment of such compensation amount, the Company shall transfer the Facility to the GOT.

(f)    <u>Termination Following Force Majeure Event Under the Power Purchase Agreement or Fuel Supply Contract</u>

If following a force majeure event affecting TANESCO or a force majeure event under the Fuel Supply Contract, the GOT pursuant to Article 17.5(c) elects to terminate this Agreement, the GOT shall pay the Company the compensation amount set forth in Row 9 of the Compensation Table in Schedule 2. Upon payment of such compensation amount, the Company shall transfer the Facility to the GOT.

(g)    <u>Termination Following Company's Inability to Obtain Permits</u>

If this Agreement is terminated pursuant to Article 17.5(d) as a result of the Company's inability to obtain a necessary Consent, GOT shall pay the Company the compensation amount set forth in Row 10 of the Compensation Table in Schedule 2. Upon payment of such compensation amount, the Company shall transfer the Facility to GOT.

(h)    <u>Use of Certain Insurance Proceeds</u>

Whenever this Agreement is terminated pursuant to Article XVII following a Force Majeure Event, and the GOT is obligated to pay compensation to the Company pursuant to Article 20.1 and insurance proceeds are available in connection with the Force Majeure Event, the total amount of the net proceeds made available under the insurance policies to which the Company is entitled with respect to the Facility shall, if not used to effect a Restoration or

make repairs to the Facility, be used to pay the following items in the following order of priority;

* to the payment of all indebtedness secured by the Facility;

* then to the other compensation, if any, payable by the GOT to the Company as set forth in Schedule 2; and

* then to the Company.

**20.2 Reimbursement**

In the event of a termination of this Agreement for any reason other than a GOT Event of Default, a Force Majeure Event, or a Change in Law, prior to the Commercial Operations Date, the Company shall reimburse the GOT for all costs and expenses (including reasonable attorneys' fees and expenses) relating to the Project incurred by the GOT prior to the termination, which amount in any event shall not exceed USD100,000.

**20.3 Obligations Upon Termination**

Upon the expiration or earlier termination of this Agreement, the Parties shall have no further obligations hereunder except for obligations that arise prior to or arise upon such expiration or termination and obligations that expressly survive such expiration or termination pursuant to this Agreement, <u>provided, however,</u> that notwithstanding anything to the contrary in the Agreement, the rights and obligations set out in Article XIV (Foreign Currency Exchange and Transfer of Funds) and Article XXI (Resolution of Disputes) shall survive any termination or expiration of this Agreement until all provisions are fulfilled and all funds payable hereunder by GOT are received by the Company or the Lenders upon the sale or other disposal of the assets related to the Project, including without limitation, proceeds from the enforcement by the Lenders of the security created by the Company under or pursuant to the Security Package have been repatriated and, if the Company or the Foreign Investors so desire in the case of Shilling funds, converted by the Company or the Foreign Investors into Foreign Currency by Bank of Tanzania in accordance with the terms of this Agreement and repatriated.

## ARTICLE XXI

### RESOLUTION OF DISPUTES

**21.1 Procedural Law**

The Law governing the procedure and administration of any arbitration instituted shall be the English Law.

**21.2 Arbitration**

Any dispute or difference between the Parties arising out of or in connection with this Agreement (each a "Dispute") shall be settled by arbitration in accordance with the Rules of Procedure for Arbitration Proceedings (the "ICSID Rules") of the International Centre for the Settlement of Investment Disputes (the "Centre") established by the Convention on the Settlement of Investment Disputes between States and Nationals of other States (the "Convention"). For purposes of consenting to the jurisdiction of the Convention, the Parties agree that the Company is a foreign controlled entity unless the amount of the voting stock in the Company held by Foreign Investors should decrease to less than thirty-five (35) percent of the outstanding voting stock of the Company.

If for any reason the Dispute cannot be settled in accordance with the ICSID Rules, whether if the GOT fails to implement the Convention, or if the Company should not be agreed to be a foreign controlled entity, or if the request for arbitration proceedings is not registered by the Centre, or if the Centre fails or refuses to take jurisdiction over such Dispute, or otherwise, any Dispute shall be finally settled by arbitration under the Rules of Arbitration of the International Chamber of Commerce (the "ICC Rules") by one or more arbitrators appointed in accordance with the ICC Rules.

The arbitration shall, unless otherwise agreed by the Parties, be conducted in London, England. Unless otherwise agreed by the Parties, the number of arbitrators shall be three (3), one arbitrator nominated by the Company, one arbitrator nominated by GOT and one arbitrator nominated jointly by the arbitrators appointed by the Company and GOT provided that if the arbitrators appointed by the Company and GOT fail to nominate an arbitrator or agree on the nomination of the arbitrator within 28 days of either both being appointed either party may apply to the High Court of the England and Wales to appoint the third arbitrator.

For the purpose of Article 25(3) of the Convention, the GOT hereby approves TANESCO's consents in the Power Purchase Agreement to arbitration under the ICSID Rules.

No arbitrator appointed pursuant to this Article 21.2 shall be a national of the jurisdiction of either Party or of the jurisdiction of any shareholder or group of shareholders owning thirty (30) percent or more of the Ordinary Share Capital, nor shall any arbitrator be an employee or agent or former employee or agent of any such person.

## 21.3 Commercial Acts

Subject to Article 24.7, the GOT unconditionally and irrevocably agrees that the execution, delivery, and performance by it of this Agreement and those agreements included in the Security Package to which it is a party constitute private and commercial acts.

## ARTICLE XXII

### GUARANTEE

The GOT shall, simultaneously with this Implementation Agreement, execute and deliver to the Company the Guarantee as per schedule 1 to this Agreement.

## ARTICLE XXIII

### NOTICES

#### 23.1 Address for Notice

All notices, communications, or other documents (together "Notices") to be given or made by one Party to the other Party pursuant to this Agreement shall be in writing, shall be addressed for the attention of the person indicated below, and shall either be delivered personally or sent by telegram, registered or certified mail, or facsimile. The addresses for service of the Parties and their respective facsimile numbers shall be:

* For the GOT          :     MINISTRY OF WATER ENERGY AND MINERALS
* Attention            :     PRINCIPAL SECRETARY
* Address              :     SOKOINE DRIVE/MKWEPU STREET
                             P.O. Box 2000, Dar es Salaam
* Facsimile            :     51-44071
* For the Company      :     Independent Power Tanzania Ltd
* Attention            :     Mr. James Rugemalira
* Address              :     5th Floor, Extelcoms House,
                             Samora Avenue, P.O. Box 1461
                             Dar es Salaam
                             United Republic of Tanzania

* Facsimile            :     51-46017
* With a copy to Counsel for the Company: LONG & COMPANY
* Attention            :     Ms. Joanne C. F. Long
* Address              :     9B Bukit Ceylon
                             50200 Kuala Lumpur
                             Malaysia

* Facsimile            :     603-201 4832

* or such other addresses and facsimile numbers as either Party may have notified to the other Party in accordance with this Article 23.1

#### 23.2 Delivery

All Notices shall be deemed delivered:

(a)  when presented personally;

(b)  if received on a business Day for the receiving Party, when transmitted by facsimile to the receiving Party's

56

facsimile number specified above and, if received on a Day that is not business Day for the receiving Party, on the first business Day following the date transmitted by facsimile to the receiving Party's facsimile number specified above;

(c)    one (1) Day after being delivered to a courier for overnight delivery, addressed to the receiving Party, at the address indicated above (or such other address as such Party may have specified by Notice delivered to the delivering Party at its address or facsimile number specified above); or

(d)    five (5) Days after being deposited in a regularly maintained receptacle for the postal service in Tanzania, postage prepaid, registered or certified, return receipt requested, addressed to the receiving Party, at the address indicated above (or such other address as the receiving Party may have specified by written Notice delivered to the delivering Party at its address or facsimile number specified above). Any notice given by facsimile shall be confirmed in writing delivered personally or sent by registered or certified mail, but the failure to so confirm shall not void or invalidate the original notice if it is in fact received by the Party to which it is addressed.

## ARTICLE XXIV

### MISCELLANEOUS PROVISIONS

24.1 Variations in Writing

All additions, amendments and variations to this Agreement shall be binding only if in writing and signed by duly authorized representatives of the Parties.

24.2 Entire Agreement

This Agreement, the Power Purchase Agreement, and together with their attached schedules, incorporate the entire understanding between the Parties in relation to the Project and supersede all previous oral and written representations, agreements or arrangements between the Parties in respect of the Project.

24.3 Waivers

No waiver by either Party of any default by the other in the performance of any of the provisions of this Agreement:

(i)    shall operate or be construed as a waiver of any other or further default whether of a like or different character; or

(ii)   shall be effective unless in writing duly executed by an authorized representative of the Party.

The failure by either Party to insist on any occasion upon the performance of the terms, conditions, and provisions of this Agreement, or time or other indulgence granted by one Party to the other shall not thereby act as a waiver of the breach, as acceptance of any variation, or as the relinquishment of any such right hereunder, which shall remain in full force and effect.

24.4 Confidentially

(a)  Each of the Parties shall, and shall ensure that their Contractors, subcontractors, consultants, and agents, and each of their respective permitted successors and assigns, hold in confidence all documents and other information whether technical or commercial, which is of a confidential nature supplied to it by or on behalf of the other Party relating to the Project and shall not (save as required by law or appropriate regulatory authorities or prospective lenders to, or investors in, the Company or the respective professional advisers of the Parties or of such lenders or investors as aforesaid) publish or otherwise disclose or use the same for its own purposes, otherwise than as may be required to perform its obligations under this Agreement.

58

The provisions of this Article 24.4 shall survive the termination of this Agreement, but shall expire and be of no further effect upon the fifth (5th) anniversary of the date of termination of this Agreement.

(b)  The provisions of Article 24.4(a) above shall not apply to:

(i)  information in the public domain otherwise than by breach of this Agreement;

(ii)  information in the possession of the receiving Party thereof before divulgence that was not obtained under any obligation of confidentiality; and

(iii)  information obtained from a third party who the receiving Party believes, after reasonable inquiry, is free to divulge the same so long as the information was not obtained by the receiving Party under any obligation of confidentiality to the third party.

(iv)  Nothing herein shall preclude the use of provisions similar to those contained in this and the other agreements referred to herein in any agreements prepared and issued in connection with other projects.

## 24.5 Successors and Assignees

This Agreement shall inure to the benefit of, and be binding upon, the permitted successors and permitted assignees of the Parties.

## 24.6 No Third Party Beneficiaries

This Agreement shall not confer any right of suit or action whatsoever on any third party, except for the specific rights granted to the Lenders pursuant to Articles 15.2, 18.2 and 19.4.

## 24.7 Sovereign Immunity

The GOT hereby irrevocably and unconditionally agrees that: (i) should any proceedings be brought against the GOT or its assets, or other than its aircraft, naval vessels and other defence related assets or assets protected by the diplomatic and consular privileges under the State Immunity Act of England or the foreign Sovereign Immunities Act of the United States or any analogous legislation (the "Protected Assets") in any jurisdiction in connection with this Agreement or any of the transactions contemplated by this Agreement, no claim of immunity from such proceedings will be claimed by or on behalf of the GOT on behalf of itself or any of its assets (other than the Protected Assets); (ii) it waives any right of immunity which it or

59

any of its assets (other than the Protected Assets) now has or may in the future have in any jurisdiction in connection with any such proceedings; and (iii) consents generally in respect of the enforcement of any judgment against it in any such proceedings in any jurisdiction to the giving of any relief or the issue of any process in connection with such proceedings (including without limitation, the making, enforcement or execution against or in respect of any of its assets whatsoever (other than the Protected Assets) regardless of its use or intended use.

### 24.8 Governing Law

This Agreement and the (rights and obligations of the Parties hereunder shall be governed by and construed in accordance with the Laws of Tanzania.

### 24.9 Consent to Jurisdiction

Each Party hereby consents to the jurisdiction of the courts of London, England for any action filed by other Party to enforce a judgment entered by the courts of England and Wales recognizing any award or decision of any arbitrator(s) or experts who were duly appointed under this Agreement to resolve any Dispute between the Parties. With respect to any such proceedings for the enforcement of any such award against the assets of a Party (other than the Protected Assets in the case of proceedings against the GOT):

* The GOT appoints the Commercial Counsellor of The United Republic of Tanzania in London (or, in his absence, a responsible officer in the High Commission) whose address is presently [          ], London, England to receive for and on its behalf service of process in such jurisdiction in any such enforcement proceeding;

* The Company appoints MR. AHMED DAYA whose address is presently 212, Station Road, Edgware, Middless HA87AR, England to receive for and on its behalf service of process in such jurisdiction in any such enforcement proceeding;

* Each Party shall maintain in England a duly appointed agent for the receipt of service of process and shall notify the other Party of the name and address of such agent and any change in such agent and/or the address of such agent; and

* Each party agrees that the failure by any such agent for the receipt of service of process to give it notice of any process that has been served on such agent shall not impair the validity of such service or of any judgment based thereon.

24.10    Most Favoured Nation

If the GOT grants any concessions, incentives or more favourable terms and conditions (other than those that granted to the project company because of technical limitations of, or fuel used by, or location of, the project) in an implementation agreement entered into between the GOT and a project company that has <u>prior to the date</u> of this Agreement entered into a memorandum of understanding for an implementation agreement related to such project, the GOT agrees to amend this Agreement to include such concessions, incentives or more favourable terms and conditions that are requested in writing in a notice from the Company to the GOT.

IN WITNESS WHEREOF, the Parties have entered into this Agreement as of the date first above written.

THE UNITED REPUBLIC OF TANZANIA

By:      RAPHAEL MOLLEL
Title:   PRINCIPAL SECRETARY, MINISTRY OF WATER, ENERGY
         AND MINERALS

INDEPENDENT POWER TANZANIA LTD.

By:      JAMES B. RUGEMALIRA
Title:   DIRECTOR


[SEAL]

SCHEDULE I

FORM OF GUARANTEE

THIS GUARANTEE is made at Dar es Salaam, United Republic of Tanzania the 8th of June, 1995

BETWEEN:

THE GOVERNMENT OF THE UNITED REPUBLIC OF TANZANIA acting through its Ministry of Water, Energy and Minerals (hereinafter referred to as the "Guarantor") of the one part; and

Independent Power Tanzania Ltd. a private limited Company incorporated under the laws of Tanzania, whose registered office is located at 5th Floor, Extelcoms House, Samora Avenue, P.O. Box 1461, Dar es Salaam, United Republic of Tanzania (hereinafter referred to as the 'Company").

WHEREAS:

(A) The Guarantor and the Company have entered into an Implementation Agreement (the "Implementation Agreement") dated 8th June, 1995.

(B) The Tanzania Electric Supply Company Limited ("TANESCO") has entered into a Power Purchase Agreement with the Company (the "Power Purchase Agreement") dated 26th may, 1995.

(C) In accordance with Article XXII of the Implementation Agreement, the Guarantor has agreed to enter into this Guarantee of the payment obligations of TANESCO under the Power Purchase Agreement.

NOW IT IS HEREBY AGREED as follows:

1          GUARANTEE

## 1.1  Guarantee

In consideration of the Company entering into the Power Purchase Agreement with TANESCO the Guarantor hereby irrevocably and unconditionally guarantees and promises to pay the Company any and every sum of money TANESCO is obligated to pay to the Company pursuant to the Power Purchase Agreement TANESCO has failed to pay in accordance with the terms of those agreements.

## 1.2  Waiver of Defence

The obligations of the Guarantor under this Guarantee shall be absolute and unconditional and shall remain in full force and effect until all the covenants, terms, and agreements set forth in the Power Purchase Agreement, shall have been completely discharged and performed, unless waived by the Company in writing. The obligations of the Guarantor shall not be modified or impaired upon the happening from time to time of any event, including the following:

1.2.1    The extension of time for payment of any amounts due or of time for performance of any of the covenants, terms, or agreements of TANESCO, set forth in the Power Purchase Agreement.

1.2.2    Amendments to the Power Purchase Agreement that do not affect in any material way the rights or obligations of TANESCO,  or the Company under those agreements.

1.2.3    The failure, omission, or delay by the Company to enforce, ascertain, or exercise any right, power or remedy under or pursuant to the terms of the Power Purchase Agreement, Insurance, or this Guarantee;

1.2.4    The bankruptcy, insolvency, or other failure or financial disability of TANESCO, or the Company; or

1.2.5    The addition, or partial or entire release of any guarantor, maker, or other Party (including TANESCO) primarily or secondarily responsible for the performance of any of the covenants, terms, or agreements set forth in the Power Purchase Agreement or by any extension, waiver, amendment, or thing whatsoever that may release or create a defence for a guarantor (other than performance in accordance with the terms of the Power Purchase Agreement).

## 1.3  Continuing Guarantee

1.3.1    This Guarantee shall be a continuing security and, accordingly, shall extend to cover the

balance due to the Company at any time from TANESCO under the Power Purchase Agreement. No demand made by the Company hereunder shall prejudice or restrict the right of the Company to make further or other demands.

1.4  **Additional Security**

1.4.1    This Guarantee shall be in addition to, and not in substitution for or derogation of, any other security that the Company may at any time hold in respect of the obligations of TANESCO under the Power Purchase Agreement.

1.4.2    The Company may enforce this Guarantee notwithstanding that it may hold any other guarantee, lien, or security of or for the obligations of TANESCO under the Power Purchase Agreement or have available to it any other remedy at law or equity.

1.5  **Preliminary Recourse**

1.5.1    Before taking steps to enforce this Guarantee and demanding payment from the GOT, the Company shall be obliged only to make demand in writing for payment from TANESCO. After 30 Days (during which time the Company shall make further requests for payment, with a copy to the GOT of each request, from TANESCO) from the date payment was due, the Company may notify the GOT in writing that payment from TANESCO is past due and make a demand for payment from the GOT under this Guarantee, and the GOT shall make payment within five (5) Days. Late payments hereunder shall bear mark-up at an annual rate equal to the then applicable one-year LIBOR rate plus three (3) percentage points. Amounts in dispute under the Power Purchase Agreement shall be deemed not to be due and owing for purposes of this Guarantee until expiration of any dispute resolution procedures provided in each of the respective Agreements.

1.5.2    Except as provided in Article 1.4.1, the Company shall not be obliged before taking steps to enforce this Guarantee to exercise any other remedies that may be available to it under or in respect of the Power Purchase Agreement or to obtain judgment against TANESCO thereon.

1.6  **Certification**

Any demand for payment made pursuant to this Guarantee shall be made in person by a duly authorized officer of the

Company at the Guarantors offices at [identify location] and shall be accompanied by a certificate signed by a duly authorised officer of the Company stating that:

"We hereby certify that (1) [specify Company], (the "Company") is making this demand on the Government of the Republic of Tanzania (the "Guarantor") in the amount of United States Dollars [insert amount] in accordance with Article 1 of the Guarantee dated 8[th] June, 1995, between the Guarantor and the Company; (2) the amount specified above is due and payable by the Tanzania Electric Company Limited ("TANESCO") under the Power Purchase Agreement between the Company and TANESCO and no part of the amount specified above is the subject of a dispute between the Parties; (3) demand in writing for payment from TANESCO has been made; (4) for a period of not less than 30 Days from the date payment was due, further request for payment have been made to TANESCO or to obtain the payment of such amount; and (5) such amount, on the date hereof, remains unpaid by TANESCO.

## 1.7 Subordination

Any right that the Guarantor may at any time have to be indemnified by TANESCO in respect of sums paid out by the Guarantor in performance of this Guarantee shall be subordinated to the rights of the Company to recover from TANESCO in full all sums that may at any time become due from TANESCO under the Power Purchase Agreement.

## 1.8 No Set-off

No set-off, counterclaim, reduction, or diminution of any obligation that the Guarantor has or may have against the Company shall be available to the Guarantor against the Company in connection with any obligation of the Guarantor to the Company under this Guarantee; provided, however, that notwithstanding the foregoing the Guarantor shall have the benefit of all rights of set-off, counterclaim, reduction, or diminution of any obligations that are available to TANESCO, pursuant to the Power Purchase Agreement or that are otherwise directly related to the Project.

## 1.9 Consent to Jurisdiction

Each Party hereby consents to the jurisdiction of the courts of London, England for any action filed by the Party to enforce any award or decision of any arbitrator (s) or expert (s) who were duly appointed under this Agreement to resolve any Dispute between the Parties. With respect to any such proceedings for the enforcement of any such award against that assets of a Party (other than the Protected Assets in the case of enforcement proceedings against the GOT) :

(a) The GOT appoints the Commercial Counsellor of the Republic of Tanzania in London (or, in his absence, a responsible officer in the Tanzania High Commission) whose address is presently 43 Hertford Street, London, WIY7 TF, England to receive for and on its behalf service of process in such jurisdiction in any such enforcement proceeding;

(b) The Company appoints Mr. Ahmed Daya whose address is presently 212, Station Road, Edgware, Middlesex HA8 7AR, England to receive for and on its behalf service of process in such jurisdiction in any such enforcement proceeding;

(c) Each Party shall maintain in England a duly appointed agent for the receipt of service of process and shall notify the other Party of the name and address of such agent and any change in such agent and/or the address of such agent; and

(d) Each Party agrees that the failure by any such agent for the receipt of service of process to give it notice of any process that has been served on such agent shall not impair the validity of such service or of any judgement based thereon.

## 2    REPRESENTATIONS AND WARRANTIES

The Guarantor represents and warrants that, as of the date hereof:

### 2.1    Power and Authority

The Guarantor has full power, authority, and legal right to incur the obligation, to execute and deliver, and to perform and observe the terms and provisions of this Guarantee.

### 2.2    Legal Validity

This Guarantee constitutes legal, valid, binding, and enforceable obligations of the Guarantor in accordance with its terms.

### 2.3    Approvals

All necessary action has been taken, and all approvals required have been obtained, under the Laws of Tanzania to authorise the execution, delivery, and performance of this Guarantee.

### 2.4    Tax

In addition to any amount then due and payable to the

Company by TANESCO under the Power Purchase Agreement respectively, and payable by the Guarantor under the terms of this Guarantee, the Guarantor shall be liable for any duty, impost, levy, charge, fee or tax or whatsoever nature ("Tax") levied or imposed by a Governmental Authority or any political subdivision or authority thereof on or with regard to any payment hereunder unless the payment, if made by TANESCO would itself have been subject to the Tax. If under applicable law the Guarantor is unable to pay the Tax and the Company is required to pay the Tax, the amount to be paid to the Company hereunder shall be increased by an amount sufficient so that such payment, net of the Tax, would equal the payment the Company would have received from TANESCO net of any Taxes applicable to payment from TANESCO to the Company.

## 2.5   Full Faith and Credit

The obligations and covenants of the Guarantor in this Guarantee constitute unconditional obligations of the Guarantor, for the performance of which the full faith and credit of the Guarantor is pledged.

## 2.6   Sovereign Immunity

that it is subject to suit in England with respect to its obligations hereunder, and that the execution, delivery, and performance of this Guarantee constitute private and commercial acts of the Guarantor. The GOT hereby irrevocably and unconditionally agrees: (i) that should any proceedings be brought against the GOT or its assets, other than its aircraft, naval vessels and other defence related assets or assets protected by the diplomatic and consular privileges under the State Immunity Act of England or the Foreign Sovereign Immunities Act of the United States or any analogous legislation (the "Protected Assets"), in any jurisdiction in connection with this Guarantee or any of the transactions contemplated by this Guaranty, no claim of immunity from such proceedings will be claimed by or on behalf of the GOT on behalf of itself or any of its assets (other than the Protected Assets); (ii) it waives any right of immunity which it or any of its assets (other than the Protected Assets) now has or may in the future have in any jurisdiction in connection with any such proceedings; and (iii) it consents generally in respect of the enforcement of any judgement against it in any such proceedings in any jurisdiction to the giving of any relief or the issue of any process in connection with such proceedings (including without limitation, the making, enforcement, or execution against or in respect of any of its assets whatsoever (other than the Protected Assets) regardless of the use or intended use of the asset.

3    UNDERTAKING

3.1  Duration

This Guarantee shall remain in full force and effect
from and after the date hereof until the termination
of the initial term of the Power Purchase Agreement
and for so long thereafter as any amount owed the
Company by the Guarantor, TANESCO, in connection with
such initial term is or may be outstanding.

3.2  Performance of Agreements

The Guarantor shall not take any action that would
prevent or interfere with the performance by TANESCO
of any of its obligations under the Power Purchase
Agreement (except, in the case of any unintentional
action, where the Guarantor promptly remedies such
action).

4        NO WAIVER; REMEDIES CUMULATIVE

4.1  No Waiver

No failure or delay by the Company to exercise any
right or remedy under this Guarantee shall constitute
a waiver of that right or remedy.  No single or
partial exercise of any right or remedy shall preclude
any other or further exercise thereof or the exercise
of any other right or remedy.   No waiver by the
Company shall be effective unless it is in writing.  .

4.2  Remedies Cumulative

The rights and remedies of the Company provided by
this Guarantee are cumulative and not exclusive of any
rights or remedies provided by law.

5        NOTICES

5.1  Address for Notice

All  notices  or  other  communications  (together
"Notices") to be given or made hereunder shall be in
writing, shall be addressed for the attention of the
person  indicated  below  and  shall  be  delivered
personally or sent by registered or certified mail or
facsimile.  All Notices shall be deemed delivered (a)
when  presented  personally,  (b)  if  received  on  a
business Day of the receiving party, when transmitted
by facsimile to the receiving party's facsimile number
specified above and, if received on a Day that is not
a business Day of the receiving Party, on the first
business Day of the receiving Party following the date
transmitted by facsimile to the receiving party's
facsimile number specified above,  or one (1) Day
after being delivered to a courier for overnight
delivery, addressed to the receiving Party, at the
address indicated above  or such

other address as such party may have specified by notice delivered to the delivering Party at its address or facsimile number specified above or (d five (5) Days after being deposited in a regularly maintained receptacle for the postal service in Tanzania, postage prepaid, registered or certified, return receipt requested, addressed to the receiving Party, at the address indicated above (or such other address as the receiving Party may have specified by written Notice delivered to the delivering Party at its address or facsimile number specified above). Any notice given by facsimile shall be confirmed in writing delivered personally or sent by registered or certified mail, but the failure to do so confirm shall not void or invalidate the original notice if it is in fact received by the Party to which it is addressed. The address for service of earth Party and its respective facsimile number shall be:

5.1.1    For the Guarantor:    The Government of United Republic of Tanzania

•    Attention:    The Principal Secretary Ministry of Water, Energy and Minerals

•    Address:    Sokoine Drive/Mkwepu Street
P.O. BOX 2000
Dar es Salaam

•    Facsimile:    51-44071

5.1.2.    For the Company:    Independent Power Tanzania Ltd.

•    Attention:    Mr. James Rugemalira

•    Address:    5th Floor, Extelcoms House, Samora Avenue, P O Box 1461, Dar es Salaam, United Republic of Tanzania

•    Facsimile:    51-46017

•    with a copy to the Company's counsel:
LONG & COMPANY

•    Attention:    Ms. Joanne Long

•    Address:    9B Bukit Ceylon, 50,200 Kuala Lumpur, Malaysia

•    Facsimile:    603-201 4832

or such other addresses or facsimile numbers as either Party may have notified to the other Party in accordance with this Article 5.1.

5.2    **Effectiveness of Service**

Each Notice under this Guarantee shall be effective only upon actual receipt thereof.

6        ASSIGNMENT

6.1  Assignment by the Guarantor

The Guarantor may not assign or transfer all or any part of its rights or obligations hereunder without the prior written consent of the Company.

6.2  Assignment by the Company

The Company may not assign or transfer all or any part of its rights or obligations hereunder without the prior written consent of the Guarantor. Notwithstanding the provision of the immediately preceding sentence, for the purpose of construction or permanent financing of the GOT, the Company may assign or create a security interest over its rights and interests in and to this Guarantee.

6.3  Successors

This Guarantee shall be binding upon and inure to the benefit of the Guarantor and the Company and the respective successors and permitted assigns of each.

7        GOVERNING LAW AND ARBITRATION

7.1  Governing Law

The rights and obligations of the Parties under or pursuant to this Guarantee shall be governed by and construed according to the Laws of Tanzania.

7.2  Arbitration

Any dispute or difference between the Parties arising out of or in connection with this Agreement shall be arbitrated in accordance with Article 21.2 of the Implementation Agreement.

8        MISCELLANEOUS

8.1  Severability

If one or more provisions contained in this Guarantee is held or found to be invalid, illegal, or unenforceable in any respect, the provision(s) shall be given effect to the extent permitted by law and the invalidity, illegality, or unenforceability of any provision shall not affect the validity of the remaining provisions of this Guarantee.

8.2  Definitions

The capitalised terms used but not defined in this Guarantee shall have the meanings given to them in the Implementation Agreement.

IN WITNESS WHEREOF, this Guarantee has been executed the day first above written.

THE UNITED REPUBLIC OF TANZANIA

By    :    RAPHAEL MOLLEL

Title :    PRINCIPAL SECRETARY MINISTRY OF WATER, ENERGY AND MINERALS

PRINCIPAL SECRETARY
MINISTRY OF WATER, ENERGY
AND MINERALS

INDEPENDENT POWER TANZANIA LTD.

By    :    JAMES B. RUGEMALIRA

Title :    DIRECTOR

(SEAL)

SCHEDULE 2

COMPENSATION AMOUNTS

This Schedule 2 consists of two parts. Part 1 is a Compensation Table showing in a matrix format the amounts payable in accordance with Article 19.1. The tables refers to various compensation elements, labelled as a, b, c, d, e and f, which are set forth in Part 2.

PART 1 OF SCHEDULE 2 - COMPENSATION TABLE

| | TERMINATION EVENT | COMPENSATION PAYABLE BY GOT |
|---|---|---|
| 1 | Termination for a Company Event of Default (other than a Restoration Schedule Default) where the GOT elects to purchase the Complex - Article 20.1(a). | a - c |
| 2 | Termination for a GOT Event of Default - Article 20.1(b). | a + b + d + e |
| 3 | Termination following a Change in Law - Article 20.1(c) | a + b + d + e |
| 4 | Termination following Acquisition of Shares and Assets - Article 20.1(d). | a + b + e |
| 5 | Termination following a Force Majeure Event where the Report concludes that Restoration is feasible but the GOT elects to terminate - Article 20.1(e)(i). | a + b + d + e |
| 6 | Termination following a Force Majeure Event where the Report concludes that Restoration is not feasible - Article 20.1(e)(ii) | a + b + e |
| 7 | Termination following a Force Majeure Event where the Report concludes that Restoration is feasible but financing is not available - Article 20.1(e)(iii) | a + b + (d/2) + e |
| 8 | Termination for a Restoration Schedule Default following a Force Majeure Event - Article 20.1(e)(iv) | a + f - c |

## PART 2 OF SCHEDULE 2 - COMPENSATION ELEMENTS

In this Schedule 2, the letters a, b, c, d, e and f are used to signify different elements of compensation to be paid upon the occurrence of the events described in Article 20 and this Schedule 2. The letters shall represent the following amounts :

a = Sum of (i) the total amount outstanding to the Lenders under the Financing Documents (including interest during the original construction period through the earlier of the date of termination of this Agreement or the Scheduled Commercial Operations Date) plus (ii) the total amount outstanding under any loan agreements for capital improvements to the Facility that are required under the Power Purchase Agreement, as approved by the GOT, plus (iii) the total amount of any other outstanding debt incurred by the Company that was approved by the GOT, less any insurance proceeds available to the Company following a Force Majeure Event and not spent for Restoration.

b = The initial equity investment by the shareholders of the Company multiplied by a fraction, the numerator of which is the number of years remaining in the initial term of the Power Purchase Agreement and the denominator of which is the initial term of the Power Purchase Agreement.

c = The capital expenditures (including interest) required by the GOT or its designee, if any, to make the Facility operable following a transfer of the Facility.

d = For a period equal to the lesser of (i) five (5) years and (ii) the remainder of the initial term of the Power Purchase Agreement (as such initial term may have been extended under the terms of the Power Purchase Agreement), an amount equal to the "Net Cash Flow" for such period, discounted to its present value by applying a discount rate equal to twenty and one tenth of one percent (20.10%) to the base case pro forma that is agreed to by the Lenders at Financial Closing. The term "Net Cash Flow" shall mean the net profits of the Company after depreciation with respect to the Facility less all principal repayment amounts, all as projected in such base case pro forma.

e = The summation of the products of (i) any additional equity amounts that are contributed by the shareholders of the Company for any of the events that are described under Article 17.5 plus any such equity contributions approved by the GOT, times (ii) a fraction, the numerator of which is the number of years remaining in the initial term of the Power Purchase Agreement and the denominator of which is the number of years remaining in the initial term of the Power Purchase Agreement at the time of such contribution or approval for each such additional equity amount.

f = The summation of the products of (i) any additional equity amounts that are contributed by the shareholders of the Company for any of the events that are described under Article 17.5 prior to the Force Majeure Event giving rise to the restoration which led to the Restoration Schedule Default plus (ii) other equity contributions approved by the GOT, including the original equity

contributions, times a fraction, the numerator of which is the number of years remaining in the initial term of the Power Purchase Agreement and the denominator of which is two times the number of years remaining in the initial term of the Power Purchase Agreement at the time of such contribution or approval for each such additional equity amount.

**Exhibit C to Declaration of Sazi B. Salula**

DATED THIS 8TH DAY OF JUNE 1995

BETWEEN

GOVERNMENT OF THE UNITED REPUBLIC OF TANZANIA

AND

INDEPENDENT POWER TANZANIA LIMITED

---

GUARANTEE

---

# GUARANTEE

THIS GUARANTEE is made at Dar es Salaam, United Republic of Tanzania the of 8th day of June 1995

BETWEEN:

THE GOVERNMENT OF THE UNITED REPUBLIC OF TANZANIA acting through its Ministry of Water, Energy and Minerals (hereinafter referred to as the "Guarantor") of the one part; and

Independent Power Tanzania Limited a limited company incorporated under the laws of Tanzania, whose registered office is located at 5th Floor, Extelcoms House, Samora Avenue, P O Box 1461, Dar-es-Salaam, United Republic of Tanzania (hereinafter referred to as the "Company") of the other part.

WHEREAS:

(A)   The Guarantor and the Company have entered into an Implementation Agreement (the "Implementation Agreement") dated 8th day of June 1995.

(B)   The Tanzania Electric Supply Company Limited ("TANESCO") has entered into a Power Purchase Agreement with the Company (the "Power Purchase Agreement") dated 26th day of May 1995

(C)   In accordance with Article XXII of the Implementation Agreement, the Guarantor has agreed to enter into this Guarantee of the payment obligations of TANESCO under the Power Purchase Agreement.

NOW IT IS HEREBY AGREED as follows:

1    **GUARANTEE**

1.1    **Guarantee**

In consideration of the Company entering into the Power Purchase Agreement with TANESCO the Guarantor hereby irrevocably and unconditionally guarantees and promises to pay the Company any and every sum of money TANESCO is obligated to pay to the Company pursuant to the Power Purchase Agreement TANESCO has failed to pay in accordance with the terms of those agreements.

1.2    **Waiver of Defence**

The obligations of the Guarantor under this Guarantee shall be absolute and unconditional and shall remain in full force and effect until all the covenants, terms, and agreements set forth in the Power Purchase Agreement, shall have been completely discharged and performed, unless waived by the Company in writing. The obligations of the Guarantor shall not be modified or impaired upon the happening from time to time of any event, including the following:

1.2.1    The extension of time for payment of any amounts due or of time for performance of any of the covenants, terms, or agreements of TANESCO, set forth in the Power Purchase Agreement.

1.2.2    Amendments to the Power Purchase Agreement that do not affect in any material way the rights or obligations of TANESCO, or the Company under those agreements.

1.2.3    The failure, omission, or delay by the Company to enforce, ascertain, or exercise any right, power or remedy under or pursuant to the terms of the Power Purchase Agreement, Insurance, or this Guarantee;

1.2.4    The bankruptcy, insolvency, or other failure or financial disability of TANESCO, or the Company; or

1.2.5    The addition, or partial or entire release of any guarantor, maker, or other Party (including TANESCO) primarily or secondarily responsible for the performance of any of the covenants, terms, or agreements set forth in the Power Purchase Agreement or by any extension, waiver, amendment, or thing whatsoever that may release or create a defence for a guarantor (other than performance in accordance with the terms of the Power Purchase Agreement).

**1.3    Continuing Guarantee**

1.3.1    This Guarantee shall be a continuing security and, accordingly, shall extend to cover the balance due to the Company at any time from TANESCO under the Power Purchase Agreement. No demand made by the Company hereunder shall prejudice or restrict the right of the Company to make further or other demands.

**1.4    Additional Security**

1.4.1    This Guarantee shall be in addition to, and not in substitution for or derogation of, any other security that the Company may at any time hold in respect of the obligations of TANESCO under the Power Purchase Agreement.

1.4.2    The Company may enforce this Guarantee notwithstanding that it may hold any other guarantee, lien, or security of or for the obligations of TANESCO under the Power Purchase Agreement or have available to it any other remedy at law or equity.

**1.5    Preliminary Recourse**

1.5.1    Before taking steps to enforce this Guarantee and demanding payment from the GOT, the Company shall be obliged only to make demand in writing for payment from TANESCO. After 30 Days (during which time the Company shall make further requests for payment, with a copy to the GOT of each request, from TANESCO from the date payment was due, the Company may notify the GOT in writing that payment from TANESCO is past due and make a demand for payment from the GOT under this Guarantee, and the GOT shall make payment within five (5) Days. Late payments hereunder shall bear mark-up at an annual rate equal to the then applicable one-year LIBOR rate plus three (3) percentage points. Amounts in dispute under the Power Purchase Agreement shall be deemed not to be due and owing for purposes of this Guarantee until expiration of any dispute resolution procedures provided in each of the respective Agreements.

1.5.2    Except as provided in Article 1.4.1, the Company shall not be obliged before taking steps to enforce this Guarantee to exercise any other remedies that may be available to it under or in respect of the Power Purchase Agreement or to obtain judgment against TANESCO thereon.

**1.6    Certification**

Any demand for payment made pursuant to this Guarantee shall be made in person by a duly authorized officer of the Company at the Guarantors offices at Sokoine Drive, Mkwepu Street, PO Box 2000, Dar es Salaam, United Republic of Tanzania and shall be accompanied by a certificate signed by a duly authorized officer of the Company stating that:



"We hereby certify that (1) [specify Company], (the "Company") is making this demand on the Government of the Republic of Tanzania (the "Guarantor") in the amount of United States Dollars [insert amount] in accordance with Article 1 of the Guarantee dated 8th day of June 1995, between the Guarantor and the Company; (2) the amount specified above is due and payable by the Tanzania Electric Company Limited ("TANESCO") under the Power Purchase Agreement between the Company and TANESCO and no part of the amount specified above is the subject of a dispute between the Parties; (3) demand in writing for payment from TANESCO has been made; (4) for a period of not less than 30 Days from the date payment was due, further request for payment have been made to TANESCO or to obtain the payment of such amount; and (5) such amount, on the date hereof, remains unpaid by TANESCO".

1.7    **Subordination**

Any right that the Guarantor may at any time have to be indemnified by TANESCO in respect of sums paid out by the Guarantor in performance of this Guarantee shall be subordinated to the rights of the Company to recover from TANESCO in full all sums that may at any time become due from TANESCO under the Power Purchase Agreement.

1.8    **No Set-off**

No set-off, counterclaim, reduction, or diminution of any obligation that the Guarantor has or may have against the Company shall be available to the Guarantor against the Company in connection with any obligation of the Guarantor to the Company under this Guarantee; provided, however, that notwithstanding the foregoing the Guarantor shall have the benefit of all rights of set-off, counterclaim, reduction, or diminution of any obligations that are available to TANESCO, pursuant to the Power Purchase Agreement or that are otherwise directly related to the Project.

1.9    **Consent to Jurisdiction**

Each Party hereby consents to the jurisdiction of the courts of London, England for any action filed by the Party to enforce any award or decision of any arbitrator(s) or expert(s) who were duly appointed under this Agreement to resolve any Dispute between the Parties. With respect to any such proceedings for the enforcement of any such award against the assets of a Party (other than the Protected Assets in the case of enforcement proceedings against the GOT):

(a)    The GOT appoints the Commercial Counsellor of The United Republic of Tanzania in London (or, in his absence, a responsible officer in the Tanzania High Commission) whose address is presently 43 Hertford Street, London W1Y 7TF, England to receive for and on its behalf service of process in such jurisdiction in any such enforcement proceeding;

(b)    The Company appoints Mr. Ahmed Daya whose address is presently 2½?

Station Road, Edgware, Middlesex HA8 7AR, England to receive for and on its behalf service of process in such jurisdiction in any such enforcement proceeding;

(c)    Each Party shall maintain in England a duly appointed agent for the receipt of service of process and shall notify the other Party of the name and address of such agent and any change in such agent and/or the address of such agent; and

(d)    Each Party agrees that the failure by any such agent for the receipt of service of process to give it notice of any process that has been served on such agent shall not impair the validity of such service or of any judgment based thereon.

## 2    REPRESENTATIONS AND WARRANTIES

The Guarantor represents and warrants that, as of the date hereof:

### 2.1 Power and Authority

The Guarantor has full power, authority, and legal right to incur the obligation, to execute and deliver, and to perform and observe the terms and provisions of this Guarantee.

### 2.2 Legal Validity

This Guarantee constitutes legal, valid, binding, and enforceable obligations of the Guarantor in accordance with its terms.

### 2.3 Approvals

All necessary action has been taken, and all approvals required have been obtained, under the Laws of Tanzania to authorize the execution, delivery, and performance of this Guarantee.

### 2.4 Tax

In addition to any amount then due and payable to the Company by TANESCO under the Power Purchase Agreement respectively, and payable by the Guarantor under the terms of this Guarantee, the Guarantor shall be liable for any duty, impost, levy, charge, fee or tax of whatsoever nature ("Tax") levied or imposed by a Governmental Authority or any political subdivision or authority thereof on or with regard to any payment hereunder unless the payment, if made by TANESCO would itself have been subject to the Tax. If under applicable law the Guarantor is unable to pay the Tax and the Company is required to pay the Tax, the amount to be paid to the Company hereunder shall be increased by an amount sufficient so that such payment, net of the Tax, would equal the payment the Company would have received from TANESCO net of any Taxes applicable to payment from TANESCO to the Company.

### 2.5 Full Faith and Credit

The obligations and covenants of the Guarantor in this Guarantee constitute unconditional obligations of the Guarantor, for the performance of which the full faith and credit of the Guarantor is pledged.

### 2.6 Sovereign Immunity

The Guarantor irrevocably and unconditionally agrees that it is subject to suit in the England with respect to its obligations hereunder, and that the execution, delivery, and performance of this Guarantee constitute private and commercial acts of the Guarantor. The GOT hereby irrevocably and unconditionally agrees: (i) that should any proceedings be brought against the GOT or its assets, other than its aircraft, naval vessels and other defence related assets or assets protected by the diplomatic and consular privileges under the State Immunity Act of England or the Foreign Sovereign Immunities Act of the United States or any analogous legislation (the "Protected Assets"), in any jurisdiction in connection with this Guarantee or any of the transactions contemplated by this Guaranty, no claim of immunity from such proceedings will be claimed by or on behalf of the GOT on behalf of itself or any of its assets (other than the Protected Assets); (ii) it waives any right of immunity which it or any of its assets (other than the Protected Assets) now has or may in the future have in any jurisdiction in connection with any such proceedings; and (iii) it consents generally in respect of the enforcement of any judgment against it in any such proceedings in any jurisdiction to the giving of any relief or the issue of any process in connection with such proceedings (including without limitation, the making, enforcement, or execution against or in respect of any of its assets whatsoever (other than the Protected Assets) regardless of the use or intended use of the asset.

## 3   UNDERTAKING

### 3.1 Duration

This Guarantee shall remain in full force and effect from and after the date hereof until the termination of the initial term of the Power Purchase Agreement and for so long thereafter as any amount owned the Company by the Guarantor, TANESCO, in connection with such initial term is or may be outstanding.

### 3.2 Performance of Agreements

The Guarantor shall not take any action that would prevent or interfere with the performance by TANESCO of any of its obligations under the Power Purchase Agreement (except, in the case of any unintentional action, where the Guarantor promptly remedies such action).

**4   NO WAIVER; REMEDIES CUMULATIVE**

**4.1 No Waiver**

No failure or delay by the Company to exercise any right or remedy under this Guarantee shall constitute a waiver of that right or remedy. No single or partial exercise of any right or remedy shall preclude any other or further exercise thereof or the exercise of any other right or remedy. No waiver by the Company shall be effective unless it is in writing.

**4.2 Remedies Cumulative**

The rights and remedies of the Company provided by this Guarantee are cumulative and not exclusive of any rights or remedies provided by law.

**5   NOTICES**

**5.1 Address for Notice**

All notices or other communications (together "Notices") to be given or made hereunder shall be in writing, shall be addressed for the attention of the person indicated below and shall be delivered personally or sent by registered or certified mail or facsimile. All Notices shall be deemed delivered (a) when presented personally, (b) if received on a business Day of the receiving Party, when transmitted by facsimile to the receiving Party's facsimile number specified above and, if received on a Day that is not a business Day of the receiving Party, on the first business Day of the receiving Party following the date transmitted by facsimile to the receiving Party's facsimile number specified above, (c) one (1) Day after being delivered to a courier for overnight delivery, addressed to the receiving Party, at the address indicated above (or such other address as such Party may have specified by notice delivered to the delivering Party at its address or facsimile number specified above) or (d) five (5) Days after being deposited in a regularly maintained receptacle for the postal service in Tanzania, postage prepaid, registered or certified, return receipt requested, addressed to the receiving Party, at the address indicated above (or such other address as the receiving Party may have specified by written Notice delivered to the delivering Party at its address or facsimile number specified above). Any notice given by facsimile shall be confirmed in writing delivered personally or sent by registered or certified mail, but the failure to so confirm shall not render void or invalidate the original notice if it is in fact received by the Party to which it is addressed. The address for service of each Party and its respective facsimile number shall be:

5.1.1  For the Guarantor    :    The Government of United Republic of Tanzania

* Attention    :    The Principal Secretary
Ministry of Water, Energy and Minerals

* Address    :    Sokoine Drive, Mkwepu Street
PO Box 2000
Dar es Salaam
United Republic of Tanzania

* Facsimile    :    51-44071

5.1.2  For the Company    :    Independent Power Tanzania Ltd.

* Attention    :    Mr. James Mugemalira

* Address    :    5th Floor, Extelcoms House
Samora Avenue, P O Box 1461
Dar es Salaam
United Republic of Tanzania

* Facsimile    :    51-46017

* with a copy to the Company's counsel:    LONG & COMPANY

* Attention    :    Ms. Joanne Long

* Address    :    9B Bukit Ceylon, 50200 Kuala Lumpur, Malaysia

* Facsimile    :    603- 201 4832

or such other addresses or facsimile numbers as either Party may have notified to the other Party in accordance with this Article 5.1.

**5.2 Effectiveness of Service**

Each Notice under this Guarantee shall be effective only upon actual receipt thereof.

## 6    ASSIGNMENT

**6.1 Assignment by the Guarantor**

The Guarantor may not assign or transfer all or any part of its rights or obligations hereunder without the prior written consent of the Company.

### 6.2 Assignment by the Company

The Company may not assign or transfer all or any part of its rights or obligations hereunder without the prior written consent of the Guarantor. Notwithstanding the provision of the immediately preceding sentence, for the purpose of construction or permanent financing of the GOT, the Company may assign or create a security interest over its rights and interests in and to this Guarantee.

### 6.3 Successors

This Guarantee shall be binding upon and inure to the benefit of the Guarantor and the Company and the respective successors and permitted assigns of each.

## 7     GOVERNING LAW AND ARBITRATION

### 7.1 Governing Law

The rights and obligations of the Parties under or pursuant to this Guarantee shall be governed by and construed according to the Laws of Tanzania.

### 7.2 Arbitration

Any dispute or difference between the Parties arising out of or in connection with this Agreement shall be arbitrated in accordance with Article 21.2 of the Implementation Agreement.

## 8     MISCELLANEOUS

### 8.1 Severability

If one or more provisions contained in this Guarantee is held or found to be invalid, illegal, or unenforceable in any respect, the provision(s) shall be given effect to the extent permitted by law and the invalidity, illegality, or unenforceability of any provision shall not affect the validity of the remaining provisions of this Guarantee.

### 8.2 Definitions

The capitalized terms used but not defined in this Guarantee shall have the meanings given to them in the Implementation Agreement.

IN WITNESS WHEREOF, this Guarantee has been executed the day first above written.

THE GOVERNMENT OF THE UNITED REPUBLIC OF TANZANIA

.......................................        PRINCIPAL SECRETARY
                                              MINISTRY OF WATER, ENERGY
By      :   RAPHAEL MOLLEL                        AND MINERALS
Title   :   PRINCIPAL SECRETARY
            MINISTRY OF WATER, ENERGY AND MINERALS

INDEPENDENT POWER TANZANIA LTD.

.......................................

By      :   JAMES B. RUGEMALIRA
Title   :   DIRECTOR

## DECLARATION OF SERVICE

Bradford C. Mulder, hereby declares under penalty of perjury pursuant to 28 U.S.C. § 1746.

I am Managing Clerk at the law firm of Hunton & Williams LLP, attorneys for Defendant The Government of the United Republic of Tanzania.

That on January 22, 2008, I served a true copy of the attached Declaration of Sazi B. Salula, with Exhibits, on Plaintiff's counsel at the address listed below, by depositing the same in a duly enclosed and sealed wrapper, for Federal Express Next Day Overnight Service.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on  January 22, 2008.

Bradford C. Mulder

TO:    Robert C. Sentner, Esq.
       NIXON PEABODY LLP
       437 Madison Avenue
       New York, New York  10022

       *Attorneys for Plaintiff*