UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

INDEPENDENT POWER TANZANIA LTD.,

                           Plaintiff,

      vs.                                         07 CV 10366 (AKH)

THE GOVERNMENT OF THE REPUBLIC OF TANZANIA,

                           Defendant.

## PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS

**NIXON PEABODY LLP**
437 Madison Avenue
New York, NY  10022
(212) 940-3000
*Attorneys for Plaintiff*

*Of Counsel*

Robert C. Sentner

# TABLE OF CONTENTS

Page

INTRODUCTION.................................................................................................. 1

BACKGROUND ................................................................................................... 3

I.      The Relevant Agreements................................................................................ 3

        A.      The Power Purchase Agreement.......................................................... 4

        B.      GOT's Guarantee Of Payment............................................................ 4

        C.      GOT's Express Waiver Of Immunity And Agreement To FSIA
                Jurisdiction In U.S. Courts.................................................................. 5

II.     The International Centre for Settlement of Investment Disputes Arbitration.......... 7

        A.      The ICSID Arbitration Award Settled The Issues Leading To This Action.......... 7

III.    The Undisputed Sum Due To IPTL Based On The ICSID Arbitration Award............... 10

IV.     Tanesco Specifically Agreed That The Sum Sought Here Is Due To ITPL................. 10

        A.      GOT And Tanesco Are Not Entitled To Withhold The Undisputed
                Sum Due To IPTL............................................................................. 11

ARGUMENT.................................................................................................... 12

POINT I –    THIS COURT HAS SUBJECT MATTER JURISDICTION OVER THE
             GOVERNMENT OF TANZANIA IN CONNECTION WITH DISPUTES
             ARISING OUT OF THE GUARANTEE ....................................... 12

I.      GOT's Contention That This Court Does Not Have Subject Matter
        Jurisdiction Because Yet Another Arbitration Is Required Is Disingenuous.............. 13

POINT II –   GOT'S CONTENTION THAT THIS COURT DOES NOT HAVE
             PERSONAL JURISDICTION OVER GOT IS WRONG ...................... 16

I.      GOT Was Property Served Under FSIA................................................................ 16

II.     GOT's Contention That It Is Not Subject To This Court's Jurisdiction
        Because It Does Not Have Minimum Contacts With The United States Is Wrong........ 18

        A.      28 U.S.C. § 1605(A)(1) Provides Personal Jurisdiction Over GOT
                Regardless Of Any Minimum Contacts Analysis.................................... 19

                1.      Cases Involving 28 U.S.C. § 1605(A)(2) Are Distinguishable
                        And Do Not Implicate The Facts In The Current Case.............. 19

2.     Cases Involving 28 U.S.C. § 1605(A)(6) Are Distinguishable In That §1605(A)(6) Does Not Involve The Contacts With The United States Required By § 1605(A)(1) ..................................... 21

B.    Even If The Court Finds That A Separate Due Process Analysis Is Necessary, GOT Has Sufficient Contacts With The United States To Justify A Finding Of Personal Jurisdiction ............................................................................. 23

III.    IPTL Is Entitled To Conduct Limited Jurisdictional Discovery of GOT .......................... 25

**POINT III – GOT'S FORUM NON CONVENIENS MOTION MUST BE DENIED** ......... 26

A.    The Plaintiff's Choice Of Forum Is Entitled To Considerable Deference Because the Choice Was Based Upon Legitimate Reasons ................................. 28

**CONCLUSION** .......................................................................................................... 29

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Bigio v. Coca-Cola Co.*, 448 F.3d 176 (2d Cir. 2006)......................................................28

*Birch Shipping Corp. v. Embassy of the United Republic of Tanz.*,
    507 F. Supp. 311 (D.D.C. 1980) ...............................................................................23, 24

*Continental Group v. NPS Commc'ns*, 873 F.2d 613 (2d Cir. 1989) ...............................13

*Creighton Ltd. v. Gov't of Qatar*, 181 F.3d 118 (D.C. Cir. 1999).....................................22

*Dar El-Bina Eng'g & Contracting Co., Ltd. v. Republic of Iraq*,
    79 F. Supp. 2d 374 (S.D.N.Y. 2000)...............................................................................21

*Dwyer v. Gen. Motors Corp.*, 853 F. Supp. 690 (S.D.N.Y. 1994)....................................28

*First City v. Rafidan Bank*, 150 F.3d 172 (2d Cir. 1998) ..................................................25

*Frontera Resources Azerbaijan Corp. v. State Oil Co. of the Azerbaijan Republic*,
    479 F. Supp. 2d 376 (S.D.N.Y. 2007)............................................................................21

*Hanil Bank v. PT. Bank Negara Indonesia*, 148 F.3d 127 (2d Cir. 1998).........................20

*Iragorri v. United Techs. Corp.*, 274 F.3d 65 (2d Cir. 2001) ...........................................27

*Liberty Mut. Ins. v. N. Picco & Sons*,
    No. 05 Civ. 217, 2008 U.S. Dist. LEXIS 4915 (S.D.N.Y. Jan. 16, 2008)...................14

*Maran Coal Corp. v. Societe Generale de Surveillance S.A.*,
    No. 92 Civ. 8728, 1993 U.S. Dist. LEXIS 12160 (S.D.N.Y. Sept. 2, 1993) ...............27

*Marlowe v. Argentine Naval Comm'n*, 604 F. Supp. 703 (D.D.C. 1985).........................17

*Metito (Overseas) Ltd. v. GE*, 05 Civ. 9478, 2006 U.S. Dist. LEXIS 81683
    (S.D.N.Y. Nov. 7, 2006) ................................................................................................28

*R. Maganlal & Co. v. M.G. Chem. Co.*, 942 F.2d 164 (2d Cir. 1991)..............................27

*Reiss v. Societe Centrale*, 235 F.3d 738 (2d Cir. 2000)....................................................26

*Republic of Argentina v. Weltover, Inc.*,
    504 U.S. 607, 119 L. Ed. 2d 394, 112 S. Ct. 2160 (1992)............................................20

*Shen v. Japan Airlines*, 918 F. Supp. 686 (S.D.N.Y. 1994) ........................................22, 23

*Space Sys./Loral, Inc. v. Yuzhnoye Design Office,*
    164 F. Supp. 2d 397 (S.D.N.Y. 2001)...............................................................16, 17

*Strategic Value Master Fund, Ltd. v. Cargill Fin. Servs., Corp.,*
    421 F. Supp. 2d 741 (S.D.N.Y. 2006)...............................................................27

*Texas Trading & Milling Corp. v. Fed. Republic of Nigeria,*
    647 F.2d 300 (2d Cir. 1981)...............................................................19

*WIWA v. Royal Dutch Petroleum Co.,* 226 F.3d 88 (2d Cir. 2000)...................................27

## STATE CASES

*Fidelity and Deposit Co. of Md. v. Parsons & Whittemore Contractors Corp.,*
    48 N.Y.2d 127 (1979) ...............................................................13, 14

## STATUTES

22 U.S.C. § 1650a (2008) ...............................................................15

28 U.S.C. § 1330(a) (2008)...............................................................12

28 U.S.C. § 1605(a)(1) (2008) ...............................................................19

28 U.S.C. § 1605(a)(2) (2008) ...............................................................19

28 U.S.C. § 1605(a)(6) (2008) ...............................................................19

28 U.S.C. § 1608 (2008) ...............................................................16

## MISCELLANEOUS

H.R. Rep. No. 94-1487, reprinted in 1976 U.S.C.C.A.N. 6612...........................................22

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

INDEPENDENT POWER TANZANIA LTD.,

                                        Plaintiff,

        vs.                                              07 CV 10366 (AKH)

THE GOVERNMENT OF THE REPUBLIC OF TANZANIA,

                                        Defendant.

## INTRODUCTION

In this action, Plaintiff Independent Power Tanzania Ltd. ("IPTL") seeks to recover $27 million due it from the Government of the Republic of Tanzania ("GOT") on an unconditional guarantee of payment of an undisputed debt of its wholly owned subsidiary Tanzania Electric Supply Company ("Tanesco"). Not only has Tanesco confirmed in writing that the sum sought here is indisputably due IPTL, but a lengthy, expensive, and exhaustive arbitration between IPTL and Tanesco specifically determined the sums due to IPTL. Under black letter law, as guarantor of Tanesco's payment obligations, GOT is bound by the result of that arbitration. Moreover, under clear law, this Court has jurisdiction over GOT in this proceeding. IPTL brings this action in the United States because the United States is a country where GOT conducts extensive financial business with the World Bank, as well as business with U.S. companies, and where it has already been found to be subject to the jurisdiction of U.S. Courts.

GOT moves to dismiss the complaint on three grounds. Those grounds are pre-textual. GOT's real motive is to delay payment to IPTL as long as possible in order to bankrupt IPTL, so that GOT can take over the power plant. IPTL has no realistic recourse against GOT in Tanzania. The arbitration GOT contends should now occur, has already occurred. GOT simply

seeks to force IPTL to re-arbitrate issues already arbitrated, and to incur the unnecessary expense and time that would be associated with such an arbitration, in the hope that IPTL will be unable to do so.

GOT's motion fails with respect to each of the grounds it has asserted.

First, GOT contends that this Court does not have subject matter jurisdiction of this case on the ground that an arbitration is required to determine GOT's liability to IPTL, and that GOT only waived its immunity in connection with such an arbitration, and proceedings brought to enforce an arbitration award. As set forth in Point I below, this is incorrect. First, there already has been an arbitration that has determined the amount due to IPTL, and under black letter law, GOT is bound by the result in that arbitration. Second, the debt GOT guaranteed has been admitted in writing. Hence, there is no dispute as to the sum due. GOT's position that IPTL must go through yet another arbitration in order to obtain an award declaring that GOT is liable to it for the sums that are not disputed is disingenuous. IPTL spent years arbitrating this very issue. GOT was heavily involved in that arbitration. GOT and Tanesco, having now determined to no longer comply with the award rendered in that arbitration, cannot credibly claim that IPTL must arbitrate yet again what has already been arbitrated. Third, GOT has waived immunity with respect to any action brought, in any jurisdiction, in connection with the Guarantee. Hence, its waiver of immunity, for purposes of evaluating subject matter jurisdiction under the Foreign Sovereign Immunities Act ("FSIA"), waives its immunity for purposes of this case.

Second, GOT contends that it was not properly served with the summons and complaint in this action. Again, GOT is wrong. As discussed at Point II, Section I below, the guarantee at issue specifies the means by which service is to be made. IPTL effected service pursuant to the terms of that guarantee. Under well-established case law, GOT was properly served with the summons and complaint under the FSIA.

Third, GOT contends that this case should be dismissed because it does not have sufficient contacts with the United States to justify the exercise of jurisdiction over it, and also, that the case should be dismissed on *forum non conveniens* grounds. GOT's arguments are without merit. First, as discussed at Point II, Section II below, under the FSIA, there is no requirement that the foreign government have minimal contacts with the United States in a case such as this. GOT specifically agreed to be subject to Foreign Sovereign Immunities Act jurisdiction of the United States Courts. It cannot now credibly claim it is not subject to that jurisdiction. Second, even if such contacts were required, the GOT has extensive contacts with the United States. As discussed at Point II, Section III below, since GOT has denied this and made it an issue, IPTL is entitled to conduct limited jurisdictional discovery on this issue.

GOT's motion should be denied.

## BACKGROUND

## I.    THE RELEVANT AGREEMENTS

IPTL developed, financed, built, and operates a privately financed 100 MW power plant in the Republic of Tanzania (the "Power Plant"). The IPTL plant is the largest entirely private investment in Tanzania, and the first privately-owned power project in Sub-Saharan Africa (Complaint, ¶ 1; February 8, 2008 Declaration of Parthiban Chandrasakaran ("Parthiban Dec.") ¶ 1, 2). It is believed that the GOT wishes to take over the Power Plant, and that payment has been withheld from IPTL in order to force it turn the Power Plant over to GOT at a fire sale price.

The Power Plant was developed pursuant to a series of agreements.

By Agreement with IPTL dated as of June 8, 1995, GOT stated, among other things, that it supported the development of the Power Plant:

Whereas,

(1) The GOT as a matter of policy has decided to involve the private sector in the generation of electricity for sale to the national grid.

(2) Consistent with the GOT's policy and guidelines, [IPTL] has proposed to design, insure, finance, acquire, construct, complete, own, operate and maintain an electric power plant (the "Facility") at Tegeta, Dar es Salaam, Tanzania, to supply electric power to Tanzania Electric Supply Company Limited (TANESCO).

(3) Simultaneously herewith, [IPTL] is entering into a Power Purchase Agreement with TANESCO.

(4) The GOT and [IPTL] are entering into this Agreement so that [IPTL's] proposal to build the Facility may be implemented in a manner that reflects the close cooperation between the public and private sectors in the generation of electricity for sale on the national grid.

(Complaint, ¶ 8).

A.    The Power Purchase Agreement

Accordingly, IPTL and Tanesco entered into a Power Purchase Agreement (the "PPA") with an effective date of 26 May 1995 (Parthiban Dec. Exh. A).  Pursuant to the PPA, Tanesco is to pay IPTL, on a monthly basis, and for a term of twenty years, capacity payments, energy payments and supplemental payments (PPA, Articles 2.1 and 5).  As set forth at pp. 7-10 below, the calculation of Tanesco's payment obligations to IPTL for that twenty year term were fully arbitrated, and determined, in a final arbitral award.  GOT's contention that the sum due to IPTL must be re-arbitrated is simply a disingenuous effort to delay payment as long as possible.

B.    GOT's Guarantee Of Payment

By guarantee dated June 8, 1995, entered into between The Government of the United Republic of Tanzania (the "GOT"), on the one side, and IPTL on the other, GOT

irrevocably and unconditionally guarantee[d] and promise[d] to pay [IPTL] any and every sum of money TANESCO is obligated to pay to [IPTL] pursuant to the Power Purchase Agreement

TANESCO has failed to pay in accordance with the terms of those agreements.

The obligations of the Guarantor under this Guarantee shall be absolute and unconditional and shall remain in full force and effect until all the covenants, terms, and agreements set forth in the Power Purchase Agreement, shall have been completely discharged and performed, unless waived by [IPTL] in writing.[1]

(Parthiban Dec. Exh.B).

C.    GOT's Express Waiver Of Immunity And Agreement To FSIA Jurisdiction In U.S. Courts

In GOT's unconditional guarantee of Tanesco's payment obligations, it expressly waived any claim of immunity with respect to any action, brought in any jurisdiction, that was related to the Guarantee.  GOT expressly waived any immunity with respect to any proceeding brought in connection with the Guarantee, and, GOT specifically agreed to be subject to jurisdiction under the Foreign Sovereign Immunities Act of the United States:

The Guarantor irrevocably and unconditionally agrees that it is subject to suit in the England[2] with respect to its obligations hereunder, and that the execution, delivery, and performance of this Guarantee constitute private and commercial acts of the Guarantor.  The GOT hereby irrevocably and unconditionally agrees: (i) that should *any proceedings* be brought against the GOT or its assets, other than its aircraft, naval vessels and other defense related assets or assets protected by the diplomatic  and consular privileges *under the* State Immunity Act of England or the *Foreign Sovereign Immunities Act of the United States* or any analogous legislation (the "Protected Assets"), *in any jurisdiction in connection with this Guarantee* or any of the transactions contemplated by this Guaranty, no claim of immunity from such proceedings will be claimed by or on behalf of the GOT on behalf

---

[1]    While the Guarantee contains an arbitration clause calling for the arbitration of any disputes under the Guarantee, this action does not concern any disputes under the Guarantee.  Rather, all such disputes have already been arbitrated in the ICSID Arbitration with Tanesco.  This action is solely to collect sums that are indisputably due pursuant to the Guarantee as already held in the ICSID Arbitration Award.  Specifically, this action is only to collect those sums that Tanesco has not disputed are due under the PPA, and hence are presently due under the Guarantee.  Accordingly, this suit is not subject to the arbitration clause in the Guarantee.

[2]    Non-exclusive jurisdiction.

<u>of itself or any of its assets (other than the Protected Assets)</u>; (ii) <u>it waives any right of immunity which it or any of its assets (other than the Protected Assets) now has or may in the future have <em>in any jurisdiction</em> in connection with any such proceedings</u>; and (iii) <u><em>it consents generally in respect of the enforcement of any judgment against it in any such proceedings in any jurisdiction to the giving of any relief or the issue of any process in connection with such proceedings</em></u> (including without limitation, the making, enforcement, or execution against or in respect of any of its assets whatsoever (other than the Protected Assets) regardless of the use or intended use of the asset.

(<u>Emphasis added</u>.)  Hence:

(1) GOT's waiver is extremely broad.  It relates to "any proceedings" brought against GOT or its assets;

(2) The Guarantee specifically contemplates that an action may be brought against GOT in the United States under the Foreign Sovereign Immunities Act.  GOT specifically agrees that it will not make a claim of immunity with respect to any such proceeding.

(3) GOT specifically waives any claim of immunity with respect to any proceedings brought in any jurisdiction, and specifically, in the United States.

(4) GOT specifically consents to the giving of any relief or the issue of any process, in any proceeding in any jurisdiction.

Thus, GOT's contention that its waiver is narrow, and does not result in a waiver of any action brought in any jurisdiction in connection with the Guarantee is incorrect.  Moreover, GOT's contention that it had no expectation that proceedings might be brought against it in the United States is false.  To the contrary, it specifically agreed that it would be subject to United States Courts' jurisdiction, and, it specifically agreed that it would make no claim of immunity when such a proceeding was brought.  Its present motion is in breach of that obligation.

## II.    THE INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES ARBITRATION

On 25 November 1998,  after the Power Plant was constructed, Tanesco commenced an arbitration under the auspices of the International Centre for the Settlement of Investment Disputes ("ICSID").  ICSID is an arbitral body located in Washington D.C., under the auspices of the World Bank.  While the PPA provided that the hearings themselves would take place in London, the arbitration was administered from Washington D.C., and all papers were filed in ICSID headquarters in Washington D.C. (Final ICSID Award, ¶ 13; Parthiban Dec. Exh. C). Moreover, the final day of hearings took place in the World Bank headquarters in Washington D.C. (Final ICSID Award ¶ 57).  The Final Award in the arbitration is deposited in ICSID headquarters, in Washington D.C.

In the arbitration, Tanesco sought generally to (1) terminate the Power Purchase Agreement between it and IPTL, and (2) failing termination, to reduce the capacity charges set forth in that Power Purchase Agreement.

### A.    The ICSID Arbitration Award Settled The Issues Leading To This Action

The arbitration lasted more than two and one-half years.  Millions of dollars of legal fees were incurred by both sides.  By Final Award dated July 12, 2001, ICSID rendered a Final Award (the "ICSID Award") (Parthiban Dec. Exh. C).  Representatives of the Government of Tanzania were present at the arbitration, as were representatives of Tanesco (Declaration of Robert Sentner, ¶¶ 2,3, Exh. A).

The Final Award of the Arbitral Tribunal states that the Power Purchase Agreement contains a "Reference Tariff," which is comprised of a "Capacity Purchase Price" and an "Energy Purchase Price."  (Final Award, ¶ 5).  The unpaid sum sought in this action is with respect to unpaid "Capacity Purchase Price" payments.

Appendix F to the Arbitration Award states that the tariff, including the Capacity Purchase Price payments, was to be determined, during the term of the PPA, based upon the decision of the arbitrators, and based on a financial model, to which the parties had agreed, and which was incorporated into the Final Award:

> 1.  TANESCO and IPTL agree that the tariff which is to be calculated pursuant to the Power Purchase Agreement ("PPA") dated 26 May 1995, as amended, shall be calculated based on the Decisions of the Arbitrators herein dated 9 February 2001 and 24 May 2001, the applicable terms of the PPA, and the financial model entitled 'Tegeta July 2001.123' which is annexed hereto, in both electronic and paper format (the 'Financial Model'). The tariff shall be calculated initially at commencement of commercial operation of the Tegeta power plant and during the term of the PPA in accordance with the PPA and the Financial Model.

The Final Award also stated that where there were differences between the Financial Model and the PPA, the Financial Model governed, and superseded the PPA:

> 2.  The Financial Model contains notes and comments which form part of the parties' agreement as to the calculation of the tariff. The parties recognize that there are instances where the formulae, mechanisms, notes, or comments contained in the Financial Model differ from or supplement the terms of the PPA. Where such differences exist, the parties agree that the Financial Model shall govern and supersede the terms of the PPA.

The Final Award goes on to state that the Financial Model is the agreement of the parties with respect to the calculation of the tariff, and that the Financial Model is to be included in the Final Award:

> 3.  The parties recognize that certain further mechanical steps need to be undertaken in order to make the Financial Model fully useful and operational for purposes of billing and tariff adjustment. The parties agree to cooperate together to take whatever steps are required to effectuate that end. However, the parties agree that the Financial Model sets forth the agreement of the parties as to the

<u>calculation of the tariff, and that any further steps which are taken must be consistent with the Financial Model</u>.

4.  <u>The parties further agree that the Financial Model is to be included in the Final Award in this arbitration.</u>

As stated in the Final Award, the Financial Model is part of the Award:

64.  Following publication of our Decision On All Further Remaining Issues, the parties agreed on the adjustments to be made to the financial model to take account of the Tribunal's various decisions, and submitted to the Tribunal an agreed financial model in both hard copy and electronic form to be used for the calculation of the initial Reference Tariff.  <u>That financial model which forms part of this award, is appended hereto as Appendix F (both hard copy and electronic form) and incorporated herein by reference</u>. . . .

The Financial Model, along with the original Final Award, is deposited in ICSID

Headquarters in Washington D.C.  The Final Award of the ICSID Arbitration concludes by

ordering that, (1) the tariff under the PPA was to be as set forth in Appendix F (which sets forth

the Financial Model), and (2) that the parties shall comply with their respective obligations under

the PPA.

THEREFORE, THE TRIBUNAL AWARDS AS FOLLOWS:

1.  The Tribunal decides as set forth above and in Appendices A, B, C, D, E and F hereto.

2.  In particular:

A.  The Power Purchase Agreement between the parties dated 'as of' 26 May 1995 is and remains a valid and effective contract between them;

B.  The Reference Tariff under the Power Purchase Agreement between the parties dated 'as of' 26 May 1995 is as set forth in Appendix F hereto. . . .

D.  The parties shall comply with their respective obligations under the Power Purchase Agreement between them dated 'as of' 26 May 1995 . . . .

Pursuant to the PPA, the term of the agreement is 20 years from the "last Commercial Operations Date." (PPA, ¶ 2.1). The last Commercial Operations Date occurred in January 2002. Hence, the terms of the PPA extends to January 2022 (Parthiban Dec. ¶ 11).

Hence, contrary to GOT's argument, the calculation of the capacity payments for the duration of the term of the PPA was fully arbitrated and resolved in the ICSID arbitration. Pursuant to the Final Award, those capacity payments are to be calculated based on the Financial Model that is deposited in the World Bank in Washington D.C.

## III.    THE UNDISPUTED SUM DUE TO IPTL BASED ON THE ICSID ARBITRATION AWARD

IPTL has always calculated the monthly capacity payment invoices based on the ICSID Final Award Financial Model (Parthiban Dec. ¶ 15, Exh. D and E). Tanesco's agent, Dr. Martin Swales, has reviewed those invoices. He has consistently certified that they were properly calculated (Parthiban Dec. ¶ 15, 16, Exh. E). For approximately five years, Tanesco paid the invoices (albeit often very late). However, beginning in January 2007, Tanesco stopped making payments[3].

## IV.    TANESCO SPECIFICALLY AGREED THAT THE SUM SOUGHT HERE IS DUE TO IPTL

Tanesco has disputed only a portion of the capacity payment invoices that have been submitted by IPTL (Parthiban Dec. ¶ 22, Exh. J). It has admitted in writing that the undisputed portion of the capacity payment invoices is, in fact, due to IPTL. By letter dated November 28, 2007 from the Managing Director of Tanesco to the Government of Tanzania's Permanent Secretary, Ministry of Finance, the Tanesco Managing Director states, among other things:

---

[3]    Other than US$ 3,599,918 received in February 2007 for December 2006 Energy Payment and US$ 3,216,004 received in May 2007 for partial payment of the November 2006 Capacity Payment.

> Out of the outstanding amount, the capacity charges amounting to Tshs [Tanzanian shillings] 21,865.8 million have been disputed and <u>the remaining part amounting to Tshs 31,100 million is undisputed.  In accordance with the Agreement, the undisputed amount is due for payment.</u>

31,100 million Tanzanian Shillings was equal to US$26,703,605, as of the date the letter was written.

This is the sum that is presently sought in this action (the sum that is overdue increases each month, as does the interest and late charges on the payments due).  As set forth in the Complaint, in this action, IPTL seeks to collect only this undisputed amount that is clearly due to IPTL (Complaint ¶¶ 13, 24-26).

A.    <u>GOT and Tanesco Are Not Entitled To Withhold The Undisputed Sum Due to IPTL</u>

Contrary to GOT's contention that it is entitled to hold that sum back in order to set it off against excess payments it now contends (for the first time) it may have made to IPTL, the PPA – and hence the ICSID Final Award – specifically state otherwise.  Rather, where there is a dispute, IPTL is still entitled to timely payment of the undisputed portion of the payments, while any dispute is resolved as to the disputed portion of the payments [PPA, ¶ 6.8(b)("If the Parties are unable to resolve the dispute in this manner, any amounts disputed on subsequent bills for the same reason may thereafter be withheld and deposited in the Escrow Account pending final resolution of the dispute in accordance with the procedures described in Article 18.2 <u>but the undisputed amount shall be promptly paid in accordance with this Article VI where applicable.</u>"]. <u>(Emphasis added.)</u>

Hence, there is no credible argument that GOT  does not owe to IPTL the undisputed portion of the capacity payments, pursuant to its guarantee of Tanesco's payment obligations.  Similarly, there is no credible argument that GOT has not waived any immunity it might have

had to suit in this Court to collect on those payment obligations. Finally, there is no credible argument that IPTL should be forced to arbitrate all over again issues that have already been fully arbitrated. As set forth below, GOT is bound by the Final ICSID Arbitration Award, and IPTL is entitled to enforce GOT's payment obligation under the Guarantee with respect to that Final Award.

## **ARGUMENT**
### **POINT I**

**THIS COURT HAS SUBJECT MATTER
JURISDICTION OVER THE GOVERNMENT OF TANZANIA IN
CONNECTION WITH DISPUTES ARISING OUT OF THE GUARANTEE**

Pursuant to the Foreign Sovereign Immunities Act ("FSIA") this Court has jurisdiction over GOT. First, under 28 U.S.C. § 1330(a) (2008), a district court has subject matter jurisdiction if a foreign state is "not entitled to immunity either under section 1605-1607 . . . or under any applicable international agreement." 28 U.S.C. § 1330(a) (2008). Pursuant to 28 U.S.C. § 1605(a)(1) (2008), an exception to foreign state immunity occurs when "the foreign state has waived its immunity either explicitly or by implication." Here, GOT has clearly waived any immunity to suit in this Court with respect to "any proceeding" that is brought "in any jurisdiction in connection with this Guarantee or any of the transactions contemplated by this Guaranty." (Guarantee, ¶ 2.6, Parthiban Dec., Exh. B). This action is brought to enforce the Guarantee. Hence, GOT has waived immunity with respect to this action.

As a consequence, this Court has subject matter jurisdiction over GOT in connection with this proceeding.

## I.   GOT'S CONTENTION THAT THIS COURT DOES NOT HAVE SUBJECT MATTER JURISDICTION BECAUSE YET ANOTHER ARBITRATION IS REQUIRED IS DISINGENUOUS

GOT attempts to avoid its agreement to be subject to this Court's jurisdiction by contending that the parties agreed to arbitrate any disputes before the International Centre for the Settlement of Investment Disputes, and that its waiver of immunity applies only to actions brought to enforce arbitration awards rendered in such ICSID arbitrations. This argument fails.

First, a plain reading of GOT's waiver shows that its argument is wrong. The waiver applies to "any proceeding" brought "in connection with this Guarantee or any of the transactions contemplated by this Guaranty."

Second, there is no arbitrable dispute. As set forth above, there has already been a full ICSID arbitration, which has already determined the sum due to IPTL as capacity charge payments for the full twenty year duration of the PPA. As guarantor of Tanesco's payment obligations, GOT is bound by the result of that arbitration. This is particularly so since GOT representatives participated in, and were present at, the arbitration hearings, and Tanesco is a wholly owned GOT entity (Sentner Dec. ¶¶ 2,3, Exh. A). The law of this Circuit is clear that a guarantor is bound by the result of an arbitration with respect to the agreement that it guarantees. For instance, in *Continental Group v. NPS Commc'ns,* 873 F. 2d 613, 618-620 (2d Cir. 1989), the Second Circuit held that the corporate guarantor of an underlying obligation was bound by the results of an arbitration between the parties to the underlying agreement. *See also, Id.* at 619 ("In point of fact, Corp. is bound by . . . the arbitrator's award in favor of CGI and against Communications in the sense that the merits of those disputes cannot be re-litigated. But Corp. did not consent to arbitral resolution of its obligations as guarantor."). The Second Circuit cited with approval *Fidelity and Deposit Co. of Md. v. Parsons & Whittemore Contractors Corp.,* 48 N.Y.2d 127 (1979). In that case, the New York Court of Appeals held that where a party acts a

surety with respect to an underlying contract that contains an arbitration clause, it is bound by the results of any arbitration between the parties to that contract:

> Although it [the surety] did not agree to participate in any arbitration, it did accept the agreement of the general contractor and the subcontractor that disputes between them would be settled by arbitration. An implicit corollary of that acceptance was agreement by the surety company that for purposes of later determining its liability under its performance bond, it would accept and be bound by the resolution reached in the arbitration forum of any dispute between the general contractor and the subcontractor.

48 N.Y.2d at 131. This Court recently confirmed that this is the law of this District, in the case *Liberty Mut. Ins. v. N. Picco & Sons,* No. 05 Civ. 217, 2008 U.S. Dist. LEXIS 4915, at \*33-38 (S.D.N.Y. Jan. 16, 2008), stating that guarantors are bound by the arbitration clauses and arbitration results pursuant to the underlying agreements that they guarantee.

Here, any issue with respect to the calculation of the quantum of Tanesco's capacity payment obligations to IPTL was fully resolved in the ICSID arbitration. GOT is bound by that result.

Moreover, as a signatory to the ICSID Convention, GOT has agreed that it, and the Courts of the United States, shall enforce the ICSID Arbitration Award here as if it were a final judgment of a court of the United States. Article 54 of the ICSID Convention provides:

> (1) Each Contracting State shall recognize an award rendered pursuant to this Convention as binding and enforce the pecuniary obligations imposed by that award within its territories as if it were a final judgment of a court in that State. A Contracting State with a federal constitution may enforce such an award in or through its federal courts and may provide that such courts shall treat the award as if it were a final judgment of a constituent state.

The United States' enabling legislation for the ICSID Convention is found at 22 U.S.C. § 1650a. This statute specifically provides that an ICSID arbitral award will be enforced in the United States as if the award were a final judgment of a district court:

> (a) Treaty rights; enforcement; full faith and credit; nonapplication of Federal Arbitration Act. An award of an arbitral tribunal rendered pursuant to chapter IV of the convention shall create a right arising under a treaty of the United States. The pecuniary obligations imposed by such an award shall be enforced and shall be given the same full faith and credit as if the award were a final judgment of a court of general jurisdiction of one of the several States. The Federal Arbitration Act (9 U.S.D. 1 et seq.) shall not apply to enforcement of awards rendered pursuant to the convention.
>
> (b) Jurisdiction; amount in controversy. The district courts of the United States (including the courts enumerated in title 28, United States Code, section 460 [28 U.S.C.S § 460]) shall have exclusive jurisdiction over actions and proceedings under paragraph (a) of this section, regardless of the amount in controversy.

22 U.S.C. § 1650a (2008).

To be sure, this is not an action to enforce the ICSID Arbitration Award against Tanesco. Rather, it is an action to enforce GOT's obligation to guarantee Tanesco's obligations, which were defined by the ICSID Award. However, GOT cannot be heard to argue that it is not bound to fully respect and permit the enforcement of that award.

GOT's effort to force IPTL to incur the time and expense of another major arbitration is disingenuous. IPTL has already fully arbitrated the issue of how the capacity payments are to be calculated. GOT has not identified a single factual or legal issue that needs to be resolved in arbitration. There is no issue of contract interpretation identified by GOT that in any way casts doubt on its obligation to fulfill Tanesco's payment obligations. The fact is that the financial model that determines the sum of each monthly capacity payment was agreed-upon between the

parties and made part of the final ICSID Award, which is deposited in Washington DC at the ICSID offices.[4]

GOT waived any claim of immunity with respect to this action. This Court has subject matter jurisdiction over GOT in this action.

## POINT II

### GOT'S CONTENTION THAT THIS COURT DOES NOT HAVE PERSONAL JURISDICTION OVER GOT IS WRONG

## I.    GOT WAS PROPERLY SERVED UNDER FSIA

First, GOT contends that it was not properly served under the FSIA. GOT is wrong. Under the FSIA, service may be made, in the first instance, "by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the agency or instrumentality." 28 U.S.C. § 1608 (b)(1) (2008). This Court interpreted this provision in *Space Sys./Loral, Inc. v. Yuzhnoye Design Office*, 164 F. Supp. 2d 397 (S.D.N.Y. 2001). There, a foreign government contended it was not properly served, as GOT contends here. The agreement at issue provided that "All notices and communications between the parties shall be in writing and shall be effective, if delivered in person to the authorized representative of the recipient party at the address listed below, or sent by express mail or Data fax." *Id.* at 402. This Court held that this provision established a special arrangement for the service of process under the FSIA, and hence, that service pursuant to that provision was effective. The Court noted that this result was well-established in federal courts

---

[4]  Moreover, GOT's half-hearted contention that IPTL has not satisfied the dispute resolution mechanisms to obtain payment of the undisputed sums due it, is absurd. As set forth in the Parthiban Dec., ¶¶ 18, 19, 20, 21, 25, 26, and Exhibits G, H and I, IPTL has spared no effort to try to resolve this matter with Tanesco and GOT. It has been met with stone silence, and a refusal to even explain the basis of Tanesco/GOT's position. IPTL has not been paid in over a year. It has satisfied every step under the PPA for trying to resolve this.

throughout the country. *Id.* For instance, the United States District Court for the District of Columbia reached the same conclusion in *Marlowe v. Argentine Naval Comm'n,* 604 F. Supp. 703 (D.D.C. 1985). In that case, which also dealt with service under the FSIA, the agreement provided that:

> All notices, requests, demands, or other communications to or upon the respective parties hereto shall be deemed to have given or made when deposited in the mail, postage prepaid, or in the case of telegraphic notice when delivered to the telegraph company or when actually sent by Telex, addressed to Seller, or Buyer, as the case may be, at their respective addresses set forth below. . .

*Id.* at 704. Service of the summons and complaint was made based on this provision. The Court held that the notice provision in the agreement constituted a special arrangement under the FSIA, and that service was therefore effective.

Here, just as in *Space Systems/Loral* and *Marlow,* the Guarantee provide that:

> 5.1 All notices or other communication (together 'Notices') to be given or made hereunder shall be in writing, shall be addressed for the attention of the person indicated below and shall be delivered personally or sent by registered or certified mail or facsimile. All Notices shall be deemed delivered (a) when presented personally, (b) if received on a business Day of the receiving Party . . . The address for service of each Party and its respective facsimile number shall be:

| 5.1.1 | For the Guarantor: | The Government of the Republic of Tanzania |
|---|---|---|
| | Attention | The Principal Secretary |
| | | Ministry of Water, Energy and Minerals |
| | Address | Sokoine Drive, Mkwepu Street |
| | | PO Box 2000 |
| | | Dar es Salaam |
| | | United Republic of Tanzania |

> . . . .

> or such other addresses or facsimile numbers as either Party
> may have notified to the other Party in accordance with this
> Article 5.1.
>
> 5.2    Effectiveness of Service
>
> Each Notice under this Guarantee shall be effective only
> upon actual receipt thereof.

As set forth in the Declarations of Parthiban Chandrasakaran (¶¶ 4-6) and Jigge

Venerabilis (¶ 2), service was effected in full compliance with this provision in the Guarantee on

November 22, 2007. Hence, service was properly effected on GOT, and this Court has personal

jurisdiction over GOT in this action.

In the event that this Court disagrees, and determines that service has not been properly

effected, IPTL requests that it be permitted to serve in the manner directed by the Court.

## II.    GOT'S CONTENTION THAT IT IS NOT SUBJECT TO THIS COURT'S JURISDICTION BECAUSE IT DOES NOT HAVE MINIMUM CONTACTS WITH THE UNITED STATES IS WRONG

GOT's contention that there is no personal jurisdiction due to GOT's alleged lack of

minimum contacts with the United States is factually and legally wrong. First, under section

1605(a)(1) of the FSIA, this Court has personal jurisdiction over GOT regardless of its contacts

with the United States. GOT specifically agreed to waive its immunity, and, specifically agreed

that it would do so in actions brought in the United States under the FSIA. Hence, it cannot

claim that it did not anticipate being hauled into Court here. The fact is that GOT specifically

agreed that it would be subject to FSIA jurisdiction. Not one of the cases cited by GOT deals

with a government which has so agreed.

Second, even if the court were to find that an additional due process analysis was

required, GOT has sufficient contacts with the United States to justify an application of personal

jurisdiction. At a minimum, IPTL is entitled to conduct limited discovery as to GOT's contacts in the United States.

A.    28 U.S.C. § 1605(a)(1) Provides Personal Jurisdiction Over GOT Regardless of Any Minimum Contacts Analysis

The cases cited by GOT in support of its proposition that IPTL must establish that GOT has minimum contacts with the United States are inapposite, as those cases do not evaluate jurisdiction in the context of a foreign government that has expressly waived immunity by agreement under 28 U.S.C. § 1605(a)(1), as GOT has here. Rather, those cases consider situations in which the courts found an exception to the general jurisdictional immunity of a foreign state where (a) the action is based upon commercial activity carried on in the United States (28 U.S.C. § 1605(a)(2) (2008)), or (b) the action is seeking to enforce an arbitral award (28 U.S.C. § 1605(a)(6) (2008)). Neither of those subsections require the level of intent to be subject to suit within the United States that exists in section 1605(a)(1), and thus are legally distinguishable from the case at hand.

1.    Cases Involving 28 U.S.C. § 1605(a)(2) Are Distinguishable and Do Not Implicate the Facts in the Current Case

Defendant's reliance on *Texas Trading & Milling Corp. v. Fed. Republic of Nigeria*, 647 F.2d 300 (2d Cir. 1981), which applies 28 U.S.C. § 1605(a)(2), is not instructive, as the case does not involve the specific and intentional relinquishment of a right. There is an inherent difference between sections 1605(a)(1) and 1605(a)(2). Section 1605(a)(1), which applies where "the foreign state has waived its immunity either explicitly or by implication . . . ." (28 U.S.C. 1605(a)(1) (2008)), requires an element of intent to be subject to the jurisdiction of the United States, which is absent in 1605(a)(2), which involves "commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere . . . ." 28 U.S.C. 1605(a)(2) (2008). In

this case, GOT has not merely carried on commercial activity within the United States thus making it subject to the nation's laws and jurisdiction. Rather, it expressly consented to the legal jurisdiction of the United States, intentionally opening itself to suit in this country under the FSIA. Hence, the cases cited by GOT, which are based on situations in which the commercial activities of the nation in question are the bases for exercising jurisdiction, are simply inapplicable to this case, in which GOT has intentionally agreed to waived sovereign immunity and to subject itself to FSIA jurisdiction in the United States.

Even if the court finds that the ruling in *Texas Trading* applies in this situation, the Second Circuit has questioned the validity of the holding in light of subsequent case law from the U.S. Supreme Court. In *Hanil Bank v. PT. Bank Negara Indonesia*, the Second Circuit, reflecting on the U.S. Supreme Court decision in *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 119 L. Ed. 2d 394, 112 S. Ct. 2160 (1992), stated "we are uncertain whether our holding [in *Texas Trading*] remains good law." *Hanil Bank v. PT. Bank Negara Indonesia*, 148 F.3d 127, 134 (2d Cir. 1998). In *Weltover*, the U.S. Supreme Court assumed without decision that a foreign state is a "person" for the purposes of the Due Process Clause of the U.S. Constitution. *Id.*; *Weltover*, 504 U.S. at 619. However, the Court then went on to note that States of the Union were *not* persons under the same clause. *Hanil Bank*, 148 F.3d at 134; *Weltover*, 504 U.S. at 619. Thus, the Second Circuit acknowledges that its requirement for a separate due process analysis under 28 U.S.C. § 1605(a)(2) may no longer be applicable.[5] Indeed, in *Dar El-Bina Eng'g & Contracting Co., Ltd. v. Republic of Iraq*, the Southern District of New York found personal jurisdiction in the context of 28 U.S.C. § 1605(a)(2) without conducting a separate due process analysis, stating, "[t]he limited exceptions enumerated in

---

[5]    It should be noted that in *Hanil Bank*, the court eventually did not need to address the issue of whether such an analysis was necessary because minimum contacts were readily discernable. *Hanil Bank v. PT. Bank Negara Indonesia*, 148 F.3d 127, 134 (2d Cir. 1998).

Section 1605 require either a waiver of immunity or some connection between the lawsuit and the United States and therefore prescribe the necessary contacts that must exist before personal jurisdiction may be exercised." *Dar El-Bina Eng'g & Contracting Co., Ltd. v. Republic of Iraq*, 79 F. Supp. 2d 374, 388 (S.D.N.Y. 2000). Thus, even if the court were to find that sections 1605(a)(1) and 1605(a)(2) both fall under the holding in *Texas Trading*, which they do not, that holding itself has been questioned and at times ignored by the courts in this district.

      2.      <u>Cases Involving 28 U.S.C. § 1605(a)(6) Are Distinguishable In That</u>
                <u>§1605(a)(6) Does Not Involve the Contacts With the United States</u>
                <u>Required by § 1605(a)(1)</u>

The remainder of the cases cited by GOT in support of its contention that a separate due process analysis is required under the FSIA apply 28 U.S.C. § 1605(a)(6), which finds an exception from the general jurisdictional immunity of a foreign state where the plaintiff is seeking to enforce an arbitral award – these cases are inapplicable to the facts of the current issue. As noted in *Frontera Resources Azerbaijan Corp. v. State Oil Co. of the Azerbaijan Republic*, cited by GOT, "[w]hen Congress passed the original FSIA, it was assumed that the exercise of personal jurisdiction over foreign states under the statute always would satisfy the demands of the Constitution." *Frontera Resources Azerbaijan Corp. v. State Oil Co. of the Azerbaijan Republic*, 479 F. Supp. 2d. 376, 382 (S.D.N.Y. 2007) (citations omitted). The legislative history of the FSIA upholds this view, stating

> The requirements of minimum jurisdictional contacts and adequate notice are embodied in the provision [namely, 28 U.S.C. § 1605(a)(1)-(5)]. *Cf. International Shoe Co. v. Washington*, 326 U.S. 310, 90 L. Ed. 95, 66 S. Ct. 154 (1945), and *McGee v. International Life Insurance Co.*, 355 U.S. 220, 223, 2 L. Ed. 2d 223, 78 S. Ct. 199 (1957). . . . Significantly, each of the immunity provisions in the bill . . . requires some connection between the lawsuit and the United States, or an express or implied waiver by the foreign state of its immunity from jurisdiction. These immunity provisions, therefore, prescribe the necessary contacts which must exist before our courts can exercise personal jurisdiction.

H.R. Rep. No. 94-1487, at 13, reprinted in 1976 U.S.C.C.A.N. at 6612.  The section of the FSIA

applied in GOT's remaining cases, 1605(a)(6), was added in 1988 as an amendment to the bill,

and in no way requires the same minimum contacts considered in § 1605(a)(1) – (a)(5).

*Creighton Ltd. v. Gov't of Qatar*, 181 F.3d 118, 125-26 (D.C. Cir. 1999).

One case that is instructive in the difference between § 1605(a)(1) and § 1605(a)(6) is

*Creighton Ltd. v. Gov't of Qatar*.  In *Creighton*, the D.C. District Court of Appeals directly

compared the two sections, noting that a separate due process analysis was needed under section

1605(a)(6) because "unlike § 1605(a)(1), § 1605(a)(6) deals not with waiver but with forfeiture. .

. . Waiver is different from forfeiture.  Whereas forfeiture is the failure to make the timely

assertion of a right, waiver is the intentional relinquishment or abandonment of a known right."

*Creighton*, 181 F.3d at 126.  The court goes on to note, "[u]nlike subsection (a)(1), subsection

(a)(6) contains no intentionality requirement.  Therefore, although subsection (a)(6) confers

subject matter jurisdiction upon the court, it does not follow that Qatar waived its objection to

personal jurisdiction."  *Id.*  Thus those cases used by GOT that apply section 1605(a)(6) are not

applicable to the situation at hand and do not provide a sufficient basis for requiring a separate

due process analysis.

GOT also claims that the situation in this case closely mirrors that in the Southern

District of New York case *Shen v. Japan Airlines*, 918 F. Supp. 686 (S.D.N.Y. 1994).  In fact,

*Shen* does not even begin to resemble the fact pattern in the current matter.  That case involved a

suit for damages sustained when the plaintiff was refused entry into Japan and was deported to

Shanghai, China.  There was no contractual relationship between the parties and no express or

implied waiver of immunity under the FSIA.  In fact, there was no subject matter jurisdiction

whatsoever as the court found that the FSIA was not applicable – "Plaintiff has pointed to no

provision of the FSIA that would permit suit against [Japan Immigration Bureau] and none

appears to apply." *Shen*, 918 F. Supp. at 691. With no subject matter jurisdiction under the FSIA, it logically follows that the court would not find personal jurisdiction. As GOT in this case expressly subjected itself to the FSIA, the holding in *Shen* has no relevance to the issues before this court.

Finally, it should be noted that GOT does not, because it cannot, reference a single case in which a court conducted a separate due process analysis when a state specifically and expressly waived its right to sovereign immunity, as GOT has here.

B.     <u>Even If The Court Finds That A Separate Due Process Analysis Is Necessary, GOT Has Sufficient Contacts With the United States to Justify a Finding of Personal Jurisdiction</u>

Even if the court should find that an additional due process minimum contacts analysis is necessary in cases where a state has expressly waived sovereign immunity, GOT has enough contacts within the United States to support a finding of personal jurisdiction.

First, GOT's contention that it is not subject to the jurisdiction of United States Courts, and that its bank accounts in the United States are purely for embassy use and are immune from suit here, has already been rejected by the U.S. Courts. In *Birch Shipping Corp. v. Embassy of the United Republic of Tanz.*, 507 F. Supp. 311 (D.D.C. 1980), plaintiff ship-owner sought to attach a bank account where the Government of Tanzania maintained an account. The Government of Tanzania argued that its property was immune from attachment pursuant to FSIA. *Id.* at 311-12. The court undertook the two-step analysis relevant for determining immunity, specifically whether the government waived its immunity and whether the property attached was used for a commercial purpose. *Id.* at 311-13. Based on this analysis, the court found that the arbitration agreement at issue constituted an implicit waiver. *Id.* at 312. Second, the court concluded that the checking account of the Government of Tanzania's embassy was used for a commercial activity. *Id.* at 311-12. Furthermore, the court found that even though the

account was not used solely for a commercial activity, it was not immune from attachment. *Id.* at 313. Consequently, it has already been determined that GOT's bank accounts here are subject to attachment, and GOT is subject to the jurisdiction of United States Courts.

Further, evidence exists that GOT conducts substantial financial and commercial business in the United States.

Among other things, GOT and Tanesco's dispute with IPTL, which led to the ICSID arbitration, appears to have been substantially the result of communications between the World Bank, in Washington D.C., and GOT. This is evidenced by the World Bank's October 22, 1997 letter to GOT (Sentner Dec. Exh. B). In that letter, the World Bank urged the GOT re-evaluate its contract with IPTL, claiming that Tanzania did not need the electricity that IPTL was to generate (this was flat wrong). Shortly thereafter, Hunton & Williams was engaged, Tanesco sought to terminate the PPA, the ICSID arbitration was underway, and the arbitrators held that Tanesco was wrong in trying to terminate the PPA. Hence, it appears that the World Bank, in Washington DC, has been involved in GOT's decision-making process regarding IPTL from the very beginning. This is further reported in the October 10, 1997 Tanzanian newspaper article annexed to the Sentner Declaration as Exhibit C.

This is part and parcel of an extensive financial relationship between the World Bank in Washington DC and GOT, specifically with respect to GOT's energy industry. For instance, the World Bank has provided financing recently to GOT for the purpose of financing GOT's acquisition of fuel to run power projects (Sentner Dec. Exh. D). It is believed that World Bank financing has financed Tanesco's obligations to IPTL in various respects (Parthiban Dec. ¶ 28). This is purely a commercial-type arrangement – financing provided for the purpose of generating and selling electricity. While the World Bank loans money to governments, the loans at issue

here are commercial in nature.  They are the same types of loans a bank would provide to a utility.

Another example of GOT's commercial contacts with the United States is its contractual relationship with Richmond Development Corporation, a U.S. based company with whom it contract to develop a power project in Tanzania (Sentner Dec. Exh. E).  Indeed, the Richmond Development power project was recently developed in Tanzania, and is in direct competition with the IPTL project.  In fact, it is more likely than not that the development of the Richmond Development project has had a direct causal effect on GOT and Tanesco's unwillingness to pay IPTL the sum due to it.

IPTL respectfully submits that these actions that are centered in the United States provide more than enough of a nexus to the United States to justify this Court's exercise of jurisdiction over GOT in connection with its payment obligations to IPTL.  Moreover, given the World Bank's extensive financing of GOT and Tanesco, it is very possible that funds necessary to satisfy GOT's debt to IPTL will be sourced from the World Bank.

## III.    IPTL IS ENTITLED TO CONDUCT LIMITED JURISDICTIONAL DISCOVERY OF GOT

At a minimum, there is sufficient evidence of GOT's commercial transactions in the United States to warrant limited jurisdictional discovery with respect to GOT's commercial transactions in the United States.  It is well established that when jurisdiction is challenged in a case such as this, limited discovery with respect to jurisdiction is called for.  The Second Circuit, in case involving a challenge to jurisdiction under the Foreign Sovereign Immunities Act, stated that where jurisdiction is an issue, "we have explained 'that generally a plaintiff may be allowed limited discovery with respect to the jurisdictional issue; but until she has shown a reasonable basis for assuming jurisdiction, she is not entitled to any other discovery.'" *First City v. Rafidan*

*Bank*, 150 F.3d 172, 176 (2d Cir. 1998) (citing *Filus v. Lot Polish Airlines*, 907 F.2d 1328, 1332

(2d Cir. 1990)).  Similarly, in *Reiss v. Societe Centrale*, 235 F.3d 738 (2d Cir. 2000), the Court

held that where jurisdiction was raised as a defense in a Foreign Sovereign Immunities Act case,

the plaintiff was entitled to discovery:

> We think that it would be helpful to have the depositions of Juliard
> and de Chavanne, the latter of whom was not only the Director
> General of Societe but of GAN S.A. as well, to assist the Court in
> undertaking an FSIA jurisdiction analysis. . . . Reiss should be
> permitted to go forward with the discovery to which he is entitled.
> We have stated that 'on a challenge to the district court's subject
> matter jurisdiction, the court may resolve disputed jurisdictional
> fact issues by reference to evidence outside the pleadings, such as
> affidavits.' See *Filetech V.S. v. France Telecom S.A.* 157 F.3d 922,
> 932 (2d Cir. 1998).  We think it essential for the district court to
> afford the parties the opportunity to present evidentiary material at
> a hearing on the question of FSIA jurisdiction.  The district court
> should afford broad latitude to both sides in this regard and resolve
> disputed factual matters by issuing findings of fact.

*Id.* at 747-48.

IPTL requests that it be permitted to conduct limited discovery, with respect to GOT's

commercial activities in the United States.  The discovery sought would be limited to GOT's

commercial and financial dealings in the United States, as set forth in Appendix A hereto.


## POINT III

### GOT'S FORUM NON
### <u>CONVENIENS MOTION MUST BE DENIED</u>

IPTL has brought this action in the United States, because it is a jurisdiction in which

GOT has assets, a jurisdiction GOT specifically agreed to be subject to, and a jurisdiction in

which GOT obtains many millions of dollars of financing.  GOT has not identified another

jurisdiction in which this is true. GOT has certainly not stated that it has sufficient assets in England to satisfy any judgment rendered against it.

The Second Circuit has crafted a three-step inquiry for its district courts to follow when evaluating a motion to dismiss based upon the doctrine of *forum non conveniens:*

> 'At step one, a court determines the degree of deference properly accorded the plaintiff's choice of forum. At step two, it considers whether the alternative forum proposed by the defendants is adequate to adjudicate the parties' dispute. Finally, at step three, a court balances the private and public interests implicated in the choice of forum.'

*Strategic Value Master Fund, Ltd. v. Cargill Fin. Servs., Corp.*, 421 F. Supp. 2d 741, 754 (S.D.N.Y. 2006) (Leisure, J.) (quoting *Norex Petroleum Ltd. v. Access Indus., Inc.*, 416 F.3d 146, 153 (2d Cir. 2005) (citing *Iragorri v. United Techs. Corp.*, 274 F.3d 65, 73-74 (2d Cir. 2001) (*en banc*))).

"A defendant moving for dismissal on forum non conveniens grounds bears the burden of proof." *Strategic Value Master Fund, Ltd.*, 421 F. Supp. 2d at 754. A court reviewing a motion to dismiss for forum non conveniens should begin with the assumption that the plaintiff's choice of forum will stand unless the defendant meets its burden. See *Iragorri*, 274 F.3d at 71.

It is well-settled that there is a strong presumption in favor of a plaintiff's choice of forum, and the plaintiff's choice should only be disturbed if there exist "compelling" factors favoring the alternate forum. *R. Maganlal & Co. v. M.G. Chem. Co.*, 942 F.2d 164, 167 (2d Cir. 1991); accord, *WIWA v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 100 (2d Cir. 2000) (citing *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947) ("a plaintiff's choice of forum should rarely be disturbed"); *Maran Coal Corp. v. Societe Generale de Surveillance S.A.*, No. 92 Civ. 8728, 1993 U.S. Dist. LEXIS 12160, at *6 (S.D.N.Y. Sept. 2, 1993). The burden of showing the propriety of the transfer lies with the moving party, who must make a "clear-cut showing that a

transfer is in the best interests of the litigation." *Dwyer v. Gen. Motors Corp.*, 853 F. Supp. 690, 692 (S.D.N.Y. 1994). GOT fails to meet its burden in all regards and, as such, this action should stay in this forum.

> A.    The Plaintiff's Choice Of Forum Is Entitled To Considerable Deference Because the Choice Was Based Upon Legitimate Reasons

The Second Circuit has made clear that when a foreign plaintiff chooses to sue in a United States court for "legitimate reasons," the more deference must be given to that choice of forum. In *Bigio v. Coca-Cola Co.*, 448 F.3d 176 (2d Cir. 2006), plaintiffs Canadian Jews appealed a *forum non conveniens* dismissal from the district court that held that Egypt was an adequate alternative forum. *See Id.* at 178. The Second Circuit stated that "the more that a plaintiff, even a foreign plaintiff, chooses to sue in a United States court for 'legitimate reasons,' the more deference must be given to that choice." *Id.* at 179 (quoting *Iragorri*, 274 F.3d at 73); *see also, e.g., Metito (Overseas) Ltd. v. GE*, 05 Civ. 9478, 2006 U.S. Dist. LEXIS 81683, at *8 (S.D.N.Y. Nov. 7, 2006) ("[A]ssuming. . . plaintiff was motivated in part by forum shopping -- which is dubious -- that would not mean that plaintiff's forum choice is entitled to 'no' deference, but rather to 'less' deference . . . . Similarly, the fact that plaintiff is foreign does not. . . render the forum choice completely undeserving of respect."). "Furthermore, even where the degree of deference is reduced, 'the action should be dismissed only if the chosen forum is shown to be genuinely inconvenient and the selected forum significantly preferable.'" *Bigio*, 448 F.3d at 179 (quoting *Iragorri*, 274 F.3d at 74-75).

First, GOT has offered no compelling reason to disturb Plaintiff's choice of forum. Its only stated ground is that litigating in English Courts would be more convenient to it than litigating in Courts in the United States. This is hardly a sufficient ground to disturb Plaintiff's choice of forum, particularly since GOT is not a resident of England. The availability of

evidence and witnesses is no greater in England than it is in the United States. Unlike England, however, there is evidence that GOT conducts substantial financial and commercial business in the United States.

As GOT has offered no basis to rule that transferring this litigation to England will be in the best interests of the litigation, its motion should be denied.

In the event that the Court believes there are factual issues that need to be developed with respect to GOT's *forum non conveniens* motion, IPTL requests that it be permitted to conduct limited discovery with respect to the *forum non conveniens* issues.

## **CONCLUSION**

IPTL respectfully requests this Court deny GOT's motion to dismiss the Complaint, and direct that it immediately provide to IPTL the discovery set forth in Appendix A.

Dated: New York, New York
February 8, 2008

NIXON PEABODY LLP

By: /s/   Robert C. Sentner
        Robert C. Sentner (RS 5223)
Attorneys for Plaintiff
437 Madison Avenue
New York, NY 10022
(212) 940-3000

# APPENDIX A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------------

INDEPENDENT POWER TANZANIA LTD.,                    07 CV 10366 (AKH)

                                        Plaintiff,

      vs.

THE GOVERNMENT OF THE REPUBLIC OF TANZANIA,

                                        Defendant.

-------------------------------------------------------------------------------

## APPENDIX A – JURISDICTIONAL DISCOVERY REQUESTED

1.      GOT should produce a witness with knowledge to testify about GOT's commercial transactions with entities in the United States, including but not limited to Richmond Development Company and the World Bank.

2.      GOT should produce documents relating to communications between it, on the one side, and representatives of the World Bank, on the other, as they relate to the IPTL Project and other energy projects in Tanzania.  Further, IPTL should be permitted to serve a subpoena on the World Bank requiring it to produce such documents from its files.

3.      GOT should produce a witness with knowledge to testify about its assets in the United States, including but not limited to its bank accounts.

Dated:  February 8, 2008