UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------

INDEPENDENT POWER TANZANIA LTD.,                    07 CV 10366 (AKH)

                                    Plaintiff,

                                                            DECLARATION

        vs.

THE GOVERNMENT OF THE REPUBLIC OF TANZANIA,

                                    Defendant.

-------------------------------------------------------------------------

## DECLARATION OF PARTHIBAN CHANDRASAKARAN

Parthiban Chandrasakaran hereby deposes and states the following pursuant to 28 U.S.C. § 1746:

1.      I am the General Manager of Independent Power Tanzania Ltd. ("IPTL"), which developed, financed, built, and operates, a privately financed 100 MW power plant in the Republic of Tanzania (the "Power Plant").

2.      The Power Plant was developed pursuant to a Power Purchase Agreement with Tanesco, which is the Government of Tanzania's wholly-owned electric supply company. A copy of the Power Purchase Agreement is annexed as Exhibit A.

3.      The Government of Tanzania executed a guarantee of Tanesco's obligations under the Power Purchase Agreement. A copy of that Guarantee is annexed as Exhibit B (the "Guarantee").

## SERVICE OF THE SUMMONS AND COMPLAINT

4.      Under the terms of the Guarantee,

        5.1 All notices or other communication (together 'Notices') to be given or made hereunder shall be in writing, shall be addressed for

the attention of the person indicated below and shall be delivered personally or sent by registered or certified mail or facsimile. All Notices shall be deemed delivered (a) when presented personally, (b) if received on a business Day of the receiving Party . . . The address for service of each Party and its respective facsimile number shall be:

| 5.1.1 | For the Guarantor: | The Government of the Republic of Tanzania |
| | Attention | The Principal Secretary |
| | | Ministry of Water, Energy and Minerals |
| | Address | Sokoine Drive, Mkwepu Street |
| | | PO Box 2000 |
| | | Dar es Salaam |
| | | United Republic of Tanzania |

. . . .

or such other addresses or facsimile numbers as either Party may have notified to the other Party in accordance with this Article 5.1.

5.2    Effectiveness of Service

Each Notice under this Guarantee shall be effective only upon actual receipt thereof.

5.    On November 22, 2007, I instructed our Administrative Manager Mr. Jigge Venerabilis to deliver copies of the Summons and Complaint that have been filed in this action to the appropriate Government of Tanzania Ministries and to Tanesco. Mr. Venerabilis delivered the summons and complaint to the following individuals at their respective addresses, as follows:

a.    Mr. Arthur Mwakapugi – Permanent Secretary, Ministry of Energy and Minerals, of the Government of Tanzania, Samora Avenue, PO Box 2000, Dar Es Salaam;

b.    Mr. Bashir Mrindoko – Commissioner of Energy and Petroleum Affairs, Ministry of Energy and Minerals, of the Government of Tanzania, Samora Avenue, PO Box 2000, Dar Es Salaam;

c. Mr. Gray Mgonja – Permanent Secretary, Ministry of Finance, of the Government of Tanzania, Shaaban Roberts Street, PO Box 9111, Dar Es Salaam;

d. Mr. Nazir Karamagi – Minister of Energy and Minerals, of the Government of Tanzania, Samora Avenue, PO Box 2000, Dar Es Salaam;

e. Mrs Zakia Meghji – Minister of Finance, of the Government of Tanzania, Shaaban Roberts Street, PO Box 9111, Dar Es Salaam;

f. Dr. Idris Rashidi – Managing Director of Tanesco, Tanesco Ubungo Head Office, Umeme Park, PO Box 9024, Dar Es Salaam;

g. Deputy Permanent Secretary – Ministry of Justice and Constitutional Affairs, of the Government of Tanzania, Kivukoni Front, PO Box 9053, Dar Es Salaam;

h. Governor, Bank of Tanzania – Sokoine Drive, PO Box 2939 Dar Es Salaam.

6. While the Guarantee requires that service be made on The Principal Secretary Ministry of Water, Energy and Minerals, service was made on Mr. Arthur Mwakapugi – Permanent Secretary, Ministry of Energy and Minerals. This reflects simply a name change in the title of the ministry and from principal secretary to permanent secretary.

## THE CAPACITY PAYMENTS THAT ARE DUE WERE ALREADY THE SUBJECT OF THE INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES ARBITRATION

7. On 25 November 1998, after the Power Plant was constructed, Tanesco commenced the ICSID arbitration against IPTL. Tanesco sought generally to (1) terminate the Power Purchase Agreement between it and IPTL, and (2) failing termination, to reduce the tariff set forth in that Power Purchase Agreement.

40465634.1                                3

8.    Included among the disputes that were arbitrated was the dispute about the amount of the monthly capacity payments under the PPA. After extensive hearings and the issuance of several preliminary awards, the Tribunal issued the final ICSID Award. By Final Award dated July 12, 2001, ICSID rendered an Award in the arbitration entitled *Tanzania Electric Supply Company Limited v. Independent Power Tanzania Limited* (ICSID Case No. ARB/98/8) (the "ICSID Award"). A copy of the ICSID Award is annexed as Exhibit C.

9.    The Final Award of the Arbitral Tribunal states that the Power Purchase Agreement contains a "Reference Tariff," which is comprised of a "Capacity Purchase Price" and an "Energy Purchase Price." (Final Award, ¶ 5). The unpaid sum sought here is with respect to unpaid "Capacity Purchase Price" payments.

10.    During the course of the arbitration, the parties agreed-upon a financial model that would determine the monthly capacity payments [Award, p. 25, ¶ 2B]. The financial model was made part and parcel of the ICSID Award [Award, p. 25, ¶ 2B, Appendix F]. Appendix F to the Arbitration Award states:

> 1. TANESCO and IPTL agree that the tariff which is to be calculated pursuant to the Power Purchase Agreement ("PPA") dated 26 May 1995, as amended, shall be calculated based on the Decisions of the Arbitrators herein dated 9 February 2001 and 24 May 2001, the applicable terms of the PPA, and the financial model entitled 'Tegeta July 2001.123' which is annexed hereto, in both electronic and paper format (the 'Financial Model'). The tariff shall be calculated initially at commencement of commercial operation of the Tegeta power plant and during the term of the PPA in accordance with the PPA and the Financial Model.

> 2. The Financial Model contains notes and comments which form part of the parties' agreement as to the calculation of the tariff. The parties recognize that there are instances where the formulae, mechanisms, notes, or comments contained in the Financial Model differ from or supplement the terms of the PPA. Where such differences exist, the parties agree that the Financial Model shall govern and supersede the terms of the PPA.

4

3. The parties recognize that certain further mechanical steps need to be undertaken in order to make the Financial Model fully useful and operational for purposes of billing and tariff adjustment. The parties agree to cooperate together to take whatever steps are required to effectuate that end. However, the parties agree that the Financial Model sets forth the agreement of the parties as to the calculation of the tariff, and that any further steps which are taken must be consistent with the Financial Model.

4. The parties further agree that the Financial Model is to be included in the Final Award in this arbitration.

11.     The Final Award of the Arbitral Tribunal, dated June 22, 2001, states:

64. Following publication of our Decision On All Further Remaining Issues, the parties agreed on the adjustments to be made to the financial model to take account of the Tribunal's various decisions, and submitted to the Tribunal an agreed financial model in both hard copy and electronic form to be used for the calculation of the initial Reference Tariff. That financial model which forms part of this award, is appended hereto as Appendix F (both hard copy and electronic form) and incorporated herein by reference. . . .

THEREFORE, THE TRIBUNAL AWARDS AS FOLLOWS:

1. The Tribunal decides as set forth above and in Appendices A, B, C, D, E and F hereto.

2. In particular:

   A. The Power Purchase Agreement between the parties dated 'as of' 26 May 1995 is and remains a valid and effective contract between them;

   B. The Reference Tariff under the Power Purchase Agreement between the parties dated 'as of' 26 May 1995 is as set forth in Appendix F hereto. . . .

   D. The parties shall comply with their respective obligations under the Power Purchase Agreement between them dated 'as of' 26 May 1995 . . . .

Pursuant to the Power Purchase Agreement, the term of the agreement is 20 years from the "last Commercial Operations Date." (PPA, ¶ 2.1). The last Commercial Operations Date occurred on January 15, 2002. Hence, the terms of the PPA extends to January 15, 2022.

12.    In sum, the ICSID Arbitral Tribunal determined the method of calculating the capacity payment invoices that IPTL would submit to Tanesco over the 20 year term of the PPA. Hence, contrary to GOT's argument, the calculation of the capacity payments for the duration of the term of the PPA was arbitrated and resolved in the ICSID arbitration.

13.    Pursuant to the Power Purchase Agreement (and the ICSID Award), in the event that Tanesco has some dispute about a portion of the payments, IPTL is still entitled to timely payment of the undisputed portion of the payments, while any dispute is resolved as to the disputed portion of the payments [PPA, ¶ 6.8(b)("If the Parties are unable to resolve the dispute in this manner, any amounts disputed on subsequent bills for the same reason may thereafter be withheld and deposited in the Escrow Account pending final resolution of the dispute in accordance with the procedures described in Article 18.2 but the undisputed amount shall be promptly paid in accordance with this Article VI where applicable."]. (Emphasis added.)

14.    The Government of Tanzania's contention that it is entitled to withhold the undisputed portions of the capacity payments, on the purported basis that they may be used to set-off some supposed overpayments, is incorrect under the plain language of the PPA. To the contrary, Tanesco is obligated to promptly pay any undisputed portion of IPTL's invoices, despite the fact that it might dispute portions of those invoices. Moreover, to this day, neither Tanesco nor the Government of Tanzania have ever suggested that IPTL might owe money back to them. The fact is, they have not paid IPTL in over a year, so there cannot be a credible claim that they have overpaid IPTL.

## EVENTS SINCE THE CONCLUSION OF THE ICSID ARBITRATION

15.    For approximately five years, IPTL submitted capacity payment invoices to Tanesco that were all calculated based on the ICSID Financial Model. Tanesco's agent Dr. Martin Swales reviewed the invoices, and based on his certification that they were calculated in accordance with the ICSID Financial Model, Tanesco paid the invoices (albeit often very late). However, beginning in January 2007, Tanesco stopped making payments[1], despite the fact that (1) the invoices were calculated in accordance with the ICSID Financial Model in the same manner as they had been for the previous five years, and (2) Dr. Martin Swales certified that the calculations with respect to each and every invoice were performed correctly.

16.    Copies of the invoices are annexed as Exhibit D. Copies of Dr. Swales' certifications are annexed as Exhibit E. As indicated above, Dr. Swales was intimately involved in the ICSID arbitration, and was deeply involved in the preparation of the financial model that is part of the ICSID Award.

17.    Copies of Tanesco's "Invoice Dispute Notices" are annexed as Exhibit F.

18.    IPTL has on numerous occasions demanded that Tanesco inform it of the details of Tanesco's claim that the calculation of the capacity payment invoices was not in compliance with the ICSID Arbitration Award (see Exh. G).

19.    Neither the Government of Tanzania nor Tanesco have ever set forth in what manner the invoices do not comply with the ICSID Arbitration Award. Nor have they informed IPTL as to what, in their view, the correct calculation should be under the ICSID Arbitration Award.

---

[1]    Other than US$ 3,599,918 received in February 2007 for December 2006 Energy Payment and US$ 3,216,004 received in May 2007 for partial payment of the November 2006 Capacity Payment.

20.    Moreover, IPTL has demanded on numerous occasions that Tanesco release the undisputed portions of the payments that are overdue, in compliance with the PPA and Tanesco's obligations under the ICSID Arbitration Award (Exh. H).

21.    Finally, by notices dated August 23 and 29, 2007, IPTL made demand on the Government of Tanzania that it fulfill its obligation under the Guarantee (Exh. I). The Government has failed to comply with those obligations.

22.    This is despite the fact that Tanesco notified the Government of Tanzania that the sum that IPTL seeks here is not disputed, and that it is due to IPTL. Attached as Exhibit J is a copy of a November 28, 2007 letter from the Managing Director of Tanesco to the Government of Tanzania's Permanent Secretary, Ministry of Finance. In that letter, the Tanesco Managing Director states, among other things:

> Out of the outstanding amount, the capacity charges amounting to Tshs [Tanzanian shillings] 21,865.8 million have been disputed and the remaining part amounting to Tshs 31,100 million is undisputed. In accordance with the Agreement, the undisputed amount is due for payment.

23.    31,100 million Tanzanian Shillings was equal to US$26,703,605, as of the date the letter was written. This is the sum that is presently sought in this action (the sum that is overdue increases each month, as does the interest and late charges on the payments due.)

24.    It is noteworthy that this letter was written after IPTL served the summons and complaint on the Government of Tanzania. As a result, we assumed that the Government of Tanzania would comply with its obligations and cause IPTL to be paid the undisputed sum, and that this litigation would not have to proceed. However, the Government of Tanzania continued to stonewall IPTL, and, despite the fact that a great deal of the capacity payment invoices are undisputed by Tanesco, and hence the undisputed sums are unquestionably due to IPTL, Tanesco and the Government of Tanzania have refused to pay to IPTL even the undisputed portions, and

have prevented the Bank of Tanzania from releasing any funds from escrow to fulfill those payment obligations.

25.    Neither the Government of Tanzania nor Tanesco have detailed to IPTL the grounds for not paying the invoices. Neither the Government of Tanzania nor Tanesco have ever notified IPTL that they might seek to recover sums that had already been paid to IPTL.

26.    While IPTL has made great efforts to try to resolve any issues surrounding the disputed portions of the capacity payments due to IPTL, the fact is that all that is sought in this action is the undisputed portion of the capacity payments that are due to IPTL. With respect to that, Tanesco has admitted that those payments are due, and the Government of Tanzania has never objected to paying those sums. However, despite numerous requests to the Government of Tanzania, it has failed to comply with its obligations under its guarantee of Tanesco's obligations, and has made no payment to IPTL. IPTL has fulfilled all requirements and conditions to enforcing the Government of Tanzania's payment obligations under the Guarantee.

27.    The consequence of this is that IPTL is facing imminent financial ruin. It is unable to maintain the plant, service its debt and other financial obligations, or to produce electricity when it is needed. It is believed that this is the Government of Tanzania's very intent -- to effectively expropriate the plant for its own purposes, by violating the ICSID Convention and ICSID Award.

28.    It is believed that the World Bank has provided financing to GOT and or Tanesco in connection with the IPTL project in various respects.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 8, 2008

_____

Parthiban Chandrasakaran

# EXHIBIT A



DATED THIS 26TH DAY OF MAY 1995


BETWEEN


TANZANIA ELECTRIC SUPPLY COMPANY LIMITED


and


INDEPENDENT POWER TANZANIA LIMITED


POWER PURCHASE AGREEMENT

INDEX

ARTICLE I

DEFINITIONS

1.1      Defined Terms


ARTICLE II

TERM

2.1      Initial Term
2.2      Extension of Term
2.3      Force Majeure Extension


ARTICLE III

SALE AND PURCHASE OBLIGATIONS

3.1      Sale and Purchase of Test Energy
3.2      Sale and Purchase of Electrical Energy
3.3      Sale and Purchase of Dependable Capacity
3.4      The Seller's Obligation to Provide Power During System Emergencies
3.5      Exceptions to TANESCO's Obligation to Accept Electrical
         Energy
3.6      Prudent Utility Practices


ARTICLE IV

CONDITIONS PRECEDENT

4.1      Conditions Precedent to Purchase Obligations
4.2      Conditions Precedent to the Seller's Obligations


ARTICLE V

PURCHASE PRICE AND OTHER CHARGES

5.1      Purchase Price : Capacity and Energy
5.2      Supplemental Tariff
5.3      Supplemental Charges
5.4      Penalty and Bonus Payments


ARTICLE VI

COMPENSATION, READING, BILLING AND PAYMENT

6.1      Reading of Meters for Energy Payment
6.2      Capacity Payment
6.3      Supplemental Tariff Payments
6.4      Supplemental Charges
6.5      Penalty and Bonus Payments





6.6     TANESCO or GOT Security
6.7     Payment
6.8     Payment Disputes
6.9     No Set-Off
6.10    Currency and Timing of Payment
6.11    Records


ARTICLE VII

PRE-OPERATIONS PERIOD AND OPERATIONS PROCEDURE

7.1     Facility Construction and Start-Up
7.2     Initial Operations Date
7.3     Commercial Operations Date
7.4     Operating Procedure


ARTICLE VIII

Despatch

8.1     Control and Operation of the Facility: Despatch
8.2     Scheduling and Despatch
8.3     Operating Guidelines


ARTICLE IX

OPERATION AND MAINTENANCE

9.1     Operation and Maintenance of Facility
9.2     Dependable Capacity : Testing of Capacity Rating
9.3     Scheduled Outages
9.4     Maintenance Outages
9.5     Forced Outage
9.6     TANESCO Maintenance Schedule


ARTICLE X

INTERCONNECTION

10.1    Interconnection Facilities
10.2    Protective Devices
10.3    Title and Risk of Loss


ARTICLE XI

METERING

11.1    Metering Device
11.2    Inspection of Metering Device
11.3    Adjustments of Inaccurate Meters
11.4    Metering Readings
11.5    Records

## ARTICLE XII

## REPRESENTATIONS AND WARRANTIES OF THE SELLER AND TANESCO; ADDITIONAL COVENANTS OF THE SELLER

12.1   The Seller's Status and Authorization
12.2   TANESCO's Status and Authorization
12.3   Permits Licenses, Approvals and Compliance with Laws
12.4   Continuity of Existence
12.5   Operating and Maintenance Standards
12.6   Qualified Personnel
12.7   Testing
12.8   Access to Operation Records
12.9   Easements and Rights-of-Way
12.10  Sale of Energy to Third Parties
12.11  Interconnection Facilities
12.12  GOT Guarantee

## ARTICLE XIII

## TAXES, FINES

13.1   Taxes Applicable to THE SELLER
13.2   Taxes Applicable to TANESCO

## ARTICLE XIV

## INSURANCE

14.1   Insurance Required
14.2   Substitute Coverage
14.3   Evidence of Insurance
14.4   Application of Proceeds

## ARTICLE XV

## FORCE MAJEURE EVENT

15.1   Definitions
15.2   Notification
15.3   Duty to Mitigate
15.4   Delay Caused by Force Majeure
15.5   Payments During Force Majeure Event

## ARTICLE XVI

## TERMINATION AND DEFAULT

16.1   The Seller Events of Default - Termination by TANESCO
16.2   TANESCO Events of Default - Termination by THE SELLER
16.3   Termination Notices
16.4   Notice to the GOT of TANESCO's Default
16.5   Notice to the Lenders of THE SELLER's Default
16.6   Obligations Upon Termination
16.7   Reimbursement
16.8   Other Remedies

## ARTICLE XVII

## INDEMNIFICATION AND LIABILITY

17.1    Limitation of liability
17.2    Indemnification
17.3    Indemnification for Fines and Penalties
17.4    Notice of Proceedings
17.5    Assertion of Claims to Exceed Minimum Indemnification Amount
17.6    Defence of Claims
17.7    Double Jeopardy

## ARTICLE XVIII

## DISPUTE RESOLUTION

18.1    Resolution by Parties
18.2    Mediation by Expert
18.3    Arbitration
18.4    Commercial Acts

## ARTICLE XIX

## MISCELLANEOUS

19.1    Transfers
19.2    Assignment
19.3    Notices
19.4    Choice of Law
19.5    Entire Agreement
19.6    Further Assurances
19.7    Waiver
19.8    Modification or Amendment
19.9    Severability
19.10   Counterparts
19.11   Confidential Information
19.12   Independent Contractors
19.13   Third Parties
19.14   Headings
19.15   Language



**APPENDICES**

**APPENDIX A**          Description of the Facility and Site

**APPENDIX B**          Reference of Tariff
                        Tariff Schedule

**APPENDIX C**          Performance Standards

**APPENDIX D**          Energy Accounting and Metering Equipment

**APPENDIX E**          Interconnection and Communication

**APPENDIX F**          Fuel Details

**APPENDIX G**          Electricity Characteristics

**APPENDIX H**          Tax Assumptions

**APPENDIX I**          Testing Procedures for Determining Net Capacity

**EXHIBITS**

## POWER PURCHASE AGREEMENT

This Agreement, dated as of 26th day of May, 1995, by and between  Independent Power Tanzania Ltd. (hereinafter referred to as "THE SELLER") of the one part and  Tanzania Electric Supply Company Limited (hereinafter referred to as "TANESCO") of the other part (each, a "Party" and, collectively, the "Parties").

Recitals :

1.        THE SELLER proposes to design, construct, own, operate and maintain an electricity generating Facility with a nominal Net Capacity of 100 megawatts at Site Conditions (as hereinafter defined) to be located in Tegeta, Dar es Salaam for the generation of electrical energy and the sale of electrical energy and capacity  to TANESCO which facility will be designed and constructed in Units. Such Units to be collectively known as the "Facility" and described more specifically in Appendix A.

2.        TANESCO desires to encourage and promote the development of low cost and reliable power options for generating electricity to meet the needs of its customers.

3.        THE SELLER desires to sell to TANESCO and TANESCO desires to purchase from THE SELLER all the electricity required to be generated by the Facility for the period specified in Article II of this Agreement after the Commercial Operations Date as hereinafter defined at the rates and in accordance with the terms and conditions set forth herein.

4.        Simultaneously herewith, THE SELLER is entering into an Implementation Agreement with the Government of the United Republic of Tanzania ("GOT").

        NOW THEREFORE, in consideration of these premises and the mutual covenants set forth herein, the Parties hereby  agree that the following terms and conditions shall govern THE SELLER's sale and delivery of electricity from the Facility to TANESCO and the purchase and receipt by TANESCO of such electricity from THE SELLER:





## ARTICLE I - DEFINITIONS

### 1.1    Defined Terms

Unless otherwise defined herein or in any appendix or exhibit hereto, the following Terms when used herein or in any appendix or exhibit hereto shall have the meanings set forth below.

"**Agent**" :  The meaning ascribed thereto in Article 16.5.

"**Agreement**" : This Power Purchase Agreement, including all appendices, exhibits, amendments and supplements that may be entered into by the Parties and in effect from time to time.

"**Back-up Metering Device**" : Any meters and metering device installed by THE SELLER and owned by TANESCO and used for backup purposes to measure Dependable Capacity, and payment purposes, the delivery and receipt of Net Electrical Output.

"**Base Lending Rate**" :  The one month London Interbank Offering Rate, as adjusted from time to time, plus two percent (2%) per annum.

"**Bonus Payment**" :  The meaning ascribed thereto in Article 6.5(b).

"**BTU**" : British Thermal Unit.

"**Business Day**" :  Any day on which commercial banks are not authorised or required to be closed in Dar es Salaam, Tanzania.

"**Capital Component**" :    The meaning ascribed thereto in Appendix B.

"**Capacity Billing Period**" : The period (i) commencing on the Commercial Operations Date of the first Unit and ending on the last calendar day of the following month, and (ii) between the respective last calendar day of any two consecutive calendar months thereafter.

"**Capacity Damages Amount**" : The amount expressed in Shillings equal to the total Capacity Payment paid by TANESCO to THE SELLER during the relevant Contract Year.

"**Capacity Payment**" : For any Capacity Billing Period, the payment to be made by TANESCO to THE SELLER  as  ascribed thereto in Article 5.1(a).

"**Capacity Purchase Price**" : For each Contract Year, the amount expressed in Shillings per kW per Month and shown in Appendix B, as such amount is adjusted from time to time in accordance with Appendix B.

"**Change in Law**" : Any of the following events occurring after the Effective Date as a result of, or in connection with, any action or inaction by any Governmental Authority:

(i)        a change in or repeal of an existing Law;

(ii)       an enactment or making of a new Law;

(iii)      a cancellation or non-renewal or a change in the conditions applicable to any permit, licenses approval or governmental authorisation from a Governmental Authority granted to THE SELLER or relating to the Facility;

(iv)      change in the manner in which a Law is applied or in the application or interpretation thereof (including any interpretation of best available control technology or other environmental standard that is materially different from that which THE SELLER

2

utilised in preparing its capital and operating cost assumptions) under this Agreement; or

(v)    any other change in, or other alteration of the application to THE SELLER or its shareholders of tax rates, depreciation schedules or assumptions set forth in Appendix H.

"Closing Date" : The date of the closing for the Financing Documents for the construction financing for the Facility.

"Commencement Date" : The date on which construction work on the Facility is to begin and notice of such date shall be given not less than 30 Days prior by THE SELLER to TANESCO.

"Commercial Operations Date" : As to each Unit, the first date on which (i) all of the conditions set forth in Article IV shall have been satisfied, and (ii) the conditions set forth in Articles 7.3 and 9.2(a) shall have been satisfied.

"Consents" : All such approvals, consents, authorisations, notifications, concessions, acknowledgements, agreements, licenses, permits, decisions or similar item required to be obtained from, any Governmental Authority for THE SELLER for the construction, financing, ownership, operation and maintenance of the Facility.

"Contract Year" : The 12-month period commencing on the Commercial Operations Date of the first Unit and each 12-month period thereafter.

"Construction Contractor" : The firm or firms retained by THE SELLER to provide services in connection with the design, engineering, procurement, construction, testing    and commissioning of the Facility.

"Construction Contracts" : All contracts to be entered into between THE SELLER and the Construction Contractor in connection with the design, engineering, procurement, construction, installation, testing and commissioning of the Facility and the Interconnection Facilities, as amended from time to time.

"Consumables"    : Consumables are oil, grease, diesel fuel, chemicals, ink, paper, water treatment and the like required for the proper operation of the Facility.

"Contractors"    : The Construction Contractor and the Operation and Maintenance Contractor.

"Conversion"    : The addition or modification to, or change in, or replacement or renewal (otherwise than in the ordinary course in accordance with Prudent Utility Practices) of the Units, equipment, machinery or facilities used by THE SELLER for the purposes of, or incidental to, the production of electricity at the Facility or the receipt, storage, treatment and transmission to the Facility of the Fuel at or from the Fuel storage facility.

"Conversion Period" : The period required for the Conversion with an additional testing period of 3 months.

"Day"    : The 24-hour period beginning and ending at 12.00 midnight Tanzania Time

"Debt Component" :    The meaning ascribed thereto in Appendix B.

"Dependable Capacity" : The capacity of the Facility (and measured in kilowatts at the applicable Interconnection Point) to be made available by THE SELLER to TANESCO as provided for in Article 9.2.

"Derated Hour" : For any period, any hour during such period when any portion (but not al



3

of the Dependable Capacity of the Facility is not available due to a Forced Outage, Maintenance Outage or Scheduled Outage.

"**Description of the Facility**" : The description of the Facility as described in Appendix A.

"**Despatch**" : Instructions, in accordance with Prudent Utility Practices, from the Grid Control Centre, directing the Facility to commence, increase, decrease or cease the delivery of electricity into the TANESCO System.

"**Dispute**" : Any dispute or disagreement of any kind whatsoever between TANESCO and THE SELLER in connection with or arising out of this Agreement.

"**Effective Date**" : The date of the execution and delivery of this Agreement by THE SELLER and TANESCO.

"**Emergency Condition**" : A condition or situation that in TANESCO's and THE SELLER'S reasonable judgement presents an imminent physical threat of danger to life, health or property, or could reasonably be expected to cause a significant disruption on the TANESCO System and could reasonably be expected to adversely affect TANESCO's ability to meet its obligations to provide safe, adequate and reliable electric service to its customers including other utilities with which TANESCO is interconnected.

"**Energy Billing Period**" : The period between (i) the Initial Operations Date and the first monthly meter reading used for billing purposes pursuant to Article VI, and (ii) any two consecutive monthly meter readings used for billing purposes pursuant to Article VI.

"**Energy Payment**" : For each Energy Billing Period, the Energy Purchase Price to be paid by TANESCO to THE SELLER for each kWh of Net Electrical Output subject to Minimum Quantity, as ascribed thereto in Article 5.1(b).

"**Energy Purchase Price**" : The amount expressed in Shillings per kWh subject to Minimum Quantity, identified as the Energy Purchase Price in Appendix B, as such amount is adjusted from time to time in accordance with the provisions of Appendix B or (b) the amount nominated by THE SELLER pursuant to Article 5.1(b).

"**Equivalent Availability Factor**" : For any period, the availability of the Facility to produce electrical energy (measured in kilowatt-hours at the applicable Interconnection Points) during such period for delivery to TANESCO at the Interconnection Points, as determined by the following equation and expressed as a percentage:

$$EAF = ((PH - EDH)/PH) * 100$$

where,

| | | |
|---|---|---|
| EAF | = | Equivalent Availability Factor for such period. |
| EDH | = | Equivalent Derated Hours for such period. |
| PH | = | Period Hours in such period. |
| * | = | Multiply |





4

Equivalent Derated Hours shall be calculated in accordance with the following formula :

$$\text{EDH} = \sum_{x=1}^{n} \frac{(DC-NGC) \cdot t_x}{DC}$$

where :

| | | |
|---|---|---|
| EDH | = | Equivalent Derated Hours for such period |
| DC | = | Dependable Capacity (kW) for such period |
| n | = | Total number of sub-periods in such period where DC differs from NGC |
| NGC | = | net generating capacity (kW) of each sub-period where DC differs from NGC |
| t | = | number of Derated Hours of each sub-period where NGC is less than DC or number of hours of each sub-period where NGC is more than DC. |
| x | = | each sub-period where DC differs from NGC |
| * | = | multiply |

**"Escrow Account"** : The account established by TANESCO or GOT pursuant to Article 6.6.

**"Escrow Agreement"** : The agreement between TANESCO or GOT, THE SELLER and the Escrow Bank in Tanzania controlling the disposition of funds deposited in the Escrow Account by TANESCO or GOT.

**"Escrow Bank"** : A bank in Tanzania with which TANESCO or GOT establishes the Escrow Account.

**"Facility"** : The electricity generating facility described in Recital 1, with the exception that prior to the Commercial Operations Date of any such Unit(s), the Facility shall refer expressly to such Units where the Commercial Operations Date has been declared.

**"Financial Closing"** : The date on which the Financing Documents relating to the construction financing for the Facility shall have been entered into by THE SELLER and the other parties thereto, and all conditions for the initial borrowing by THE SELLER under such Financing Documents shall have been satisfied by THE SELLER or waived by the Financing Parties thereunder.

**"Financing Documents"** : The loan agreements (including agreements for any subordinated debt), notes, bonds, indentures, security agreements and any other documents relating to the financing or refinancing for the construction, ownership, operation and maintenance of the Facility by THE SELLER.

**"Financing Parties"** : Lenders providing financing or refinancing to THE SELLER for the design, construction, ownership, operation and maintenance of the Facility by THE SELLER.

**"FM Ratio"** : As provided in Article 15.

**"Force Majeure Events"** : The Force Majeure Events described in Article 15.1.



"Forced Outage" : Any interruption (excluding an interruption due to a Force Majeure Event during the Conversion Period, a request by TANESCO in accordance with this Agreement, or a condition caused by TANESCO or the TANESCO System) or reduction of the electricity generating capability of the Facility that is not the result of a Scheduled Outage or Maintenance Outage.

"Fuel" : Fuel Oil and Natural Gas with the proposed fuel specifications set forth in Appendix F for the generation of electrical energy, the type of which may be changed from time to time upon the consent of both Parties.

"Fuel Oil" : Fuel oil and Industrial Diesel Oil.

"Fuel Supplier" : The parties with whom contracts are or to be entered into by THE SELLER for the supply and transportation of fuel for the Facility.

"Fuel Supply Contract(s)" : The contracts entered into or to be entered into by THE SELLER for the supply and transportation of fuel for the Facility.

"Grid Control Centre" : The Grid Control Centre of TANESCO as designated in writing by TANESCO from time to time as being the primary TANESCO Grid Control Centre for the Facility.

"GOT" : The Government of the United Republic of Tanzania and its successors.

"Governmental Authority" : Any state, municipal or local government or regulatory department, body, political subdivision, commission, instrumentality, agency, ministry, court, judicial or administrative body, taxing authority or other relevant authority having jurisdiction over either Party, the Facility.

"Guarantee" : The guarantee by the GOT for the payment obligations of TANESCO under this Agreement, in substantially the form provided in Schedule 1 of the Implementation Agreement, as maybe amended from time to time.

"Implementation Agreement" : The Implementation Agreement dated 8th June 1995 between GOT and THE SELLER, as maybe amended from time to time.

"Invoice for Bonus Payments" : A written invoice for Bonus Payment provided to TANESCO by THE SELLER pursuant to Article 6.5.

"Invoice for Penalty Payments" : A written invoice for Penalty Payment provided to THE SELLER by TANESCO pursuant to Article 6.5.

"Invoice Dispute Notice" : The meaning ascribed thereto in Article 6.8.

"Independent Engineer" : The internationally reputable consulting engineering firm or professional engineer retained by THE SELLER and approved by the Financing Parties as the independent engineer of THE SELLER in connection with the design and construction of the Facility.

"Initial Operations Date" : The first date on which electrical energy is generated by the Facility and metered in accordance with Article XI at any of the Interconnection Points.

"Interconnection Facilities" : All of the facilities determined by TANESCO and THE SELLER to be necessary (in accordance with Prudent Utility Practices) to enable TANESCO to receive electrical energy from the Facility and to maintain the stability of the TANESCO System as more specifically described in Appendix E.

"Interconnection Point" : Any of the physical points where the Facility and the TANESCO

6

System are connected as shown in Appendix E or such other point or points as the Parties may agree.

| "kJ" | : | Kilojoule |
| "kV" | : | Kilovolt |
| "kVAr" | : | Kilovolt Ampere Reactive |
| "kVArh" | : | Kilovolt Ampere Reactive hour |
| "kW" | : | Kilowatt |
| "kWh" | : | Kilowatt-hour |

"Lapse of Consent" : Any Consent (a) ceasing to remain in full force and effect or (b) not being issued or renewed upon application having been properly and timely made and diligently pursued or (c) being made subject, subsequent to its grant, to any terms or conditions that, in each case, materially and adversely affects THE SELLER's ability to perform its obligations under any document included within the Security Package, in each of the above instances through no fault of THE SELLER.

"Law" : Includes the State, Municipal and local laws of the United Republic of Tanzania, and all orders, rules, regulations, decrees, Policies, judgments and notifications made pursuant thereto, as such orders, rules, regulations, decrees, Policies, judgments and notifications as maybe amended from time to time.

"Lenders"    : The lenders party to the Financing Documents, together with their successors and assigns.

"Licence" : The licence required by THE SELLER pursuant to Section 4 of the Electricity Ordinance 1931 to enable THE SELLER to own, operate and maintain the Facility and supply energy to TANESCO therefrom.

"Loss" : Any and all loss, damage, liability, payment and obligation (excluding any indirect or consequential loss, damage, liability, payment or obligation), and all expenses (including without limitation reasonable legal fees).

"Maintenance Outage" : An interruption or reduction of the electricity generating capability of the Facility that (i) is not a Scheduled Outage, (ii) not during the Conversion Period, (iii) has been coordinated with TANESCO in accordance with Article 9.4 and (iv) is for the purpose of performing work on specific components of the Facility.

"Maintenance Schedule" : The meaning ascribed in Article 9.6.

"Metering Device" : All meters and metering devices (including remote terminal units) installed by THE SELLER and owned by TANESCO and used to measure Dependable Capacity, and payment purposes, the delivery and receipt of Net Electrical Output.

"Minimum Indemnification Amount" : The amount, equal to USD 100,000 that a Party's claim for indemnification pursuant to Article 17.

"Minimum Quantity" : Following the generation of electrical energy on Natural Gas, for each Energy Billing Period or such other period as maybe determined by the Parties TANESCO shall purchase or deemed to have purchased from THE SELLER such energy in kilowatt-hour or the equivalent Natural Gas which THE SELLER is required to purchase under the Fuel Supply Contracts.

"**Month**" : A calendar month according to the Gregorian calendar beginning at 12.00 midnight on the last day of the preceding month and ending at 12.00 midnight on the last day of that month.

"**MMBTU**"      :      One million British Thermal Units.

"**MW**"      :      Megawatt.

"**MWh**"      :      Megawatt-hours or 1000 kilowatt-hours.

"**Natural Gas**" : Natural gas to be supplied by GOT or any entity authorised by GOT.

"**Net Capacity**" : With respect to the Facility, the net generating capacity (on a continuous rating basis) of such Facility (measured in kilowatts at the applicable Interconnection Points), as the case may be, to be determined as set forth in Appendix 1 (as adjusted from time to time to take account of any reduction in the net generating capacity of such Facility). Provided always that in the event of TANESCO System constrain in establishing the Net Capacity of all the Units simultaneously at the Interconnection Point, the Net Capacity of the Facility will be obtained through the summation of the net generating capacity of the Units.

"**Net Electrical Output**" : With respect to the Facility for any period, the electrical energy output of such Facility (measured in kilowatt-hours at the applicable Interconnection Points), net of station use.

"**Notice of Intent to Terminate**" : A notice delivered by THE SELLER or TANESCO, as the case maybe, of it's intent to terminate this Agreement pursuant to Article 16.3 due to default of the other Party.

"**Operating Procedures**" : The meaning ascribed thereto in Article 7.4(c).

"**Parties**" : Both TANESCO and THE SELLER.

"**Party**" : One of the parties defined in the first paragraph of the Agreement.

"**Pass-Through Items**" : Certain costs or charges identified as Pass-Through Items in Appendix B.

"**Penalty Payments**" : The meaning ascribed thereto in Article 6.5(a).

"**Period Hours**" : With respect to any period, the number of hours during such period (including any Force Majeure Event hours).

"**Person**" : Any individual, corporation, partnership, joint venture, trust, unincorporated organization or government agency.

"**Policies**" : Such policies adopted by the GOT, Governmental Authority, as have been published.

"**Prescribed Fee**" : With respect to any Consent, the charge or fee, if any, prescribed by the Law.

"**Project Contracts**" : The engineering, procurement and Construction Contracts, Fuel Supply Contracts, operations and maintenance agreement, and any material contract including but not limited to contracts relating to the development, construction, operations or maintenance of the Facility.

"**Prudent Utility Practices**" : The practices generally followed by the electric utility industry including independent power producers as changed from time to time, which generally include, but are not limited to, engineering and operating considerations, the use of equipment practices, methods and adherence to applicable industry codes, standards and regulations.

8

"Scheduled Commercial Operations Date" :  The date that is 28 months after Financial Closing, as such date is extended for Force Majeure Events in accordance with provisions of Article XV.

"Scheduled Outage" :  A planned interruption of the electricity generating capability of the Facility that (i) is not a Maintenance Outage, (ii) is not during the Conversion Period, (iii) has been coordinated in advance with TANESCO with a mutually agreed start date and duration pursuant to Article 9.3 and (iv) that is required for the inspection, preventive maintenance or corrective maintenance, repair or improvement of the Facility.

"Security Package" : The following: (a) Implementation Agreement; (b) this Agreement; (c) Fuel Supply Contracts; (d) Operation and Maintenance Agreement, if any; (e) Construction Contracts; (f) Financing Documents; (g) Insurance Policies; (h) Guarantee; and (j) Instruments conveying title to the Site.

"Site" : The parcel of land upon which the Facility is to be constructed and located as more specifically described in Appendix A.

"Site Conditions" : The following assumed ambient conditions:

| | |
|---|---|
| Ambient Air Temperature | 35deg Dry bulb |
| Atmospheric Pressure | 1013 mbar |
| Ambient Relative Humidity | 85 % |
| Power Factor Level | 0.85 lagging |
| Site Altitude | 28m above MSL |

"Shillings"      : The lawful currency of the United Republic of Tanzania.

"Supplemental Tariff" : Additional compensation payable by TANESCO to THE SELLER pursuant to Articles 5.2.

"Supplemental Tariff Payments" : The payments for the Supplemental Tariff in accordance with the payment schedule agreed by THE SELLER and TANESCO, which shall be designed to permit THE SELLER to the recover the Supplemental Tariff over the Term.

"Supplemental Charges" : Certain costs or charges identified as Supplemental Charges in Appendix B.

"TANESCO" :      Tanzania Electric Supply Company Limited or any successors thereto.

"TANESCO Letter of Credit" : The revolving, unconditional and irrevocable direct pay letter of credit issued by a first class Bank  in Tanzania reasonably acceptable in form to THE SELLER, in an amount equal to an aggregate of two (2) Months of Capacity Payments and Energy Payments (each as adjusted in accordance with Appendix B) computed on the basis of the declared Dependable Capacity.

"TANESCO System" : The power network controlled or used by TANESCO for the purpose of generating, transmitting, and distributing electricity to TANESCO's customers.

"Tanzania": The United Republic of Tanzania.

"Term" : The period of this Agreement as specified in Article 2.1 and any extension thereof in accordance with Articles 2.2 and 2.3.

"Test Energy" : The electrical energy associated with the start-up and commissioning of the



9

Facility and metered in accordance with Article XI at the Interconnection Points.

"Test Energy Payment" : The meaning ascribed thereto in Article 5.1(c).

"THE SELLER" : Independent Power Tanzania Ltd., a limited liability company incorporated under the laws of Tanzania, its successors and permitted assigns.

"Unit" : Refers to each Unit of electricity generating engine, its, auxillary and generator.

"USD", "Dollars" : The lawful currency of the United States of America.

"Week" : Each period of seven (7) consecutive Days beginning at 12.00 midnight Tanzania time falling between a Sunday and Monday.

1.2     **Construction of Certain Terms and Phrases:**

(i)     words of any gender include every other gender;

(ii)    words using the singular or plural number also include the plural or singular number, respectively;

(iii)   the Terms "hereof", "herein", "hereby" and similar words refer to this entire Agreement and not any particular Article, Section, Subsection, Exhibit, Appendix or Schedule or any other subdivision of this Agreement;

(iv)    references to "Article", "Section", "Subsection", "Exhibit", "Appendix" or "Schedule" are to this Agreement;

(v)     the words "include" or "including" shall be deemed to be following by "without limitation" or "but not limited to" whether or not they are followed by such phrases or words of like import;

(vi)    reference to any statute or statutory provision shall be construed as a reference to the same as it may have been, or may from time to time be, amended, modified or re-enacted; and

(vii)   references to "this Agreement" or any other agreement or document shall be construed as a reference to this Agreement or such document as amended, modified or supplemented from time to time and shall include a reference to any document which amends, modifies or supplements it or is entered into, made or given pursuant to or in accordance with its Terms;

(viii)  unless stated otherwise all references to MW output, heat rate and or efficiency are at Site Conditions.

(ix)    unless otherwise provided herein, whenever a consent or approval is required by one Party from the other Party, such consent or approval shall not be unreasonably withheld or delayed.

All accounting terms used herein and not expressly defined herein shall have the meanings given to them under generally accepted accounting principles of the United Republic of Tanzania applied on a consistent basis with those used in the preparation of the latest financial statement of THE SELLER.

**END OF ARTICLE**

10

## ARTICLE II - TERM

### 2.1    Initial Term

This Agreement shall become effective as of the Effective Date and shall continue in effect for an initial period ending on the date that is 20 years from the last Commercial Operations Date unless otherwise extended or terminated in accordance with the provisions of this Agreement.

### 2.2    Extension of Term

The initial term of this Agreement or subsequent extension periods may be extended for a further term of 5 years if either TANESCO or THE SELLER requests an extension of this Agreement. The parties shall promptly enter into good faith negotiations to reach an agreement on the extension of this Agreement, on terms and conditions mutually acceptable to both parties, provided always that the agreement on such extension is reached at least 1 year prior to the end of the initial term or subsequent extension periods, as the case may be. If the Parties cannot agree to the terms and conditions for the extension of this Agreement, THE SELLER will be permitted to contract with any other party for the sale of dependable capacity and electrical energy from the Facility and TANESCO shall deliver to the SELLER any necessary Consents for such sale, provided, however, that TANESCO shall have no obligation to assist in such sale unless otherwise required by law.

### 2.3    Force Majeure Extension

The Term shall automatically be extended by the aggregate of Days all Force Majeure Events declared by THE SELLER were in existence. During each Month of such extension, THE SELLER shall be paid the Debt Component of the Capacity Purchase Price as in existence during such Force Majeure Event plus the Capital Component of the Capacity Purchase Price applicable to the 20th Contract Year (as shall be further escalated pursuant to the provisions of Appendix B) multiplied by the then prevailing Dependable Capacity. The Term shall automatically be extended by the aggregate of Days all Force Majeure Events declared by TANESCO were in existence. During each Month of such extension, THE SELLER shall be paid the Capital Component of the Capacity Purchase Price applicable to the 20th Contract Year (as shall be further escalated pursuant to the provisions of Appendix B) multiplied by the then prevailing Dependable Capacity. During any such extensions, THE SELLER shall also receive the Energy Purchase Price.

**END OF ARTICLE**





## ARTICLE III - SALE AND PURCHASE OBLIGATIONS

### 3.1    Sale and Purchase of Test Energy

As to each Unit, subject to the terms and conditions of this Agreement, THE SELLER shall sell and deliver, and TANESCO shall purchase and accept, all Test Energy beginning on the Initial Operations Date and continuing until earlier of either (A) the date this Agreement is terminated or (B) the date immediately preceding the Commercial Operations Date of that Unit.

### 3.2    Sale and Purchase of Electrical Energy

Subject to the terms and conditions of this Agreement THE SELLER shall sell and deliver, and TANESCO shall purchase and accept, on and after, the Commercial Operations Date for each Unit and for the Term, the Net Electrical Output from the Facility as the Facility is Despatched by TANESCO from time to time pursuant to Article VIII provided always that if electrical energy is generated on Natural Gas, TANESCO shall purchase or deemed to have purchased from THE SELLER the Net Electrical Output or the Minimum Quantity, whichever shall be the greater for each Energy Billing Period or such other period as may be determined by the Parties.

### 3.3    Sale and Purchase of Dependable Capacity

Except as provided in this Agreement, including Article 3.4, THE SELLER shall sell and make available, and TANESCO shall purchase and pay for, from and after, the Commercial Operations Date for each   Unit and for the Term of this Agreement, a level of Dependable Capacity up to but not exceeding the Net Capacity of the Facility as established pursuant to Article 9.2.

### 3.4    THE SELLER's Obligation to Provide Power During System Emergencies

Notwithstanding any other provision of this Article III,  THE SELLER agrees that, during Emergency Condition and situations where the safety, reliability, or security of the TANESCO System is threatened, THE SELLER shall, at TANESCO's request, use reasonable efforts to provide electrical energy or capacity consistent with Prudent Utility Practices and/or  use reasonable efforts to delay or to accelerate any Scheduled Outage and Maintenance Outage of the Facility.  TANESCO shall reimburse THE SELLER for any additional costs incurred by THE SELLER as a result of its reasonable efforts to provide electrical energy referred to in this Article 3.4.

### 3.5    Exceptions to TANESCO's Obligation To Accept Electrical Energy

Notwithstanding the above provisions and in addition to the provisions of Article XV, TANESCO shall not be obligated to accept electrical energy from the Facility if any of the events described below occur:

(a)        an Emergency Condition occurs on the part of the TANESCO System that is interconnected with the Facility such that there would be no means of delivering electrical  energy from the Facility to the remainder of the TANESCO System provided that such failure of means is not attributable to omission on the part of TANESCO. Such refusal to purchase may occur on an instantaneous basis, provided that TANESCO shall give THE SELLER advance notice of such occurrence(s) and duration of the Emergency Condition to the extent practicable under the circumstance then prevailing and shall give THE SELLER an explanation of such occurrence(s) after the fact where advance notice is impractical.



(b)    TANESCO intentionally interrupts the acceptance of electrical energy from the Facility to conduct necessary maintenance of TANESCO's Interconnection Facilities, metering equipment or adjacent transmission and distribution facilities pursuant to TANESCO's schedule of planned maintenance under Article 9.6. In such instances, TANESCO shall give THE SELLER as much advance notice as possible with duration of the interruption but in no event less than 7 Business Days prior to any such planned maintenance under Article 9.6.

(c)    In the reasonable opinion of TANESCO, the Facility produces electrical energy of a character inconsistent with that described in Appendix G or that may adversely affect the safety, reliability or security of TANESCO's equipment, facilities, personnel or system, or the safety, reliability or security of those of any other supplier of electricity to TANESCO or to TANESCO's customers. TANESCO shall notify THE SELLER of this condition and allow THE SELLER reasonable time to correct it. If THE SELLER fails to correct the condition within 15 Days, TANESCO may physically interrupt the flow of electrical energy from the Facility until the condition is corrected or until THE SELLER demonstrates to the reasonable satisfaction of TANESCO that THE SELLER is operating in accordance with the operating standards set forth in Article IX.

For the purposes of this Article 3.5 the occurrence of any such events shall not relieve TANESCO from its obligation to make any payment due under this Agreement, including Energy Payments and Capacity Payments and shall reimburse THE SELLER for any additional costs reasonably incurred by THE SELLER due to the occurrence of any such events, except where the occurrence of any of the foregoing events set forth above is the result of a breach by THE SELLER of its material obligations under this Agreement.

### 3.6.    Prudent Utility Practices

All action required or taken under this Agreement by either Party including this Article III shall be consistent with Prudent Utility Practices.

END OF ARTICLE



13

## ARTICLE IV - CONDITIONS PRECEDENT

### 4.1    Conditions Precedent to Purchase Obligations

The obligations of TANESCO under this Agreement to purchase electrical energy and capacity from THE SELLER are contingent upon THE SELLER's compliance with the following conditions.

(a)    Prior to the Commencement Date, THE SELLER shall, at its own expenses, (i) make or cause to be made all applications (whether initial applications or renewal applications) for Consents to the appropriate Governmental Authority, shall diligently pursue all such applications and shall use all reasonable efforts to maintain in effect the Consents once obtained; (ii) give all required notices and allow all required inspections under all Consents obtained by it in connection with the Facility; and (iii) pay all Prescribed Fee in connection with such Consents. The information supplied in the applications shall be complete and accurate and shall satisfy the substantive and procedural requirements of the applicable Law. TANESCO shall cooperate with THE SELLER in connection with, and support THE SELLER's applications for Consents as THE SELLER may reasonably request from time to time.

(b)    Not less than 30 Days prior to the Commencement Date, THE SELLER shall submit to TANESCO the general layout drawings of the Facility, which submission shall be accompanied by a certificate from the Independent Engineer stating that (i) the Facility, when constructed in accordance with such general layout drawings, will (A) conform with the Description of the Facility, (B) meet any requirement for supplying reactive power at  the Facility within the rated power factor capability of the generators, and (C) meet the guidelines and performance standards for parallel operation set forth in Appendix C, (ii) it is technically and financially feasible for the Commercial Operations Date to occur on or before the Scheduled Commercial Operations Date and (iii) the Facility has a useful life no shorter than the initial Term.

(c)    As soon as available, but in any event prior to the Initial Operations Date of each Unit, THE SELLER shall provide to TANESCO a certificate from the Independent Engineer stating that the Facility has been designed and constructed in accordance with Prudent Utility Practices, and in all material respects with the terms of this Agreement and the general layout drawings submitted to TANESCO pursuant to Article 4.1(b).

### 4.2    Conditions Precedent to the Seller's Obligations

Notwithstanding anything in this agreement to the contrary, it is a condition precedent to the obligations of THE SELLER hereunder that :

(a)    THE SELLER shall have received the Guarantee by the GOT for the payment obligations of TANESCO under this Agreement.

(b)    THE SELLER shall have received any necessary easements, rights-of-way or wayleave directly related to the Facility, as necessary for THE SELLER to perform its obligations under this Agreement and the Project Contracts.

(c)    THE SELLER shall have received all Consents required to commence and complete construction of the Facility and to own the Facility on or prior to the Commencement Date.



(d)    The Fuel Supply Contract shall have been executed prior to the Initial Operatio
Date.

(e)    The Financial Closing shall have occurred.

**END OF ARTICLE**





## ARTICLE V - PURCHASE PRICE AND OTHER CHARGES

**5.1**     Purchase Price : Capacity and Energy

TANESCO agrees to pay THE SELLER the following amounts from and after the Init
Operations Date of the first Unit:

(a)     Capacity Payment

For each Capacity Billing Period commencing on and after the Commerc
Operations Date for the Facility, TANESCO shall pay the Capacity Payment to TH
SELLER. The Capacity Payment shall be equal to the product of the Capac
Purchase Price and the Dependable Capacity in effect during such Capacity Billi
Period.

(b)     Energy Payment

For each Energy Billing Period commencing on and after the Commercial Operatio
Date of the first Unit, TANESCO shall pay THE SELLER the Energy Purchase Pr
for each kWh Net Electrical Output.

(c)     Test Energy Payment

For each kWh of Test Energy generated from the Facility and metered by t
TANESCO-owned metering equipment at the Interconnection Points before t
applicable Commercial Operations Date, TANESCO shall pay THE SELLER
amount equal to the (aa) Fuel Costs Component less the costs of Fuel stored in t
Fuel storage tank prior to the Initial Operations Date of the first Unit (bb) lubricati
oil and (cc) Consumables, it being understood that no Capacity Payment shall be pa
by TANESCO to THE SELLER under this Article 5.1(c).

**5.2**     Supplemental Tariff

(a)     Change in Law

In the event of the occurrence of a Change in Law that requires a mater
modification or a material capital addition to the Facility, which is completed by TH
SELLER, and the Implementation Agreement is not terminated pursuant to Artic
17.8(a) or Article 17.8(b) thereof, THE SELLER will be entitled to recei
Supplemental Tariff Payments from TANESCO in accordance with the procedures
forth in Appendix B. Such Supplemental Tariff Payments will allow THE SELLE
to recover the costs of complying with the Change in Law, including (i) the cost
any material modifications or material capital additions to the Facility that a
necessary for THE SELLER to come into compliance with the Change in Law a
are approved in accordance with Article 17.7(d) of the Implementation Agreement a
(ii) the cost of consumable or additional quantities of consumable that can be direc
attributed to compliance by THE SELLER with the Change in Law.

(b)     Force Majeure Events

In the event that a Force Majeure Events results in damage to, or other adver
effects on, the Facility which is repaired or otherwise remedied by THE SELLE
and the Implementation Agreement is not terminated pursuant to Article 17.8(a)
Article 17.8(b) thereof THE SELLER shall be entitled to receive Supplemental Tar
Payments from TANESCO in accordance with the procedures set forth in Appen
B to recover the difference between the restoration costs approved in accordance w

16

Article 17.7(d) of the Implementation Agreement and any insurance proceeds by THE SELLER as a result of the occurrence of the Force Majeure Event.

### 5.3    Supplemental Charges

In addition to the Capacity Payment and Energy Payment, THE SELLER shall be entitled to Supplemental Charges as identified in Appendix B.

### 5.4    Penalty and Bonus Payments

(a)    If in any Contract Year the Equivalent Availability Factor shall be less than 85%, THE SELLER shall pay TANESCO, as penalty, the Penalty Payment, calculated in accordance with the following formula:

$$PP = (0.85 - EAF) * Y$$

(b)    If in any Contract Year the Equivalent Availability Factor shall be more than 90%, TANESCO shall pay THE SELLER, as bonus, the Bonus Payment, calculated in accordance with the following formula :

$$BP = (EAF - 0.90) * Y$$

PP    =    Penalty Payment.

BP    =    Bonus Payment.

EAF    =    Equivalent Availability Factor.

Y    =    Capacity Damages Amount.

*    =    Multiply.

**END OF ARTICLE**

17



## ARTICLE VI - COMPENSATION, READING, BILLING AND PAYMENT

**6.1      Reading of Meters for Energy Payment**

TANESCO and THE SELLER shall jointly read the Metering Device at the Interconnection Points on the last day of each Month in accordance with Article 11.4. TANESCO and THE SELLER shall agree on a mutually convenient time for such reading.

(a)      Billing for Test Energy Payment and Energy Payment

THE SELLER shall prepare and render to TANESCO within 10 Business Days after the end of each Energy Billing Period a statement detailing the meter reading and THE SELLER's calculation of the Test Energy Payment and Energy Payment due to THE SELLER for such Energy Billing Period.

(b)      Payment for Test Energy Payment and Energy Payment

Payment for the Test Energy Payment and Energy Payment for each Energy Billing Period shall be made within 30 Days of the date of the invoice for such Energy Billing Period sent by THE SELLER to TANESCO.

**6.2      Capacity Payment**

(a)      Billing for Capacity Payment

THE SELLER shall prepare and render to TANESCO within 10 Business Days after the end of each Capacity Billing Period a statement detailing the calculation of the Capacity Payment due to THE SELLER for such Capacity Billing Period.

(b)      Payment for Capacity Payment

Payment for the Capacity Payment for each Capacity Billing Period shall be made within 30 Days from the date of invoice from THE SELLER for such Capacity Billing Period.

**6.3      Supplemental Tariff Payments**

If there shall be have occurred a Force Majeure Event or a Change in Law, then upon the termination of the Force Majeure Event or compliance with the Change in Law, as the case may be, and the completion of restoration or modification of the Facility and the resumption of normal operations at the Facility, THE SELLER will be entitled to invoice TANESCO and TANESCO shall pay to THE SELLER in addition to the Capacity Payment and the Test Energy Payment and Energy Payment pursuant to Article 5.1(a), 5.1(b) and 5.1(c), the Supplemental Tariff Payments. Invoices for Supplemental Tariff Payments shall be delivered by THE SELLER and paid by TANESCO in the same manner as invoices for Capacity Payments as provided in Article 6.2. Except for the return on equity on any additional equity contributions made by THE SELLER and any portions of the Supplemental Tariff to cover the cost of additional consumable, the Supplemental Tariff shall be escalable under Appendix B.

**6.4      Supplemental Charges**

Unless specifically provided otherwise in Appendix B any amounts or portions of amounts that are Supplemental Charges may be invoiced by THE SELLER on a Monthly basis at any time after the first Day of the Month following the Month in which any such Supplemental Charges



18

are incurred by THE SELLER and shall state that the due date for payment of such invoice by TANESCO which shall be the date 10 Business Days following the date of delivery of such invoice. With respect to invoices for Pass-Through Items, such invoices from THE SELLER to TANESCO shall be accompanied by the invoice to THE SELLER for which recovery from TANESCO is being sought.

**6.5    Penalty and Bonus Payment**

(a)    Penalty Payment

      (i)    Within 30 Days after the end of the Contract Year, subject to THE SELLER's review, TANESCO shall compute and advise THE SELLER in the Invoice for Penalty Payments of the amount of Penalty Payments due to TANESCO pursuant to this Agreement for the preceding Contract Year. Disputes regarding payments of any amount specified in an Invoice for Penalty Payments shall be resolved pursuant to the terms of Article 6.8.

      (ii)    THE SELLER shall pay the invoice amount to TANESCO by no later than 30 Days after delivery by TANESCO of the Invoice for Penalty Payments. Late payments shall bear interest at a rate per annum equal to the Base Lending Rate plus two percent per annum (or at the Base Lending Rate in the event that THE SELLER has notified TANESCO within such 30 Day period that it disputes such payment and pays within such 30 Day period all undisputed amounts) compounded semi-annually and shall be computed for the actual number of Days on the basis of a three hundred sixty-five (365) day year.

(b)    Bonus Payment

      (i)    Within 30 Days after the end of the Contract Year, subject to TANESCO's review, THE SELLER shall compute and advise TANESCO in the Invoice for Bonus Payments of the amount of Bonus Payment due to THE SELLER pursuant to this Agreement for the preceding Contract Year. Disputes regarding payments of any amount specified in an Invoice for Bonus Payments shall be resolved pursuant to the terms of Article 6.8.

      (ii)    TANESCO shall pay the invoice amount to THE SELLER by no later than 30 Days after delivery by THE SELLER of the Invoice for Bonus Payments. Late payments shall bear interest at a rate per annum equal to the Base Lending Rate plus two percent per annum (or at the Base Lending Rate in the event that TANESCO has notified THE SELLER within such 30 Day period that it disputes such payment and pays within such 30 Day period all undisputed amounts) compounded semi-annually and shall be computed for the actual number of Days on the basis of a three hundred sixty-five (365) day year.

**6.6    TANESCO or GOT Security**

(a)    On the Commercial Operations Date, TANESCO shall provide to THE SELLER the TANESCO Letter of Credit, which shall have a term of twelve (12) Months from the Commercial Operations Date. Not less than ten (10) Days prior to the expiration of the TANESCO Letter of Credit and any subsequent TANESCO Letter of Credit TANESCO shall provide a replacement TANESCO Letter of Credit which shall have a term of twelve (12) Months from the expiration of the immediately preceding TANESCO Letter of Credit. The TANESCO Letter of Credit shall provide for draws by THE SELLER on a Monthly basis in immediately available funds, upon presentation of a certificate of an authorized officer of THE SELLER, stating that the amounts shown in the invoice accompanying the certificate are due and payable by



19

TANESCO to THE SELLER under this Agreement and (2) an invoice for such amount has been delivered to TANESCO at least 10 Business Days prior to the presentation of the certificate and either (aa) no amount shown in such invoice have been disputed by TANESCO or (bb) a portion of the amount shown in the invoice has been disputed by TANESCO, identifying such disputed amount. The certificate shall be accompanied by the relevant invoice delivered to TANESCO and any Invoice Dispute Notice to THE SELLER by TANESCO. THE SELLER shall not be entitled to draw any amount shown in the invoice to TANESCO that have been disputed by TANESCO. The TANESCO Letter of Credit provided pursuant to this Article 6.6(a) shall be maintained in the required amount throughout the Term. The TANESCO Letter of Credit shall be reinstated to the full required amount within 30 Days of any draw therein by THE SELLER.

(b)      Notwithstanding the provisions of Article 6.6(a) above, in lieu of delivering the TANESCO Letter of Credit or any replacement TANESCO Letter of Credit, TANESCO or GOT may in its sole discretion establish with the Escrow Bank an Escrow Account equal to the then-required amount of the TANESCO Letter of Credit from which only amounts due and payable by TANESCO to THE SELLER under this Agreement may be withdrawn. The Escrow Agreement governing this account shall provide for withdrawals from the account upon presentation of a draft executed by THE SELLER, for any amount due and payable by TANESCO under this Agreement and shall be accompanied by (1) a certificate executed by an authorized officer of THE SELLER stating that (aa) amounts due and payable by TANESCO to THE SELLER under this Agreement have been invoiced to TANESCO in accordance with this Agreement at least 10 Business Days prior to the presentation of the certificate and (bb) either (xx) no amount shown in such invoice have been disputed by TANESCO or (yy) a portion of the amount shown in the invoice has been disputed by TANESCO, identifying such disputed amount, (2) the relevant invoice delivered to TANESCO and (3) the Invoice Dispute Notice delivered to THE SELLER by TANESCO, if any. THE SELLER shall not be entitled to draw any amount shown in the invoice to TANESCO that have been disputed by TANESCO. If and for so long as TANESCO or GOT maintains the Escrow Account in lieu of the TANESCO Letter of Credit, the Escrow Accounts shall be reinstated to the full required amount within 30 Days of any draw therein by THE SELLER. For so long as TANESCO or GOT maintains the Escrow Account in lieu of the TANESCO Letter of Credit, THE SELLER shall draw or collect all amounts due and payable by TANESCO under this Agreement directly from the Escrow Account established by TANESCO or GOT.

(C)      If TANESCO is required by the provisions of this Article VI to pay Capacity Payments, Energy Payments, Supplemental Tariff Payments and Charges and Bonus Payment, THE SELLER may draw or collect such amounts directly from the TANESCO Letter of Credit or, if TANESCO or GOT has established the Escrow Account pursuant to Article 6.6(b), the Escrow Account.

**6.7      Payment**

(a)      THE SELLER shall draw on the TANESCO Letter of Credit pursuant to Article 6.6(a) or the Escrow Account pursuant to Article 6.6(b), for the amount due to THE SELLER under Articles 6.1, 6.2, 6.3 and 6.4 as the case maybe, less any disputed amounts, on or after the tenth (10) Business Day following the Day the invoice is delivered to TANESCO.

(b)      If any undisputed payment from TANESCO shall not be paid when due, there shall be due and payable to THE SELLER interest therein, calculated at the rate of 2% above the Base Lending Rate, from the date on which such payment became overdue to and until such payment is paid in full.



20

**6.8**    **Payment Disputes**

(a)    In the event of any disputes on the accuracy of a bill, either party may serve notice (an "Invoice Dispute Notice") within five (5) Business Days from the date of the invoice on the other Party that the amount or part thereof of the invoice submitted to a Party is in dispute. Each Invoice Dispute Notice shall specify the invoice concerned, the amount of the dispute and the basis therefore. A copy of any Invoice Dispute Notice delivered by TANESCO to THE SELLER shall also be delivered to the TANESCO Letter of Credit issuing bank or the Escrow Bank, as appropriate. Until a copy of the Invoice Dispute Notice delivered by TANESCO to THE SELLER is received by the TANESCO Letter of Credit issuing bank or the Escrow Bank, as appropriate, such bank shall be entitled to assume that no amount shown in the relevant invoice delivered by THE SELLER for payment is disputed by TANESCO.

(b)    If either Party disputes the accuracy of a bill, the Parties shall use their best efforts to resolve the dispute in accordance with Article 18.1. Any adjustments which the parties may subsequently agree to make with respect to any such billing dispute shall be made by a credit or additional charge on the next bill rendered. If the Parties are unable to resolve the dispute in this manner, any amounts disputed on subsequent bills for the same reason may thereafter be withheld and deposited in the Escrow Account pending final resolution of the dispute in accordance with the procedures described in Article 18.2 but the undisputed amount shall be promptly paid in accordance with this Article VI where applicable.

(c)    Upon resolution of a disputed amount, the amount shall be due and payable to the appropriate Party, with interest therein from the date on which such amount would otherwise have first become overdue hereunder if no dispute had arisen, calculated at the rate of 2% above the Base Lending Rate. The existence of a dispute as to any bill shall not relieve either Party of complying with any other provision of this Agreement.

**6.9**    **No Set-Off**

Any amounts, other than those specified in Articles 6.1 and 6.2, due to either Party under this Agreement shall be paid without set-off against any amounts due under Article 6.1 and 6.2.

**6.10**    **Currency and Timing of Payment**

Notwithstanding anything contained in this Agreement, (i) all payments to be made by either Party under this Agreement shall be made in lawful currency of the United Republic of Tanzania, and (ii) any payment that becomes due and payable on a day that is other than a Business Day shall be paid on the succeeding Business Day.

**6.12**    **Records**

Each Party shall keep properly stored and maintained at its offices, for a minimum of 5 years and for such additional time period as may be required by this Agreement to be maintained and all data, documents and other materials relating to or substantiating any charges to be paid by or to THE SELLER. Each Party and its authorized employees, agents or representatives and auditors shall with prior notice in writing given to the other Party have the right at all reasonable times, to inspect, examine, and copy any such records, data, documents and other materials.

**END OF ARTICLE**



# ARTICLE VII - PRE-OPERATIONS PERIOD AND OPERATIONS PROCEDURE

**7.1**    **Facility Construction and Start-Up**

(a)    The Facility is intended to be constructed in two phases.

(i)    The first phase requires the construction of the Facility to operate and generate electrical energy on Fuel Oil. Upon an appropriate supply of Natural Gas made available by GOT, as the second phase the Facility is to be converted to operate and generate electrical energy on Natural Gas.

(ii)    The second phase requires the Seller to conduct Conversion to enable the Facility to operate and generate electrical energy using Natural Gas, subject to the following conditions precedent:

(A)    appropriate supply of Natural Gas being made available by GOT or any entity authorised by GOT

(B)    any Consents of the Lenders

(C)    the Fuel Supply Contract for the supply of Natural Gas having been executed

(b)    THE SELLER shall provide TANESCO with (i) at least 60 Days prior notice of the proposed Commencement Date, and (ii) written confirmation that the Commencement Date has occurred within 60 Days after the occurrence thereof. Not less than 60 Days prior to the Initial Operations Date, THE SELLER shall submit to TANESCO the commissioning, start-up and testing schedules of the Facility.

(c)    From and after the Commencement Date until the Scheduled Commercial Operations Date of all the Units, THE SELLER shall provide TANESCO with copies of reports describing construction progress.

(d)    From and after the Commencement Date until the Commercial Operations Date of all the Units, TANESCO upon 30 days notice from THE SELLER shall provide the Facility with supply of electricity and THE SELLER shall pay TANESCO for the supply of electricity at TANESCO's prevailing tariff.

(e)    TANESCO shall have the right to have a copy of the general layout drawings of the Facility and upon reasonable prior notice to THE SELLER to observe the progress of the construction, start-up and testing of the Facility, including physical inspections at the Site for the purpose of ensuring that the Facility can operate safely and successfully in parallel with the TANESCO System. THE SELLER shall cooperate with TANESCO to ensure that the Facility's power generation equipment and switch-gear are designed and installed in a manner that will permit the Facility to operate safely and successfully in parallel with the TANESCO System.

(f)    Without the prior written consent of TANESCO (which consent shall not be unreasonably withheld or delayed), THE SELLER shall not make, or permit to be made, any material modification to the design or construction of the Facility if such modification could reasonably be expected to have a material adverse effect on TANESCO's rights under this Agreement or the TANESCO System.

**7.2**    **Initial Operations Date**

(a)    THE SELLER shall provide TANESCO with at least 60 Days prior notice of the

22

proposed Initial Operations Date, which notice shall be accompanied by the proposed hourly delivery schedule of Test Energy from the Facility. TANESCO shall have the right to delay the Initial Operations Date if it reasonably determines that parallel operation of the Facility with the TANESCO System could adversely affect the TANESCO System; provided always that any such delay shall not extend beyond the Scheduled Commercial Operations Date and shall not exceed 5 Days after such proposed Initial Operations Date and provided also that in such event, TANESCO shall within 7 Days of receipt of THE SELLER's notice of the proposed Initial Operations Date give THE SELLER notice of the reason for delaying the Initial Operations Date, and the applicable Party shall proceed promptly to rectify any identified problems, it being understood that if TANESCO exercises its right to delay, unless such delay of the Initial Operations Date is directly attributable to a breach of THE SELLER'S obligations pursuant to this Agreement, TANESCO shall compensate THE SELLER an amount equal to the carrying cost on the debt related to the Facility incurred under the Financing Documents plus fifty percent (50%) of the Capital Component of the Capacity Purchase Price. In the event TANESCO exercises its right under this Article 7.2(a) to delay the Initial Operations Date THE SELLER will be entitled to reschedule the Scheduled Commercial Operations Date. The rescheduled new Scheduled Commercial Operations Date shall take into account the delay of the Initial Operations Date pursuant to this Article and be extended by such length of time that the Initial Operations Date has been delayed.

(b)     No generation of electrical energy from the Facility in a parallel mode with the TANESCO System, whether for testing purposes or otherwise, may take place and the Initial Operations Date may not occur, until (i) all Interconnection Facilities pursuant to Appendix E shall have been installed and (ii) TANESCO has confirmed in writing that parallel operation of the Facility with the TANESCO System may commence pursuant to Article 9.1. Such inspection, and confirmation in writing by TANESCO shall take place not less than 14 Days prior to such proposed Initial Operations Date pursuant to Article 7.2(a) above, provided that the Parties shall have installed all applicable interconnection protective device required for the Facility 30 Days before the proposed Initial Operations Date.

(c)     THE SELLER shall provide TANESCO with written confirmation that the Initial Operations Date has occurred within five (5) Days after the occurrence thereof.

## 7.3    Commercial Operations Date

THE SELLER shall notify TANESCO in writing 14 Days in advance of any proposed Commercial Operations Date, which notice shall also set forth the anticipated Net Capacity of the applicable Unit. The Commercial Operations Date of such Unit shall be deemed to have occurred on the day immediately following the date of expiry of the 14 Days' notice referred to in this Article 7.3 and further subject to Article 9.2(a). The applicable Capacity Billing Period shall commence on such date.

## 7.4    Operating Procedures

THE SELLER shall develop written operating procedures for the Facility no later than thirty (30) Days prior to the then-existing Initial Operations Date. The operating procedures shall be based on the designs of the Metering Device, the Interconnection Facilities and TANESCO System and shall be consistent with the Prudent Utility Practices. The operating procedures shall deal with all operational interfaces between TANESCO and THE SELLER, including, but not limited to, the method of day-to-day communication, and switching practices, outages scheduling, capacity and energy reporting. The operating procedures are to be developed in accordance with the following process:

23

(a) Not later than 60 Days before the first Initial Operations Date THE SELLER shall give TANESCO the proposed operating procedures;

(b) Within 15 Days after TANESCO's receipt of the proposed operating procedures TANESCO shall notify THE SELLER if it is satisfied with the proposed operating procedures. If TANESCO wishes certain reasonable amendments to be made to the proposed operating procedures, it shall notify THE SELLER within such 15 Day period of the amendments and its reasons for them. THE SELLER shall make any such amendments reasonably requested by TANESCO.

(c) If TANESCO notifies THE SELLER that it is satisfied with the proposed operating procedures or fails to notify THE SELLER within the 15 Day period referred to in clause (ii) above or if THE SELLER makes any amendments pursuant to clause (ii) above to the proposed operating procedures or refuses to make such amendments, then the proposed operating procedures, as amended (if appropriate), shall become the Operating Procedures.

**END OF ARTICLE**





## ARTICLE VIII - Despatch

**8.1**   **Control and Operation of the Facility : Despatch**

(a)   Prior to each Operating Day (at such time as defined in Operating Procedures developed by the Operations Committee pursuant to Article 8.3(a)) THE SELLER shall inform by telephone confirmed in writing the Grid Control Centre as to the daily operating availability and expected maximum net generating capability of the Facility, including, without limitation, any anticipated outage.

(b)   Subject to Article III, THE SELLER agrees to control and operate the Facility consistent at all times with TANESCO's Despatch of the Facility and the terms of this Agreement.

(c)   The Grid Control Centre shall have the sole discretion to Despatch (up to the then current declared generating capacity of the Facility) the generation of the electricity from the Facility and the delivery thereof to the Interconnection Points. When the Grid Control Centre elects to Despatch the Facility, it shall do so above the minimum despatchable load of 20 MW, it being understood that except for TANESCO's rights pursuant to Article 3.4, the Facility shall have no obligation to generate electrical energy if the load is below the minimum despatchable load.

(d)   TANESCO shall have the right to Despatch the Facility in accordance with the terms of this Agreement subject to TANESCO providing THE SELLER with at least 120 minutes prior notice of changes in operating levels to be achieved by the Facility.

**8.2**   **Scheduling and Despatch**

In order to assist with scheduling of the Facility to meet the requirements of TANESCO, the Parties agree that, from and after ninety (90) Days prior to the Scheduled Commercial Operations Date, the following procedures will be adhered to:

(a)   <u>Year Ahead Notifications</u>. Not less than ninety (90) Days before the Scheduled Commercial Operations Date, and thereafter not less than ninety (90) Days before the beginning of each Year, TANESCO shall provide to THE SELLER estimated requirements on a Monthly basis for Net Electrical Output for the remainder of the Year in which the Commercial Operations Date is scheduled to occur, and thereafter for each subsequent Year, but TANESCO shall not be bound by these figures.

(b)   <u>Month Ahead Notification</u>. Not less than fourteen (14) Days before the beginning of each Month, TANESCO shall provide to THE SELLER estimated requirements on a day-by-day basis, for Net Electrical Output during the Month and also, provisionally, for the following Month, but TANESCO shall not be bound by these figures.

(c)   <u>Week Ahead Notification</u>. Not less than forty-eight (48) hours before the beginning of each Week TANESCO shall provide to THE SELLER estimated requirements, on a hour-by-hour basis, for Net Electrical Output during that Week and also, provisionally, during the following Week, but TANESCO shall not be bound by these figures.

(d)   <u>Day Ahead Notification</u>. Not less than seven (7) hours before the start of each Day, TANESCO shall provide to THE SELLER firm requirements, on an hour by hour basis, for Net Electrical Output, during that Day and also provisionally, during the following Day.

25

**8.3    Operational Guidelines**

(a)    Operations Committee

On or before 180 Days prior to the Scheduled Commercial Operations Date, the Parties shall establish an Operations Committee comprising six (6) members. Each Party shall designate three (3) members to represent it on the Operations Committee. and either Party may remove or replace any of its Operations Committee members at any time upon notice to the other Party. The chairmanship of the Operations Committee shall rotate each six (6) months between the Parties and the Parties agree that the first chairman shall be nominated by TANESCO. Decisions of the Operations Committee shall require the approval of a majority of members of the Operations Committee.

The Operations Committee shall coordinate the operations of the Facility according to the Operating Procedures to be developed pursuant to Article 7.4;

(b)    Normal Operation : During normal operating conditions THE SELLER should provide continuous information as is reasonably practicable under prevailing circumstances about the conditions of the Facility, such as its load, generation, voltage and reactive schedule, safety-related and emergency procedures, fuel supply, personnel status, and other conditions that could affect system reliability.

(c)    Emergency Operation : In preparation for and during an Emergency Condition, THE SELLER should observe the following requirements :

(i)    At the Grid Control Centre's requests, THE SELLER shall make all reasonable efforts to deliver power.

THE SELLER is required to use reasonable efforts to comply with instructions under the direction of the Grid Control Centre until the TANESCO System has returned to normal.

THE SELLER shall cooperate with the Grid Control Centre in establishing emergency plans including but not limited to recovery from a local or widespread electrical blackout; voltage reduction to effect load curtailment and other plans which may arise.

(A)    Restoration procedures - Restoration requires an orderly plan for safe and rapid restoration of the electric network. Generation must be carefully regulated to maintain the supply/demand balance.

(B)    Generation - if THE SELLER has been isolated from the TANESCO System, it will be allowed to reconnect only under the direction of the Grid Control Centre.    THE SELLER should be ready to pick up load as soon as possible.

(C)    Transmission - To assure personnel safety and provide rapid restoration, THE SELLER's Interconnection Facilities shall be reconnected to the TANESCO System only under the direction of the Grid Control Centre.

(ii)    THE SELLER should consult the Grid Control Centre before changing its generation schedule.  This is to assure that generation/demand balance is maintained, and inadvertent inter-utility interchange is minimized.  If this is not possible, THE SELLER shall notify the Grid Control Centre as soon as practicable after changing its schedule.



26

(iii)     THE SELLER shall maintain contact with the Grid Control Centre.

(iv)     Automatic voltage regulators must be maintained in operation unless the Grid Control Centre asks that manual adjustments be made.

**END OF ARTICLE**



## ARTICLE IX - OPERATION AND MAINTENANCE

9.1     **Operation and Maintenance of Facility**

(a)     THE SELLER shall design, construct, operate and maintain the Facility in acce... with Prudent Utility Practices and otherwise in accordance with this Agreement. Not less than 90 Days prior to the Scheduled Commercial Operations Date, THE SELLER shall enter into an operations and maintenance agreement for the Facility.

(b)     The operation of the intertie and/or synchronizing circuit breaker shall occur under the direction of the Grid Control Centre in accordance with the procedures set forth in Appendix E.

(c)     THE SELLER shall operate the Facility in parallel with the TANESCO System during the Term of this Agreement. The Facility shall be designed, constructed, operated and maintained in accordance with Prudent Utility Practices and the performance standards set forth in Appendix C including the guidelines and standards relating to synchronization, voltage control and generation of harmonic frequencies so that operation of the Facility will not have an adverse impact on the voltage level or wave form of the TANESCO System.

(d)     THE SELLER shall notify TANESCO in a timely manner of any limitations, restrictions or outages affecting the Facility.

(e)     All electricity delivered by THE SELLER to TANESCO from the Facility shall have, at the Interconnection Points, the electrical characteristics set forth in Appendix G.

(f)     In addition to the Facility's back-up electricity supply, TANESCO shall provide, if available, the Facility with supply of back-up and start-up electricity during scheduled, unscheduled or emergency outages of the Facility at TANESCO's prevailing tariffs.

(g)     THE SELLER shall only be entitled to carry out any Conversion to the Facility if:

   (i)      the Conversion does not contravene Prudent Utility Practices;

   (ii)     the Conversion will not result in the Facility being unable to operate within TANESCO System;

   (iii)    (in the case of Conversion capable of having a material adverse effect on the safety or security of all or part of the TANESCO System), TANESCO has received full details of the proposed Conversion in advance and THE SELLER has established to TANESCO's reasonable satisfaction that the design of the Conversion incorporates sufficient safeguards in accordance with Prudent Utility Practices so as to prevent, insofar as reasonably practicable, that effect arising; or

In any event TANESCO shall not be relieved from its obligations to make Energy Payment and Capacity Payment during the Conversion Period.

(h)     Following the Conversion:

   (i)      THE SELLER shall use Natural Gas as the sole Fuel for the Facility except:

      (A)     that THE SELLER shall (subject to sub-paragraph (ii) below) be entitled to burn Fuel Oil at such times as may be consistent with Prudent Utility Practices in order to turn over the stocks of Fuel Oil maintained by THE SELLER in the Fuel Oil storage tank;



28

(B)     at any time when Natural Gas is unavailable to the Facility.

(ii)     TANESCO shall be entitled by notice to THE SELLER to require electrical energy to be generated using Fuel Oil, subject only to:

(A)     compliance with Prudent Utility Practices including environmental regulations;

(B)     a notice period of 60 days in the case of generation using Fuel Oil in any one month period of more than 36,500 MWh;

(C)     prior consent of THE SELLER.

and provided, further, that at the time of the giving of TANESCO's notice it can reasonably be anticipated that compliance with such requirement by THE SELLER will not give rise to an obligation on the part of THE SELLER under the Fuel Supply Contract to pay for a quantity of Natural Gas in excess of the quantity consumed by THE SELLER.

Any notice served by TANESCO under this sub-paragraph (ii) shall state the period for which TANESCO requires electrical energy to be generated using Fuel Oil, and any such notice shall be irrevocable without the consent of THE SELLER.

9.2     **Dependable Capacity : Testing of Capacity Rating**

(a)     Prior to or on the Commercial Operations Date for each  Unit, THE SELLER shall establish a Net Capacity for such  Unit under Site Conditions and otherwise in accordance with the test procedures for "Net Capacity" set forth in Appendix I. Upon so establishing the Net Capacity of the Facility, THE SELLER shall declare the Dependable Capacity of the Facility to TANESCO. The Dependable Capacity of the Facility so declared shall be effective until the Dependable Capacity of the Facility is next determined or established pursuant to this Article 9.2.  The Facility shall thereafter be tested annually during each Contract Year in accordance with the procedures set forth in Appendix I to demonstrate the Net Capacity of such Facility. THE SELLER shall, upon completing any such test for such Facility, declare a new Dependable Capacity of the Facility up to the Net Capacity of the  Facility so demonstrated.  The costs and expenses of such annual test shall be borne by THE SELLER.  Prior to the Commercial Operations Date of each  Unit, if THE SELLER is unable to carry out the test procedures for determining the Net Capacity of such Unit as provided under this Article 9.2 due to reasons not attributable to THE SELLER, then THE SELLER shall have the right to declare the Dependable Capacity of the Facility up to its full load site test rating adjusted for Site Conditions less auxiliary power which shall be deemed to be the Dependable Capacity for the Facility for the purpose of calculating the Capacity Payment.

(b)     TANESCO upon reasonable notice, shall be entitled to effect within the period of any Contract Year one (1) test on the Facility for which costs and expenses shall be borne by THE SELLER for the purpose of the determination or re-determination of the Dependable Capacity of the Facility, provided always that in such event where TANESCO exercises its rights in this Article 9.2(b), THE SELLER shall be entitled to effect a retest on the Facility within 7 Business Days of the receipt by THE SELLER of the results of the test so effected by TANESCO and referred to herein and the results obtained from such retest by THE SELLER shall be deemed to be the new Dependable Capacity of the Facility. In no event shall TANESCO have the right to require THE SELLER to determine or redetermine the Dependable Capacity of the Facility during a Force Majeure Event, a Forced Outage, a Maintenance Outage, Schedule Outage or during the Conversion Period.

29

(c) THE SELLER shall have the right to establish a new Dependable Capacity of the Facility by re-determining the Net Capacity of such Facility at any time upon 7 Days' prior written notice to TANESCO. If THE SELLER shall exercise such right, and the Net Capacity of the Facility re-determined in the manner set forth in Appendix I is greater than the Dependable Capacity of such Facility in effect immediately prior to such re-determination, then THE SELLER shall have the right to declare a new Dependable Capacity for such Facility up to the Net Capacity of such Facility so re-determined. If THE SELLER shall exercise such right, and the Net Capacity of the Facility re-determined in the manner set forth in Appendix I is less than the Dependable Capacity of such Facility in effect immediately prior to such redetermination, then the new Net Capacity of such Facility will automatically and immediately become the new Dependable Capacity of such Facility until the Dependable Capacity of such Facility is next so determined or established pursuant to this Article 9.2 or Appendix I. All costs and expenses for such redetermination shall be borne by THE SELLER.

(d) THE SELLER shall immediately declare to the Grid Control Centre any interruption in the availability of the Facility or any reduction in the net generating capacity of the Facility available at the Interconnection Points for despatch, which declaration shall state the type and expected duration of the outage or derating causing such interruption or reduction. If for any reason any change to such declaration is necessary, THE SELLER shall notify TANESCO immediately by telephone and promptly thereafter in writing by facsimile.

## 9.3 Scheduled Outages

At least 45 Days prior to the Commercial Operations Date of the first Unit and thereafter (i) TANESCO and THE SELLER shall mutually agree on the Scheduled Outages for the Facility for such calendar year, and (ii) THE SELLER shall submit a proposed schedule of Scheduled Outages for the following five calendar years, which schedule shall include the estimated times of operation, amounts of electricity production, number of Scheduled Outages, and reductions of output and the reasons therefore, and the earliest and latest start dates, times and durations of Scheduled Outages, including a specification of the maintenance requiring shutdown or reduction in output of the Facility. TANESCO may, upon not less than 30 Days prior written notice, request THE SELLER to revise its proposed schedule for the timing and duration of any Scheduled Outages or reduction of output of the Facility to accommodate the requirements of TANESCO in accordance with Prudent Utility Practices. TANESCO shall reimburse THE SELLER for any costs reasonably incurred by THE SELLER if the maintenance is delayed or accelerated to suit TANESCO's requirements. THE SELLER shall notify the Grid Control Centre 24 hours prior to the commencement of any Scheduled Outage.

## 9.4 Maintenance Outages

In accordance with the requirements of the TANESCO System and Prudent Utility Practices, THE SELLER agrees to coordinate Maintenance Outages with TANESCO, including providing TANESCO with at least 24 hours notice prior to removing the Facility from service for a Maintenance Outage which notice shall include the scheduled start date and time and estimated duration of such Maintenance Outage.

## 9.5 Forced Outage

THE SELLER shall be permitted to interrupt the flow of electrical energy from the Facility for Forced Outage.





30

**9.6    TANESCO's Maintenance Schedule**

At least 45 Days prior to the Commercial Operations Date of the first Unit and thereafter (i) TANESCO and THE SELLER shall mutually agreed on TANESCO's schedule for maintenance of TANESCO's Interconnection Facilities, metering equipment or adjacent transmission and distribution facilities ("Maintenance Schedule") for such calendar year, and (ii) shall submit a proposed Maintenance Schedule for the following five calendar years, which schedule shall include the earliest and latest start dates, times and durations of maintenance, including a specification of the maintenance requiring shutdown or reduction in output of the Facility.

**END OF ARTICLE**



31

## ARTICLE X - INTERCONNECTION

### 10.1    Interconnection Facilities

THE SELLER shall design, construct and install the Interconnection Facilities at its expense in accordance with Prudent Utility Practices and the requirements set forth in Appendix E. THE SELLER shall complete the construction and installation of the Interconnection Facilities no later than 30 days prior to the Initial Operations Date. TANESCO shall at all times co-operate with THE SELLER to ensure that the Interconnection Facilities are constructed and installed in the manner and by the date set out in this Article 10.1. Upon completion and installation of the Interconnection Facilities, THE SELLER shall provide and transfer to TANESCO all operating and maintenance manuals, spares, rights, title and interest to that portion of the Interconnection Facilities identified in Appendix E to be transferred to TANESCO so that TANESCO shall become the owner thereof. Upon such transfer all property and risk therein shall pass to TANESCO and TANESCO shall thereafter be responsible for the operation and maintenance of the same. The portion of the Interconnection Facilities identified in Appendix E that is not intended to be transferred to TANESCO shall continue to be owned by THE SELLER and shall be operated and maintained by THE SELLER at its sole cost and expense. TANESCO shall operate and maintain the Interconnection Facilities in accordance with (i) the operating and maintenance standards recommended by the Interconnection Facilities' equipment suppliers and (ii) Prudent Utility Practices.

### 10.2    Protective Device

Except as otherwise provided in Appendix E each Party shall be responsible for protecting its own facilities from possible damage caused by electrical disturbances.

### 10.3    Title and Risk of Loss

Title to and the risk of loss on any electrical energy generated from the Facility and transmitted to TANESCO in accordance with this Agreement shall pass to TANESCO at the applicable Interconnection Point.

**END OF ARTICLE**



## ARTICLE XI - METERING

### 11.1    Metering Device

(a)    The electrical energy generated from the Facility and transmitted to TANESCO pursuant to this Agreement shall be measured by Metering Device located adjacent to the Interconnection Points to be installed by THE SELLER in accordance with Prudent Utility Practices.    All such Metering Device shall be owned, operated, maintained and controlled solely by TANESCO.

(b)    The number, type and general location of such Metering Device shall be as set forth in Appendix D and shall include main metering and check Metering Device owned by TANESCO.    All TANESCO Metering Device shall be sealed and the seal shall be broken only by TANESCO when such Metering Device are to be inspected and tested or adjusted in accordance with Articles 11.2 and 11.3.

(c)    Upon reasonable notice by THE SELLER, TANESCO will, consistent with Prudent Utility Practices, provide THE SELLER with reasonable access to pulse initiating contacts for the utilization of THE SELLER, such pulse initiating contacts to be purchased by THE SELLER.

### 11.2    Inspection of Metering Device

(a)    TANESCO shall inspect and test all Metering Device at its own expense on a regular schedule.    TANESCO shall provide THE SELLER with reasonable advance notice of and permit a representative of THE SELLER to witness and verify, such inspection and tests and shall test any adjustments to be made thereto in accordance with Articles 11.2 and 11.3.

(b)    Upon two weeks prior written notice by THE SELLER, TANESCO shall perform additional inspections or tests of any TANESCO Metering Device.    THE SELLER and TANESCO shall agree on a mutually convenient time for such inspections or tests and TANESCO shall permit a qualified representative of THE SELLER to inspect or witness such testing of any Metering Device.    The actual expense of any such requested additional inspection or testing shall be borne by THE SELLER unless upon such inspections or testing a Metering Device is found to register inaccurately by more than +/- 0.5% in which event the expense of the requested additional inspection or testing shall be borne by TANESCO.

(c)    If any TANESCO Metering Device is found to be defective or inaccurate, it shall be adjusted, repaired, replaced and/or re-calibrated by TANESCO.    Subject to the requirements set forth in Appendix D, THE SELLER may elect to install and maintain, at its own cost and expense, as part of the Facility, back-up metering including separate current and potential transformers in addition to those installed and maintained by TANESCO.    At all times, THE SELLER agrees to keep all meter locations associated with the Facility clean, clear and, upon reasonable advance notice, accessible to TANESCO and its authorized agents.

### 11.3    Adjustments for Inaccurate Meters

If the Metering Device fails to register, or if the measurement made by a Metering Device is found upon testing to be inaccurate by more than +/-0.5%, an adjustment shall be made correcting all measurements by the inaccuracy and the period of the inaccuracy, in the following manner :



(a)    In the event that the Parties cannot agree on the amount of the adjustment necessary to correct the measurements made by any inaccurate/or defective Metering Device, the Parties shall use the Back-up Metering Device, to determine the amount of such inaccuracy, provided that in the event that the Back-up Metering Device also are found upon testing to be inaccurate by more than the allowable limits applicable to Metering Device under Article 11.3 and the Parties cannot agree on the amount of the adjustment necessary to correct the measurements made by such inaccurate or defective Back-up Metering Device, the Parties shall estimate the amount of the necessary adjustment on the basis of deliveries of electrical energy from the Facility to the TANESCO System during periods of similar operating conditions (e.g. based on the Facility's Fuel use records) when the Metering Device was registering accurately;

(b)    In the event that the Parties cannot agree on the actual period during which the inaccurate measurements were made, the period during which the measurements are to be adjusted shall be the shorter of (i) one half of the period from the last test of the Metering Device, or (ii) the current month and the month immediately preceding the test that found the Metering Device to be defective or inaccurate; and

(c)    To the extent that the adjustment period covers a period of deliveries for which payments has already been made by TANESCO, TANESCO shall use the corrected measurements as determined in accordance with this Article 11.3 to re-compute the amount due for the period of the inaccuracy and shall subtract the previous payments by TANESCO for such period from such re-computed amount. If the difference is a positive number, that difference shall be paid by TANESCO to THE SELLER; if the difference is a negative number, that difference shall be paid by THE SELLER to TANESCO. Payment of such difference by the owing Party shall be made within the time period in accordance with Article 6.2.

## 11.4    Metering Readings

The Metering Device shall be read monthly on the last day of each Month for the purpose of determining the Net Electrical Output of the Facility since the preceding reading. THE SELLER shall read the Metering Device during normal business hours, and unless otherwise decided by the Operations Committee, shall give TANESCO at least 48 hours notice of the time THE SELLER shall read the Metering Device. TANESCO shall have the right to have a representative present during any such reading. In the event that a TANESCO representative is present at such reading of the Metering Device for the purpose of measuring Net Electrical Output, then such reading shall be jointly taken and recorded. In the event that a TANESCO representative is not present at a reading of Net Electrical Output, then THE SELLER representatives shall take and record such reading together with a photographic record thereof. THE SELLER shall maintain a log of all such meter readings. In the event that the Metering Device is faulty or not in service as a result of maintenance, repairs or testing, then the Back-up Metering device, shall be used during the period that the main Metering Device is faulty or not in service and the foregoing provisions of this Article 11.4 shall apply to the reading of the Back-up Metering Device. At each reading of the Metering Device, the Parties shall read the Back-up Metering Device to ensure that the Metering Device is not faulty.

## 11.5    Records

Each Party shall maintain for a period of not less than 5 years all records relating to or produced by its Metering Device (including, without limitation, all meter reading and test data and results) and shall, promptly upon request by the other Party, provide to such other Party copies of any and all such records and other information in its possession or custody relating to or produced by its Metering Device.

**END OF ARTICLE**

34

## ARTICLE XII - REPRESENTATIONS AND WARRANTIES OF THE SELLER AND TANESCO: ADDITIONAL COVENANTS OF THE SELLER

**12.1    THE SELLER'S Status and Authorization**

THE SELLER represents and warrants to TANESCO as follows :

(a)    THE SELLER is a limited liability company duly organized, validly existing and good standing under the laws of Tanzania and is qualified in good standing in ea[ch] other jurisdiction where the failure so to qualify would have a material effect up[on] the business or financial condition of THE SELLER of the Facility, and TH[E] SELLER has all requisite power and authority to conduct its business, to own i[ts] properties and to execute to deliver, and perform its obligations under th[is] Agreement.

(b)    The execution, delivery and performance by THE SELLER of this Agreement ha[s] been duly authorised by all necessary corporate action and does not and will not (i) require any consent or approval of THE SELLER's Board of Directors [or] shareholders, other than those that have been obtained (evidence of which shall b[e] if it has not already been delivered to TANESCO), or (ii) result in a breach of, [or] constitute a default under, any provisions of THE SELLER's constitution [or] incorporation documents, any indenture, contract or agreement to which it is a Part[y] or by which it or its assets may be bound, or violate any law, rule, regulation, order, writ, judgment, injunction, decree, determination or award presently in effect havin[g] applicability to THE SELLER.

(c)    THE SELLER will obtain or apply for all Consents, necessary for the due execution, delivery and performance by THE SELLER of this Agreement and THE SELLE[R] will maintain in full force and effect all Consents, referred to in Article 4.1 durin[g] the Term of this Agreement.

(d)    This Agreement constitutes a legal, valid and binding obligation of THE SELLER an[d] is enforceable against THE SELLER in accordance with its terms.

(e)    There is no pending or threatened action or proceeding affecting THE SELLE[R] before any court, governmental authority or arbitrator that could reasonably b[e] expected to materially and adversely affect the financial conditions hereunder, or tha[t] purports to affect the legality, validity or enforceability of this Agreement.

**12.2    TANESCO's Status and Authorization**

TANESCO represents and warrants to THE SELLER as follows :

(a)    TANESCO is a public limited company duly organised, validly existing and in good standing under the Laws of Tanzania with perpetual succession, capable of suing and being sued in its corporate name and with power to purchase or otherwise acquire, hold and exchange or alienates or otherwise deal with in any lawful manner whatsoever, any property movable and immovable, and to enter into contracts and generally to do such act and things as a body corporate may do by law and as are necessary for, or incidental to, the carrying out of its objects and the exercise of its powers as set out in the Memorandum and Articles of Association including but not limited to the execution, delivery and performance of its obligations under this Agreement.

(b)    The execution, delivery and performance by TANESCO of this Agreement has been duly authorised by all necessary corporate action of TANESCO's Board of Directors,



35

and does not and will not (i) require any further consent or approval of TANESCO's Board of Directors other than those that have been delivered to THE SELLER, or (ii) result in a breach of or constitute a default under any provisions of TANESCO's constitution or enabling documents, any indenture, contract or agreement to which it is a party or by which it or its assets may be bound, or violate any law, rule, regulation, order, writ, judgement, injunction, decree, determination or award presently in effect having applicability of TANESCO.

(c)     No authorization or approval by any governmental authority or other official agency is necessary for the due execution, delivery and performance by TANESCO of this Agreement as in effect on the date hereof.

(d)     This Agreement constitutes a legal, valid and binding obligation of TANESCO and is enforceable against TANESCO in accordance with its terms.

(e)     There is no pending or threatened action or proceeding affecting TANESCO before any court, governmental authority or arbitrator that could reasonably be expected to materially and adversely affect the financial condition or operations of TANESCO or the ability of TANESCO to perform its obligations hereunder, or that purports to affect the legality, validity or enforceability of this Agreement.

(f)     TANESCO has obtained or will obtain all necessary consents, authorisations, licences and approvals for the purchase and receipt of the electricity to be delivered to it hereunder and for the generation and delivery of the electricity to be delivered by it hereunder.

(g)     Prior to the expiry of TANESCO's current licence under Section 4 of the Electricity Ordinance 1931, TANESCO undertakes to extend or renew the licence for at least the Term of this Agreement.

## 12.3    Permits Licenses, Approvals and Compliance with Laws

(a)     THE SELLER shall, at its expense, acquire and maintain in effect, from any and all agencies, commissions and authorities with jurisdiction over THE SELLER and/or the Facility, all Consents, and complete or have completed all inspections and environmental impact studies, in each case necessary (i) for the operation and maintenance of the Facility, and (ii) for THE SELLER to perform its obligations under this Agreement.

(b)     THE SELLER shall, at all times, comply with the terms and conditions of the Licence and all applicable laws, ordinances, rules and regulations applicable to it and/or to the Facility including (i) all environmental laws in effect at any time during the Term, and (ii) all such laws, ordinances, rules and regulations relating to fuel security storage or back-up or otherwise concerning any type of facility used for the generation of electric power.

(c)     TANESCO shall, at its own expenses, (i) use all reasonable efforts to obtain and maintain in effect all permits, licenses, approvals and other governmental authorisation required by all applicable government agencies and authorities with jurisdiction over TANESCO, the Interconnection Facilities, and the Metering Device in order to enable it to perform its obligations under this Agreement; (ii) give all required notices and allow all required inspections under all consents, permits, licenses and approval obtained by it in connection with the Facility; and (iii) pay all Prescribed Fees in connection with such consents, permits, licenses and approvals.



**12.4    Continuity of Existence**

THE SELLER agrees to preserve and keep in force and effect its corporate existence and all franchises, licenses and permits necessary to the proper conduct of its business including the business of owning and operating the Facility.

**12.5    Operating and Maintenance Standards**

THE SELLER covenants that the Facility will be operated and maintained in accordance with (i) the operating and maintenance standards recommended by the Facility's equipment suppliers, (ii) Prudent Utility Practices including synchronizing, voltage and reactive power control, (iii) the operating procedures described under Article VIII, and (iv) the performance standards and requirements of the TANESCO System set forth in Appendix C.

**12.6    Qualified Personnel**

THE SELLER shall, during the Term, only employ appropriately qualified personnel for the purposes of operating and maintaining the Facility and coordinating operations with the TANESCO System.

**12.7    Testing**

All tests to be carried out by THE SELLER pursuant to Article 9.2 will be in accordance with Prudent Utility Practices.

**12.8    Access to Operation Records**

Each Party upon reasonable notice shall have access to the other Party's operations records (not including maintenance and financial documents), such operations records to be used without prejudice to the other Party and for the sole purpose of ensuring proper operations and coordination of electrical supply to the TANESCO System.

**12.9    Easements and Rights-of-Way**

Each Party shall grant to the other Party all necessary easements and right-of-way, including adequate and continuing access rights on such Party's properties, to construct, install, operate, maintain, replace and/or remove any of the Facility and Interconnection Facilities located on such Party's properties.  All such easements and rights-of-way shall survive termination or expiration of this Agreement.

**12.10    Sale of Energy to Third Parties**

THE SELLER shall not without the prior written consent of TANESCO, sell any electrical energy or capacity from the Facility to any person other than TANESCO.

**12.11    Interconnection Facilities**

THE SELLER shall not, and shall not permit any of its employees, agents, contractors or subcontractors of any tier, to operate, maintain, or tamper with the Interconnection Facilities on TANESCO's side of the Interconnection Points or any of TANESCO's metering equipment without the prior written consent of TANESCO, except in situations where such actions are taken

37

to prevent immediate injury, death or property damage, and THE SELLER uses its reasonable efforts to provide TANESCO with advance notice of the need of such actions.

### 12.12    GOT Guarantee

TANESCO will use its best efforts to assist THE SELLER in the procurement of the Guarantee by the GOT for the Term of this Agreement or such extension thereto to cover all payment obligations of TANESCO under this Agreement.

**END OF ARTICLE**



## ARTICLE XIII - TAXES, FINES

### 13.1    Taxes Applicable to THE SELLER

Subject to the terms of the Implementation Agreement, all present and future State, municipal or other local government lawful taxes, duties, levies or other impositions applicable to THE SELLER, the Facility and THE SELLER's other assets shall be paid by THE SELLER in a timely fashion. Nothing herein, however, shall in any way limit or override any provisions of Appendix B and H and Articles 5.2 and 5.3 which allow certain taxes and charges to be treated as "pass-through" items.

### 13.2    Taxes Applicable to TANESCO

All present and future state, provincial, municipal or other lawful taxes, duties, levies, or other impositions applicable to TANESCO arising from or in connection with its rights and obligations under this Agreement shall be paid by TANESCO in a timely fashion.

**END OF ARTICLE** 

39

## ARTICLE XIV - INSURANCE

### 14.1    Insurance Required

THE SELLER undertakes to TANESCO that so long as the same is available on commercially acceptable terms it will itself or it will procure its contractors to:-

(i)      take out all insurance required by law or regulation;

(ii)     take out such insurance as is appropriate and customary for an independent generating company; and

(iii)    without prejudice to clause (ii) above, take out all insurance required pursuant to the terms of any Financing Documents entered into by it to enable it to finance the construction and/or operation of the Facility.

THE SELLER to procure that the insurance providing the cover in respect of THE SELLER's general third party liability on the operation of the Facility shall name TANESCO as an additional insured.

### 14.2    Substitute Coverage

(a)      If the coverages required under Article 14.1, or relatively comparable coverage, are unavailable, including unavailable at reasonable commercial terms for any reason whatsoever, from insurance companies in Tanzania or elsewhere, THE SELLER may procure an alternative coverage.

(b)      Following a Force Majeure Event, to the extent that the insurance required by Article 14.1 above, is not available to THE SELLER at commercially reasonable rates due to the occurrence of the Force Majeure Event, upon notice to TANESCO by THE SELLER the additional cost of such insurance attributable to the occurrence of the Force Majeure Event as determined by an expert in conformity with the provisions of Article 18.2, shall be recoverable by THE SELLER from TANESCO and treated as a Pass-Through Item. The additional compensation provided under this Article 14.2 shall cease as soon as THE SELLER's insurance rates are no longer affected by the Force Majeure Event. From time to time, at the request of TANESCO, the expert will determine the extent to which THE SELLER's insurance rates are then affected by the Force Majeure Event.

### 14.3    Evidence of Insurance

THE SELLER  shall cause such insurers  of or the agents thereof to provide TANESCO with certificates of insurance evidencing the policies and endorsements described in Article 14.1. Failure to provide such certificates shall not relieve THE SELLER of its obligation or liability imposed on THE SELLER elsewhere in this Agreement.  Not less than 7 Days prior to the Commencement Date, THE SELLER shall provide to TANESCO certificates of insurance coverage or insurance policies for the  construction period as required by this Article XIV. Not less than 7 Days prior to the Initial Operations Date,  THE SELLER shall provide to TANESCO certificates of insurance coverage or insurance policies for the operation period as required by this Article XIV.

### 14.5    Application of Proceeds

For the Term of this Agreement, and subject to the requirements of the Financing Document



40

and the rights or remedies of the Financing Parties thereunder, THE SELLER shall apply the proceeds of any such insurance policies received for damages to the Facility to the repair of the Facility.

**END OF ARTICLE**



## ARTICLE XV - FORCE MAJEURE EVENT

## FORCE MAJEURE

### 15.1    Definition

A "Force Majeure Event" shall mean any event or circumstance or combination of events or circumstances beyond the reasonable control of a Party occurring on or after the Effective Date that materially and adversely affects  the performance by such affected Party of its obligations under or pursuant to this Agreement (including a Party's ability to deliver or receive energy from the Facility); provided, however, that such material and adverse effect could not have been prevented, overcome, or remedied in whole or in part by the affected  Party through the exercise of diligence and reasonable care,  it being understood and agreed that reasonable care includes the expenditure of sums of money to protect the Facility from a casualty event, which sums are reasonable in light of the likelihood of such event occurring, the probable effect of such event if it should occur and the likely efficacy of such preventive measures. "Force Majeure Events" shall include the following events and circumstances, but only to the extent that each satisfies the above requirements:

(a)        Change in Law which adversely affects the other Party

(b)        Events beyond the control of the affected Party including, but not limited to:

      (i)        lightning, fire, earthquake, tsunami, flood, storm, cyclone, typhoon, or tornado;

      (ii)        explosion or chemical contamination (other than resulting from an act of war);

      (iii)        epidemic or plague;

      (iv)        a Lapse of Consent, for the first twenty-five (25) Days of its occurrence;

      (v)        prior to the Commercial Operations Date, a delay beyond the tenth (10th) Day after the scheduled receipt date of the receipt at the Site of a major piece of equipment that has been timely ordered and must be manufactured expressly for a Party to perform its obligations under this Agreement, when such delay is caused solely by an accident in transportation or a strike.

      (vi)        any act of war (whether declared or undeclared), invasion, armed conflict or act of foreign enemy, blockade, embargo, revolution, riot, insurrection, civil commotion, act of terrorism, or sabotage;

      (vii)        radioactive contamination or ionizing radiation

      (viii)        strikes, works to rule or go-slows that are widespread or nationwide;

      (vix)        unavailability or interruption in the supply of Fuel as the result of the Fuel Supplier having failed to perform its obligations under the Fuel Supply Contract due to the occurence of a Force Majeure Event under the Fuel Supply Contract;

Force Majeure Events shall expressly not include the following conditions, except and to the extent they result directly from a Force Majeure Event;

(i)        late delivery to a Party of machinery, equipment (except as provided in Article 15.1(b)(v)) materials spare parts or consumables;



42

(ii)    a delay in the performance of any Contractor; and

(iii)   normal wear and tear or random flaws in materials and equipment or breakdowns in equipment.

### 15.2    Notification

(a)    If by reason of a Force Majeure Event a Party is wholly or partially unable to carry out its obligations under this Agreement, the affected Party shall

(i)    give the other Party notice of the Force Majeure Event(s) as soon as practicable, but in any event, not later than the later of forty-eight (48) hours after the affected Party becomes aware of the occurrence of the Force Majeure Event(s) or forty-eight (48) hours after the resumption of any means of providing notice between THE SELLER and TANESCO, and;

(ii)    give the other Party a second notice, describing the Force Majeure Event(s) in reasonable detail and, to the extent that can be reasonably determined at the time of the second notice, providing a preliminary evaluation of the obligations affected, a preliminary estimate of the period of time that the affected Party will be unable to perform the obligations, and other relevant matters as soon as practicable, but in any event, not later than seven (7) Days after the initial notice of the occurrence of the Force Majeure Event(s) is given by the affected Party. When appropriate or when reasonably requested to do so by the other Party, the affected Party shall provide further to the other Party more fully describing the Force Majeure Event(s) and its cause(s) and providing or updating information relating to the efforts of the affected Party to avoid and/or to mitigate the effect(s) thereof and estimates, to the extent practicable, of the time that the affected Party reasonably expects it will be unable to carry out any of its affected obligations due to the Majeure Event(s).

(b)    The affected Party shall also provide notice to the other Party of (i) the cessation of the Force Majeure Event, and (ii) the affected Party's ability to recommence performance of its obligations under this Agreement by reason of the cessation of the Force Majeure Event as soon as possible, but in any event, not later than seven (7) Days after the occurrence of each of (i) and (ii) above.

(c)    Failure by the affected Party to give notice of a Force Majeure Event to the other Party within the forty eight (48) hour period required by Article 15.2(a) shall not prevent the affected Party from giving such notice at a later time; provided, however, that in such case, the affected Party shall not be excused pursuant to Article 15.4 for any failure or delay in complying with its obligations under or pursuant to this Agreement until the notice required by Article 15.2(a)(i) has been given. If such notice is given within the forty-eight (48) hour period as required by Article 15.2(a)(i), the affected Party shall be excused for such failure or delay pursuant to Article 15.4 from the date of commencement of the relevant Force Majeure Event.

### 15.3    Duty to Mitigate

The effected Party shall use all reasonable efforts to mitigate the effects of a Force Majeure Event, including, but not limited to, the payment of all reasonable sums of money by or on behalf of the affected Party.



43

### 15.4    Delay Caused by Force Majeure

So long as the affected Party has at all times since the occurrence of the Force Majeure Event complied with the obligations of Article 15.3 and continues to so comply, then:

(a)    the affected Party shall not be liable for any failure or delay in performing its obligations (other than an obligation to make a payment) under or pursuant to this Agreement during the existence of a Force Majeure Event and;

(b)    any performance deadline that the affected Party is obligated to meet under this Agreement shall be extended; provided, however, that no relief, including without limitation, the extension of performance deadlines, shall be granted to the affected Party pursuant to this Article 15.4 to the extent that such failure or delay would have nevertheless been experienced by the affected Party had the Force Majeure Event not occurred; provide, however, that in no event shall the obligations of the affected Party under this Agreement to meet performance deadlines be extended beyond a period equal to the period during which the Force Majeure Event continued or in the case of a Force Majeure Event which damages the Facility beyond the end of the Restoration Period (as defined in the Implementation Agreement) determined in accordance with Article XVII of the Implementation Agreement. Other than for breaches of this Agreement by the other Party, and without prejudice to the affected Party's right to indemnification pursuant to Article XVII or for payment pursuant to this Article V or Article VI, the other Party shall not bear any liability for any loss or expense suffered by the affected Party as a result of a Force Majeure Event.

### 15.5    Payments During Force Majeure Event

(a)    Upon the occurrence of any Force Majeure Event after the Commercial Operations Date, then during the pendency of a Force Majeure Event, TANESCO shall pay to THE SELLER Energy Payments delivered during the pendency of such Force Majeure Events plus Capacity Payments in an amount equal to the amount due to THE SELLER pursuant to Article 5.1 immediately prior to such Force Majeure Event multiplied by the FM Ratio. For the purposes of this Article 15.5, the FM Ratio shall be :

(i)    in the case of a Force Majeure Event declared by THE SELLER, a fraction, the numerator of which is the Dependable Capacity as determined by testing in accordance with Article IX as soon as practicable after the declaration of such Force Majeure Event, and the denominator of which is the Dependable Capacity determined by the most recent test prior to the Force Majeure Event conducted pursuant to Article IX;

(ii)    in the case of a Force Majeure Event declared by TANESCO the FM Ratio shall be one (1).

(b)    During the pendency of a Force Majeure Event, either Party may request that a Dependable Capacity or gross capacity test, as the case may be, be performed in order to determine the FM Ratio applicable in Article 15.5(a)(i), and thereafter such new FM Ratio shall be used to compute the payments to be made by TANESCO to THE SELLER; provided, however, that no more than two (2) tests may be requested by a Party within any thirty (30) Day period during the pendency of the Force Majeure Event.

**END OF ARTICLE**



## ARTICLE XVI - TERMINATION AND DEFAULT

### 16.1    THE SELLER Events of Default - Termination by TANESCO

Each of the following events shall be an event of default by THE SELLER (each a "SELLER Event of Default"), which, if not cured within the time period permitted (if any), with the prior written consent of the GOT, a copy of which consent shall be provided to THE SELLER with any notice provided under Article 16.3 shall give rise to the right on the part of TANESCO to terminate this Agreement pursuant to Article 16.3; PROVIDED, HOWEVER, that no such event shall be an Event of Default by THE SELLER (i) if it results solely from a breach by TANESCO of this Agreement or by the GOT of the Implementation Agreement; or (ii) if it results from a breach by the Fuel Supplier of the Fuel Supply Contract and THE SELLER have taken all reasonable steps to procure the supply of Fuel from other fuel suppliers; or (iii) if it occurs as a result of or during a Force Majeure Event for the period provided pursuant to Article 15.4:

(a)     the failure of THE SELLER to achieve Commencement Date within ninety (90) Days after Financial Closing;

(b)     the failure of THE SELLER to achieve the Commercial Operations Date within twenty four (24) months after the Scheduled Commercial Operations Date;

(c)     the failure of THE SELLER to comply with any of its material obligations under this Agreement and such failure shall continue uncured for 90 Days after notice thereof by TANESCO, provided that if such failure cannot be cured within a period of 90 Days with the exercise of reasonable diligence, then such cure period shall be extended for an additional period of 90 Days so long as THE SELLER is exercising reasonable diligence to cure such failure;

(d)     THE SELLER shall (i) apply for or consent to the appointment of or taking of possession by a receiver, custodian, trustee or liquidator of itself or of all or a substantial part of its property, (ii) admit in writing its inability to pay its debts as such debts become due (iii) make a general assignment or an arrangement or composition with if for the benefit of its creditors (iv) commence a voluntary case or file a petition seeking to take advantage of any law relating to bankruptcy, insolvency, winding-up or composition or readjustment of debts (v) fail to controvert in a timely and appropriate manner, or acquiesce in writing to, any petition filed against such Party in an involuntary case under any bankruptcy or similar law, or (vi) take any action for the purpose of effecting any of the foregoing;

(e)     a proceeding or case shall be commenced against THE SELLER, without the application or consent of THE SELLER, in any court of competent jurisdiction, seeking (i) its liquidation, reorganization, dissolution or winding-up, or the composition or readjustment of its debts (ii) the appointment of a trustee, receiver, custodian, liquidator or the like of such Party or of all or any substantial part of its assets, or (iii) similar relief under any law relating to bankruptcy, insolvency, winding-up, composition or adjustment of debts and such proceeding or case shall continue not defended or dismissed or an order, judgment or decree approving or ordering any of the foregoing shall be entered and continue not stayed and in effect, for a period of 90 Days, or an order for relief against THE SELLER shall be entered in an involuntary case under any bankruptcy or similar law;

### 16.2    TANESCO Events of Default - Termination by THE SELLER

Each of the following events shall be an event of default by TANESCO (each a "TANESCO Event of Default"), which, if not cured within the time period permitted (if any) to cure shall



45

give rise to the right on the part of THE SELLER to terminate this Agreement pursuant to Article 16.2; PROVIDED, HOWEVER, that no such event shall be an Event of Default by TANESCO (i) if it results from a breach by THE SELLER of this Agreement; or (ii) if it occurs as a result of a Force Majeure Event during the period provided pursuant to Article 15.4:

(a)     the dissolution, pursuant to law, of TANESCO, except for :

    (i)     the privatization of TANESCO's power stations; or

    (ii)    an amalgamation, reorganization, reconstruction, or further privatization of TANESCO where the GOT without interruption guarantees the performance of the succeeding entity on the same terms and conditions as the Guarantee or such commercial security is provided for the obligation of the succeeding entity that in the reasonable business judgment of THE SELLER provides an adequate alternative to the Guarantee;

(b)     any default or defaults by TANESCO in the making of any payment or payments required to be made by it within sixty (60) Days of the due date therefore and then, upon notice to the GOT, any default or defaults by the GOT in the making of any payment in accordance with the terms of the Guarantee which exceed, in the aggregate at any one time, the sum equivalent to one (1) month of Capacity Payments;

(c)     the failure of TANESCO to comply with any of its material obligations under this Agreement and such failure shall continue uncured for 90 Days after notice thereof by THE SELLER, provided that if such failure cannot be cured within a period of 90 Days with the exercise of reasonable diligence, then such cure period shall be extended for an additional period of 90 Days so long as TANESCO is exercising reasonable diligence to cure such failure;

(d)     TANESCO shall (i) apply for or consent to the appointment of or taking of possession by a receiver, custodian, trustee or liquidator of itself or of all or a substantial part of its property; (ii) admit in writing its inability to pay its debts as such debts become due; (iii) make a general assignment or an arrangement or composition with if for the benefit of its creditors; (iv) commence a voluntary case or file a petition seeking to take advantage of any law relating to bankruptcy, insolvency, winding-up or composition or readjustment of debts; (v) fail to controvert in a timely and appropriate manner, or acquiesce in writing to, any petition filed against such Party in an involuntary case under any bankruptcy or similar law; or (vi) take any action for the purpose of effecting any of the foregoing;

(e)     a proceeding or case shall be commenced against TANESCO, without the application or consent of TANESCO, in any court of competent jurisdiction, seeking (i) its liquidation, reorganization, dissolution or winding-up, or the composition or readjustment of its debts; (ii) the appointment of a trustee, receiver, custodian, liquidator or the like of such Party or of all or any substantial part of its assets; or (iii) similar relief under any law relating to bankruptcy, insolvency, winding-up, composition or adjustment of debts and such proceeding or case shall continue not defended or dismissed or an order, judgment or decree approving or ordering any of the foregoing shall be entered and continue not stayed and in effect, for a period of 90 Days, or an order for relief against TANESCO shall be entered in an involuntary case under any bankruptcy or similar law;

**16.3    Termination Notices**

(a)     Upon the occurrence of a TANESCO Event of Default or a SELLER Event of Default, as the case may be, that is not cured within the applicable period (if any) for

cure, the non-defaulting Party may, at its option, initiate termination of this Agreement by delivering a notice (a "Notice of Intent to Terminate") of its intent to terminate this Agreement to the defaulting Party. The Notice of Intent to Terminate shall specify in reasonable detail THE SELLER Event of Default or TANESCO Event of Default, as the case may be, giving rise to such notice.

(b)     Following the delivery of a Notice of Intent to Terminate, the Parties shall consult for a period of up to thirty (30) Days in case of a failure by either Party to make payments or provide security when due, and up to sixty (60) Days with respect to any other Event of Default (or such longer period as the Parties may mutually agree), as to what steps shall be taken with a view to mitigating the consequences of the relevant Event of Default taking into account all the circumstances. During the period following the delivery of the Notice of the Intent to Terminate, the Party in default may continue to undertake efforts to cure the default, and if the default is cured at any time prior to the delivery of a Termination Notice in accordance with Article 16.3(c). then the non-defaulting Party shall have no right to terminate this Agreement in respect of such cured default.

(c)     Upon expiration of the consultation period described in Article 16.3(b) and unless the Parties shall have otherwise agreed or unless the Event of Default giving rise to the Notice of Intent to Terminate shall have been remedied, the Party having given the Notice of Intent to Terminate may terminate this Agreement by delivering a Termination Notice to the other Party, whereupon this Agreement shall immediately terminate.

(d)     In the event that the Facility is transferred to the GOT under the terms of the Implementation Agreement, this Agreement shall immediately terminate and THE SELLER shall have no obligations to TANESCO hereunder except those obligations which arose prior to or upon the termination of this Agreement.

## 16.4     Notice to the GOT of TANESCO's Default

(a)     Anything in this Agreement notwithstanding, THE SELLER shall not seek to terminate this Agreement as a result of any default of TANESCO, without first giving a copy of any notices required to be given to TANESCO under Article 16.2 and 16.3 to the GOT, such notices to include a request to the GOT to cure any such default within the same cure period as provided to TANESCO hereunder and such cure period to commence upon delivery of each such notice to the GOT. Each such notice shall be deemed to have been delivered (i) when presented personally to the GOT, (ii) when transmitted by facsimile, or (iii) five (5) Days after being deposited in a regularly maintained receptacle for the Postal Service in Tanzania, postage prepaid, registered or certified, return receipt requested, addressed to the GOT, at the address indicated in Article 23.1 of the Implementation Agreement (or such other address as the GOT may have specified by written notice delivered in accordance therewith).

(b)     No rescission or termination of this Agreement, by THE SELLER shall be effective without such notice and expiration of such cure period. Except as provided by the terms of the Guarantee, the GOT may, but shall be under no obligation to perform any act required of TANESCO hereunder with the same effect as if the payment or act had been made or performed by TANESCO. If the GOT fails to cure or is unable or unwilling to cure a default of TANESCO within the cure periods provided to TANESCO under this Agreement, THE SELLER shall have all of its rights and remedies with respect to such default as set forth in this Agreement; PROVIDED, HOWEVER, that if the GOT is diligently attempting to cure such default of TANESCO and, demonstrable progress toward affecting such cure is being made, the GOT shall be granted an additional period not exceeding ninety (90) Days to affect such cure before THE SELLER may exercise its rights and remedies with respect to such default set forth in this Agreement.

**16.5**    **Notice to the Lenders of THE SELLER's Default**

(a)    Anything in this Agreement notwithstanding, from and after the occurrence of the Financial Closing, TANESCO shall not seek to terminate this Agreement as the result of any default of THE SELLER without first giving a copy of any notices required to be given to THE SELLER under Articles 16.1 and 16.3 to the Lenders, such notice to be coupled with a request to the Lenders to cure any such default within the same cure period as provided to THE SELLER in this Agreement and such cure period to commence upon delivery of each such notice to the Lenders. If there is more than one Lender, the Lenders will designate in writing to TANESCO an agent (the "Agent") and any notice required hereunder shall be delivered to such Agent, such notice to be effective upon delivery to the Agent as if delivered to each of the Lenders. Each such notice shall be in writing and shall be deemed to have been delivered (a) when presented personally to the Lender or the Agent, (b) when transmitted by facsimile to the number specified in accordance with the procedure set forth below, or (c) five (5) Days after being deposited in a regularly maintained receptacle for the Postal Service in Tanzania, postage prepaid, registered or certified, return receipt requested, addressed to the Lender at the address indicated at Financial Closing ( or such other address or to the Agent at such address as the Lenders may have specified by written notice delivered in accordance herewith). Any notice given by facsimile under this Article 16.5 shall be confirmed in writing delivered personally or sent by prepaid post, but failure to so confirm shall render not void or invalidate the original notice if it is in fact received by the Lender or the Agent. If the address of the Lender or Agent is outside Tanzania, any notice delivered to the Lender or Agent pursuant to this Article 16.5 shall be sent by international courier or facsimile, and if sent by facsimile, confirmed by international courier. The address and facsimile number for Lender or Agent shall be provided to TANESCO by THE SELLER at Financial Closing and thereafter may be changed by the Lender or the Agent by subsequent delivery of a notice to TANESCO at the address or facsimile number for TANESCO provided in Article 19.3 (or at such other address or facsimile number subsequently delivered to the Lender or the Agent in accordance with this Article 16.5) and otherwise in accordance with the requirements of Article 19.3.

(b)    No rescission or termination of this Agreement by TANESCO shall be valid or binding upon the Lenders without such notice and the expiration of such cure period. The Lenders may make, but shall be under no obligation to make, any payment or perform any act required to be made or performed by THE SELLER, with the same effect as if made or performed by THE SELLER. If the Lenders fail to cure or are unable or unwilling to cure a default within the cure period as provided to THE SELLER in this Agreement, TANESCO shall have all its rights and remedies with respect to such default as set forth in this Agreement; provided, however, that if the Lenders are diligently attempting to cure such default of THE SELLER and demonstrable progress toward affecting such cure is being made, the Lenders shall be granted an additional period not exceeding ninety (90) Days to affect such cure before TANESCO may exercise its rights and remedies with respect to such default set forth in this Agreement.

**16.6**    **Obligations Upon Termination**

Upon expiration or termination of this Agreement, the Parties shall have no further obligations hereunder except for obligations that arose prior to such expiration or termination and obligations that expressly survive such expiration or termination pursuant to this Agreement, including without limitation, the obligation to pay expenses under Article 16.7 and Penalty and Bonus Payments under Article VI.



**16.7     Reimbursement**

In the event of a termination of this Agreement prior to the Commercial Operations Date for any reason other than (i) a TANESCO Event of Default; (ii) a GOT Event of Default under the Implementation Agreement; (iii) a Force Majeure Event or (iv) a Change in Law, THE SELLER shall reimburse TANESCO for all costs and expenses (including reasonable attorney's fees) relating to the project herein incurred by TANESCO prior to such termination, which amount in any event shall not exceed USD100,000

**16.8     Other Remedies**

The exercise of the right of a Party to terminate this Agreement, as provided herein, does not preclude the Party from exercising other remedies that are provided herein or are available at Law. Remedies are cumulative, and the exercise of, or failure to exercise, one or more remedy by a Party shall not limit or preclude the exercise of, or constitute a waiver of, other remedies by that Party; <u>PROVIDED HOWEVER</u>, that the remedies provided in Article 6.7 and 16.2 are exclusive remedies available to THE SELLER'.

**END OF ARTICLE**



## ARTICLE XVII - INDEMNIFICATION AND LIABILITY

### 17.1     Limitation of liability

Except as provided in Article 17.2, neither Party shall be liable to the other Party in contract, tort, warranty, strict liability, or any other legal theory for any indirect, consequential, incidental, punitive, or exemplary damages. Neither Party shall have any liability to the Party except pursuant to, or for breach of, this Agreement; PROVIDED, HOWEVER, that this provision is not intended to constitute a waiver of any rights of one Party against the other with regard to matters unrelated to this Agreement or to any activity not contemplated by this Agreement.

### 17.2     Indemnification

(a)     TANESCO

Except as specifically provided elsewhere in this Agreement, TANESCO shall indemnify THE SELLER against, and hold THE SELLER harmless from, at all times after the date hereof, any and all Losses incurred, suffered, sustained, or required to be paid, directly or indirectly, by or sought to be imposed upon, THE SELLER, to personal injury or death to persons or damage to property arising out of the negligent or intentional act or omission of TANESCO in connection with this Agreement. Notwithstanding anything to the contrary contained in the preceding sentence, nothing in this Article 17.2(a) shall apply to any loss in respect of which THE SELLER receives, indemnification in full pursuant to the terms of the Implementation Agreement.

(b)     THE SELLER

THE SELLER shall indemnify TANESCO against, and hold TANESCO harmless from, at all times after the date hereof, any and all Losses incurred, suffered, sustained, or required to be paid, directly or indirectly, by, or sought to be imposed upon, TANESCO for personal injury or death to persons or damage to property arising out of the negligent or intentional act or omission of THE SELLER in connection with this Agreement.

(c)     Joint Negligence

In event that injury or damage results from the joint or current negligent or intentional acts or omissions of the Parties, each Party shall be liable under this indemnification in proportion to its relative degree of fault.

(d)     Indemnification to Survive

The provisions of this Article 17.2 shall survive for a period of five (5) years following the termination of this Agreement.

### 17.3     Indemnification for Fines and Penalties

Any fines or other penalties incurred by a Party for non-compliance with the Law shall not be reimburse by the other Party but shall be the sole responsibility of the non-complying Party.





**17.4    Notice of Proceedings**

Each Party shall promptly notify the other Party of any Loss or proceeding in respect of which it is or may be entitled to indemnification under Article 17.2. Such notice shall be given as soon as reasonably practicable after the relevant Party becomes aware of the Loss or proceeding.

**17.5    Assertion of Claims to Exceed Minimum Indemnification Amount**

Each Party shall be solely liable, and shall not be entitled to assert any claim for indemnification under this Agreement, for any Loss that would otherwise be the subject of indemnification under this Agreement until all such Losses of such Party arising during the then-current Year exceed, in the aggregate, USD100,000. For purposes of this Article 17.5, a loss (or claim for indemnification) shall be deemed to arise in the Year the event giving rise to the Loss (or claim for indemnification) occurred or, if the event is continuing in more than one Year, in the Year during which the event ends.

**17.6    Defence of Claims**

(a)    The indemnifying Party shall be entitled, at its option, to assume and control the defence of such claim, action, suit or proceeding at its expenses and counsel of its selection, subject to the prior approval of the indemnified Party, PROVIDED it gives prompt notice of its intention to do so to the indemnified Party and reimburses the indemnified Party for the reasonable costs and expenses incurred by the indemnified Party prior to the assumption by the indemnifying Party of such defence.

(b)    Unless and until the indemnifying Party acknowledges in writing its obligations to indemnify the indemnified Party and assumes control of the defence of a claim, suit, action or proceeding in accordance with Article 17.6(a), the indemnified Party shall have the right, but not the obligation, to contest, defend and litigate, with counsel of its own selection, any claim, actions, suit or proceeding by any third party alleged or asserted against such Party in respect of, resulting from, related to or arising out of any matter for which it is entitled to be indemnified hereunder, and the reasonable costs and expenses thereof shall be subject to the indemnification obligations of the indemnifying Party hereunder.

(c)    Upon assumption by the indemnifying Party of the control of the defence of a claim, suit, action or proceeding, the indemnifying Party shall reimburse the indemnified Party for the reasonable costs and expenses of the indemnified Party in the defence of the claim, suit, action or proceeding prior to the indemnifying Party's acknowledgement of the indemnification and assumption of the defence.

(d)    Neither Party shall be to entitled settle or compromise any such claim, action, suit or proceeding without the prior written consent of the other Party; provided, however, that after agreeing in writing to indemnify the indemnified Party, the indemnifying Party may settle or compromise any claim without the approval of the indemnified Party.

(e)    Following the acknowledgement of the indemnification and the assumption of the defence by the indemnifying Party, the indemnified Party shall have the right to employ its own counsel and such counsel may participate in such actions, but the fees and expenses of such counsel shall be at the expense of such indemnified Party, when and as incurred, unless (i) the employment of counsel by such indemnified Party has been authorized in writing by the indemnifying Party, (ii) the indemnified Party shall have reasonably concluded that there may be a conflict of interest between the indemnifying Party and the indemnified Party in the conduct of the defence of such action, (iii) the indemnifying Party shall not in fact have employed independent



51

contributions, times a fraction, the numerator of which is the number of years remaining in the initial term of the Power Purchase Agreement and the denominator of which is two times the number of years remaining in the initial term of the Power Purchase Agreement at the time of such contribution or approval for each such additional equity amount.

counsel reasonably satisfactory to the indemnified Party to assume the defence of such action and shall have been so notified by the indemnified Party, or (iv) the indemnified Party shall have reasonably concluded and specifically notified the indemnifying Party either that there may be specific defence available to it that are different from or additional to those available to the Party or that such claim, action, suit or proceeding involves or could have a material adverse effect upon it beyond the scope of this Agreement. If clauses (ii), (iii) or (iv) of the preceding sentence shall be applicable, then counsel for the indemnified Party shall have the right to direct the defence of such claim, action, suit or proceeding on or behalf of the indemnified Party and the reasonable fees and disbursements of such counsel shall constitute legal or other expenses hereunder.

### 17.7    Double Jeopardy

A final, non-appealable order issued in a proceeding initiated by the GOT and based upon a claim of breach of the Implementation Agreement shall be with prejudice to any proceedings against THE SELLER based upon the same claim that TANESCO could otherwise bring for breach by THE SELLER of its obligations under this Agreement. Nothing in this Article shall prevent TANESCO and the GOT from separately initiating proceedings to terminate this Agreement and the Implementation Agreement, respectively, pursuant to Articles 16.1 and 16.3 of this Agreement and Article 19.1 and 19.3 of the Implementation Agreement.

**END OF ARTICLE**



## ARTICLE XVIII - DISPUTE RESOLUTION

**18.1**    **Resolution by Parties**

(a)    In the event that a Dispute arises, the Parties shall attempt in good faith to settle such Dispute by mutual discussion, which may include referring the Dispute to the Operations Committee, provided that any matters that are described in Article 7.4 shall be referred to the Operations Committee for its review and recommendations or attempted resolution, where appropriate.

(b)    In the event that the Dispute is not resolved by discussion in accordance with Article 18.1(a) or if either party does not agree with the recommendation of or resolution proposed by the Operations Committee or the Operations Committee has not made a recommendation or proposed a resolution within thirty (30) Days of the Dispute being referred to it; either Party may refer the Dispute to the chief executive officer or chief operating officer of THE SELLER and the Chief Executive Officer of TANESCO for further consideration. In the event the such individuals are unable to reach agreement within fifteen (15) Days, or such longer period as they may agree, then either Party may refer the matter to an expert in accordance with Article 18.2 hereof or, if the Dispute is not of a type required to be referred to an expert under Article 18.2, commence arbitration of the Dispute in accordance with Article 18.3.

**18.2**    **Mediation by Expert**

(a)    In the event that the Parties are unable to resolve a Dispute in accordance with Article 18.1, then either Party, in accordance with this Article 18.2, may refer the Dispute to an expert for consideration of the Dispute and to obtain a recommendation from the expert as to the resolution of the Dispute.

(b)    The Party initiating submission of the Dispute to the expert shall provide the other Party with a notice stating that it is submitting the Dispute to an expert and nominating the person it proposes to be the expert. The other Party shall, within fifteen (15) Days of receiving such notice, notify the initiating Party whether such person is acceptable. If the Party receiving such notice fails to respond or notifies the initiating Party that the person is not acceptable, the Parties shall meet and discuss in good faith for a period of ten (10) Days to agree upon a person to be the expert. If the Parties are unable to agree, the responding Party shall by the end of such ten (10) day period nominate a person to be an expert, whereupon the two nominated experts shall meet and agree upon a third person who shall be expert.

(c)    (i)    Consideration of the Dispute by an expert shall be initiated by the Party who is seeking consideration of the Dispute by the expert submitting to both the expert and the other Party written materials setting forth:

        (A)    a description of the Dispute;

        (B)    a Statement of the Party's position; and

        (C)    copies of records supporting the Party's position.

    (ii)    Within ten (10) Days of the date that a party has submitted the materials described in Article 18.2(c)(i), the other Party may submit to the expert:

        (A)    a description of the Dispute;

        (B)    a Statement of the Party's position; and





53

(C)     copies of any records supporting the Party's position.

The expert shall consider any such information submitted by the responding Party within the period provided in Article 18.2(c)(ii) and, in the expert's discretion, may consider any additional information submitted by either Party at a later date.

(d)     The Parties shall not be entitled to apply for discovery of documents, but shall be entitled to receive copies of the records submitted by the other Party.

(e)     Each Party shall designate one person knowledgeable about the issues in Dispute who shall be available to the expert to answer question and provide any additional information requested by the expert. Except of such person, a Party shall not be required to, but may, provide oral statements or presentations to the expert or make any particular individuals available to the expert.

(f)     Except as provided in Article 18.2(h) with respect to the payment of costs, the proceedings shall be without prejudice to any Party and any evidence given or statements made in the course of this process may not be used against a Party in any other proceedings. The process shall not be regarded as an arbitration and the laws relating to commercial arbitration shall not apply. Unless the Parties agree in a writing signed by both Parties at the time the expert is selected stating that the decision of the expert will be binding, determination of the expert shall not be binding.

(g)     When consideration of the Dispute by an expert is initiated, the expert shall be requested to provide a recommendation within fifteen (15) Days after the tenth (10) day response period provided in Article 18.2(c)(ii) above has run. If the expert's recommendation is given within such fifteen (15) Days period, of if the expert's recommendation is given at a later time and neither Party has at such time initiated any other proceeding concerning the Dispute, the parties shall review and discuss the recommendation with each other in good faith for a period of ten (10) Days following delivery of the recommendation before proceeding with any other actions.

(h)     If a Party does not accept the recommendation of the expert with respect to the Dispute, it may initiate arbitration proceedings in accordance with Article 18.3, provided, however, that prior to initiating the arbitration proceedings it shall have paid all costs of the expert (including the reimbursement of any costs paid to the other expert by the other Party) and all out-of-pocket costs of the other Party. Similarly if the expert has not submitted its recommendation within the time period provided in Article 18.2(g), a Party may initiate arbitration proceedings in accordance with Article 18.3, provided that prior to initiating the arbitration proceedings it shall have paid all costs of the expert (including the reimbursement of any costs paid to the expert by the other Party).

(i)     Except as provided in Article 18.2(h), the costs of engaging an expert shall be borne equally by the Parties and each Party shall bear its own costs in preparing materials for and making presentations to the expert.

If any Dispute shall arise between TANESCO and THE SELLER, the Parties shall attempt to settle such Dispute by mutual discussion or by resolution by the Operations Committee within thirty (30) Days of the date the disputing Party gives written notice of the Dispute to the non-disputing Party.

## 18.3     Arbitration

(a)     Any Dispute arising out of or in connection with this Agreement shall be settled by arbitration in accordance with the Rules of Procedures for Arbitration Proceedings (the "ICSID Rules") of the International Centre for the Settlement of Investment

Disputes (the "Centre") established by the Convention on the Settlement of Investment Disputes between States and Nationals of other States (the "Convention"). For purposes of consenting to the jurisdiction of the Convention, the Parties agree that THE SELLER is a foreign controlled entity unless the amount of the voting stock in THE SELLER held by foreign investors should decrease to less than fifty percent (50%) of the outstanding voting stock of THE SELLER.

(b)     If for any reason the Dispute cannot be settled in accordance with the ICSID Rules, whether due to any failure to implement the Convention, or THE SELLER should not be agreed to be a foreign controlled entity, or the request for arbitration proceedings is not registered by the Centre, or the Centre fails or refuses to take jurisdiction over such Dispute, or otherwise, such Dispute shall be finally settled by arbitration under the Rules of Arbitration of the International Chamber of Commence (the "ICC Rules") by one or more arbitrators appointed in accordance with the ICC Rules.

(c)     The arbitration shall be conducted in London, England and, unless otherwise agreed by the Parties, the number of arbitrators shall be three, one arbitrator nominated by THE SELLER, one arbitrator nominated by TANESCO and one arbitrator nominated by the arbitrators appointed by THE SELLER and TANESCO provided that if the arbitrators appointed by THE SELLER and TANESCO fail to nominate an arbitrator or agree on the nomination of the arbitrator within 28 days of either both being appointed either party may apply to the High Court of the England and Wales to appoint the third arbitrator.

(d)     No arbitrator appointed pursuant to Article 18.3(b) or Article 18.3(c) shall be a national of the jurisdiction of either Party to this Agreement or of the jurisdiction of any shareholder or group of shareholders holding more than thirty (30) percent of THE SELLER nor shall any such arbitrator be an employee or agent or former employee or agent of any such person.

(e)     The Law governing the procedure and administration of any arbitration instituted shall be the English Law.

## 18.4    Commercial Acts

TANESCO unconditionally and irrevocably agrees that the execution, delivery and performance by it of this Agreement and those agreements included in the Security Package to which it is a party constitute private and commercial acts.

## END OF ARTICLE

## ARTICLE XIX - MISCELLANEOUS

### 19.1    Transfers

Except as required by the Financing Parties under the Financing Documents, THE SELLER may not sell, convey, transfer or otherwise dispose of the Facility and the Site or any material part or any interest therein to any Party without the prior written consent of TANESCO, which consent shall not be unreasonably withheld or delayed.

### 19.2    Assignment

Neither this Agreement nor any of the rights or obligations hereunder, may be assigned, transferred or delegated by either Party without the express prior written consent of the other party, which consent shall not be unreasonably withheld or delayed provided that THE SELLER may assign its rights and/or obligations under this Agreement to the Financing Parties and their successors and assigns as required for financing and refinancing purposes, and provided further that, unless expressly agreed to by the other Party, no assignment, whether or not consented to, shall relieve the assignor of its obligations hereunder in the event its assignee fails to perform.

### 19.3    Notices

Except for Despatch orders and as otherwise specified in this Agreement, any notice, demand for information or documents required or authorised by this Agreement to be given to a Party shall be given in writing. All Notices shall be deemed delivered:

(a)  when presented personally;

(b)  if received on a Business Day for the receiving Party, when transmitted by facsimile to the receiving Party's facsimile number specified herein and, if received on a Day that is not Business Day for the receiving Party, on the first Business Day following the date transmitted by facsimile to the receiving Party's facsimile number specified herein,;

(c)  one (1) Day after being delivered to a courier for overnight delivery, addressed to the receiving Party, at the address indicated above (or such other address as such Party may have specified by Notice delivered to the delivering Party at its address or facsimile number specified herein) or

(d)  five (5) Days after being deposited in a regularly maintained receptacle for the postal service in Tanzania, postage prepaid, registered or certified, return receipt requested, addressed to the receiving Party, at the address indicated above (or such other address as the receiving Party may have specified by written Notice delivered to the delivering Party at its address or facsimile number specified herein). Any notice given by facsimile shall be confirmed in writing delivered personally or sent by registered or certified mail, but the failure to so confirm shall not void or invalidate the original notice if it is in fact received by the Party to which it is addressed.

The address for the delivery of notices and bills to each Party and the respective telephone and facsimile numbers are as follows :



56

| (a) | For THE SELLER | : | Independent Power Tanzania Ltd. |
| | Attention | : | Managing Director |
| | Address | : | 5th Floor, Extelcoms, Samora Avenue, P O Box 1461, Dar-es-Salaam, United Republic of Tanzania |
| | Telephone | : | 51-46017 |
| | Facsimile | : | 51-46017 |
| (b) | For TANESCO | : | Tanzania Electric Supply Company Limited |
| | Attention | : | Managing Director |
| | Address | : | P O Box 9024, Dar-es-Salaam, United Republic of Tanzania |
| | Telephone | : | 51-46242 |
| | Facsimile | : | 51-44668/36427/26704 |

**19.4    Choice of Law**

This Agreement shall be governed by, and construed in accordance with, the laws of Tanzania.

**19.5    Entire Agreement**

This Agreement constitutes the entire understanding between the Parties and supersedes any and all previous understandings between the Parties with respect to the subject matter hereof. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.

**19.6    Further Assurances**

If either Party determines in its reasonable discretion that any further instruments or other things are necessary or desirable to carry out the terms of this Agreement, the other Party shall execute and deliver all such instruments and assurances and do all things reasonable necessary or desirable to carry out the terms of this Agreement.

**19.7    Waiver**

No waiver by either Party of the performance of any obligation under this Agreement or with respect to any default or any other matter arising in connection with this Agreement shall be deemed a waiver with respect to any subsequent performance, default or matter.

**19.8    Modification or Amendment**

This Agreement may be modified or amended, and any provision hereof may be waived, by an instrument in writing and signed by both Parties.

**19.9    Severability**

If any term or provision of this Agreement or the application thereof to any Person or circumstances shall to any extent be declared invalid or unenforceable by any governmental authority or court of competent jurisdiction, the remainder of this Agreement or the application of such term or provision to Persons or circumstances other than those as to which it is declared invalid or unenforceable shall not be affected thereby, and each other term and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by Law.

**19.10    Counterparts**

This Agreement may be executed in counterparts all of which shall constitute one agreement binding on both Parties and shall have the same force and effect as an original instrument, notwithstanding that both Parties may not be signatories to the same original or the same counterpart.

**19.11    Confidential Information**

Any information provided by either Party to the other Party pursuant to this Agreement and labelled "CONFIDENTIAL" shall be utilized by the receiving Party solely in connection with the purpose of this Agreement and shall not be disclosed by the receiving Part to any third Party, except with the providing Party's consent, and upon request of providing Party shall be returned thereto. Notwithstanding the above, the Parties acknowledge and agree that such information may be disclosed to the Financing Parties, suppliers and potential suppliers of Fuel and major equipment to the Facility and other third parties as may be necessary for TANESCO and THE SELLER to perform their obligations under this Agreement. To the extent that such disclosures are necessary, the Parties also agree that they shall endeavour in disclosing such information to seek to preserve the confidentiality of such disclosures. This provision shall not prevent either Party from providing any confidential information received from the other Party to any court or governmental authority as may be required by such court or governmental authority, provided that, if feasible, the disclosing Party shall have given prior notice to the other Party of such required disclosure and, if so requested by such other Party, shall have used all reasonable efforts to oppose the requested disclosure, as appropriate under the circumstances, or to make other such disclosures pursuant to a protective order or other similar arrangement for confidentiality.

**19.12    Independent Contractors**

The Parties are independent contractors. Nothing contained herein shall be deemed to create an association, joint venture, partnership or principal/agent relationship between the Parties or to impose any partnership obligation or liability on either Party. Neither Party shall have any right, power or authority to enter into any agreement or commitment, act on behalf of, or otherwise bind the other Party in any way.

**19.13    Third Parties**

This Agreement is intended solely for the benefit of the Parties. Nothing in this Agreement shall be construed to create any duty or liability to or standard of care with reference to any other Person.

**19.14    Headings**

The headings contained in this Agreement are solely for the convenience of the Parties and

should not be used or relied upon in any manner in the construction or interpretation of this Agreement.

**19.15    Language**

(a)       The official text of this Agreement shall be in the English languages.

(b)       All documents, notices, waivers and all other communications, written or otherwise, between the Parties in connection with this Agreement shall be in the English language.

**END OF ARTICLE**





IN WITNESS WHEREOF, the Parties hereto have hereunto affixed their hands and seals the day and year above written.


THE COMMON SEAL OF
TANZANIA ELECTRIC SUPPLY COMPANY LTD.
was hereunto affixed
in the presence of :


....................
Director

....................
Secretary


THE COMMON SEAL OF
INDEPENDENT POWER TANZANIA LTD.
was hereunto affixed
in the presence of :


....................
Director

....................
Secretary

S. Abubaker

# POWER PURCHASE AGREEMENT

## DATED 26TH MAY, 1995

## BETWEEN

## INDEPENDENT POWER TANZANIA LIMITED

## AND

## TANZANIA ELECTRIC SUPPLY COMPANY LIMITED

## ADDENDUM NO. 1 DATED 9TH DAY OF JUNE, 1995

This Addendum No. 1 to the Power Purchase Agreement dated 26th May, 1995 between INDEPENDENT POWER TANZANIA LIMITED (" THE SELLER") and TANZANIA ELECTRIC SUPPLY COMPANY LIMITED (TANESCO) amends the main agreement as below:- The capitalised terms used herein bear the same meaning as defined in the Power Purchase Agreement dated 26th day of May, 1995.

1.    Before commencement of commercial operations the Reference Tariff mentioned in Table I of Appendix B will be adjusted upwards or downwards depending on the effect of changes that will have taken place on any or all the underlying assumptions stated in the Power Purchase Agreement.

2.    Article VI (6.6) is amended to read the Escrow Account opened by Government of Tanzania on behalf of TANESCO.

IN WITNESS WHEREOF, the Parties hereto have set
their hands and seals the day and year above written.

THE COMMON SEAL OF
TANZANIA ELECTRIC SUPPLY COMPANY LIMITED
was hereunto affixed in the presence of:

**S. L. Mhaville**
**Managing Director**

**M. S. Masanja**
**Company Secretary**

THE COMMON SEAL OF
INDEPENDENT POWER TANZANIA LIMITED
was hereunto affixed in the presence of:

-------------------------
**D I R E C T O R**

-------------------------
**DIRECTOR/SECRETARY**

2

# EXHIBIT B

`

## DATED THIS 8TH DAY OF JUNE 1995

### BETWEEN

## GOVERNMENT OF THE UNITED REPUBLIC OF TANZANIA

### AND

## INDEPENDENT POWER TANZANIA LIMITED

---

### GUARANTEE

---

# GUARANTEE

**THIS GUARANTEE** is made at Dar es Salaam, United Republic of Tanzania the of 8th day of June 1995

## BETWEEN:

**THE GOVERNMENT OF THE UNITED REPUBLIC OF TANZANIA** acting through its Ministry of Water, Energy and Minerals (hereinafter referred to as the "Guarantor") of the one part; and

**Independent Power Tanzania Limited** a limited company incorporated under the laws of Tanzania, whose registered office is located at 5th Floor, Extelcoms House, Samora Avenue, P O Box 1461, Dar-es-Salaam, United Republic of Tanzania (hereinafter referred to as the "Company") of the other part.

## WHEREAS:

(A)     The Guarantor and the Company have entered into an Implementation Agreement (the "Implementation Agreement") dated 8th day of June 1995.

(B)     The Tanzania Electric Supply Company Limited ("TANESCO") has entered into a Power Purchase Agreement with the Company (the "Power Purchase Agreement") dated 26th day of May 1995

(C)     In accordance with Article XXII of the Implementation Agreement, the Guarantor has agreed to enter into this Guarantee of the payment obligations of TANESCO under the Power Purchase Agreement.

**NOW IT IS HEREBY** AGREED as follows:

1    **GUARANTEE**

1.1    **Guarantee**

In consideration of the Company entering into the Power Purchase Agreement with TANESCO the Guarantor hereby irrevocably and unconditionally guarantees and promises to pay the Company any and every sum of money TANESCO is obligated to pay to the Company pursuant to the Power Purchase Agreement TANESCO has failed to pay in accordance with the terms of those agreements.

1.2    **Waiver of Defence**

The obligations of the Guarantor under this Guarantee shall be absolute and unconditional and shall remain in full force and effect until all the covenants, terms, and agreements set forth in the Power Purchase Agreement, shall have been completely discharged and performed, unless waived by the Company in writing. The obligations of the Guarantor shall not be modified or impaired upon the happening from time to time of any event, including the following:

1.2.1    The extension of time for payment of any amounts due or of time for performance of any of the covenants, terms, or agreements of TANESCO, set forth in the Power Purchase Agreement.

1.2.2    Amendments to the Power Purchase Agreement that do not affect in any material way the rights or obligations of TANESCO, or the Company under those agreements.

1.2.3    The failure, omission, or delay by the Company to enforce, ascertain, or exercise any right, power or remedy under or pursuant to the terms of the Power Purchase Agreement, Insurance, or this Guarantee;

1.2.4    The bankruptcy, insolvency, or other failure or financial disability of TANESCO, or the Company; or

1.2.5    The addition, or partial or entire release of any guarantor, maker, or other Party (including TANESCO) primarily or secondarily responsible for the performance of any of the covenants, terms, or agreements set forth in the Power Purchase Agreement or by any extension, waiver, amendment, or thing whatsoever that may release or create a defence for a guarantor (other than performance in accordance with the terms of the Power Purchase Agreement).

**1.3     Continuing Guarantee**

1.3.1   This Guarantee shall be a continuing security and, accordingly, shall extend to cover the balance due to the Company at any time from TANESCO under the Power Purchase Agreement. No demand made by the Company hereunder shall prejudice or restrict the right of the Company to make further or other demands.

**1.4     Additional Security**

1.4.1   This Guarantee shall be in addition to, and not in substitution for or derogation of, any other security that the Company may at any time hold in respect of the obligations of TANESCO under the Power Purchase Agreement.

1.4.2   The Company may enforce this Guarantee notwithstanding that it may hold any other guarantee, lien, or security of or for the obligations of TANESCO under the Power Purchase Agreement or have available to it any other remedy at law or equity.

**1.5     Preliminary Recourse**

1.5.1   Before taking steps to enforce this Guarantee and demanding payment from the GOT, the Company shall be obliged only to make demand in writing for payment from TANESCO. After 30 Days (during which time the Company shall make further requests for payment, with a copy to the GOT of each request, from TANESCO from the date payment was due, the Company may notify the GOT in writing that payment from TANESCO is past due and make a demand for payment from the GOT under this Guarantee, and the GOT shall make payment within five (5) Days. Late payments hereunder shall bear mark-up at an annual rate equal to the then applicable one-year LIBOR rate plus three (3) percentage points. Amounts in dispute under the Power Purchase Agreement shall be deemed not to be due and owing for purposes of this Guarantee until expiration of any dispute resolution procedures provided in each of the respective Agreements.

1.5.2   Except as provided in Article 1.4.1, the Company shall not be obliged before taking steps to enforce this Guarantee to exercise any other remedies that may be available to it under or in respect of the Power Purchase Agreement or to obtain judgment against TANESCO thereon.

**1.6     Certification**

Any demand for payment made pursuant to this Guarantee shall be made in person by a duly authorized officer of the Company at the Guarantors offices at Sokoine Drive, Mkwepu Street, PO Box 2000, Dar es Salaam, United Republic of Tanzania and shall be accompanied by a certificate signed by a duly authorized officer of the Company stating that:

"We hereby certify that (1) [specify Company], (the "Company") is making this demand on the Government of the Republic of Tanzania (the "Guarantor") in the amount of United States Dollars [insert amount] in accordance with Article 1 of the Guarantee dated 8th day of June 1995, between the Guarantor and the Company; (2) the amount specified above is due and payable by the Tanzania Electric Company Limited ("TANESCO") under the Power Purchase Agreement between the Company and TANESCO and no part of the amount specified above is the subject of a dispute between the Parties; (3) demand in writing for payment from TANESCO has been made; (4) for a period of not less than 30 Days from the date payment was due, further request for payment have been made to TANESCO or to obtain the payment of such amount; and (5) such amount, on the date hereof, remains unpaid by TANESCO".

## 1.7   Subordination

Any right that the Guarantor may at any time have to be indemnified by TANESCO in respect of sums paid out by the Guarantor in performance of this Guarantee shall be subordinated to the rights of the Company to recover from TANESCO in full all sums that may at any time become due from TANESCO under the Power Purchase Agreement.

## 1.8   No Set-off

No set-off, counterclaim, reduction, or diminution of any obligation that the Guarantor has or may have against the Company shall be available to the Guarantor against the Company in connection with any obligation of the Guarantor to the Company under this Guarantee; provided, however, that notwithstanding the foregoing the Guarantor shall have the benefit of all rights of set-off, counterclaim, reduction, or diminution of any obligations that are available to TANESCO, pursuant to the Power Purchase Agreement or that are otherwise directly related to the Project.

## 1.9   Consent to Jurisdiction

Each Party hereby consents to the jurisdiction of the courts of London, England for any action filed by the Party to enforce any award or decision of any arbitrator(s) or expert(s) who are duly appointed under this Agreement to resolve any Dispute between the Parties. With respect to any such proceedings for the enforcement of any such award against the assets of a Party (other than the Protected Assets in the case of enforcement proceedings against the GOT):

(a)     The GOT appoints the Commercial Counsellor of The United Republic of Tanzania in London (or, in his absence, a responsible officer in the Tanzania High Commission) whose address is presently 43 Hertford Street, London W1Y 7TF, England to receive for and on its behalf service of process in such jurisdiction in any such enforcement proceeding;

(b)     The Company appoints  Mr. Ahmed Daya  whose address is presently 212,

Station Road, Edgware, Middlesex HA8 7AR, England to receive for and on its behalf service of process in such jurisdiction in any such enforcement proceeding;

(c)  Each Party shall maintain in England a duly appointed agent for the receipt of service of process and shall notify the other Party of the name and address of such agent and any change in such agent and/or the address of such agent; and

(d)  Each Party agrees that the failure by any such agent for the receipt of service of process to give it notice of any process that has been served on such agent shall not impair the validity of such service or of any judgment based thereon.

## 2  REPRESENTATIONS AND WARRANTIES

The Guarantor represents and warrants that, as of the date hereof:

### 2.1 Power and Authority

The Guarantor has full power, authority, and legal right to incur the obligation, to execute and deliver, and to perform and observe the terms and provisions of this Guarantee.

### 2.2 Legal Validity

This Guarantee constitutes legal, valid, binding, and enforceable obligations of the Guarantor in accordance with its terms.

### 2.3 Approvals

All necessary action has been taken, and all approvals required have been obtained, under the Laws of Tanzania to authorize the execution, delivery, and performance of this Guarantee.

### 2.4 Tax

In addition to any amount then due and payable to the Company by TANESCO under the Power Purchase Agreement respectively, and payable by the Guarantor under the terms of this Guarantee, the Guarantor shall be liable for any duty, impost, levy, charge, fee or tax of whatsoever nature ("Tax") levied or imposed by a Governmental Authority or any political subdivision or authority thereof on or with regard to any payment hereunder unless the payment, if made by TANESCO would itself have been subject to the Tax. If under applicable law the Guarantor is unable to pay the Tax and the Company is required to pay the Tax, the amount to be paid to the Company hereunder shall be increased by an amount sufficient so that such payment, net of the Tax, would equal the payment the Company would have received from TANESCO net of any Taxes applicable to payment from TANESCO to the Company.

### 2.5 Full Faith and Credit

The obligations and covenants of the Guarantor in this Guarantee constitute unconditional obligations of the Guarantor, for the performance of which the full faith and credit of the Guarantor is pledged.

### 2.6 Sovereign Immunity

The Guarantor irrevocably and unconditionally agrees that it is subject to suit in the England with respect to its obligations hereunder, and that the execution, delivery, and performance of this Guarantee constitute private and commercial acts of the Guarantor. The GOT hereby irrevocably and unconditionally agrees: (i) that should any proceedings be brought against the GOT or its assets, other than its aircraft, naval vessels and other defence related assets or assets protected by the diplomatic and consular privileges under the State Immunity Act of England or the Foreign Sovereign Immunities Act of the United States or any analogous legislation (the "Protected Assets"), in any jurisdiction in connection with this Guarantee or any of the transactions contemplated by this Guaranty, no claim of immunity from such proceedings will be claimed by or on behalf of the GOT on behalf of itself or any of its assets (other than the Protected Assets); (ii) it waives any right of immunity which it or any of its assets (other than the Protected Assets) now has or may in the future have in any jurisdiction in connection with any such proceedings; and (iii) it consents generally in respect of the enforcement of any judgment against it in any such proceedings in any jurisdiction to the giving of any relief or the issue of any process in connection with such proceedings (including without limitation, the making, enforcement, or execution against or in respect of any of its assets whatsoever (other than the Protected Assets) regardless of the use or intended use of the asset.

## 3   UNDERTAKING

### 3.1 Duration

This Guarantee shall remain in full force and effect from and after the date hereof until the termination of the initial term of the Power Purchase Agreement and for so long thereafter as any amount owned the Company by the Guarantor, TANESCO, in connection with such initial term is or may be outstanding.

### 3.2 Performance of Agreements

The Guarantor shall not take any action that would prevent or interfere with the performance by TANESCO of any of its obligations under the Power Purchase Agreement (except, in the case of any unintentional action, where the Guarantor promptly remedies such action).

## 4   NO WAIVER; REMEDIES CUMULATIVE

### 4.1 No Waiver

No failure or delay by the Company to exercise any right or remedy under this Guarantee shall constitute a waiver of that right or remedy. No single or partial exercise of any right or remedy shall preclude any other or further exercise thereof or the exercise of any other right or remedy. No waiver by the Company shall be effective unless it is in writing.

### 4.2 Remedies Cumulative

The rights and remedies of the Company provided by this Guarantee are cumulative and not exclusive of any rights or remedies provided by law.

## 5   NOTICES

### 5.1 Address for Notice

All notices or other communications (together "Notices") to be given or made hereunder shall be in writing, shall be addressed for the attention of the person indicated below and shall be delivered personally or sent by registered or certified mail or facsimile. All Notices shall be deemed delivered (a) when presented personally, (b) if received on a business Day of the receiving Party, when transmitted by facsimile to the receiving Party's facsimile number specified above and, if received on a Day that is not a business Day of the receiving Party, on the first business Day of the receiving Party following the date transmitted by facsimile to the receiving Party's facsimile number specified above, (c) one (1) Day after being delivered to a courier for overnight delivery, addressed to the receiving Party, at the address indicated above (or such other address as such Party may have specified by notice delivered to the delivering Party at its address or facsimile number specified above) or (d) five (5) Days after being deposited in a regularly maintained receptacle for the postal service in Tanzania, postage prepaid, registered or certified, return receipt requested, addressed to the receiving Party, at the address indicated above (or such other address as the receiving Party may have specified by written Notice delivered to the delivering Party at its address or facsimile number specified above). Any notice given by facsimile shall be confirmed in writing delivered personally or sent by registered or certified mail, but the failure to so confirm shall not render void or invalidate the original notice if it is in fact received by the Party to which it is addressed. The address for service of each Party and its respective facsimile number shall be:

| 5.1.1 | For the Guarantor | : | The Government of United Republic of Tanzania |
|---|---|---|---|
| | * Attention | : | The Principal Secretary<br>Ministry of Water, Energy and Minerals |
| | * Address | : | Sokoine Drive, Mkwepu Street<br>PO Box 2000<br>Dar es Salaam<br>United Republic of Tanzania |
| | * Facsimile | : | 51-44071 |
| 5.1.2 | For the Company | : | Independent Power Tanzania Ltd. |
| | * Attention | : | Mr. James Mugemalira |
| | * Address | : | 5th Floor, Extelcoms House<br>Samora Avenue, P O Box 1461<br>Dar es Salaam<br>United Republic of Tanzania |
| | * Facsimile | : | 51-46017 |
| | * with a copy to the Company's counsel: | | LONG & COMPANY |
| | * Attention | : | Ms. Joanne Long |
| | * Address | : | 9B Bukit Ceylon, 50200 Kuala Lumpur, Malaysia |
| | * Facsimile | : | 603- 201 4832 |

or such other addresses or facsimile numbers as either Party may have notified to the other Party in accordance with this Article 5.1.

## 5.2 Effectiveness of Service

Each Notice under this Guarantee shall be effective only upon actual receipt thereof.

# 6   ASSIGNMENT

## 6.1 Assignment by the Guarantor

The Guarantor may not assign or transfer all or any part of its rights or obligations hereunder without the prior written consent of the Company.

**6.2 Assignment by the Company**

The Company may not assign or transfer all or any part of its rights or obligations hereunder without the prior written consent of the Guarantor. Notwithstanding the provision of the immediately preceding sentence, for the purpose of construction or permanent financing of the GOT, the Company may assign or create a security interest over its rights and interests in and to this Guarantee.

**6.3 Successors**

This Guarantee shall be binding upon and inure to the benefit of the Guarantor and the Company and the respective successors and permitted assigns of each.

# 7    GOVERNING LAW AND ARBITRATION

**7.1 Governing Law**

The rights and obligations of the Parties under or pursuant to this Guarantee shall be governed by and construed according to the Laws of Tanzania.

**7.2 Arbitration**

Any dispute or difference between the Parties arising out of or in connection with this Agreement shall be arbitrated in accordance with Article 21.2 of the Implementation Agreement.

# 8    MISCELLANEOUS

**8.1 Severability**

If one or more provisions contained in this Guarantee is held or found to be invalid, illegal, or unenforceable in any respect, the provision(s) shall be given effect to the extent permitted by law and the invalidity, illegality, or unenforceability of any provision shall not affect the validity of the remaining provisions of this Guarantee.

**8.2 Definitions**

The capitalized terms used but not defined in this Guarantee shall have the meanings given to them in the Implementation Agreement.

IN WITNESS WHEREOF, this Guarantee has been executed the day first above written.

**THE GOVERNMENT OF THE UNITED REPUBLIC OF TANZANIA**

.........................................................

By        :   RAPHAEL MOLLEL
Title     :   PRINCIPAL SECRETARY
              MINISTRY OF WATER, ENERGY AND MINERALS

**INDEPENDENT POWER TANZANIA LTD.**

.........................................................

By        :   JAMES B. RUGEMALIRA
Title     :   DIRECTOR

# EXHIBIT C

DATE OF DISPATCH TO THE PARTIES: JULY 12, 2001

## BEFORE THE INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES

### ICSID Case No. ARB/98/8

**TANZANIA ELECTRIC SUPPLY COMPANY LIMITED**

**Claimant**

-and-

**INDEPENDENT POWER TANZANIA LIMITED**

**Respondent**

---

### FINAL AWARD

---

BEFORE THE INTERNATIONAL CENTRE FOR SETTLEMENT
OF INVESTMENT DISPUTES

ICSID Case No. ARB/98/8

TANZANIA ELECTRIC SUPPLY COMPANY LIMITED

Claimant

-and-

INDEPENDENT POWER TANZANIA LIMITED

Respondent

FINAL AWARD

1.    The Claimant, Tanzania Electric Supply Company Limited ("TANESCO"), is a Tanzanian corporation, being a public utility wholly owned by the United Republic of Tanzania, and charged with responsibility for the generation, supply and transmission of electric power throughout the country.

2.    The Respondent, Independent Power Tanzania Limited ("IPTL"), is similarly a corporation incorporated in Tanzania.  It was formed as a "joint venture" company between VIP Engineering & Marketing Limited, a Tanzanian engineering company, and Mechmar Corporation (Malaysia) Berhard, a Malaysian corporation.

1

3.   This arbitration arises out of a Power Purchase Agreement ("PPA") dated "as of" 26 May 1995 between TANESCO and IPTL, whereby IPTL agreed to design, construct, own, operate and maintain an electricity generating facility with a nominal net capacity of 100 megawatts, to be located in Tegeta, Tanzania (approximately 25 kilometres north of Dar es Salaam) (the "Facility"), and to operate the Facility and deliver electricity generated thereby to TANESCO for an initial period of 20 years, subject to extension for further periods as therein provided.  We refer to the project as "the Project".

4.   Under Article V of the PPA, the price to be paid after the Initial Operations Date of the first unit comprised three basic elements, namely:

   (1)   A "Capacity Payment";

   (2)   An "Energy Payment";

   (3)   A "Test Energy Payment", to be applied before the applicable Commercial Operations Date.

5.   Under Appendix B, a "Reference Tariff" was to be established, comprising a "Capacity Purchase Price" (which in turn consisted of two elements, namely a "Capital Component" and a "Debt Component"), and an "Energy Purchase Price" (also consisting of two elements, namely a "Fuel Cost Component", and a "Variable Operations and Maintenance Costs Component"), which was subject to escalation/variation in accordance with the detailed provisions of Appendix B so as to arrive at the actual price or tariff to be payable.

6.   Under Article IV it was a condition precedent to the obligation of TANESCO to purchase

2

electrical energy and capacity from IPTL that IPTL should have fulfilled certain conditions, including in particular under Article 4.1(b) the submission, not less than 30 days prior to the Commencement Date of a certificate from the Independent Engineer stating that the Facility, when constructed in accordance with the general layout drawings submitted therewith would (inter alia) conform with the Description of the Facility; and under Article 4.1(c) the provision, as soon as available but in any event prior to the Initial Operations Date of each unit, of a certificate from the Independent Engineer stating that the Facility has been designed and constructed (inter alia) in all material respects in accordance with the terms of the Agreement and the general layout drawings.

7.    Addendum No. 1 to the PPA, dated 9 June 1995, provided (inter alia):

> "Before commencement of commercial operations the Reference Tariff mentioned in Table I of Appendix B will be adjusted upwards or downwards depending on the effect of changes that will have taken place on any or all the underlying assumptions stated in the Power Purchase Agreement".

8.    On 8 June 1995, an Implementation Agreement and a Guarantee Agreement were entered into between the Government of the United Republic of Tanzania and IPT.

9.    The above contractual relationship was entered into against the background of a severe shortage of electric power within Tanzania, which was apparently due in part to developments in the economy which stimulated significant growth in the demand for electricity, coupled with problems experienced within Tanzania's existing hydro-generated power system. A firm of international consultants, Acres International Limited ("Acres"), had been involved in advising the Government of Tanzania and TANESCO on

3

a continuing basis since the late 1970's. By 1995, the need for further generating capacity was regarded as urgent.

10.    Article XVIII of the PPA provided (inter alia) agreed machinery for the resolution of disputes. By Article 18.3, it was agreed that any dispute arising out of or in connection with the PPA should be settled by arbitration in accordance with the Rules of Procedure for Arbitration Proceedings of the International Centre for the Settlement of Investment Disputes (the "ICSID Arbitration Rules") established by the Convention on the Settlement of Investment Disputes between States and Nationals of other States (the "ICSID Convention"), and that for the purposes of consenting to the jurisdiction of the Centre it was agreed that IPTL was a foreign-controlled entity, unless the amount of the voting stock in IPTL held by non-Tanzanian investors should decrease to less than fifty per cent of its voting stock. Such arbitration was to be conducted in London, England and, unless otherwise agreed by the parties, before a tribunal of three arbitrators - one to be nominated by TANESCO, one to be nominated by IPTL, and the third to be nominated by the party - nominated arbitrators or failing their agreement by the High Court of England and Wales.

11.    Disputes did arise between the parties, as hereinafter more particularly defined, which were duly referred to arbitration pursuant to the aforesaid contractual provision - the Request for Arbitration being lodged with ICSID on 25 November 1998, and formally registered by the Secretary-General on 7 December 1998.

12.    TANESCO and IPTL nominated the Honorable Charles N Brower of Messrs White &

4

Case LLP, 601 Thirteenth Street, NW, Suite 600 South, Washington, DC, United States of America, and the Honourable Andrew Rogers QC of 233 Macquarie Street, Level 7, Sydney NSW 2000, Australia respectively as arbitrators, and the two arbitrators so nominated agreed to the appointment of Kenneth Rokison QC of 20 Essex Street, London WC2R 3AL, United Kingdom to be third arbitrator and President of the Tribunal. The Tribunal was fully constituted on 24 March 1999.

13. The arbitral proceedings have been conducted throughout in accordance with the ICSID Convention and the ICSID Arbitration Rules, under the auspices and administration of the Centre in Washington, DC. Jurisdiction in this case has at no time been contested by either party. TANESCO was designated by Tanzania as an agency of that state pursuant to Article 25(1) of the Convention on 24 September 1998, and TANESCO's consent to arbitrate disputes with IPTL in accordance with the ICSID Arbitration Rules as provided by Article XVIII of the PPA was expressly approved by the Government of Tanzania by Article 21.2 of the Implementation Agreement. IPTL, although a Tanzanian corporation, has at all material times been owned and controlled to the extent of at least 70% by nationals of Malaysia. Both Tanzania and Malaysia are parties to the ICSID Convention.

14. In due course, on 4 February 1997, an Engineering, Procurement and Construction Contract (the "EPC Contract") was concluded between IPTL and Stork-Wartsila Diesel B.V. ("Stork-Wartsila"), a company established in The Netherlands, for the purpose of constructing the generation plant required to perform the PPA. In addition, on 21 May 1997, IPTL entered into a Fuel Supply Agreement (the "FSA") with Galana Petroleum Limited ("Galana") and Total International Limited ("Total") for an initial term of 5 years

5

to supply the fuel necessary to operation of the Facility.

15.    As the Facility was being constructed and the prospect of commencing commercial operations came nearer, the disagreements between the parties which ultimately led to this arbitration developed. In particular, TANESCO took issue with the fact that the EPC Contract with Stork-Wartsila called for the provision of ten 10 MW medium speed diesel engines, instead of the five 20 MW slow speed diesels originally envisioned under the terms of the PPA. Further, it was becoming necessary for the parties to discuss adjustment of the Reference Tariff as foreseen in Addendum No. 1 to the PPA.

16.    These events took place against the background of apparent controversy within Tanzania regarding a competing project, known as the SONGO-SONGO Gas-to-Electricity or "SONGAS" Project, in respect of which agreements had been initialed on 23 March 1997 between (inter alia) the Government of Tanzania, TANESCO, and two Canadian companies, Ocelot Energy Inc. ("Ocelot") and TransCanada Pipelines Limited. This rival project was to be built by Canadian interests and financed by the International Bank for Reconstruction and Development. There was evidence in the arbitration that, notwithstanding the urgency with which the PPA had been concluded in 1995, pressures were thereafter exerted both on and within the Government of Tanzania and TANESCO to defer it, if not eliminate it, in favour of the SONGAS Project.

17.    On 9 April 1998, on the eve of scheduled discussions between TANESCO and IPTL on the adjustment of the Reference Tariff TANESCO served on IPTL a Notice of Default asserting that IPTL was "in default on its obligation to supply and install slow speed

6

diesel generating sets in accordance with Section 1.1 of Appendix A to the PPA" and calling upon IPTL to cure such default within 90 days as required under Article 16.3 of the PPA

18.    Negotiations proceeded somewhat sporadically during the course of the summer and early autumn of 1998 with the participation of the Tanzanian Government, TANESCO, and its legal and technical advisers, Hunton & Williams and Acres respectively, together with IPTL.  However the parties remained at loggerheads regarding both adjustment of the Reference Tariff and the substitution of medium speed diesels for slow speed diesels.

19.    On 25 November 1998 the Request for Arbitration was lodged on behalf of TANESCO, asserting two claims:

(1)    That medium speed diesel engines had been substituted for the required slow speed diesels without obtaining the prior written consent of TANESCO, thus entitling TANESCO to terminate the PPA; alternatively

(2)    That, pursuant to Addendum No. 1 the Capacity Purchase Price was to be "cost based", but IPTL was refusing to share relevant information with TANESCO and the cost seemed excessive, so that in the event that the PPA could not be terminated the tariff should be adjusted.

20.    On 14 December 1998, TANESCO gave to IPTL Notice of Intent to Terminate pursuant

7

to Article 16.3(a) of the PPA, which was copied to IPTL's lenders, stating that, barring consensual resolution of the matter, TANESCO reserved its right to terminate the PPA pursuant to Article 16.3(c).

21.     Meanwhile on 30 November 1998, five days after lodging of the Request for Arbitration with the Centre, IPTL filed a petition in the High Court of Tanzania in Dar es Salaam, directed against TANESCO and three officials of the Government of Tanzania, seeking both a declaration that commercial operations of IPTL's facility should be deemed as having commenced 15 September 1998 and an order for payment to IPTL by TANESCO of a "Capacity Payment" in the amount of $3,623,000 monthly beginning on that date.

22.     On 7 December 1998, being the same day the Request for Arbitration was registered by the Secretary-General, TANESCO petitioned the Tanzanian High Court to stay the proceedings recently commenced against it.

23.     On the following day, 8 December 1998, IPTL submitted to the same Court a "Notice of Objection on a Preliminary Point of Law" asserting in effect that TANESCO had waived its right to pursue this arbitration.

24.     On 5 March 1999 the High Court of Tanzania sustained the preliminary objections of IPTL and proceeded immediately to grant the relief requested by IPTL in its original petition.  Leave was given to TANESCO to appeal and it sought a stay of execution pending such appeal.

8

25.    In response, on 7 April 1999, IPTL applied for an order of execution in the amount of $23,670,266.67, that being the accumulated sum of the monthly "Capacity Payments" due pursuant to the High Court's Order up to 1 April 1999. Thereafter IPTL agreed that it would not execute for a limited period of time.

26.    When the Tribunal convened its initial session with the parties on 14 June 1999, TANESCO had already issued a request for an order of provisional measures from the Tribunal directed at a cessation of all the above proceedings in the Courts of Tanzania.

27.    In the course of that session, it was clarified that IPTL was willing further to stay its hand in relation to the proceedings in Tanzania, but that it would itself seek provisional measures from this Tribunal substantially to the same effect as it had obtained from the High Court of Tanzania.

28.    Thereafter, on 28 June 1999, IPTL filed with the Tribunal a request for the following provisional measures:

(1)    Permitting commercial operations of the Facility to commence;

(2)    Requiring TANESCO to make monthly Capacity Payments in the amount of $3,623,000, or, in the alternative, in the amount of $3,400,000 (an interim monthly payment which TANESCO previously had agreed with IPTL, subject however to approval of the Government of Tanzania, which had not been forthcoming); and

9

(3)     Requiring Tanzania to pay forthwith a lump sum of $32,607,000, being the accumulated monthly Capacity Payments due from 15 September 1998 to May 1999 in accordance with the order of the High Court of Tanzania.

29.     On 18 October 1999 the Tribunal convened to hear both parties' applications for provisional measures. In the meantime, on 8 July 1999, the order of the High Court of Tanzania had been stayed by a single Justice of the Court of Appeal of Tanzania, pending determination of the appeal thereof, and the parties then requested the Tribunal to defer consideration of TANESCO's request for provisional measures directed at the Tanzanian court proceedings.

30.     At this hearing IPTL revised its request by (1) withdrawing its demand for a lump sum payment of the alleged "arrears" accumulated in respect of the order of the High Court of Tanzania, and (2) requesting that the requested order permitting commercial operations also enjoin TANESCO to co-operate with IPTL, including conducting operational tests and connecting the Facility to the Tanzanian power grid. The demand for a monthly Capacity Payment remained.

31.     On 20 December 1999 the Tribunal issued its Decision On The Respondent's Request For Provisional Measures, a copy of which is attached hereto as Appendix A and which is incorporated herein by reference. The relief that had been requested by IPTL was denied by the Tribunal on the ground that it would change rather than maintain the status quo by ordering performance of the PPA, and thus was outside the scope of Arbitration Rule 39,

10

and that there was insufficient demonstration of urgency in that IPTL, should it prevail on the merits, would in any event receive tariff payments over 20 years as foreseen by the PPA and would lose only the interim use of funds, for which an award of damages would on the face of it be an adequate remedy.

32.     The conclusions of the Tribunal in relation to the Request for Provisional Measures, in common with the conclusions of the Tribunal in relation to other matters which were submitted to the Tribunal for its decision in the course of the proceedings, were published in the form of "Decisions", to be incorporated into our Final Award by reference in due course.  The Tribunal adopted this course because the ICSID Arbitration Rules contain no provisions which permit or even contemplate "Partial" or "Interim" awards, and, indeed, it seemed to the Tribunal that the Rules contemplated only one, Final Award.  The course which the Tribunal adopted was not challenged or objected to by either party.

33.     By the time of the hearing resulting in the Tribunal's Decision On The Respondent's Request For Provisional Measures, it had become clear that it would be appropriate to determine as a preliminary matter certain issues of construction of the PPA and law.  It was ordered, therefore, that the parties should make written submissions with respect to the following preliminary issues:

    1.     Was or is TANESCO entitled to terminate the PPA?

    2.     If not, what are the effects (if any) on the parties' respective rights and obligations under the PPA of:

        (1)     the change from low speed to medium speed diesel engines; and/or

    (2)    any other alleged differences between the Facility as built and that provided for in the PPA and/or any other agreements between the parties?

3.    How is the final Reference Tariff to be calculated, in the light of the said change and any other differences which may be established?

4.    What was the effect on the parties' respective rights and obligations of Addendum No. 1 dated 9 June 1995, and, in particular, did Addendum No. 1 on its true construction have the effect that the final Reference Tariff was to be calculated by reference to the reasonable and prudently incurred cost of the Facility as built; and what were "the underlying assumptions stated in the PPA"?

34.    A hearing was held 13, 14, 15 and 16 March 2000 on these preliminary issues, and on 22 May 2000 the Tribunal issued its Decision On Preliminary Issues of Construction/Law, a copy of which is attached hereto as Appendix B and which is incorporated herein by reference. As set forth in paragraph 19 of that Decision, the "Conclusions" of the Tribunal on the Preliminary Issues were as follows:

(1)    That the PPA was not subject to an unsatisfied condition precedent as alleged or at all, and was not void for uncertainty; and accordingly was a valid and effective contract between the parties;

(2)    That TANESCO was not entitled to serve Notice of Default and was and is not entitled to give notice of termination pursuant thereto;

(3)    That the Reference Tariff should be adjusted in accordance with Addendum No. 1 by reference to changes that had taken place, before commercial operations would have commenced but for TANESCO's purported Notice of Default, in any of the assumptions listed in Mr Rugemalira's letter to the Principal Secretary of the Ministry of Water, Energy and Minerals dated 31 May 1995, with the following qualifications, namely:-

    (1)    that the figure of 23% for "IRR" should be amended to read "22.31%";

    (2)    that it is open to TANESCO to prove that any costs incurred by IPTL relating to any of the listed assumptions were not reasonably and prudently so incurred.

The Tribunal went on to answer the Preliminary Issues listed in paragraph 33 above as follows:

    (1)       Not on any grounds argued and dealt with in this decision.

    (2)       None, save that there may be consequences on the cost of the Facility and therefore on the adjustment to the Reference Tariff to be carried out pursuant to Addendum No. 1 to the PPA.

    (3) & (4)   The "underlying assumptions stated in the PPA" were those listed in Mr Rugemalira's letter to the Principal Secretary of the Ministry of Water, Energy and Minerals dated 31 May 1995, and the effect of Addendum No. 1 dated 9 June 1995 was as summarised in sub-paragraph (3) above."

35.    At the time of the hearing on Preliminary Issues, and at the date of our Decision on those issues, a date had already been fixed for what was hoped would be the final hearing in this matter, to consider remaining issues in relation to the fixing of the tariff, to take place during the last week in July 2000.

36.    Between the date of the hearing on Preliminary Issues and the date of our Decision, on 20 April 2000 TANESCO submitted a request to the Tribunal for an order for discovery concerning alleged payments and/or gifts made or given, offered or promised by agents of IPTL to officials of the Government of the Republic of Tanzania or TANESCO, including the provision of Answers to Interrogatories and a Request for Admissions in relation to such payments or gifts.

37.    Reference to allegations of bribery or attempted bribery had been made earlier in the course of the proceedings, but TANESCO had never formally pleaded such allegations or

13

sought to raise them by way of claim or defence.

38.   The request was supported by the unsworn statements of Mr. Patrick Rutabanzibwa, the Permanent Secretary of the Ministry of Energy and Minerals of the Republic of Tanzania and formerly the Commissioner for Energy and Petroleum Affairs in that Ministry; Mr. Prosper A.M. Victus, the Assistant Commissioner for Energy (Petroleum and Gas); and Mrs. Esther Masunzu, the Assistant Commissioner for Energy (Electricity).

39.   The Tribunal declined to make any of the orders requested, on the ground that no allegation of bribery had been pleaded, and that it would in any event not be right to order the answering of questions on oath when the only basis for the allegations upon which the questions were based was unsworn statements.

40.   The request was renewed on 26 May 2000, when TANESCO submitted its Reply on the Merits, in which it pleaded for the first time a claim to be entitled to rescind the PPA on the basis of its allegations of bribery, which it purported to raise as an "Ancillary Claim" pursuant to Rule 40 of the ICSID Arbitration Rules (which by its paragraph (2) must be presented not later than in the Reply).  The renewed application was supported by the Statutory Declaration of Mr Victus, and sworn statements of Mrs Masunzu and Mr Rutabanzibwa.

41.   On 6 June 2000 IPTL raised objection to the assertion of the bribery claim and the renewed request for discovery, on the grounds (inter alia):

14

(1)    That it was not an "ancillary" claim, but was a claim which should have been asserted, if at all, in TANESCO's Memorial on the Merits in January 2000;

(2)    That, even assuming the truth of the facts alleged in the witness statements, TANESCO had failed to make out a prima facie case for rescission of the PPA; and

(3)    That if the plea were to be allowed, it would jeopardise the July hearing date.

Alternatively, in the event that the Tribunal was minded to permit TANESCO to proceed with its plea of bribery, IPTL sought an order for immediate production by TANESCO of all documents relevant to the plea.

42.    On 12 June 2000 the Tribunal informed the parties of its decision that it would permit TANESCO to raise the bribery issue pursuant to Rule 40 of the ICSID Arbitration Rules, and ordered both parties to produce any documents in their possession, custody or power relating to that issue. It declined to order the wide-ranging Interrogatories or the Request for Admissions proposed, which sought the answers to questions concerning possible bribery and attempts at bribery by employees and agents of IPTL generally, on the ground that no allegations of bribery or attempted bribery had been made against any representatives of IPTL except Mr. Rugemalira. The Tribunal made it clear that the addition of the bribery allegations would not be permitted to delay the July hearing, which had been scheduled for some time.

15

43.    On 27 June 2000 the Tribunal ruled that TANESCO should produce relevant documents in the files of its counsel emanating from the Government of Tanzania, even though the original documents had never been in the possession, custody or power of TANESCO itself.

44.    These documents were produced by TANESCO's Counsel, Hunton & Williams, under cover of a letter dated 5 July 2000, on the basis of an express agreement as to their confidentiality (which in the view of the Tribunal would have applied in any event). In the penultimate paragraph of its letter, Hunton & Williams stated:

> The investigation in Tanzania is not complete. In the light of this fact, we have been instructed to advise that TANESCO will not proceed further at this time with respect to its bribery allegations but will make oral application at the hearing later this month for an extension of time to present its case with respect to the bribery claims.

TANESCO further purported to "reserve all rights regarding its bribery claim" under the ICSID Convention and Arbitration Rules and under Tanzanian law.

45.    Meanwhile, on 29 June 2000 IPTL served its Reply Counter Memorial (or "Rejoinder") on the Merits and on 10 July 2000 served its Memorial on the Calculation of the Tariff. On 11 July 2000 TANESCO served its Memorial on the Calculation of the Tariff.

46.    An oral hearing took place before the Tribunal at the International Dispute Resolution Centre, 8 Breams Buildings, London on 21, 21, 24, 25 and 26 July 2000.

47.    After the close of the oral hearing, and pursuant to the invitation of the Tribunal, IPTL filed a written submission dated 18 August 2000 on its claim for Damages for Breach of Contract, and each party filed a Post-Hearing Memorial dated 12 September 2000. Thereafter, on 2 October 2000, each party filed a written submission on the Award of Arbitration Costs.

48.    At the start of the July hearing and upon the application of TANESCO, the Tribunal received "information" from Mr. Rutabanzibwa (although he was not formally called as a witness) as to the progress of the investigation in Tanzania of the allegations of bribery, which had apparently started in late 1997, had thereafter proceeded somewhat sporadically, but which was said to be continuing.  On the basis of this information, Counsel for TANESCO asked for an extension of time of 3 months to make additional filings in relation to these issues.

49.    Mr. Hawkins declined the invitation of the Tribunal to apply to withdraw the allegation, and, after considering the application, the Tribunal refused to grant the extension requested, and indicated that since the allegation remained on the record, it must be dealt with on its merits on the basis of the material put before it.

50.    The issues which were canvassed before the Tribunal at the July hearing and which we were called upon to determine included the following:

(1)    The issue of alleged bribery;

17

(2)     Did IPTL and/or the parties fail to perform conditions precedent to Commercial Operations, including:

    (1)     Failing to provide a certificate from the Independent Engineer stating that the Facility when constructed would conform with the Description of the Facility, or that the Facility had been designed and constructed in all material respects within the terms of the PPA and the general layout drawings?

    (2)     Failing to agree the Reference Tariff?

(3)     Was TANESCO in breach of its obligation to act in good faith in relation to the negotiations concerning the fixing of the tariff, and if so what are the consequences?

(4)     Was IPTL in breach of its obligation to act in good faith in relation to the negotiations and in particular to the disclosure of relevant documents and information, and if so what are the consequences?

(5)     Did IPTL and Stork-Wartsila conspire together falsely to inflate the EPC price?

(6)     Was IPTL in breach of its obligation to act reasonably and prudently in relation to any costs and expenses which it would have input into the amount prima facie payable by TANESCO as the Capacity Payment element of the tariff, and in

18

particular in relation to the procurement of the EPC Contract?

(7)    Was IPTL in breach of its implied obligation to act reasonably and prudently in relation to the procurement of the FSA, and if so what consequences flow?

(8)    Were any breaches on the part of either party waived, or is any complaint or remedy barred by estoppel?

(9)    What adjustment should be made to the Reference Tariff stated in the PPA?

(10)    What if any further orders should be made?

(11)    What if any order should be made in respect of the costs of the arbitration (including the fees and expenses of the Tribunal), and/or the legal and other costs of the parties?

51.    In considering these issues and insofar as any issue depended on an application of principles of law, the Tribunal sought to apply the law of the Republic of Tanzania, as it has sought to do throughout this arbitration, that being the governing law of the contract expressly designated by the parties by Article 19.4 of the PPA.

52.    By its Decision On Tariff And Other Remaining Issues dated 9 February 2001, a copy of which is attached hereto as Appendix C, and which is incorporated herein by reference, the Tribunal, for the reasons set out therein, concluded that:

19

(1)    The allegation of bribery failed and should be dismissed; in this connection, the Tribunal repeated its conclusion to the effect that the PPA was an effective contract between the parties.

(2)    IPTL did not fail to perform a condition precedent to commercial operations by failing to produce an Independent Engineer's Certificate in accordance with Article 4.1.(b) or (c) of the PPA.

(3)    Although commercial operations could not commence until the Reference Tariff had been adjusted to take account of changes in the underlying assumptions stated in the PPA, in the absence of agreement between the parties, it was for the Tribunal to decide what, if any, adjustments were appropriate and for commercial operations then to commence in accordance with that decision.

(4)    IPTL had not made out its allegation that TANESCO failed and refused to negotiate in good faith after April 1998, and that, at all events, any such failure or refusal was not the sole or effective cause of the failure of the parties to agree on the adjusted Reference Tariff so that commercial operations could commence, that IPTL's claim for damages for such alleged failure should be dismissed, and that TANESCO's parallel claim against IPTL was academic insofar as it claimed no damages for breach.

(5)    IPTL and Stork-Wartsila did not conspire together falsely to inflate the EPC

Contract price.

(6)    IPTL was in breach of its implied obligation to act reasonably and prudently in relation to a number of items of costs and expenses which would have an input into the amount prima facie payable by TANESCO as the Capacity Purchase Price element of the Reference Tariff, including the procurement of the EPC Contract (as more particularly set out in our Decision), and that accordingly a number of adjustments would have to be made for the purposes of arriving at the initial Reference Tariff.

(7)    IPTL was not in breach of its implied obligation to act reasonably and prudently in relation to the procurement of the Fuel Supply Agreement.

(8)    There was no relevant waiver or estoppel.

53.    In its Decision of 9 February 2001, the Tribunal recorded its understanding that the parties were confident that, armed with that Decision, they would be able to agree on the "financial model" originally produced by Mr. Willy Lim, and which had already been subjected to agreed adjustments, and the Reference Tariff which should be derived as a consequence; but communicated separately that, if this were not the case, further application must be made to the Tribunal. It was not the intention of the Tribunal to invite further submissions on matters which had already been dealt with in its Decision.

54.    The Tribunal further indicated that it considered it appropriate to order that the parties

21

should co-operate in taking whatever steps would be necessary to achieve the commencement of commercial operations as soon as possible after our Decision.

55.    Finally, the Tribunal concluded that it would be fair to order that each party should bear its own legal and other costs and to share the costs of the arbitration, including the fees and expenses of the Tribunal and of ICSID, on a 50/50 basis.

56.    Following the publication of our Decision On Tariff And Other Remaining Issues, TANESCO raised a number of further matters going to the calculation of the Reference Tariff; and IPTL invited the Tribunal to fix a date by which the commencement of commercial operations should be achieved.

57.    After the exchange of written Memorials and Reply Memorials, and at the request of TANESCO, a further oral hearing took place before the Tribunal on 29 April 2001 at the offices of the World Bank in Washington DC, United States of America, when the following issues were referred to the Tribunal for decision:

(1)    How the Construction Contingency Reserve should be dealt with.

(1)    What, if any, adjustment should be made to the figure for Sovereign Risk and other insurances?

(2)     What, if any, adjustment should be made to the Lenders' Participation Fee portion of "Financing and Agency" fees in consequence of the Tribunal's conclusions as to the deductions to be made from the claimed Project Costs.

(3)     What, if any, adjustment should be made to the Reference Tariff by reason of the alleged reduction in IPTL's deemed equity in the project?

(4)     What, if any, further orders should be made in relation to the Commencement of Commercial Operations?

58.    At the hearing, the Tribunal was informed that the parties had reached agreement on issues (2) and (3); and subsequently, pursuant to the invitation of the Tribunal, the parties submitted the agreed terms of their agreement to be incorporated into the Tribunal's Decision, and, by reference, this Final Award.

59.    The parties further invited the Tribunal to note and incorporate in its Decision and its Final Award the terms of the agreement between the parties concerning the Cost of Gas Conversion.

60.    On 24 May 2001 the Tribunal published its Decision On All Further Remaining Issues, a copy of which is attached hereto as Appendix D, and which is incorporated herein by reference.

61.    In addition to recording the agreements of the parties referred to in paragraphs 58 and 59 above, the Tribunal concluded that the financial model must be calculated on the basis that the Construction Contingency Reserve should be included as part of the Project Cost, but that it should be released at the date when commercial operations commenced, with a consequent adjustment to the Project Cost and the Reference Tariff, save to the extent to which any variation order would be made under the EPC Contract before the commencement of commercial operations, which IPTL contended should be funded out of the Construction Contingency Reserve. The Tribunal recorded in its Decision the agreement between the parties that any dispute as to whether and to what extent the Construction Contingency Reserve should be utilized in such a case should be referred to an ICSID Tribunal comprised of Messrs Charles N. Brower, Andrew Rogers, and Kenneth Rokison, with Mr. Rokison serving as President, for subsequent decision and award as necessary. A copy of the parties-agreed Stipulation, submitted on 23 May 2001, is attached hereto as Appendix E.

62.    The Tribunal rejected TANESCO's submission that there should be a further adjustment to the Reference Tariff by reason of the alleged reduction in IPTL's equity contribution to the project.

63.    Finally, in relation to the timing of the commencement of commercial operations, the Tribunal amended and refined the order which it had indicated it was minded to make in paragraph 168 of its Decision of 9 February 2001, and ordered the parties to comply with their respective obligations under the PPA, and to use their best endeavours and to co-operate together to achieve the commencement of commercial operations as soon as

24

practicable and with a view to commercial operations commencing within 90 days of the publication of our Final Award.

64.  Following publication of our Decision On All Further Remaining Issues, the parties agreed on the adjustments to be made to the financial model to take account of the Tribunal's various decisions, and submitted to the Tribunal an agreed financial model in both hard copy and electronic form to be used for the calculation of the initial Reference Tariff. That financial model which forms part of this award, is appended hereto as Appendix F (both hard copy and electronic form) and incorporated herein by reference.

65.  Finally, the Tribunal wishes to repeat its appreciation to the legal representatives on each side for their considerable industry and assistance, and to the ICSID Centre in Washington for its efficient and very helpful administration of the arbitration.

THEREFORE, THE TRIBUNAL AWARDS AS FOLLOWS:

1.  The Tribunal decides as set forth above and in Appendices A, B, C, D, E and F hereto.

2.  In particular:

A. The Power Purchase Agreement between the parties dated "as of" 26 May 1995 is and remains a valid and effective contract between them;

B. The Reference Tariff under the Power Purchase Agreement between the parties dated "as of" 26 May 1995 is as set forth in Appendix F hereto;

25

C.  As agreed by the parties and submitted by them in accordance with ICSID
Arbitration Rule 43(2):

**Gas Conversion**:

"Pursuant to Section 7.1 of the Power Purchase Agreement ("PPA") dated 26 May
1995, between Tanzania Electric Supply Company Limited ("TANESCO") and
Independent Power Tanzania Limited ("IPTL"), IPTL is required to convert the
Tegeta facility to operate on Natural Gas upon the occurrence of certain conditions
precedent.

Accordingly, the Engineering Procurement and Construction Agreement (the
"EPC Contract"), dated February 1997, between IPTL and Stork-Wartsila Diesel
B.V. ("wartsila") contains provisions pursuant to which Wartsila shall convert the
facility to Natural Gas operation for a fixed price of US$11,583,000.

TANESCO hereby agrees that upon fulfilment of the conditions precedent
contained in Section 7.1 of the PPA, TANESCO will fully fund the costs of
conversion at the fixed price and under the payment terms contained in the EPC
Contract."

D.  The parties shall comply with their respective obligations under the Power
Purchase Agreement between them dated "as of" 26 May 1995 and shall use their
best endeavours and co-operate together to achieve the commencement of
commercial operations of the Facility under said Agreement as soon as practicable
and with a view to commercial operations commencing with ninety (90) days of
the publication to them by the Centre of this Final Award.

E.  Each party shall bear its own legal and other costs, and the cost of the arbitration,
including the fees and expenses of the Tribunal and of ICSID, shall be borne as to
50 per cent by each party.

26

Dated this 22 day of June 2001

The Honorable Charles N. Brower

The Honourable Andrew Rogers QC

Kenneth Rokison QC

# APPENDIX F

## BEFORE THE INTERNATIONAL CENTRE
## FOR SETTLEMENT OF INVESTMENT DISPUTES

TANZANIA ELECTRIC SUPPLY                     )
COMPANY LTD.                                 )
                                             )
                    Claimant,                )
                                             )
            v.                               )          ICSID Case No. ARB/98/8
                                             )
INDEPENDENT POWER                            )
TANZANIA LTD.                                )
                                             )
                    Respondent.              )
                                             )

## STIPULATION AND AGREEMENT

Tanzania Electric Supply Company Limited ("TANESCO") and Independent Power Tanzania Limited ("IPTL") have agreed to settle certain disputed matters in this arbitration concerning the financial model to be used to calculate the tariff. The parties request that the terms of their settlement be incorporated in the Award of the Tribunal as follows:

1.    TANESCO and IPTL agree that the tariff which is to be calculated pursuant to the Power Purchase Agreement ("PPA") dated 26 May 1995, as amended, shall be calculated based on the Decisions of the Arbitrators herein dated 9 February 2001 and 24 May 2001, the applicable terms of the PPA, and the financial model entitled "Tegeta July 2001.123" which is annexed hereto, in both electronic and paper format (the "Financial Model"). The tariff shall be calculated initially at commencement of commercial operation of the Tegeta power plant and during the term of the PPA in accordance with the PPA and the Financial Model.

2.    The Financial Model contains notes and comments which form part of the parties' agreement as to the calculation of the tariff. The parties recognize that there are instances where the formulae, mechanisms, notes, or comments contained in the Financial Model differ from or

supplement the terms of the PPA. Where such differences exist, the parties agree that the Financial Model shall govern and supersede the terms of the PPA.

3.      The parties recognize that certain further mechanical steps need to be undertaken in order to make the Financial Model fully useful and operational for purposes of billing and tariff adjustment. The parties agree to cooperate together to take whatever steps are required to effectuate that end. However, the parties agree that the Financial Model sets forth the agreement of the parties as to the calculation of the tariff, and that any further steps which are taken must be consistent with the Financial Model.

4.      The parties further agree that the Financial Model is to be included in the Final Award in this arbitration.

**TANZANIA ELECTRIC**
**SUPPLY COMPANY**

By: _____
    BEAT Luhanga
    **Managing Director**

**INDEPENDENT POWER**
**TANZANIA LTD.**

By: _____
    **Datuk Baharuden Bin**
    **Abdul Majid**
    **Chairman**

09/07 '01 MON 14:59 FAX 803 5192888          MECHMAR CORP.                                     ☒002

BEFORE THE INTERNATIONAL CENTRE
FOR SETTLEMENT OF INVESTMENT DISPUTES

| | | |
|---|---|---|
| TANZANIA ELECTRIC SUPPLY COMPANY LTD. | ) | |
| | ) | |
| | ) | |
| Claimant, | ) | |
| | ) | |
| v. | ) | ICSID Case No. ARB/98/8 |
| | ) | |
| INDEPENDENT POWER TANZANIA LTD. | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

## STIPULATION AND AGREEMENT

Tanzania Electric Supply Company Limited ("TANESCO") and Independent Power Tanzania Limited ("IPTL") have agreed to settle certain disputed matters in this arbitration concerning the financial model to be used to calculate the tariff. The parties request that the terms of their settlement be incorporated in the Award of the Tribunal as follows:

1.      TANESCO and IPTL agree that the tariff which is to be calculated pursuant to the Power Purchase Agreement ("PPA") dated 26 May 1995, as amended, shall be calculated based on the Decisions of the Arbitrators herein dated 9 February 2001 and 24 May 2001, the applicable terms of the PPA, and the financial model entitled "Tegeta July 2001.123" which is annexed hereto, in both electronic and paper format (the "Financial Model"). The tariff shall be calculated initially at commencement of commercial operation of the Tegeta power plant and during the term of the PPA in accordance with the PPA and the Financial Model.

2.      The Financial Model contains notes and comments which form part of the parties' agreement as to the calculation of the tariff. The parties recognize that there are instances where the formulae, mechanisms, notes, or comments contained in the Financial Model differ from or

09/07 '01 MON 14:59 FAX 803 5192888     MECHMAR CORP.     ⓸003

supplement the terms of the PPA. Where such differences exist, the parties agree that the Financial Model shall govern and supersede the terms of the PPA.

3.     The parties recognize that certain further mechanical steps need to be undertaken in order to make the Financial Model fully useful and operational for purposes of billing and tariff adjustment. The parties agree to cooperate together to take whatever steps are required to effectuate that end. However, the parties agree that the Financial Model sets forth the agreement of the parties as to the calculation of the tariff, and that any further steps which are taken must be consistent with the Financial Model.

4.     The parties further agree that the Financial Model is to be included in the Final Award in this arbitration.

**TANZANIA ELECTRIC
SUPPLY COMPANY**

By: _____
       **BEAT Luhanga
       Managing Director**

**INDEPENDENT POWER
TANZANIA LTD.**

By _____
       **Datuk Baharuden Bin
       Abdul Majid
       Chairman**

F-806     P.003     T-382     From-NIXONPEABODY     10:00     Jul-01-2001

# TANZANIA 100MW IPP
## CAPITAL COST ASSUMPTIONS
US Dollars in Thousands

**Sources of Funds**

| | | |
|---|---|---|
| Senior Debt | 70.0% | 89,041 |
| Equity | 30.0% | 38,160 |
| Total Senior Debt & Equity | | 127,201 |

**Uses of Funds**

| | |
|---|---|
| EPC Contract | 98,189 |
| Construction Contingency | 4,909 |
| Land | 1,000 |
| Insurance | 4,118 |
| Lenders Advisors | 467 |
| Project Advisors | 2,640 |
| Development | 3,036 |
| Mobilisation | 1,394 |
| Financing & Agency Fees | 1,858 |
| Working Capital | 1,704 |
| Fuel Oil Reserve | 3,249 |
| Interest During Construction | 4,636 |
| Commitment Fees | 1 |
| Total Uses of Funds | 127,201 |

**Reference Tariff Capital Cost Adjustment \***

| | |
|---|---|
| Projected Total Project Cost | 163,531 |
| Actual Total Project Cost | 127,201 |
| (%) Increase / Decrease(-) in Capacity Ref. Tariff | -22.2157% |

**Interest Rate & Senior Debt Assumptions**

Senior Debt:

| | |
|---|---|
| Base Rate During Construction : | 6.00% |
| Interest Rate | 2.50% |
| Aggregate Interest Rate During Construction | 8.50% |
| | |
| Base Rate During Operation : | 6.00% |
| Interest Rate | 2.50% |
| Aggregate Interest Rate During Operation | 8.50% |
| Interest Rate after factoring withholding tax | 10.00% |
| Amortization Period (years) | 8.0 |
| Commitment Fees (% of senior debt) | 1.000% |
| | |
| Senior Debt Reserve (months of debt service) | 6 |
| Reserve & Cash Balance Earning Rate | 3.000% |

**Tax Assumptions**

| | |
|---|---|
| Years of Tax Holiday Beginning at C.O.D | 5 |
| Income Tax Rate (Years 6 to 20) | 35.00% |
| Withholding Tax Rate (Years 6 to 20) On: | |
| i) Dividends | 10.00% |
| ii) Interest payable on foreign loan | 15.00% |
| Import Duties | 0.00% |
| Sales Tax | 0.00% |
| Tax Rate On Interest Income | 15.00% |

**Capital Allowance / Depreciation Assumptions**

Capital Allowance Rates:

| | |
|---|---|
| Equipment: Initial | 20.00% |
| Industrial Building: Initial | 20.00% |
| Equipment: Annual | 12.50% |
| Industrial Building: Annual | 4.00% |

Depreciation & Amortisation Lives (years):

| | |
|---|---|
| Equipment | 8 |
| Industrial Building | 25 |
| Amortiables | 20 |

Depreciable Costs:

| | |
|---|---|
| EPC Contract | 98,189 |
| Construction Contingency | 4,909 |

Non-Depreciable Costs:

| | |
|---|---|
| Land | 1,000 |
| Working Capital | 1,704 |
| Fuel Oil Reserve | 3,249 |
| Owners Initial Spares | 4,257 |
| Total | 10,210 |

Amortised Costs:

| | |
|---|---|
| Total Project Cost | 127,201 |
| Less: Depreciable Costs | 103,098 |
| Less: Non-Depreciable Costs | 10,210 |
| Amortised Costs | 13,893 |

PRIVATE AND CONFIDENTIAL

PRIVATE AND CONFIDENTIAL

Cap Cost Ass:K14: mcs  03/07/01  04:12:41 PM
This value is to be updated based on the lenders' agent's advice concerning the interest rate applicable at COD.

07/10/2001

TANZANIA 100MW IPP
OPERATING ASSUMPTIONS I
US Dollars in Thousands

**Facility Operation Assumptions (@ 35 degrees C air temp.)**

| | |
|---|---|
| Facility Capacity (MW) | 97.64 |
| Auxiliary Usage and Transformer Loss (MW) | 0.0000 |
| Annual Output Degradation before gas conversion | 0.00% |
| Capacity Factor | 85.00% |

**Heat Rate and Fuel Assumptions**

| | |
|---|---|
| Nett Heat Rate (Btu/kWh HHV) | 8,913 |
| Fuel Gross Calorific Value (Btu/lb) | 18,100 |
| FO Price (US$/MTon) | 100.00 |
| FO Price (US$/MMBtu) | 2.506 |
| GasOil Price (US$/MTon) | 249 |
| Gas Price (US$/MMBtu) | 0.50 |

**Lube Oil Assumptions**

| | |
|---|---|
| Lube Oil Consumption (g/kWh) | 1.00 |
| Lube Oil Density (kg/litre) | 0.91 |
| Lube Oil Price (US$/litre) | 1.14 |

**PPA Tariff**

| | |
|---|---|
| Capacity Purch. Price (US$/kW/month) (Pre-adjustment & indexation) | 41.88 |
| Energy Fuel (US Cents/kWh) (1) | 2.23 |
| Energy Variable O&M (US Cents/kWh) | 0.74 |

**Operating & Maintenance Expense Assumptions**

**Fixed Expenses**

| | | |
|---|---|---|
| Salary & Fixed O&M Fees | | 2,140 |
| General & Administrative | | 941 |
| Operating Insurance | | 362 |
| Financing Fees | | 60 |
| Lenders' Hedging Requirement | 1.00% | 2,349 |
| Contingency | 5.00% | 303 |
| Total Fixed Expenses | | 6,355 |

**Variable Expenses** (US$/kWh)

| | | |
|---|---|---|
| Variable O&M | 0.0058 | 4,217 |
| Lube Oil | 0.0013 | 911 |
| Contingency | 5.00% | 0.0004 | 256 |
| **Total** | 0.0074 | 5,384 |

**Note:**
(1) Adjusted for price variation from PPA reference fuel price of 2.23 US cts/kWh

**Escalation Assumptions**

**Annual Escalations:**

| | | |
|---|---|---|
| Capacity | (Assumed) | 0.38% |
| O&M | (Assumed) | 0.38% |
| Fuel | (Assumed) | 0.00% |
| Pre-Operation Annual Escalation | (Assumed) | 0.00% |
| Aggregate Pre-Operation Escalation | (Assumed) | 8.05% |

**Phase II Gas Firing Conversion Assumption**

| | |
|---|---|
| ~~Cost Of Gas Firing Conversion Equipment~~ | 0 |
| ~~Year Of Conversion To Gas Firing~~ | ~~2003 (yr 3)~~ |
| ~~(The base case assumes that FO is used throughout)~~ | |

**Phase I Commercial Operation Date Assumptions**

| | |
|---|---|
| C.O.D of first 30MW block (mths from start of Cons.) | 12 |
| C.O.D of second 40MW block (mths from start of Cons.) | 12 |
| C.O.D of third 30MW block (mths from start of Cons.) | 12 |
| Target Commercial Operation Date (Full Capacity) | late 2001 |

| | |
|---|---|
| Maintenance Reserve Target Balance | 5,000 |

PRIVATE AND CONFIDENTIAL

07/10/2001

Op Ass:E7: mcs   03/07/01 03:54:23 PM
This value to be determined at the interconnection point based on the Facility acceptance tests to be completed prior to Commercial Operations Date.

Op Ass:E8: This value will become zero once the Facility Capacity has been determined.

BASE HEAT RATE: mcs   03/07/01 04:00:36 PM
The heat rate at ambient conditions of 33 degrees Celcius shall be determined at the interconnection point as the net plant heat rate established during the acceptance tests prior to COD.  The value shall be multiplied by a factor of 1.0263.

Op Ass:E17: To be updated in accordance with the PPA provisions as set out in Appendix B.

Op Ass:E25: mcs   03/07/01 04:08:25 PM
This value is to be determined at COD as the commercial price available to the Tegeta plant operator.  The value will be subject to normal escalation applied to all other O&M costs thereafter.

Op Ass:J24: mcs   03/07/01 04:09:58 PM
This value is assumed to be at prices of May 1998 and will be escalated to COD based on the US CPI.

Op Ass:K14: mcs   03/07/01 04:15:17 PM
This value is assumed to be at prices of May 1998 and will be escalated to COD based on the US CPI.

Op Ass:K15: mcs   03/07/01 04:15:23 PM
This value is assumed to be at prices of May 1998 and will be escalated to COD based on the US CPI.

Op Ass:K16: mcs   03/07/01 04:15:27 PM
This value is assumed to be at prices of May 1998 and will be escalated to COD based on the US CPI.

Op Ass:M15: This data has been superceded by the Parties agreement on the financing of gas conversion of May 24 2001.

Op Ass:Q12: mcs   03/07/01 04:17:23 PM
This value is will be set to zero once the costs and revenues are updated to COD prices.

07/10/2001

PRIVATE AND CONFIDENTIAL

**TANZANIA 100MW IPP**
**SOURCES & USES OF FUNDS - CONSTRUCTION**
**[US Dollars in Thousands]**

| | | Total | Fin. Close | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **USES OF FUNDS** | | | | | | | | | | | | | | | |
| EPC Contract | | 98,189 | 10,402 | 9,453 | 27,082 | 639 | 13,860 | 639 | 13,860 | 639 | 639 | 639 | 639 | 643 | 19,054 |
| Construction Contingency | 5.00% | 4,909 | 520 | 473 | 1,354 | 32 | 693 | 32 | 693 | 32 | 32 | 32 | 32 | 32 | 953 |
| Land | | 1,000 | 1,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Insurance | | 4,418 | 4,121 | 0 | 0 | 0 | 0 | 797 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Lenders Advisors | | 467 | 347 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 0 | 0 | 0 |
| Project Advisors | | 2,640 | 1,925 | 110 | 55 | 55 | 55 | 55 | 55 | 55 | 55 | 55 | 55 | 55 | 55 |
| Development | | 3,036 | 3,036 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mobilisation | | 1,394 | 0 | | | | | | | | | | | | |
| Financing & Agency Fees | 2.00% | 1,888 | 1,888 | | | | | | | | 279 | 279 | 279 | 279 | 279 |
| Working Capital | | 1,704 | 0 | | | | | | | | | | 349 | 349 | 1,006 |
| Fuel Oil Reserve | | 3,249 | 0 | | | | | | | | 975 | 1,300 | 975 | 0 | 0 |
| Interest During Construction | 8.500% | 4,636 | 0 | 113 | 163 | 305 | 312 | 386 | 393 | 468 | 475 | 485 | 499 | 514 | 524 |
| Commitment Fees | 1.00% | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| **Total Uses of Funds** | 100.00% | 127,201 | 22,409 | 10,159 | 28,664 | 1,040 | 14,930 | 1,919 | 15,012 | 1,203 | 2,464 | 2,799 | 2,838 | 1,881 | 21,882 |
| **SOURCES OF FUNDS** | | | | | | | | | | | | | | | |
| Equity | 30.0% | 38,160 | 6,723 | 3,048 | 8,599 | 312 | 4,479 | 576 | 4,503 | 361 | 739 | 840 | 851 | 564 | 6,565 |
| Senior Debt | 70.0% | 89,041 | 15,687 | 7,111 | 20,065 | 728 | 10,451 | 1,343 | 10,508 | 842 | 1,725 | 1,960 | 1,986 | 1,317 | 15,318 |
| **Total Equity & Senior Debt** | 100.00% | 127,201 | 22,409 | 10,159 | 28,664 | 1,040 | 14,930 | 1,919 | 15,012 | 1,203 | 2,464 | 2,799 | 2,838 | 1,881 | 21,882 |
| Cumulative Equity | | | 6,723 | 9,771 | 18,370 | 18,682 | 23,161 | 23,737 | 28,240 | 28,601 | 29,340 | 30,180 | 31,031 | 31,596 | 38,160 |
| Cumulative Senior Debt | | | 15,687 | 22,798 | 42,863 | 43,591 | 54,042 | 55,385 | 65,893 | 66,736 | 68,460 | 70,420 | 72,406 | 73,723 | 89,041 |
| Cumulative Equity & Senior Debt | | | 22,409 | 32,569 | 61,233 | 62,273 | 77,203 | 79,122 | 94,133 | 95,337 | 97,801 | 100,600 | 103,438 | 105,319 | 127,201 |

PRIVATE AND CONFIDENTIAL

**TANZANIA 100MW IPP**
**SOURCES & USES OF FUNDS - CONSTRUCTION**
**US Dollars in Thousands**

| | Fin. Close | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **DRAWDOWN SCHEDULE** | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| Monthly Budgeted Expense | 22,409 | 10,159 | 28,664 | 1,040 | 14,930 | 1,919 | 15,012 | 1,203 | 2,464 | 2,799 | 2,838 | 1,881 | 21,882 | | Total 0 |
| Cumulative Budgeted Expense | 22,409 | 32,569 | 61,233 | 62,273 | 77,203 | 79,122 | 94,133 | 95,337 | 97,801 | 100,600 | 103,438 | 105,319 | 127,201 | | 127,201 |
| | | | | | | | | | | | | | | | |
| Estimated Senior Debt Portion | 15,687 | 7,111 | 20,065 | 728 | 10,451 | 1,343 | 10,508 | 842 | 1,725 | 1,960 | 1,986 | 1,317 | 15,318 | | 0 |
| Drawdown in Multiple of 500,000 | 16,000 | 7,000 | 10,000 | 1,000 | 10,500 | 1,000 | 10,500 | 1,000 | 1,500 | 2,000 | 2,000 | 1,500 | 15,841 | | 89,041 |
| | | | | | | | | | | | | | | | |
| Equity Contribution To Match Drawdown | 6,857 | 3,000 | 8,571 | 439 | 4,500 | 429 | 4,500 | 429 | 643 | 857 | 857 | 643 | 6,446 | | 38,160 |
| | | | | | | | | | | | | | | | |
| Total Debt and Equity | 22,857 | 10,000 | 28,571 | 1,429 | 15,000 | 1,429 | 15,000 | 1,429 | 2,143 | 2,857 | 2,857 | 2,143 | 21,487 | | 127,201 |
| | | | | | | | | | | | | | | | |
| % Debt to Cumulative Drawdown | 70% | 70% | 70% | 70% | 70% | 70% | 70% | 70% | 70% | 70% | 70% | 70% | 70% | | |
| | | | | | | | | | | | | | | | |
| % Equity to Cumulative Drawdown | 30% | 30% | 30% | 30% | 30% | 30% | 30% | 30% | 30% | 30% | 30% | 30% | 30% | | |
| | | | | | | | | | | | | | | | |
| Cumulative Debt | 16,000 | 23,000 | 43,000 | 44,000 | 54,500 | 55,500 | 66,000 | 67,000 | 68,500 | 70,500 | 72,500 | 74,000 | 89,041 | | |
| Cumulative Equity | 6,857 | 9,857 | 18,429 | 18,857 | 23,357 | 23,786 | 28,286 | 28,714 | 29,357 | 30,214 | 31,071 | 31,714 | 38,160 | | |
| Total | 22,857 | 32,857 | 61,429 | 62,857 | 77,857 | 79,286 | 94,286 | 95,714 | 97,857 | 100,714 | 103,571 | 105,714 | 127,201 | | |
| | | | | | | | | | | | | | | | |
| Excess Drawdown over Actual | 448 | 289 | 196 | 584 | 654 | 164 | 152 | 378 | 57 | 114 | 134 | 395 | 0 | | |

PRIVATE AND CONFIDENTIAL

07/10/2001

**TANZANIA 100MW IPP**
**EPC CONTRACT DRAWS**
**US Dollars in Thousands**

| | Fin. Close | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **EPC Contract** | | | | | | | | | | | | | | | | |
| EPC Contract | 8,814 | 8,814 | 26,443 | 0 | 13,222 | 0 | 13,222 | 0 | 0 | 0 | 0 | 0 | 17,629 | 0 | 0 | 88,144 |
| Civil Works | 1,004 | 639 | 639 | 639 | 639 | 639 | 639 | 639 | 639 | 639 | 639 | 643 | 2,009 | 0 | 0 | 10,045 |
| Others | 583 | | | | | | | | | | | | (583) | | | 0 |
| | | | | | | | | | | | | | | | | |
| **Total** | 10,402 | 9,453 | 27,082 | 639 | 13,860 | 639 | 13,860 | 639 | 639 | 639 | 639 | 643 | 19,054 | 0 | 0 | 98,189 |
| | | | | | | | | | | | | | | | | |
| Equipment Payment Schedule (%) | 10.00% | 10.00% | 30.00% | 0.00% | 15.00% | 0.00% | 15.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 20.00% | 0.00% | 0.00% | 100.00% |
| Civil Works Payment Schedule (%) | 10.00% | 6.36% | 6.36% | 6.36% | 6.36% | 6.36% | 6.36% | 6.36% | 6.36% | 6.36% | 6.36% | 6.40% | 20.00% | 0.00% | 0.00% | 100.00% |
| | | | | | | | | | | | | | | | | |
| Equipment Payment Schedule (Cumulative %) | 10.00% | 20.00% | 50.00% | 50.00% | 65.00% | 80.00% | 80.00% | 80.00% | 80.00% | 80.00% | 80.00% | 100.00% | 100.00% | 100.00% | 100.00% | |

PRIVATE AND CONFIDENTIAL

07/10/2001

TANZANIA 100MW IPP
OPERATING ASSUMPTIONS II / Tariff
US Dollars in Thousands

| | Esc. | See Note | 1<br>2001 | 2<br>2002 | 3<br>2003 | 4<br>2004 | 5<br>2005 | 6<br>2006 | 7<br>2007 | 8<br>2008 | 9<br>2009 | 10<br>2010 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Escalation Factors** | | | | | | | | | | | | |
| Capacity | 0.38% | | | | | | | | | | | |
| O&M | 0.38% | | | | | | | | | | | |
| Fuel | 0.00% | | | | | | | | | | | |
| | | | | | | | | | | | | |
| **Facility Output for Electricity Sales** | | | | | | | | | | | | |
| Facility Capacity (MW) | | | 97.64 | 97.64 | 97.64 | 97.64 | 97.64 | 97.64 | 97.64 | 97.64 | 97.64 | 97.64 |
| Output Degradation | | | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| Degraded Facility Capacity (MW) | | | 97.64 | 97.64 | 97.64 | 97.64 | 97.64 | 97.64 | 97.64 | 97.64 | 97.64 | 97.64 |
| | | | | | | | | | | | | |
| Auxiliary Usage & Transformer Loss (MW) | | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Net Facility Capacity (MW) | | | 97.64 | 97.64 | 97.64 | 97.64 | 97.64 | 97.64 | 97.64 | 97.64 | 97.64 | 97.64 |
| Hours in Year | | | 8,760 | 8,760 | 8,760 | 8,760 | 8,760 | 8,760 | 8,760 | 8,760 | 8,760 | 8,760 |
| Capacity Factor | | | 85.00% | 85.00% | 85.00% | 85.00% | 85.00% | 85.00% | 85.00% | 85.00% | 85.00% | 85.00% |
| Net Electricity Sold (MWh) | | | 727,045 | 727,045 | 727,045 | 727,045 | 727,045 | 727,045 | 727,045 | 727,045 | 727,045 | 727,045 |
| | | | | | | | | | | | | |
| **Capacity Tariff (USD/kW/mth)** | | | | | | | | | | | | |
| Adjusted Capital Component | | | 12.33 | 12.75 | 13.19 | 13.72 | 14.31 | 17.39 | 25.77 | 29.72 | 29.72 | 29.72 |
| Adjusted Debt Component (& after Interest Adj.) | | | 17.59 | 17.46 | 17.28 | 16.99 | 16.48 | 13.17 | 4.08 | -0.14 | 0.00 | 0.00 |
| Adjusted Capacity Purchase Price | | | 29.92 | 30.21 | 30.47 | 30.71 | 30.80 | 30.56 | 29.85 | 29.59 | 29.72 | 29.72 |
| | | | | | | | | | | | | |
| **Electricity Tariff in US cents/kWh** | | | | | | | | | | | | |
| Capacity (US cents/kWh) (1) | | | 4.82 | 4.87 | 4.91 | 4.95 | 4.96 | 4.93 | 4.81 | 4.77 | 4.79 | 4.79 |
| Energy Fuel (US cents/kWh)(2) | | | 2.41 | 2.41 | 2.41 | 2.41 | 2.41 | 2.41 | 2.41 | 2.41 | 2.41 | 2.41 |
| Energy O&M (US cents/kWh) | | | 0.80 | 0.80 | 0.80 | 0.80 | 0.80 | 0.80 | 0.80 | 0.80 | 0.80 | 0.80 |
| **Aggregate Tariff (US cents/kWh)** | | 20 Yr. Ave.<br>8.04 | 8.03 | 8.08 | 8.12 | 8.16 | 8.18 | 8.14 | 8.02 | 7.98 | 8.00 | 8.00 |

Note:
(1) After including interest payment/reimbursement
(2) Energy fuel tariff will vary with fuel price (input in operating assumptions page)

PRIVATE AND CONFIDENTIAL

07/10/2001

**TANZANIA 100MW IPP**
**OPERATING ASSUMPTIONS II / Tariff**
**US Dollars in Thousands**

| | Esc. | See Note | 11 2011 | 12 2012 | 13 2013 | 14 2014 | 15 2015 | 16 2016 | 17 2017 | 18 2018 | 19 2019 | 20 2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Escalation Factors** | | | | | | | | | | | | |
| Capacity | 0.38% | | | | | | | | | | | |
| O&M | 0.38% | | | | | | | | | | | |
| Fuel | 0.00% | | | | | | | | | | | |
| | | | | | | | | | | | | |
| **Facility Output for Electricity Sales** | | | | | | | | | | | | |
| Facility Capacity (MW) | | | 97.64 | 97.64 | 97.64 | 97.64 | 97.64 | 97.64 | 97.64 | 97.64 | 97.64 | 97.64 |
| Output Degradation | | | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| Degraded Facility Capacity (MW) | | | 97.64 | 97.64 | 97.64 | 97.64 | 97.64 | 97.64 | 97.64 | 97.64 | 97.64 | 97.64 |
| | | | | | | | | | | | | |
| Auxiliary Usage & Transformer Loss (MW) | | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Net Facility Capacity (MW) | | | 97.64 | 97.64 | 97.64 | 97.64 | 97.64 | 97.64 | 97.64 | 97.64 | 97.64 | 97.64 |
| Hours in Year | | | 8,760 | 8,760 | 8,760 | 8,760 | 8,760 | 8,760 | 8,760 | 8,760 | 8,760 | 8,760 |
| Capacity Factor | | | 85.00% | 85.00% | 85.00% | 85.00% | 85.00% | 85.00% | 85.00% | 85.00% | 85.00% | 85.00% |
| Net Electricity Sold (MWh) | | | 727,045 | 727,045 | 727,045 | 727,045 | 727,045 | 727,045 | 727,045 | 727,045 | 727,045 | 727,045 |
| | | | | | | | | | | | | |
| **Capacity Tariff (USD/kW/mth)** | | | | | | | | | | | | |
| Adjusted Capital Component | | | 29.72 | 29.72 | 29.72 | 29.72 | 29.72 | 29.72 | 29.72 | 29.72 | 29.72 | 29.72 |
| Adjusted Debt Component (& after Interest Adj.) | | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Adjusted Capacity Purchase Price | | | 29.72 | 29.72 | 29.72 | 29.72 | 29.72 | 29.72 | 29.72 | 29.72 | 29.72 | 29.72 |
| | | | | | | | | | | | | |
| **Electricity Tariff in US cents/kWh** | | | | | | | | | | | | |
| Capacity (US cents/kWh)(1) | | | 4.79 | 4.79 | 4.79 | 4.79 | 4.79 | 4.79 | 4.79 | 4.79 | 4.79 | 4.79 |
| Energy Fuel (US cents/kWh)(2) | | | 2.41 | 2.41 | 2.41 | 2.41 | 2.41 | 2.41 | 2.41 | 2.41 | 2.41 | 2.41 |
| Energy O&M (US cents/kWh) | | | 0.80 | 0.80 | 0.80 | 0.80 | 0.80 | 0.80 | 0.80 | 0.80 | 0.80 | 0.80 |
| Aggregate Tariff (US cents/kWh)  20 Yr Avg. 8.04 | | | 8.00 | 8.00 | 8.00 | 8.00 | 8.00 | 8.00 | 8.00 | 8.00 | 8.00 | 8.00 |

Note:
(1) After including interest payment/reimbursement
(2) Energy fuel tariff will vary with fuel price (input in o)

PRIVATE AND CONFIDENTIAL

07/10/2001

TANZANIA 100MW IPP
OPERATING REVENUES
US Dollars in Thousands

| | | 1 2001 | 2 2002 | 3 2003 | 4 2004 | 5 2005 | 6 2006 | 7 2007 | 8 2008 | 9 2009 | 10 2010 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Capacity Revenues** | | | | | | | | | | | |
| Adjusted Capacity Capital (US$/kW/mth) | | 12.33 | 12.75 | 13.19 | 13.72 | 14.31 | 17.39 | 25.77 | 29.72 | 29.72 | 29.72 |
| PPA Capacity Debt Ref. Tariff (US$/kW/mth) | -22.2157% | 24.43 | 23.91 | 23.28 | 22.55 | 21.71 | 17.37 | 5.57 | 0.00 | 0.00 | 0.00 |
| Proportionate Adjustment as per Addendum 1 | | 19.00 | 18.60 | 18.11 | 17.54 | 16.89 | 13.51 | 4.33 | 0.00 | 0.00 | 0.00 |
| Dependable Capacity (MW) | | 97.64 | 97.64 | 97.64 | 97.64 | 97.64 | 97.64 | 97.64 | 97.64 | 97.64 | 97.64 |
| Capacity Revenues | | 36,712 | 36,726 | 36,676 | 36,626 | 36,559 | 36,204 | 35,270 | 34,825 | 34,825 | 34,825 |
| **Energy Revenues** | | | | | | | | | | | |
| Tariff Rate - Energy Fuel (US cents/kWh) | | 2.410 | 2.410 | 2.410 | 2.410 | 2.410 | 2.410 | 2.410 | 2.410 | 2.410 | 2.410 |
| Net Electricity Sold (MWh) | | 727,045 | 727,045 | 727,045 | 727,045 | 727,045 | 727,045 | 727,045 | 727,045 | 727,045 | 727,045 |
| Energy Fuel Revenues | | 17,518 | 17,518 | 17,518 | 17,518 | 17,518 | 17,518 | 17,518 | 17,518 | 17,518 | 17,518 |
| Tariff Rate - Energy O&M (US cents/kWh) | | 0.803 | 0.803 | 0.803 | 0.803 | 0.803 | 0.803 | 0.803 | 0.803 | 0.803 | 0.803 |
| Net Electricity Sold (MWh) | | 727,045 | 727,045 | 727,045 | 727,045 | 727,045 | 727,045 | 727,045 | 727,045 | 727,045 | 727,045 |
| Energy O&M Revenues | | 5,817 | 5,840 | 5,840 | 5,840 | 5,840 | 5,840 | 5,840 | 5,840 | 5,840 | 5,840 |
| **Capacity Capital Component Indexation** | | | | | | | | | | | |
| PPA Capacity Capital Reference Tariff | | 17.44 | 17.96 | 18.59 | 19.33 | 20.17 | 24.50 | 36.31 | 41.88 | 41.88 | 41.88 |
| (A) Proportionate Adjustment as per Addendum 1 | -22.2157% | 13.57 | 13.97 | 14.46 | 15.04 | 15.69 | 19.06 | 28.24 | 32.58 | 32.58 | 32.58 |
| (B) Capacity Capital Inflation Indexation Factor | | 1.0805 | 1.0846 | 1.0846 | 1.0846 | 1.0846 | 1.0846 | 1.0846 | 1.0846 | 1.0846 | 1.0846 |
| Adjusted Capacity Capital Ref. Tariff: (A) x (B) | | 14.66 | 15.15 | 15.68 | 16.31 | 17.02 | 20.67 | 30.63 | 35.33 | 35.33 | 35.33 |
| After "22.31%" Equity IRR Equalisation Factor Adj. | 0.84118 | 12.33 | 12.75 | 13.19 | 13.72 | 14.31 | 17.39 | 25.77 | 29.72 | 29.72 | 29.72 |

07/10/2001

PRIVATE AND CONFIDENTIAL

**TANZANIA 100MW IPP**
**OPERATING REVENUES**
**US Dollars in Thousands**

| | | 11 2011 | 12 2012 | 13 2013 | 14 2014 | 15 2015 | 16 2016 | 17 2017 | 18 2018 | 19 2019 | 20 2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Capacity Revenues** | | | | | | | | | | | |
| Adjusted Capacity Capital (US$/kW/mth) | | 29.72 | 29.72 | 29.72 | 29.72 | 29.72 | 29.72 | 29.72 | 29.72 | 29.72 | 29.72 |
| PPA Capacity Debt Ref. Tariff (US$/kW/mth) | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Proportionate Adjustment as per Addendum 1 | -22.2157% | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Dependable Capacity (MW) | | 97.64 | 97.64 | 97.64 | 97.64 | 97.64 | 97.64 | 97.64 | 97.64 | 97.64 | 97.64 |
| Capacity Revenues | | 34,825 | 34,825 | 34,825 | 34,825 | 34,825 | 34,825 | 34,825 | 34,825 | 34,825 | 34,825 |
| **Energy Revenues** | | | | | | | | | | | |
| Tariff Rate - Energy Fuel (US cents/kWh) | | 2.410 | 2.410 | 2.410 | 2.410 | 2.410 | 2.410 | 2.410 | 2.410 | 2.410 | 2.410 |
| Net Electricity Sold (MWh) | | 727,045 | 727,045 | 727,045 | 727,045 | 727,045 | 727,045 | 727,045 | 727,045 | 727,045 | 727,045 |
| Energy Fuel Revenues | | 17,518 | 17,518 | 17,518 | 17,518 | 17,518 | 17,518 | 17,518 | 17,518 | 17,518 | 17,518 |
| Tariff Rate - Energy O&M (US cents/kWh) | | 0.803 | 0.803 | 0.803 | 0.803 | 0.803 | 0.803 | 0.803 | 0.803 | 0.803 | 0.803 |
| Net Electricity Sold (MWh) | | 727,045 | 727,045 | 727,045 | 727,045 | 727,045 | 727,045 | 727,045 | 727,045 | 727,045 | 727,045 |
| Energy O&M Revenues | | 5,840 | 5,840 | 5,840 | 5,840 | 5,840 | 5,840 | 5,840 | 5,840 | 5,840 | 5,840 |
| **Capacity Capital Component Indexation** | | | | | | | | | | | |
| PPA Capacity Capital Reference Tariff | | 41.88 | 41.88 | 41.88 | 41.88 | 41.88 | 41.88 | 41.88 | 41.88 | 41.88 | 41.88 |
| (A) Proportionate Adjustment as per Addendum 1 | -22.2157% | 32.58 | 32.58 | 32.58 | 32.58 | 32.58 | 32.58 | 32.58 | 32.58 | 32.58 | 32.58 |
| (B) Capacity Capital Inflation Indexation Factor | | 1.0846 | 1.0846 | 1.0846 | 1.0846 | 1.0846 | 1.0846 | 1.0846 | 1.0846 | 1.0846 | 1.0846 |
| Adjusted Capacity Capital Ref. Tariff: (A) x (B) | | 35.33 | 35.33 | 35.33 | 35.33 | 35.33 | 35.33 | 35.33 | 35.33 | 35.33 | 35.33 |
| After "22.31%" Equity IRR Equalisation Factor Adj. | 0.84118 | 29.72 | 29.72 | 29.72 | 29.72 | 29.72 | 29.72 | 29.72 | 29.72 | 29.72 | 29.72 |

PRIVATE AND CONFIDENTIAL

07/10/2001

**TANZANIA 100MW IPP**
**OPERATING EXPENSES**
**US Dollars in Thousands**

| | 1<br>2001 | 2<br>2002 | 3<br>2003 | 4<br>2004 | 5<br>2005 | 6<br>2006 | 7<br>2007 | 8<br>2008 | 9<br>2009 | 10<br>2010 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Labour and Fixed O&M Fees** | | | | | | | | | | |
| Salary and Fees Cost | 2,140 | 2,140 | 2,140 | 2,140 | 2,140 | 2,140 | 2,140 | 2,140 | 2,140 | 2,140 |
| O&M Escalation Factor | 1.0805 | 1.0846 | 1.0846 | 1.0846 | 1.0846 | 1.0846 | 1.0846 | 1.0846 | 1.0846 | 1.0846 |
| Salary and Fees Expense | 2,312 | 2,321 | 2,321 | 2,321 | 2,321 | 2,321 | 2,321 | 2,321 | 2,321 | 2,321 |
| **Operating Insurance** | | | | | | | | | | |
| Insurance Cost | 562 | 562 | 562 | 562 | 562 | 562 | 562 | 562 | 562 | 562 |
| O&M Escalation Factor | 1.0805 | 1.0846 | 1.0846 | 1.0846 | 1.0846 | 1.0846 | 1.0846 | 1.0846 | 1.0846 | 1.0846 |
| Insurance Expense | 608 | 610 | 610 | 610 | 610 | 610 | 610 | 610 | 610 | 610 |
| **General & Administrative** | | | | | | | | | | |
| General & Administrative Expense | 941 | 941 | 941 | 941 | 941 | 941 | 941 | 941 | 941 | 941 |
| O&M Escalation Factor | 1.0805 | 1.0846 | 1.0846 | 1.0846 | 1.0846 | 1.0846 | 1.0846 | 1.0846 | 1.0846 | 1.0846 |
| General & Administrative Expense | 1,017 | 1,021 | 1,021 | 1,021 | 1,021 | 1,021 | 1,021 | 1,021 | 1,021 | 1,021 |
| **Financing Fees** | | | | | | | | | | |
| Lender Agency Fees | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 0 |
| O&M Escalation Factor | 1.0000 | 1.0000 | 1.0000 | 1.0000 | 1.0000 | 1.0000 | 1.0000 | 1.0000 | 1.0000 | 1.0000 |
| Financing Fees Expense | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 0 | 0 |
| **Sovereign Risk Hedge** | | | | | | | | | | |
| Fees | 2,349 | 2,250 | 2,151 | 2,053 | 1,954 | 1,855 | 1,757 | 1,658 | 1,559 | 1,461 |
| O&M Escalation Factor | 1.0000 | 1.0000 | 1.0000 | 1.0000 | 1.0000 | 1.0000 | 1.0000 | 1.0000 | 1.0000 | 1.0000 |
| Sovereign Risk Hedge Expense | 2,349 | 2,250 | 2,151 | 2,053 | 1,954 | 1,855 | 1,757 | 1,658 | 1,559 | 1,461 |

07/10/2001

PRIVATE AND CONFIDENTIAL

**TANZANIA 100MW IPP**
**OPERATING EXPENSES**
US Dollars in Thousands

| | 11 2011 | 12 2012 | 13 2013 | 14 2014 | 15 2015 | 16 2016 | 17 2017 | 18 2018 | 19 2019 | 20 2020 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Labour and Fixed O&M Fees** | | | | | | | | | | |
| Salary and Fees Cost | 2,140 | 2,140 | 2,140 | 2,140 | 2,140 | 2,140 | 2,140 | 2,140 | 2,140 | 2,140 |
| O&M Escalation Factor | 1.0846 | 1.0846 | 1.0846 | 1.0846 | 1.0846 | 1.0846 | 1.0846 | 1.0846 | 1.0846 | 1.0846 |
| Salary and Fees Expense | 2,321 | 2,321 | 2,321 | 2,321 | 2,321 | 2,321 | 2,321 | 2,321 | 2,321 | 2,321 |
| **Operating Insurance** | | | | | | | | | | |
| Insurance Cost | 562 | 562 | 562 | 562 | 562 | 562 | 562 | 562 | 562 | 562 |
| O&M Escalation Factor | 1.0846 | 1.0846 | 1.0846 | 1.0846 | 1.0846 | 1.0846 | 1.0846 | 1.0846 | 1.0846 | 1.0846 |
| Insurance Expense | 610 | 610 | 610 | 610 | 610 | 610 | 610 | 610 | 610 | 610 |
| **General & Administrative** | | | | | | | | | | |
| General & Administrative Expense | 941 | 941 | 941 | 941 | 941 | 941 | 941 | 941 | 941 | 941 |
| O&M Escalation Factor | 1.0846 | 1.0846 | 1.0846 | 1.0846 | 1.0846 | 1.0846 | 1.0846 | 1.0846 | 1.0846 | 1.0846 |
| General & Administrative Expense | 1,021 | 1,021 | 1,021 | 1,021 | 1,021 | 1,021 | 1,021 | 1,021 | 1,021 | 1,021 |
| **Financing Fees** | | | | | | | | | | |
| Lender Agency Fees | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| O&M Escalation Factor | 1.0000 | 1.0000 | 1.0000 | 1.0000 | 1.0000 | 1.0000 | 1.0000 | 1.0000 | 1.0000 | 1.0000 |
| Financing Fees Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Sovereign Risk Hedge Fees** | | | | | | | | | | |
| Fees | 1,362 | 1,263 | 1,165 | 1,066 | 967 | 868 | 770 | 671 | 572 | 474 |
| O&M Escalation Factor | 1.0000 | 1.0000 | 1.0000 | 1.0000 | 1.0000 | 1.0000 | 1.0000 | 1.0000 | 1.0000 | 1.0000 |
| Sovereign Risk Hedge Expense | 1,362 | 1,263 | 1,165 | 1,066 | 967 | 868 | 770 | 671 | 572 | 474 |

PRIVATE AND CONFIDENTIAL

07/10/2001

**TANZANIA 100MW IPP**
**OPERATING EXPENSES**
**US Dollars in Thousands**

| | 1 2001 | 2 2002 | 3 2003 | 4 2004 | 5 2005 | 6 2006 | 7 2007 | 8 2008 | 9 2009 | 10 2010 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Heat Rate** | | | | | | | | | | |
| Nett Heat Rate (BTU/kWh HHV) | 8,913 | 8,913 | 8,913 | 8,913 | 8,913 | 8,913 | 8,913 | 8,913 | 8,913 | 8,913 |
| **Fuel Usage & Expense** | | | | | | | | | | |
| Net Electricity Sold (MWh) | 727,045 | 727,045 | 727,045 | 727,045 | 727,045 | 727,045 | 727,045 | 727,045 | 727,045 | 727,045 |
| Nett Heat Rate (Btu/kWh HHV) | 8,913 | 8,913 | 8,913 | 8,913 | 8,913 | 8,913 | 8,913 | 8,913 | 8,913 | 8,913 |
| Total Heat Consumption (MMBtu) | 6,480,148 | 6,480,148 | 6,480,148 | 6,480,148 | 6,480,148 | 6,480,148 | 6,480,148 | 6,480,148 | 6,480,148 | 6,480,148 |
| Fuel Price (US$/MMBtu) | 2.7078 | 2.7078 | 2.7078 | 2.7078 | 2.7078 | 2.7078 | 2.7078 | 2.7078 | 2.7078 | 2.7078 |
| Total Heat Consumption (MMBtu) | 6,480,148 | 6,480,148 | 6,480,148 | 6,480,148 | 6,480,148 | 6,480,148 | 6,480,148 | 6,480,148 | 6,480,148 | 6,480,148 |
| Fuel Expense | 17,547 | 17,547 | 17,547 | 17,547 | 17,547 | 17,547 | 17,547 | 17,547 | 17,547 | 17,547 |
| **Lube Oil** | | | | | | | | | | |
| Lube Oil Consumption (g/kWh) | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 |
| Lube Oil Density (kg/litre) | 0.91 | 0.91 | 0.91 | 0.91 | 0.91 | 0.91 | 0.91 | 0.91 | 0.91 | 0.91 |
| Lube Oil Consumption (litre/kWh) | 0.0011 | 0.0011 | 0.0011 | 0.0011 | 0.0011 | 0.0011 | 0.0011 | 0.0011 | 0.0011 | 0.0011 |
| Lube Oil Price (US$/litre) | 1.14 | 1.14 | 1.14 | 1.14 | 1.14 | 1.14 | 1.14 | 1.14 | 1.14 | 1.14 |
| Lube Oil Consumption (litre/kWh) | 0.0011 | 0.0011 | 0.0011 | 0.0011 | 0.0011 | 0.0011 | 0.0011 | 0.0011 | 0.0011 | 0.0011 |
| Lube Oil Expense (US$/kWh) | 0.0013 | 0.0013 | 0.0013 | 0.0013 | 0.0013 | 0.0013 | 0.0013 | 0.0013 | 0.0013 | 0.0013 |
| Lube Oil Expense (US$/kWh) | 0.0013 | 0.0013 | 0.0013 | 0.0013 | 0.0013 | 0.0013 | 0.0013 | 0.0013 | 0.0013 | 0.0013 |
| Net Facility Output (MWh) | 727,045 | 727,045 | 727,045 | 727,045 | 727,045 | 727,045 | 727,045 | 727,045 | 727,045 | 727,045 |
| Lube Oil Expense | 911 | 911 | 911 | 911 | 911 | 911 | 911 | 911 | 911 | 911 |
| O&M Escalation Factor | 1.0805 | 1.0846 | 1.0846 | 1.0846 | 1.0846 | 1.0846 | 1.0846 | 1.0846 | 1.0846 | 1.0846 |
| Escalated Lube Oil Expense | 984 | 988 | 988 | 988 | 988 | 988 | 988 | 988 | 988 | 988 |
| **Variable Operating & Maintenance** | | | | | | | | | | |
| Variable Operating Cost (US$/kWh) | 0.0058 | 0.0058 | 0.0058 | 0.0058 | 0.0058 | 0.0058 | 0.0058 | 0.0058 | 0.0058 | 0.0058 |
| Net Facility Output (MWh) | 727,045 | 727,045 | 727,045 | 727,045 | 727,045 | 727,045 | 727,045 | 727,045 | 727,045 | 727,045 |
| O&M Escalation Factor | 1.0805 | 1.0846 | 1.0846 | 1.0846 | 1.0846 | 1.0846 | 1.0846 | 1.0846 | 1.0846 | 1.0846 |
| Variable O & M Expense | 4,556 | 4,574 | 4,574 | 4,574 | 4,574 | 4,574 | 4,574 | 4,574 | 4,574 | 4,574 |

PRIVATE AND CONFIDENTIAL

# TANZANIA 100MW IPP
## OPERATING EXPENSES
US Dollars in Thousands

| | 11<br>2011 | 12<br>2012 | 13<br>2013 | 14<br>2014 | 15<br>2015 | 16<br>2016 | 17<br>2017 | 18<br>2018 | 19<br>2019 | 20<br>2020 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Heat Rate** | | | | | | | | | | |
| Net Heat Rate (BTU/kWh HHV) | 8,913 | 8,913 | 8,913 | 8,913 | 8,913 | 8,913 | 8,913 | 8,913 | 8,913 | 8,913 |
| **Fuel Usage & Expense** | | | | | | | | | | |
| Net Electricity Sold (MWh) | 727,045 | 727,045 | 727,045 | 727,045 | 727,045 | 727,045 | 727,045 | 727,045 | 727,045 | 727,045 |
| Net Heat Rate (Btu/kWh HHV) | 8,913 | 8,913 | 8,913 | 8,913 | 8,913 | 8,913 | 8,913 | 8,913 | 8,913 | 8,913 |
| Total Heat Consumption (MMBtu) | 6,480,148 | 6,480,148 | 6,480,148 | 6,480,148 | 6,480,148 | 6,480,148 | 6,480,148 | 6,480,148 | 6,480,148 | 6,480,148 |
| Fuel Price (US$/MMBtu) | 2.7078 | 2.7078 | 2.7078 | 2.7078 | 2.7078 | 2.7078 | 2.7078 | 2.7078 | 2.7078 | 2.7078 |
| Total Heat Consumption (MMBtu) | 6,480,148 | 6,480,148 | 6,480,148 | 6,480,148 | 6,480,148 | 6,480,148 | 6,480,148 | 6,480,148 | 6,480,148 | 6,480,148 |
| **Fuel Expense** | 17,547 | 17,547 | 17,547 | 17,547 | 17,547 | 17,547 | 17,547 | 17,547 | 17,547 | 17,547 |
| **Lube Oil** | | | | | | | | | | |
| Lube Oil Consumption (g/kWh) | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 |
| Lube Oil Density (kg/litre) | 0.91 | 0.91 | 0.91 | 0.91 | 0.91 | 0.91 | 0.91 | 0.91 | 0.91 | 0.91 |
| Lube Oil Consumption (litre/kWh) | 0.0011 | 0.0011 | 0.0011 | 0.0011 | 0.0011 | 0.0011 | 0.0011 | 0.0011 | 0.0011 | 0.0011 |
| Lube Oil Price (US$/litre) | 1.14 | 1.14 | 1.14 | 1.14 | 1.14 | 1.14 | 1.14 | 1.14 | 1.14 | 1.14 |
| Lube Oil Consumption (litre/kWh) | 0.0011 | 0.0011 | 0.0011 | 0.0011 | 0.0011 | 0.0011 | 0.0011 | 0.0011 | 0.0011 | 0.0011 |
| Lube Oil Expense (US$/kWh) | 0.0013 | 0.0013 | 0.0013 | 0.0013 | 0.0013 | 0.0013 | 0.0013 | 0.0013 | 0.0013 | 0.0013 |
| Lube Oil Expense (US$/kWh) | 0.0013 | 0.0013 | 0.0013 | 0.0013 | 0.0013 | 0.0013 | 0.0013 | 0.0013 | 0.0013 | 0.0013 |
| Net Facility Output (MWh) | 727,045 | 727,045 | 727,045 | 727,045 | 727,045 | 727,045 | 727,045 | 727,045 | 727,045 | 727,045 |
| Lube Oil Expense | 911 | 911 | 911 | 911 | 911 | 911 | 911 | 911 | 911 | 911 |
| O&M Escalation Factor | 1.0846 | 1.0846 | 1.0846 | 1.0846 | 1.0846 | 1.0846 | 1.0846 | 1.0846 | 1.0846 | 1.0846 |
| Escalated Lube Oil Expense | 988 | 988 | 988 | 988 | 988 | 988 | 988 | 988 | 988 | 988 |
| **Variable Operating & Maintenance** | | | | | | | | | | |
| Variable Operating Cost (US$/kWh) | 0.0058 | 0.0058 | 0.0058 | 0.0058 | 0.0058 | 0.0058 | 0.0058 | 0.0058 | 0.0058 | 0.0058 |
| Net Facility Output (MWh) | 727,045 | 727,045 | 727,045 | 727,045 | 727,045 | 727,045 | 727,045 | 727,045 | 727,045 | 727,045 |
| O&M Escalation Factor | 1.0846 | 1.0846 | 1.0846 | 1.0846 | 1.0846 | 1.0846 | 1.0846 | 1.0846 | 1.0846 | 1.0846 |
| **Variable O & M Expense** | 4,574 | 4,574 | 4,574 | 4,574 | 4,574 | 4,574 | 4,574 | 4,574 | 4,574 | 4,574 |

07/10/2001

PRIVATE AND CONFIDENTIAL

PRIVATE AND CONFIDENTIAL

**TANZANIA 100MW IPP**
**DEBT & DEBT RESERVE**
**US Dollars in Thousands**

| | 1 — 2001 | 2 — 2002 | 3 — 2003 | 4 — 2004 | 5 — 2005 | 6 — 2006 | 7 — 2007 | 8 — 2008 | 9 — 2009 | 10 — 2010 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Senior Debt** | | | | | | | | | | |
| Amortization % (100.00%) | 18.00% | 20.00% | 22.00% | 10.00% | 10.00% | 5.00% | 5.00% | 10.00% | 0.00% | 0.00% |
| Interest Rate (grossed up for tax yr 6+) | 8.500% | 8.500% | 8.500% | 8.500% | 8.500% | 10.000% | 10.000% | 10.000% | 0.00% | 0.00% |
| Beginning Balance | 89,041 | 73,014 | 55,205 | 35,616 | 26,712 | 17,808 | 13,356 | 8,904 | 0 | 0 |
| Principal (-) | 16,027 | 17,808 | 19,589 | 8,904 | 8,904 | 4,452 | 4,452 | 8,904 | 0 | 0 |
| Ending Balance | 73,014 | 55,205 | 35,616 | 26,712 | 17,808 | 13,356 | 8,904 | 0 | 0 | 0 |
| Interest Due | 7,228 | 5,828 | 4,276 | 2,838 | 2,081 | 1,670 | 1,224 | 668 | | |
| | | | | | | | | | | |
| Total Senior Debt Service | 23,255 | 23,636 | 23,865 | 11,742 | 10,985 | 6,122 | 5,676 | 9,572 | | |
| | | | | | | | | | | |
| Senior Debt Coverage Ratio | 1.22 | 1.44 | 1.67 | 3.03 | 3.22 | 4.44 | 4.63 | 2.92 | n.a | n.a |
| **Debt Service Reserve** | | | | | | | | | | |
| Cash Available for Reserve | 5,116 | 5,287 | 5,600 | 17,989 | 17,969 | 17,781 | 13,605 | 19,182 | 19,405 | |
| Target Balance | 11,818 | 11,933 | 5,871 | 5,493 | 3,061 | 2,838 | 4,786 | 0 | 0 | 0 |
| Beginning Balance | 0 | 5,116 | 10,403 | 5,871 | 5,493 | 3,061 | 2,838 | 4,786 | 0 | 0 |
| Additions (Releases) | 5,116 | 5,287 | (4,532) | (378) | (2,432) | (223) | 1,948 | (4,786) | 0 | 0 |
| Ending Balance | 5,116 | 10,403 | 5,871 | 5,493 | 3,061 | 2,838 | 4,786 | 0 | 0 | 0 |
| | | | | | | | | | | |
| Interest Earnings on Reserve (3.00%) | 0 | 153 | 312 | 176 | 165 | 92 | 85 | 144 | 0 | 0 |
| **Working Capital** | | | | | | | | | | |
| Beginning Balance | 0 | 1,704 | 1,704 | 1,704 | 1,704 | 1,704 | 1,704 | 1,704 | 1,704 | 1,704 |
| Additions (Releases) | 1,704 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ending Balance | 1,704 | 1,704 | 1,704 | 1,704 | 1,704 | 1,704 | 1,704 | 1,704 | 1,704 | 1,704 |
| **Maintenance Reserve** | | | | | | | | | | |
| Cash Available for Reserve | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Target Balance | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| Beginning Balance | 0 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| Additions (Releases) | 5,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ending Balance | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| **Conversion Equipment Reserve** | | | | | | | | | | |
| Cash Available for Reserve | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Target Balance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Beginning Balance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5,000 | 0 | 0 |
| Additions (Releases) | 0 | 0 | 0 | 0 | 0 | 0 | 5,000 | (5,000) | 0 | 0 |
| Ending Balance | 0 | 0 | 0 | 0 | 0 | 0 | 5,000 | 0 | 0 | 0 |
| | | | | | | | | | | |
| Interest Earnings on Reserve (3.00%) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

**TANZANIA 100MW IPP**
**DEBT & DEBT RESERVE**
**US Dollars in Thousands**

| | | 11 2011 | 12 2012 | 13 2013 | 14 2014 | 15 2015 | 16 2016 | 17 2017 | 18 2018 | 19 2019 | 20 2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Senior Debt** | | | | | | | | | | | |
| Amortization % | 100.00% | | | | | | | | | | |
| Interest Rate (grossed up for tax yr 6 +) | | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| | | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| Beginning Balance | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Principal (-) | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ending Balance | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Interest Due | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Senior Debt Service** | | | | | | | | | | | |
| Senior Debt Coverage Ratio | | n.a | n.a | n.a | n.a | n.a | n.a | n.a | n.a | n.a | n.a |
| **Debt Service Reserve** | | | | | | | | | | | |
| Cash Available for Reserve | | | | | | | | | | | |
| Target Balance | | 19,501 | 19,597 | 19,692 | 19,788 | 19,884 | 19,980 | 20,076 | 20,172 | 20,267 | 20,363 |
| Beginning Balance | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Additions (Release) | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ending Balance | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Interest Earnings on Reserve | 3.00% | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Working Capital** | | | | | | | | | | | |
| Beginning Balance | | 1,704 | 1,704 | 1,704 | 1,704 | 1,704 | 1,704 | 1,704 | 1,704 | 1,704 | 1,704 |
| Additions (Release) | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (1,704) |
| Ending Balance | | 1,704 | 1,704 | 1,704 | 1,704 | 1,704 | 1,704 | 1,704 | 1,704 | 1,704 | 0 |
| **Maintenance Reserve** | | | | | | | | | | | |
| Cash Available for Reserve | | | | | | | | | | | |
| Target Balance | | 19,501 | 19,597 | 19,692 | 19,788 | 19,884 | 19,980 | 20,076 | 20,172 | 20,267 | 20,363 |
| Beginning Balance | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Additions (Release) | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ending Balance | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Conversion Equipment Reserve** | | | | | | | | | | | |
| Cash Available for Reserve | | | | | | | | | | | |
| Target Balance | | 19,501 | 19,597 | 19,692 | 19,788 | 19,884 | 19,980 | 20,076 | 20,172 | 20,267 | 22,067 |
| Beginning Balance | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Additions (Release) | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ending Balance | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Interest Earnings on Reserve | 3.00% | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

07/10/2001

PRIVATE AND CONFIDENTIAL

# TANZANIA 100MW IPP
## Monthly Cash Flow Operating Year 1
USD '000

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Sources of Funds** | | | | | | | | | | | | |
| Working Capital | 2,942.474 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| Balance in Project Bank Account | 0.000 | 0.000 | 3,069.128 | 6,063.257 | 9,132.385 | 12,201.514 | 3,116.521 | 6,185.649 | 9,254.778 | 12,248.906 | 15,318.035 | 18,387.163 |
| Capacity Payment | 0.000 | 2,921.899 | 2,921.899 | 2,921.899 | 2,921.899 | 2,921.899 | 2,921.899 | 2,921.899 | 2,921.899 | 2,921.899 | 2,921.899 | 2,921.899 |
| Energy Fuel Payment | 0.000 | 1,459.854 | 1,459.854 | 1,459.854 | 1,459.854 | 1,459.854 | 1,459.854 | 1,459.854 | 1,459.854 | 1,459.854 | 1,459.854 | 1,459.854 |
| Energy O&M Payment | 0.000 | 484.788 | 484.788 | 484.788 | 484.788 | 484.788 | 484.788 | 484.788 | 484.788 | 484.788 | 484.788 | 484.788 |
| **Total Sources of Funds** | 2,942.474 | 4,866.541 | 7,935.670 | 10,929.798 | 13,998.927 | 17,068.055 | 7,983.062 | 11,052.190 | 14,121.319 | 17,115.447 | 20,184.576 | 23,253.704 |
| **Uses of Funds** | | | | | | | | | | | | |
| Fuel | 0.000 | 1,462.229 | 1,462.229 | 1,462.229 | 1,462.229 | 1,462.229 | 1,462.229 | 1,462.229 | 1,462.229 | 1,462.229 | 1,462.229 | 1,462.229 |
| Lube Oil | 0.000 | 82.010 | 82.010 | 82.010 | 82.010 | 82.010 | 82.010 | 82.010 | 82.010 | 82.010 | 82.010 | 82.010 |
| Salary | 167.689 | 168.427 | 168.427 | 168.427 | 168.427 | 168.427 | 168.427 | 168.427 | 168.427 | 168.427 | 168.427 | 168.427 |
| Fixed O&M Management Fee | 84.747 | 84.747 | 84.747 | 84.747 | 84.747 | 84.747 | 84.747 | 84.747 | 84.747 | 84.747 | 84.747 | 84.747 |
| General & Admin | 0.000 | 0.000 | 75.000 | 0.000 | 0.000 | 75.000 | 0.000 | 0.000 | 75.000 | 0.000 | 0.000 | 75.000 |
| Operating Insurance | 281.190 | 0.000 | 0.000 | 0.000 | 0.000 | 281.190 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| Lender Agency Fee | 60.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| Political Risk Insurance | 2,348.848 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| **Total Before Loan Repayment** | 2,942.474 | 1,797.413 | 1,872.413 | 1,797.413 | 1,797.413 | 2,153.602 | 1,797.413 | 1,797.413 | 1,872.413 | 1,797.413 | 1,797.413 | 1,872.413 |
| Interest on Loan | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 8,013.690 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 8,013.690 |
| Principal Repayment | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 3,784.242 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 3,443.661 |
| **Total Uses of Funds** | 2,942.474 | 1,797.413 | 1,872.413 | 1,797.413 | 1,797.413 | 13,951.535 | 1,797.413 | 1,797.413 | 1,872.413 | 1,797.413 | 1,797.413 | 13,329.763 |
| Sources of funds less Uses of funds | 0.000 | 3,069.128 | 6,063.257 | 9,132.385 | 12,201.514 | 3,116.521 | 6,185.649 | 9,254.778 | 12,248.906 | 15,318.035 | 18,387.163 | 9,923.941 |
| Cash Balance Carried Fwd to PBA | 0.000 | 3,069.128 | 6,063.257 | 9,132.385 | 12,201.514 | 3,116.521 | 6,185.649 | 9,254.778 | 12,248.906 | 15,318.035 | 18,387.163 | 9,923.941 |
| DSCR | 1.447 | | | | | 2.030 | | | | | | |
| LLCR | 1.743 | | | | | | | | | | | |

PRIVATE AND CONFIDENTIAL

TANZANIA 100MW IPP
INTEREST RATE ADJUSTMENTS
US Dollars in Thousands

| | 1 2001 | 2 2002 | 3 2003 | 4 2004 | 5 2005 | 6 2006 | 7 2007 | 8 2008 | 9 2009 | 10 2010 |
|---|---|---|---|---|---|---|---|---|---|---|
| **PPA Assumptions:** | | | | | | | | | | |
| Reference Rate | 10.94% | | | | | | | | | |
| Withholding Tax | 15.00% | | | | | | | | | |
| Grossed Up Interest Rate | 12.87% | | | | | | | | | |
| | | | | | | | | | | |
| Interest charges under PPA assumptions | 8,878 | 7,158 | 5,252 | 3,486 | 2,556 | 2,065 | 1,515 | 826 | 0 | 0 |
| Interest payment under financing document | 7,228 | 5,828 | 4,276 | 2,838 | 2,081 | 1,670 | 1,224 | 668 | 0 | 0 |
| Reimbursement From(+)/ Payment To TAN(-) | (1,650) | (1,330) | (976) | (648) | (475) | (396) | (290) | (158) | 0 | 0 |

PRIVATE AND CONFIDENTIAL

07/10/2001

TANZANIA 100MW IPP
DEPRECIATION FOR INSURANCE
US Dollars in Thousands

| | | 1 2001 | 2 2002 | 3 2003 | 4 2004 | 5 2005 | 6 2006 | 7 2007 | 8 2008 | 9 2009 | 10 2010 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Remaining Value of Plant  Str. Line : | 5% | 100.00% | 95.00% | 90.00% | 85.00% | 80.00% | 75.00% | 70.00% | 65.00% | 60.00% | 55.00% |
| **CEND** | | | | | | | | | | | |
| Insured Value as % of Project Cost | 100.00% | | | | | | | | | | |
| Project Cost | 127,201 | | | | | | | | | | |
| CEND Insurance Rate | | 1.368% | 1.368% | 1.368% | 1.368% | 1.368% | 1.368% | 1.368% | 1.368% | 1.368% | 1.368% |
| Insured Value (USD '000) | | 127,201 | 120,841 | 114,481 | 108,121 | 101,761 | 95,401 | 89,041 | 82,681 | 76,321 | 69,961 |
| CEND Premium | | 1,740 | 1,653 | 1,566 | 1,479 | 1,392 | 1,305 | 1,218 | 1,131 | 1,044 | 957 |
| **War** | | | | | | | | | | | |
| Insured Value as % of Project Cost | 70.00% | | | | | | | | | | |
| Project Cost | 127,201 | | | | | | | | | | |
| War Insurance Rate | | 0.2625% | 0.2625% | 0.2625% | 0.2625% | 0.2625% | 0.2625% | 0.2625% | 0.2625% | 0.2625% | 0.2625% |
| Insured Value (USD '000) | | 89,041 | 84,589 | 80,137 | 75,685 | 71,233 | 66,781 | 62,329 | 57,877 | 53,425 | 48,973 |
| War Premium | | 234 | 222 | 210 | 199 | 187 | 175 | 164 | 152 | 140 | 129 |
| **CI** | | | | | | | | | | | |
| Insured Value (USD '000) | | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 |
| CI Rate | | 1.250% | 1.250% | 1.250% | 1.250% | 1.250% | 1.250% | 1.250% | 1.250% | 1.250% | 1.250% |
| CI Premium | | 375 | 375 | 375 | 375 | 375 | 375 | 375 | 375 | 375 | 375 |

PRIVATE AND CONFIDENTIAL

07/10/2001

**TANZANIA 100MW IPP**
**DEPRECIATION FOR INSURANCE**
**US Dollars in Thousands**

| | | 11 2011 | 12 2012 | 13 2013 | 14 2014 | 15 2015 | 16 2016 | 17 2017 | 18 2018 | 19 2019 | 20 2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Remaining Value of Plant  Str. Line | 5% | 50.00% | 45.00% | 40.00% | 35.00% | 30.00% | 25.00% | 20.00% | 15.00% | 10.00% | 5.00% |
| **CEND** | | | | | | | | | | | |
| Insured Value as % of Project Cost | 100.00% | | | | | | | | | | |
| Project Cost | 127,201 | | | | | | | | | | |
| CEND Insurance Rate | 1.368% | 1.368% | 1.368% | 1.368% | 1.368% | 1.368% | 1.368% | 1.368% | 1.368% | 1.368% | 1.368% |
| Insured Value (USD '000) | | 63,601 | 57,241 | 50,881 | 44,520 | 38,160 | 31,800 | 25,440 | 19,080 | 12,720 | 6,360 |
| CEND Premium | | 870 | 783 | 696 | 609 | 522 | 435 | 348 | 261 | 174 | 87 |
| **War** | | | | | | | | | | | |
| Insured Value as % of Project Cost | 70.00% | | | | | | | | | | |
| Project Cost | 127,201 | | | | | | | | | | |
| War Insurance Rate | 0.2625% | 0.2625% | 0.2625% | 0.2625% | 0.2625% | 0.2625% | 0.2625% | 0.2625% | 0.2625% | 0.2625% | 0.2625% |
| Insured Value (USD '000) | | 44,520 | 40,068 | 35,616 | 31,164 | 26,712 | 22,260 | 17,808 | 13,356 | 8,904 | 4,452 |
| War Premium | | 117 | 105 | 93 | 82 | 70 | 58 | 47 | 35 | 23 | 12 |
| **CI** | | | | | | | | | | | |
| Insured Value (USD '000) | | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 |
| CI Rate | 1.250% | 1.250% | 1.250% | 1.250% | 1.250% | 1.250% | 1.250% | 1.250% | 1.250% | 1.250% | 1.250% |
| CI Premium | | 375 | 375 | 375 | 375 | 375 | 375 | 375 | 375 | 375 | 375 |

07/10/2001

PRIVATE AND CONFIDENTIAL

**TANZANIA 100MW IPP**
**AFTER-TAX CASH FLOW**
**US Dollars in Thousands**

| | | 1 2001 | 2 2002 | 3 2003 | 4 2004 | 5 2005 | 6 2006 | 7 2007 | 8 2008 | 9 2009 | 10 2010 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **OPERATING REVENUES** | | | | | | | | | | | |
| Capacity Capital Charge | | 14,447 | 14,935 | 15,458 | 16,074 | 16,772 | 20,373 | 30,193 | 34,825 | 34,825 | 34,825 |
| Capacity Debt Charge | | 22,266 | 21,792 | 21,217 | 20,552 | 19,787 | 15,831 | 5,077 | 0 | 0 | 0 |
| Capacity Debt Adjustment | | (1,650) | (1,330) | (976) | (648) | (475) | (396) | (290) | (158) | 0 | 0 |
| Energy Fuel Charge | | 17,518 | 17,518 | 17,518 | 17,518 | 17,518 | 17,518 | 17,518 | 17,518 | 17,518 | 17,518 |
| Energy O&M Charge | | 5,817 | 5,840 | 5,840 | 5,840 | 5,840 | 5,840 | 5,840 | 5,840 | 5,840 | 5,840 |
| **Total Operating Revenues** | | 58,398 | 58,754 | 59,058 | 59,336 | 59,442 | 59,166 | 58,338 | 58,025 | 58,183 | 58,183 |
| **OPERATING EXPENSES** | | | | | | | | | | | |
| Fuel | | 17,547 | 17,547 | 17,547 | 17,547 | 17,547 | 17,547 | 17,547 | 17,547 | 17,547 | 17,547 |
| Lube Oil | | 984 | 988 | 988 | 988 | 988 | 988 | 988 | 988 | 988 | 988 |
| Variable O&M | | 4,556 | 4,574 | 4,574 | 4,574 | 4,574 | 4,574 | 4,574 | 4,574 | 4,574 | 4,574 |
| Salary & Fixed O&M Fees | | 2,312 | 2,321 | 2,321 | 2,321 | 2,321 | 2,321 | 2,321 | 2,321 | 2,321 | 2,321 |
| General & Administrative | | 1,017 | 1,021 | 1,021 | 1,021 | 1,021 | 1,021 | 1,021 | 1,021 | 1,021 | 1,021 |
| Operating Insurance | | 608 | 610 | 610 | 610 | 610 | 610 | 610 | 610 | 610 | 610 |
| Financing Fees | | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 60 |
| Risk Hedging: 1 | | 1,740 | 1,653 | 1,566 | 1,479 | 1,392 | 1,305 | 1,218 | 1,131 | 1,044 | 957 |
| Risk Hedging: 2 | | 234 | 222 | 210 | 199 | 187 | 175 | 164 | 152 | 140 | 129 |
| Risk Hedging: 3 | | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 |
| Contingency (% of fixed & variable) | 5.00% | 594 | 591 | 586 | 581 | 576 | 571 | 567 | 562 | 554 | 549 |
| **Total Operating Expenses** | | 30,027 | 29,962 | 29,858 | 29,754 | 29,651 | 29,547 | 29,444 | 29,340 | 29,173 | 29,070 |
| **OPERATING MARGIN** | | 28,371 | 28,792 | 29,200 | 29,582 | 29,791 | 29,619 | 28,894 | 28,685 | 29,010 | 29,113 |
| Interest Earnings on Reserves (+) | | 0 | 153 | 312 | 176 | 165 | 92 | 85 | 144 | 209 | 392 |
| Tax Payments (5 Yr. Tax Holiday) (-) | | 0 | 23 | 47 | 26 | 25 | 5,620 | 5,521 | 5,652 | 10,037 | 10,101 |
| **CASH AVAILABLE FOR SENIOR DEBT** | | 28,371 | 28,923 | 29,465 | 29,731 | 29,931 | 24,090 | 23,458 | 23,177 | 19,182 | 19,405 |
| Senior Debt Interest Expense (-) | | 7,228 | 5,828 | 4,276 | 2,838 | 2,081 | 1,670 | 1,224 | 668 | 0 | 0 |
| Senior Debt Principal Repayment (-) | | 16,027 | 17,808 | 18,589 | 8,904 | 8,904 | 4,452 | 4,452 | 8,904 | 0 | 0 |
| **CASH AVAILABLE FOR RESERVES** | | 5,116 | 5,287 | 5,600 | 17,989 | 18,946 | 17,969 | 17,781 | 13,605 | 19,182 | 19,405 |
| Addition (Release) : Debt Service Reserve (-) | | 5,116 | 5,287 | 5,287 | (378) | (2,432) | (223) | 1,948 | (4,786) | 0 | 0 |
| Addition (Release): Maintenance Reserve (-) | | | (4,532) | 5,000 | | | | | | 0 | 0 |
| Addition (Release): Gas Equipment Reserve (-) | | | 5,000 | | | | | | (5,000) | 0 | 0 |
| **AFTER-TAX CASH FLOW FOR DIVIDENDS** | | 0 | 0 | 5,132 | 18,368 | 21,378 | 18,192 | 15,834 | 18,391 | 24,182 | 19,405 |

| | Min | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| DSCR | 1.22 | 1.22 | 1.44 | 1.67 | 3.03 | 3.22 | 4.44 | 4.63 | 2.92 | 2.92 | |
| LLCR | 1.74 | 1.74 | 1.92 | 2.23 | 2.92 | 3.11 | 3.30 | 3.03 | 2.37 | | |

| | Avg |
|---|---|
| | 2.06 |

07/10/2001

PRIVATE AND CONFIDENTIAL

**TANZANIA 100MW IPP**
**AFTER-TAX CASH FLOW**
**US Dollars in Thousands**

| | 11 2011 | 12 2012 | 13 2013 | 14 2014 | 15 2015 | 16 2016 | 17 2017 | 18 2018 | 19 2019 | 20 2020 |
|---|---|---|---|---|---|---|---|---|---|---|
| **OPERATING REVENUES** | | | | | | | | | | |
| Capacity Capital Charge | 34,825 | 34,825 | 34,825 | 34,825 | 34,825 | 34,825 | 34,825 | 34,825 | 34,825 | 34,825 |
| Capacity Debt Charge | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Capacity Debt Adjustment | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Energy Fuel Charge | 17,518 | 17,518 | 17,518 | 17,518 | 17,518 | 17,518 | 17,518 | 17,518 | 17,518 | 17,518 |
| Energy O&M Charge | 5,840 | 5,840 | 5,840 | 5,840 | 5,840 | 5,840 | 5,840 | 5,840 | 5,840 | 5,840 |
| Total Operating Revenues | 58,183 | 58,183 | 58,183 | 58,183 | 58,183 | 58,183 | 58,183 | 58,183 | 58,183 | 58,183 |
| **OPERATING EXPENSES** | | | | | | | | | | |
| Fuel | 17,547 | 17,547 | 17,547 | 17,547 | 17,547 | 17,547 | 17,547 | 17,547 | 17,547 | 17,547 |
| Lube Oil | 988 | 988 | 988 | 988 | 988 | 988 | 988 | 988 | 988 | 988 |
| Variable O&M | 4,574 | 4,574 | 4,574 | 4,574 | 4,574 | 4,574 | 4,574 | 4,574 | 4,574 | 4,574 |
| Salary & Fixed O&M Fees | 2,321 | 2,321 | 2,321 | 2,321 | 2,321 | 2,321 | 2,321 | 2,321 | 2,321 | 2,321 |
| General & Administrative | 1,021 | 1,021 | 1,021 | 1,021 | 1,021 | 1,021 | 1,021 | 1,021 | 1,021 | 1,021 |
| Operating Insurance | 610 | 610 | 610 | 610 | 610 | 610 | 610 | 610 | 610 | 610 |
| Financing Fees | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Risk Hedging 1 | 870 | 783 | 696 | 609 | 522 | 435 | 348 | 261 | 174 | 87 |
| Risk Hedging 2 | 117 | 105 | 93 | 82 | 70 | 58 | 47 | 35 | 23 | 12 |
| Risk Hedging 3 | 375 | 375 | 375 | 375 | 375 | 375 | 375 | 375 | 375 | 375 |
| Contingency (% of fixed & variable) 5.00% | 544 | 539 | 534 | 529 | 524 | 519 | 514 | 509 | 504 | 499 |
| Total Operating Expenses | 28,966 | 28,862 | 28,759 | 28,655 | 28,552 | 28,448 | 28,344 | 28,241 | 28,137 | 28,033 |
| **OPERATING MARGIN** | 29,217 | 29,321 | 29,424 | 29,528 | 29,631 | 29,735 | 29,839 | 29,942 | 30,046 | 30,150 |
| Interest Earnings on Reserves (+) | 426 | 459 | 493 | 526 | 560 | 593 | 627 | 660 | 694 | 727 |
| Tax Payments (5 Yr. Tax Holiday) (-) | 10,142 | 10,183 | 10,225 | 10,266 | 10,307 | 10,349 | 10,390 | 10,431 | 10,473 | 10,514 |
| **CASH AVAILABLE FOR SENIOR DEBT** | 19,501 | 19,597 | 19,692 | 19,788 | 19,884 | 19,980 | 20,076 | 20,172 | 20,267 | 20,363 |
| Senior Debt Interest Expense (-) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Senior Debt Principal Repayment (-) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **CASH AVAILABLE FOR RESERVES** | 19,501 | 19,597 | 19,692 | 19,788 | 19,884 | 19,980 | 20,076 | 20,172 | 20,267 | 20,363 |
| Addition (Release) : Debt Service Reserve (-) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Addition (Release) : Maintenance Reserve (-) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Addition (Release) : Gas Equipment Reserve (-) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **AFTER-TAX CASH FLOW FOR DIVIDENDS** | 19,501 | 19,597 | 19,692 | 19,788 | 19,884 | 19,980 | 20,076 | 20,172 | 20,267 | 20,363 |

| | Min | Avg |
|---|---|---|
| DSCR | 1.22 | 2.06 |
| LLCR | 1.74 | |

07/10/2001

PRIVATE AND CONFIDENTIAL

**TANZANIA 100MW IPP**
**INCOME & TAXATION**
**US Dollars in Thousands**

| | | 1 2001 | 2 2002 | 3 2003 | 4 2004 | 5 2005 | 6 2006 | 7 2007 | 8 2008 | 9 2009 | 10 2010 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Taxable Operating Income** | | | | | | | | | | | |
| Operating Margin | | 28,371 | 28,792 | 29,200 | 29,582 | 29,791 | 29,619 | 28,894 | 28,685 | 29,010 | 29,113 |
| Add: Financing Fee | | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 0 | 0 |
| Less: Interest Expense | | 7,228 | 5,828 | 4,276 | 2,838 | 2,081 | 1,670 | 1,224 | 668 | 0 | 0 |
| Income Before Capital Allowances | | 21,203 | 23,025 | 24,984 | 26,804 | 27,770 | 28,009 | 27,730 | 28,077 | 29,010 | 29,113 |
| Less: Pre-Trading Expenditure | | 8,754 | | | | | | | | | |
| Less: Utilized Capital Allowances | | 11,991 | 11,991 | 11,991 | 11,991 | 11,991 | 11,991 | 11,991 | 11,991 | 422 | 422 |
| Taxable income | | 458 | 11,034 | 12,993 | 14,813 | 15,779 | 16,019 | 15,739 | 16,086 | 28,588 | 28,692 |
| | Tax Rate | | | | | | | | | | |
| Tax Payable on Operating Income | 35.0% | 0 | 0 | 0 | 0 | 0 | 5,607 | 5,509 | 5,630 | 10,006 | 10,042 |
| **Taxable Interest Income** | | | | | | | | | | | |
| Debt Service Reserve | | | | | | | | | | | |
| Cash Balance | | 0 | 153 | 312 | 176 | 165 | 92 | 85 | 144 | 0 | 0 |
| Total Interest Income | | 0 | 153 | 312 | 176 | 165 | 92 | 85 | 144 | 209 | 392 |
| Tax Payable on Interest Income | 15.0% | 0 | 23 | 47 | 26 | 25 | 14 | 13 | 22 | 31 | 59 |
| **Taxes Payable** | | | | | | | | | | | |
| Tax Payable on Operating Income | | 0 | 0 | 0 | 0 | 0 | 5,607 | 5,509 | 5,630 | 10,006 | 10,042 |
| Tax Payable on Interest Income | | 0 | 23 | 47 | 26 | 25 | 14 | 13 | 22 | 31 | 59 |
| Total Tax Liability | | 0 | 23 | 47 | 26 | 25 | 5,620 | 5,521 | 5,652 | 10,037 | 10,101 |

PRIVATE AND CONFIDENTIAL

07/10/2001

**TANZANIA 100MW IPP**
**INCOME & TAXATION**
**US Dollars in Thousands**

| | 11 2011 | 12 2012 | 13 2013 | 14 2014 | 15 2015 | 16 2016 | 17 2017 | 18 2018 | 19 2019 | 20 2020 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Taxable Operating Income** | | | | | | | | | | |
| Operating Margin | 29,217 | 29,321 | 29,424 | 29,528 | 29,632 | 29,735 | 29,839 | 29,942 | 30,046 | 30,150 |
| Add: Financing Fee | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Less: Interest Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Income Before Capital Allowances | 29,217 | 29,321 | 29,424 | 29,528 | 29,632 | 29,735 | 29,839 | 29,942 | 30,046 | 30,150 |
| Less: Pre-Trading Expenditure | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Less: Utilized Capital Allowances | 422 | 422 | 422 | 422 | 422 | 422 | 422 | 422 | 422 | 422 |
| Taxable Income | 28,795 | 28,899 | 29,002 | 29,106 | 29,210 | 29,313 | 29,417 | 29,521 | 29,624 | 29,728 |
| Tax Rate 35.0% | | | | | | | | | | |
| Tax Payable on Operating Income | 10,078 | 10,115 | 10,151 | 10,187 | 10,223 | 10,260 | 10,296 | 10,332 | 10,368 | 10,405 |
| **Taxable Interest Income** | | | | | | | | | | |
| Debt Service Reserve | | | | | | | | | | |
| Cash Balance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Interest Income | 426 | 459 | 493 | 526 | 560 | 593 | 627 | 660 | 694 | 727 |
| Tax Rate 15.0% | | | | | | | | | | |
| Tax Payable on Interest Income | 64 | 69 | 74 | 79 | 84 | 89 | 94 | 99 | 104 | 109 |
| **Taxes Payable** | | | | | | | | | | |
| Tax Payable on Operating Income | 10,078 | 10,115 | 10,151 | 10,187 | 10,223 | 10,260 | 10,296 | 10,332 | 10,368 | 10,405 |
| Tax Payable on Interest Income | 64 | 69 | 74 | 79 | 84 | 89 | 94 | 99 | 104 | 109 |
| Total Tax Liability | 10,142 | 10,183 | 10,225 | 10,266 | 10,307 | 10,349 | 10,390 | 10,431 | 10,473 | 10,514 |

PRIVATE AND CONFIDENTIAL

07/10/2001

**TANZANIA 100MW IPP**
**CAPITAL ALLOWANCES & DEPRECIATION**
**US Dollars in Thousands**

| | Total | 1 2001 | 2 2002 | 3 2003 | 4 2004 | 5 2005 | 6 2006 | 7 2007 | 8 2008 | 9 2009 | 10 2010 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Capital Allowance Schedule** | | | | | | | | | | | |
| Utility Generating Equipment | 100.00% | 12.50% | 12.50% | 12.50% | 12.50% | 12.50% | 12.50% | 12.50% | 12.50% | 0.00% | 0.00% |
| Building | 80.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% |
| **New Capital Allowances** | | | | | | | | | | | |
| Utility Generating Equipment | 92,551 | 11,569 | 11,569 | 11,569 | 11,569 | 11,569 | 11,569 | 11,569 | 11,569 | 0 | 0 |
| Building | 10,547 | 422 | 422 | 422 | 422 | 422 | 422 | 422 | 422 | 422 | 422 |
| Total New Capital Allowances | | 11,991 | 11,991 | 11,991 | 11,991 | 11,991 | 11,991 | 11,991 | 11,991 | 422 | 422 |
| **Book Depreciation & Amortization Rates** | | | | | | | | | | | |
| Utility Equipment | 8.0 | 12.50% | 12.50% | 12.50% | 12.50% | 12.50% | 12.50% | 12.50% | 12.50% | 0.00% | 0.00% |
| Building | 25.0 | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% |
| Amortisables | 20.0 | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% |
| **New Book Depreciation** | | | | | | | | | | | |
| Utility Equipment | 92,551 | 11,569 | 11,569 | 11,569 | 11,569 | 11,569 | 11,569 | 11,569 | 11,569 | 0 | 0 |
| Building | 10,547 | 422 | 422 | 422 | 422 | 422 | 422 | 422 | 422 | 422 | 422 |
| Total Depreciable | 103,098 | 11,991 | 11,991 | 11,991 | 11,991 | 11,991 | 11,991 | 11,991 | 11,991 | 422 | 422 |
| **Remaining Depreciable Basis** | | 91,107 | 79,116 | 67,126 | 55,135 | 43,144 | 31,154 | 19,163 | 7,172 | 6,750 | 6,328 |
| **New Book Amortization** | | | | | | | | | | | |
| Amortization | 13,893 | 695 | 695 | 695 | 695 | 695 | 695 | 695 | 695 | 695 | 695 |
| Remaining Amortizables | | 13,199 | 12,504 | 11,809 | 11,115 | 10,420 | 9,725 | 9,031 | 8,336 | 7,641 | 6,947 |

07/10/2001

PRIVATE AND CONFIDENTIAL

TANZANIA 100MW IPP
CAPITAL ALLOWANCES & DEPRECIATION
US Dollars in Thousands

| | Total | 11 2011 | 12 2012 | 13 2013 | 14 2014 | 15 2015 | 16 2016 | 17 2017 | 18 2018 | 19 2019 | 20 2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Capital Allowance Schedule** | | | | | | | | | | | |
| Utility Generating Equipment | 100.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| Building | 80.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% |
| **New Capital Allowances** | | | | | | | | | | | |
| Utility Generating Equipment | 92,551 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Building | 10,547 | 422 | 422 | 422 | 422 | 422 | 422 | 422 | 422 | 422 | 422 |
| Total New Capital Allowances | | 422 | 422 | 422 | 422 | 422 | 422 | 422 | 422 | 422 | 422 |
| **Book Depreciation & Amortization Rates** | | | | | | | | | | | |
| Utility Equipment | 8.0 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| Building | 25.0 | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% |
| Amortisables | 20.0 | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% |
| **New Book Depreciation** | | | | | | | | | | | |
| Utility Equipment | 92,551 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Building | 10,547 | 422 | 422 | 422 | 422 | 422 | 422 | 422 | 422 | 422 | 422 |
| Total Depreciable | 103,098 | 422 | 422 | 422 | 422 | 422 | 422 | 422 | 422 | 422 | 422 |
| **Remaining Depreciable Basis** | | 5,906 | 5,485 | 5,063 | 4,641 | 4,219 | 3,797 | 3,375 | 2,953 | 2,531 | 2,109 |
| **New Book Amortization** | | | | | | | | | | | |
| Amortization | 13,893 | 695 | 695 | 695 | 695 | 695 | 695 | 695 | 695 | 695 | 695 |
| Remaining Amortizables | | 6,252 | 5,557 | 4,863 | 4,168 | 3,473 | 2,779 | 2,084 | 1,389 | 695 | 0 |

PRIVATE AND CONFIDENTIAL

07/10/2001

TANZANIA 100MW IPP
BOOK INCOME (PROFIT & LOSS A/C)
US Dollars in Thousands

| | 1 2001 | 2 2002 | 3 2003 | 4 2004 | 5 2005 | 6 2006 | 7 2007 | 8 2008 | 9 2009 | 10 2010 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Book Income** | | | | | | | | | | |
| Taxable Operating Income Bfr Capital Allows | 21,203 | 23,025 | 24,984 | 26,804 | 27,770 | 28,009 | 27,730 | 28,077 | 29,010 | 29,113 |
| Plus: Interest Income | 0 | 153 | 312 | 176 | 165 | 92 | 85 | 144 | 209 | 392 |
| Less: Depreciation | 11,991 | 11,991 | 11,991 | 11,991 | 11,991 | 11,991 | 11,991 | 11,991 | 422 | 422 |
| Less: Amortization | 695 | 695 | 695 | 695 | 695 | 695 | 695 | 695 | 695 | 695 |
| Book Income Before Tax | 8,518 | 10,493 | 12,610 | 14,294 | 15,249 | 15,416 | 15,130 | 15,535 | 28,102 | 28,389 |
| Less: Tax Payable | 0 | 23 | 47 | 26 | 25 | 5,620 | 5,521 | 5,652 | 10,037 | 10,101 |
| Less: Deferred Tax | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Net After-Tax Profit/Book Income | 8,518 | 10,470 | 12,564 | 14,268 | 15,224 | 9,796 | 9,608 | 9,884 | 18,065 | 18,288 |

PRIVATE AND CONFIDENTIAL

TANZANIA_100MW IPP
BOOK INCOME (PROFIT & LOSS A/C)
US Dollars in Thousands

| | 11<br>2011 | 12<br>2012 | 13<br>2013 | 14<br>2014 | 15<br>2015 | 16<br>2016 | 17<br>2017 | 18<br>2018 | 19<br>2019 | 20<br>2020 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Book Income** | | | | | | | | | | |
| Taxable Operating Income Bfr Capital Allows | 29,217 | 29,321 | 29,424 | 29,528 | 29,632 | 29,735 | 29,839 | 29,942 | 30,046 | 30,150 |
| Plus: Interest Income | 426 | 459 | 493 | 526 | 560 | 593 | 627 | 660 | 694 | 727 |
| Less: Depreciation | 422 | 422 | 422 | 422 | 422 | 422 | 422 | 422 | 422 | 422 |
| Less: Amortization | 695 | 695 | 695 | 695 | 695 | 695 | 695 | 695 | 695 | 695 |
| Book Income Before Tax | 28,526 | 28,664 | 28,801 | 28,938 | 29,075 | 29,212 | 29,349 | 29,486 | 29,623 | 29,761 |
| Less: Tax Payable | 10,142 | 10,183 | 10,225 | 10,266 | 10,307 | 10,349 | 10,390 | 10,431 | 10,473 | 10,514 |
| Less: Deferred Tax | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Net After-Tax Profit/Book Income | 18,384 | 18,480 | 18,576 | 18,672 | 18,768 | 18,863 | 18,959 | 19,055 | 19,151 | 19,247 |

PRIVATE AND CONFIDENTIAL

07/10/2001

TANZANIA 100MW IPP
DIVIDENDS & ACCOUNTS
US Dollars in Thousands

| | 1 2001 | 2 2002 | 3 2003 | 4 2004 | 5 2005 | 6 2006 | 7 2007 | 8 2008 | 9 2009 | 10 2010 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Dividend Constraints** | | | | | | | | | | |
| After-Tax Book Income | 8,518 | 10,470 | 12,564 | 14,268 | 15,224 | 9,796 | 9,608 | 9,884 | 18,065 | 18,288 |
| After-Tax Cash Available to Pay Dividends | 0 | 0 | 5,132 | 18,368 | 21,378 | 18,192 | 15,834 | 18,391 | 24,182 | 19,405 |
| Available Dividends | 0 | 0 | 5,132 | 14,268 | 15,224 | 9,796 | 9,608 | 9,884 | 18,065 | 18,288 |
| **Accumulated Income Account** | | | | | | | | | | |
| Beginning Balance | 0 | 8,518 | 18,988 | 26,420 | 22,320 | 16,167 | 7,771 | 1,545 | 0 | 0 |
| Net Income (Book) (+) | 8,518 | 10,470 | 12,564 | 14,268 | 15,224 | 9,796 | 9,608 | 9,884 | 18,065 | 18,288 |
| Dividends Paid (-) | 0 | 0 | 5,132 | 18,368 | 21,378 | 18,192 | 15,834 | 11,429 | 18,065 | 18,288 |
| Ending Balance | 8,518 | 18,988 | 26,420 | 22,320 | 16,167 | 7,771 | 1,545 | 0 | 0 | 0 |
| **Accumulated Cash Account For Divds** | | | | | | | | | | |
| Beginning Balance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6,962 | 13,079 |
| After-Tax Cash (+) | 0 | 0 | 5,132 | 18,368 | 21,378 | 18,192 | 15,834 | 18,391 | 24,182 | 19,405 |
| Dividends Paid (-) | 0 | 0 | 5,132 | 18,368 | 21,378 | 18,192 | 15,834 | 11,429 | 18,065 | 18,288 |
| Ending Balance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6,962 | 13,079 | 14,195 |
| Interest Earnings on Cash Balance — Earn Rate 3.00% | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 209 | 392 |
| Cumulative Income | 8,518 | 18,988 | 31,551 | 40,687 | 37,544 | 25,962 | 17,379 | 11,429 | 18,065 | 18,288 |
| Cumulative Cash | 0 | 0 | 5,132 | 18,368 | 21,378 | 18,192 | 15,834 | 18,391 | 31,144 | 32,484 |
| Dividends Attributable to Shareholders | 0 | 0 | 5,132 | 18,368 | 21,378 | 18,192 | 15,834 | 11,429 | 18,065 | 18,288 |

PRIVATE AND CONFIDENTIAL

07/10/2001

**TANZANIA 100MW IPP**
**DIVIDENDS & ACCOUNTS**
**US Dollars in Thousands**

| | 11 2001 | 12 2012 | 13 2013 | 14 2014 | 15 2015 | 16 2016 | 17 2017 | 18 2018 | 19 2019 | 20 2020 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Dividend Constraints** | | | | | | | | | | |
| After-Tax Book Income | 18,384 | 18,480 | 18,576 | 18,672 | 18,768 | 18,863 | 18,959 | 19,055 | 19,151 | 19,247 |
| After-Tax Cash Available to Pay Dividends | 19,501 | 19,597 | 19,692 | 19,788 | 19,884 | 19,980 | 20,076 | 20,172 | 20,267 | 20,363 |
| Available Dividends | 18,384 | 18,480 | 18,576 | 18,672 | 18,768 | 18,863 | 18,959 | 19,055 | 19,151 | 19,247 |
| **Accumulated Income Account** | | | | | | | | | | |
| Beginning Balance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Net Income (Book) (+) | 18,384 | 18,480 | 18,576 | 18,672 | 18,768 | 18,863 | 18,959 | 19,055 | 19,151 | 19,247 |
| Dividends Paid (-) | 18,384 | 18,480 | 18,576 | 18,672 | 18,768 | 18,863 | 18,959 | 19,055 | 19,151 | 19,247 |
| Ending Balance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Accumulated Cash Account For Divds** | | | | | | | | | | |
| Beginning Balance | 14,195 | 15,312 | 16,428 | 17,545 | 18,662 | 19,778 | 20,895 | 22,011 | 23,128 | 24,244 |
| After-Tax Cash (+) | 19,501 | 19,597 | 19,692 | 19,788 | 19,884 | 19,980 | 20,076 | 20,172 | 20,267 | 20,363 |
| Dividends Paid (-) | 18,384 | 18,480 | 18,576 | 18,672 | 18,768 | 18,863 | 18,959 | 19,055 | 19,151 | 19,247 |
| Ending Balance | 15,312 | 16,428 | 17,545 | 18,662 | 19,778 | 20,895 | 22,011 | 23,128 | 24,244 | 25,361 |
| Interest Earnings on Cash Balance    Earn. Rate 3.00% | 426 | 459 | 493 | 526 | 560 | 593 | 627 | 660 | 694 | 727 |
| Cumulative Income | 18,384 | 18,480 | 18,576 | 18,672 | 18,768 | 18,863 | 18,959 | 19,055 | 19,151 | 19,247 |
| Cumulative Cash | 33,696 | 34,909 | 36,121 | 37,333 | 38,546 | 39,758 | 40,970 | 42,183 | 43,395 | 44,608 |
| **Dividends Attributable to Shareholders** | 18,384 | 18,480 | 18,576 | 18,672 | 18,768 | 18,863 | 18,959 | 19,055 | 19,151 | 19,247 |

PRIVATE AND CONFIDENTIAL

07/10/2001

TANZANIA 100MW IPP
SHAREHOLDER CASH FLOWS & RETURN
US Dollars In Thousands

## SUMMARY OF TARIFF & RETURNS

20 Year Average Tariff : 8.04 US cents/kWh

20 Year After-Tax IRR : 22.31%

### DEBT STATISTICS

|  | Avg | Min |
|---|---|---|
| Senior DSCR : | 2.06 | 1.22 |
| Senior LLCR : |  | 1.74 |

| | 1 2001 | 2 2002 | 3 2003 | 4 2004 | 5 2005 | 6 2006 | 7 2007 | 8 2008 | 9 2009 | 10 2010 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Summary of Shareholder Cash Flows** | | | | | | | | | | |
| **Distributions & Additional Tax:** | | | | | | | | | | |
| Dividends Paid * 10.00% | 0 | 0 | 5,132 | 18,368 | 21,378 | 18,192 | 15,834 | 11,429 | 18,065 | 18,288 |
| less: Withholding Tax (5 Yr Hol.) | 0 | 0 | 0 | 0 | 0 | (1,819) | (1,583) | (1,143) | (1,807) | (1,829) |
| Total After-With. Tax Distributions | 0 | 0 | 5,132 | 18,368 | 21,378 | 16,372 | 14,250 | 10,286 | 16,259 | 16,460 |
| Inv. Amt at Fin. Close ** | (43,258) | | | | | | | | | |
| Divds. for IRR Calc. | | 0 | 5,132 | 18,368 | 21,378 | 16,372 | 14,250 | 10,286 | 16,259 | 16,460 |
| Cumulative--> | | -50.86% | -14.85% | 0.85% | 7.57% | 11.45% | 13.47% | 15.77% | 17.43% | |

* Assumes that local portion of equity is funded offshore
and therefore subject to withholding tax

** Prior to adjustment for variations in total capital cost

PRIVATE AND CONFIDENTIAL

07/10/2001

TANZANIA 100MW IPP
SHAREHOLDER CASH FLOWS & RETURN
US Dollars in Thousands

| Summary of Shareholder Cash Flows | | 11 2011 | 12 2012 | 13 2013 | 14 2014 | 15 2015 | 16 2016 | 17 2017 | 18 2018 | 19 2019 | 20 2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Distributions & Additional Tax: | | | | | | | | | | | |
| Dividends Paid * | | 18,384 | 18,480 | 18,576 | 18,672 | 18,768 | 18,863 | 18,959 | 19,055 | 19,151 | 19,247 |
| less: Withholding Tax (5 Yr Hol.) | 10.00% | (1,838) | (1,848) | (1,858) | (1,867) | (1,877) | (1,886) | (1,896) | (1,906) | (1,915) | (1,925) |
| Total After-With. Tax Distributions | | 16,546 | 16,632 | 16,718 | 16,805 | 16,891 | 16,977 | 17,063 | 17,150 | 17,236 | 17,322 |
| | | | | | | | | | | | 25,361 |
| Inv. Amt at Fin. Close ** | (43,258) | | | | | | | | | | 42,683 |
| Dvds. for IRR Calc. | | 16,546 | 16,632 | 16,718 | 16,805 | 16,891 | 16,977 | 17,063 | 17,150 | 17,236 | |
| Cumulative-> | | 18.63% | 19.52% | 20.20% | 20.72% | 21.11% | 21.43% | 21.67% | 21.86% | 22.02% | 22.31% |

* Assumes that local portion of equity is funded offshore
and therefore subject to withholding tax

** Prior to adjustment for variations in total capital cost

PRIVATE AND CONFIDENTIAL

**Tepelo 100MW IPP**
**Sample Calculations for Adjustments in the Reference Tariff**
**(Adjustments are made at COD and every 6 months thereafter)**

**Assumptions of Values at Reference Date (COD) 1st September 2001**

| US Consumer Price Index | 117.50 |
|---|---|
| USD/Tanzanian Shillings ("TS") Exchange Rate | 860.00 |

Assumed Values

First Adjustment Date, 1st January, 2002

| @ Month End | US CPI | US/TS |
|---|---|---|
| Jul 2001 | 117.26 | 875.00 |
| Aug 2001 | 117.50 | 860.00 |
| Sept 2001 | 117.80 | 890.00 |
| Oct 2001 | 118.10 | 885.00 |
| Nov 2001 | 118.40 | 890.00 |
| Dec 2001 | 118.70 | 900.00 |
| Average | 117.95 | 886.67 |

Calculation of Inflation and Exchange Rate Factors

$$IE\ at\ COD = \frac{117.95}{117.50} \times \frac{886.67}{860.00}$$

$$= 1.0038 \times 1.0078$$

Adjustments to The Components of The Reference Tariff

Variable O&M Component

$$O\&M\ Component\ at\ COD = 0.002 \times \frac{0.86\ US\ cents/kWh}{0.000032\ USD/kWh}$$

$$O\&M\ Payment = 0.000032 \times 7.12\ TS/kWh \times 886.67$$

Capital Component

After Adjustment for 22.31% IR

$$Capital\ Component = 12.33\ USD/kW/Mth$$

$$Capital\ Payment = 10,932.56 \times 12.33\ TS/kW/Mth \times 886.67$$

Debt Component

Debt Component at COD × 19.00

$$Debt\ Payment = 19.00 \times 16,849.04\ TS/kW/Mth \times 886.67$$

PRIVATE AND CONFIDENTIAL

07/10/2001

APPENDIX D TO FINAL AWARD DATED JUNE 22, 2001

## BEFORE THE INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES

ICSID Case No. ARB/98/8

### TANZANIA ELECTRIC SUPPLY COMPANY LIMITED

Claimant

-and-

### INDEPENDENT POWER TANZANIA LIMITED

Respondent

## DECISION ON ALL FURTHER REMAINING ISSUES

BEFORE THE INTERNATIONAL CENTRE FOR SETTLEMENT OF
INVESTMENT DISPUTES

<u>ICSID Case No. ARB/98/8</u>

TANZANIA ELECTRIC SUPPLY COMPANY LIMITED

<u>Claimant</u>

-and-

INDEPENDENT POWER TANZANIA LIMITED

<u>Respondent</u>

## <u>DECISION ON ALL FURTHER REMAINING ISSUES</u>

1.  In our Decision on Tariff and other Remaining Issues dated 9 February 2001, which followed the submission of detailed written Memorials and oral submissions from both parties, the Tribunal considered and determined a number of issues, including, in particular:

    What, if any, adjustments should be made to the Reference Tariff stated in the PPA?

2.  We considered this issue in Part 11 (paragraphs 164 to 166), in which we recorded our understanding that, by the time of the last exchanges between the parties, they were confident that, armed with the appropriate adjustments to take account of the specific matters referred to us, they would be able to agree on the application of the financial model and the tariff which should be derived as a consequence. However, although our Decision was intended and expressed to be final in relation to those issues with which we had dealt, we gave the parties the opportunity to make further application to the Tribunal if such agreement was not reached.

1

3.   Following the publication of our Decision, TANESCO raised a number of further matters going to the calculation of the Reference Tariff.

4.   Further, in Part 12 of our Decision (paragraphs 167 to 168), the Tribunal recorded its understanding that both parties were agreed that, once the appropriate figures to be fed into the financial model had been ascertained so that the initial Reference Tariff could be calculated, steps should be taken to bring about the commencement of commercial operations.  We noted that neither party had addressed the question of how much time would be required for this purpose, and therefore restricted ourselves at that stage to ordering the parties to co-operate in taking whatever steps would be necessary to achieve the commencement of commercial operations as soon as reasonably practicable.

5.   Following the publication of our Decision, IPTL invited the Tribunal to fix a date by which the commencement of commercial operations should be achieved.

6.   Written Memorials and Reply Memorials were then submitted sequentially on behalf of the parties as follows:

TANESECO's "Memorial Regarding Remaining Tariff Issues" dated 26 March 2001;

IPTL's "Memorial Regarding Remaining Tariff Issues" dated 2 April 2001;

TANESCO's "Reply Memorial Regarding Remaining Tariff Issues" dated 16 April 2001;

IPTL's "Reply Regarding Remaining Tariff Issues" dated 20 April 2001.

TANESCO submitted further evidence in the form of the Sixth and Seventh Witness Statements of Dr Martin C Swales and the Second Witness Statement of Mr Miles S Connell.

7.    The following remaining issues were referred to the Tribunal for decision:

(1)  How the Construction Contingency Reserve should be dealt with.

(2)  What, if any, adjustment should be made to the figure for Sovereign Risk and other insurances?

(3)  What, if any, adjustment should be made to the Lenders' Participation Fee portion of "Financing and Agency" fees in consequence of the Tribunal's conclusions as to the deductions to be made from the claimed Project Costs.

(4)  What, if any, adjustment should be made to the Reference Tariff by reason of the alleged reduction in IPTL's deemed equity in the project?

(5)  What, if any, further orders should be made in relation to the Commencement of Commercial Operations?

8.    The Tribunal was also asked to note and incorporate in its Decision and thereafter in its final Award a formal stipulation as to the agreement between the parties concluded since the last hearing concerning the Cost of Gas Conversion, to which the Tribunal had referred briefly in paragraph 144 of its Decision of 9 February 2001.

9.    At the request of TANESCO, a further oral hearing before the Tribunal was held on Sunday 29 April 2001 at the offices of the World Bank in Washington DC, United

States of America, at which TANESCO was represented by Mr Robert W Hawkins and Mr John Jay Range of Hunton & Williams and IPTL was represented by Mr Robert Sentner of Nixon Peabody LLP. Dr Swales and Mr Connell were in attendance, but were not questioned in relation to their statements.

10.    At the hearing, the Tribunal was informed that the parties had reached agreement on remaining issues (2) and (3) as summarised in paragraph 7 above. The Tribunal invited the parties to reduce the terms of their agreement to writing and to submit the same to the Tribunal for incorporation into this Decision and, by reference, our final Award. The terms of the agreed stipulations relating to these issues were communicated to the Tribunal under cover of a letter from Hunton & Williams to ICSID dated 14 May 2001, confirmed by Nixon Peabody LLP on the same day.

11.    We therefore set out first, as part of this Decision, the terms of the agreed stipulations made between the parties in relation to: (1) the Cost of Gas Conversion; (2) Financing and Agency Fees; and (3) Sovereign Risk and other insurances, as follows:

(1)    **Gas Conversion**:

"Pursuant to Section 7.1 of the Power Purchase Agreement ("PPA") dated 26 May 1995, between Tanzania Electric Supply Company Limited ("TANESCO") and Independent Power Tanzania Limited ("IPTL"), IPTL is required to convert the Tegeta facility to operate on Natural Gas upon the occurrence of certain conditions precedent.

Accordingly, the Engineering Procurement and Construction Agreement (the "EPC Contract"), dated February 1997, between IPTL and Stork-Wartsila Diesel B.V. ("Wartsila") contains provisions pursuant to which Wartsila shall convert the facility to Natural Gas operation for a fixed price of US$11,583,000.

TANESCO hereby agrees that upon fulfilment of the conditions precedent contained in Section 7.1 of the PPA, TANESCO will fully fund the costs of

4

conversion at the fixed price and under the payment terms contained in the EPC Contract."

(2) **Financing and Agency Fees:**

"1.    In paragraph 9(E) of the Loan Facility Agreement, the Lender's Participation Fee portion of the Financing and Agency Fees for the Tegeta Power Plant was set at two percent (2%) of the Project loan amount of $105,000,000, which loan amount was fixed at 70% of Project Cost of $150,000,000.

2.    In its February 9, 2001 Decision, the Tribunal reduced the amount of certain claimed expenses that may be included in the total Project Cost for purposes of tariff calculation.  The final Project Cost (and the corresponding final loan amount) that may be included in the calculation of the tariff cannot be determined until resolution of all remaining disputes concerning Project Cost.

3.    The parties stipulate and agree that the amount to be included as a Project Cost for the Lender's Participation Fee portion of financing and agency fees will be 2% of loan amount, calculated as [70% or 73.51%] of the reduced Project Cost resulting from the Award of this Tribunal, subject to adjustment upward or downward by the Award of a subsequent Tribunal, if any, that finally determines the amounts allowable for the Construction Contingency portion of the Project Cost."

(3) **Sovereign Risk and other Insurances:**

"1.    The insurance expenses claimed by IPTL as a Project Cost in the financial model, and referenced in a letter dated July 21, 1997 from Johnson & Higgins to Mechmar bearing document nos. I00014 through I00018, at Joint Appendix 302, are the following: $1,879,802 for Construction Cover, $2,052,000 for CEND Cover, $393,750 for War Risk Cover, and $450,000 for Currency Inconvertibility Cover. The premium on CEND Cover was calculated on an insured value of $150,000,000 (i.e., 100% of claimed Project Cost) at a rate of 1.368%. The premium on War Risk Cover was calculated on an insured value of $105,000,000 (i.e., the debt portion of claimed Project Cost) at a rate of .375%. The premium on Currency Inconvertibility Cover was calculated on an insured value of $30,000,000 at a rate of 1.5%.

5

2.  In its February 9, 2001 Decision, the Tribunal reduced the amount of certain claimed expenses that may be included in the total Project Cost for purposes of tariff calculation. The final Project Cost that will be included in the calculation of the tariff cannot be determined until resolution of all remaining disputes concerning Project Cost. The parties have reached an agreement that, when all remaining issues are ultimately resolved, the amount to be used as the insured value of Construction, CEND and War Risk Cover for purposes of calculating insurance premiums included as a Project Cost should be reduced based on the amount of total Project Cost allowed by the Tribunal.

3.  The parties therefore stipulate and agree that the amount to be used as the insured value of Construction, CEND and War Risk Cover for purposes of calculating premiums to be included as a Project Cost will be reduced in proportion to the reduction in claimed Project Cost resulting from the Award of this Tribunal, subject to adjustment upward or downward by the Award of a subsequent Tribunal, if any, that finally determines the amounts allowable for the Construction Contingency portion of the Project Cost. The insured value of Currency Inconvertibility Cover will remain at $30,000,000, and the resulting premium of $450,000 will not be proportionately reduced.

4.  For purposes of determining and modelling the insurance portion of fixed operations and maintenance cost, a 20-year straight line depreciation schedule will be adopted to reduce the insured value of CEND and War Risk Cover that may be included in the financial model ear year of the PPA. The initial value used in the depreciation schedule will be the value determined from the proportionate reduction in Project Cost resulting from the award or awards referenced above. Each year thereafter, the value for which the Project may be insured for purposes of the tariff calculation will be reduced by five percent (5%) per annum such that the value of the Project in the year 20 is only 5% of its value in year 1. The amount of CEND Cover that may be included each year to calculate the fixed operations and maintenance cost will be established according to the depreciation schedule referenced in this paragraph. The amount of War Risk Cover that may be included each year to calculate operations and maintenance cost will be fixed at [70% or 73.51%] of the depreciated value of the Project as determined from the depreciation schedule referenced in this paragraph. The parties have agreed, for purposes of modelling future operating expenses only, that $30,000,000 will continue to be used as the maximum insured value of Currency Inconvertibility Cover. If future operating experience indicates less than $30,000,000 needs to be converted from Tanzanian shillings to U.S. dollars, TANESCO may request IPTL to reduce the amount of Currency Inconvertibility Cover. Should the parties not reach mutual agreement, TANESCO reserves the right to challenge whether $30,000,000 is an excessive amount of Currency Inconvertibility Cover.

6

5.  The intial rates used in the financial model to calculate premiums for operating expenses will be the rates set out in the Premium Schedules provided by IPTL on April 24, 2001. The rate for CEND Cover will be 1.368%. The rate for War Risk Cover will be .2625%. The rate for Currency Inconvertibility Cover will be 1.25% until IPTL obtains a current quotation for such Cover, which quotation will then be used in the model.

6.  The sovereign risk insurance portions of fixed operations and maintenance cost for the entire 20 year term of the PPA will initially be calculated using the depreciation schedule referenced in paragraph 4 above and the rates referenced in paragraph 5 above. Each year thereafter, rates will be adjusted to the extent that CEND, War Risk or Currency Inconvertibility Cover is renewed at a different market rate.

7.  IPTL stipulates and agrees that with respect to insurance costs that will be passed through the tariff to TANESCO, it has an obligation to act in a commercially reasonably and prudent manner and otherwise in accordance with the requirements of the PPA in procuring the insurance."

12.  We now turn to the remaining issues upon which the parties were not agreed and which we deal with in the order as above.

**The Construction Contingency Reserve:**

13.  Although it was submitted on behalf of IPTL that TANESCO should be precluded from re-opening this issue, which they contended had been the subject of an earlier agreement, the Tribunal concluded that no such binding agreement had been made.

14.  TANESCO's submission, in brief summary, was as follows:

(1)  No part of the Construction Contingency Reserve of US$5,709,000 had been utilised before IPTL had informed TANESCO in September 1998 that the plant was ready for the commencement of commercial operations, as certified by an Independent Engineer.

7

(2)  No part of the Construction Contingency Reserve had been utilised since.

(3)  The Reserve could only properly be utilised for payment of the cost of variation orders under the EPC Contract, and no such variation order had been issued or was likely to be issued.

(4)  The only suggestion made on behalf of IPTL as to the possibility of any variation order being issued before the commencement of commercial operations related to possible further work or changes due to the plant having remained idle for 2½ years, in circumstances in which the Tribunal had held that IPTL was to be responsible for all such delay.

(5)  For these reasons, the Construction Contingency Reserve should now be set at zero for the purposes of the calculation of the initial Reference Tariff.

15.  IPTL, for its part, accepted the first three propositions, but challenged the fourth, as well as TANESCO's conclusion.  There were, it was contended, two separate but associated questions, namely:

(1)  Whether any part of the Construction Contingency Reserve was or would be used?

(2)  To the extent to which it was not used, when should it be released?

16.  As to the first of these questions, the Construction Contingency Reserve was, according to IPTL, to be available for any legitimate extra work or variation up to the time of commencement of commercial operations.  While no part of it had been used thus far, it was impossible to say at this stage that no circumstances could arise under which it would be used.  Apart from the fact that the plant had remained idle for 2½ years,

8

testing had not yet taken place. Furthermore, the Tribunal had not concluded that any and all consequences of delay were to be for IPTL's account, but merely that, since, IPTL was at least in part responsible for the long-standing impasse between the parties, it could not recover damages from TANESCO for the latter's alleged breach in failing to do its part to fulfil conditions precedent to commercial operation commencing.

17.    As to the second question, IPTL submitted that, although the loan documentation provided for the release of any unused part of the Construction Contingency Reserve at the end of eight years, TANESCO, through Dr Swales, had challenged the reasonableness of this provision. In his proposed financial model put forward on behalf of TANESCO on 11 July 2000, Dr Swales had modelled the release of the funds during the first operating year, and being applied to fund the debt service and maintenance reserves. The Reserve was included as a proper cost for tariff calculation purposes over the first year after the commencement of commercial operations. IPTL stated in its Post-Hearing Memorial that it accepted that proposal.

18.    TANESCO pointed out that, in Mr Willy Lim's Witness Statement of 11 July 2000, he had conceded that, since it was not expected that any part of the Construction Contingency Reserve would be utilised, the total project cost would be reduced accordingly at the date of commercial operation: Dr Swales' "proposal" was therefore not open for acceptance.

19.    The Tribunal concludes that, in the above circumstances, it cannot and should not determine finally at this stage that the amount of the Construction Contingency Reserve to be fed into the financial model should be set at zero. If, before commercial operations commence, any extra work or variation is required, which IPTL claims

should be funded out of the Construction Contingency Reserve, then, if TANESCO disagrees, there will be a further dispute which will have to be resolved. The Tribunal also concludes that there is no binding agreement between the parties as to when any unused portion of the Construction Contingency Reserve should be released. It would have been inclined to accede to Dr Swales' uncontroverted opinion on this point, but IPTL has offered to be more generous and to agree that any part of the fund which has not been utilised by the time commercial operations commence shall be released forthwith with the result that, in effect, there will have to be a further adjustment at that time to the Reference Tariff ab initio.

20.    Accordingly, the Tribunal concludes that for present purposes the financial model must be calculated on the basis that the Construction Contingency Reserve is included as part of the Project Cost, but shall be released at the date when commercial operations commence with a consequent adjustment to the Project Cost and the Reference Tariff, save to the extent to which any extra work or variation is required before the commencement of commercial operations which IPTL contends should be funded out of the Construction Contingency Reserve. The parties agreed at the hearing that any dispute as to whether and to what extent the Construction Contingency Reserve should be utilised for this purpose shall be referred to the present Tribunal for subsequent decision and Award as necessary. The parties have undertaken to provide such agreement in writing for incorporation by the Tribunal into its prospective Final Award.

**The Alleged Reduction in IPTL's Deemed Equity Contribution:**

21.  It will be recalled that one of the assumptions contained within the 31 May 1995 letter was that the ratio between what was described as "Senior Debt" and "Equity" should be 70%/30%.

22.  TANESCO contends that, in consequence of the Tribunal's Decision which disallowed a number of items of alleged expenditure, which were claimed to have constituted part of the overall Project Costs and which were said to have been funded by IPTL as part of its equity contribution (totalling US$5,027,410.35), IPTL's equity contribution was in fact reduced to 26.49%; that accordingly, IPTL's return on its actual equity, if unadjusted, would be higher than the agreed adjusted IRR of 22.31%; and that there should therefore be an appropriate further adjustment to the Reference Tariff pursuant to Addendum No. 1.

23.  On behalf of IPTL, it was first of all submitted that this is a new point, which should have been raised (if at all) as part of the disputed tariff calculation issues which were the subject of the Tribunal's Decision of 9 February 2001.  IPTL goes further and contends that, not only was the point not taken but, through Dr Swales, TANESCO conceded that the 70%/30% debt/equity ratio remained.  The proposed financial model which Dr Swales put forward was calculated on that ratio, and in his Fifth Witness Statement submitted for the purposes of the tariff calculation phase of the proceedings, he listed, in paragraph 3, those of the assumptions which had not changed as including "Senior Debt: 70%" and "Equity: 30%" (although he added a footnote to the effect that he was unable to verify from the documents produced by IPTL that it did in fact contribute equity equal to 30% of the claimed project costs).  One thing is clear – it was not suggested on behalf of TANESCO at that stage that the 70%/30% ratio would have to be adjusted to take account of any part of the claimed project costs which the

11

Tribunal determined should be disallowed, depending on the source of the relevant funds.

24.   Mr Hawkins for TANESCO fairly conceded that the point had not been raised, but suggested that TANESCO had not been in a position to raise it until after the Tribunal made its decision on the various items of claimed costs which were challenged. We do not accept that argument. The adjustment might not have been quantifiable at that stage, but the point could certainly have been raised, argued in principle and determined. It was not the intention of the Tribunal to give the parties a further opportunity to raise wholly new points after publication of its Decision.

25.   However, Mr Sentner for IPTL also invited us to dismiss the point on its merits, insofar as he contended that TANESCO had failed to make out its case on the facts. TANESCO relied in particular on the documents relating to the 9th and last drawdown, which showed a total drawdown figure of US$119,296,000, comprising a contribution from the agent bank of US$84,000,000 (being 70%) and an equity portion of US$35,296,000 (being precisely 30%). TANESCO's claim for adjustment depended on the assumption that certain of the items which we had disallowed, and in particular: Development Cost of US$3,202,869; Cost of Raising Equity of US$715,486.35; KTA Tenaga Fees of US$809,055; and payment to Omni Management Services of US$300,000, were claimed as being part of IPTL's equity contribution. However, IPTL contended that one should not assume for these purposes that these items of claimed expenditure were to be identified as having been funded by or attributed to IPTL's equity contribution, and others as being the product of the bank loans. Both aspects of the money contributed went into one notional "pot" from which expenditure was made.

26.   The Tribunal respectfully agrees that, even if this claim for adjustment were not to be dismissed on the "technical" ground that it was raised too late, one result of it being submitted without the opportunity of investigating precisely what contribution was in fact made by the banks on the one hand or by IPTL on the other in relation to each item of claimed cost which the Tribunal rejected or reduced was that the exercise could not now be carried out. Although the Tribunal was not persuaded by every aspect of Dr Swales' evidence, it shares his inability to verify from the evidence presented precisely what were the respective debt and equity proportions of the claimed Project Costs.

27.   Furthermore, as it seems to the Tribunal, if one were to reduce IPTL's equity contribution by reference to these specific costs which were disallowed, one should do a similar exercise in relation to the debt contribution. TANESCO's figures did not (for instance) appear to include in the equation the substantial deduction which the Tribunal concluded was to be made from the EPC Contract Price, and thus the Project Costs, for the purposes of calculating the Reference Tariff. In order to determine the "true" debt/equity contribution, the question arises whether this should be deducted from debt or equity, or remain deemed to have been contributed on the assumed 70%/30% ratio. Despite Mr Hawkins' admirable persistence, the Tribunal was not persuaded that in the calculation which it presented TANESCO had been comparing like with like.

28.   Finally, the Tribunal is of the view that different considerations might in any event have applied, depending on the reason why the sums claimed were disallowed in whole or in part – whether the Tribunal was not satisfied that the money was spent at all; or whether the Tribunal was not satisfied that it was spent in connection with this project; or whether the Tribunal merely concluded that the expenditure was not reasonably or

prudently incurred. Since only the latter had been in issue before us in the proceedings leading to our Decision, we saw no need to differentiate, and had not done so.

29.    Accordingly, and for these reasons, the Tribunal concludes that further adjustments should not be made to the financial model on this ground.

## The Commencement of Commercial Operations:

30.    The Tribunal has already referred above to paragraph 168 of its Decision of 9 February 2001.

31.    For IPTL, Mr Sentner at one stage seems to be asking the Tribunal for an order that commercial operations should commence by 31 July 2001. However, he conceded that IPTL would need a period which he estimated as 90 days from the publication of our Final Award in order to complete all necessary preliminary steps, and in particular to arrange for the provision of the necessary finance from the lenders. Whilst the Tribunal undertook to use its best endeavours to produce its Final Award as soon as possible, it was acknowledged that, after the communication of this Decision to the parties, final adjustments would have to be made to the financial model, which the parties agreed should then be incorporated by reference into our Final Award.

32.    In these circumstances, and also in view of the fact that no-one could be sure what, if any, problems would be revealed during commissioning and testing, and what, if any, further physical work needs to be done, the Tribunal considers that it would not be helpful to the parties for us to make an order which may not be achievable despite the good faith efforts of the parties.

33.    Accordingly, the Tribunal amends and refines the order which we indicated we were minded to make in paragraph 168 of our Decision of 9 February 2001, and hereby orders that the parties shall comply with their respective obligations under the PPA, and shall use their best endeavours and co-operate together to achieve the commencement of commercial operations as soon as practicable and with a view to commercial operations commencing within 90 days of the publication of our Final Award.

Dated this 24TH day of May. 2001.


The Honorable Charles N. Brower

The Honourable Andrew Rogers QC


Kenneth Rokison QC

15

# EXHIBIT D



**INDEPENDENT POWER TANZANIA LTD.**

Date :    1st March 2007

OPERATIONS
Plot No. 2931, 2932, 2933 and 256 Block 'Y' Salasala, Togala
P.O. Box 77173 Dar Es Salaam, Tanzania
Tel: + 255 822 650750    Facsimile: + 255 222 650751
Email: admin@ipl.co.tz

The Managing Director
Tanzania Electric Supply Company Limited
P.O. Box 9024, Dar-es-Salaam
United Republic of Tanzania

| Contract Re : Power Purchase Agreement Dated 26th May 1995 | TAX INVOICE NO : 09/2007/IPTL |
|---|---|
| Project    : I.P.T.L. 100 MW Diesel Power Station | |
| **BONUS PAYMENT** | TIN NO : 100-164-090 |
| **FROM 15.01.2006 - 14.01.20067** | VRN NO : 10-00458331 |

Period of the Invoice:
From   15.01.2006
To     14.01.2007

USD

TOTAL BONUS PAYMENT
In Accordance with Article 6.5 (b) of PPA                  791,634.24

TOTAL BONUS PAYMENT                                        781,634.24

VAT AT 20%  Total Bonus                                    158,326.85
Sub-Total after VAT                                        949,961.09

                                                           949,961.09

Exchange Rate                                              1,299.48

                                    TSH      1,234,455,435

PAYMENT BY TELEGRAPHIC TRANSFER / CHEQUE, IN TSH AT LEAST BY 31.03.2007
IN ACCORDANCE WITH ARTICLE 6.10 OF THE PPA TO:
INDEPENDENT POWER TANZANIA LIMITED
ACCOUNT NO. 100222-043 for TSH remittance
CITIBANK TANZANIA LIMITED
PEUGEOT HOUSE, UPANGA ROAD
P.O.BOX 71625, DAR ES SALAAM
TANZANIA.

AUTHORISED SIGNATURE:

INDEPENDENT POWER TANZANIA LIMITED

A-Standard Bonus for Article for 6 m (27)



**INDEPENDENT
POWER TANZANIA LTD.**

OPERATIONS:
Plot No. 292/1, 292/2, 292/3 and 299 Block 17 Safasale, Tegeta
P.O. Box 77178 Dar Es Salaam, Tanzania
Tel: + 255 222 660750   Facsimile: + 255 222 650751
Email: admin@iptl.co.tz

Date :   1st Mar 2007

The Managing Director
Tanzania Electric Supply Company Limited
P.O. Box 9024, Da-es-Salaam
United Republic of Tanzania

| Contract Re : Power Purchase Agreement Dated 26th May 1995<br>Project     : I.P.T.L. 100 MW Diesel Power Station | TAX INVOICE NO : 08/2007SPTL |
|---|---|
| **SUPPLEMENTAL CHARGES<br>FOR THE MONTH ENDED 28TH FEB 2007** | TIN NO : 100-194-996<br>VRN NO : 10-006583-H |

Period of the Invoice:
From   01.02.2007
To    28.02.2007

|  | TSH | | TSH |
|---|---|---|---|
| TOTAL SUPPLEMENTAL CHARGES<br>EWURA REGULATORY LEVY | | | |
| Capacity Charges - Feb '07 | 3,674,061,651.00 | | |
| Energy Charges - Feb '07 | 1,790,231,324.00 | | |
|  | 5,464,292,975.00 | | |
| Rate - 1% of gross revenues<br>Government Gazette No. 157<br>of 17th November 2006 | 54,642,929.75 | | 54,642,929.75 |
| In Accordance with Article 6.4 of PPA<br>TOTAL SUPPLEMENTAL CHARGES | | | 54,642,929.75 |
| TOTAL | | TSH | 54,642,929.75 |

PAYMENT BY TELEGRAPHIC TRANSFER / CHEQUE, IN TSH AT LEAST BY 21.03.2007,
IN ACCORDANCE WITH ARTICLE 6.10 OF THE PPA TO:
INDEPENDENT POWER TANZANIA LIMITED
ACCOUNT NO. 100222-043
CITIBANK TANZANIA LIMITED
PEUGEOT HOUSE, UPANGA ROAD
P.O.BOX 71625, DAR ES SALAAM
TANZANIA.

AUTHORISED SIGNATURE:

INDEPENDENT POWER TANZANIA LIMITED



**INDEPENDENT
POWER TANZANIA LTD.**

OPERATIONS:
Plot No. 2921, 2922, 2923 and 296 Block 17 Sotasala, Tegeta
P.O. Box 77173 Dar Es Salaam, Tanzania
Tel: +255 222 650750   Facsimile: +255 222 650751
Email: admin@iptl.co.tz

Date :   1st Mar 2007

The Managing Director
Tanzania Electric Supply Company Limited
P.O. Box 9024, Dar-es-Salaam
United Republic of Tanzania

| Contract No : Power Purchase Agreement Dated 26th May 1995<br>Project      : I.P.T.L. 100 MW Diesel Power Station | TAX INVOICE NO : 87/2007/IPTL |
|---|---|
| **SUPPLEMENTAL CHARGES**<br>**FOR THE MONTH ENDED 28th FEB 2007** | TIN NO :  100-154-890<br>VRN NO : 10-006593-H |

Period of the Invoice:
From   01.02.2007
To     28.02.2007

TSH

|  | USD | Rate ** | TSH |
|---|---|---|---|
| TOTAL SUPPLEMENTAL CHARGES |  |  |  |
| Workers Welfare Fund | 3,567.48 | 1,299.48 | 4,635,865.00 |
| City Service Levy |  |  |  |
| Pre-Shipment Inspection |  |  |  |

In Accordance with Article 8.4 of PPA

TOTAL SUPPLEMENTAL CHARGES                         4,635,865.00

TOTAL          TSH          4,635,865.00

** Exchange Rate Average 4 months as per PPA App B 15.1

PAYMENT BY TELEGRAPHIC TRANSFER / CHEQUE, IN TSH AT LEAST BY 31.01.2007.
IN ACCORDANCE WITH ARTICLE 8.10 OF THE PPA TO:
INDEPENDENT POWER TANZANIA LIMITED
ACCOUNT NO. 190222-843
CITIBANK TANZANIA LIMITED
PEUGEOT HOUSE, UPANGA ROAD
P.O.BOX 71625, DAR ES SALAAM
TANZANIA.

AUTHORISED SIGNATURE:

INDEPENDENT POWER TANZANIA LIMITED

Supplementary Charges No Feb 07 - 94ME000



# INDEPENDENT
# POWER TANZANIA LTD.

OPERATIONS:
Plot No. 292/1, 292/2, 292/3 and 296 Block 'D' Sokoaka, Tegeta
P.O. Box 77173 Dar Es Salaam, Tanzania
Tel: + 255 722 650/751    Facsimile: + 255 722 650/751
Email: admin@ipt.co.tz

Date :   1st May 2007

The Managing Director
Tanzania Electric Supply Company Limited
P.O. Box 9024, Dar es Salaam
United Republic of Tanzania

| | |
|---|---|
| Contract Re : Power Purchase Agreement Dated 26th May 1995 | TAX INVOICE NO :    00/2007/IPTL |
| Project    : I.P.T.L. 100 MW Diesel Power Station | TIN NO : 100-184-960 |
| | VRN NO : 10-000583-H |

## ENERGY CHARGES
## FOR THE MONTH ENDED 28th FEB 2007

Period of the invoice:
    From   01.02.2007
    To     28.02.2007

                                                                    TSH

TOTAL ENERGY TARIFF
    In Accordance with Article 6.1 of PPA                    1,790,231,324.00

                                                            1,790,231,324.00

TOTAL ENERGY TARIFF

VAT AT 20% of Total Energy Tariff                            358,046,265.00
    Sub Total after VAT                                     2,148,277,589.00


                            TOTAL        TSH        2,148,277,589.00

** Exchange Rate Average 6 months as per PPA App B 15.1


PAYMENT BY TELEGRAPHIC TRANSFER / CHEQUE IN TSH AT LEAST BY 31.03.2007
IN ACCORDANCE WITH ARTICLE 6.10 OF THE PPA TO:
INDEPENDENT POWER TANZANIA LIMITED
ACCOUNT NO. 100222-013
CITIBANK TANZANIA LIMITED
PEUGEOT HOUSE, UPANGA ROAD
P.O BOX 71625, DAR ES SALAAM
TANZANIA.


AUTHORISED SIGNATURE.



INDEPENDENT POWER TANZANIA LIMITED



**INDEPENDENT POWER TANZANIA LTD.**

OPERATIONS:
Plot No. 2921, 2922, 2923 and 298 Block 'D' Sabasaia, Tegeta
P.O. Box 77173 Dar Es Salaam, Tanzania
Tel: + 255 222 650750.    Facsimile: + 255 222 650751
Email: admin@ipd.co.tz

Date :    1st Mar 2007

The Managing Director
Tanzania Electric Supply Company Limited
P.O. Box 9024, Da-es-Salaam
United Republic of Tanzania

| Contract Re : Power Purchase Agreement Dated 26th May 1995 | TAX INVOICE NO :    05/2007/IPTL |
| Project    : I.P.T.L. 100 MW Diesel Power Station | |
| | TIN NO : 100-181-980 |
| CAPACITY CHARGES | VRN NO : 10-008583-H |
| FOR THE MONTH ENDED 28th FEB 2007 | |

Period of the Invoice:
From    01.02.2007
To    28.02.2007

| | TSH |
| TOTAL CAPACITY TARIFF | |
| In Accordance with Article 6.2 of PPA | 3,674,061,651.00 |
| | |
| TOTAL CAPACITY TARIFF | 3,674,061,651.00 |
| | |
| VAT AT 20% of Total Capacity Tariff | 734,812,330.00 |
| Sub-Total after VAT | 4,408,873,981.00 |
| | |
| TOTAL    TSH | 4,408,873,981.00 |

** Exchange Rate Average 6 months as per PPA App B 15.1

PAYMENT BY TELEGRAPHIC TRANSFER / CHEQUE, IN TSH AT LEAST BY 31.03.2007
IN ACCORDANCE WITH ARTICLE 8.10 OF THE PPA TO:
INDEPENDENT POWER TANZANIA LIMITED
ACCOUNT NO. 100293-043
CITIBANK TANZANIA LIMITED
PEHGEOT HOUSE, UPANGA ROAD
P.O.BOX 71625, DAR ES SALAAM
TANZANIA.

AUTHORISED SIGNATURE:

INDEPENDENT POWER TANZANIA LIMITED



**INDEPENDENT POWER TANZANIA LTD.**

OFFICES:
Plot No. 2921, 2922, 2923 and 296 Block 'D' Sabasaba, Tegeta
P.O. Box 71173 Dar Es Salaam, Tanzania
Tel: + 255 222 650750    Facsimile: + 255 222 650751
Email: admin@iptl.co.tz

Date : 1st Feb 2007

The Managing Director
Tanzania Electric Supply Company Limited
P.O. Box 9024, Dar es-Salaam
United Republic of Tanzania

| Contract Re : Power Purchase Agreement Dated 26th May 1995 Project : I.P.T.L. 100 MW Diesel Power Station | TAX INVOICE NO : 04/2007/IPTL |
|---|---|
| **SUPPLEMENTAL CHARGES FOR THE MONTH ENDED 31ST JAN 2007** | TIN NO : 100-184-890 VAT NO : 10-00058144 |

Period of the Invoice:
From  01.01.2007
To  31.01.2007

|  | TSH |  | TSH |
|---|---|---|---|
| **TOTAL SUPPLEMENTAL CHARGES** |  |  |  |
| **EWURA REGULATORY LEVY** |  |  |  |
| Capacity Charges - Jan '07 | 3,702,452,852.00 |  |  |
| Energy Charges - Jan '07 | 1,793,096,525.00 |  |  |
|  | 5,495,549,377.00 |  |  |
| Rate - 1% of gross revenues | 54,955,493.77 |  | 54,955,493.77 |
| Government Gazette No. 157 of 17th November 2006 |  |  |  |
| In Accordance with Article 6.4 of PPA |  |  |  |
| TOTAL SUPPLEMENTAL CHARGES |  |  | 54,955,493.77 |
| **TOTAL** | TSH |  | 54,955,493.77 |

PAYMENT BY TELEGRAPHIC TRANSFER / CHEQUE, IN TSH AT LEAST BY 03.03.2007.
IN ACCORDANCE WITH ARTICLE 6.10 OF THE PPA TO:
INDEPENDENT POWER TANZANIA LIMITED
ACCOUNT NO. 100222-043
CITIBANK TANZANIA LIMITED
PEUGEOT HOUSE, UPANGA ROAD
P.O.BOX 71625, DAR ES SALAAM
TANZANIA.

AUTHORISED SIGNATURE:

INDEPENDENT POWER TANZANIA LIMITED

Supplemental Charges EWURA Jan 07  14 Feb 2007



**INDEPENDENT POWER TANZANIA LTD.**

OPERATIONS
Plot No. 2021, 2022, 2020 and 296 Block 'D' Salasala, Tegeta
P.O. Box 72173 Dar Es Salaam, Tanzania
Tel: + 255 222 650750    Facsimile: + 255 222 650751
Email: admin@iptl.co.tz

Date :    1st Feb 2007

The Managing Director
Tanzania Electric Supply Company Limited
P.O. Box 9024, Dar-es-Salaam
United Republic of Tanzania

| Contract Re : Power Purchase Agreement Dated 26th May 1995 | TAX INVOICE NO : 0X2007/IPTL |
| Project      : I.P.3 L. 100 MW Diesel Power Station | |
| | TIN NO : 100-161-996 |
| **SUPPLEMENTAL CHARGES** | VRN NO : VI-006583-M |
| **FOR THE MONTH ENDED 31ST JAN 2007** | |

Period of the Invoice:
  From   01.01.2007
  To     31.01.2007

|  | USD | Rate ** | TSH |
|---|---|---|---|
| **TOTAL SUPPLEMENTAL CHARGES** | | | |
| Workers Welfare Fund | 4,880.57 | 1,299.48 | 6,342,213.59 |
| City Service Levy (Oct-Dec 06) | 43,073.93 | 1,299.48 | 55,973,716.00 |
| Pre-Shipment Inspection | | | |
| | | | |
| In Accordance with Article 5.4 of PPA | | | |
| | | | |
| **TOTAL SUPPLEMENTAL CHARGES** | | | 62,315,929.59 |
| | | | |
| **TOTAL** | | TSH | 62,315,929.59 |

** Exchange Rate Average 6 months as per PPA App B 15.1

PAYMENT BY TELEGRAPHIC TRANSFER / CHEQUE, IN TSH AT LEAST BY 01.03.2007.
     IN ACCORDANCE WITH ARTICLE 6.10 OF THE PPA TO:
     INDEPENDENT POWER TANZANIA LIMITED
     ACCOUNT NO. 190222-843
     CITIBANK TANZANIA LIMITED
     PEUGEOT HOUSE, UPANGA ROAD
     P.O.BOX 71625, DAR ES SALAAM
     TANZANIA.

AUTHORISED SIGNATURE:

INDEPENDENT POWER TANZANIA LIMITED

Supplementary Charges for Jan 02 - 144C552



**INDEPENDENT POWER TANZANIA LTD.**

OPERATIONS:
Plot No. 299/1, 299/2, 299/3 and 296 Block 'D' Salasala, Tegeta
P.O. Box 77173 Dar Es Salaam, Tanzania
Tel: + 255 222 650750    Facsimile: + 255 222 650751
Email: admin@iptl.co.tz

Date : 1st Feb 2007

The Managing Director
Tanzania Electric Supply Company Limited
P.O. Box 9024, Dar-es-Salaam
United Republic of Tanzania

| | |
|---|---|
| Contract Re : Power Purchase Agreement Dated 26th May 1995<br>Project : I.P.T.L. 100 MW Diesel Power Station | TAX INVOICE NO : 02/2007/IPTL |
| **ENERGY CHARGES**<br>**FOR THE MONTH ENDED 31st JAN 2007** | TIN NO : 100-184-990<br>VRN NO : 10 006583-H |

Period of the Invoice:
From  01.01.2007
To  31.01.2007

TSH

TOTAL ENERGY TARIFF
In Accordance with Article 6.1 of PPA                                1,793,096,525.00

TOTAL ENERGY TARIFF                                                       1,793,096,525.00

VAT AT 20% of Total Energy Tariff                                        358,619,305.00
Sub-Total after VAT                                                          2,151,715,830.00

TOTAL          TSH          2,151,715,830.00

** Exchange Rate Average 6 months as per PPA App B 15.1

PAYMENT BY TELEGRAPHIC TRANSFER / CHEQUE, IN TSH AT LEAST BY 03.03.2007
IN ACCORDANCE WITH ARTICLE 6.10 OF THE PPA TO:
INDEPENDENT POWER TANZANIA LIMITED
ACCOUNT NO. 100223-043
CITIBANK TANZANIA LIMITED
PEUGEOT HOUSE, UPANGA ROAD
P.O.BOX 71625, DAR ES SALAAM
TANZANIA.

AUTHORISED SIGNATURE:

INDEPENDENT POWER TANZANIA LIMITED

Energy Billing for Jan 07 - TANESCO



**INDEPENDENT POWER TANZANIA LTD.**

OPERATIONS
Plot No. 2021, 2022, 2023 and 296 Block 'D' Salecide, Ilagala
P.O. Box 77173 Dar Es Salaam, Tanzania
Tel : + 255 222 850750    Facsimile : + 255 222 850751
Email : admin@ipti.co.tz

Date :    1st Feb 2007

The Managing Director
Tanzania Electric Supply Company Limited
P.O. Box 9024, Dar-es-Salaam
United Republic of Tanzania

| Contract Re : Power Purchase Agreement Dated 26th May 1995<br>Project    : I.P.T.L. 100 MW Diesel Power Station | TAX INVOICE NO :    01/2007/IPTL |
|---|---|
| **CAPACITY CHARGES**<br>**FOR THE MONTH ENDED 31st JAN 2007** | TIN NO :  100-184-990<br>VRN NO :  10-00650-H |

Period of the Invoice:
From    01.01.2007
To    31.01.2007

|  | TSH |
|---|---|
| TOTAL CAPACITY TARIFF<br>In Accordance with Article 6.2 of PPA | 3,702,452,852.00 |
| TOTAL CAPACITY TARIFF | 3,702,452,852.00 |
| VAT AT 20% of Total Capacity Tariff<br>Sub-Total after VAT | 740,490,570.00<br>4,442,943,422.00 |
| **TOTAL**    TSH | 4,442,943,422.00 |

" Exchange Rate Average 6 months as per PPA App B 15.1

PAYMENT BY TELEGRAPHIC TRANSFER / CHEQUE, IN TSH AT LEAST BY 03.03.2007
IN ACCORDANCE WITH ARTICLE 6.10 OF THE PPA TO:
INDEPENDENT POWER TANZANIA LIMITED
ACCOUNT NO. 100223-643
CITIBANK TANZANIA LIMITED
PEUGEOT HOUSE, UPANGA ROAD
P.O.BOX 71625, DAR ES SALAAM
TANZANIA.

AUTHORISED SIGNATURE:

INDEPENDENT POWER TANZANIA LIMITED

Capacity Billing for Jan 07 - TANESCO



**INDEPENDENT POWER TANZANIA LTD.**

OPERATIONS:
Plot No. 2521, 2522, 2523 and 258 Block 'D' Salasala, Tegeta
P.O. Box 77173 Dar Es Salaam, Tanzania
Tel. + 255 222 690750    Facsimile + 255 222 650761
Email: admin@iptl.co.tz

Date :    1st Jan 2007

The Managing Director
Tanzania Electric Supply Company Limited
P.O. Box 9024, Da-es-Salaam
United Republic of Tanzania

| Contract Re : Power Purchase Agreement Dated 26th May 1995 | TAX INVOICE NO : 50/2008/IPTL |
| Project     : I.P.T.L. 100 MW Diesel Power Station | |

**SUPPLEMENTAL CHARGES**
**FOR THE MONTH ENDED 31ST DEC 2006**

TIN NO : 100-184-998
VRN NO : 10-006583-11

Period of the Invoice:
From  01.12.2006
To    31.12.2006

|  | TSH | TSH |
|---|---|---|
| TOTAL SUPPLEMENTAL CHARGES | | |
| EWURA REGULATORY LEVY | | |
| Capacity Charges - Dec '06 | 3,545,266,524.00 | |
| Energy Charges - Dec '06 | 3,698,405,358.00 | |
| | 7,243,671,882.00 | |
| Rate : 1% of gross revenues | | |
| Government Gazette No. 157 | 72,436,718.82 | 72,436,718.82 |
| of 17th November 2006 | | |
| In Accordance with Article 6.4 of PPA | | |
| TOTAL SUPPLEMENTAL CHARGES | | 72,436,718.82 |
| TOTAL | TSH | 72,436,718.82 |

PAYMENT BY TELEGRAPHIC TRANSFER / CHEQUE, IN TSH AT LEAST BY 31.01.2007.
IN ACCORDANCE WITH ARTICLE 8.10 OF THE PPA TO:
INDEPENDENT POWER TANZANIA LIMITED
ACCOUNT NO. 100223-043
CITIBANK TANZANIA LIMITED
PEUGEOT HOUSE, UPANGA ROAD
P.O.BOX 71625, DAR ES SALAAM
TANZANIA.

AUTHORISED SIGNATURE:

INDEPENDENT POWER TANZANIA LIMITED



**INDEPENDENT
POWER TANZANIA LTD.**

OPERATIONS:
Plot No. 292/1, 292/2, 292/3 and 296 Block 'D' Salasala, Tegeta
P.O. Box 77173 Dar Es Salaam, Tanzania
Tel: + 255 222 650750      Facsimile: + 255 222 650751
Email: admin@iptl.co.tz

Date :  11th Dec 2006

The Managing Director
Tanzania Electric Supply Company Limited
P.O. Box 9024, Dar-es-Salaam
United Republic of Tanzania

| Contract No : Power Purchase Agreement Dated 26th May 1995 | |
| Project      : I.P.T.L. 100 MW Diesel Power Station | TAX INVOICE NO : 49/2006 IPTL |

**SUPPLEMENTAL CHARGES
FOR THE MONTH ENDED 30TH NOV 2006**

TIN NO : 100-154-990
VRN NO : 10-005383-H

Period of the Invoice:
       From   01.11.2006
       To     30.11.2006

|  | TSH | TSH |
|---|---|---|
| TOTAL SUPPLEMENTAL CHARGES | | |
| EWURA REGULATORY LEVY | | |
| Capacity Charges - Nov '05 | 3,545,266,924.00 | |
| Energy Charges - Nov '06 | 7,170,559,571.00 | |
| | 10,715,826,495.00 | |
| Rate - 1% of gross revenues | 107,158,264.95 | 107,158,264.95 |
| Government Gazette No. 157 | | |
| of 17th November 2006 | | |
| In Accordance with Article 6.4 of PPA | | |
| TOTAL SUPPLEMENTAL CHARGES | | 107,158,264.95 |
| TOTAL. | TSH | 107,158,264.95 |

PAYMENT BY TELEGRAPHIC TRANSFER / CHEQUE, IN TSH AT LEAST BY 10.01.2007,
IN ACCORDANCE WITH ARTICLE 6.10 OF THE PPA TO:
INDEPENDENT POWER TANZANIA LIMITED
ACCOUNT NO. 100222-043
CITIBANK TANZANIA LIMITED
PEUGEOT HOUSE, UPANGA ROAD
P.O.BOX 71625, DAR ES SALAAM
TANZANIA.

AUTHORISED SIGNATURE

INDEPENDENT POWER TANZANIA LIMITED

Supplementary Charges EWURA Nov 06 - TANESCO



**INDEPENDENT
POWER TANZANIA LTD.**

OPERATIONS:
Plot No. 2021, 2022, 2023 and 298 Block 'D' Salasala, Togata
P.O. Box 77173 Dar Es Salaam, Tanzania
Tel: + 255 222 650753    Facsimile: + 255 222 650751
Email: admin@iptl.co.tz

Date :   1st Jan 2007

The Managing Director
Tanzania Electric Supply Company Limited
P.O. Box 9024, Dar-es-Salaam
United Republic of Tanzania

| Contract Re : Power Purchase Agreement Dated 26th May 1995 | TAX INVOICE NO : 48/2006/IPTL |
| Project       : I.P.T.L. 100 MW Diesel Power Station | |
| | TIN NO : 100-154-390 |
| **SUPPLEMENTAL CHARGES** | VRN NO : 10-000583-N |
| **FOR THE MONTH ENDED 31ST DEC 2006** | |

Period of the Invoice:
   From   01.12.2006
   To     31.12.2006

|  | USD | Rate ** | TSH |
|---|---|---|---|
| TOTAL SUPPLEMENTAL CHARGES | | | |
| Workers Welfare Fund | 4,148.00 | 1,232.83 | 5,113,777.00 |
| City Service Levy (Jul-Sept 06) | | 1,232.83 | |
| Pre-Shipment Inspection | | 1,232.83 | |
| In Accordance with Article 6.4 of PPA | | | |
| TOTAL SUPPLEMENTAL CHARGES | | | 5,113,777.00 |
| **TOTAL** | | **TSH** | **5,113,777.00** |

** Exchange Rate Average 6 months as per PPA App B 15.1

PAYMENT BY TELEGRAPHIC TRANSFER / CHEQUE, IN TSH AT LEAST BY 31.01.2007,
IN ACCORDANCE WITH ARTICLE 6.18 OF THE PPA TO:
INDEPENDENT POWER TANZANIA LIMITED
ACCOUNT NO. 1M222-043
CITIBANK TANZANIA LIMITED
PEUGEOT HOUSE, UPANGA ROAD
P.O.BOX 71625, DAR ES SALAAM
TANZANIA.

AUTHORISED SIGNATURE:

INDEPENDENT POWER TANZANIA LIMITED

Supplementary Charges for Dec 06 - 48/IPTL/2006



**INDEPENDENT POWER TANZANIA LTD.**

OPERATIONS.
Plot No. 2921, 2922, 2923 and 296 Block 'D' Sabasaba, Tegeta
P.O. Box 77172 Dar Es Salaam, Tanzania
Tel. + 255 222 650759    Facsimile + 255 222 650751
Email: admin@iptl.co.tz

Date : 1st Jan 2007

The Managing Director
Tanzania Electric Supply Company Limited
P.O. Box 9024, Dar-es-Salaam
United Republic of Tanzania

| Contract Re : Power Purchase Agreement Dated 26th May 1995 | TAX INVOICE NO : 47-JU200GfPTL |
| Project      : I.P.T.L. 100 MW Diesel Power Station | |

**ENERGY CHARGES**
**FOR THE MONTH ENDED 31st DEC 2006**

TIN NO : 100-184-090
VRN NO : 10-005583-H

Period of the Invoice:
From  01.12.2006
To   31.12.2006

TSH

TOTAL ENERGY TARIFF
In Accordance with Article 6.1 of PPA                3,698,405,358.00

TOTAL ENERGY TARIFF                                  3,698,405,358.00

VAT AT 20% of Total Energy Tariff                      739,681,072.00
Sub-Total after VAT                                  4,438,086,430.00

TOTAL        TSH        4,438,086,430.00

** Exchange Rate Average 6 months as per FPA App B 15.1

PAYMENT BY TELEGRAPHIC TRANSFER / CHEQUE, IN TSH AT LEAST BY 31.01.2007
IN ACCORDANCE WITH ARTICLE 6.10 OF THE PPA TO:
INDEPENDENT POWER TANZANIA LIMITED
ACCOUNT NO. 100222-043
CITIBANK TANZANIA LIMITED
PEUGEOT HOUSE, UPANGA ROAD
P.O.BOX 71576, DAR ES SALAAM
TANZANIA.

AUTHORISED SIGNATURE

INDEPENDENT POWER TANZANIA LIMITED

Energy Billing for Dec 06   TANESCO

**INDEPENDENT POWER TANZANIA LTD.**

OPERATIONS:
Plot No. 292/1, 292/2, 293/3 and 296 Block 'D' Salasala, Tegeta
P.O. Box 77173 Dar Es Salaam, Tanzania
Tel: + 255 222 650750   Facsimile: + 255 222 650751
Email: admin@iptl.co.tz

Date :   1st Jan 2007

The Managing Director
Tanzania Electric Supply Company Limited
P.O. Box 9024, Dar-es-Salaam
United Republic of Tanzania

| Contract Re : Power Purchase Agreement Dated 26th May 1995 | TAX INVOICE NO :   46/2006/IPTL |
| Project     : I.P.T.L. 100 MW Diesel Power Station | |

CAPACITY CHARGES
FOR THE MONTH ENDED 31st DEC 2006

TIN NO : 100-184-880
VRN NO : 10-006583-H

Period of the Invoice:
      From   01.12.2006
      To     31.12.2006

|  | TSH |
|---|---|
| TOTAL CAPACITY TARIFF | |
| In Accordance with Article 6.2 of PPA | |
|  | 3,545,266,524.00 |
| TOTAL CAPACITY TARIFF | |
|  | 3,545,266,524.00 |
| VAT AT 20% of Total Capacity Tariff | |
| Sub-Total after VAT | 709,053,305.00 |
|  | 4,254,319,829.00 |

|  |  | TSH | |
|---|---|---|---|
| TOTAL | | | 4,254,319,829.00 |

* Exchange Rate Average 6 months as per PPA App 8 15.1

PAYMENT BY TELEGRAPHIC TRANSFER / CHEQUE, IN TSH AT LEAST BY 31.01.2007
IN ACCORDANCE WITH ARTICLE 6.10 OF THE PPA TO:
INDEPENDENT POWER TANZANIA LIMITED
ACCOUNT NO. 100222-043
CITIBANK TANZANIA LIMITED
PEUGEOT HOUSE, UPANGA ROAD
P.O.BOX 71625, DAR ES SALAAM
TANZANIA.

AUTHORISED SIGNATURE:

INDEPENDENT POWER TANZANIA LIMITED

Capacity Banque Due Dr - TANESCO



**INDEPENDENT POWER TANZANIA LTD.**

OPERATIONS:
Plot No. 2991, 2992, 2923 and 296 Block 'D' Salasala, Tegeta
P.O. Box 77173 Dar Es Salaam, Tanzania
Tel: + 255 222 650750    Facsimile: + 255 222 650751
Email: admin@iptl.co.tz

Date :  1st Dec 2006

The Managing Director
Tanzania Electric Supply Company Limited
P.O. Box 9024, Dar-es-Salaam
United Republic of Tanzania

| Contract Re : Power Purchase Agreement Dated 26th May 1995<br>Project    : I.P.T.L. 100 MW Diesel Power Station | TAX INVOICE NO : 452/006SPTL |
| --- | --- |
| **SUPPLEMENTAL CHARGES**<br>**FOR THE MONTH ENDED 30TH NOV 2006** | TIN NO : 100-154-550<br>VRN NO : 10-004583-H |

Period of the Invoice:
From   01.11.2006
To    30.11.2006

| | USD | Rate ** | TSH |
| --- | --- | --- | --- |
| TOTAL SUPPLEMENTAL CHARGES | | | |
| Workers Welfare Fund | 3,966.61 | 1,232.83 | |
| City Service Levy (Jul-Sept 06) | | | 4,890,159.00 |
| Pre-Shipment Inspection | 412,784.85 | 1,232.83 | 508,893,543.00 |

In Accordance with Article 6.4 of PPA

TOTAL SUPPLEMENTAL CHARGES                                        513,783,702.00

TOTAL         TSH      513,783,702.00

** Exchange Rate Average 6 months as per PPA App B 15.1

PAYMENT BY TELEGRAPHIC TRANSFER / CHEQUE, IN TSH AT LEAST BY 31.12.2006,
IN ACCORDANCE WITH ARTICLE 6.18 OF THE PPA TO:
INDEPENDENT POWER TANZANIA LIMITED
ACCOUNT NO. 190722-843
CITIBANK TANZANIA LIMITED
PEUGEOT HOUSE, UPANGA ROAD
P O BOX 71625, DAR ES SALAAM
TANZANIA.

AUTHORISED SIGNATURE:

INDEPENDENT POWER TANZANIA LIMITED

**INDEPENDENT
POWER TANZANIA LTD.**

OPERATIONS
P.O. Box 2027326/25454 Road 'O' Block 'O' Sakasala, Tegeta
Tel: + 255 222 650750    Facsimile: + 255 222 650751
Email: admin@ipti.co.tz

Date :  1st Dec 2006

The Managing Director
Tanzania Electric Supply Company Limited
P.O. Box 9024, Dar-es-Salaam
United Republic of Tanzania

| Contract Re : Power Purchase Agreement Dated 26th May 1995<br>Project    : I.P.T.L, 100 MW Diesel Power Station | TAX INVOICE NO :    43/2006IPTL |
|---|---|
| **CAPACITY CHARGES**<br>**FOR THE MONTH ENDED 30TH NOV 2006** | TIN NO : 100-184-690<br>VRN NO : 10-006553-H |

Period of the invoice:
From  01.11.2006
To    30.11.2006

<u>TSH</u>

TOTAL CAPACITY TARIFF
In Accordance with Article 6.2 of PPA                                    3,545,266,524.60

TOTAL CAPACITY TARIFF                                                    3,545,266,524.60

VAT AT 20% of Total Capacity Tariff                                        709,053,305.00
Sub-Total after VAT                                                     4,254,319,829.60

                                            **TOTAL**    TSH    4,254,319,829.00

** Exchange Rate Average 6 months as per PPA App B 15.1

PAYMENT BY TELEGRAPHIC TRANSFER / CHEQUE, IN TSH AT LEAST BY 31.12.2006
IN ACCORDANCE WITH ARTICLE 6.10 OF THE PPA TO:
INDEPENDENT POWER TANZANIA LIMITED
ACCOUNT NO. 100222-043
CITIBANK TANZANIA LIMITED
PEUGEOT HOUSE, UPANGA ROAD
P.O.BOX 71625, DAR ES SALAAM
TANZANIA.

AUTHORISED SIGNATURE

_____
INDEPENDENT POWER TANZANIA LIMITED

Casacs, Bürger No. 02 - 1ANUSTD

**INDEPENDENT POWER TANZANIA LTD.**

OPERATIONS:
Plot No. 292/1, 292/2, 292/3 and 296 Block 'D' Sabasaba, Tegeta
P.O. Box 77173 Dar Es Salaam, Tanzania
Tel: + 255 222 650750        Facsimile: + 255 222 650751
Email: admin@iptl.co.tz

Date :   1st June 2007

The Managing Director
Tanzania Electric Supply Company Limited
P.O. Box 9024, Dar-es-Salaam
United Republic of Tanzania

| Contract Re : Power Purchase Agreement Dated 26th May 1995<br>Project : I.P.T.L. 100 MW Diesel Power Station | TAX INVOICE NO : 19/2007/IPTL |
|---|---|
| **SUPPLEMENTAL CHARGES**<br>**FOR THE MONTH ENDED 31ST MAY 2007** | TIN NO : 100-184-958<br>VRN NO : 10-006583-H |

Period of the Invoice:
From   01.05.2007
To   31.05.2007

| | TSH | TSH |
|---|---|---|
| TOTAL SUPPLEMENTAL CHARGES | | |
| EWURA REGULATORY LEVY | | |
| Capacity Charges - May '07 | 3,673,311,234.00 | |
| Energy Charges - May '07 | | |
| | 3,673,311,234.00 | |
| Rate - 1% of gross revenues. | 36,733,112.34 | 36,733,112.34 |
| Government Gazette No. 157 of 17th November 2006 | | |
| In Accordance with Article 6.4 of PPA | | |
| TOTAL SUPPLEMENTAL CHARGES | | 36,733,112.34 |
| | | |
| TOTAL | TSH | 36,733,112.34 |

PAYMENT BY TELEGRAPHIC TRANSFER / CHEQUE, IN TSH AT LEAST BY 01.07.2007.
IN ACCORDANCE WITH ARTICLE 6.10 OF THE PPA TO:
INDEPENDENT POWER TANZANIA LIMITED
ACCOUNT NO. 100222-841
CITIBANK TANZANIA LIMITED
PEUGEOT HOUSE, UPANGA ROAD
P.O.BOX 71823, DAR ES SALAAM
TANZANIA.

AUTHORISED SIGNATURE:

INDEPENDENT POWER TANZANIA LIMITED

Supplemental Charges EWURA May '07 - 11/05/2003



# INDEPENDENT
# POWER TANZANIA LTD.

OPERATIONS:
Plot No. 2921, 2922, 2923 and 236 Block 'D' Salasala, Tegeta
P.O. Box 77173 Dar Es Salaam, Tanzania
Tel  – 255 222 650750    Facsimile  – 255 222 650751
Email: admin@iptl.co.tz

Date :     1st June 2007

The Managing Director
Tanzania Electric Supply Company Limited
P.O. Box 9024, Dar-es-Salaam
United Republic of Tanzania

| Contract Re : Power Purchase Agreement Dated 26th May 1995 | |
| --- | --- |
| Project       : I.P.T.L. 100 MW Diesel Power Station | TAX INVOICE NO : 19/29073PTL |
| **SUPPLEMENTAL CHARGES**<br>**FOR THE MONTH ENDED 31ST MAY 2007** | TIN NO :  150-134-956<br>VRN NO :  10-006521-H |

Period of the Invoice:
From   01.05.2007
To     31.05.2007

| | USD | Rate ¬ | TSH |
| --- | --- | --- | --- |
| TOTAL SUPPLEMENTAL CHARGES | | | |
| Workers Welfare Fund | 3,165.75 | 1,299.48 | 4,113,826.50 |
| City Service Levy | 9,184.19 | 1,299.48 | 11,934,658.00 |
| Pre-Shipment Inspection | | | |

In Accordance with Article 6.4 of PPA

| TOTAL SUPPLEMENTAL CHARGES | | | 16,048,483.50 |
| --- | --- | --- | --- |

| | TOTAL | TSH | 16,048,483.50 |
| --- | --- | --- | --- |

¬ Exchange Rate Average 6 months as per PPA App B 15.1

PAYMENT BY TELEGRAPHIC TRANSFER / CHEQUE, IN TSH AT LEAST BY 01.07.2007,
IN ACCORDANCE WITH ARTICLE 6.16 OF THE PPA TO:
INDEPENDENT POWER TANZANIA LIMITED
ACCOUNT NO. 100231-041
CITIBANK TANZANIA LIMITED
PEUGEOT HOUSE, UPANGA ROAD
P.O.BOX 71625, DAR ES SALAAM
TANZANIA.

AUTHORISED SIGNATURE:

INDEPENDENT POWER TANZANIA LIMITED

Supplemental Charges for May 07 - TANESCO

**INDEPENDENT POWER TANZANIA LTD.**

OPERATIONS:
Plot No. 2921, 2922, 2923 and 226 Block 'D' Sabasaba, Tegeta
P.O. Box 77173 Dar Es Salaam, Tanzania
Tel: +255 222 650759    Facsimile: +255 222 650721
Email: admin@ipt.co.tz

Date :    1st June 2007

The Managing Director
Tanzania Electric Supply Company Limited
P.O. Box 9074, Da-es-Salaam
United Republic of Tanzania

| Contract Re : Power Purchase Agreement Dated 26th May 1995 | TAX INVOICE NO : | 18/2007/IPTL |
| Project    : I.P.T.L. 100 MW Diesel Power Station | | |

CAPACITY CHARGES
FOR THE MONTH ENDED 31ST MAY 2007

TIN NO : 100-184-990
VRN NO : 10-006483-H

Period of the Invoice:
From    01.05.2007
To    31.05.2007

TSH

TOTAL CAPACITY TARIFF
In Accordance with Article 6.2 of PPA

3,673,311,234.00

TOTAL CAPACITY TARIFF

3,673,311,234.00

VAT AT 20% of Total Capacity Tariff as per letter from TRA ref.no 30-4/TIN100-183-471/4
Sub-Total after VAT

NIL

3,673,311,234.00

TOTAL    TSH    3,673,311,234.00

** Exchange Rate Average 6 months as per PPA App B 15.1

PAYMENT BY TELEGRAPHIC TRANSFER / CHEQUE, IN TSH AT LEAST BY 01.07.2007
IN ACCORDANCE WITH ARTICLE 6.10 OF THE PPA TO:
INDEPENDENT POWER TANZANIA LIMITED
ACCOUNT NO. 100222-043
CITIBANK TANZANIA LIMITED
PEUGEOT HOUSE, UPANGA ROAD
P.O.BOX 71625, DAR ES SALAAM
TANZANIA.

AUTHORISED SIGNATURE:

INDEPENDENT POWER TANZANIA LIMITED



**INDEPENDENT
POWER TANZANIA LTD.**

OPERATIONS:
Plot No. 230/1, 232/2, 232/3 and 296 Block 'D' Salasala, Tegeta
P.O. Box 77173 Dar Es Salaam, Tanzania
Tel: + 255 222 650750    Facsimile: + 255 222 650751
Email: admin@ipt.co.tz

Date :    1st May 2007

The Managing Director
Tanzania Electric Supply Company Limited
P.O. Box 9024, Dar-es-Salaam
United Republic of Tanzania

| Contract Ref : Power Purchase Agreement Dated 26th May 1995<br>Project     : I.P.T.L. 100 MW Diesel Power Station | TAX INVOICE NO : 17/2007/IPTL |
| --- | --- |
| **SUPPLEMENTAL CHARGES**<br>**FOR THE MONTH ENDED 30TH APRIL, 2007** | TIN NO : 100-184-986<br>VRN NO : 10-006583-H |

Period of the Invoice:
    From    01.04.2007
    To      30.04.2007

|  |  | TSH |  | TSH |
| --- | --- | --- | --- | --- |
| TOTAL SUPPLEMENTAL CHARGES |  |  |  |  |
| EWURA REGULATORY LEVY |  |  |  |  |
| Capacity Charges - Apr '07 |  | 3,674,061,651.00 |  |  |
| Energy Charges - Apr '07 |  | 203,310,494.00 |  |  |
|  |  | 3,877,372,145.00 |  |  |
| Rate - 1% of gross revenues | 38,773,721.45 |  |  | 38,773,721.45 |
| Government Gazette No. 157 |  |  |  |  |
| of 17th November 2006 |  |  |  |  |
| In Accordance with Article 6.4 of PPA |  |  |  |  |
| TOTAL SUPPLEMENTAL CHARGES |  |  |  | 38,773,721.45 |
| **TOTAL** |  | TSH | | **38,773,721.45** |

PAYMENT BY TELEGRAPHIC TRANSFER / CHEQUE, IN TSH AT LEAST BY 31.05.2007,
IN ACCORDANCE WITH ARTICLE 6.10 OF THE PPA TO:
INDEPENDENT POWER TANZANIA LIMITED
ACCOUNT NO. 100222-043
CITIBANK TANZANIA LIMITED
PEUGEOT HOUSE, UPANGA ROAD
P.O.BOX 71625, DAR ES SALAAM
TANZANIA.

AUTHORISED SIGNATURE:

INDEPENDENT POWER TANZANIA LIMITED

Supplementary Charges EWURA for 07 - TANESCO



**INDEPENDENT POWER TANZANIA LTD.**

OPERATIONS:
Plot No. 292/1, 292/2, 292/3 and 296 Block 'D' Sahasala, Tegela
P.O. Box 77173 Dar Es Salaam, Tanzania.
Tel: + 255 222 650750    Facsimile: + 255 222 650751
Email: admin@itpl.co.tz

Date :   1st May 2007

The Managing Director
Tanzania Electric Supply Company Limited
P.O. Box 9874, Dar-es-Salaam
United Republic of Tanzania

| Contract Re : Power Purchase Agreement Dated 26th May 1995<br>Project    : I.P.T.L. 100 MW Diesel Power Station<br><br>**SUPPLEMENTAL CHARGES**<br>**FOR THE MONTH ENDED 30TH APRIL, 2007** | TAX INVOICE NO : 16/2007/IPTL<br><br>TIN NO : 100-154-596<br>VRN NO : 10-006525-H |

Period of the Invoice:
From   01.04.2007
To    30.04.2007

|                             | **USD**   | Rate **   | **TSH**       |
|-----------------------------|-----------|-----------|---------------|
| TOTAL SUPPLEMENTAL CHARGES  |           |           |               |
| Workers Welfare Fund        | 3,232.43  | 1,299.48  | 4,200,476.50  |
| City Service Levy           |           |           |               |
| Pre-Shipment Inspection     |           |           |               |

In Accordance with Article 6.4 of PPA

| TOTAL SUPPLEMENTAL CHARGES |  | 4,200,476.50 |

| | TOTAL | TSH | 4,200,476.50 |

** Exchange Rate Average 6 months as per PPA B 18.1

PAYMENT BY TELEGRAPHIC TRANSFER / CHEQUE, IN TSH AT LEAST BY 31.05.2007,
IN ACCORDANCE WITH ARTICLE 6.18 OF THE PPA TO:
INDEPENDENT POWER TANZANIA LIMITED
ACCOUNT NO. 104222-043
CITIBANK TANZANIA LIMITED
PEUGEOT HOUSE, UPANGA ROAD
P.O.BOX 71625, DAR ES SALAAM
TANZANIA.

AUTHORISED SIGNATURE:

_____

INDEPENDENT POWER TANZANIA LIMITED

Supplementary Charges for Apr 07 - TANESCO

**INDEPENDENT
POWER TANZANIA LTD.**

OPERATIONS:
Plot No. 293/1, 292/2, 293/3 and 296 Block 'O' Salocda, Tegeta
P.O. Box 77173 Dar Es Salaam, Tanzania
Tel: + 255 222 650750    Facsimile: + 255 222 650751
Email: admin@iptl.co.tz

Date :    1st May 2007

The Managing Director
Tanzania Electric Supply Company Limited
P.O. Box 9024, Dar-es-Salaam
United Republic of Tanzania

| Contract Re : Power Purchase Agreement Dated 26th May 1995<br>Project    : I.P.T.L. 100 MW Diesel Power Station | TAX INVOICE NO :    15/2007/IPTL |
|---|---|
| **ENERGY CHARGES**<br>**FOR THE MONTH ENDED 30TH APRIL 2007** | TIN NO : 100-184-890<br>VRN NO : 10-005563-H |

Period of the Invoice:
From    01.04.2007
To    30.04.2007

**TSH**

TOTAL ENERGY TARIFF
In Accordance with Article 6.1 of PPA                                    203,310,494.00

TOTAL ENERGY TARIFF                                                      203,310,494.00

VAT AT 20% of Total Energy Tariff                                         40,662,099.80
Sub-Total after VAT                                                      243,972,593.90

TOTAL            TSH            243,972,591.00

** Exchange Rate Average 6 months as per PPA App B 15.1

PAYMENT BY TELEGRAPHIC TRANSFER / CHEQUE, IN TSH AT LEAST BY 31.05.2007
IN ACCORDANCE WITH ARTICLE 6.10 OF THE PPA TO:
INDEPENDENT POWER TANZANIA LIMITED
ACCOUNT NO. 100222-043
CITIBANK TANZANIA LIMITED
PEUGEOT HOUSE, UPANGA ROAD
P.O.BOX 71625, DAR ES SALAAM
TANZANIA.

AUTHORISED SIGNATURE:

INDEPENDENT POWER TANZANIA LIMITED

Energy Billing for April 07 - TANESCO



**INDEPENDENT
POWER TANZANIA LTD.**

OPERATIONS:
Plot No. 292/1, 292/2, 292/3 and 296 Block 'D' Salaam, Tegeta
P.O. Box 77173 Dar Es Salaam, Tanzania
Tel:  + 255 222 650750 · Facsimile:  + 255 222 650751
Email: admin@iptl.co.tz

Date :   1st May 2007

The Managing Director
Tanzania Electric Supply Company Limited
P.O. Box 9024, Dar-es-Salaam
United Republic of Tanzania

| Contract Re : Power Purchase Agreement Dated 26th May 1995 | TAX INVOICE NO :    14/2007/IPTL |
|---|---|
| Project        : I.P.T.L. 100 MW Diesel Power Station | |
| | TIN NO :  100-184-990 |
| CAPACITY CHARGES | VRN NO :  10-006583-H |
| FOR THE MONTH ENDED 30th APRIL 2007 | |

Period of the Invoice:
      From    01.04.2007
      To     30.04.2007

                                      **TSH**

TOTAL CAPACITY TARIFF
   In Accordance with Article 6.2 of PPA                  3,674,061,651.00

TOTAL CAPACITY TARIFF                        3,674,061,651.00

VAT AT 20% of Total Capacity Tariff as per letter from TRA ref.no 30-4/TIN100-183-471/4    **NIL**
   Sub-Total after VAT                       3,674,061,651.00

                **TOTAL**      **TSH**    **3,674,061,651.00**

\*\* Exchange Rate Average 6 months as per PPA App B 15.1

PAYMENT BY TELEGRAPHIC TRANSFER / CHEQUE, IN TSH AT LEAST BY 31.05.2007
   IN ACCORDANCE WITH ARTICLE 6.10 OF THE PPA TO:
   INDEPENDENT POWER TANZANIA LIMITED
   ACCOUNT NO. 100222-043
   CITIBANK TANZANIA LIMITED
   PEUGEOT HOUSE, UPANGA ROAD
   P.O.BOX 71625, DAR ES SALAAM
   TANZANIA.

AUTHORISED SIGNATURE:

INDEPENDENT POWER TANZANIA LIMITED

Capacity Billing for Apr 07 - TANESCO



**INDEPENDENT POWER TANZANIA LTD.**

OPERATIONS:
Plot No. 292/1, 292/2, 292/3 and 296 Block 'D' Salasala, Tegeta
P.O. Box 77173 Dar Es Salaam, Tanzania
Tel: + 255 222 650750    Facsimile: + 255 222 650751
Email: admin@iptl.co.tz

Date : 1st Apr 2007

The Managing Director
Tanzania Electric Supply Company Limited
P.O. Box 9024, Dar-es-Salaam
United Republic of Tanzania

Contract Re : Power Purchase Agreement Dated 26th May 1995
Project       : I.P.T.L. 100 MW Diesel Power Station

TAX INVOICE NO : 13/2007/IPTL

SUPPLEMENTAL CHARGES
FOR THE MONTH ENDED 31ST MAR 2007

TIN NO : 100-184-900
VRN NO : 10-006583-H

Period of the Invoice:
From   01.03.2007
To     31.03.2007

|  | TSH | TSH |
|---|---|---|
| TOTAL SUPPLEMENTAL CHARGES | | |
| EWURA REGULATORY LEVY | | |
| Capacity Charges - Mar '07 | 3,674,061,651.00 | |
| Energy Charges - Mar '07 | 394,894,805.00 | |
| | 4,068,956,456.00 | |
| Rate - 1% of gross revenues | 40,689,564.56 | |
| Government Gazette No. 157 | | 40,689,564.56 |
| of 17th November 2006 | | |
| In Accordance with Article 6.4 of PPA | | |
| TOTAL SUPPLEMENTAL CHARGES | | 40,689,564.56 |
| TOTAL | TSH | 40,689,564.56 |

PAYMENT BY TELEGRAPHIC TRANSFER / CHEQUE, IN TSH AT LEAST BY 01.05.2007,
IN ACCORDANCE WITH ARTICLE 6.10 OF THE PPA TO:
INDEPENDENT POWER TANZANIA LIMITED
ACCOUNT NO. 100222-043
CITIBANK TANZANIA LIMITED
PEUGEOT HOUSE, UPANGA ROAD
P.O.BOX 71825, DAR ES SALAAM
TANZANIA

AUTHORISED SIGNATURE:

INDEPENDENT POWER TANZANIA LIMITED

Supplemental Charges EWURA Mar 07 - TANESCO



**INDEPENDENT
POWER TANZANIA LTD.**

OPERATIONS:
Plot No. 2021, 2922, 2923 and 296 Block 'D' Salvata, Tegeta
P.O. Box 77173 Dar Es Salaam, Tanzania
Tel : + 255 222 650750    Facsimile : + 255 222 650751
E-mail: admin@iptl.co.tz

Date :    1st Apr 2007

The Managing Director
Tanzania Electric Supply Company Limited
P.O. Box 9024, Dar-es-Salaam
United Republic of Tanzania

| Contract Re : Power Purchase Agreement Dated 26th May 1995 | TAX INVOICE NO : 12/2007/APTL |
| Project   : I.P.T.L. 100 MW Diesel Power Station | |

**SUPPLEMENTAL CHARGES
FOR THE MONTH ENDED 31st MAR 2007**

TIN NO :  100-124-990
VRN NO :  10-006583-41

Period of the Invoice:
From   01.03.2007
To    31.03.2007

| | **USD** | **Rate **** | **TSH** |
|---|---|---|---|
| TOTAL SUPPLEMENTAL CHARGES | | | |
| Workers Welfare Fund | 3,898.41 | 1,299.46 | 5,065,905.00 |
| City Service Levy | | | |
| Pre-Shipment Inspection | | | |

In Accordance with Article 6.4 of PPA

| TOTAL SUPPLEMENTAL CHARGES | | 5,065,905.00 |
|---|---|---|

| | TOTAL | TSH | 5,065,905.00 |
|---|---|---|---|

** Exchange Rate Average 6 months as per PPA App B 15.1

PAYMENT BY TELEGRAPHIC TRANSFER / CHEQUE, IN TSH AT LEAST BY 01.06.2007,
IN ACCORDANCE WITH ARTICLE 8.10 OF THE PPA TO:
INDEPENDENT POWER TANZANIA LIMITED
ACCOUNT NO. 106222-043
CITIBANK TANZANIA LIMITED
PEUGEOT HOUSE, UPANGA ROAD
P.O.BOX 71825, DAR ES SALAAM
TANZANIA.

AUTHORISED SIGNATURE

INDEPENDENT POWER TANZANIA LIMITED

Supplementary Charges for Mar 07 - TANESCO



**INDEPENDENT POWER TANZANIA LTD.**

OPERATIONS:
Plot No. 2927, 2932, 2933 and 298 Block 'D' Salasala, Togota
P.O. Box 77173 Dar Es Salaam, Tanzania
Tel: + 255 222 650750    Facsimile: + 255 222 650751
Email: admin@iptl.co.tz

Date : 12.04.2007

The Managing Director
Tanzania Electric Supply Company Limited
P.O. Box 9024, Da-es-Salaam
United Republic of Tanzania

| Contract Re : Power Purchase Agreement Dated 26th May 1995 Project : I.P.T.L. 100 MW Diesel Power Station <br><br> **CREDIT NOTE FOR THE MONTH ENDED 31ST MARCH 2007** | CREDIT NOTE: CN01/2007 <br><br> TIN NO : 100-184-990 <br> VRN NO : 10-006583-H |
|---|---|

Period of the Credit Note:
    From  01.03.2007
    To    31.03.2007

TSH

VAT AT 20% of TOTAL CAPACITY TARIFF
Invoice No. 10/2007/IPTL

734,812,330.00

734,812,330.00

Exchange Rate Average 6 months as per PPA App B 15.1

NIL

TSH    734,812,330.00

AUTHORISED SIGNATURE:

INDEPENDENT POWER TANZANIA LIMITED



## INDEPENDENT
## POWER TANZANIA LTD.

OPERATIONS:
Plot No. 292/1, 292/2, 292/3 and 294 Block 'D' Sabasaba, Tegeta
P.O. Box 77173 Dar Es Salaam, Tanzania
Tel: + 255 222 650750    Facsimile: + 255 222 650751
Email: admin@ipt.co.tz

Date :    1st Apr 2007

The Managing Director
Tanzania Electric Supply Company Limited
P.O. Box 9024, Da-es-Salaam
United Republic of Tanzania

| Contract Re : Power Purchase Agreement Dated 26th May 1995<br>Project : I.P.T.L. 100 MW Diesel Power Station | TAX INVOICE NO : 11/2007/IPTL |
| --- | --- |
| ENERGY CHARGES<br>FOR THE MONTH ENDED 31st MAR 2007 | TIN NO : 100-184-696<br>VRN NO : 10-006583-H |

Period of the Invoice:
From    01.03.2007
To    31.03.2007

|  | **TSH** |
| --- | --- |
| TOTAL ENERGY TARIFF<br>In Accordance with Article 6.1 of PPA |  |
|  | 394,894,805.00 |
| TOTAL ENERGY TARIFF |  |
|  | 394,894,805.00 |
| VAT AT 20% of Total Energy Tariff |  |
| Sub-Total after VAT | 78,978,961.00 |
|  | 473,873,766.00 |

| | TOTAL | TSH | 473,873,766.00 |

** Exchange Rate Average 6 months as per PPA App B 16.1

PAYMENT BY TELEGRAPHIC TRANSFER / CHEQUE, IN TSH AT LEAST BY 01.05 2007
IN ACCORDANCE WITH ARTICLE 6.10 OF THE PPA TO:
INDEPENDENT POWER TANZANIA LIMITED
ACCOUNT NO. 100222-043
CITIBANK TANZANIA LIMITED
PEUGEOT HOUSE, UPANGA ROAD
P.O. BOX 71625, DAR ES SALAAM
TANZANIA.

AUTHORISED SIGNATURE:

INDEPENDENT POWER TANZANIA LIMITED



# INDEPENDENT
# POWER TANZANIA LTD.

OPERATIONS:
Plot No. 292/1, 292/2, 292/3 and 290 Block 'D' Salasala, Toyota
P.O. Box 77173 Dar Es Salaam, Tanzania
Tel: + 255 222 650750    Facsimile: + 255 222 650751
Email: admin@iptl.co.tz

Date :    1st Apr 2007

The Managing Director
Tanzania Electric Supply Company Limited
P.O. Box 9024, Da-es-Salaam
United Republic of Tanzania

| Contract Re : Power Purchase Agreement Dated 26th May 1995 | TAX INVOICE NO :    10/2007/IPTL |
| Project    : I.P.T.L. 100 MW Diesel Power Station | |
| | TIN NO : 100-184-990 |
| **CAPACITY CHARGES** **FOR THE MONTH ENDED 31st MAR 2007** | VRN NO : 10-006583-H |

Period of the Invoice:
        From    01.03.2007
        To      31.03.2007

                                                                TSH

TOTAL CAPACITY TARIFF
    In Accordance with Article 6.2 of PPA                3,674,061,651.00

TOTAL CAPACITY TARIFF                                    3,674,061,651.00

VAT AT 20% of Total Capacity Tariff                       734,812,330.00
    Sub-Total after VAT                                  4,408,873,981.00


                            TOTAL        TSH    4,408,873,981.00

**    Exchange Rate Average 6 months as per PPA App B 15.1


PAYMENT BY TELEGRAPHIC TRANSFER / CHEQUE, IN TSH AT LEAST BY 01.05.2007
    IN ACCORDANCE WITH ARTICLE 6.10 OF THE PPA TO;
    INDEPENDENT POWER TANZANIA LIMITED
    ACCOUNT NO. 100222-043
    CITIBANK TANZANIA LIMITED
    PEUGEOT HOUSE, UPANGA ROAD
    P.O.BOX 71625, DAR ES SALAAM
    TANZANIA.

AUTHORISED SIGNATURE

INDEPENDENT POWER TANZANIA LIMITED

Capacity Billing for Mar 07 - 14NEECO



**INDEPENDENT**
**POWER TANZANIA LTD.**

OPERATIONS:
Plot No. 293/1, 292/2, 292/3 and 296 Block 'D' Salasala, Tegeta
P.O. Box 77173 Dar Es Salaam, Tanzania
Tel: + 255 222 650750    Facsimile: + 255 222 650751
Email: admin@iptl.co.tz

Date :    1st October 2007

The Managing Director
Tanzania Electric Supply Company Limited
P.O. Box 9024, Da-es-Salaam
United Republic of Tanzania

| | |
|---|---|
| Contract Ref : Power Purchase Agreement Dated 26th May 1995 | TAX INVOICE NO : 34/2007/IPTL |
| Project     : I.P.T.L. 100 MW Diesel Power Station | |
| **SUPPLEMENTAL CHARGES**<br>**FOR THE MONTH ENDED 30TH SEPTEMBER 2007** | TIN NO :  100-184-690<br>VRN NO : 10-006583-H |

Period of the Invoice:
From    01.09.2007
To      30.09.2007

|  | TSH | | TSH |
|---|---|---|---|
| TOTAL SUPPLEMENTAL CHARGES | | | |
| EWURA REGULATORY LEVY | | | |
| Capacity Charges - Sept '07 | 3,630,392,774.00 | | |
| Energy Charges - | - | | |
| | 3,630,392,774.00 | | |
| Rate - 1% of gross revenues | 36,303,927.74 | | 36,303,927.74 |
| *Government Gazette No. 157* | | | |
| *of 17th November 2006* | | | |
| In Accordance with Article 5.4 of PPA | | | |
| TOTAL SUPPLEMENTAL CHARGES | | | 36,303,927.74 |
| | | | |
| TOTAL | | TSH | 36,303,927.74 |

PAYMENT BY TELEGRAPHIC TRANSFER / CHEQUE, IN TSH AT LEAST BY 31.10.2007.
IN ACCORDANCE WITH ARTICLE 6.10 OF THE PPA TO:
INDEPENDENT POWER TANZANIA LIMITED
ACCOUNT NO. 100222-043
CITIBANK TANZANIA LIMITED
PEUGEOT HOUSE, UPANGA ROAD
P.O.BOX 71625, DAR ES SALAAM
TANZANIA.

AUTHORISED SIGNATURE:

INDEPENDENT POWER TANZANIA LIMITED

Supplementary Charges EWURA Sept 07 - TANESCO.xls



**INDEPENDENT POWER TANZANIA LTD.**

OPERATIONS:
Plot No. 2291, 2292, 2293 and 296 Block 'D' Salasala, Tegeta
P.O. Box 77173 Dar Es Salaam, Tanzania
Tel: + 255 222 650750     Facsimile: + 255 222 650751
Email: admin@iptl.co.tz

Date : 1st October 2007

The Managing Director
Tanzania Electric Supply Company Limited
P.O. Box 9024, Dar-es-Salaam
United Republic of Tanzania

| Contract Re : Power Purchase Agreement Dated 26th May 1995 Project    : I.P.T.L 100 MW Diesel Power Station | TAX INVOICE NO : 33/2007/IPTL |
|---|---|
| **SUPPLEMENTAL CHARGES FOR THE MONTH ENDED 30TH SEPTEMBER 2007** | TIN NO : 100-184-999 WRN NO : 10-086583-H |

Period of the Invoice:
From    01.09.2007
To      30.09.2007

|  | USD | Rate ** | TSH |
|---|---|---|---|
| TOTAL SUPPLEMENTAL CHARGES |  |  |  |
| Workers Welfare Fund | 3,812.33 | 1,280.77 | 4,882,720.50 |
| City Service Levy |  |  |  |
| Pre-Shipment Inspection |  |  |  |
| In Accordance with Article 6.4 of PPA |  |  |  |
| TOTAL SUPPLEMENTAL CHARGES |  |  | 4,882,720.50 |

| TOTAL | TSH | 4,882,720.50 |
|---|---|---|

** Exchange Rate Average 6 months as per PPA App B 15.1

PAYMENT BY TELEGRAPHIC TRANSFER / CHEQUE, IN TSH AT LEAST BY 31.10.2007,
IN ACCORDANCE WITH ARTICLE 8.10 OF THE PPA TO:
INDEPENDENT POWER TANZANIA LIMITED
ACCOUNT NO. 100222-043
CITIBANK TANZANIA LIMITED
PEUGEOT HOUSE, UPANGA ROAD
P.O.BOX 71825, DAR ES SALAAM
TANZANIA.

AUTHORISED SIGNATURE :

INDEPENDENT POWER TANZANIA LIMITED

Suppliumntary Charges for Sept 07 - TANESCO n.3



**INDEPENDENT
POWER TANZANIA LTD.**

OPERATIONS:
Plot No. 292/1, 292/2, 292/3 and 296 Block '0' Salasala, Tegeta
P.O. Box 77173 Dar Es Salaam, Tanzania
Tel:  + 255 222 650730    Facsimile: + 255 222 650751
Email: admin@ipd.co.tz

Date :    1st October 2007

The Managing Director
Tanzania Electric Supply Company Limited
P.O. Box 9024, Dar-es-Salaam
United Republic of Tanzania

| Contract Re : Power Purchase Agreement Dated 26th May 1995 | TAX INVOICE NO : | 32/2007/IPTL |
|---|---|---|
| Project      : I.P.T.L. 100 MW Diesel Power Station | | |

CAPACITY CHARGES
FOR THE MONTH ENDED 30TH SEPTEMBER 2007

TIN NO :  100-184-950
VRN NO :  10-006583-h

Period of the Invoice:
      From    01.09.2007
      To       30.09.2007

TSH

TOTAL CAPACITY TARIFF
   In Accordance with Article 6.2 of PPA                         3,630,392,774.00

TOTAL CAPACITY TARIFF                         3,630,392,774.00

VAT AT 20% of Total Capacity Tariff as per letter from TRA ref.no 30-4/TIN100-183-47 1/4     NIL
   Sub-Total after VAT                           3,630,392,774.00

                            TOTAL      TSH     3,630,392,774.00

** Exchange Rate Average 6 months as per PPA App B 15.1

PAYMENT BY TELEGRAPHIC TRANSFER / CHEQUE, IN TSH AT LEAST BY 21.10.2007
IN ACCORDANCE WITH ARTICLE 6.10 OF THE PPA TO:
INDEPENDENT POWER TANZANIA LIMITED
   ACCOUNT NO. 100222-043
   CITIBANK TANZANIA LIMITED
   PEUGEOT HOUSE, UPANGA ROAD
   P.O.BOX 71625, DAR ES SALAAM
   TANZANIA.

AUTHORISED SIGNATURE:

INDEPENDENT POWER TANZANIA LIMITED

Cap Charge for Sept 07 - TANESCO.xls



**INDEPENDENT**
**POWER TANZANIA LTD.**

OPERATIONS.
Plot No. 2921, 2922, 2923 and 296 Block 'O' Salasala, Tegeta
P.O. Box 77173 Dar Es Salaam, Tanzania
Tel : + 255 222-650750    Facsimile: + 255 222-650751
Email: admin@ipll.co.tz

Date :    1st September 2007

The Managing Director
Tanzania Electric Supply Company Limited
P.O. Box 9024, Dar-es-Salaam
United Republic of Tanzania

| Contract Re : Power Purchase Agreement Dated 26th May 1995<br>Project     : I.P.T.L. 100 MW Diesel Power Station | TAX INVOICE NO : 31/2007/IPTL |
|---|---|
| **SUPPLEMENTAL CHARGES**<br>**FOR THE MONTH ENDED 31ST AUGUST 2007** | TIN NO : 100-184-950<br>VRN NO : 10-005591-H |

Period of the Invoice:
From    01.08.2007
To    31.08.2007

|  | TSH | | TSH |
|---|---|---|---|
| TOTAL SUPPLEMENTAL CHARGES |  | | |
| **EWURA REGULATORY LEVY** |  | | |
| Capacity Charges - Aug '07 | 3,630,392,774.00 | | |
| Energy Charges - | — | | |
| | 3,630,392,774.00 | | |
| Rate - 1% of gross revenues | 36,303,927.74 | | 36,303,927.74 |
| Government Gazette No. 157 | | | |
| of 17th November 2006 | | | |
| In Accordance with Article 9.4 of PPA | | | |
| TOTAL SUPPLEMENTAL CHARGES | | | 36,303,927.74 |
| | | | |
| TOTAL | | TSH | 36,303,927.74 |

PAYMENT BY TELEGRAPHIC TRANSFER / CHEQUE, IN TSH AT LEAST BY 01.10.2007.
IN ACCORDANCE WITH ARTICLE 9.18 OF THE PPA TO:
INDEPENDENT POWER TANZANIA LIMITED
ACCOUNT NO. 100222-042
CITIBANK TANZANIA LIMITED
PEUGEOT HOUSE, UPANGA ROAD
P.O.BOX 71625, DAR ES SALAAM
TANZANIA.

AUTHORISED SIGNATURE.

INDEPENDENT POWER TANZANIA LIMITED

Supplementary Charges EWURA Aug 07 - TANESCO.xls



# INDEPENDENT
# POWER TANZANIA LTD.

OPERATIONS
Plot No. 2921, 2922, 2923 and 296 Block 'D' Saldada, Tegeta
P.O. Box 77173 Dar Es Salaam, Tanzania
Tel: + 255 222 650750    Facsimile: + 255 222 650751
Email: admin@iptl.co.tz

Date: 1st September 2007

The Managing Director
Tanzania Electric Supply Company Limited
P.O. Box 9024, Da-es-Salaam
United Republic of Tanzania

Contract Ref : Power Purchase Agreement Dated 26th May 1995
Project      : I.P.T.L. 100 MW Diesel Power Station

TAX INVOICE NO : 3/02007/IPTL

**SUPPLEMENTAL CHARGES**
**FOR THE MONTH ENDED 31ST AUGUST 2007**

TIN NO : 100-164-898
VRN NO : 1P-000590-H

Period of the Invoice:
From  01.08.2007
To    31.08.2007

| | USD | Rate ** | TSH |
|---|---|---|---|
| TOTAL SUPPLEMENTAL CHARGES | | | |
| Workers Welfare Fund | 3,163.85 | 1,230.77 | |
| Car Service Levy | | | 3,887,553.50 |
| Pre-Shipment Inspection | | | |

In Accordance with Article 6.4 of PPA

TOTAL SUPPLEMENTAL CHARGES

3,887,553.50

TOTAL        TSH        3,887,553.50

** Exchange Rate Average 6 months as per PPA App E 18.1

PAYMENT BY TELEGRAPHIC TRANSFER / CHEQUE, IN TSH AT LEAST BY 21.10.2007
IN ACCORDANCE WITH ARTICLE 8.10 OF THE PPA TO:
INDEPENDENT POWER TANZANIA LIMITED
ACCOUNT NO: 100222-045
CITIBANK TANZANIA LIMITED
PEUGEOT HOUSE, UPANGA ROAD
P.O. BOX 71625, DAR ES SALAAM
TANZANIA

AUTHORISED SIGNATURE:

INDEPENDENT POWER TANZANIA LIMITED

Supplementary Charges for August - TANESCO.xls



# INDEPENDENT
# POWER TANZANIA LTD.

OPERATIONS
Plot No. 2980, 2982, 2923 and 296 Block 'D' Sulasati, Tegeta
P.O. Box 77173 Dar Es Salaam, Tanzania
Tel. + 255 222 650750    Facsimile + 255 222 650751
Email: admin@ipil.co.tz

Date :    1st September 2007

The Managing Director
Tanzania Electric Supply Company Limited
P.O. Box 9024, Dar-es-Salaam
United Republic of Tanzania

| Contract Re : Power Purchase Agreement Dated 26th May 1995 | TAX INVOICE NO : Z9/2007/IPTL |
| Project    : I.P.T.L. 100 MW Diesel Power Station | |
| **CAPACITY CHARGES** | TIN NO : 100-164-895 |
| **FOR THE MONTH ENDED 31ST AUGUST 2007** | VRN NO : 10-005583-H |

Period of the invoice:
From   01.08.2007
To     31.08.2007

|  | TSH |
| --- | --- |
| TOTAL CAPACITY TARIFF | |
| In Accordance with Article 8.2 of PPA | 3,630,392,774.00 |
| TOTAL CAPACITY TARIFF | 3,630,392,774.00 |
| VAT AT 20% of Total Capacity Tariff as per letter from TRA ref.no 30-4/TIN100-163-4774 | NIL |
| Sub-Total after VAT | 3,630,392,774.00 |
| | |
| TOTAL    TSH | 3,630,392,774.00 |

** Exchange Rate Average 6 months as per PPA App B 15.1

PAYMENT BY TELEGRAPHIC TRANSFER / CHEQUE, IN TSH AT LEAST BY 01.10.2007
IN ACCORDANCE WITH ARTICLE 9.10 OF THE PPA TO:
INDEPENDENT POWER TANZANIA LIMITED
ACCOUNT NO. 100222-043
CITIBANK TANZANIA LIMITED
PEUGEOT HOUSE, UPANGA ROAD
P.O.BOX 71625, DAR ES SALAAM
TANZANIA.

AUTHORISED SIGNATURE:

INDEPENDENT POWER TANZANIA LIMITED

Capacity Billing for Aug 07 - TANESCO.xls



**INDEPENDENT
POWER TANZANIA LTD.**

OPERATIONS:
Plot No. 252/1, 252/2, 252/3 and 256 Block 'D' Salasala, Togota
P.O. Box 77173 Dar Es Salaam, Tanzania
Tel: + 255 222 650750   Facsimile: + 255 222 650751
Email: aperan@iptl.co.tz

Date :   03.08.2007

The Managing Director
Tanzania Electric Supply Company Limited
P.O. Box 9024, Dar-es-Salaam
United Republic of Tanzania

| Contract Re : Power Purchase Agreement Dated 26th May 1995<br>Project    : I.P.T.L. 100 MW Diesel Power Station<br><br>CREDIT NOTE FOR THE MONTH ENDED 31ST JULY 2007 | CREDIT NOTE: CN03/2007<br><br>TIN NO : 100-184-599<br>VRN NO : 10-006583-H |
| --- | --- |

Period of the Credit Note:
    From    01.07.2007
    To    31.07.2007

TSH

Difference due to average exchange rate used earlier based on 30th Jan 07
corrected to reflect 31st Jan 07 exchange rate.
Invoice No. 27/2007/IPTL
EWURA REGULATORY LEVY

|  | TSH |  |
| --- | --- | --- |
| Capacity Charges - July 07 | 3,628,393,695.00 | |
| Capacity Charges Revised - July 07 | 3,627,227,706.00 | |
|  | 1,165,989.00 | |
| Rate 1% of gross revenue | 11,659.89 | 11,659.89 |

11,659.89

Exchange Rate Average 6 months as per PPA App B 15.1

NIL

Ex. Rate : 1290·77   $ 9·10   TSH   11,659.89

AUTHORISED SIGNATURE:

INDEPENDENT POWER TANZANIA LIMITED

Credit Note On EWURA July 07 Billing  T/0158/00



**INDEPENDENT POWER TANZANIA LTD.**

OPERATIONS:
Plot No. 2921, 2922, 2923 and 296 Block 'D' Sotasuta, Tegeta
P.O. Box 77173 Dar Es Salaam, Tanzania
Tel: + 255 222 650750    Facsimile: + 255 222 650751
Email: admin@ipd.co.tz

Date :   1st August 2007

The Managing Director
Tanzania Electric Supply Company Limited
P.O. Box 9024, Dar-es-Salaam
United Republic of Tanzania

| Contract Re : Power Purchase Agreement Dated 26th May 1995<br>Project    : I.P.T.L. 100 MW Diesel Power Station | TAX INVOICE NO : 27/2007/IPTL |
| --- | --- |
| **SUPPLEMENTAL CHARGES**<br>**FOR THE MONTH ENDED 31ST JULY 2007** | TIN NO : 100-184-850<br>VRN NO : 10-000882-H |

Period of the Invoice:
From   01.07.2007
To    31.07.2007

|  | TSH |  | TSH |
| --- | --- | --- | --- |
| TOTAL SUPPLEMENTAL CHARGES |  |  |  |
| EWURA REGULATORY LEVY |  |  |  |
| Capacity Charges - July '07 | 3,628,393,696.00 |  |  |
| Energy Charges - |  |  |  |
|  | 3,628,393,695.00 |  |  |
| Rate - 1% of gross revenues. | 36,283,936.95 |  | 36,283,936.95 |
| Government Gazette No. 157 |  |  |  |
| of 17th November 2006 |  |  |  |
| In Accordance with Article 6.4 of PPA |  |  |  |
| TOTAL SUPPLEMENTAL CHARGES |  |  | 36,283,936.95 |

|  | TOTAL | TSH | 36,283,936.95 |
| --- | --- | --- | --- |

PAYMENT BY TELEGRAPHIC TRANSFER / CHEQUE, IN TSH AT LEAST BY 31.08.2007,
IN ACCORDANCE WITH ARTICLE 6.10 OF THE PPA TO:
INDEPENDENT POWER TANZANIA LIMITED
ACCOUNT NO. 100222-043
CITIBANK TANZANIA LIMITED
PEUGEOT HOUSE, UPANGA ROAD
P.O.BOX 71625, DAR ES SALAAM
TANZANIA.

AUTHORISED SIGNATURE

INDEPENDENT POWER TANZANIA LIMITED

Supplementary Charges EWURA Jul 07 - TANS.DOC

# INDEPENDENT
# POWER TANZANIA LTD.

OPERATIONS:
Plot No. 292/1, 292/2, 292/3 and 295 Block 'D' Salasala, Tegeta
P.O. Box 77173 Dar Es Salaam, Tanzania
Tel: + 255 222 650790      Facsimile: + 255 222 650751
Email: admin@ipt.co.tz

Date :   1st August 2007

The Managing Director
Tanzania Electric Supply Company Limited
P.O. Box 9024, Dar-es-Salaam
United Republic of Tanzania

| Contract Re : Power Purchase Agreement Dated 26th May 1995 | TAX INVOICE NO : 28/2007/IPTL |
| Project      : I.P.T.L. 100 MW Diesel Power Station | |
| | |
| **SUPPLEMENTAL CHARGES** | TIN NO : 100-104-900 |
| **FOR THE MONTH ENDED 31ST JULY 7007** | VRN NO : 10-008593-H |

Period of the invoice:
          From   01.07.2007
          To     31.07.2007

|  | | | | TSH |
|---|---|---|---|---|
| | **USD** | Rate ** | | |
| TOTAL SUPPLEMENTAL CHARGES | | | | |
|   Workers Welfare Fund | 3,169.85 | 1,281.18 | | 4,061,149.00 |
|   City Service Levy | 533.52 | 1,281.18 | | 683,279.00 |
|   Pre-Shipment Inspection | *373.17* | | | |
| | | | | |
| In Accordance with Article 6.4 of PPA | | | | |
| | | | | |
| TOTAL SUPPLEMENTAL CHARGES | | | | 4,744,428.00 |
| | | | | |
| | TOTAL | TSH | | 4,744,428.00 |

** Exchange Rate Average 6 months as per PPA App B 16.1

PAYMENT BY TELEGRAPHIC TRANSFER / CHEQUE, IN TSH AT LEAST BY 31.08.2007,
IN ACCORDANCE WITH ARTICLE 6.19 OF THE PPA TO:
INDEPENDENT POWER TANZANIA LIMITED
ACCOUNT NO. 100222-043
CITIBANK TANZANIA LIMITED
PEUGEOT HOUSE, UPANGA ROAD
P.O.BOX 71625, DAR ES SALAAM
TANZANIA.

AUTHORISED SIGNATURE:

INDEPENDENT POWER TANZANIA LIMITED

Supplementary Charges for Jul 07 - TANESCO

**INDEPENDENT POWER TANZANIA LTD.**

OPERATIONS:
Plot No. 293/1, 293/2, 2923 and 295 Block 'D' Sabasaa, Toyota
P.O. Box 77173 Dar Es Salaam, Tanzania
Tel: + 255 222 650750   Facsimile: + 255 222 650751
Email: admin@iptl.co.tz

Date :   03.08.2007

The Managing Director
Tanzania Electric Supply Company Limited
P.O. Box 9024, Dar-es-Salaam
United Republic of Tanzania

| | |
|---|---|
| Contract Re : Power Purchase Agreement Dated 26th May 1995<br>Project   : I.P.T.L. 100 MW Diesel Power Station<br><br>**CREDIT NOTE FOR THE MONTH ENDED 31ST JULY 2007** | **CREDIT NOTE:** CN02/2007<br><br>TIN NO : 100-164-590<br>VRN NO : 10-005563-H |

Period of the Credit Note:
From    01.07.2007
To    31.07.2007

TSH

Difference due to average exchange rate used earlier based on 30th Jan 07
corrected to reflect 31st Jan 07 exchange rate.
Invoice No  25/2007/IPTL                                                1,165,988.00

1,165,988.00

Exchange Rate Average 6 months as per PPA App 6.15 1                        NIL

TSH       1,165,988.00

Exchange Rate : 1280.77      # 910.38

AUTHORISED SIGNATURE:

INDEPENDENT POWER TANZANIA LIMITED

Credit Note On Session July 07  Billing - TANESCO



# INDEPENDENT
# POWER TANZANIA LTD.

OPERATIONS:
Plot No. 2931, 2932, 2903 and 296 Block 'D' Salasala, Togara.
P.O. Box 77173 Dar Es Salaam, Tanzania
Tel: + 255 222 660750    Facsimile: + 255 222 660751
Email: admin@ipti.co.tz

Date :    1st August 2007

The Managing Director
Tanzania Electric Supply Company Limited
P.O. Box 9024, Dar-es-Salaam
United Republic of Tanzania

| Contract Re : Power Purchase Agreement Dated 26th May 1995 | TAX INVOICE NO : 25/2007/IPTL |
| Project    : I.P.T.L. 100 MW Diesel Power Station | |
| **CAPACITY CHARGES** | TIN NO : 100-181-950 |
| **FOR THE MONTH ENDED 31ST JULY 2007** | VRN NO : 10-006583-H |

Period of the Invoice:
From    01.07.2007
To    31.07.2007

TSH

TOTAL CAPACITY TARIFF
In Accordance with Article 6.2 of PPA          3,828,393,695.00

TOTAL CAPACITY TARIFF                         3,828,393,695.00

VAT AT 20% of Total Capacity Tariff as per letter from TRA ref.no 33-4/TIN100-183-471/4     NIL
    Sub-Total after VAT                       3,828,393,695.00

TOTAL          TSH          3,828,393,695.00

** Exchange Rate Average 6 months as per FPA App B (5.1)

PAYMENT BY TELEGRAPHIC TRANSFER / CHEQUE, IN TSH AT LEAST BY 31.08.2007
IN ACCORDANCE WITH ARTICLE 6.10 OF THE PPA TO:
INDEPENDENT POWER TANZANIA LIMITED
ACCOUNT NO. 100222-013
CITIBANK TANZANIA LIMITED
PEUGEOT HOUSE, UPANGA ROAD
P.O.BOX 71625, DAR ES SALAAM
TANZANIA.

AUTHORISED SIGNATURE:

INDEPENDENT POWER TANZANIA LIMITED

Capacity Billing for Jul 07 - TANESCO



**INDEPENDENT
POWER TANZANIA LTD.**

OPERATIONS:
Plot No. 292/1, 292/2, 292/3 and 296 Block 'O' Solaesia, Tegeta
P.O. Box 77173 Dar Es Salaam, Tanzania
Tel : 255 222 650750    Facsimile : + 255 222 650751
Email: admin@iptl.co.tz

Date :    10th July 2007

The Managing Director
Tanzania Electric Supply Company Limited
P.O. Box 9024, Dar-es-Salaam
United Republic of Tanzania

| Contract Re : Power Purchase Agreement Dated 26th May 1995<br>Project     : I.P.T.L. 100 MW Diesel Power Station | TAX RIVOICE NO : 28/2007/IPTL |
|---|---|
| **INTEREST CHARGE** | TRI NO : 100-164-959<br>VRI NO : 10-008583-J1 |

Period of the Invoice:
From    15.01.2002
To    30.06.2007

USD

TOTAL INTEREST
Interest                                                                 2,216,514.85

In Accordance with Article G 7(b) of PPA

TOTAL INTEREST                                                           2,216,514.85

Sub-Total after VAT                                                          -

2,216,514.85

Exchange Rate Average 6 months as per PPA App B 15.1          1,294.42

TSH    2,069,161,192

PAYMENT BY TELEGRAPHIC TRANSFER / CHEQUE, AT LEAST BY 30.08.2007 TO :
INDEPENDENT POWER TANZANIA LIMITED
ACCOUNT NO. 108222-019 for USD remittance
ACCOUNT NO. 108222-027 for TSH remittance
CITIBANK TANZANIA LIMITED
PEUGEOT HOUSE, UPANGA ROAD
P.O.BOX 71625, DAR ES SALAAM
TANZANIA.

AUTHORISED SIGNATURE:

INDEPENDENT POWER TANZANIA LIMITED

Interest Charges for July 2007 - TANESCO



**INDEPENDENT
POWER TANZANIA LTD.**

OPERATIONS:
Plot No. 292/1, 292/2, 292/3 and 295 Block 'D' Salasala, Tegeta
P.O. Box 77173 Dar Es Salaam, Tanzania
Tel: + 255 222 650750    Facsimile: + 255 222 650751
Email: admin@iptl.co.tz

Date :    1st July 2007

The Managing Director
Tanzania Electric Supply Company Limited
P.O. Box 9024, Dar-es-Salaam
United Republic of Tanzania

| | |
|---|---|
| Contract Re : Power Purchase Agreement Dated 26th May 1995<br>Project    : I.P.T.L. 100 MW Diesel Power Station | TAX INVOICE NO : 24/2007IPTL |
| <u>EXPENSES INCURRED FOR THE GAS CONVERSION MEETINGS</u> | TIN NO : 100-184-890<br>VRN NO : 10-006585-H |

Period of the Invoice:
From    24.10.2006
To    22.03.2007

TSH

<u>EXPENSES INCURRED FOR THE GAS CONVERSION MEETINGS</u>
Details as attached summary with supporting documents
Amount Payable in USD 26,748.08 x 1277.13 (dated 20th Jun 2007)

34,150,775.00

TOTAL    TSH    34,150,775.00

PAYMENT BY TELEGRAPHIC TRANSFER / CHEQUE, IN TSH AT LEAST BY 31.07.2007,
IN ACCORDANCE WITH ARTICLE 6.10 OF THE PPA TO:
INDEPENDENT POWER TANZANIA LIMITED
ACCOUNT NO. 100222-043
CITIBANK TANZANIA LIMITED
PEUGEOT HOUSE, UPANGA ROAD
P.O. BOX 71625, DAR ES SALAAM
TANZANIA.

AUTHORISED SIGNATURE:

INDEPENDENT POWER TANZANIA LIMITED

Bill Cost for Gas Conversion



# INDEPENDENT
# POWER TANZANIA LTD.

OPERATIONS:
Plot No. 222/1, 292/2, 292/3 and 298 Block 'D' Salasela, Tegeta
P.O. Box 77173 Dar Es Salaam, Tanzania
Tel: + 255 222 650750    Facsimile: + 255 222 650751
Email: admin@ipil.co.tz

Date :    1st July 2007

The Managing Director
Tanzania Electric Supply Company Limited
P.O. Box 9024, Dar-es-Salaam
United Republic of Tanzania

| Contract Re : Power Purchase Agreement Dated 26th May 1995 | TAX INVOICE NO : 23/2007/IPTL |
| Project    : I.P.T.L. 100 MW Diesel Power Station | |
| | TIN NO : 100-154-896 |
| SUPPLEMENTAL CHARGES | VRN NO : 10-006565-H |
| FOR THE MONTH ENDED 30TH JUNE 2007 | |

Period of the Invoice:
From   01.06.2007
To   30.06.2007

|  | **TSH** |  | **TSH** |
|---|---|---|---|
| TOTAL SUPPLEMENTAL CHARGES | | | |
| EWURA REGULATORY LEVY | | | |
| Capacity Charges - June '07 | 3,673,311,234.00 | | |
| Energy Charges - June '07 | 24,449,376.00 | | |
| | 3,697,760,610.00 | | |
| Rate - 1% of gross revenues | 36,977,606.10 | | 36,977,606.10 |
| *Government Gazette No. 157* | | | |
| *of 17th November 2006* | | | |
| In Accordance with Article 5.4 of PPA | | | |
| TOTAL SUPPLEMENTAL CHARGES | | | 36,977,606.10 |

|  | TOTAL | TSH | 36,977,606.10 |
|---|---|---|---|

PAYMENT BY TELEGRAPHIC TRANSFER / CHEQUE, IN TSH AT LEAST BY 31.07.2007.
IN ACCORDANCE WITH ARTICLE 6.10 OF THE PPA TO:
INDEPENDENT POWER TANZANIA LIMITED
ACCOUNT NO. 100222-042
CITIBANK TANZANIA LIMITED
PEUGEOT HOUSE, UPANGA ROAD
P.O.BOX 71625, DAR ES SALAAM
TANZANIA.

AUTHORISED SIGNATURE:

INDEPENDENT POWER TANZANIA LIMITED



**INDEPENDENT
POWER TANZANIA LTD.**

OPERATIONS:
Plot No. 2821, 2822, 2823 and 296 Block 'D' Sahasala, Tegeta
P.O. Box 77173 Dar Es Salaam, Tanzania
Tel: + 255 222 660780    Facsimile: + 255 222 660751
Email: admin@iptl.co.tz

Date :   1st July 2007

The Managing Director
Tanzania Electric Supply Company Limited
P.O. Box 9024, Dar-es-Salaam
United Republic of Tanzania

| Contract Re : Power Purchase Agreement Dated 26th May 1995<br>Project      : I.P.T.L. 100 MW Diesel Power Station | TAX INVOICE NO : 23/2007SPTL |
| --- | --- |
| **SUPPLEMENTAL CHARGES**<br>**FOR THE MONTH ENDED 30TH JUNE 2007** | TIN NO : 100-154-890<br>VRN NO : 10-006583-N |

Period of the Invoice:
From   01.06.2007
To      30.06.2007

|                                   | USD      | Rate **  | TSH          |
| --- | --- | --- | --- |
| TOTAL SUPPLEMENTAL CHARGES        |          |          |              |
|   Workers Welfare Fund  | 3,023.15 | 1,299.45 | 3,928,524.50 |
|   City Service Levy     |          |          |              |
|   Pre-Shipment Inspection |        |          |              |

In Accordance with Article 9.4 of PPA

| TOTAL SUPPLEMENTAL CHARGES |  |  | 3,928,524.50 |
| --- | --- | --- | --- |

|       |  | TSH | 3,928,524.50 |
| --- | --- | --- | --- |
| TOTAL |  |     |              |

** Exchange Rate Average 6 months as per PPA App B 15.1

PAYMENT BY TELEGRAPHIC TRANSFER / CHEQUE, IN TSH AT LEAST BY 31.07.2007.
IN ACCORDANCE WITH ARTICLE 6.10 OF THE PPA TO:
INDEPENDENT POWER TANZANIA LIMITED
ACCOUNT NO. 109222-043
CITIBANK TANZANIA LIMITED
PEUGEOT HOUSE, UPANGA ROAD
P.O.BOX 71625, DAR ES SALAAM
TANZANIA.

AUTHORISED SIGNATORE:

INDEPENDENT POWER TANZANIA LIMITED



**INDEPENDENT POWER TANZANIA LTD.**

OPERATIONS:
Plot No. 292/1, 292/2, 298/3 and 298 Block 'D' Salasala, Tegeta
P.O. Box 77173 Dar Es Salaam, Tanzania
Tel: + 255 222 650750    Facsimile: + 255 222 650751
Email: admin@ipt.co.tz

Date :    1st July 2007

The Managing Director
Tanzania Electric Supply Company Limited
P.O. Box 9024, Da-es-Salaam
United Republic of Tanzania

| Contract Re : Power Purchase Agreement Dated 26th May 1995 | TAX INVOICE NO : | 21/2007/IPTL |
| --- | --- | --- |
| Project    : I.P.T.L. 100 MW Diesel Power Station | | |

**ENERGY CHARGES**
**FOR THE MONTH ENDED 30TH JUNE 2007**

TIN NO : 100-194-990
VRN NO : 10-008523-H

Period of the Invoice:
        From   01.06.2007
        To   30.06.2007

|  | **TSH** |
| --- | --- |
| TOTAL ENERGY TARIFF | |
| In Accordance with Article 5.1 of PPA | 24,449,376.00 |
| TOTAL ENERGY TARIFF | 24,449,376.00 |
| VAT AT 20% of Total Energy Tariff | 4,889,875.00 |
| Sub-Total after VAT | 29,339,251.00 |
| TOTAL        TSH | 29,339,251.00 |

** Exchange Rate Average 6 months as per PPA App 8 15.1

PAYMENT BY TELEGRAPHIC TRANSFER / CHEQUE, IN TSH AT LEAST BY 31.07.2007
IN ACCORDANCE WITH ARTICLE 5.10 OF THE PPA TO:
INDEPENDENT POWER TANZANIA LIMITED
ACCOUNT NO. 100222-048
CITIBANK TANZANIA LIMITED
PEUGEOT HOUSE, UPANGA ROAD
P.O.BOX 71625, DAR Es SALAAM
TANZANIA.

AUTHORISED SIGNATURE:

INDEPENDENT POWER TANZANIA LIMITED

Energy Billing for Jun 07 - TANEPOS



**INDEPENDENT POWER TANZANIA LTD.**

OPERATIONS:
Plot No. 292/1, 292/2, 292/3 and 298 Block 'D' Satonia, Tegeta
P.O. Box 77173 Dar Es Salaam, Tanzania
Tel: + 255 222 650750   Facsimile: + 255 222 650751
Email: admin@iptl.co.tz

Date :   1st July 2007

The Managing Director
Tanzania Electric Supply Company Limited
P.O. Box 9024, Dar-es-Salaam
United Republic of Tanzania

| | |
|---|---|
| Contract Re : Power Purchase Agreement Dated 26th May 1995<br>Project    : I.P.T.L. 100 MW Diesel Power Station | TAX INVOICE NO :     20/2007/IPTL |
| **CAPACITY CHARGES**<br>**FOR THE MONTH ENDED 30TH JUNE 2007** | TIN NO : 100-184-960<br>VRN NO : 10-006663-H |

Period of the Invoice:
From   01.06.2007
To     30.06.2007

|  | **TSH** |
|---|---|
| TOTAL CAPACITY TARIFF<br>In Accordance with Article 6.2 of PPA | 3,673,311,234.00 |
| TOTAL CAPACITY TARIFF | 3,673,311,234.00 |
| VAT AT 20% of Total Capacity Tariff as per letter from TRA ref.no 20-47/N100-163-471/4 | **NIL** |
| Sub-Total after VAT | 3,673,311,234.00 |
| **TOTAL**                                        TSH | 3,673,311,234.00 |

" Exchange Rate Average 6 months as per PPA App B 15.1

PAYMENT BY TELEGRAPHIC TRANSFER / CHEQUE IN TSH AT LEAST BY 21.07.2007
IN ACCORDANCE WITH ARTICLE 6.10 OF THE PPA TO:
    INDEPENDENT POWER TANZANIA LIMITED
    ACCOUNT NO. 100222-043
    CITIBANK TANZANIA LIMITED
    PEUGEOT HOUSE, UFANGA ROAD
    P.O.BOX 71625, DAR ES SALAAM
    TANZANIA.

AUTHORISED SIGNATURE:

INDEPENDENT POWER TANZANIA LIMITED

# EXHIBIT E

Gentlemen

I am in receipt of your email of December 4, 2006 with the attached copy of the Tegeta working model adjusted for the November 2006 invoice.

There has been a small decline in the Lenders Interest Rate this month from 7.54813% to 7.40%. As a result, the Capacity Payment has declined by US$ 2,631.72 this month relative to the Capacity Payment for October. IPTL has made no other changes to the key factors used in the invoice calculation.

I note that, during November, 10,484.428 tonnes of fuel oil were purchased at US$ 370.65 per tonne. The total energy delivered by the Tegeta plant in September was on 63,746.6 MW.h, a plant factor of about 85.6%. The incremental cost of energy from Tegeta during September was 9.124 US cents per kW.h or about Tsh 112.5 per kW.h. As expected, the cost of fuel oil is declining and the incremental cost of energy from the Tegeta plant is also declining from the highs reached in September this year.

I note that after several months of invoices, IPTL are passing through a significant Destination Inspection Fee of US$ 412,784.85. As this is the first such pass-through charge in several months, I urge TANESCO to obtain supporting documentation from IPTL.

Based on the data I have been given, I conclude that the calculation of the invoice amount is correct. The table attached summarizes my numerical observations.

I hope this review has been useful.

With best wishes


Martin Swales

Review of the November 2006 Invoice Data

| Issue | IPTL Value | TANESCO Value | Comment |
|---|---|---|---|
| Date for US CPI Application | 31-May-06 | 31-May-06 | Agreed |
| Date for US$ to TSh Exchange Application | 30-June-06 | 30-June-06 | Agreed |
| Update of Risk Insurance Rates | Unchanged from Jan '06 | | None expected |
| Change in Lender's Interest Rate | Change from 7.54813% to 7.40% | | No Comment |
| Update of the 3-mo LIBOR Rate | 5.50% | Updated per agreements | Agreed |
| Recalibrate the Model | No | No | Agreed |
| Add new fuel purchase data | 10,484.428 tonnes @ $370.65 | | No comment |
| Monthly Energy Sales, MW.h | 63,746.6 MW.h | No Independent Data | No Comment |
| Change to the Dependable Capacity | None | No Independent Data | No Comment |
| Supplemental Charges | $3,966.61 $0 | No Independent Data | Workers Welfare Fund, City Services Levy |
| Destination Inspection Fees (DIF) | $412,784.85 | No Independent Data | TANESCO to obtain supporting documentation |

Gentlemen

I am in receipt of the email of February 1 from IPTL and the attached working model, Tegeta Jan 07.xls, of the invoice for January 2007. I have checked all of the adjustments made by IPTL and find them to be consistent with the Agreements. I offer the following observations.

The Lender's interest rate for their debt has not changed from the value of 7.40% set at November 1, 2006. IPTL has updated the US CPI record to December 2006 with the data available on the US Government web site and the model has been updated to reflect escalation to November 2006. IPTL has updated the value of LIBOR at January 15 2007 to 5.36025% and this is the same as the record available from the British Banking website. The exchange rate data for spot sales of Tanzania Shillings at the end of each month has been updated and that the date for the calculation of the average exchange rate has been adjusted to December 2006. Although the Shilling strengthened relative to the US$ during late 2006, the exchange rate has since declined so that the rate used by IPTL, that is the average exchange during the period July-Dec 2006, is below the exchange rate effective January 31, 2007.

I note that the rate for insurance have increased very marginally for CEND but the rates for War Risk and for Currency Inconvertibility remain effectively unchanged. Overall, the total risk insurance premiums have decreased by $51,850 for the 6-mo period from January through June 2007.

I note that IPTL has made the necessary manual fixes to values in certain cells of the EBITDA and Current Expenses sheets in the correct order. IPTL has also recalibrated the model to deliver the target return of 22.31% on imputed lender's equity.

I note that Tegeta was dispatched at 20.6% for a total energy delivery of 15,637.8 MW.h, a rate that is well below its' capability. IPTL did not purchased any fuel during January.

The Workers Welfare Fund charge for January 2007 was $4,880.57 and the City Service Levy was $43,073.93. The EWURA levy equal to 1% of the monthly invoice before VAT is $42,290.34. There are no pre-shipment Inspection Charges in the invoice. I shall assume that TANESCO will have seen the invoices for these Supplemental Charges.

I hope that this review has been helpful.
With best wishes
Martin Swales

Review of the January 2007 Invoice Data

| Issue | IPTL Value | TANESCO Value | Comment |
|---|---|---|---|
| Date for US CPI Application | 30-Nov-06 | 30-Nov-06 | Agreed |
| Date for US$ to TSh Exchange Application | 31-Dec-06 | 31-Dec-06 | Agreed |
| Update of Risk Insurance Rates | CEND rate from 1.4941% to 1.4970% War Risk & Currency Risk unchanged | | Some change was expected |
| Update of the 3-mo LIBOR Rate | 5.36025% | 5.36025% | Agreed |
| Recalibrate the Model | Yes | Yes | Agreed |
| Add new fuel purchase data | None | | |
| Monthly Energy Sales, MW.h | 15,837.8 MW.h | No Independent Data | No Comment |
| Update the Debt Interest Rate | 7.40% | | No Change from November 2006 rate |
| Change to the Dependable Capacity | None | No Independent Data | No Comment |
| Supplemental Charges | $4,880.57 $43,073.93 | No Independent Data | Workers Welfare Fund & City Services Levy |
| Pre-Shipment Inspection Charges | $0.00 | | No Comment |
| EWURA Levy, 1% | $42,290.34 | | No Comment |

Gentlemen

I apologize for the delay in responding but I have been away.

I am in receipt of your email of May 3, 2007 with the attached copy of the Tegeta working model adjusted for the April 2007 invoice.

There has been no further change in the Lenders Interest Rate this month from the rate of 7.40063% that was set on February 1, 2007. IPTL has made no other changes to the key factors used in the invoice calculation.

IPTL has included a small fuel oil purchase made effective on March 31 2007 in the amount of 840.249 tonnes at $362.46. The fuel purchased by IPTL in December 2006 at $355.67/tonne has been sufficient for all energy delivered so far in 2007 so the higher 2007 fuel costs have yet to be reflected in the 2007 energy charges. The total energy delivered by the Tegeta plant in April was only 1,794.5 MW.h and the incremental cost of energy from Tegeta was the same as the cost in February, i.e. 8.72 US cents per kW.h or about Tsh 113.3 per kW.h.

The invoice does not include any charges for Destination Inspection Fees. Based on the data I have been given, I conclude that the calculation of the invoice amount for April 2007 is correct. The table attached summarizes my numerical observations.

I hope this review has been useful.

With best wishes

Martin Swales

Review of the April 2007 Invoice Data

| Issue | IPTL Value | TANESCO Value | Comment |
|---|---|---|---|
| Date for US CPI Application | 30-Nov-06 | 30-Nov-06 | Agreed |
| Date for US$ to TSh Exchange Application | 31-Dec-06 | 31-Dec-06 | Agreed |
| Update of Risk Insurance Rates | Unchanged from Jan '07 | | None expected |
| Change in Lender's Interest Rate | 7.40063% set on Feb 1 '07 | | No comment |
| Update of the 3-mo LIBOR Rate | 5.36025% | | Agreed |
| Recalibrate the Model | No | No | Agreed |
| Add new fuel purchase data | 840.249 @ $362.46 | | No comment |
| Monthly Energy Sales, MW.h | 1,794.5 MW.h | No Independent Data | No Comment |
| Change to the Dependable Capacity | None | No Independent Data | No Comment |
| Supplemental Charges | $3,232.43 $0 | No Independent Data | Workers Welfare Fund, City Services Levy |
| Destination Inspection Fees (DIF) | $0.00 | No Independent Data | |
| EWURA Regulatory Levy (1%) | $29,837.85 | Ref: GOT Gazette #157 | |

Gentlemen

I am in receipt of your email of September 4, 2007 with the attached copy of the Tegeta working model adjusted for the August 2007 invoice.

There has been no change in the Lenders Interest rate in August and IPTL has made no other changes to the key factors used in the invoice calculation.

IPTL has added no more fuel oil since May 31, 2007. During August, Tegeta delivered no energy so the energy part of the invoice is zero.

The invoice does not include any charges for Destination Inspection Fees.

I note that the invoice has an EWURA Regulatory Levy calculated based on the total invoice whereas I recall that the amount of the same levy on the Songas invoice was determined based only on the energy component of the invoice. I recommend that this issue be reconciled to be consistent on all invoices for power and energy from IPP's.

With the foregoing caveat, I conclude that the calculation of the base invoice amount for August 2007 is correct. The table attached summarizes my numerical observations.

I hope this review has been useful.

With best wishes

Martin Swales

Review of the August 2007 Invoice Data

| Issue | IPTL Value | TANESCO Value | Comment |
|---|---|---|---|
| Date for US CPI Application | 31-May-07 | 31-May-07 | Agreed |
| Date for US$ to TSh Exchange Application | 30-June-07 | 30-June-07 | Agreed |
| Update of Risk Insurance Rates | Unchanged from Jan '07 | | None expected |
| Change in Lender's Interest Rate | 7.36% effective May 1, 2007 | | No change |
| Update of the 3-mo LIBOR Rate | 5.36% | | Agreed |
| Recalibrate the Model | No | No | Agreed |
| Add new fuel purchase data | 0 tonnes | | |
| Monthly Energy Sales, MW.h | 0 MW.h | No Independent Data | No Comment |
| Change to the Dependable Capacity | None | No Independent Data | No Comment |
| Supplemental Charges | $3,035.32 | No Independent Data | Workers Welfare Fund, |
| Destination Inspection Fees (DIF) | $0.00 | No Independent Data | |
| EWURA Regulatory Levy (1%) | $28,345.47 | Ref: GOT Gazette #157 | Note comment in text above |

Gentlemen

I am in receipt of your email of August 1, 2007 with the attached copy of the Tegeta working model adjusted for the July 2007 invoice. In July, the spreadsheet must be updated and re-calibrated in accordance with the PPA and the provisions of the ICSID award.

There was no change in the Lenders Interest rate in July. IPTL has made the changes to the key input data and other factors used in the invoice calculation generally in accordance with the Agreements.

However, I note that the exchange rate used for the end of January 2007 was taken from January 30th whereas the agreements require that the value on last business day of the month be used. IPTL has entered a value of 1316.92 whereas the value on January 31st was 1314.45. There is a small but measurable difference in the exchange rate that is to be used for the July 2007 through December 2007 period. Unless there are reasons for using the January 30th exchange rate that I am unaware of, I recommend that the model be corrected with the exchange rate for January 31st, 2007.

In the recalibration of the rate of return, the tolerance accepted by IPTL for the adjustment factor results in a slightly higher Capital Component than is the case when a more accurate adjustment factor is used. Again, I recommend that the3 more accurate figure be adopted.

For your assistance, I have included a copy of my revised spreadsheet for July 2007.

IPTL has added no more fuel oil since May 2007. During July 2007, Tegeta was not dispatched at all. The invoice does not include any charges for Destination Inspection Fees.

Based on the data I have been given, I conclude that the calculation of the invoice amount for July 2007 is slightly high as summarized below.

| Invoice Item | IPTL Value, TSh | Revised Amount, TSh | Difference |
|---|---|---|---|
| Capital Component | 1,965,907,153 | 1,965,275,353 | -1,165,988 |
| | | | |
| Total Invoice | 3,669,422,053 | 3,668,242,880 | -1,179,173 |

I hope this review has been useful.

With best wishes

Martin Swales

Review of the July 2007 Invoice Data

| Issue | IPTL Value | TANESCO Value | Comment |
|---|---|---|---|
| Date for US CPI Application | 31-May-07 | 31-May-07 | Agreed |
| Date for US$ to TSh Exchange Application | 30-June-07 | 30-June-07 | Agreed |
| Update of Risk Insurance Rates | Unchanged from Jan '07 | | None expected |
| Change in Lender's Interest Rate | 7.36% effective May 1, 2007 | | No change |
| Update of the 3-mo LIBOR Rate | 5.36% | | Agreed |
| Recalibrate the Model | Yes | Yes | TANESCO recommends using a more accurate IRR adjustment factor |
| Add new fuel purchase data | None | | |
| Monthly Energy Sales, MW.h | 0 MW.h | | No Comment |
| Change to the Dependable Capacity | None | No Independent Data | No Comment |
| Supplemental Charges | $3,169.85 $533.32 | No Independent Data | Workers Welfare Fund, City Service Levy |
| Destination Inspection Fees (DIF) | $0.00 | No Independent Data | |
| EWURA Regulatory Levy (1%) | $28,320.75 | Ref: GOT Gazette #157 | |

Gentlemen

I am in receipt of your email of July 10, 2007 with the attached copy of the Tegeta working model adjusted for the June 2007 invoice.

There has been no change in the Lenders Interest rate in June and IPTL has made no other changes to the key factors used in the invoice calculation.

IPTL has added fuel oil effective May 31, 2007. An amount of 1,516.73 tonnes were received at a unit price of US$362.36. However, the Tegeta plant has been dispatched at very low rates since December 2006 so the fuel cost for energy is still based on the price paid for fuel in December 2006. During June, Tegeta delivered only 215.8 MW.h. I note that IPTL has fuel stocks of over 11,000 tonnes as at June 30, 2007.

The invoice does not include any charges for Destination Inspection Fees. Based on the data I have been given, I conclude that the calculation of the invoice amount for June 2007 is correct. The table attached summarizes my numerical observations.

I hope this review has been useful.

With best wishes

Martin Swales

Review of the June 2007 Invoice Data

| Issue | IPTL Value | TANESCO Value | Comment |
|---|---|---|---|
| Date for US CPI Application | 30-Nov-06 | 30-Nov-06 | Agreed |
| Date for US$ to TSh Exchange Application | 31-Dec-06 | 31-Dec-06 | Agreed |
| Update of Risk Insurance Rates | Unchanged from Jan '07 | | None expected |
| Change in Lender's Interest Rate | 7.36% effective May 1, 2007 | | No comment |
| Update of the 3-mo LIBOR Rate | 5.36025% | | Agreed |
| Recalibrate the Model | No | No | Agreed |
| Add new fuel purchase data | 1,516.73 tonnes @ $362.36 | | |
| Monthly Energy Sales, MW.h | 215.80 MW.h | No Independent Data | No Comment |
| Change to the Dependable Capacity | None | No Independent Data | No Comment |
| Supplemental Charges | $3,023.15 | No Independent Data | Workers Welfare Fund, |
| Destination Inspection Fees (DIF) | $0.00 | No Independent Data | |
| EWURA Regulatory Levy (1%) | $28,455.67 | Ref: GOT Gazette #157 | |

Gentlemen

I am in receipt of your email of April 4, 2007 with the attached copy of the Tegeta working model adjusted for the March 2007 invoice.

There has been no further change in the Lenders Interest Rate this month from the rate of 7.40063% that was set on February 1, 2007.  IPTL has made no other changes to the key factors used in the invoice calculation.

IPTL has included two purchases of fuel oil made February 2007; the first in the amount of 4,017.069 tonnes at $361.35 and the second 4,595.766 tonnes at $397.36.  The fuel purchased by IPTL in December 2006 at $355.67/tonne has been sufficient for all energy delivered so far in 2007 so the higher 2007 fuel costs have yet to be reflected in the 2007 energy charges.  The total energy delivered by the Tegeta plant in March was only 3,485.5 MW.h and the incremental cost of energy from Tegeta was the same as the cost in February, i.e. 8.72 US cents per kW.h or about Tsh 113.3 per kW.h.

The invoice does not include any charges for Destination Inspection Fees.  Based on the data I have been given, I conclude that the calculation of the invoice amount for March 2007 is correct.  The table attached summarizes my numerical observations.

I hope this review has been useful.

With best wishes

Martin Swales

Review of the March 2007 Invoice Data

| Issue | IPTL Value | TANESCO Value | Comment |
|---|---|---|---|
| Date for US CPI Application | 30-Nov-06 | 30-Nov-06 | Agreed |
| Date for US$ to TSh Exchange Application | 31-Dec-06 | 31-Dec-06 | Agreed |
| Update of Risk Insurance Rates | Unchanged from Jan '07 | | None expected |
| Change in Lender's Interest Rate | 7.40063% set on Feb 1 '07 | | No comment |
| Update of the 3-mo LIBOR Rate | 5.36025% | | Agreed |
| Recalibrate the Model | No | No | Agreed |
| Add new fuel purchase data | 4,017.069 @ $361.35 & 4,595.766 @ $397.36 | | No comment |
| Monthly Energy Sales, MW.h | 3,485.5 MW.h | No Independent Data | No Comment |
| Change to the Dependable Capacity | None | No Independent Data | No Comment |
| Supplemental Charges | $3,898.41 $0 | No Independent Data | Workers Welfare Fund, City Services Levy |
| Destination Inspection Fees (DIF) | $0.00 | No Independent Data | |
| EWURA Regulatory Levy (1%) | $31,312.17 | Ref: GOT Gazette #157 | |

Gentlemen

I am in receipt of your email of June 7, 2007 with the attached copy of the Tegeta working model adjusted for the May 2007 invoice.

There has been a decline in the Lenders Interest Rate this month from the rate of 7.40063% that was set on February 1, 2007 to the rate of 7.36% effective May 1, 2007. IPTL has made no other changes to the key factors used in the invoice calculation.

IPTL has added no more fuel oil since March 31 2007. The Tegeta plant was not dispatched during May so the energy component of the charges is zero.

Although not reported in my comments on the April 2007 invoice, I note the change to the application of VAT on the invoice. VAT is applied to only the energy component of the invoice effective April 1, 2007. As the energy component is zero, the total VAT charged in May is zero.

The invoice does not include any charges for Destination Inspection Fees. Based on the data I have been given, I conclude that the calculation of the invoice amount for May 2007 is correct. The table attached summarizes my numerical observations.

I hope this review has been useful.

With best wishes

Martin Swales

Review of the May 2007 Invoice Data

| Issue | IPTL Value | TANESCO Value | Comment |
|---|---|---|---|
| Date for US CPI Application | 30-Nov-06 | 30-Nov-06 | Agreed |
| Date for US$ to TSh Exchange Application | 31-Dec-06 | 31-Dec-06 | Agreed |
| Update of Risk Insurance Rates | Unchanged from Jan '07 | | None expected |
| Change in Lender's Interest Rate | From 7.40063% set on Feb 1 '07 to 7.36% effective May 1, 2007 | | TANESCO to obtain supporting documentation from IPTL |
| Update of the 3-mo LIBOR Rate | 5.36025% | | Agreed |
| Recalibrate the Model | No | No | Agreed |
| Add new fuel purchase data | | | |
| Monthly Energy Sales, MW.h | 0.0 MW.h | No Independent Data | No Comment |
| Change to the Dependable Capacity | None | No Independent Data | No Comment |
| Supplemental Charges | $3,165.75 $9,184.19 | No Independent Data | Workers Welfare Fund, City Services Levy |
| Destination Inspection Fees (DIF) | $0.00 | No Independent Data | |
| EWURA Regulatory Levy (1%) | $28,267.53 | Ref: GOT Gazette #157 | |

Gentlemen

I am in receipt of your email of October 1, 2007 with the attached copy of the Tegeta working model adjusted for the September 2007 invoice.

There has been no change in the Lenders Interest rate in September and IPTL has made no other changes to the key factors used in the invoice calculation.

IPTL has added no more fuel oil since May 31, 2007.  During September, Tegeta delivered no energy so the energy part of the invoice is zero.

The invoice does not include any charges for Destination Inspection Fees.

As noted in previous reviews, the invoice has an EWURA Regulatory Levy calculated based on the total invoice rather than just on the energy or variable part of the invoice.

With the foregoing caveat, I conclude that the calculation of the base invoice amount for September 2007 is correct.  The table attached summarizes my numerical observations.

I hope this review has been useful.

With best wishes

Martin Swales

Review of the September 2007 Invoice Data

| Issue | IPTL Value | TANESCO Value | Comment |
|---|---|---|---|
| Date for US CPI Application | 31-May-07 | 31-May-07 | Agreed |
| Date for US$ to TSh Exchange Application | 30-June-07 | 30-June-07 | Agreed |
| Update of Risk Insurance Rates | Unchanged from Jan '07 | | None expected |
| Change in Lender's Interest Rate | 7.36% effective May 1, 2007 | | No change |
| Update of the 3-mo LIBOR Rate | 5.36% | | Agreed |
| Recalibrate the Model | No | No | Agreed |
| Add new fuel purchase data | 0 tonnes | | |
| Monthly Energy Sales, MW.h | 0 MW.h | No Independent Data | No Comment |
| Change to the Dependable Capacity | None | No Independent Data | No Comment |
| Supplemental Charges | $3,812.33 | No Independent Data | Workers Welfare Fund, |
| Destination Inspection Fees (DIF) | $0.00 | No Independent Data | |
| EWURA Regulatory Levy (1%) | $28,345.47 | Ref: GOT Gazette #157 | Note comment in text above |

Gentlemen

I am in receipt of your email of January 10, 2007 with the attached copy of the Tegeta working model adjusted for the December 2006 invoice.

There has been no further change in the Lenders Interest Rate this month from the rate of 7.40% that was set on November 1, 2006. IPTL has made no other changes to the key factors used in the invoice calculation.

I note that, during December, 11,287.29 tonnes of fuel oil were purchased at US$ 355.69 per tonne. The total energy delivered by the Tegeta plant in December was on 33,240.1 MW.h, a plant factor of some 43.2%. The incremental cost of energy from Tegeta during December was 9.025 US cents per kW.h or about Tsh 111.3 per kW.h. As expected, the cost of fuel oil is declining and the incremental cost of energy from the Tegeta plant is also declining from the highs reached earlier in 2006.

The invoice does not include any charges for Destination Inspection Fees. However, there is a new Supplementary Charge, the EWURA REGULATORY LEVY of 1% of gross revenues to IPTL. IPTL refer to the Government Gazette No. 157 of November 17, 2006 as the basis for applying this new charge. IPTL has interpreted the new levy as a tax or duty to be passed through to TANESCO in accordance with Section 14 of Appendix B to the PPA.

Based on the data I have been given, I conclude that the calculation of the invoice amount is correct. The table attached summarizes my numerical observations.

I hope this review has been useful.

With best wishes


Martin Swales

Review of the December 2006 Invoice Data

| Issue | IPTL Value | TANESCO Value | Comment |
|---|---|---|---|
| Date for US CPI Application | 31-May-06 | 31-May-06 | Agreed |
| Date for US$ to TSh Exchange Application | 30-June-06 | 30-June-06 | Agreed |
| Update of Risk Insurance Rates | Unchanged from Jan '06 | | None expected |
| Change in Lender's Interest Rate | No Change from 7.40% | | No Comment |
| Update of the 3-mo LIBOR Rate | 5.50% | Updated per agreements | Agreed |
| Recalibrate the Model | No | No | Agreed |
| Add new fuel purchase data | 11,287.29 tonnes @ $355.69 | | No comment |
| Monthly Energy Sales, MW.h | 33,240.1 MW.h | No Independent Data | No Comment |
| Change to the Dependable Capacity | None | No Independent Data | No Comment |
| Supplemental Charges | $4,181.00 $0 | No Independent Data | Workers Welfare Fund, City Services Levy |
| Destination Inspection Fees (DIF) | $0.00 | No Independent Data | |
| EWURA Regulatory Levy (1%) | $58,756.55 | Ref: GOT Gazette #157 | |

Gentlemen

I am in receipt of your email of March 1, 2007 with the attached copy of the Tegeta working model adjusted for the February 2007 invoice.

There has been a small change in the Lenders Interest Rate this month from the rate of 7.40% that was set on November 1, 2006 to 7.40063% effective February 1, 2007. IPTL has made no other changes to the key factors used in the invoice calculation.

I note that IPTL has advised that although some additional fuel oil was purchased during February, the purchase has not been included in the model as the new oil supplier has not yet delivered its' invoice for that new oil. The fuel determined to be in the IPTL tanks by the tariff model is sufficient for February 2007. The total energy delivered by the Tegeta plant in February was on 15,801.3 MW.h, a plant factor of some 22.7%. The incremental cost of energy from Tegeta during February was 8.72 US cents per kW.h or about Tsh 113.3 per kW.h.

The invoice does not include any charges for Destination Inspection Fees as the most recent fuel oil invoice has not been received by IPTL. Based on the data I have been given, I conclude that the calculation of the invoice amount for February 2007 is correct. The table attached summarizes my numerical observations.

IPTL has sent me a copy of their calculation of the annual bonus that is due in accordance with the PPA. I have reviewed the calculation of the "Capacity Damages Amount", numerically equal to the total of the Capacity Payments made during the current Contract Year. The Contract Year for the bonus being calculated runs from January 15, 2006 through January 14, 2007. I agree that this amount has been calculated correctly. However, I do not have any supporting documentation for the availability of 92.3% claimed by IPTL so I shall assume that TANESCO has the supporting documentation for this figure. Note that the figure should be determined directly from the Daily Reports at the TANESCO Control Centre.

I hope this review has been useful.

With best wishes

Martin Swales

Review of the February 2007 Invoice Data

| Issue | IPTL Value | TANESCO Value | Comment |
|---|---|---|---|
| Date for US CPI Application | 30-Nov-06 | 30-Nov-06 | Agreed |
| Date for US$ to TSh Exchange Application | 31-Dec-06 | 31-Dec-06 | Agreed |
| Update of Risk Insurance Rates | Unchanged from Jan '07 | | None expected |
| Change in Lender's Interest Rate | Changed from 7.40% in Nov 06 to 7.40063% | | TANESCO to obtain documentary support from IPTL |
| Update of the 3-mo LIBOR Rate | 5.36025% | | Agreed |
| Recalibrate the Model | No | No | Agreed |
| Add new fuel purchase data | | | Invoice for February fuel not received by IPTL as at March 1, 2007 |
| Monthly Energy Sales, MW.h | 15,801.3 MW.h | No Independent Data | No Comment |
| Change to the Dependable Capacity | None | No Independent Data | No Comment |
| Supplemental Charges | $4,880.57 $0 | No Independent Data | Workers Welfare Fund, City Services Levy |
| Destination Inspection Fees (DIF) | $0.00 | No Independent Data | |
| EWURA Regulatory Levy (1%) | $42,049.81 | Ref: GOT Gazette #157 | |

# EXHIBIT F

*"Tunayaangaza Maisha Yako"*

# TANESCO

## TANZANIA ELECTRIC SUPPLY COMPANY LIMITED

Ubungo Head Office, "Umeme Park", PO Box 9024 Dar es Salaam, Tanzania  Tel: +255 022 2451138/38  Fax: +255 022 2451148

Our Ref:

DMDF&CS/02/05

Date:

17 June 2004

Independent Power Tanzania Limited
5th Floor, Extelecoms
Samora Avenue
P O Box 1461
**Dar es Salaam**
United Republic of Tanzania

**RECEIVED**

**1 7 JUN 2004**

**IPTL
DSM.**

Attn. Managing Director

Dear Sir,

RE:    **INVOICE DISPUTE NOTICE**

TAKE NOTICE that the amount of the Invoice FOR THE MONTH OF MAY 2004 (bearing Ref. No.20/2004/IPTL dated 1st June 2004 (received on 2nd June 2004) is in dispute.

TANESCO disputes the amount of TShs.3,366,646,422/= from the above referred invoice.

The basis of the dispute is the erroneous computation of Capacity Purchase Price, described in the invoice as Capacity Charges and Capacity Tariff.

This notice is given as required under Article 6.8 of the Power Purchase Agreement.

Yours faithfully,
For:   **TANZANIA ELECTRIC SUPPLY COMPANY LIMITED**

**C .G .N Huysen
MANAGING DIRECTOR**
SEW/rcjm:

CONFIDENTIAL

TANESCO BOARD OF DIRECTORS: Mr N. H. Kitomari (Chairman), Mr A. Mapunda, Mr B. Lunga, Hon. M. H. Minwa (MP),

# TANESCO

## TANZANIA ELECTRIC SUPPLY COMPANY LIMITED

Ubungo Head Office, "Umeme Park", P.O Box 9024 Dar es Salaam, Tanzania  Tel: +255 022 2451130/38  Fax: +255 022 2451148

Our Ref:

DMD-F&CS/02/05

Date:

5TH July, 2004

The General Manager,
Independent Power Tanzania Limited,
Plot No. 292/1,292/2,292/3 and 296
Block "D" Salasala, Tegeta,
P.O.Box 77173,
**DAR ES SALAAM**

RECEIVED

0 5 JUL 2004

IPTL
DSM.

Dear Sir,

RE:    **INVOICE DISPUTE NOTICE**

**TAKE NOTICE**  that the amount of the invoice for the month of June, 2004 (bearing ref. 23/2004/IPTL dated 1st July, 2004 ( received by us on 2nd July, 2004) is in dispute.

**TANESCO**  disputes the amount of Tshs. 3,666,646,422.00 from the above referred invoice.

The basis of the dispute is the erroneous computation of Capacity Purchase Price, described in the invoice as Capacity Charges and Capacity Tariff.

This notice is given as required under Article 6.8 of the Power Purchase Agreement dated as of 26th May, 1995.

Yours faithfully,
For: **TANZANIA ELECTRIC SUPPLY COMPANY LIMITTED**

C.G.N. Huysen
**MANAGING DIRECTOR**
CGNH/SEW/JJM

# CONFIDENTIAL

TANESCO BOARD OF DIRECTORS: Mr N. N. Kilonzai (Chairman), Mr A. Maganda, Mr C. Lyimo, Hon. M. N. Mbogo (MP),
Hon. P. A. Magani (MP), Dr. E. S. Bukuku, Mr. A. Kilewo, Mr. B. J. Mlindoko and Mr R. H. Haji

# TANESCO

## TANZANIA ELECTRIC SUPPLY COMPANY LIMITED

Ubungo Head Office, "Umeme Park", PO Box 9024 Dar es Salaam, Tanzania. Tel. +255 022 2451130/38  Fax: +255 022 2451148

Our Ref:
DMDF&CS/02/05

Date:
4th August, 2004

Independent Power Tanzania Limited
Plot No. 292/1,292/2,292/3 &296,
Block "D" Salasala, Tegeta
P O Box 77173,
Dar es Salaam
Tanzania

**Attention: Managing Director**

Dear Sir,

RE:    INVOICE DISPUTE NOTICE

TAKE NOTICE that the amount of the Invoice for the month of July 2004 reference Tax Invoice No.26/2004/IPTL, dated 1st August 2004 and received by the Tanesco Managing Director's office on 3rd August, 2004 is in dispute.

TANESCO LIMITED disputes the amount of CAPACITY CHARGES i.e. the total Capacity Tariff of Tshs 3,639,009,258/=.

We emphatically state that the dispute is based upon the erroneous computation of the Capacity Purchase Price described in the Invoice as Capacity charges and Capacity Tariff.   Moreover you have not supplied us with the data on the debt and equity components in raising the invoices as we requested for through letter Ref.MD/023 dated 29th July, 2004.

This notice is given as required under Article 6.8 of the Power Purchase Agreement dated 26th May, 1995.

Yours faithfully,
For:   TANZANIA ELECTRIC SUPPLY COMPANY LIMITED

C. G. N. Huysen
**MANAGING DIRECTOR**
LFM/rcjm:

RECEIVED
0 5 AUG 2004
IPTL
DSM.

1

CONFIDENTIAL

TANESCO BOARD OF DIRECTORS: Mr N. N. Kitomari (Chairman), Mr A. Mapunda, Mr P. Lyimo, Hon. M. H. Mlega (MP), Hon. P. A. Magani (MP), Dr. E. S. Bakuba, Mr A. Kilewo, Mr B. J. Mtandoka and Mr B. H. Haji

*"Tunayaangaza Maisha Yako"*

# TANESCO

## TANZANIA ELECTRIC SUPPLY COMPANY LIMITED

Ubungo Head Office, "Umeme Park", PO Box 9024 Dar es Salaam, Tanzania  Tel: +255 022 2451130/38  Fax: +255 022 2451148

Our Ref:                                                                         Date:

DMDF&CS/02/05                                                    3rd September, 2004

Independent Power Tanzania Limited
Plot No. 292/1,292/2,292/3 &296,
Block "D" Salasala, Tegeta
P O Box 77173,
Dar es Salaam
Tanzania



**Attention: Managing Director**

Dear Sir,

RE:    **INVOICE DISPUTE NOTICE**

TAKE NOTICE that the amount of the Invoice for the month of August 2004 (bearing Ref. No.35/2004/IPTL dated 1st September, 2004) is in dispute.

TANESCO LIMITED disputes the amount of Tshs.3,679,104,846/= from the above-referred invoice.

The basis of the dispute is the erroneous computation of Capacity Purchase Price, described in the invoice as Capacity Charges and Capacity Tariff.

This notice is given as required under Article 6.8 of the Power Purchase Agreement.

Yours faithfully,
For:   **TANZANIA ELECTRIC SUPPLY COMPANY LIMITED**

**C. G. N. HUYSEN**
**MANAGING DIRECTOR**
JJO/rcjm:

CONFIDENTIAL

TANESCO BOARD OF DIRECTORS: Mr N. H. Kassman (Chairman), Mr A. Mapunda, Mr P. Lyimo, Hon. M. H. Mbega (MP),

*We Light Up Your Life*
*'Tunayang'aza Maisha Yako'*

# TANESCO

## TANZANIA ELECTRIC SUPPLY COMPANY LIMITED

Ubungo Head Office, "Umeme Park", PO Box 9024 Dar es Salaam, Tanzania  Tel: +255 022 2451130/39  Fax: +255 022 2451148

Our Ref:

**DMDF&CS/02/05**

Date

8th November, 2004

Independent Power Tanzania Limited,
Plot No. 292/1,292/3 & 296,
Block "D" Salasala, Tegeta,
P.O. Box 77173
Dar-es-Salaam.

RECEIVED
0 9 NOV 2004
IPTL
DSM.

**Attention**: Managing Director

Dear Sir,

## RE:  INVOICE DISPUTE NOTICE

TAKE NOTE that the amount of the invoice for the period from 1st to 31st October, 2004 Tax Invoice No. 41/2004/IPTL, DATED 1ST November, 2004 and received by the Tanesco Managing Director's office on 5th November, 2004 is in dispute.

TANESCO disputes the amount of CAPACITY CHARGES i.e. the total Capacity Tariff of USD 2,730,359.52  together with the 20% VAT chargeable on same of USD 546,071.90 making a Grand Total of USD 3,276,431.45 equivalent to T.shs. 3,679,104,846/=.

We reiterate that the dispute is still based upon the erroneous computation of the capacity purchase price described in the invoice as Capacity charges and Capacity Tariff.  This notice is given as required under Article 6.8 of the Power Purchase Agreement dated 26th May, 1995.

Yours faithfully,
for:  TANZANIA ELECTRIC SUPPLY CO. LIMITED

**C.G.N. HUYSEN**
**MANAGING DIRECTOR**
CGNH/LFM/nwj



*We Light Up Your Life*
*'Tunayaangaza Maisha Yako'*

# TANESCO

## TANZANIA ELECTRIC SUPPLY COMPANY LIMITED

Umeme Head Office, "Umeme Park", PO Box 9024 Dar es Salaam, Tanzania Tel: (255 022 2451130/38 Fax: (255 022 2451148

Our Ref:                                                                 Date:

**DMDF&CS/02/05**                                              7th December, 2004

Independent Power Tanzania Limited
Plot No. 292/1,292/2,292/3 &296,
Block "D" Salasala, Tegeta
P O Box 77173,
**DAR ES SALAAM**

**RECEIVED**
**0 7 DEC 2004**
**IPTL**
**DSM.**

**Attention: Managing Director**

Dear Sir,

**RE:   INVOICE DISPUTE NOTICE**

TAKE NOTICE that the amount of the Invoice for the period from 1st to 30th November, 2004 Tax Invoice No.44/2004/IPTL dated 1st December, 2004 and received by the Tanesco Managing Director's office on 3rd December, 2004 is in dispute.

TANESCO disputes the amount of CAPACITY CHARGES i.e. the total Capacity Tariff of Tsh.3,066,734,655.00  together with the 20% VAT chargeable on same of Tsh.613,346,931.00 making a Grand Total of Tsh.3,680,081,586.00.

We reiterate that the dispute is still based upon the erroneous computation of the capacity purchase price described in the invoice as capacity charges and Capacity Tariff.  This notice is given as required under Article 6.8 of the Power Purchase Agreement dated 26th May, 1995..

Yours faithfully,
For:   **TANZANIA ELECTRIC SUPPLY COMPANY LIMITED**

**C. G. N. HUYSEN**
**MANAGING DIRECTOR**
LFM/rcjm:



TANESCO BOARD OF DIRECTORS: Mr N. N. Kaoman (Chairman), Mr A. Mapunda, Mr P. Lyimo, Hon. M. H. Mbega (MP),

# TANESCO

## TANZANIA ELECTRIC SUPPLY COMPANY LIMITED

Ubungo Head Office, "Umeme Park", PO Box 9024 Dar es Salaam, Tanzania  Tel: +255 022 2451130/08  Fax: +255 022 2451148

Our Ref:                                                                    Date:

DMDF&CS/02/05
                                                        6th January, 2005

Independent Power Tanzania Limited
Plot No. 292/1,292/2,292/3 &296,
Block "D" Salasala, Tegeta
P O Box 77173,
**DAR ES SALAAM**

**Attention: Managing Director**

Dear Sir,

RE:   **INVOICE DISPUTE NOTICE**

TAKE NOTICE that the amount of the Invoice for the period from 1st to 31st December, 2004 Tax Invoice No.47/2004/IPTL dated 1st January, 2005 and received by the Tanesco Managing Director's office on 3rd January, 2005 is in dispute.

TANESCO disputes the amount of CAPACITY CHARGES i.e. the total Capacity Tariff of Tsh.3,066,727,827.00   together with the 20% VAT chargeable on same of Tsh.613,345,565.00 making a Grand Total of Tsh.3,680,073,392.00.

We reiterate that the dispute is still based upon the erroneous computation of the capacity purchase price described in the invoice as capacity charges and Capacity Tariff.   This notice is given as required under Article 6.8 of the Power Purchase Agreement dated 26th May, 1995..

Yours faithfully,
For:   **TANZANIA ELECTRIC SUPPLY COMPANY LIMITED**

**C. G. N. HUYSEN**
**MANAGING DIRECTOR**
LFM/rcjm:

TANESCO BOARD OF DIRECTORS: Mr H. N. Kitomari (Chairman), Mr A. Mapunda, Mr P. Lyimo, Hon. N. N. Mbega (MP),

**SHIRIKA LA UMEME TANZANIA**
**TANZANIA ELECTRIC SUPPLY COMPANY LIMITED**

Ubungo Head Office, "Umeme Park", PO BOX 9024 Dar es Salaam, Tanzania. Tel. (255) 22 2451130/9.  Fax (255) 22 2452096

Our Ref:                                                                                      Date:

DMDF&CS/05/06                                                          8th May, 2006

Independent Power Tanzania Limited
Plot No. 292/1,292/2,292/3 &296,
Block "D" Salasala, Tegela
P O Box 77173,
DAR ES SALAAM

**Attention: Managing Director**

Dear Sir,

**RE:   INVOICE DISPUTE NOTICE**

TAKE NOTICE that the amount of the Invoice for the period from 1st to 30th April,2006 Tax Invoice No.17/2006/IPTL dated 1st May, 2006 and received by the Tanesco Managing Director's office on 3rd May, 2006 is in dispute.

TANESCO disputes the amount of Capacity Charges i.e. the total Capacity Tariff of Tsh.3,321,222,871.00    together with the 20% VAT chargeable on same of Tsh.664,244,574.00 making a Grand Total of Tsh.3,985,467,445.00.

We reiterate that the dispute is still based upon the erroneous computation of the capacity purchase price described in the invoice as capacity charges and Capacity Tariff.   This notice is given as required under Article 6.8 of the Power Purchase Agreement dated 26th May, 1995.

Yours faithfully,
For:   TANZANIA ELECTRIC SUPPLY COMPANY LIMITED

**Adriaan van der Merwe**
**MANAGING DIRECTOR**
SEW/rcjm:

"Tunayaangaza Maisha Yako"    *TANESCO*    "We Light Up Your Life"

# SHIRIKA LA UMEME TANZANIA
## TANZANIA ELECTRIC SUPPLY COMPANY LIMITED

Ubungo Head Office, "Umeme Park", PO BOX 9024 Dar es Salaam, Tanzania  Tel: +255 22 2451130/9·  Fax: +255 22 2452026

Our Ref:                                                                    Date:

DMDF&CS/06/06                                            7th June, 2006

Independent Power Tanzania Limited
Plot No. 292/1,292/2,292/3 &296,
Block "D" Salasala, Tegeta
P O Box  77173,
**DAR ES SALAAM**

**Attention: Managing Director**

Dear Sir,

**RE:    INVOICE DISPUTE NOTICE**

TAKE NOTICE that the amount of the Invoice for the period from 1st to 31st May, 2006 Tax Invoice No.20/2006/IPTL dated 1st June, 2006 and received by the Tanesco Managing Director's office on 5th June, 2006 is in dispute.

TANESCO disputes the amount of Capacity Charges i.e. the total Capacity Tariff of Tsh.3,321,658,435.00 together with the 20% VAT chargeable on same of Tsh.666,531,687.00 making a Grand Total of Tsh.3,999,190,00.

We reiterate that the dispute is still based upon the erroneous computation of the capacity purchase price described in the invoice as capacity charges and Capacity Tariff.   This notice is given as required under Article 6.8 of the Power Purchase Agreement dated 26th May, 1995.

Yours faithfully,
**For:  TANZANIA ELECTRIC SUPPLY COMPANY LIMITED**


**Adriaan van der Merwe**
**MANAGING DIRECTOR**
GEM/rcjm:

TANESCO BOARD OF DIRECTORS: Ambassador F.M. Kazaura (Chairman), Mr A. B. Mapunda, Hon. P Magoni (MP), Mr A. B. Kilewo,

*Tanzania Electric Supply Company*   *T A N E S C O*   *"We Light Up Your Life"*

## SHIRIKA LA UMEME TANZANIA
## TANZANIA ELECTRIC SUPPLY COMPANY LIMITED

Ubungo Head Office, "Umeme Park", PO BOX 9024 Dar es Salaam, Tanzania  Tel: +255 22 2451130/9.  Fax: +255 22 2452026

Our Ref:

Date:

DMDF&CS/10/06

9th October, 2006

Independent Power Tanzania Limited
Plot No. 292/1,292/2,292/3 &296,
Block "D" Salasala, Tegeta
P O Box 77173,
DAR ES SALAAM

**Attention: Managing Director**

Dear Sir,

RE:   **INVOICE DISPUTE NOTICE**

TAKE NOTICE that the amount of the Invoice for the for the month of September, 2006 bearing Ref. No. Tax Invoice No. 38/2006/IPTL dated 1st October, 2006 and received by the us on 4th October, 2006 is in dispute.

TANESCO disputes the amount of Tshs. 3,548,510,977.00 from the above referred invoice.

The basis of the dispute is the erroneous computation of Capacity Purchase Price, described in the invoice as Capacity Charges and Capacity Tariff, in as much as the tariff provides IPTL with an equity IRR in excess of 22.31%.

This notice is given as required under Article 6.8 of the Power Purchase Agreement.

Yours faithfully,
For: **TANZANIA ELECTRIC SUPPLY COMPANY LIMITED**

**Adriaan Merwe**
**MANAGING DIRECTOR**
GEM/rcjm:



TANESCO BOARD OF DIRECTORS: Ambassador F.M. Kazaura (Chairman), Mr A. B. Mapunda, Hon. P Magani (MP), Mr A. B. Kilewo,

*"Tunayaangaza Maisha Yako"*     *T A N E S C O*     *"We Light Up Your Life"*

## SHIRIKA LA UMEME TANZANIA
## TANZANIA ELECTRIC SUPPLY COMPANY LIMITED

Ubungo Head Office, "Umeme Park", PO BOX 9024 Dar es Salaam, Tanzania  Tel: +255 22 2451130/9-  Fax: +255 22 2452026

Our Ref:                                                                                    Date:

SEC.427/IPTL-NOTICES/04/2007                          10th April, 2007

Independent Power Tanzania Limited
Plot No. 292/1,292/2,292/3 &296,
Block "D" Salasala, Tegeta
P O Box  77173,
**DAR ES SALAAM**

**Attention: Managing Director**

Dear Sir,

RE:    INVOICE DISPUTE NOTICE

TAKE NOTICE that the amount of the Invoice for the for the month of   March 2007
bearing Ref. No. Tax Invoice No.10/2007/IPTL dated 1st April, 2007 and received by the
us on 2nd April, 2007 is in dispute.

TANESCO disputes the amount of Tshs.3,674,061,651.00 from the above referred
invoice.

The basis of the dispute is the erroneous computation of Capacity Purchase Price,
described in the Invoice as Capacity Charges and Capacity Tariff, in as much as the
tariff provides IPTL with an equity IRR in excess of 22.31%.

This notice is given as required under Article 6.8 of the Power Purchase Agreement.

Yours faithfully,
**For: TANZANIA ELECTRIC SUPPLY COMPANY LIMITED**



**DR. IDRIS M. RASHIDI**
**MANAGING DIRECTOR**
GEM/rcjm:

RECEIVED
1 0 APR 2007
IPTL
DSM.

TANESCO BOARD OF DIRECTORS: Ambassador F.M. Kazaura (Chairman), Mr A. B. Mapunda, Hon. P Magani (MP), Mr A. B. Kilewo,

*"Tunayaaagaza Maisha Yake"*     *T A N E S C O*     *"We Light Up Your Life"*

## SHIRIKA LA UMEME TANZANIA
## TANZANIA ELECTRIC SUPPLY COMPANY LIMITED

Ubungo Head Office, "Umeme Park", PO BOX 9024 Dar es Salaam, Tanzania Tel: +255 22 2451130/9. Fax: +255 22 2452026

Our Ref:                                                                                    Date:

### SEC.427/IPTL-NOTICES/06/2007                                        8th June, 2007

Independent Power Tanzania Limited
Plot No. 292/1,292/2,292/3 &296,
Block "D" Salasala, Tegeta
P O Box 77173,
DAR ES SALAAM

RECEIVED

0 8 JUN 2007

IPTL
DSM.

**Attention: Managing Director**

Dear Sir,

**RE:     INVOICE DISPUTE NOTICE**

TAKE NOTICE that the amount of the Invoice for the month of May 2007 bearing Ref.
No. Tax Invoice No.18/2007/IPTL dated 1st June, 2007 and received by the us on 5th
June, 2007 is in dispute.

TANESCO disputes the amount of Tshs.3,673,311,234.00 from the above referred
invoice.

The basis of the dispute is the erroneous computation of Capacity Purchase Price,
described in the invoice as Capacity Charges and Capacity Tariff, in as much as the
tariff provides IPTL with an equity IRR in excess of 22.31%.

This notice is given as required under Article 6.8 of the Power Purchase Agreement.

Yours faithfully,
**For: TANZANIA ELECTRIC SUPPLY COMPANY LIMITED**

P.P.

**DR. IDRIS M. RASHIDI**
**MANAGING DIRECTOR**
GEM/rcjm:

CC:-    The Governor,
        Bank of Tanzania,
        P. O. Box 2939,
        DAR ES SALAAM.

*TANESCO*    "We light Up Your life"

## SHIRIKA LA UMEME TANZANIA

## TANZANIA ELECTRIC SUPPLY COMPANY LIMITED

Ubungo Head Office, "Umeme Park", PO BOX 9024 Dar es Salaam, Tanzania Tel: (255) 22-2451130/39, Fax: (255) 22-2451050/6

Our Ref:                                                          Date:

### SEC.427/IPTL-NOTICES/08/2007

6th August, 2007

Independent Power Tanzania Limited
Plot No. 292/1,292/2,292/3 &296,
Block "D" Salasala, Tegeta
P O Box 77173,
**DAR ES SALAAM**

**RECEIVED**
**0 6 AUG 2007**
**IPTL**
**DSM.**

**Attention: Managing Director**

Dear Sir,

**RE:    INVOICE DISPUTE NOTICE**

TAKE NOTICE that the amount of the Invoice for the month of July 2007 bearing Ref. No. Tax Invoice No.25/2007/IPTL dated 1st August, 2007 and received by the us on 2nd August, 2007 is in dispute.

TANESCO disputes the amount of Tshs.3,628,393,695.00 from the above referred Invoice.

The basis of the dispute is the erroneous computation of Capacity Purchase Price, described in the invoice as Capacity Charges and Capacity Tariff, in as much as the tariff provides IPTL with an equity IRR in excess of 22.31%.

This notice is given as required under Article 6.8 of the Power Purchase Agreement.

Yours faithfully,
For: **TANZANIA ELECTRIC SUPPLY COMPANY LIMITED**

**DR. IDRIS M. RASHIDI**
**MANAGING DIRECTOR**
GEM/rcjm:

CC:-☞ The Governor,
      Bank of Tanzania,
      P. O. Box 2939,
      **DAR ES SALAAM.**

TANESCO BOARD OF DIRECTORS: Ambassador F.M. Kazaura (Chairman), Mr A. B. Mapunda, Hon. P. Magani (MP), Mr A. B. Bdnan,



"Tumaryango-ra Maisha Yako"    T A N E S C O    "We fight Our Your life"

# SHIRIKA LA UMEME TANZANIA

## TANZANIA ELECTRIC SUPPLY COMPANY LIMITED

Ubungo Head Office, "Umeme Park", PO BOX 9024 Dar es Salaam, Tanzanie. Tel: (255) 22 245 LEX/7L Fax: (255) 22 24(2028),

Our Ref:
### SEC.427/IPTL- NOTICES/09/2007

Date:
5th Sept. 2007

Independent Power Tanzania Limited,
Plot No. 292/1,292/2,292/3&296,
Block "D" Salasala, Tegeta,
P.O.Box 77173,
**DAR ES SALAAM.**

**Attn: Managing Director**

RE:   **INVOICE DISPUTE NOTICE**

**TAKE NOTICE** that the amount of the invoices for the month of August, 2007 bearing Tax Invoice No. 29/2007/IPTL dated 1st September, 2007 and received by TANESCO on 4th September, 2007 is in dispute.

TANESCO disputes the amount of Tshs.3,630,392,774.00 from the above referred invoice.

The basis of the dispute is the erroneous computation of Capacity Purchase Price, described in the invoice as Capacity Charges and Capacity Tariff, in as much as the tariff provides IPTL with equity IRR in excess of 22.31%

This notice is given as required under Article 6.8 of the Power Purchase Agreement.

Yours faithfully,
For: **TANZANIA ELECTRIC SUPLY COMPANY LIMITED**

Dr. Idris M. Rashidi
**MANAGING DIRECTOR**
IMR/SEW/jjm

CC:   The Governor,
Bank of Tanzania,
P.O.Box 2939,
**DAR ES SALAAM.**



RECEIVED
0 5 SEP 2007
IPTL
DSM.

# SHIRIKA LA UMEME TANZANIA
## TANZANIA ELECTRIC SUPPLY COMPANY LIMITED

Ubungo Head Office, "Umeme Park", PO BOX 9024 Dar es Salaam, Tanzania Tel: +255 22 2451190/9, Fax: +255 22 2452026

Our Ref:

SEC.427/IPTL-NOTICES/10/2007

Date:

2nd October, 2007

Independent Power Tanzania Limited
Plot No. 292/1,292/2,292/3 &296,
Block "D" Salasala, Tegeta
P O Box 77173,
**DAR ES SALAAM**

**Attention: Managing Director**

Dear Sir,

RE:   **INVOICE DISPUTE NOTICE**

TAKE NOTICE that the amount of the Invoice for the month of September 2007 bearing Ref. No. Tax Invoice No.32/2007/IPTL dated 1st October, 2007 and received by the us on 2nd October, 2007 is in dispute.

TANESCO disputes the amount of Tshs.3,630,392,774.00 from the above referred invoice.

The basis of the dispute is the erroneous computation of Capacity Purchase Price, described in the invoice as Capacity Charges and Capacity Tariff, in as much as the tariff provides IPTL with an equity IRR in excess of 22.31%.

This notice is given as required under Article 6.8 of the Power Purchase Agreement.

Yours faithfully,
**For: TANZANIA ELECTRIC SUPPLY COMPANY LIMITED**

**DR. IDRIS M. RASHIDI**
**MANAGING DIRECTOR**
GEM/rcjm;

CC:- ☞ The Governor,
    Bank of Tanzania,
    P. O. Box 2939,
    **DAR ES SALAAM.**



RECEIVED
0 3 OCT 2007
IPTL
DSM.

TANESCO BOARD OF DIRECTORS: Ambassador F.M. Kazaura (Chairman), Mr A. B. Mapunda, Hon. P. Magani (MP), Mr A. B. Kilewo, Mr. B. J. Mrindoko, Mrs. A. E. Bukuku, Mr. A. Mwakapugi, Mr. S. Sakila, and Mr. S.A. Juma.

# EXHIBIT G

**INDEPENDENT POWER TANZANIA LTD.**

OPERATIONS:
Plot No. 292/1, 292/2, 292/3 and 296, Block "D" Salasala Tegeta
P.O.Box 77173, Dar Es Salaam, Tanzania.

Telephone : +255-51-650750    Facsimile : +255-51-650751
E-mail    : iptl@cats-net.com

Our Ref: IPTL/216/04/PC/ehm

Date: 18th June, 2004

Mr. Rudy Huysen
Managing Director
Tanzania Electric Supply Company Ltd
·P.O.Box 9024
Dar es Salaam

Dear Mr. Huysen,

**RE: INVOICE DISPUTE NOTICE**

We acknowledge receipt of your two letters dated 17th June 2004 (your Ref. DMDF&CS/02/05).

Firstly, please note that pursuant to a notice dated 11th February 1999 (a copy of which is enclosed for your ease of reference), IPTL notified Tanesco of our change of address to:-

Plots 292/1-3 and 296
Block 'D' Sala Sala,
Tegeta,
P.O.Box 77173,
Dar es Salaam
Tel: 2650750
Fax: 2650751

Please ensure that all future notices and correspondence are forwarded to our above address only.

Under Article 6.8 of the Power Purchase Agreement the Invoice Dispute Notice should have been served within five business days from the date of the invoice. The invoice for the month of May 2004 is dated 1st June 2004 and you acknowledge receiving it on 2nd June 2004 which means that the Invoice Dispute Notice should have been served by no later than 9th June 2004. Your notice is dated 17th June 2004 and therefore is out of time and is hereby rejected. We would impress upon you to immediately pay the invoice by its due date. We reserve our right to charge interest pursuant to Article 6.7(b) for any delayed payment.

1

INDEPENDENT
POWER TANZANIA LTD.

As you are aware the monthly invoices are computed on the working model checked and verified by Dr. Martin Swales (Tanesco's expert) each month. The working model for the month of May 2004 has been approved by Dr. Swales who, has confirmed that the invoice amount for May 2004 is correct (Dr. Swales written confirmation is enclosed).

In order for us to better understand your alleged dispute in relation to the May 2004 invoice, kindly let us have clarification and specific particulars of why you assert the computation to be erroneous.

Our Invoice Numbers 04/2004/IPTL and 17/2004/IPTL (copies enclosed) are not disputed by Tanesco. We require immediate payments of these invoices. Please note that any continued failure to pay these invoices by Tanesco on the due date will not amount to an implied waiver by IPTL of Tanesco's obligation to pay such invoices within 30 days from the date of the invoice in accordance with Article VI of the Power Purchase Agreement.

Further, as you have impliedly acknowledged, Tanesco continues to be in breach of its obligation under Article 6.6(a) of the Power Purchase Agreement. Over two years after the Commercial Operations Date, you have yet to set up the Escrow Account. We would impress upon you to immediately remedy this breach and set up the Escrow Account without further delay.

Finally, please note that, pursuant to Article 19.7 of the Power Purchase Agreement, any waiver, whether implied or explicit, of Tanesco's obligation to pay on time in respect of past invoices or to provide the Escrow Account shall not be deemed to be a waiver of any subsequent performance. IPTL therefore reserves all of its rights under the Power Purchase Agreement in respect of these continuing breaches.

Yours faithfully,
Independent Power Tanzania Limited

PARTHIBAN, C
General Manager


Encl.

cc:     Mr. Patrick Rutabanzibwa
        Permanent Secretary
        Ministry of Energy & Minerals
        P.O. Box 2000
        Dar es Salaam

2

**INDEPENDENT
POWER TANZANIA LTD.**

OPERATIONS:
3rd Floor, TDFL BLDG, Ali Hassan Mwinyi Road/ Ohio Street
P.O.Box 77173, Dar Es Salaam, Tanzania.

Telephone : +255-51-110782/ 791    D/Line : +255-51-110701
Facsimile : +255-51-110790    E-Mail : iptl@cats-net.com

Our Ref: IPTL/036/99/PC/ehm                Date: February 11, 1999

The Managing Director
Tanzania Electric Supply Co. Ltd.,
P. O. Box 9024
Dar es Salaam

Attn: B.E.A.T. Luhanga

Dear Sir,

IPTL 100MW DIESEL POWER STATION
CHANGE OF ADDRESS

Please be advised that with effect from Monday February 15, 1999 the IPTL
offices in Dar es Salaam will be relocated to:-

        Plot Nos. 292.1, 292/2, 292/3 and 296
        Block `D' Sala Sala, Tegeta
        P.O. Box 77173
        Dar es Salaam.

        Tel: ++255 51 630 750
        Fax: ++255 51 650 751

        `e' Mail: iptl@cats-net.com

We look forward to continuing communications from our new premises.

Yours faithfully,
Independent Power Tanzania Limited

PARTHIBAN, C
General Manager

Cc.:

1.    Hon. Dr. A. O. Kigoda (MP)
      Minister of Energy and Minerals
      Dar es Salaam

2.    Hon. N. Malocho (MP)
      Minister of State Planning and Parastatal Reform Commission
      Dar es Salaam

3.    Hon. A. Chenge (MP)
      Attorney General
      Dar es Salaam

4.    Mr. M. Lumbanga
      Chief Secretary
      President's House
      Dar es Salaam

5.    Dr. D. Balali
      Governor
      Bank of Tanzania
      Dar es Salaam

6.    Mr. Patrick Rutabanzibwa
      Permanent Secretary
      Ministry of Energy and Minerals
      Dar es Salaam

7.    Mr. S. Sitta
      Director General
      Tanzania Investment Centre
      Dar es Salaam

8.    Mr. Raphael Mollel
      Permanent Secretary
      Ministry of Finance
      Dar es Salaam

Gentlemen

I am in receipt of your email of June 3, 2004 with the attached copy of the Tegeta working model adjusted for the May 2004 invoice.

I have reviewed this model and, based on the data I have been given, I conclude that the calculation of the invoice amount is correct. The table attached summarizes my numerical observations.

I note that Tegeta continues to be dispatched at a similar, lower rate as in April. The incremental cost of energy from Tegeta has declined again very marginally in May to 6.256 US cents per kW.h. The reduction is related to the fuel delivered in April, much of which was used in May. The new fuel oil delivered in May is marginally more expensive than the April delivery so one may expect the incremental cost of energy to increase in June relative to May.

I hope this review has been useful.

With best wishes


Martin Swales



# INDEPENDENT
# POWER TANZANIA LTD.

**OPERATIONS:**
Plot No. 292/1, 292/2, 292/3 and 296, Block "D" Salasala Togola
P.O.Box 77173, Dar Es Salaam, Tanzania.
Telephone : +255-51-650750    Facsimile : +255-51-650751
E-mail : iptl@cats-net.com

Date :  01st February 2004

The Managing Director
Tanzania Electric Supply Company Limited
P.O. Box 9024, Dar-es-Salaam
United Republic of Tanzania

| Contract Re : Power Purchase Agreement Dated 26th May 1995<br>Project : I.P.T.L. 100 MW Diesel Power Station | TAX INVOICE NO : 04/2004/IPTL |
|---|---|
| **BONUS PAYMENT**<br>**FROM 15.01.2003 - 14.01.2004** | TIN NO : 100-184-990<br>VRN NO : 10-006583-H |

Period of the Invoice:
From   15.01.2003
To   14.01.2004

USD

TOTAL BONUS PAYMENT
In Accordance with Article 6.5 (b) of PPA                    1,798,340.45

TOTAL BONUS PAYMENT                                             1,798,340.45

VAT AT 20%  Total Bonus                                            359,668.09
Sub-Total after VAT                                               2,158,008.54

2,158,008.54

Exchange Rate Average 6 months as per PPA App B 15.1            1,060.17

TSH    2,287,855,914

PAYMENT BY TELEGRAPHIC TRANSFER / CHEQUE, AT LEAST BY 02.03.2004 TO :
INDEPENDENT POWER TANZANIA LIMITED
ACCOUNT NO. 100222-019 for USD remittance
ACCOUNT NO. 100222-027 for TSH remittance
CITIBANK TANZANIA LIMITED
PEUGEOT HOUSE, UPANGA ROAD
P.O.BOX 71625, DAR ES SALAAM
TANZANIA.

AUTHORISED SIGNATURE:

INDEPENDENT POWER TANZANIA LIMITED

# INDEPENDENT
# POWER TANZANIA LTD.

OPERATIONS:
Plot No. 292/1, 292/2, 292/3 and 296, Block "D" Safasala Tegeta
P.O.Box 77173, Dar Es Salaam, Tanzania.

Telephone : +255-51-650750    Facsimile : +255-51-650751
E-mail    : iptl@cats-net.com

Date :    1st May 2004

The Managing Director
Tanzania Electric Supply Company Limited
P.O. Box 9024, Da-es-Salaam
United Republic of Tanzania

| Contract Re : Power Purchase Agreement Dated 26th May 1995 | TAX INVOICE NO : 17/2004/IPTL |
| Project    : I.P.T.L. 100 MW Diesel Power Station | |
| **CAPACITY CHARGES** | TIN NO : 100-184-590 |
| **FOR THE MONTH ENDED 30TH APRIL 2004** | VRN NO : 10-006583-H |

Period of the invoice:
From    01.04.2004
To    30.04.2004

| | USD |
|---|---|
| TOTAL CAPACITY TARIFF | |
| In Accordance with Article 6.2 of PPA | 2,646,310.20 |
| TOTAL CAPACITY TARIFF | 2,646,310.20 |
| VAT AT 20% of Total Capacity Tariff | 529,262.04 |
| Sub-Total after VAT | 3,175,572.24 |
| | 3,175,572.24 |
| Exchange Rate Average 6 months as per PPA App B 15.1 | 1,060.17 |
| TSH | 3,366,846,422 |

PAYMENT BY TELEGRAPHIC TRANSFER / CHEQUE, AT LEAST BY 31.05.2004 TO :
    INDEPENDENT POWER TANZANIA LIMITED
    ACCOUNT NO. 100222-019 for USD remittance
    ACCOUNT NO. 100222-027 for TSH remittance
    CITIBANK TANZANIA LIMITED
    PEUGEOT HOUSE, UPANGA ROAD
    P.O.BOX 71625, DAR ES SALAAM
    TANZANIA.

AUTHORISED SIGNATURE:

INDEPENDENT POWER TANZANIA LIMITED

**INDEPENDENT
POWER TANZANIA LTD.**

OPERATIONS:
Plot No. 292/1, 292/2, 292/3 and 296, Block "D" Salasaa Tageta
P.O.Box 77173, Dar Es Salaam, Tanzania.
Telephone : +255-51-650750    Facsimile : +255-51-650751
E-mail   : iptl@cats-net.com

Our Ref: IPTL/235/04/PC/ehm                    Date: 8th July, 2004

The Managing Director
Tanzania Electric Supply Company Ltd.
P.O. Box 9024
<u>Dar es Salaam</u>

Dear Mr. Huysen,

RE: <u>IPTL CAPACITY CHARGES AND INVOICE DISPUTE NOTICE</u>

I write in response to your letters (both referenced DMD-F&CS/02/05) of 5 July 2004. I look forward to discussing these issues and your concerns at our proposed meeting this Friday at 1 pm. I hope, as do you, that we can resolve these issues promptly and amicably. It must be emphasized, however, that the direction Tanesco has taken places continued operation of the IPTL plant at risk. And, it appears to us that the positions Tanesco has taken are inconsistent with the ICSID Arbitration Award, and with the PPA. Hopefully, we can resolve these issues Friday.

We remain confused about Tanesco's grounds for disputing IPTL's Capacity Payment Invoices. It appears Tanesco has focussed on two main issues – first, Tanesco has requested a copy of the Project Information Memorandum ("PIM") prepared by Standard Bank Group in connection with IPTL's efforts to re-finance its loans. Second, Tanesco appears to state that there is inconsistent or unavailable data to verify the correctness of the "Working Model" for tariff calculation purposes.

We do not believe that either of the foregoing is a ground for disputing, much less not paying in a timely fashion, IPTL's Invoices. Indeed, it appears that Tanesco's positions on both are not supported by the PPA, or by the ICSID Arbitration Award. We look forward to your further explanation. Preliminarily, however, our viewpoints on both issues are:



## 1. THE PIM

The PIM is the property of Standard Bank SA. Tanesco may contact Standard Bank with respect to this item. If Standard Bank is willing to provide a copy to Tanesco, we will not object, even though we continue to believe it is confidential, and not relevant for Tanesco's purposes.

We do not understand how any information in the PIM could have any effect on the Capacity Payments due to IPTL. First, we are currently evaluating the possibility of refinancing, thus the actual refinancing has not taken place. Second, the Capacity Payments due are based on the ICSID Arbitration Award and the PPA. Under both, the terms of any proposed re-financing would have no effect on the Capacity Payments due. We invite you to explain to us how, under either the ICSID Arbitration Award or the PPA, the current Capacity Payments would be affected or adjusted based on any proposed refinancing.

As indicated above, IPTL does not object to Standard Bank providing Tanesco with a copy of the PIM. However, IPTL is not required to provide that document, as it has no bearing on the Capacity Payments due to IPTL or the invoices presently due and unpaid.

## 2. DATA TANESCO CONTENDS IS DUE, AND THE WORKING MODEL

In paragraph 3 of page 2 of your 5 July letter, you infer that IPTL has not furnished the data in connection with IPTL's invoice for Capacity Charges. However, to our knowledge, all data and information related to the computation of the tariffs (i.e. Capacity, Energy & Supplementary Tariff) has been given to Tanesco upon submission of our Invoices. As agreed during the Arbitration, and as directed in the Arbitration Award, the Tariff is to be determined by the ICSID Approved Financial Model and to be calculated on monthly basis using the "Working Model". In the event there is any inconsistency between the Working Model and the ICSID Approved Financial Model, the ICSID Approved Financial Model shall prevail.

As agreed in the Working Model, certain information/data is to be provided by IPTL on a periodic basis. That information/data is as follows:

    i)    HFO pricing/quantity purchased – to be provided monthly

    ii)   Sovereign Risk Insurance - to be provided annually

    iii)  USCPI - to be updated on monthly basis from the agreed official source (www.bls.gov/cpi/)

    iv)  USD/Tsh Exchange Rate - to be updated on monthly basis from the agreed official source (www.bot-tz.org/)

INDEPENDENT
POWER TANZANIA LTD.

v)  Lender Interest Rate - to be updated monthly, if there are any changes.

vi) Worker Welfare Fund - relevant documents (actual receipts) to be provided on monthly basis

vii) City Service Levy - relevant documents (actual receipts) to be provided on monthly basis

Again to our knowledge all this information was provided to Tanesco upon submission of our Invoices. We are unaware of any information related to IPTL's Invoices that has not been provided. Please specify which particular data Tanesco contends has not been provided, so IPTL can respond accordingly.

Paragraph 4, page 2, of your 5 July letter, states that Dr. Swales does not have the authority to approve IPTL's invoices. The PPA does not require the Invoices to be approved by any party. As provided, Tanesco was given a time frame of 5 business days from the date of invoice to forward any dispute in connection with the invoice, by way of Invoice Dispute Notice ("IDN"). An IDN issued by Tanesco must be specific in nature providing the basis of dispute and calculation thereof. If there is no IDN issued within the stipulated time frame, the Invoices will be deemed correct and paid within the agreed period of 30 days.

Paragraph 5, page 2, of your 5 July letter, refers to the Escrow Account. As you know, Tanesco was required to establish that Escrow Account long ago, and is in breach of the PPA due to its failure to do so. IPTL has never waived the contract requirement that this Escrow (or Letter of Credit) be established. Indeed, Tanesco has repeatedly assured IPTL that the Escrow would be established, but then, has repeatedly failed to do so. As stated in your letter, the PPA does not provide or permit that Tanesco simply refrain from paying IPTL and retain the sums due itself, in the event of a dispute. As such, we again urge that the Escrow Account be established immediately. Further the Escrow comprises not only of Capacity Charges, but also Energy Charges.

Your statement that IPTL cannot collect funds based on incorrect Invoices misses the point. It was Tanesco's obligation to establish the Escrow Account, and it failed to do so. Tanesco cannot now withhold payment with itself on the ground that no Escrow Account was established. Moreover, contrary to your statement, IPTL has not submitted any incorrect Invoices. Certainly, Tanesco has yet to establish how any IPTL Invoice is incorrect.

The operation of the IPTL plant is dependant on timely receipt of the payments due from Tanesco. The continued refusal of Tanesco to make monthly Capacity Payments to IPTL will soon interfere with the continued operation of the plant. If Tanesco unilaterally withholds

**INDEPENDENT
POWER TANZANIA LTD.**

Capacity Payments (May 2004 Invoice – due on 1st July 2004 and June 2004 Invoice – due on 1st August 2004) presently due , IPTL will be unable to timely pay the Lenders, the plant operator, its statutory obligations and other critical operating expenses.  This will jeopardize the continued operation of the plant, and will cause IPTL to suffer substantial damages.

We hope this matter can be resolved shortly.   Tanesco's present course of conduct is inconsistent with the ICSID Arbitration Award and the PPA, and, if continued, will shortly have severe adverse consequences.   We hope this course of conduct will not lead to another Arbitration between Tanesco and IPTL.

Hence, Mr. Magesvaran and I look forward to meeting you Friday at 1 pm at your offices.


Yours Faithfully,
**Independent Power Tanzania Limited**

PARTHIBAN, C
General Manager



c.c.:   Mr. Patrick Rutabanzibwa
        Permanent Secretary
        Ministry of Energy & Minerals
        P.O. Box 2000
        Dar es Salaam

**INDEPENDENT
POWER TANZANIA LTD.**

OPERATIONS:
Plot No. 292/1, 292/2, 292/3 and 296, Block "D" Salasala Tegeta
P.O.Box 77173, Dar Es Salaam, Tanzania.

Telephone : +255-51-650750        Facsimile : +255-51-650751
E-mail      : iptl@cats-net.com

Our Ref: IPTL/312/04/PC/ehm                    Date: 07ᵗʰ September, 2004

Mr. Rudy Huysen
Managing Director
Tanzania Electric Supply Company Ltd.
P.O. Box 9024
Dar es Salaam

Dear Mr Huysen,

We acknowledge receipt of your letter reference DMDF&CS/02/05 dated
3ʳᵈ September 2004.

**Take Notice** that we have responded to all the queries put forward by
TANESCO on the Invoice Dispute Notice ("IDN"). Our latest letter (reference
IPTL/270/04/PC/ehm dated 6ᵗʰ August 2004) remain unanswered from your
goodselves.

We are surprised that TANESCO has issued another IDN (for the August
Capacity Charge) on a similar basis. We wish to reiterate that in our opinion,
TANESCO's position on the IDN is inconsistent with the ICSID Arbitration
Award as well as the Power Purchase Agreement ("PPA").

Meanwhile please **Take Further Notice** of the following: -

1.    **Escrow Account**
      TANESCO is in breach of its obligations under Article 6.6 (a) of the PPA.
      We would impress upon TANESCO to set up the Escrow Account without
      further delay.

2.    **Outstanding Payment**
      The July Capacity Charge has been overdue since the 1ˢᵗ of September
      2004. We would impress upon  TANESCO to settle this outstanding
      amount without further delay. Please note that the continuity of Capacity
      Charge payments from TANESCO is critical to IPTL in sustaining the
      Tegeta Plant Operations.

IPTL reserves its rights under the PPA in respect of all the issues stated above.

Yours Faithfully,
**Independent Power Tanzania Limited**

PARTHIBAN, C
General Manager

c.c.:        Mr Patrcik Rutanbanzibwa
            Permanent Secretary
            Ministry of Energy and Minerals
            P.O. Box 2000
            Dar es Salaam

c.c.:        Mr N.N. Kilomari
            Chairman
            TANESCO
            Dar es Salaam

2

**INDEPENDENT POWER TANZANIA LTD.**

Block XXDD92H, 292/2, 292/3 and 296, Block "D" Salasala Tegeta
P.O.Box 77173, Dar Es Salaam, Tanzania.
Telephone : +255-51-650750    Facsimile : +255-51-650751
E-mail    : iptl@cats-net.com

Our Ref: IPTL/381/04/PC/ehm                    Date: 10th November, 2004

Mr. Rudy Huysen
Managing Director
Tanzania Electric Supply Company Ltd.
P.O. Box 9024
Dar es Salaam

Dear Mr Huysen,

We acknowledge receipt of your letter reference DMDF&CS/02/05 dated 8th November 2004.

**Take Notice** that we have responded to all the queries put forward by TANESCO on the Invoice Dispute Notice ("IDN"). Our previous letters (reference IPTL/270/04/PC/ehm dated 6th August 2004 and IPTL/312/04/PC/ehm dated 7th September 2004) remain unanswered from your goodselves.

We are again surprised that TANESCO has issued an IDN (for the October 2004 Capacity Charge) on a similar basis. We wish to reiterate that in our opinion, TANESCO's position on the IDN is inconsistent with the ICSID Arbitration Award as well as the Power Purchase Agreement ("PPA").

Meanwhile please **Take Further Notice** of the following: -

1.   **Escrow Account**
     TANESCO is in breach of its obligations under Article 6.6 (a) of the PPA. We would impress upon TANESCO to set up the Escrow Account without further delay. Please be reminded that an Escrow Account establishment (fully funded) is prerequisite to an Invoice Dispute Notice.

2.   **Outstanding Payment**
     The September Capacity Charge of Shillings 3,679,104,846/= has been overdue since the 1st of November 2004. Further be reminded of the balance outstanding from the September 04 Energy Charges of Shillings 357,826,409.95/=. We would impress upon TANESCO to settle this outstanding amount of **Shillings 4,036,931,255.95/=** without further delay. Please note that the continuity of Capacity and Energy Charge payments from TANESCO is critical to IPTL in sustaining the Tegeta Plant operations.

1

INDEPENDENT
POWER TANZANIA LTD.

IPTL reserves its rights under the PPA in respect of all the issues stated above.

Yours Faithfully,
**Independent Power Tanzania Limited**

PARTHIBAN, C
General Manager

c.c.:    Mr Patrick Rutanbanzibwa
         Permanent Secretary
         Ministry of Energy and Minerals
         P.O. Box 2000
         <u>Dar es Salaam</u>

2

**INDEPENDENT
POWER TANZANIA LTD.**

OPERATIONS:
Plot No. 292/1, 292/2, 292/3 and 296, Block "D" Salasala Tegeta
P.O.Box 77173, Dar Es Salaam, Tanzania.
Telephone : +255-51-650750.    Facsimile : +255-51-650751
E-mail    : ipt@cats-net.com

Our Ref: IPTL/428/04/PC/ehm                    Date: 17th December, 2004

Mr. Rudy Huysen
Managing Director
Tanzania Electric Supply Company Ltd.
P.O. Box 9024
Dar es Salaam

Dear Mr Huysen,

We acknowledge receipt of your letter reference DMDF&CS/02/05 dated 7th December 2004.

**Take Notice** that we have responded to all the queries put forward by TANESCO on the Invoice Dispute Notice ("IDN"). Our previous letters

1. Reference IPTL/270/04/PC/ehm dated 6th August 2004
2. Reference IPTL/312/04/PC/ehm dated 7th September 2004 and
3. Reference IPTL/381/04/PC/ehm dated 10th November 2004

Remain unanswered from your goodselves. Further TANESCO's current actions by issuing IDN's for some months and omitting some months and not responding to IPTL's responses are seemingly becoming frivolous.

In any case we are again surprised that TANESCO has issued an IDN (for the November 2004 Capacity Charge) on a similar basis. We wish to reiterate that in our opinion, TANESCO's position on the IDN is inconsistent with the ICSID Arbitration Award as well as the Power Purchase Agreement ("PPA").

Meanwhile please **Take Further Notice** of the following: -

1.    **Escrow Account**
      TANESCO is in breach of its obligations under Article 6.6 (a) of the PPA. We would impress upon TANESCO to set up the Escrow Account without further delay. Please be reminded that an Escrow Account establishment (fully funded) is prerequisite to an Invoice Dispute Notice.

1

INDEPENDENT
POWER TANZANIA LTD.

2. **Outstanding Payment**

We thank you for the October 2004 Capacity Charge of Shillings 3,679,104,846/= (due since the 1st of December 2004) received on the 15th of December 2004. Please note that the continuity of Capacity Charge payments from TANESCO is critical to IPTL in sustaining the Tegeta Plant Operations.

IPTL reserves its rights under the PPA in respect of all the issues stated above.

Yours Faithfully,
**Independent Power Tanzania Limited**

PARTHIBAN, C
General Manager

c.c.:  Mr Patrick Rutanbanzibwa
Permanent Secretary
Ministry of Energy and Minerals
P.O. Box 2000
Dar es Salaam

2

**INDEPENDENT**
**POWER TANZANIA LTD.**

OPERATIONS:
Plot No. 292/1, 292/2, 292/3 and 296, Block "D" Salasala Tegeta
P.O. Box 77173, Dar Es Salaam, Tanzania
Telephone : +255-51-650760, Facsimile : +255-51-650751
E-mail : iptl@cats-net.com

Our Ref: IPTL/029/05/PC/ehm

Date: 19th January, 2005

Mr. Rudy Huysen
Managing Director
Tanzania Electric Supply Company Ltd.
P.O. Box 9024
<u>Dar es Salaam</u>

Dear Mr Huysen,

We acknowledge receipt of your letter reference DMDF&CS/02/05 dated 6th January 2005.

**Take Notice** that we have responded to all the queries put forward by TANESCO on the Invoice Dispute Notice ("IDN"). Our previous letters

1. Reference IPTL/270/04/PC/ehm dated 6th August 2004
2. Reference IPTL/312/04/PC/ehm dated 7th September 2004
3. Reference IPTL/381/04/PC/ehm dated 10th November 2004
4. Reference IPTL/428/04/PC/ehm dated 17th December 2004

remain unanswered from your goodselves.

TANESCO's position on the IDN is inconsistent with the ICSID Arbitration Award as well as the Power Purchase Agreement ("PPA").

Meanwhile please **Take Further Notice** of the following: -

1. **Escrow Account**
   TANESCO is in breach of its obligations under Article 6.6 (a) of the PPA. We would impress upon TANESCO to set up the Escrow Account without further delay. Please be reminded that an Escrow Account establishment (fully funded) is prerequisite to an Invoice Dispute Notice.

2. **Outstanding Payment**
   We thank you for the November 2004 Capacity Charge of Shillings **3,680,081,586/=** (due since the 1st of January 2005) received on the 18th of January 2005. Please note that the continuity of Capacity Charge payments from TANESCO is critical to IPTL in sustaining the Tegeta Plant Operations.

1

POWER TANZANIA LTD.

IPTL reserves its rights under the PPA in respect of all the issues stated above.

Yours Faithfully,
**Independent Power Tanzania Limited**

PARTHIBAN, C
General Manager

c.c.:    Mr Patrick Rutanbanzibwa
Permanent Secretary
Ministry of Energy and Minerals
P.O. Box 2000
Dar es Salaam

2

**INDEPENDENT POWER TANZANIA LTD.**

OPERATIONS:
Plot No. 2497/242 Chole Road, Masaki Peninsula O' Salasala, Toyota
Tel: + 255 222 650750    Facsimile: + 255 222 650751
Email: admin@iptl.co.tz

Our Ref: IPTL/196/06/SM/ehm

Date: 15th April, 2006

Mr Adriaan van der Merve
Managing Director
Tanzania Electric Supply Company Ltd.
P.O. Box 9024
Dar es Salaam

Dear Mr Van der Merve,

RE: INVOICE DIPSUTE NOTICE – May 2006

We have received TANESCO's 8 May 2006 Invoice Dispute Notice (the "Notice"). The Notice is improper, and immediate payment of the sum due to IPTL should be made.

First, the Notice does not state what is erroneous about the computation of the capacity purchase price. Therefore, the Notice does not comply with Article 6.8(A) of the PPA, which requires that the Notice state the basis of the dispute. Please provide details as to your contention that the computation of the capacity purchase price is erroneous.

In that connection, your contention that the calculation of the invoice is at odds with the conclusion reached by Dr Swales, who concluded on May 3, "I conclude that the calculation of the invoice is correct." (see attached.)

Further, TANESCO remains in breach of its obligations under Article 6.6 of the Power Purchase Agreement to establish an escrow account or letter of credit. IPTL has never waived this contractual obligation, and continues to impress upon TANESCO to immediately establish either an escrow account or letter of credit. Any disputed sums are required to be deposited into that account until the dispute is resolved. TANESCO is not entitled to simply withhold payment on the basis of a purported invoice dispute. Rather, under the circumstances, TANESCO is required to make immediate payment to IPTL, and IPTL firmly requests that TANESCO do so immediately.

Further, TANESCO presently owes IPTL the following: TZS 15,777,136,589 (see attached) which has not been disputed and is overdue. Please make immediate payment of those sums.

These sums do not include the current charges (Apr 2006) amounting to TZS 9,323,526,817.

INDEPENDENT
POWER TANZANIA LTD.

We note that TANESCO's failure to pay this invoice prejudices the rights and interests not only of IPTL, but of IPTL's lender. We cannot imagine that this course of conduct is helpful on the eve of the discussions that are to take place May 23 and 24.

Thanking you,

Respectfully,
Independent Power Tanzania Limited

PARTHIBAN, C
General Manager

Encl.

1. Response from Dr Swales – April 2006 Working Model
2. Statement of Account May 2006

Cc:    Mr. A. Mwakapugi
       Permanent Secretary
       Ministry of Energy & Minerals
       P.O. Box 2000
       Dar es Salaam

       Mr. Bashir Mrindoko
       Commissioner for Energy & Petroleum Affairs
       Ministry of Energy & Minerals
       P.O. Box 2000
       Dar es Salaam

# INDEPENDENT POWER TANZANIA LTD.

OPERATIONS:

P.O. Box ████████████████████ Block 'D' Sabasaba, Tegeta
Tel: + 255 222 650750    Facsimile: + 255 222 650751
Email: admin@ipt.co.tz

The Managing Director
Tanzania Electric Supply Company Limited
P.O.Box 9024, Dar Es Salaam
TANZANIA

DATE
15.05.06

## STATEMENT OF ACCOUNT

| DATE | INVOICE NO. | DESCRIPTION | DEBIT | CREDIT | BALANCE |
|------|-------------|-------------|-------|--------|---------|
| 02.02.2006 | 04/2006/IPTL | EAF Bonus for FY2005/6 | 2,099,830,428.00 | | 2,099,830,428.00 |
| 01.03.2006 | 11/2005/IPTL | Capacity Charges for Feb '06 | 3,985,467,445.00 | | 6,085,297,873.00 |
| 08.05.2006 | NBC 206595 | Payment Received | | 1,260,504,410.00 | 4,824,793,463.00 |
| 01.03.2006 | 12/2006/IPTL | Energy Charges for Feb '06 | 7,816,653,058.00 | | 12,641,446,521.00 |
| 31.03.2006 | NBC 206342 | Payment Received | | 1,000,000,000.00 | 11,641,446,521.00 |
| 04.04.2006 | NBC 206418 | Payment Received | | 3,000,000,000.00 | 8,641,446,521.00 |
| 12.04.2006 | NBC 206499 | Payment Received | | 3,816,653,058.00 | 4,824,793,463.00 |
| 01.03.2006 | 13/2006/IPTL | Supplemental Charges for Feb '06 | 4,625,380.50 | | 4,829,418,843.50 |
| 12.04.2006 | NBC 206500 | Payment Received | | 4,625,380.50 | 4,824,793,463.00 |
| 01.04.2006 | 14/2006/IPTL | Capacity Charges for Mar '06 | 3,985,467,445.00 | | 8,810,260,908.00 |
| 01.04.2006 | 15/2006/IPTL | Energy Charges for Mar '06 | 8,962,311,284.00 | | 17,772,572,192.00 |
| 25.04.2006 | NBC 206594 | Payment Received | | 1,000,000,000.00 | 16,772,572,192.00 |
| 27.04.2006 | NBC 206607 | Payment Received | | 1,000,000,000.00 | 15,772,572,192.00 |
| 01.04.2006 | 16/2006/IPTL | Supplemental Charges for Mar '06 | 4,564,397.00 | | 15,777,136,589.00 |
| 01.05.2006 | 17/2006/IPTL | Capacity Charges for Apr '06 | 3,985,467,445.00 | | 19,762,604,034.00 |
| 01.05.2006 | 19/2006/IPTL | Energy Charges for Apr '06 | 5,265,166,013.00 | | 25,027,770,047.00 |
| 01.05.2006 | 18/2006/IPTL | Supplemental Charges for Apr '06 | 72,893,359.00 | | 25,100,663,406.00 |



## AGED ANALYSIS OF OUTSTANDING BALANCES

| DATE | CURRENT | 30 DAYS | 60 DAYS | 90 DAYS | 120 DAYS | AMOUNT DUE |
|------|---------|---------|---------|---------|----------|------------|
| 15.05.06 | 9,323,526,817.00 | 10,952,343,126.00 | 2,724,963,035.00 | 2,099,830,428.00 | | 25,100,663,406.00 |

TERMS: Strictly 30 days credit from date of invoice. Please settle immediately.
All cheques should be payable to "INDEPENDENT POWER TANZANIA LIMITED"

STATEMENT OF ACCOUNT TO TANESCO May 06

Gentlemen

I am in receipt of your email of May 2, 2006 with the attached copy of the Tegeta working model adjusted for the month of April 2006 invoice.

There has been no further a change in the Lenders Interest Rate since the rate changed from 6.4775% to 6.79063% in February 2006.

I note that, during April, 9,036.66 tonnes of fuel oil were purchased at US$ 409.53 per tonne, slightly higher than the price paid in March. The incremental cost of energy from Tegeta was 9.747 US cents per kW.h. Tegeta was dispatched at a plant factor of 52%, about the same as in February, delivering 38,710.9 MW-h.

Again, I note that as there have been no Destination Inspection Fees passed through by IPTL in their monthly power and energy invoices since July 2005, I continue to look forward to advice in this regard.

Based on the data I have been given, I conclude that the calculation of the invoice amount is correct. The table attached summarizes my numerical observations.

I hope this review has been useful.

With best wishes

Martin Swales



Review of the April 2006 Invoice Data

| Issue | IPTL Value | TANESCO Value | Comment |
|---|---|---|---|
| Date for US CPI Application | 30 November-05 | 30 November-05 | Agreed |
| Date for US$ to TSh Exchange Application | 31 December-05 | 31 December-05 | Agreed |
| Update of Risk Insurance Rates | Unchanged from Jan '06 | | None expected |
| Change in Lender's Interest Rate | No further change since Feb. 1, 2006 | | |
| Update of the 3-mo LIBOR Rate | 4.60% | No change | Agreed |
| Recalibrate the Model | No | No | Agreed |
| Add new fuel purchase data | 9,036.66 tonnes @ $409.53 | | No Comment |
| Monthly Energy Sales, MW.h | 38,710.9 MW.h | No Independent Data | No Comment |
| Change to the Dependable Capacity | None | No Independent Data | No Comment |
| Supplemental Charges | $4,241.29 $58,441.10 | No Independent Data | Workers Welfare Fund & City Service Levy |
| Destination Inspection Fees (DIF) | $0.00 | No Independent Data | |



RECEIVED
0 3 MAY 2006
IPTL
DSM.

**INDEPENDENT POWER TANZANIA LTD.**

OPERATIONS:
P.O. Box 7894/345 Umoja/House 29C Block "D" Salasala, Tegeta
Tel: + 255 222 650750      Facsimile: + 255 222 650751
Email: admin@iptl.co.tz

Our Ref: IPTL/226/06/SM/ehm                    Date: 14th June, 2006

Mr Adriaan van der Merwe
Managing Director
Tanzania Electric Supply Company Ltd.
P.O. Box 9024
Dar es Salaam

Dear Mr Van der Merwe,

RE: INVOICE DISPUTE NOTICE – JUNE 2006

We have received TANESCO's 7 June 2006 Invoice Dispute Notice (the "Notice"). The Notice is improper, and immediate payment of the sum due to IPTL should be made.

We reiterate that the Notice does not state what is erroneous about the computation of the capacity purchase price. Therefore, the Notice does not comply with Article 6.8(A) of the PPA, which requires that the Notice state the basis of the dispute. Please provide details as to your contention that the computation of the capacity purchase price is erroneous.

In that connection, your contention that the calculation of the invoice is at odds with the conclusion reached by Dr Swales, who concluded on June 6, "I conclude that the calculation of the invoice is correct." (see attached.)

TANESCO also remains in breach of its obligations under Article 6.6 of the Power Purchase Agreement to establish an escrow account or letter of credit. IPTL has never waived this contractual obligation, and continues to impress upon TANESCO to immediately establish either an escrow account or letter of credit. Any disputed sums are required to be deposited into that account until the dispute is resolved. TANESCO is not entitled to simply withhold payment on the basis of a purported invoice dispute. Rather, under the circumstances, TANESCO is required to make immediate payment to IPTL, and IPTL firmly requests that TANESCO do so immediately.

Further, TANESCO presently owes IPTL the following: TZS 10,143,658,677 which is overdue. Please make immediate payment of those sums. These sums do not include the current charges amounting to TZS 5,265,913,771.50.

We note that TANESCO's failure to pay these invoices prejudices the rights and interests not only of IPTL, but of IPTL's lender.

**INDEPENDENT POWER TANZANIA LTD.**

We are also surprised at this given our recent gas conversion meetings about the conditions of Lender's consent to gas conversion. Among those conditions is that capacity payments be current, and that the capacity payment calculations be confirmed. This Invoice Dispute Notice casts substantial doubt on whether either of those conditions can be met.

Thanking you,

Respectfully,
**Independent Power Tanzania Limited**

PARTHIBAN, C
General Manager

Encl.

1. Response from Dr Swales – May 2006 Working Model
2. Statement of Account May 2006

Cc:    Mr. Arthur Mwakapugi
       Permanent Secretary
       Ministry of Energy & Minerals
       P.O. Box 2000
       Dar es Salaam

       Mr. Bashir Mrindoko
       Commissioner for Energy & Petroleum Affairs
       Ministry of Energy & Minerals
       P.O. Box 2000
       Dar es Salaam

Gentlemen

I am in receipt of your email of June 5, 2006 with the attached copy of the Tegeta working model adjusted for the May 2006 invoice.

There has been a change in the Lenders Interest Rate from 6.79063% to 7.25188 effective May 2006, an increase of 0.46125%. I shall assume that TANESCO has the supporting documentation from IPTL. As noted when the interest rate changed in previous months, the IRR on equity is affected but the effect will be compensated when the model is recalibrated in July this year.

I note that, during May, 1,550.062 tonnes of fuel oil were purchased at US$ 510.55 per tonne, $100 higher than in April. However, as the total energy delivered by the Tegeta plant in May was on 8,174.4 MW.h, a plant factor of only 11.9%, this expensive fuel has not yet affected the cost of energy. The incremental cost of energy from Tegeta during May was 9.845 US cents per kW.h but this cost will increase by over 2 cents/kW.h when the most recent fuel is passed through to TANESCO.

I note that IPTL has advised in April 2006 that Total has not invoiced IPTL for Destination Inspection Fees since July 2005. TANESCO should anticipate a significant charge at some time when these costs are passed through by Total and IPTL.

Based on the data I have been given, I conclude that the calculation of the invoice amount is correct. The table attached summarizes my numerical observations.

I hope this review has been useful.

With best wishes

Martin Swales



Review of the May 2006 Invoice Data

| Issue | IPTL Value | TANESCO Value | Comment |
|---|---|---|---|
| Date for US CPI Application | 30 November-05 | 30 November-05 | Agreed |
| Date for US$ to TSh Exchange Application | 31 December-05 | 31 December-05 | Agreed |
| Update of Risk Insurance Rates | Unchanged from Jan '06 | | None expected |
| Change in Lender's Interest Rate | Changed to 7.25188% effective May 1, 2006 | | TANESCO to obtain supporting documentation |
| Update of the 3-mo LIBOR Rate | 4.60% | No change | Agreed |
| Recalibrate the Model | No | No | Agreed |
| Add new fuel purchase data | 1,550.062 tonnes @ $510.55 | | A record high cost |
| Monthly Energy Sales, MW.h | 9,174.4 MW.h | No Independent Data | No Comment |
| Change to the Dependable Capacity | None | No Independent Data | No Comment |
| Supplemental Charges | $4,241.29 $58,441.10 | No Independent Data | Workers Welfare Fund City Service Levy |
| Destination Inspection Fees (DIF) | $0.00 | No Independent Data | |



RECEIVED
0 6 JUN 2006
IPTL DSM.

The Managing Director
Tanzania Electric Supply Company Limited
P.O.Box 9024, Dar Es Salaam
TANZANIA

DATE
13.06.2006

## STATEMENT OF ACCOUNT

| DATE | INVOICE NO. | DESCRIPTION | DEBIT | CREDIT | BALANCE |
|---|---|---|---|---|---|
| 02.02.2006 | 04/2006/IPTL | EAF Bonus for FY2005/6 | | | |
| 01.03.2006 | 11/2006/IPTL | Capacity Charges for Feb '06 | 2,099,830,428.00 | | 2,099,830,428.00 |
| 08.05.2006 | NBC 206695 | Payment Received | 3,985,467,445.00 | | 6,085,297,873.00 |
| 26.05.2006 | NBC 206929 | Payment Received | | 1,260,504,410.00 | 4,824,793,463.00 |
| 01.03.2006 | 12/2006/IPTL | Energy Charges for Feb '06 | | 2,724,963,035.00 | 2,099,830,428.00 |
| 31.03.2006 | NBC 206342 | Payment Received | 7,816,653,058.00 | | 9,916,483,486.00 |
| 04.04.2006 | NBC 206418 | Payment Received | | 1,000,000,000.00 | 8,916,483,486.00 |
| 12.04.2006 | NBC 206499 | Payment Received | | 3,000,000,000.00 | 5,916,483,486.00 |
| 01.03.2006 | 13/2006/IPTL | Supplemental Charges for Feb '06 | | 3,816,653,058.00 | 2,099,830,428.00 |
| 12.04.2006 | NBC 206500 | Payment Received | 4,625,380.50 | | 2,104,455,808.50 |
| 01.04.2006 | 14/2006/IPTL | Capacity Charges for Mar '06 | | 4,625,380.50 | 2,099,830,428.00 |
| 01.04.2006 | 15/2006/IPTL | Energy Charges for Mar '06 | 3,985,467,445.00 | | 6,085,297,873.00 |
| 25.04.2006 | NBC 206594 | Payment Received | 8,962,311,284.00 | | 15,047,609,157.00 |
| 27.04.2006 | NBC 206607 | Payment Received | | 1,000,000,000.00 | 14,047,609,157.00 |
| 26.05.2006 | NBC 206928 | Payment Received | | 1,000,000,000.00 | 13,047,609,157.00 |
| 01.04.2006 | 16/2006/IPTL | Supplemental Charges for Mar '06 | | 6,962,311,284.00 | 6,085,297,873.00 |
| 26.05.2006 | NBC 206930 | Payment Received | 4,564,397.00 | | 6,089,862,270.00 |
| 01.05.2006 | 17/2006/IPTL | Capacity Charges for Apr '06 | | 4,564,397.00 | 6,085,297,873.00 |
| 01.05.2006 | 19/2006/IPTL | Energy Charges for Apr '06 | 3,985,467,445.00 | | 10,070,765,318.00 |
| 19.06.2006 | NBC 207087 | Payment Received | 5,265,166,013.00 | | 15,335,931,331.00 |
| 01.05.2006 | 18/2006/IPTL | Supplemental Charges for Apr '06 | | 5,265,166,013.00 | 10,070,765,318.00 |
| 01.06.2006 | 20/2006/IPTL | Capacity Charges for May '06 | 72,893,359.00 | | 10,143,658,677.00 |
| 01.06.2006 | 21/2006/IPTL | Energy charges for May '06 | 3,999,190,122.00 | | 14,142,848,799.00 |
| 01.06.2006 | 22/2006/IPTL | Supplement charges for May '06 | 1,260,366,793.00 | | 15,403,215,592.00 |
| | | | 6,356,856.50 | | 15,409,572,448.50 |

### AGED ANALYSIS OF OUTSTANDING BALANCES

| DATE | CURRENT | 30 DAYS | 60 DAYS | 90 DAYS | 120 DAYS | AMOUNT DUE |
|---|---|---|---|---|---|---|
| 31.05.06 | 5,265,913,771.50 | 4,058,360,804.00 | 3,985,467,445.00 | 2,099,830,428.00 | - | 15,409,572,448.50 |

TERMS: Strictly 30 days credit from date of involve. Please settle immediately.
All cheques should be payable to "INDEPENDENT POWER TANZANIA LIMITED"

STATEMENT OF ACCOUNT TO TANESCO May 06

**INDEPENDENT**
**POWER TANZANIA LTD.**

OPERATIONS:
Plot No. 202/1, 202/2, 202/3 and 296 Block 'O' Salsada, Tegeta
P.O. Box 77173 Dar Es Salaam, Tanzania
Tel: + 255 222 650750    Facsimile: + 255 222 650751
Email: admin@iptl.co.tz

**Our Ref: IPTL/355/06/PC/ehm**                    **Date: 11th October, 2006**

Mr Adriaan Van de Merwe
Managing Director
Tanzania Electric Supply Company Ltd.
P.O. Box 9024
Dar es Salaam

Dear Mr Van de Merwe,

**RE: INVOICE DISPUTE NOTICE – SEPTEMBER 2006**

We have received TANESCO's 9th October 2006 Invoice Dispute Notice (the "Notice"). The Notice is improper, and immediate payment of the sum due to IPTL should be made.

The financial model used to calculate the Capacity Charge Payment inclusive of the 22.31 IRR is provided to Tanesco on a monthly basis. Please provide details and calculations as to your contention that the Capacity Purchase Price is erroneous.

In that connection, your contention that the calculation of the invoice is at odds with the conclusion reached by Dr Swales, who concluded on 10th October, 2006 "I conclude that the calculation of the invoice is correct." (See attached.)

TANESCO also remains in breach of its obligations under Article 6.6 of the Power Purchase Agreement to establish an escrow account or letter of credit. IPTL has never waived this contractual obligation, and continues to impress upon TANESCO to immediately establish either an escrow account or letter of credit.

Further, TANESCO presently owes IPTL the following: TZS 4,264,079,401.00 which is overdue. Please make immediate payment of those sums. These sums do not include the current charges amounting to TZS 14,277,102,482.00.

We note that TANESCO's failure to pay these invoices prejudices the rights and interests not only of IPTL, but of IPTL's Lenders.

We are also surprised at this given our recent gas conversion meetings about the conditions of Lender's consent to gas conversion. Among those conditions is that capacity payments be current, and that the capacity payment calculations be confirmed. This Invoice Dispute Notice casts substantial doubt on whether either of those conditions can be met.

Thanking you,

Respectfully,
**Independent Power Tanzania Limited**

PARTHIBAN, C
General Manager

Encl:  1.    Response from Dr Swales – September 2006 Working Model.
       2.    Statement of Account October 2006.

Cc:    Mr. Arthur Mwakapugi
       Permanent Secretary
       Ministry of Energy & Minerals
       P.O. Box 2000
       Dar es Salaam

       Mr. Bashir Mrindoko
       Commissioner for Energy & Petroleum Affairs
       Ministry of Energy & Minerals
       P.O. Box 2000
       Dar es Salaam

Gentlemen

I am in receipt of your email of October 10, 2006 with the attached copy of the Tegeta working model adjusted for the September 2006 invoice. I apologize for any delay in commenting on this invoice but an earlier copy sent on October 4 did not reach me.

There has been a no further change in the Lenders Interest Rate this month. As per the agreement, the model has been adjusted to update the escalation factor, the exchange rate factor, LIBOR and the adjustment for return on equity. I have checked the values and adjustments made by IPTL and conclude that they are all in accordance with the agreements.

I note that, during September, 13,208.285 tonnes of fuel oil were purchased at US$ 404.45 per tonne. The total energy delivered by the Tegeta plant in September was on 67,119.8 MW.h, a plant factor of over 90.1%. The incremental cost of energy from Tegeta during September was 10.09 US cents per kW.h or about Tsh 124.3 per kW.h. TANESCO should expect this incremental cost to decline slightly in October.

Based on the data I have been given, I conclude that the calculation of the invoice amount is correct. The table attached summarizes my numerical observations.

I hope this review has been useful.

With best wishes


Martin Swales

The Managing Director
Tanzania Electric Supply Company Limited
P.O.Box 9024, Dar Es Salaam
TANZANIA

DATE
09.10.06

## STATEMENT OF ACCOUNT

| DATE | INVOICE NO. | DESCRIPTION | DEBIT | CREDIT | BALANCE |
|------|-------------|-------------|-------|--------|---------|
| 01.09.2006 | 35/2006/IPTL | Capacity Charges Aug 06 | 4,258,213,172.00 | | 4,258,213,172.00 |
| 01.09.2006 | 36/2006/IPTL | Energy Charges Aug 06 | 9,884,729,402.00 | | 14,142,942,574.00 |
| 03.10.2006 | Stanbic 000505 | Payment received $5,049,830.64 x 1287 | | 6,499,132,034.00 | 7,643,810,540.00 |
| 10.10.2006 | NBC | Payment received | | 3,385,597,368.00 | 4,258,213,172.00 |
| 01.09.2006 | 37/2006/IPTL | Supplemental Charges Aug 06 | 5,866,229.00 | | 4,264,079,401.00 |
| 01.10.2006 | 38/2006/IPTL | Capacity Charges Sept 06 | 4,258,213,172.00 | | 8,522,292,573.00 |
| 01.10.2006 | 39/2006/IPTL | Energy Charges Sept 06 | 10,014,394,476.00 | | 18,536,687,049.00 |
| 01.10.2006 | 40/2006/IPTL | Supplemental Charges Sept 06 | 4,494,834.00 | | 18,541,181,883.00 |

### AGED ANALYSIS OF OUTSTANDING BALANCES

| DATE | CURRENT | 30 DAYS | 60 DAYS | 90 DAYS | 120 DAYS | AMOUNT DUE |
|------|---------|---------|---------|---------|----------|------------|
| 09.10.06 | 14,277,102,482.00 | 4,264,079,401.00 | - | - | - | 18,541,181,883.00 |

TERMS: Strictly 30 days credit from date of invoice. Please settle immediately.
All cheques should be payable to "INDEPENDENT POWER TANZANIA LIMITED"

**INDEPENDENT POWER TANZANIA LTD.**

OPERATIONS:
Plot No. 292/1, 292/2, 292/3 and 296 Block 'D' Salasala, Togole
P.O. Box 77173 Dar Es Salaam, Tanzania
Tel: + 255 222 650750    Facsimile: + 255 222 650751
Email: admin@iptl.co.tz

Our Ref: IPTL/127/07/PC/ehm                    Date: 11th April, 2007

Dr. Idris M. Rashidi
Managing Director
Tanzania Electric Supply Company Ltd.
P.O. Box 9024
Dar es Salaam

Dear Dr. Rashidi,

### RE: INVOICE DISPUTE NOTICE - MARCH 2007

We have received TANESCO's 10th April 2007 Invoice Dispute Notice (the "Notice"). The Notice is improper, and immediate payment of the sum due to IPTL should be made.

The financial model used to calculate the Capacity Charge Payment inclusive of the 22.31 IRR was concluded by the ICSID ARBITRATION RULING dated July 12 2001. All computation of Capacity Charges has been done in accordance to the above financial model and is provided to TANESCO on a monthly basis for more than 5 years. Please provide details and calculations as to your contention that the Capacity Purchase Price is erroneous.

In that connection, your contention that the calculation of the invoice is at odds with the conclusion reached by Dr Swales, who concluded on April 8, "I conclude that the calculation of the invoice amount for March 2007 is correct." (See attached.)

TANESCO presently owes IPTL the following: TZS 24,305,161,767.79 which is overdue. Please make immediate payment of those sums. These sums do not include the current charges amounting to TZS 4,928,503,216.56. We wish to impress upon Tanesco the importance of payment as for the past few months IPTL has not been able to clear its dues to not only its Lenders, Operator, Fuel Suppliers and others but also statutory imposts to various local authorities.

We note that TANESCO's failure to pay these invoices prejudices the rights and interests not only of IPTL, but of IPTL's Lenders.

INDEPENDENT
POWER TANZANIA LTD.

We are also surprised at this given the gas conversion meetings about the conditions of Lender's consent to gas conversion. Among those conditions is that Capacity Payments be current, and that the Capacity Payment calculations be reconfirmed. The Notice casts substantial doubt on whether either of those conditions can be met.


Thanking you,

Respectfully,
**Independent Power Tanzania Limited**


PARTHIBAN, C
General Manager


c.c.:    Mr. Arthur Mwakapugi
         Permanent Secretary
         Ministry of Energy & Minerals
         P.O. Box 2000
         <u>Dar es Salaam</u>


         Mr. B. Mrindoko
         Commissioner for Energy & Petroleum Affairs
         Ministry of Energy & Minerals
         P.O. Box 2000
         <u>Dar es Salaam</u>


Encl.

# INDEPENDENT POWER TANZANIA LTD.

OPERATIONS:
Plot No. 2981, 2982, 2920 and 296 Block 'O' Bahasla, Tegeta
P.O. Box 77173 Dar Es Salaam, Tanzania
Tel: + 255 222 650750    Facsimile: + 255 222 650751
Email: admin@ipd.co.tz

The Managing Director
Tanzania Electric Supply Company Limited
P.O.Box 9024, Dar Es Salaam
TANZANIA

DATE
11.04.2007

## STATEMENT OF ACCOUNT

| DATE | INVOICE NO. | DESCRIPTION | DEBIT | CREDIT | BALANCE |
|---|---|---|---|---|---|
| 01.11.2006 | 40A/2006/IPTL | Capacity Charges Oct 06 | 4,258,213,172.00 | | 4,258,213,172.00 |
| 03.01.2007 | NBC 209270 | Payment received | | 723,000,000.00 | 3,535,213,172.00 |
| 29.01.2007 | NBC 209574 | Payment received | | 1,500,000,000.00 | 2,035,213,172.00 |
| 03.04.2007 | NBC 210645 | Payment received | | 1,500,000,000.00 | 535,213,172.00 |
| 01.12.2006 | 43/2006/IPTL | Capacity Charges Nov 06 | 4,254,319,829.00 | | 4,789,533,001.00 |
| 01.12.2006 | 45/2006/IPTL | Supplemental Charges Nov 06 | 513,783,702.00 | | 5,303,316,703.00 |
| 11.12.2006 | 49/2006/IPTL | Supplemental Charges Nov 06 EWURA | 107,158,264.95 | | 5,410,474,967.95 |
| 01.01.2007 | 46/2006/IPTL | Capacity Charges Dec 06 | 4,254,319,829.00 | | 9,664,794,796.95 |
| 01.01.2007 | 48/2006/IPTL | Supplemental Charges Dec 06 | 5,113,777.00 | | 9,669,908,573.95 |
| 01.01.2007 | 50/2006/IPTL | Supplemental Charges Dec 06 EWURA | 72,436,718.82 | | 9,742,345,292.77 |
| 01.02.2007 | 01/2007/IPTL | Capacity Charges Jan 07 | 4,442,943,422.00 | | 14,185,288,714.77 |
| 01.02.2007 | 02/2007/IPTL | Energy Charges Jan 07 | 2,151,715,830.00 | | 16,337,004,544.77 |
| 01.02.2007 | 03/2007/IPTL | Supplemental Charges Jan 07 | 62,315,929.50 | | 16,399,320,474.27 |
| 01.02.2007 | 04/2007/IPTL | Supplemental Charges Jan 07 EWURA | 54,955,493.77 | | 16,454,275,968.04 |
| 01.03.2007 | 05/2007/IPTL | Capacity Charges Feb 07 | 4,408,873,981.00 | | 20,863,149,949.04 |
| 01.03.2007 | 06/2007/IPTL | Energy Charges Feb 07 | 2,148,277,589.00 | | 23,011,427,538.04 |
| 01.03.2007 | 07/2007/IPTL | Supplemental Charges Feb 07 | 4,635,865.00 | | 23,016,063,403.04 |
| 01.03.2007 | 08/2007/IPTL | Supplemental Charges Feb 07 EWURA | 54,642,929.75 | | 23,070,706,332.79 |
| 01.03.2007 | 09/2007/IPTL | EAF Bonus FY2006/2007 | 1,234,455,435.00 | | 24,305,161,767.79 |
| 01.04.2007 | 10/2007/IPTL | Capacity Charges Mar 07 | 4,408,873,981.00 | | 28,714,035,748.79 |
| 01.04.2007 | 11/2007/IPTL | Energy Charges Mar 07 | 473,873,766.00 | | 29,187,909,514.79 |
| 01.04.2007 | 12/2007/IPTL | Supplemental Charges Mar 07 | 5,065,905.00 | | 29,192,975,419.79 |
| 01.04.2007 | 13/2007/IPTL | Supplemental Charges Mar 07 EWURA | 40,689,564.56 | | 29,233,664,984.35 |

## AGED ANALYSIS OF OUTSTANDING BALANCES

| DATE | CURRENT | 30 DAYS | 60 DAYS | 90 DAYS | 120 DAYS | AMOUNT DUE |
|---|---|---|---|---|---|---|
| 11.04.07 | 4,928,503,216.56 | 7,850,885,799.75 | 6,711,930,675.27 | 4,331,870,324.82 | 5,410,474,967.95 | 29,233,664,984.35 |

TERMS: Strictly 30 days credit from date of invoice. Please settle immediately.
All cheques should be payable to "INDEPENDENT POWER TANZANIA LIMITED"



STATEMENT OF ACCOUNT TO TANESCO Apr 07

Gentlemen

I am in receipt of your email of April 4, 2007 with the attached copy of the Tegeta working model adjusted for the March 2007 invoice.

There has been no further change in the Lenders Interest Rate this month from the rate of 7.40063% that was set on February 1, 2007. IPTL has made no other changes to the key factors used in the invoice calculation.

IPTL has included two purchases of fuel oil made February 2007: the first in the amount of 4,017,069 tonnes at $361.35 and the second 4,595,766 tonnes at $397.36. The fuel purchased by IPTL in December 2006 at $355.67/tonne has been sufficient for all energy delivered so far in 2007 so the higher 2007 fuel costs have yet to be reflected in the 2007 energy charges. The total energy delivered by the Tegeta plant in March was only 3,485.5 MW.h and the incremental cost of energy from Tegeta was the same as the cost in February, i.e. 8.72 US cents per kW.h or about Tsh 113.3 per kW.h.

The invoice does not include any charges for Destination Inspection Fees. Based on the data I have been given, I conclude that the calculation of the invoice amount for March 2007 is correct. The table attached summarizes my numerical observations.

I hope this review has been useful.

With best wishes

Martin Swales



Review of the March 2007 Invoice Data

| Issue | IPTL Value | TANESCO Value | Comment |
|---|---|---|---|
| Date for US CPI Application | 30-Nov-06 | 30-Nov-06 | Agreed |
| Date for US$ to TSh Exchange Application | 31-Dec-06 | 31-Dec-06 | Agreed |
| Update of Risk Insurance Rates | Unchanged from Jan '07 | | None expected |
| Change in Lender's Interest Rate | 7.40063% set on Feb 1 '07 | | No comment |
| Update of the 3-mo LIBOR Rate | 5.36025% | | Agreed |
| Recalibrate the Model | No | No | Agreed |
| Add new fuel purchase data | 4,017.069 @ $361.35 & 4,595.766 @ $397.36 | | No comment |
| Monthly Energy Sales. MW.h | 3,485.5 MW.h | No Independent Data | No Comment |
| Change to the Dependable Capacity | None | No Independent Data | No Comment |
| Supplemental Charges | $3,898.41 $0 | No Independent Data | Workers Welfare Fund. City Services Levy |
| Destination Inspection Fees (DIF) | $0.00 | No Independent Data | |
| EWURA Regulatory Levy (1%) | $31,312.17 | Ref: GOT Gazette #157 | |

*Tunayaangaza Maisha Yako"        *T A N E S C O*        *"We Light Up Your Life"*

## SHIRIKA LA UMEME TANZANIA
## TANZANIA ELECTRIC SUPPLY COMPANY LIMITED

Ubungo Head Office, "Umeme Park", PO BOX 9024 Dar es Salaam, Tanzania. Tel: 1255 22 2451130/9. Fax: 1255 22 2452026

Our Ref:

Date:

### SEC.427/IPTL-NOTICES/04/2007                    10th April, 2007

Independent Power Tanzania Limited
Plot No. 292/1,292/2,292/3 &296,
Block "D" Salasala, Tegeta
P O Box 77173,
**DAR ES SALAAM**

**Attention: Managing Director**

Dear Sir,

RE:   **INVOICE DISPUTE NOTICE**

TAKE NOTICE that the amount of the Invoice for the for the month of   March 2007 bearing Ref. No. Tax Invoice No.10/2007/IPTL dated 1st April, 2007 and received by the us on 2nd April, 2007 is in dispute.

TANESCO disputes the amount of Tshs.3,674,061,651.00 from the above referred invoice.

The basis of the dispute is the erroneous computation of Capacity Purchase Price, described in the invoice as Capacity Charges and Capacity Tariff, in as much as the tariff provides IPTL with an equity IRR in excess of 22.31%.

This notice is given as required under Article 6.8 of the Power Purchase Agreement.

Yours faithfully,
For: **TANZANIA ELECTRIC SUPPLY COMPANY LIMITED**



**DR. IDRIS M. RASHIDI**
**MANAGING DIRECTOR**
GEM/rcjm:

---

TANESCO BOARD OF DIRECTORS: Ambassador F.M. Kazaura (Chairman), Mr A. B. Marmanda, Hon. P Magani (MPI, Mr A. B. Kilewo.

**INDEPENDENT
POWER TANZANIA LTD.**

OPERATIONS:
Plot No. 2921, 2922, 2923 and 296 Block 'D' Salasala, Tegeta
No. 9255722 Dar es Salaam. Tel: 255 222 650751
Email: admin@iptl.co.tz

Our Ref: IPTL/178/07/PC/ehm                    Date: 11ᵗʰ June, 2007

Dr. Idris Rashidi
Managing Director
Tanzania Electric Supply Company Ltd.
P.O. Box 9024
<u>Dar es Salaam</u>

Dear Dr. Rashidi,

RE: <u>INVOICE DISPUTE NOTICE – MAY 2007</u>

We have received TANESCO's 8ᵗʰ June 2007 Invoice Dispute Notice (the "Notice"). The Notice is improper, and immediate payment of the sum due to IPTL should be made.

The financial model used to calculate the Capacity Charge Payment inclusive of the 22.31 IRR was concluded by the ICSID ARBITRATION RULING dated July 12ᵗʰ 2001. All computation of Capacity Charges has been done in accordance to the above financial model and is provided to Tanesco on a monthly basis for more than 5 years.

Please provide details and calculations as to your contention that the Capacity Purchase Price is erroneous. **In fact Tanesco has failed to provide this pertinent data on similar IDN's issued intermittently over the past year.**

Further, your contention on the calculation of the May 2007 Invoice is at odds with the conclusion reached by Dr Swales, who concluded on June 7, "I conclude that the calculation of the invoice amount for May 2007 is correct." (See attached)

We urgently await your response.

Respectfully,
**Independent Power Tanzania Limited**

PARTHIBAN, C
General Manager

Encl.

POWER TANZANIA LTD.

c.c.:  Hon. Minister
       Ministry of Energy & Minerals
       P.O. Box 2000
       Dar es Salaam

       Hon. Minister
       Ministry of Finance
       P.O. Box 9111
       Dar es Salaam

       Permanent Secretary
       Ministry of Energy & Minerals
       P.O. Box 2000
       Dar es Salaam

       Permanent Secretary
       Ministry of Finance
       P.O. Box 9111
       Dar es Salaam

       The Commissioner for Energy & Petroleum Affairs
       Ministry of Energy & Minerals
       P.O. Box 2000
       Dar es Salaam

Gentlemen

I am in receipt of your email of June 7, 2007 with the attached copy of the Tegeta working model adjusted for the May 2007 invoice.

There has been a decline in the Lenders Interest Rate this month from the rate of 7.40063% that was set on February 1, 2007 to the rate of 7.36% effective May 1, 2007. IPTL has made no other changes to the key factors used in the invoice calculation.

IPTL has added no more fuel oil since March 31 2007. The Tegeta plant was not dispatched during May so the energy component of the charges is zero.

Although not reported in my comments on the April 2007 invoice, I note the change to the application of VAT on the invoice. VAT is applied to only the energy component of the invoice effective April 1, 2007. As the energy component is zero, the total VAT charged in May is zero.

The invoice does not include any charges for Destination Inspection Fees. Based on the data I have been given, I conclude that the calculation of the invoice amount for May 2007 is correct. The table attached summarizes my numerical observations.

I hope this review has been useful.

With best wishes

Martin Swales



Review of the May 2007 Invoice Data

| Issue | IPTL Value | TANESCO Value | Comment |
|---|---|---|---|
| Date for US CPI Application | 30-Nov-06 | 30-Nov-06 | Agreed |
| Date for US$ to TSh Exchange Application | 31-Dec-06 | 31-Dec-06 | Agreed |
| Update of Risk Insurance Rates | Unchanged from Jan '07 | | None expected |
| Change in Lender's Interest Rate | From 7.40063% set on Feb 1 '07 to 7.36% effective May 1, 2007 | | TANESCO to obtain supporting documentation from IPTL |
| Update of the 3-mo LIBOR Rate | 5.36025% | | Agreed |
| Recalibrate the Model | No | No | Agreed |
| Add new fuel purchase data | | | |
| Monthly Energy Sales. MW.h | 0.0 MW.h | No Independent Data | No Comment |
| Change to the Dependable Capacity | None | No Independent Data | No Comment |
| Supplemental Charges | $3.165.75 $9,184.19 | No Independent Data | Workers Welfare Fund. City Services Levy |
| Destination Inspection Fees (DIF) | $0.00 | No Independent Data | |
| EWURA Regulatory Levy (1%) | $28.267.53 | Ref: GOT Gazette #157 | ı |

The Managing Director
Tanzania Electric Supply Company Limited
P.O.Box 9024, Dar Es Salaam
TANZANIA

DATE
31.05.2007

## STATEMENT OF ACCOUNT

| DATE | INVOICE NO. | DESCRIPTION | DEBIT | CREDIT | BALANCE |
|------|-------------|-------------|-------|--------|---------|
| 01.11.2006 | 40A/2006/IPTL | Capacity Charges Oct 06 | 4,258,213,172.00 | | 4,258,213,172.00 |
| 03.01.2007 | NBC 209270 | Payment received | | 723,000,000.00 | 3,535,213,172.00 |
| 29.01.2007 | NBC 209574 | Payment received | | 1,500,000,000.00 | 2,035,213,172.00 |
| 03.04.2007 | NBC 210645 | Payment received | | 1,500,000,000.00 | 535,213,172.00 |
| 02.05.2007 | NBC 210991 | Payment received | | 535,213,172.00 | |
| 01.12.2006 | 43/2006/IPTL | Capacity Charges Nov 06 | 4,254,319,829.00 | | 4,254,319,829.00 |
| 02.05.2007 | NBC 210991 | Payment received | | 964,786,828.00 | 3,289,533,001.00 |
| 21.05.2007 | NBC 211220 | Payment received | | 1,500,000,000.00 | 1,789,533,001.00 |
| 22.05.2007 | NBC 211247 | Payment received | | 1,500,000,000.00 | 289,533,001.00 |
| 01.12.2006 | 45/2006/IPTL | Supplemental Charges Nov 06 | 513,783,702.00 | | 803,316,703.00 |
| 11.12.2006 | 49/2006/IPTL | Supplemental Charges Nov 06 EWURA | 107,158,264.95 | | 910,474,967.95 |
| 01.01.2007 | 46/2006/IPTL | Capacity Charges Dec 06 | 4,254,319,829.00 | | 5,164,794,796.95 |
| 01.01.2007 | 50/2006/IPTL | Supplemental Charges Dec 06 | 5,113,777.00 | | 5,169,908,573.95 |
| 01.01.2007 | 01/2007/IPTL | Supplemental Charges Dec 06 EWURA | 72,436,718.82 | | 5,242,345,292.77 |
| 01.02.2007 | 02/2007/IPTL | Capacity Charges Jan 07 | 4,442,943,422.00 | | 9,685,288,714.77 |
| 01.02.2007 | 03/2007/IPTL | Energy Charges Jan 07 | 2,151,715,830.00 | | 11,837,004,544.77 |
| 01.02.2007 | 04/2007/IPTL | Supplemental Charges Jan 07 | 62,315,929.50 | | 11,899,320,474.27 |
| 01.03.2007 | 05/2007/IPTL | Supplemental Charges Jan 07 EWURA | 54,955,493.77 | | 11,954,275,968.04 |
| 01.03.2007 | 06/2007/IPTL | Capacity Charges Feb 07 | 4,408,873,981.00 | | 16,363,149,949.04 |
| 01.03.2007 | 07/2007/IPTL | Energy Charges Feb 07 | 2,148,277,589.00 | | 18,511,427,538.04 |
| 01.03.2007 | 08/2007/IPTL | Supplemental Charges Feb 07 | 4,635,865.00 | | 18,516,063,403.04 |
| 01.03.2007 | 09/2007/IPTL | Supplemental Charges Feb 07 EWURA | 54,642,929.75 | | 18,570,706,332.79 |
| 01.04.2007 | 10/2007/IPTL | EAF Bonus FY2006/2007 | 1,234,455,435.00 | | 19,805,161,767.79 |
| 12.04.2007 | CN01/2007 | Capacity Charges Mar 07 | 4,408,873,981.00 | | 24,214,035,748.79 |
| 01.04.2007 | 11/2007/IPTL | Credit note on Capacity Charges Mar 07 | | 734,812,330.00 | 23,479,223,418.79 |
| 01.04.2007 | 12/2007/IPTL | Energy Charges Mar 07 | 473,873,766.00 | | 23,953,097,184.79 |
| 01.04.2007 | 13/2007/IPTL | Supplemental Charges Mar 07 | 5,065,905.00 | | 23,958,163,089.79 |
| 01.05.2007 | 14/2007/IPTL | Supplemental Charges Mar 07 EWURA | 40,688,564.56 | | 23,998,852,654.35 |
| 01.05.2007 | 15/2007/IPTL | Capacity Charges Apr 07 | 3,674,061,651.00 | | 27,672,914,305.35 |
| 01.05.2007 | 16/2007/IPTL | Energy Charges Apr 07 | 243,972,593.00 | | 27,916,886,898.35 |
| 01.05.2007 | 17/2007/IPTL | Supplemental Charges Apr 07 | 4,200,476.50 | | 27,921,087,374.85 |
| | | Supplemental Charges Apr 07 EWURA | 38,773,721.45 | | 27,959,861,096.30 |

## AGED ANALYSIS OF OUTSTANDING BALANCES

| DATE | CURRENT | 30 DAYS | 60 DAYS | 90 DAYS | 120 DAYS | AMOUNT DUE |
|------|---------|---------|---------|---------|----------|------------|
| 31.05.07 | 3,961,008,441.95 | 4,193,690,886.56 | 7,850,885,799.75 | 6,711,930,675.27 | 5,242,345,292.77 | 27,959,861,096.30 |
| | | | | | | 0.00 |

TERMS: Strictly 30 days credit from date of invoice. Please settle immediately.
All cheques should be payable to "INDEPENDENT POWER TANZANIA LIMITED"

**INDEPENDENT POWER TANZANIA LTD.**

OPERATIONS:
Plot No. 2327, 2328, 2329 and 226 Block 'D' Salasala, Togota
P.O. Box 77173 Dar Es Salaam, Tanzania
Tel: + 255 222 650790    Facsimile: + 255 222 650751
Email: admin@iptl.co.tz

Our Ref: IPTL/227/07/PC/ehm                    Date: 15th August, 2007

Dr. Idris Rashidi
Managing Director
Tanzania Electric Supply Company Ltd.
P.O. Box 9024
Dar es Salaam

Dear Dr. Rashidi,

RE: <u>INVOICE DISPUTE NOTICE – JULY 2007</u>

We have received TANESCO's 6th August 2007 Invoice Dispute Notice [the "Notice"]. The Notice is improper, and immediate payment of the sum due to IPTL should be made.

The financial model used to calculate the Capacity Charge Payment inclusive of the 22.31 IRR was concluded by the ICSID ARBITRATION RULING dated July 12th 2001. All computation of Capacity Charges has been done in accordance to the above financial model and is provided to Tanesco on a monthly basis for more than 5 years.

Please provide details and calculations as to your contention that the Capacity Purchase Price is erroneous. In fact Tanesco has failed to provide this pertinent data despite various requests.

Further, your contention on the calculation of the May 2007 Invoice is at odds with the conclusion reached by Dr Swales. (See attached)

We urgently await your response.

Respectfully,
Independent Power Tanzania Limited

PARTHIBAN, C
General Manager

Encl.

INDEPENDENT
POWER TANZANIA LTD.

c.c.:  Hon. Minister
       Ministry of Energy & Minerals
       P.O. Box 2000
       Dar es Salaam

       Hon. Minister
       Ministry of Finance
       P.O. Box 9111
       Dar es Salaam

       Permanent Secretary
       Ministry of Energy & Minerals
       P.O. Box 2000
       Dar es Salaam

       Permanent Secretary
       Ministry of Finance
       P.O. Box 9111
       Dar es Salaam

       The Commissioner for Energy & Petroleum Affairs
       Ministry of Energy & Minerals
       P.O. Box 2000
       Dar es Salaam

       Governor
       Bank of Tanzania
       P.O. Box 2939
       Dar es Salaam

INDEPENDENT POWER TANZANIA LTD.

OPERATIONS
P.O. Box 72713 Dar-es-Salaam, 2nd Block "U" Salasala, Tegeta
Tel : +255 222 630753    Facsimile : +255 222 630751
Email: admin@iptl.co.tz

Date :   03.08.2007

The Managing Director
Tanzania Electric Supply Company Limited
P.O. Box 9024, Dar-es-Salaam
United Republic of Tanzania

| Contract Re : Power Purchase Agreement Dated 26th May 1995<br>Project     : I.P.T.L. 100 MW Diesel Power Station<br><br>**CREDIT NOTE FOR THE MONTH ENDED 31ST JULY 2007** | CREDIT NOTE : CN82/2007<br><br>TIN NO : 100-134-960<br>VRN NO : 10-006593-H |
| --- | --- |

|  | Period of the Credit Note:<br>From   01.07.2007<br>To     31.07.2007 |  |
| --- | --- | --- |
|  |  | **TSH** |
| Difference due to average exchange rate used earlier based on 30th Jan 07 corrected to reflect 31st Jan 07 exchange rate.<br>Invoice No. 25/2007/APTL |  | 1,165,988.00 |
|  |  | 1,165,988.00 |
| Exchange Rate Average 6 months as per PPA App 8.15.1 |  | NIL |
|  | TSH | 1,165,988.00 |

AUTHORISED SIGNATURE:

INDEPENDENT POWER TANZANIA LIMITED

Credit Note On Capacity July 07  Billing - TANESCO

Gentlemen

I am in receipt of your email of August 1, 2007 with the attached copy of the Tegeta working model adjusted for the July 2007 invoice. In July, the spreadsheet must be updated and re-calibrated in accordance with the PPA and the provisions of the ICSID award.

There was no change in the Lenders Interest rate in July. IPTL has made the changes to the key input data and other factors used in the invoice calculation generally in accordance with the Agreements.

However, I note that the exchange rate used for the end of January 2007 was taken from January 30th whereas the agreements require that the value on last business day of the month be used. IPTL has entered a value of 1316.92 whereas the value on January 31st was 1314.45. There is a small but measurable difference in the exchange rate that is to be used for the July 2007 through December 2007 period. Unless there are reasons for using the January 30th exchange rate that I am unaware of, I recommend that the model be corrected with the exchange rate for January 31st, 2007.

In the recalibration of the rate of return, the tolerance accepted by IPTL for the adjustment factor results in a slightly higher Capital Component than is the case when a more accurate adjustment factor is used. Again, I recommend that the 3 more accurate figure be adopted.

For your assistance, I have included a copy of my revised spreadsheet for July 2007.

IPTL has added no more fuel oil since May 2007. During July 2007, Tegeta was not dispatched at all. The invoice does not include any charges for Destination Inspection Fees.

Based on the data I have been given, I conclude that the calculation of the invoice amount for July 2007 is slightly high as summarized below.

| Invoice Item | IPTL Value, TSh | Revised Amount, TSh | Difference |
|---|---|---|---|
| Capital Component | 1,965,907,153 | 1,965,275,353 | -1,165,988 |
| Total Invoice | 3,669,422,053 | 3,668,242,880 | -1,179,173 |

I hope this review has been useful.

With best wishes.

Martin Swales

Review of the July 2007 Invoice Data

| Issue | IPTL Value | TANESCO Value | Comment |
|---|---|---|---|
| Date for US CPI Application | 31-May-07 | 31-May-07 | Agreed |
| Date for US$ to TSh Exchange Application | 30-June-07 | 30-June-07 | Agreed |
| Update of Risk Insurance Rates | Unchanged from Jan '07 | | None expected |
| Change in Lender's Interest Rate | 7.36% effective May 1, 2007 | | No change |
| Update of the 3-mo LIBOR Rate | 5.36% | | Agreed |
| Recalibrate the Model | Yes | Yes | TANESCO recommends using a more accurate IRR adjustment factor |
| Add new fuel purchase data | None | | |
| Monthly Energy Sales, MW.h | 0 MW.h | | No Comment |
| Change to the Dependable Capacity | None | No Independent Data | No Comment |
| Supplemental Charges | $3,169.85 $533.32 | No Independent Data | Workers Welfare Fund, City Service Levy |
| Destination Inspection Fees (DIF) | $0.00 | No Independent Data | |
| EWURA Regulatory Levy (1%) | $28,320.75 | Ref: GOT Gazette #157 | |

Working Pulanyssd Algulel for the Hegatu Diesel Power Plant Tariff Calculation

# Monthly Invoice for Capacity

Date of Invoice   *August 1, 2007*

**Period of Invoice**

|  |  |  |  |
|---|---|---|---|
| Start Date | 1-Jul-07 | Rate | TSH |
| End Date | 31-Jul-07 |  |  |
| Number of Days | 31 |  |  |

| | | |
|---|---|---|
| Capital Component Purchase Price | $14.8357 | per kW per Month |
| Debt Component Purchase Price | $12.9401 | per kW per Month |
| Interest Rate Adjustment | -$0.3942 | per kW per Month |

| | | |
|---|---|---|
| Declared Dependable Capacity | *103,430.00* kW | |

**Capacity Payment**

| | | | |
|---|---|---|---|
| Capital Component | $1,534,452.30 | 1,280.77 | 1,965,275,352.81 |
| Debt Component | $1,338,398.33 | 1,280.77 | 1,714,175,971.65 |
| Interest Rate Adjustment | -$40,775.28 | 1,280.77 | (52,223,618.20) |

| | | |
|---|---|---|
| ***Total Capacity Payment*** | **$2,832,075.35** | 3,627,227,706.26 |
| | Round | 3,627,227,706.00 |

*Martin C. Swales*
*3/8/2007*

**INDEPENDENT POWER TANZANIA LTD.**

OPERATIONS:
Plot No. 292/1, 292/2, 292/3 and 298 Block 'D' Salasala, Tegeta
P.O. Box 77173 Dar Es Salaam, Tanzania
Tel: + 255 222 650750    Facsimile: + 255 222 650751
Email: admin@iptl.co.tz

Our Ref: IPTL/240/07/PC/ehm                    Date: 7th September, 2007

The Managing Director
Tanzania Electric Supply Company Ltd.
P.O. Box 9024
Dar es Salaam

Dear Dr. Rashidi,

RE: INVOICE DISPUTE NOTICE – AUGUST 2007

We have received TANESCO's 5th September 2007 Invoice Dispute Notice (the "Notice"). The Notice is improper, and immediate payment of the sum due to IPTL should be made.

The financial model used to calculate the Capacity Charge Payment inclusive of the 22.31 IRR was concluded by the ICSID ARBITRATION RULING dated July 12th 2001. All computation of Capacity Charges has been done in accordance to the above financial model and is provided to Tanesco on a monthly basis for more than 5 years.

Please provide **details and calculations** as to your contention that the Capacity Purchase Price is erroneous. In fact Tanesco has failed to provide this pertinent data on similar **Notices** issued intermittently over the past 3 years.

Further, your contention on the calculation of the August 2007 Invoice is at odds with the conclusion reached by Dr Swales, who concluded on September 6th, **"I conclude that the calculation of the base invoice amount for August 2007 is correct."** (See attached)

We await your response.

Sincerely,
**Independent Power Tanzania Limited**

PARTHIBAN C.
Chief Operating officer

Encl.

**INDEPENDENT POWER TANZANIA LTD.**

c.c.:    Hon. Minister
Ministry of Energy & Minerals
P.O. Box 2000
Dar es Salaam


Hon. Minister
Ministry of Finance
P.O. Box 9111
Dar es Salaam


Permanent Secretary
Ministry of Energy & Minerals
P.O. Box 2000
Dar es Salaam


Permanent Secretary
Ministry of Finance
P.O. Box 9111
Dar es Salaam


The Commissioner for Energy & Petroleum Affairs
Ministry of Energy & Minerals
P.O. Box 2000
Dar es Salaam


Governor
Bank of Tanzania
P.O. Box 2939
Dar es Salaam

Gentlemen

I am in receipt of your email of September 4, 2007 with the attached copy of the Tegeta working model adjusted for the August 2007 invoice.

There has been no change in the Lenders Interest rate in August and IPTL has made no other changes to the key factors used in the invoice calculation.

IPTL has added no more fuel oil since May 31, 2007. During August, Tegeta delivered no energy so the energy part of the invoice is zero.

The invoice does not include any charges for Destination Inspection Fees.

I note that the invoice has an EWURA Regulatory Levy calculated based on the total invoice whereas I recall that the amount of the same levy on the Songas invoice was determined based only on the energy component of the invoice. I recommend that this issue be reconciled to be consistent on all invoices for power and energy from IPP's.

With the foregoing caveat, I conclude that the calculation of the base invoice amount for August 2007 is correct. The table attached summarizes my numerical observations.

I hope this review has been useful.

With best wishes

Martin Swales



Review of the August 2007 Invoice Data

| Issue | IPTL Value | TANESCO Value | Comment |
|---|---|---|---|
| Date for US CPI Application | 31-May-07 | 31-May-07 | Agreed |
| Date for US$ to TSh Exchange Application | 30-June-07 | 30-June-07 | Agreed |
| Update of Risk Insurance Rates | Unchanged from Jan '07 | | None expected |
| Change in Lender's Interest Rate | 7.36% effective May 1, 2007 | | No change |
| Update of the 3-mo LIBOR Rate | 5.36% | | Agreed |
| Recalibrate the Model | No | No | Agreed |
| Add new fuel purchase data | 0 tonnes | | |
| Monthly Energy Sales, MW.h | 0 MW.h | No Independent Data | No Comment |
| Change to the Dependable Capacity | None | No Independent Data | No Comment |
| Supplemental Charges | $3,035.32 | No Independent Data | Workers Welfare Fund, |
| Destination Inspection Fees (DIF) | $0.00 | No Independent Data | |
| EWURA Regulatory Levy (1%) | $28,345.47 | Ref: GOT Gazette #157 | Note comment in text above |



RECEIVED
0 6 SEP 2007
IPTL
DSM.

*"Tunasaangaza Maisha Take"*    T A N E S C O    *"We light Up Your Life"*

## SHIRIKA LA UMEME TANZANIA
## TANZANIA ELECTRIC SUPPLY COMPANY LIMITED

Umeme Head Office, Ubungo Plaza, PO Box 9024 Dar es Salaam, Tanzania. Tel: (255) 22 2451130 / 9 Fax: (255) 22 2451206

Our Ref:                                                      Date:

SEC.427/IPTL- NOTICES/09/2007                           5th Sept. 2007

Independent Power Tanzania Limited,
Plot No. 292/1,292/2,292/3&296,
Block "D" Salasala, Tegeta,
P.O.Box 77173,
**DAR ES SALAAM.**

**Attn: Managing Director**

RE:   **INVOICE DISPUTE NOTICE**

**TAKE NOTICE** that the amount of the invoices for the month of August, 2007 bearing Tax Invoice No. 29/2007/IPTL dated 1st September, 2007 and received by TANESCO on 4th September, 2007 is in dispute.

TANESCO disputes the amount of Tshs.3,630,392,774.00 from the above referred invoice.

The basis of the dispute is the erroneous computation of Capacity Purchase Price, described in the invoice as Capacity Charges and Capacity Tariff, in as much as the tariff provides IPTL with equity IRR in excess of 22.31%

This notice is given as required under Article 6.8 of the Power Purchase Agreement.

Yours faithfully,
For: **TANZANIA ELECTRIC SUPLY COMPANY LIMITED**

Dr. Idris M. Rashidi
**MANAGING DIRECTOR**
IMR/SEW/jjm

CC:   The Governor,
      Bank of Tanzania,
      P.O.Box 2939,
      **DAR ES SALAAM.**



RECEIVED
0 5 SEP 2007
IPTL
DSM.

TANESCO BOARD OF DIRECTORS: Ambassador T.M. Kikwza (Chairman), Mr A. B. Mapunda, Hon. P. Magoti (MP), Mr A. H. Kileva,

**INDEPENDENT
POWER TANZANIA LTD.**

DIRECTORS: PEFL BLDG, Ali Hassan Mwinyi Road/ Ohio Street
P.O.Box 77173, Dar Es Salaam, Tanzania.
Telephone : +255-51-110782/ 791   D/Line : +255-51-110781
Facsimile : +255-51-110790   E-Mail : ipt@cats-net.com

Our Ref: IPTL/256/07/PC/chm                Date: 9th October, 2007

The Managing Director
Tanzania Electric Supply Company Ltd.
P.O. Box 9024
Dar es Salaam

Dear Dr. Rashidi,

We have received TANESCO's 2nd October 2007 Invoice Dispute Notice ("The Notice"). The Notice is improper and immediate payment of the sum due to IPTL should be made.

The financial model used to calculate the Capacity Charge Payment inclusive of the 22.31 IRR was concluded by the ICSID ARBITRATION RULING dated July 12th 2001. All computation of Capacity Charges has been done in accordance to the above financial model and is provided to TANESCO on a monthly basis for more than 5 years.

Please provide **details and calculations** as to your contention that the Capacity Purchase price is erroneous.

Tanesco has failed to provide this pertinent data on similar Notices issued intermittently for over 3 years.

Further your contention on the calculation of the September 2007 Invoice is at odds with the conclusion reached by Dr Swales, who concluded on October 2nd, **"I conclude that the calculation of the base invoice amount for September 2007 is correct."**

Kindly provide the requisite detailing without delay.

Sincerely,
**Independent Power Tanzania Limited**

PARTHIBAN C.
Chief Operating officer

c.c.:  Hon. Minister
      Ministry of Energy & Minerals
      P.O. Box 2000
      Dar es Salaam


      Hon. Minister
      Ministry of Finance
      P.O. Box 9111
      Dar es Salaam


      Permanent Secretary
      Ministry of Energy & Minerals
      P.O. Box 2000
      Dar es Salaam


      Permanent Secretary
      Ministry of Finance
      P.O. Box 9111
      Dar es Salaam


      The Commissioner for Energy & Petroleum Affairs
      Ministry of Energy & Minerals
      P.O. Box 2000
      Dar es Salaam


      Governor
      Bank of Tanzania
      P.O. Box 2939
      Dar es Salaam

Gentlemen

I am in receipt of your email of October 1, 2007 with the attached copy of the Tegeta working model adjusted for the September 2007 invoice.

There has been no change in the Lenders Interest rate in September and IPTL has made no other changes to the key factors used in the invoice calculation.

IPTL has added no more fuel oil since May 31, 2007. During September, Tegeta delivered no energy so the energy part of the invoice is zero.

The invoice does not include any charges for Destination Inspection Fees.

As noted in previous reviews, the invoice has an EWURA Regulatory Levy calculated based on the total invoice rather than just on the energy or variable part of the invoice.

With the foregoing caveat, I conclude that the calculation of the base invoice amount for September 2007 is correct. The table attached summarizes my numerical observations.

I hope this review has been useful.

With best wishes

Martin Swales



RECEIVED
0 2 OCT 2007
IPTL
DSM.

Review of the September 2007 Invoice Data

| Issue | IPTL Value | TANESCO Value | Comment |
|---|---|---|---|
| Date for US CPI Application | 31-May-07 | 31-May-07 | Agreed |
| Date for US$ to TSh Exchange Application | 30-June-07 | 30-June-07 | Agreed |
| Update of Risk Insurance Rates | Unchanged from Jan '07 | | None expected |
| Change in Lender's Interest Rate | 7.36% effective May 1, 2007 | | No change |
| Update of the 3-mo LIBOR Rate | 5.36% | | Agreed |
| Recalibrate the Model | No | No | Agreed |
| Add new fuel purchase data | 0 tonnes | | |
| Monthly Energy Sales, MW.h | 0 MW.h | No Independent Data | No Comment |
| Change to the Dependable Capacity | None | No Independent Data | No Comment |
| Supplemental Charges | $3,812.33 | No Independent Data | Workers Welfare Fund. |
| Destination Inspection Fees (DIF) | $0.00 | No Independent Data | |
| EWURA Regulatory Levy (1%) | $28,345.47 | Ref: GOT Gazette #157 | Note comment in text above |

# EXHIBIT H

**INDEPENDENT**
**POWER TANZANIA LTD.**

OPERATIONS
Plot No. 2921, 2922, 2923 and 296 Block 'U' Salasala, Tegeta
P.O. Box 77173 Dar Es Salaam, Tanzania
Tel: + 255 222 650250    Facsimile: + 255 222 650251
Email: admin@iptl.co.tz

Our Ref: IPTL/089/07/PC/ehm                    Date: 13th March, 2007

Mr. Arthur Mwakapugi
Permanent Secretary
Ministry of Energy & Minerals
P.O. Box 2000
Dar es Salaam

Dear Mr. Mwakapugi

I refer to our meeting last week on the outstanding with Tanesco which has now exceeded 25 Billion.

To date we are still trying our best with Tanesco for payment. Please note that our creditors, suppliers and others are hot on our heels to collect their overdue.

We appreciate if your good offices would arrange a meeting with the relevant ministries and Tanesco to see how best the situation of payment can be resolved.

Respectfully,
**Independent Power Tanzania Limited**

PARTHIBAN. C
General Manager

**INDEPENDENT
POWER TANZANIA LTD.**

OPERATIONS:
Plot No. 292/1, 292/2, 293/3 and 296 Block 'D' Salasala, Tegeta
P.O. Box 77173 Dar Es Salaam, Tanzania
Tel: + 255 222 650750    Facsimile: + 255 222 650751
Email: admin@iptl.co.tz

Our Ref: IPTL/103/07/PC/ehm                    Date: 16th March, 2007

Mr. Arthur Mwakapugi
Permanent Secretary
Ministry of Energy & Minerals
P.O. Box 2000
Dar es Salaam

Dear Mr. Mwakapugi,

**RE: TANESCO – OUTSTANDING SUMS**

We wish to bring to attention the outstanding sums due from Tanesco. Please find the statement of account for perusal.

There is also a bit of confusion on the Capacity Charges. These charges if we may say includes all our fixed costs which includes lube oil, operator cost (Operation and Maintenance), Spare Parts, Lenders repayment, Insurance, Local Government Taxes etc. The Energy Charges as you know is mainly Fuel Cost. This confusion arises from the fact that Tanesco has not paid its dues despite various reminders and that they are awaiting government contributions to make onward payment to IPTL especially on the Capacity Charges which is overdue since October last year. Please note the Tegeta Power Plant cannot operate on Energy Charges alone.

Part of the outstanding due to IPTL if we may say again is Energy Charges. Our creditors especially the Fuel Oil suppliers have been waiting for their dues for sometime now. Some have threatened legal action and have charged finance and storage cost on to IPTL. We include 2 self explanatory letters from Total and Oryx.

We also had a brief discussion with the TRA who gave until the end of this month to settle its dues with penalties. Please note that IPTL is currently not in a position to settle any of this.

We are concerned that this situation will aggravate further with our Operator and Suppliers if there are no payments received from Tanesco very soon. Please note that we also have no choice but to pass on these penalty costs on to Tanesco.



We are kindly requesting that Tanesco and or the Government liquidate some of the oustandings very soon and make a plan to liquidate the remaining sums. A meeting at your earliest convenience between Tanesco and the relevant ministries would be appreciated.

Respectfully,
**Independent Power Tanzania Limited**

PARTHIBAN, C
General Manager

Encl.

c.c.:   The Commissioner for Energy & Petroleum Affairs
        Ministry of Energy & Minerals
        P.O. Box 2000
        <u>Dar es Salaam</u>

        Managing Director
        Tanzania Electric Supply Co. Ltd
        P.O. Box 9024
        <u>Dar es Salaam</u>

The Managing Director
Tanzania Electric Supply Company Limited
P.O.Box 9024, Dar Es Salaam
TANZANIA

DATE
16.03.2007

## STATEMENT OF ACCOUNT

| DATE | INVOICE NO. | DESCRIPTION | DEBIT | CREDIT | BALANCE |
|------|-------------|-------------|-------|--------|---------|
| 01.11.2006 | 40A/2006/IPTL | Capacity Charges Oct 06 | 4,258,213,172.00 | | 4,258,213,172.00 |
| 03.01.2007 | NBC 209270 | Payment received | | 723,000,000.00 | 3,535,213,172.00 |
| 29.01.2007 | NBC 209574 | Payment received | | 1,500,000,000.00 | 2,035,213,172.00 |
| 01.12.2006 | 43/2006/IPTL | Capacity Charges Nov 06 | 4,254,319,829.00 | | 6,289,533,001.00 |
| 01.12.2006 | 45/2006/IPTL | Supplemental Charges Nov 06 | 513,783,702.00 | | 6,803,316,703.00 |
| 11.12.2006 | 49/2006/IPTL | Supplemental Charges Nov 06 EWURA | 107,158,264.95 | | 6,910,474,967.95 |
| 01.01.2007 | 46/2006/IPTL | Capacity Charges Dec 06 | 4,254,319,829.00 | | 11,164,794,796.95 |
| 01.01.2007 | 48/2006/IPTL | Supplemental Charges Dec 06 | 5,113,777.00 | | 11,169,908,573.95 |
| 01.01.2007 | 50/2006/IPTL | Supplemental Charges Dec 06 EWURA | 72,436,718.82 | | 11,242,345,292.77 |
| 01.02.2007 | 01/2007/IPTL | Capacity Charges Jan 07 | 4,442,943,422.00 | | 15,685,288,714.77 |
| 01.02.2007 | 02/2007/IPTL | Energy Charges Jan 07 | 2,151,715,830.00 | | 17,837,004,544.77 |
| 01.02.2007 | 03/2007/IPTL | Supplemental Charges Jan 07 | 62,315,929.50 | | 17,899,320,474.27 |
| 01.02.2007 | 04/2007/IPTL | Supplemental Charges Jan 07 EWURA | 54,955,493.77 | | 17,954,275,968.04 |
| 01.03.2007 | 05/2007/IPTL | Capacity Charges Feb 07 | 4,408,873,981.00 | | 22,363,149,949.04 |
| 01.03.2007 | 06/2007/IPTL | Energy Charges Feb 07 | 2,148,277,589.00 | | 24,511,427,538.04 |
| 01.03.2007 | 07/2007/IPTL | Supplemental Charges Feb 07 | 4,635,865.00 | | 24,516,063,403.04 |
| 01.03.2007 | 08/2007/IPTL | Supplemental Charges Feb 07 EWURA | 54,642,929.75 | | 24,570,706,332.79 |
| 01.03.2007 | 09/2007/IPTL | EAF Bonus FY2006/2007 | 1,234,455,435.00 | | 25,805,161,767.79 |

## AGED ANALYSIS OF OUTSTANDING BALANCES

| DATE | CURRENT | 30 DAYS | 60 DAYS | 90 DAYS | 120 DAYS | AMOUNT DUE |
|------|---------|---------|---------|---------|----------|------------|
| 16.03.07 | 7,850,885,799.75 | 6,711,930,675.27 | 4,331,870,324.82 | 4,875,261,795.95 | 2,035,213,172.00 | 25,805,161,767.79 |

TERMS: Strictly 30 days credit from date of invoice. Please settle immediately.
All cheques should be payable to "INDEPENDENT POWER TANZANIA LIMITED"



# ORYX

**Oryx Oil Company Limited**

Our Ref : MD/OOCL/2007       000399

Your Ref :

City     : DAR ES SALAAM

**RECEIVED**
14 FEB 2007
**IPTL**
DSM.

14th February 2007

The General Manager
Mr. C. Parthiban
Independent Power Tanzania Ltd.
P O Box 77173
Dar es Salaam

Dear Sir,

RE.     **LPO 040 for 15,000 Mt FO180**

With regard to your LPO 040 dated 1 December 2006 for 15,000 mt of FO180 to be delivered in January 2007, we have noted with concern that there has been a 19 days delay before our first deliveries were accepted by IPTL in fulfillment of your requirement schedule with a resultant delay in payment from IPTL. This has caused us to incur additional storage and financial costs on our initial order. As at 14 February, we have delivered and have received payment for 7500 Mt. Reluctantly, we are therefore obliged to pass on the costs of these elements to IPTL as follows.

## COSTS INCURRED UP TO 31 JANUARY 2007

**Finance Cost**
Per Day it is15,000 Mt @ $361.679 @ 9% / 365  = $1337.72
$1,337.72 for 19 days is $25,417

**Storage Cost**
Per Day it is15,000 Mt @ $7 / 30  = $3,500
$3,500 per day for 19 days is $66,500

The total additional costs that Oryx have incurred in January are therefore $91,917

## COSTS INCURRED UP TO 14 FEBRUARY 2007

**Finance Cost**
Per Day it is 7,500 Mt @ $361.679 @ 9% / 365 = $668.86
$668.86 for 14 days is $9364

**Storage Cost**
Per Day it is7,500 Mt @ $7 / 30  = $1,750
$1,750 per day for 14 days is $24,500

Mandela Road - Kurasini
Lube Oil Blending Plant
P.O. Box 9540
Dar es Salaam, Tanzania
Tel: (255) (22) 2120190/2120159/2120175
Fax: (255) (22) 2120405/2120391



Exclusive Distributor for
**AGIP LUBRICANT**

The total additional costs that Oryx have incurred in February are therefore $33,864

**The total claim is therefore $125,781**

This situation is causing us much hardship and is creating severe cash flow problems. We have had to go out and seek additional banking facilities in order to absorb the impact of the unexpectedly high stocks we are having to hold. Moreover, in view of the slow drawdown on your LPO, it is likely that these costs will persist into the month of March as well. In this event, we will be forced to seek additional reimbursement of costs incurred after the 14 February up to the date of full drawdown and payment.

Therefore, please find attached an invoice for the above amount. Your prompt settlement thereof would be much appreciated.

Yours faithfully,
ORYX OIL COMPANY LTD.

Vaughan Gibson
**Managing Director**

**ORYX** Oryx Oil Company Limited

P.O.BOX 9640
TEL:21201902120159
DAR ES SALAAM

TAX DEBIT/CREDIT NOTE

Page:    1

ORIGINAL-CUSTOMER

VAT 10-005283-L    TIN 100-181-819

INDEPENDENT POWER TANZANIA LTD
BLOCK D, PLOT NO.292/1/2/3&296
SALASALA-TEGETA, P.O.BOX 77173,DSM
TEL:+255 22 2650 751/MOB:0753 773 030
DAR ES SALAAM
EMAIL: parthiban.c@iptl.co.tz

Account:    105812

100-184-990    10-006583-H

Date:    02/14/07 RI
Invoice Number: 7000073 RI

| | | | |
|---|---|---|---|
| FIN.COST JAN'7@1,337.72$ P/DAY | | | 25,416.68 |
| STORAGE JAN'7@3,500 $ PER DAY | | | 66,500.00 |
| FIN.COST FEB'7@668.86$ PER/DAY | | | 9,364.04 |
| STORAGE FEB@1,750 $ PER DAY | | | 24,500.00 |
| | VAT | | 25,156.15 |
| | USD | | 150,936.87 |

PREPARED BY    CHECKED BY    AUTHORISED BY

Parthiban

From:       Gordon.CRAIG@total.co.tz
Sent:       Thursday, March 15, 2007 9:30 AM
To:         Magesvaran
Cc:         Elizabeth.MUSEMWA@total.co.tz; Isaya.KOMBA@total.co.tz; parthiban.c@iptl.co.tz;
            eric.montfajon@totsa.com; guillaume.compain@totsa.com; jly@mechmar.com.my;

Subject: RE: TAX PAYMENT


                                                                    Without Prejudice

Dear Mages

Thank you for your message below.  As we have pointed out before, IPTL's dealings with Tanesco have nothing
to do with Total.  IPTL has a contractual obligation with Total.  Please note that we shall charge interest daily on
the outstanding balance at the equivalent annual rate of 15.5% (our overdraft rate) until we receive payment in
full.  This action does not prejudice our right to take legal action against IPTL to recover the debt.


Regards

Gordon Craig
MD
Total Tanzania Limited




"Magesvaran" <admin@iptl.co.tz>                   To  <Elizabeth.MUSEMWA@total.co.tz>

15/03/2007 09:03                                  cc  "anan ananta mwemutsi" <anan.mwemutsi@total.co.tz>,
                                                      <gordon.craig@total.co.tz>, <parthiban.c@iptl.co.tz>,
                                                      <Isaya.KOMBA@total.co.tz>
                                                  Subject RE: TAX PAYMENT




Dear Elizabeth,
Thank you for the complete documentation for month of Nov 06.
We will settle the outstanding amount once we receive funds from Tanesco.

Sorry for any inconvenient cause.
Thank you.

Regards
Magesvaran




3/16/2007

**INDEPENDENT
POWER TANZANIA LTD.**

OPERATIONS:
Plot No. 292/1, 292/2, 292/3 and 296 Block 'D' Salasala, Tegeta
P.O. Box 77173 Dar Es Salaam, Tanzania
Tel: + 255 222 650790     Facsimile: + 255 222 650751
Email: admin@ipti.co.tz

Our Ref: IPTL/146/07/PC/ehm                    Date: 25th April, 2007

Dr. Idris M. Rashidi
Managing Director
Tanzania Electric Supply Company Ltd.
P.O. Box 9024
<u>Dar es Salaam</u>

Dear Dr. Rashidi,

Further to our meeting yesterday, we were supposed to receive some funds
to enable settlement of small monthly bills.

We have been trying to get hold of you and up until now we have been
unsuccessful. In fact we left a message with Mr. Decklan Mhaiki regarding
this matter.

We also note that the Tegeta Plant is being dispatched since this morning.
We are obviously glad to support Tanesco.

Would you kindly provide us with an update of the outstanding as to when
we can expect payment? Some firm planning would really help.

We have no choice but to keep bothering you on this matter as you know our
major creditors, lenders and the TRA are intense in their handling with IPTL.

Respectfully,
**Independent Power Tanzania Limited**

PARTHIBAN, C
General Manager

c.c:     Hon. Minister of Energy & Minerals
         P.O Box 2000
         <u>Dar es Salaam</u>

c.c.:    Hon. Minister of Finance
         P.O Box 9111
         Dar es Salaam



*INDEPENDENT POWER TANZANIA LTD.*

c.c.:  Permanent Secretary
Ministry of Finance
P.O Box 9111
Dar es Salaam

c.c.:  Mr Arthur Mwakapugi
Permanent Secretary
Ministry of Energy & Minerals
P.O Box 2000
Dar es Salaam

c.c.:  Mr. B Mrindoko
Commissioner for Energy & Petroleum Affairs
Ministry of Energy & Minerals
P.O Box 2000
Dar es Salaam

**INDEPENDENT**
**POWER TANZANIA LTD.**

OPERATIONS
Plot No. 2921, 2922, 2923 and 296 Block 'D' Salasala, Tegeta
P.O. Box 77173 Dar Es Salaam, Tanzania
Tel. + 255 222 650750    Facsimile: + 255 222 650751
Email: admin@iptl.co.tz

Our Ref: IPTL/177/07/PC/ehm                    Date: 7th June, 2007

Mr. Arthur Mwakapugi,
Permanent Secretary
Ministry of Energy & Minerals
P.O. Box 2000
<u>Dar es Salaam</u>

Dr. Idris Rashidi
Managing Director
Tanzania Electric Supply Co. Ltd
P.O. Box 9024
<u>Dar es Salaam</u>

Mr. Daudi Ballali
Governor,
Bank of Tanzania
P.O Box 2939
<u>Dar es Salaam</u>

Dear Sirs,

RE: <u>OUTSTANDING PAYMENTS TO IPTL</u>

We refer to the signing of the Escrow Agreement dated July 2006 between the parties recently and the indication from the Ministry and Tanesco that Tanesco would settle it's outstanding sometime in early June. We have also on the 15th of May 2007 made a claim on the Escrow Account.

We wish to reiterate that to date we have not received the indicated settlement of outstanding from Tanesco and we have yet to receive information from the Escrow Agent despite numerous reminders. Our daily efforts to seek an appointment to meet the Governor of the Bank of Tanzania – The Escrow Agent on this matter also seem futile.

We are <u>**kindly requesting**</u> the Ministry of Energy and Minerals or Tanesco or the Escrow Agent settle the outstanding sums without delay either thru the Escrow Account or otherwise.

INDEPENDENT
POWER TANZANIA LTD.

Please find an updated Statement of Accounts for your kind perusal.

Respectfully,
**Independent Power Tanzania Limited**

PARTHIBAN, C
General Manager

Encl.

c.c.:  Hon. Minister
       Ministry of Energy & Minerals
       P.O. Box 2000
       Dar es Salaam

       Hon. Minister
       Ministry of Finance
       P.O. Box 9111
       Dar es Salaam

       The Commissioner for Energy & Petroleum Affairs
       Ministry of Energy & Minerals
       P.O. Box 2000
       Dar es Salaam

**INDEPENDENT POWER TANZANIA LTD.**

The Managing Director
Tanzania Electric Supply Company Limited
P.O.Box 9024, Dar Es Salaam
TANZANIA

DATE
31.05.2007

## STATEMENT OF ACCOUNT

| DATE | INVOICE NO. | DESCRIPTION | DEBIT | CREDIT | BALANCE |
|------|-------------|-------------|-------|--------|---------|
| 01.11.2006 | 40A/2006/IPTL | Capacity Charges Oct 06 | 4,258,213,172.00 | | |
| 03.01.2007 | NBC 209276 | Payment received | | | 4,258,213,172.00 |
| 29.01.2007 | NBC 209374 | Payment received | | 723,000,000.00 | 3,535,213,172.00 |
| 03.04.2007 | NBC 210645 | Payment received | | 1,500,000,000.00 | 2,035,213,172.00 |
| 02.05.2007 | NBC 210991 | Payment received | | 1,500,000,000.00 | 535,213,172.00 |
| 01.12.2006 | 43/2006/IPTL | Capacity Charges Nov 06 | 4,254,319,829.00 | 535,213,172.00 | |
| 02.05.2007 | NBC 210991 | Payment received | | | 4,254,319,829.00 |
| 21.05.2007 | NBC 211220 | Payment received | | 964,786,828.00 | 3,289,533,001.00 |
| 22.05.2007 | NBC 211247 | Payment received | | 1,500,000,000.00 | 1,789,533,001.00 |
| 01.12.2006 | 45/2006/IPTL | Supplemental Charges Nov 06 | | 1,500,000,000.00 | 289,533,001.00 |
| 11.12.2006 | 49/2006/IPTL | Supplemental Charges Nov 06 EWURA | 513,783,702.00 | | 803,316,703.00 |
| 01.01.2007 | 46/2006/IPTL | Capacity Charges Dec 06 | 107,158,264.95 | | 910,474,967.95 |
| 01.01.2007 | 48/2006/IPTL | Supplemental Charges Dec 06 | 4,254,319,829.00 | | 5,164,794,796.95 |
| 01.01.2007 | 50/2006/IPTL | Supplemental Charges Dec 06 EWURA | 5,113,777.00 | | 5,169,908,573.95 |
| 01.02.2007 | 01/2007/IPTL | Capacity Charges Jan 07 | 72,436,718.82 | | 5,242,345,292.77 |
| 01.02.2007 | 02/2007/IPTL | Energy Charges Jan 07 | 4,442,943,422.00 | | 9,685,288,714.77 |
| 01.02.2007 | 03/2007/IPTL | Supplemental Charges Jan 07 | 2,151,715,830.00 | | 11,837,004,544.77 |
| 01.02.2007 | 04/2007/IPTL | Supplemental Charges Jan 07 EWURA | 62,315,929.50 | | 11,899,320,474.27 |
| 01.03.2007 | 05/2007/IPTL | Capacity Charges Feb 07 | 54,955,493.77 | | 11,954,275,968.04 |
| 01.03.2007 | 06/2007/IPTL | Energy Charges Feb 07 | 4,408,873,981.00 | | 16,363,149,949.04 |
| 01.03.2007 | 07/2007/IPTL | Supplemental Charges Feb 07 | 2,148,277,589.00 | | 18,511,427,538.04 |
| 01.03.2007 | 08/2007/IPTL | Supplemental Charges Feb 07 EWURA | 4,635,865.00 | | 18,516,063,403.04 |
| 01.03.2007 | 09/2007/IPTL | EAF Bonus FY2006/2007 | 54,642,929.75 | | 18,570,706,332.79 |
| 01.04.2007 | 10/2007/IPTL | Capacity Charges Mar 07 | 1,234,455,435.00 | | 19,805,161,767.79 |
| 12.04.2007 | CN01/2007 | Credit note on Capacity Charges Mar 07 | 4,408,873,981.00 | 734,812,330.00 | 24,214,035,748.79 |
| 01.04.2007 | 11/2007/IPTL | Energy Charges Mar 07 | | | 23,479,223,418.79 |
| 01.04.2007 | 12/2007/IPTL | Supplemental Charges Mar 07 | 473,873,766.00 | | 23,953,097,184.79 |
| 01.04.2007 | 13/2007/IPTL | Supplemental Charges Mar 07 EWURA | 5,065,905.00 | | 23,958,163,089.79 |
| 01.05.2007 | 14/2007/IPTL | Capacity Charges Apr 07 | 40,689,564.56 | | 23,998,852,654.35 |
| 01.05.2007 | 15/2007/IPTL | Energy Charges Apr 07 | 3,674,061,651.00 | | 27,672,914,305.35 |
| 01.05.2007 | 16/2007/IPTL | Supplemental Charges Apr 07 | 243,972,593.00 | | 27,916,886,898.35 |
| 01.05.2007 | 17/2007/IPTL | Supplemental Charges Apr 07 EWURA | 4,200,476.50 | | 27,921,087,374.85 |
| | | | 38,773,721.45 | | 27,959,861,096.30 |

### AGED ANALYSIS OF OUTSTANDING BALANCES

| DATE | CURRENT | 30 DAYS | 60 DAYS | 90 DAYS | 120 DAYS | AMOUNT DUE |
|------|---------|---------|---------|---------|----------|------------|
| 31.05.07 | 3,961,008,441.95 | 4,193,690,886.66 | 7,850,885,799.75 | 6,711,930,675.27 | 5,242,345,292.77 | 27,959,861,096.30 |
| | | | | | | 0.00 |

TERMS: Strictly 30 days credit from date of Invoice. Please settle immediately.
All cheques should be payable to "INDEPENDENT POWER TANZANIA LIMITED"

**INDEPENDENT POWER TANZANIA LTD.**

Plot No. 2909/1, 2902/2, 2927/3 and 2918 Block "U" Sababia, Tegeta
P.O. Box 77173 Dar Es Salaam, Tanzania
Tel: + 255 222 660750    Facsimile: + 255 222 650751
Email: ndwan@iptl.co.tz

Our Ref: IPTL/202/07/PC/ehm                    Date: 27th June, 2007

Dr. Idris Rashidi
Managing Director
Tanzania Electric Supply Company Ltd.
P.O. Box 9024
Dar es Salaam

Dear Dr. Rashidi,

RE: <u>OUTSTANDING AMOUNT</u>

Tanesco currently owes IPTL 27,911,330,519.70. This excludes the May 2007 charges which will become due on the 1st of July 2007.

We have continued to remind Tanesco of its obligation to settle the amount owed without delay. We have tried to explain on various occasions either thru letters or at meetings, the problems IPTL is currently facing without prompt payments.

Tanesco's continued reluctance to settle the amount owed contravenes the ICSID Arbitration Award. In fact Tanesco has issued two 2 unfounded Invoice Dispute Notices for Capacity Charges for the month of March and May 2007. To date IPTL's has not received the requisite calculations and data it urgently requested.

Further the Escrow Agent (The Bank of Tanzania) continues to remain silent over the claim on the Tegeta Escrow Account that IPTL made on the 15th of May 2007. This once again contravenes the Escrow Agreement and the ICSID Arbitration Award.

Please find the current Statement of Account on the amount owed to IPTL.

IPTL requires Tanesco to settle its dues immediately.

Respectfully,
**Independent Power Tanzania Limited**

PARTHIBAN, C
General Manager

Encl.

POWERGEN (TANZANIA) LTD.

c.c.:  Hon. Minister
       Ministry of Energy & Minerals
       P.O. Box 2000
       <u>Dar es Salaam</u>

       Hon. Minister
       Ministry of Finance
       P.O. Box 9111
       <u>Dar es Salaam</u>

       Permanent Secretary
       Ministry of Energy & Minerals
       P.O. Box 2000
       <u>Dar es Salaam</u>

       Permanent Secretary
       Ministry of Finance
       P.O. Box 9111
       <u>Dar es Salaam</u>

       The Commissioner for Energy & Petroleum Affairs
       Ministry of Energy & Minerals
       P.O. Box 2000
       <u>Dar es Salaam</u>

# INDEPENDENT POWER TANZANIA LTD.

Bernard 2021, 292/2, 292/3 and 296 Block 'I' Salacala, Tegeta
P.O. Box 77173 Dar Es Salaam, Tanzania
Tel: + 255 222 650/53    Facsimile: + 255 222 650/51
Email: admin@ipil.co.tz

The Managing Director
Tanzania Electric Supply Company Limited
P.O.Box 9024, Dar Es Salaam
TANZANIA

DATE
27.06.2007

## STATEMENT OF ACCOUNT

| DATE | INVOICE NO. | DESCRIPTION | DEBIT | CREDIT | BALANCE |
|------|-------------|-------------|-------|--------|---------|
| 01.11.2006 | 40A/2006/IPTL | Capacity Charges Oct 06 | 4,258,213,172.00 | | 4,258,213,172.00 |
| 03.01.2007 | NBC 209270 | Payment received | | 723,000,000.00 | 3,535,213,172.00 |
| 29.01.2007 | NBC 209574 | Payment received | | 1,500,000,000.00 | 2,035,213,172.00 |
| 03.04.2007 | NBC 210545 | Payment received | | 1,500,000,000.00 | 535,213,172.00 |
| 02.05.2007 | NBC 210991 | Payment received | | 535,213,172.00 | - |
| 01.12.2006 | 43/2006/IPTL | Capacity Charges Nov 06 | 4,254,319,829.00 | | 4,254,319,829.00 |
| 02.05.2007 | NBC 210991 | Payment received | | 964,786,828.00 | 3,289,533,001.00 |
| 21.05.2007 | NBC 211220 | Payment received | | 1,500,000,000.00 | 1,789,533,001.00 |
| 22.05.2007 | NBC 211247 | Payment received | | 1,500,000,000.00 | 289,533,001.00 |
| 18.06.2007 | Contra | Contra settlement agst creditors | | 48,530,576.60 | 241,002,424.40 |
| 01.12.2006 | 45/2006/IPTL | Supplemental Charges Nov 06 | 513,783,702.00 | | 754,786,126.40 |
| 11.12.2006 | 49/2006/IPTL | Supplemental Charges Nov 06 EWURA | 107,158,264.95 | | 861,944,391.35 |
| 01.01.2007 | 46/2006/IPTL | Capacity Charges Dec 06 | 4,254,319,829.00 | | 5,116,264,220.35 |
| 01.01.2007 | 48/2006/IPTL | Supplemental Charges Dec 06 | 5,113,777.00 | | 5,121,377,997.35 |
| 01.01.2007 | 50/2006/IPTL | Supplemental Charges Dec 06 EWURA | 72,436,718.82 | | 5,193,814,716.17 |
| 01.02.2007 | 01/2007/IPTL | Capacity Charges Jan 07 | 4,442,943,422.00 | | 9,636,758,138.17 |
| 01.02.2007 | 02/2007/IPTL | Energy Charges Jan 07 | 2,151,715,830.00 | | 11,788,473,968.17 |
| 01.02.2007 | 03/2007/IPTL | Supplemental Charges Jan 07 | 62,315,929.50 | | 11,850,789,897.67 |
| 01.02.2007 | 04/2007/IPTL | Supplemental Charges Jan 07 EWURA | 54,955,493.77 | | 11,905,745,391.44 |
| 01.03.2007 | 05/2007/IPTL | Capacity Charges Feb 07 | 4,408,873,981.00 | | 16,314,619,372.44 |
| 01.03.2007 | 06/2007/IPTL | Energy Charges Feb 07 | 2,148,277,589.00 | | 18,462,896,961.44 |
| 01.03.2007 | 07/2007/IPTL | Supplemental Charges Feb 07 | 4,635,865.00 | | 18,467,532,826.44 |
| 01.03.2007 | 08/2007/IPTL | Supplemental Charges Feb 07 EWURA | 54,642,929.75 | | 18,522,175,756.19 |
| 01.03.2007 | 09/2007/IPTL | EAF Bonus FY2006/2007 | 1,234,455,435.00 | | 19,756,631,191.19 |
| 01.04.2007 | 10/2007/IPTL | Capacity Charges Mar 07 | 4,408,873,981.00 | | 24,165,505,172.19 |
| 12.04.2007 | CN01/2007 | Credit note on Capacity Charges Mar 07 | | 734,812,330.00 | 23,430,692,842.19 |
| 01.04.2007 | 11/2007/IPTL | Energy Charges Mar 07 | 473,873,766.00 | | 23,904,566,608.19 |
| 01.04.2007 | 12/2007/IPTL | Supplemental Charges Mar 07 | 5,065,905.00 | | 23,909,632,513.19 |
| 01.04.2007 | 13/2007/IPTL | Supplemental Charges Mar 07 EWURA | 40,689,564.56 | | 23,950,322,077.75 |
| 01.05.2007 | 14/2007/IPTL | Capacity Charges Apr 07 | 3,674,061,651.00 | | 27,624,383,728.75 |
| 01.05.2007 | 15/2007/IPTL | Energy Charges Apr 07 | 243,972,593.00 | | 27,868,356,321.75 |
| 01.05.2007 | 16/2007/IPTL | Supplemental Charges Apr 07 | 4,200,476.50 | | 27,872,556,798.25 |
| 01.05.2007 | 17/2007/IPTL | Supplemental Charges Apr 07 EWURA | 38,773,721.45 | | 27,911,330,519.70 |
| 01.06.2007 | 18/2007/IPTL | Capacity Charges May 07 | 3,673,311,234.00 | | 31,584,641,753.70 |
| 01.06.2007 | 19/2007/IPTL | Supplemental Charges May 07 | 16,048,493.50 | | 31,600,690,247.20 |
| 01.06.2007 | 19A/2007/IPTL | Supplemental Charges May 07 EWURA | 36,733,112.34 | | 31,637,423,359.54 |

### AGED ANALYSIS OF OUTSTANDING BALANCES

| DATE | CURRENT | 30 DAYS | 60 DAYS | 90 DAYS | 120 DAYS | AMOUNT DUE |
|------|---------|---------|---------|---------|----------|------------|
| 27.06.07 | 3,726,092,839.84 | 3,961,008,441.95 | 4,193,690,886.56 | 7,850,886,799.75 | 11,905,745,391.44 | 31,637,423,359.54 |
| | | | | | | 0.00 |

TERMS: Strictly 30 days credit from date of invoice. Please settle immediately.
All cheques should be payable to "INDEPENDENT POWER TANZANIA LIMITED"

STATEMENT OF ACCOUNT TO TANESCO Jun 07 -P.xls



**INDEPENDENT POWER TANZANIA LTD.**

OPERATIONS:
Plot No. 2921, 2922, 2923 and 266 Block 'D' Sabasaia, Tegeta
P.O. Box 77173 Dar Es Salaam, Tanzania
Tel: + 255 222 650750    Facsimile: + 255 222 650751
Email: admin@iptl.co.tz

Our Ref: IPTL/209/07/PC/ehm                 Date: 16th July, 2007

Dr. Idris Rashidi
Managing Director
Tanzania Electric Supply Company Ltd.
P.O. Box 9024
<u>Dar es Salaam</u>

Dear Dr. Rashidi,

Thank you for your 13th July 2007 letter.

As the Chief Operating Officer of IPTL, I am happy to discuss the dispute with you at any time. Indeed, I have tried to discuss it with you and others at Tanesco on numerous occasions since the IDN was issued. However, I have never received any cooperation or explanation from Tanesco of the IDN in that regard. As mentioned in Nixon Peabody's 11 July letter, Tanesco is already in breach of Article 18.1 of the PPA - the provision it now seeks to invoke. In any event, I do welcome the opportunity to speak with you about this, and I will call you on Monday, 16th July, 2007, to discuss it.

You indicated to me on the telephone on Friday, 13th July, that you are unavailable for 1 week. We cannot wait that long. We need talk only on the telephone. And, the subject of the call simply needs to be for you to inform us:

1.    What precisely is the basis of the IDN and how is it based on the PPA and the ICSID Arbitration Award;

2.    Tanesco's willingness to direct the Bank of Tanzania to release the funds due to IPTL from the escrow account.

There is no basis for the undisputed portion of the sums due to IPTL to not be released immediately. Hence, we request again that Tanesco and the Government of Tanzania immediately direct the Bank of Tanzania to release from escrow the undisputed portion of the invoices presently due to IPTL. This should not wait our discussion on these payment issues.

IPTL does not waive any rights it has under the PPA arising out of Tanesco's default in making payment when due.

Please call me anytime. My mobile telephone number is +255753773030.

Very truly yours,
Independent Power Tanzania Limited

PARTHIBAN, C
Chief Operating Officer


c.c.:   Permanent Secretary
        Ministry of Energy & Minerals
        P.O. Box 2000
        Dar es Salaam


        Permanent Secretary
        Ministry of Finance
        P.O. Box 9111
        Dar es Salaam


        The Governor
        Bank of Tanzania
        P.O. Box 2939
        Dar es Salaam


        John Beardsworth, Esq.
        Hunton & Williams
        Richmond, VA


        Messrs Nixon Peabody LLP
        Attorneys at Law
        437 Madison Avenue
        New York, New York 10022-7001



# INDEPENDENT POWER TANZANIA LTD.

OPERATORS:
Plot No. 2921, 2922, 2923 and 930 Block 'U' Sabasaba, Kgota
P.O. Box 77173 Dar Es Salaam, Tanzania
Tel: + 255 222 050158    Facsimile: + 255 222 850151
Email: admin@iptl.co.tz

Our Ref: IPTL/210/07/PC/ehm                    Date: 19th July, 2007

Dr. Idris Rashidi
Managing Director
Tanzania Electric Supply Company Ltd.
P.O. Box 9024
Dar es Salaam

Dear Dr. Rashidi,

Following your letter of 13th July 2007 invoking Article 18.1(b) of the PPA referring the Dispute between the parties to the Chief Operating Office of IPTL and the Chief Executive Officer of Tanesco, I have been trying to call you to discuss this matter. In the past (3) days, I have called your office six (6) times. I have had no response. Six of the fifteen days set forth in Article 18.1(b) have now passed, with no effort on your part to try to resolve this issue in good faith. Please contact me immediately to discuss this.

Also, as previously stated, there is no basis for withholding payment of the undisputed portions of IPTL's invoices. Please direct the Bank of Tanzania to immediately release those sums.

Respectfully,
**Independent Power Tanzania Limited**

PARTHIBAN, C
Chief Operating Officer



c.c.:    Permanent Secretary
         Ministry of Energy & Minerals
         P.O. Box 2000
         Dar es Salaam

         Permanent Secretary
         Ministry of Finance
         P.O. Box 9111
         Dar es Salaam



**INDEPENDENT POWER TANZANIA LTD.**

OPERATIONS:
Plot No. 292/1, 292/2, 292/3 and 296 Block 'D' Salasala, Tegeta
P.O. Box 77173 Dar Es Salaam, Tanzania
Tel: + 255 222 650750    Facsimile: + 255 222 650751
Email: admin@iptl.co.tz

Our Ref: IPTL/218/07/PC/ehm                    Date: 30th July, 2007

Mr. Arthur Mwakapugi,
Permanent Secretary
Ministry of Energy & Minerals
P.O. Box 2000
Dar es Salaam

Dear Sir,

As you know, Tanesco has refused to cause the Bank of Tanzania to release from escrow the undisputed portions of the capacity payments that are presently due to IPTL. Tanesco is required to make (at a minimum) payment of the undisputed portions of the capacity, energy and supplemental payments. Presently, the undisputed portions of the payments that are past due total Tsh. 20,276,260,426.75 million. This sum increases at the rate of Tsh. 3.7 billion per month, plus applicable interest.

Under the Implementation Agreement and Guarantee, the Government of Tanzania is required to cause these payments to be made, if Tanesco itself does not make them.

We again request that you do whatever is possible to have these funds released from the escrow account. Please recall that the Government of Tanzania is a party to the escrow agreement governing that account.

Respectfully,
**Independent Power Tanzania Limited**

PARTHIBAN, C
Chief Operating Officer



c.c.:   Permanent Secretary
        Ministry of Finance
        P.O. Box 9111
        Dar es Salaam


        Mr. Daudi Ballali
        Governor,
        Bank of Tanzania
        P.O Box 2939
        Dar es Salaam


        Dr. Idris Rashidi
        Managing Director
        Tanzania Electric Supply Co. Ltd
        P.O. Box 9024
        Dar es Salaam


        Messrs Nixon Peabody LLP
        437 Madison Avenue
        New York 10022-7001
        New York


        John Beardsworth, Esq
        Hunton & Williams
        Richmond, VA

**INDEPENDENT POWER TANZANIA LTD.**

OPERATIONS:
Plot No. 293/1, 293/2, 293/3 and 296 Block 'D' Salasala, Toyota
P.O. Box 77173 Dar Es Salaam, Tanzania
Tel: + 255 222 650750    Facsimile: + 255 222 650751
Email: admin@iptl.co.tz

Our Ref: IPTL/228/07/PC/ehm                    Date: 21st August, 2007

Dr. Idris Rashidi
Managing Director
Tanzania Electric Supply Company Ltd.
P.O. Box 9024
Dar es Salaam

Dear Dr. Rashidi,

We are in receipt of your letter dated 17th August 2007.

With respect to your comments regarding the minutes of the 25th July 2007 meeting, I believe that the minutes I forwarded to you accurately reflect the statements that were made at that meeting.

With respect to Tanesco's payment obligations to IPTL, we have the following questions and comments:

1.    In paragraph 2 of your letter, you mention payment of energy payments within 10 days after receiving loan funds. However, you provide no commitment as the date on which Tanesco will make these long overdue payments.

2.    In paragraph 3 of your letter, with respect to payment of capacity payments, you indicate that Tanesco will continue to dispute IPTL's invoices until the dispute is resolved. However,

   A.    You do not commit Tanesco to paying the undisputed portions of IPTL's invoices immediately, as Tanesco is required to do under the PPA.

   B.    You continue to provide no details as to Tanesco's 'dispute' with IPTL's invoices. You will recall that at the 25th July meeting, I kindly requested for the basis of the dispute and was prepared to discuss this with you, but you did not want to do so. Given how much time has past since Tanesco first notified IPTL of this dispute, it is extremely surprising and unsatisfactory that Tanesco still cannot, or will not, provide the details of its dispute to IPTL.

   C.    You provide no assurance that Tanesco is actually interested in resolving the dispute. We are left with the conclusion that it is Tanesco's goal to delay payment to IPTL indefinitely.

**INDEPENDENT POWER TANZANIA LTD.**

3.      With respect to the nature of the 25th July meeting, please recall that it was Tanesco which invoked Article 18.1 (b) of the PPA, by its letter dated 13th July 2007. Article 18.1(b) provides for a meeting with either the chief executive officer, or chief operating officer, of the companies, and that the meeting is to take place within 15 days of the letter. As indicated in my letter of 19th July 2007, after receiving your request for the meeting, I immediately tried to call you numerous times to arrange the meeting. I received no response. Finally, on 20th July, you wrote and scheduled the meeting for 24th July. I, as IPTL's Chief Operating Officer, immediately left my family holiday in Malaysia, and flew to Dar es Salaam, to attend the meeting, which took place on 25th July. We were never told that this meeting was anything but the Article 18.1 meeting that you called for and scheduled with your 20th July letter. As far as IPTL is concerned, the Article 18.1(b) meeting has occurred.

This is not to say that we are not willing to continue to meet to try to resolve this matter. We are willing to do so, and welcome the opportunity for a full exchange of thoughts and effort to resolve this dispute to move forward.

However, given that Tanesco (1) appears to be intentionally delaying resolution of this matter, and (2) continues to refuse to immediately pay at least the undisputed portions of the long overdue capacity payments, IPTL cannot wait indefinitely for a resolution and payment of IPTL's outstanding invoices. As we have previously indicated, Tanesco's conduct is causing IPTL enormous financial distress. Hence, we must reserve our right to commence arbitration as set forth in the PPA.

I look forward to hearing from you.

Sincerely,
**Independent Power Tanzania Limited**

PARTHIBAN, C
Chief Operating Officer

c.c.:    Hon. Minister
         Ministry of Energy & Minerals
         P.O. Box 2000
         Dar es Salaam

         Hon. Minister
         Ministry of Finance
         P.O. Box 9111
         Dar es Salaam

         Permanent Secretary
         Ministry of Energy & Minerals
         P.O. Box 2000



Permanent Secretary
Ministry of Finance
P.O. Box 9111
Dar es Salaam

The Commissioner for Energy & Petroleum Affairs
Ministry of Energy & Minerals
P.O. Box 2000
Dar es Salaam

Governor
Bank of Tanzania
P.O. Box 2939
Dar es Salaam

Mkono & Company
Advocates
P.O. Box 4369
Dar es Salaam

Nixon Peabody LLP
Attorneys at Law
437 Madison Avenue
New York, New York 10022-7001



**INDEPENDENT POWER TANZANIA LTD.**

Plot No. 2021, 2022, 2023 and 296 Block 'D' Salasala, Togota
P.O. Box 77173 Dar Es Salaam, Tanzania
Tel:  + 255 222 650750    Facsimile: + 255 222 650751
Email: admin@iptl.co.tz

Our Ref: IPTL/239/07/PC/ehm                    Date: 5th September, 2007

The Managing Director
Tanzania Electric Supply Company Ltd.
P.O. Box 9024
<u>Dar es Salaam</u>

Dear Dr. Rashidi,

Thank you for your 31 August 2007 letter.

First, TANESCO began serving the Invoice Dispute Notices that are at issue here approximately 3 years ago. We do not believe it credible that TANESCO needs still more time to be able to explain clearly the nature of its dispute. We have asked frequently for it to do so. To this day, TANESCO has yet to explain the basis for its dispute of IPTL's capacity payment invoices.

Second, it seems clear that TANESCO's goal here is to delay resolution of this matter. As we have indicated to you frequently, TANESCO's failure to pay IPTL amounts due to it under the PPA, and pursuant to the ICSID Arbitration Award that has been rendered, has and continues to cause IPTL to suffer severe financial distress.

Third, under the PPA, IPTL is entitled to payment of the undisputed portions of the capacity payments as those payments become due. Hence, even assuming TANESCO has some legitimate basis for disputing a portion of the capacity payments (it does not), it has no basis for withholding payment of the undisputed portions of the capacity, energy and supplementary charge payments. Along with the interest that is chargeable under Article 6.7 (b) of the PPA, the undisputed portion that is immediately due to IPTL is TZS **30,976,719,734.20** (see attached sheet). TANESCO must immediately make good on its contractual obligation to pay that sum, before there are any discussions regarding the disputed portion of the capacity payments. TANESCO has yet to explain to IPTL why it has not fulfilled this contractual obligation.

Fourth, please send to us promptly TANESCO's proposed date and agenda for the meeting, and a written explanation of its invoice dispute notices, so that we can prepare for that meeting. Given that TANESCO has been serving these invoice dispute notices for three years now, it must have a written explanation of them that it has circulated internally. Please either forward this to us, or prepare such an explanation for our benefit.

In sum, TANESCO must immediately pay the undisputed portion of the overdue capacity, energy and supplementary payments. There is no legitimate reason why it should take TANESCO the time it has to explain the basis for its invoice dispute notices. It leads us to believe that TANESCO is

**INDEPENDENT POWER TANZANIA LTD.**

simply trying to delay payment to IPTL. TANESCO's delays and breaches of its contractual obligations have caused IPTL severe financial distress, and IPTL cannot continue to wait for TANESCO to make good on its contract obligations, and on its obligations pursuant to the ICSID Arbitration Award. Finally, TANESCO should immediately explain in writing the details of its invoice dispute notices.

Sincerely,
**Independent Power Tanzania Limited**

PARTHIBAN C.
Chief Operating officer

Encl.

c.c.:   Hon. Minister
Ministry of Energy & Minerals
P.O. Box 2000
Dar es Salaam

Hon. Minister
Ministry of Finance
P.O. Box 9111
Dar es Salaam

Permanent Secretary
Ministry of Energy & Minerals
P.O. Box 2000
Dar es Salaam

Permanent Secretary
Ministry of Finance
P.O. Box 9111
Dar es Salaam

The Commissioner for Energy & Petroleum Affairs
Ministry of Energy & Minerals
P.O. Box 2000
Dar es Salaam

Governor
Bank of Tanzania
P.O. Box 2939
Dar es Salaam

The Managing Director
Tanzania Electric Supply Company Limited
P.O.Box 9024, Dar Es Salaam
TANZANIA

DATE
31.08.2007

## STATEMENT OF ACCOUNT

| DATE | INVOICE NO. | DESCRIPTION | | DEBIT | CREDIT | BALANCE |
|------|-------------|-------------|---|-------|--------|---------|
| 01.12.2006 | 43/2006/IPTL | Capacity Charges Nov 06 | | 4,254,319,829.00 | | 4,254,319,829.00 |
| 02.05.2007 | NBC 210991 | Payment received | | | 964,786,828.00 | 3,289,533,001.00 |
| 21.05.2007 | NBC 211220 | Payment received | | | 1,500,000,000.00 | 1,789,533,001.00 |
| 22.05.2007 | NBC 211247 | Payment received | | | 1,500,000,000.00 | 289,533,001.00 |
| 18.05.2007 | Contra | Contra settlement agst creditors | | | 48,530,576.60 | 241,002,424.40 |
| 01.12.2006 | 45/2006/IPTL | Supplemental Charges Nov 06 | | 513,783,702.00 | | 754,786,126.40 |
| 11.12.2006 | 49/2006/IPTL | Supplemental Charges Nov 06 EWURA | | 107,158,264.95 | | 861,944,391.35 |
| 01.01.2007 | 46/2006/IPTL | Capacity Charges Dec 06 | | 4,254,319,829.00 | | 5,116,264,220.35 |
| 01.01.2007 | 48/2006/IPTL | Supplemental Charges Dec 06 | | 5,113,777.00 | | 5,121,377,997.35 |
| 01.01.2007 | 50/2006/IPTL | Supplemental Charges Dec 06 EWURA | | 72,436,718.82 | | 5,193,814,716.17 |
| 01.02.2007 | 01/2007/IPTL | Capacity Charges Jan 07 | | 4,442,943,422.00 | | 9,636,758,138.17 |
| 01.02.2007 | 02/2007/IPTL | Energy Charges Jan 07 | | 2,151,715,830.00 | | 11,788,473,968.17 |
| 01.02.2007 | 04/2007/IPTL | Supplemental Charges Jan 07 | | 62,315,929.50 | | 11,850,789,897.67 |
| 01.02.2007 | 03/2007/IPTL | Supplemental Charges Jan 07 EWURA | | 54,955,493.77 | | 11,905,745,391.44 |
| 01.03.2007 | 05/2007/IPTL | Capacity Charges Feb 07 | | 4,408,873,981.00 | | 16,314,619,372.44 |
| 01.03.2007 | 06/2007/IPTL | Energy Charges Feb 07 | | 2,148,277,589.00 | | 18,462,896,961.44 |
| 01.03.2007 | 07/2007/IPTL | Supplemental Charges Feb 07 | | 4,635,865.00 | | 18,467,532,826.44 |
| 01.03.2007 | 08/2007/IPTL | Supplemental Charges Feb 07 EWURA | | 54,642,929.75 | | 18,522,175,756.19 |
| 01.04.2007 | 10/2007/IPTL | EAF Bonus FY2006/2007 | | 1,234,455,435.00 | | 19,756,631,191.19 |
| 12.04.2007 | CN01/2007 | D Capacity Charges Mar 07 | | 4,408,873,981.00 | | 24,165,505,172.19 |
| 01.04.2007 | 11/2007/IPTL | D Credit note on Capacity Charges Mar 07 | | | 734,812,330.00 | 23,430,692,842.19 |
| 01.04.2007 | 12/2007/IPTL | Energy Charges Mar 07 | | 473,873,766.00 | | 23,904,566,608.19 |
| 01.04.2007 | 14/2007/IPTL | Supplemental Charges Mar 07 | | 5,065,905.00 | | 23,909,632,513.19 |
| 01.05.2007 | 13/2007/IPTL | Supplemental Charges Mar 07 EWURA | | 40,689,564.56 | | 23,950,322,077.75 |
| 01.05.2007 | 15/2007/IPTL | Capacity Charges Apr 07 | | 3,674,061,651.00 | | 27,624,383,728.75 |
| 01.05.2007 | 16/2007/IPTL | Energy Charges Apr 07 | | 243,972,593.00 | | 27,868,356,321.75 |
| 01.05.2007 | 17/2007/IPTL | Supplemental Charges Apr 07 | | 4,200,476.50 | | 27,872,556,798.25 |
| 01.06.2007 | 10/2007/IPTL | D Supplemental Charges Apr 07 EWURA | | 38,773,721.45 | | 27,911,330,519.70 |
| 01.06.2007 | 19/2007/IPTL | Capacity Charges May 07 | | 3,673,311,234.00 | | 31,584,641,753.70 |
| 01.06.2007 | 19A/2007/IPTL | Supplemental Charges May 07 | | 16,048,493.50 | | 31,600,690,247.20 |
| 01.07.2007 | 20/2007/IPTL | Supplemental Charges May 07 EWURA | | 36,733,112.34 | | 31,637,423,359.54 |
| 01.07.2007 | 21/2007/IPTL | Capacity Charges June 07 | | 3,673,311,234.00 | | 35,310,734,593.54 |
| 01.07.2007 | 22/2007/IPTL | Energy Charges June 07 | | 29,339,251.00 | | 35,340,073,844.54 |
| 01.07.2007 | 23/2007/IPTL | Supplemental Charges June 07 | | 3,928,524.50 | | 35,344,002,369.04 |
| 01.07.2007 | 24/2007/IPTL | Supplemental Charges June 07 EWURA | | 36,977,606.10 | | 35,380,979,975.14 |
| 30.07.2007 | 28/2007/IPTL | Expenses for Gas Conversion Meetings | | 34,160,775.00 | | 35,415,140,750.14 |
| 01.08.2007 | 25/2007/IPTL | Interest Charge Jan '02 to Jun 07 | | 2,869,101,652.00 | | 38,284,241,902.14 |
| | | D Capacity Charges Jul 07 | | 3,628,393,695.00 | | 41,912,635,597.14 |
| 03.08.2007 | CN02/2007 | Credit note on Capacity Charges Jul 07 | | | 1,165,988.00 | 41,911,469,609.14 |
| 01.08.2007 | 26/2007/IPTL | Supplemental Charges Jul 07 | | 4,744,428.00 | | 41,916,214,037.14 |
| 01.08.2007 | 27/2007/IPTL | Supplemental Charges Jul 07 EWURA | | 36,283,936.95 | | 41,952,497,974.09 |
| 03.08.2007 | CN03/2007 | Credit note on Supp. EWURA Jul 07 | | | 11,659.89 | 41,952,486,314.20 |

### AGED ANALYSIS OF OUTSTANDING BALANCES

| DATE | CURRENT | 30 DAYS | 60 DAYS | 90 DAYS | 120 DAYS | AMOUNT DUE |
|------|---------|---------|---------|---------|----------|------------|
| 31.08.07 | 6,537,345,564.06 | 3,777,717,390.60 | 3,726,092,839.84 | 3,961,008,441.95 | 23,950,322,077.75 | 41,952,486,314.20 |
| | | | | | | 0.00 |

TERMS: Strictly 30 days credit from date of invoice. Please settle immediately.
All cheques should be payable to "INDEPENDENT POWER TANZANIA LIMITED"

Summary:-
| | |
|---|---|
| Undisputed Capacity Charges | 21,928,957,976.40 |
| Disputed Capacity Charges - D | 10,975,766,680.00 |
| Energy Charges | 6,047,179,029.00 |
| Supplemental Charges | 1,097,310,801.80 |
| Interest | 2,869,101,152.00 |
| Expenses for Gas Con. | 34,160,775.00 |
| | 41,952,486,314.20 |

STATEMENT OF ACCOUNT TO TANESCO Aug 07 R1.xls



**INDEPENDENT POWER TANZANIA LTD.**

OPERATIONS
Plot No. 292/1, 292/2, 292/3 and 296 Block 'D' Salasala, Togela
P.O. Box 77173 Dar Es Salaam, Tanzania
Tel: + 255 222 650750    Facsimile: + 255 222 650751
Email: admin@iptl.co.tz

Our Ref: IPTL/248/07/PC/ehm                    Date: 20th September, 2007

The Managing Director
Tanzania Electric Supply Company Ltd.
P.O. Box 9024
Dar es Salaam

Dear Dr. Rashidi,

RE:    **REMINDER – PAYMENT – EXPLANATION OF IDN –**
       **MEETING AGENDA AND DATE**

It's been over 2 weeks since we responded to your letter dated 31st August
2007. We have yet to receive payments of the undisputed sums amounting
to over 30 Billion Shillings, written explanation of the invoice dispute notice
and a proposed agenda and date.

In fact Tanesco proposed a meeting between the parties towards the end of
September but to date we have yet to receive and agenda or a date and we
only have less than 10 days before the month of September ends.

We wish to remind Tanesco to promptly make payment of the undisputed
sums, provide a written explanation of the invoice dispute notice and the
agenda and date for the meeting.

Sincerely,
**Independent Power Tanzania Limited**

PARTHIBAN C.
Chief Operating officer

c.c.:   Hon. Minister
        Ministry of Energy & Minerals
        P.O. Box 2000
        Dar es Salaam

        Hon. Minister
        Ministry of Finance
        P.O. Box 9111
        Dar es Salaam



Permanent Secretary
Ministry of Energy & Minerals
P.O. Box 2000
Dar es Salaam


Permanent Secretary
Ministry of Finance
P.O. Box 9111
Dar es Salaam


The Commissioner for Energy & Petroleum Affairs
Ministry of Energy & Minerals
P.O. Box 2000
Dar es Salaam


Governor
Bank of Tanzania
P.O. Box 2939
Dar es Salaam

**INDEPENDENT POWER TANZANIA LTD.**

OPERATIONS:
3rd Floor, TDFL BLDG, Ali Hassan Mwinyi Road/ Ohio Street
P.O.Box 77173, Dar Es Salaam, Tanzania.
Telephone : +255-51-110782/ 791    D/Line : +255-51-110781
Facsimile : +255-51-110790      E-Mail : iptl@cats-net.com

Our Ref: IPTL/258/07/PC/ehm                Date:  10th October, 2007

The Managing Director
Tanzania Electric Supply Company Ltd.
P.O. Box 9024
Dar es Salaam

Dear Dr. Rashidi,

We received your October 4 letter.

Please explain to us why Tanesco has not, and apparently will not, immediately pay the undisputed portions of the overdue capacity payments. The "dispute" (which Tanesco has yet to detail to IPTL) has no effect on those undisputed portions, which Tanesco is contractually obligated to pay even if it disputes portions of the capacity payments.

We expect an answer to this question immediately. If there is no answer and no payment immediately, it is beyond dispute that Tanesco, and the Government of Tanzania, are in breach of the PPA, the ICSID Arbitration Award, and the GOT Guarantee.

Sincerely,
Independent Power Tanzania Limited

PARTHIBAN C.
Chief Operating officer

INDEPENDENT
POWER TANZANIA LTD.

c.c.:  Hon. Minister
       Ministry of Energy & Minerals
       P.O. Box 2000
       Dar es Salaam


       Hon. Minister
       Ministry of Finance
       P.O. Box 9111
       Dar es Salaam


       Permanent Secretary
       Ministry of Energy & Minerals
       P.O. Box 2000
       Dar es Salaam


       Permanent Secretary
       Ministry of Finance
       P.O. Box 9111
       Dar es Salaam


       The Commissioner for Energy & Petroleum Affairs
       Ministry of Energy & Minerals
       P.O. Box 2000
       Dar es Salaam


       Governor
       Bank of Tanzania
       P.O. Box 2939
       Dar es Salaam

# EXHIBIT I

**INDEPENDENT
POWER TANZANIA LTD.**

HEADQUARTERS:
No. 1, Jalan Perunding U1/17,
Glenmarie Industrial Park, 40150 Shah Alam,
Selangor Darul Ehsan, Malaysia.
Telephone : +603-55692828 (7 Lines)
Facsimile : +603-55692888

23 August 2007

The Permanent Secretary
Ministry of Energy & Minerals
(being the Guarantor)
Sokoine Drive, Mkwepu Street,
PO Box 2000
Dar es Salaam

**Certification for Demand of Payment Pursuant to Article 1.6 of the Guarantee
Dated 8th June 1995**

Dear Sir:

By Notice dated 15 August 2007, Independent Power Tanzania Ltd. ("IPTL") submitted its certification for demand for payment of sums that were not disputed by Tanesco, but were overdue, pursuant to Article 1.6 of the Guarantee dated 8th June 1995 (the "Guarantee").

More than five days have elapsed since the Certification was delivered. No payment has been made, in violation of Article 1.5 of the Guarantee.

Under Article 1.5 of the Guarantee, late payments are to bear mark-up at an annual rate equal to the then applicable one-year LIBOR rate plus three (3) percentage points. As the sums claimed are not disputed by Tanesco, that interest rate commences 20 August 2007 (five days after delivery of IPTL's certification.). (we have to mention here that this is the interest applicable for the period after a claim has been made to the GOT; there is an interest factor in the PPA chargeable to Tanesco as well.)

Notwithstanding IPTL's right on the late payment interest, IPTL reserve its right to initiate legal proceeding on the Government violation of the Article 1.5 of the Guarantee.

In addition, Article 5.1.2 of the Guarantee provides that all notices are to be given to Mr. James Rugemalira and copied to IPTL's legal counsel, Ms. Joanne Long, Kuala Lumpur, Malaysia. IPTL hereby requests that any such notices be provided instead to:-

| | | |
|---|---|---|
| For the Company | : | Independent Power Tanzania Limited |
| Attention | : | Mr. Parthiban Chandrasakaran |
| Address | : | Plot 292/1, 292/2 and 296, Sala-Sala, Tegeta, PO Box 77173 Dar Es Salaam. |
| Facsimile | : | +255 22 2650751 |



With a copy to the Company's counsel      :      Nixon Peabody LLP
Attention              :        Mr. Robert C. Sentner
Address               :        437 Madison Avenue, New York, NY, USA,
Facsimile             :


Yours faithfully,


Datuk Baharuden Majid
Managing Director

Plot No. 292/1,292/2,292/3 and 296
Block "D" Salasala Tegeta,
P.O. Box 77173 Dar Es Salaam, Tanzania.
Tel. No. +255-51-650750
Fax No. +255-61-650751
E-mail: admin@ipti.co.tz

**INDEPENDENT
POWER TANZANIA LTD.**

# Memo

| | | |
|---|---|---|
| **To** | : | **Deputy Permanent Secretary – Ministry of Finance** |
| **From** | : | **Chief Operating Officer** |
| **Date:** | : | **29th August, 2007** |

Dear Sir,

I would like to seek an appointment to meet you.

The subject matter is related to the current non payment from Tanesco/ Government and the disputes without basis by Tanesco. In fact Tanesco has not been paid Independent Power Tanzania Ltd from January 2007 invoice. Please note that the Tanzania Revenue Authority has recovered VAT from IPTL while Tanesco has not settled its debt.

We appreciate if you can revert with a date and time for this meeting. Anytime this week would be appreciated.

Kind Regards,

PARTHIBAN, C
Chief Operating Officer



**INDEPENDENT POWER TANZANIA LTD.**

OPERATIONS
Plot No. 292/1, 292/2, 292/3 and 296 Block 'D' Salsadar, Tegeta
P.O. Box 77173 Dar Es Salaam, Tanzania
Tel: + 255 222 650750     Facsimile: + 255 222 650751
Email: admin@iptl.co.tz

**Our Ref: IPTL/230/07/PC/ehm**                    **Date: 29th August, 2007**

Honorable Minister
Ministry of Energy & Minerals
P.O. Box 2000
Dar es Salaam

Honorable Sir,

### RE: <u>APPOINTMENT FOR A MEETING</u>

Our Managing Director Datuk Baharuden Majid who is based in Malaysia wishes to meet the Honorable Minister of Energy and Minerals in Dar es Salaam.

We appreciate if the Honorable Minister can suggest a date, time and venue for this meeting. The subject matter is related to the current non payment from Tanesco/ GOT and the disputes without basis by Tanesco.

We appreciate if the Honorable Minister can revert with a date and time for this meeting sometime next week.

Respectfully,
**Independent Power Tanzania Limited**

PARTHIBAN, C
Chief Operating Officer

# THE UNITED REPUBLIC OF TANZANIA
## MINISTRY OF FINANCE

Telegrams: "TREASURY", Dar es Salaam,
Tel: 2111174/6, Fax 2110326.
Telex: 41329.
(All Official communications should be
addressed to the Permanent Secretary to
The Treasury and NOT to individuals).



P. O. Box 9111,

DAR ES SALAAM,
TANZANIA.

In reply please quote:  **TYC/E/60/23**

**October 8, 2007**

Mr. Parthiban C,
Chief Operating Officer,
Independent Power Tanzania Limited,
P.O Box 77173,
**DAR ES SALAAM.**

Dear Sir,

### RE: APPOINTMENT FOR A MEETING

Reference is made to your letter dated August 28, 2007 on the above captioned matter.

Currently, matters relating to IPTL are handled through the Ministry of Energy and Minerals.

We recommend that you make an appointment with the Minister for Energy and Minerals or Permanent Secretary to discuss the issue before the matters are presented to the Minister for Finance.

Yours sincerely,

Ramadhani M. Khijjah
**for: PERMANENT SECRETARY-TREASURY**



RECEIVED

1 0 OCT 2007

IPTL
DSM.

**CC:**   Permanent Secretary,
Ministry of Energy and Minerals,
**DAR ES SALAAM.**

Governor,
Bank of Tanzania,
**DAR ES SALAAM.**

Managing Director,
Tanzania Electric Company Limited,
**DAR ES SALAAM.**

# EXHIBIT J



"Tunayaangaza Maisha Yako"    *TANESCO*    "We Light Up Your Life"

### SHIRIKA LA UMEME TANZANIA
### TANZANIA ELECTRIC SUPPLY COMPANY LIMITED

Ubungo Head Office, "Umeme Park", PO BOX 9024 Dar es Salaam, Tanzania. Tel: +255 22 2451130/9. Fax: +255 22 2452026

Our Ref:

Date:

DF/MF/IPTL

28ᵗʰ November 2007

The Permanent Secretary,
Ministry of Finance,
P.O. Box 9111,
**Dar es Salaam.**

Dear Sir,

RE:    PAYMENT OF IPTL OUTSTANDING INVOICES

Reference is made to the various correspondences regarding the above captioned subject.

We confirm that according to our records the outstanding invoices to IPTL as at 31ˢᵗ October 2007 was Tshs 52,966.3 million. The break down of this figure is shown in the attached sheet to this letter. As you may note from the schedule, the outstanding amount includes bonus amount Tshs 1,234.5million, capacity charge Tshs 42,560.3 million, energy charges Tshs 5,047.2 million, supplementary charges 1,255.3 million and interest charged on late payment of Tshs 2,869.1 million.

Out of the outstanding amount, the capacity charges amounting to Tshs 21,865.8 million have been disputed and the remaining part amounting to Tshs 31,100 million is undisputed. In accordance with the Agreement, the undisputed amount is due for payment.

We confirm further that the entire amount outstanding will be deposited into the escrow account held by the Escrow Agent, The Bank of Tanzania. IPTL will have to access the money due in line with the procedures prescribed in the Escrow Agreement. As you may be aware TANESCO deposited USD 22mn and Tshs 6,000 million in the USD and Tanzania Shillings account respectively. It is TANESCO's intention to use part of the proceeds from the syndicated loan to fill the gap between the available balance with the Escrow Agent and the outstanding amount.

We thank you for the cooperation and support in this regard.

Yours faithfully,
For: **TANZANIA ELECTRIC SUPPLY COMPANY LIMITED,**

Jamauri J. Ngelime
For: **MANAGING DIRECTOR**

TANESCO BOARD OF DIRECTORS: Ambassador F.M. Kazaura (Chairman), Mr A. S. Mapunda, Hon. P Mugani (MP), Mr A. B. Rilewo, Mr. S. J. Mrindoko, Mrs. A. E. Busumbu, Mr. A. Mwakapugi, Mr. S. Salehe, and Mr. S.A. Juma

c.c.:   Permanent Secretary,
        Ministry of Energy and Mineral,
        P.O. Box 2000,
        Dar es Salaam.

c.c.:   Governor
        Bank of Tanzania,
        P.O. Box 2939,
        Dar es Salaam - Attn: E. M. Boaz

30 Nov 2007 10:39AM    HP LASERJET FAX

CAPITAL EXPENDITURE DEPARTMENT

**APPENDIX "A"**

OUTSTANDING PAYMENT TO IPTL AS AT 19.11.2007

| PAYEE | DESCRIPTION | INVOICE NO | UNDISPUTED | DISPUTED | TOTAL |
|---|---|---|---|---|---|
| ENERGY | | | | | |
| | BONUS(JAN 06-JAN07) | 06/2007/IPTL | 1,234,455,435.00 | 0 | 1,234,455,435.00 |
| | Subtotal | | 1,234,455,435.00 | 0.00 | 1,234,455,435.00 |
| | CAPACITY CHARGE (DEC 2006) | 48/2006/IPTL | 4,254,319,829.00 | 0 | 4,254,319,829.00 |
| | CAPACITY CHARGE (FEB 2007) | 05/2007/IPTL | 4,406,873,981.00 | 0 | 4,406,873,981.00 |
| | CAPACITY CHARGE (JAN07) | 01/2007/IPTL | 4,442,943,422.00 | 0 | 4,442,943,422.00 |
| | CAPACITY CHARGE (MAR 07) | 10/2007/IPTL | | 3,674,061,651.00 | 3,674,061,551.00 |
| | CAPACITY PAYMENT(NOV 2006) | 43/2006/IPTL | 241,002,424.40 | | 241,002,424.40 |
| | CAPACITY PAYMENT(APRIL 2007) | 14/2007/IPTL | 3,874,061,651.00 | | 3,874,061,651.00 |
| | CAPACITY PAYMENT(MAY 2007) | 18/2007/IPTL | | 3,673,311,234.00 | 3,673,311,234.00 |
| | CAPACITY PAYMENT(JUNE 2007) | 20/2007/IPTL | 3,673,311,234.00 | | 3,673,311,234.00 |
| | CAPACITY PAYMENT(JULY 2007) | 25/2007/IPTL | | 3,627,227,707.00 | 3,627,227,707.00 |
| | CAPACITY PAYMENT(AUGUST 2007) | 29/2007/IPTL | | 3,630,392,774.00 | 3,630,392,774.00 |
| | CAPACITY PAYMENT(SEPTEMBER 2007) | 32/2007/IPTL | | 3,630,392,774.00 | 3,630,392,774.00 |
| | CAPACITY PAYMENT(OCTOBER 2007) | 35/2007/IPTL | | 3,630,392,774.00 | 3,630,392,774.00 |
| | Subtotal | | 20,694,512,541.40 | 21,865,778,914.00 | 42,560,291,455.40 |
| | ENERGY CHARGE (MAR 2007) | 11/2007/IPTL | 473,873,786.00 | 0 | 473,873,786.00 |
| | ENERGY CHARGE(FEB 2007) | 05/2007/IPTL | 2,148,277,589.00 | 0 | 2,148,277,589.00 |
| | ENERGY CHARGE(JAN07) | 02/2007/IPTL | 2,151,715,830.00 | 0 | 2,151,715,830.00 |
| | ENERGY CHARGE (APRIL) | 15/2007/IPTL | 243,972,593.00 | 0 | 243,972,593.00 |
| | ENERGY CHARGE(JUNE) | 21/2007/IPTL | 29,339,251.00 | 0 | 29,339,251.00 |
| | Subtotal | | 5,047,179,029.00 | 0 | 5,047,179,029.00 |
| | SUPPL PAYMENT (NOV 2006) | 45/2006/IPTL | 513,783,702.00 | 0 | 513,783,702.00 |
| | SUPPLIMENTAL CHARGE(DEC 2006) | 50/2006/2006 | 72,436,718.82 | 0 | 72,436,718.82 |
| | SUPPLIMENTAL CHARGE(FEB 2007) | 43/2007/IPTL | 5,113,777.00 | 0 | 5,113,777.00 |
| | SUPPLIMENTAL CHARGE(JAN 2007) | 07/2007/IPTL | 4,635,865.00 | 0 | 4,635,865.00 |
| | SUPPLIMENTAL CHARGE(NOV 2006) | 03/2007/IPTL | 62,315,929.50 | 0 | 62,315,929.50 |
| | SUPPLIMENTAL CHARGE- (MAR 2007) | 49/2006/IPTL | 107,158,264.55 | 0 | 107,158,264.55 |
| | SUPPLIMENTAL EWURA (JAN 2007) | 12/2007/IPTL | 5,065,905.00 | 0 | 5,065,905.00 |
| | SUPPLIMENTAL EWURA ( MAR 2007) | 04/2007/IPTL | 54,955,493.77 | 0 | 54,955,493.77 |
| | SUPPLIMENTAL EWURA (FEB 2007) | 13/2007/IPTL | 40,689,564.56 | 0 | 40,689,564.56 |
| | SUPPLIMENTAL CHARGE (APRIL 2007) | 06/2007/IPTL | 54,642,929.75 | 0 | 54,642,929.75 |
| | SUPPLIMENTAL EWURA (APRIL 2007) | 18/2007/IPTL | 4,200,478.50 | 0 | 4,200,478.50 |
| | SUPPLIMENTAL EWURA (MAY 2007) | 17/2007/IPTL | 38,773,721.45 | 0 | 38,773,721.45 |
| | SUPPLIMENTAL CHARGE (MAY 2007) | 19/2007/IPTL | 36,733,112.34 | 0 | 36,733,112.34 |
| | SUPPLIMENTAL EWURA(JUNE 2007) | 19/2007/IPTL | 16,048,493.50 | 0 | 16,048,493.50 |
| | SUPPLIMENTAL CHARGE(JUNE 2007) | 23/2007/IPTL | 36,977,608.10 | 0 | 36,977,608.10 |
| | GAS CONVERSION EXPENSES | 22/2007/IPTL | 3,928,524.53 | 0 | 3,928,524.53 |
| | SUPPLIMENTAL CHARGE (JULY 2007) | 24/2007/IPTL | 34,160,775.00 | 0 | 34,160,775.00 |
| | SUPPLIMENTAL CHARGE(JUNE 2007) | 26/2007/IPTL | 4,744,426.00 | 0 | 4,744,426.00 |
| | SUPPLIMENTAL CHARGE(AUGUST 2007) | 27/2007/IPTL | 36,283,936.95 | 0 | 36,283,936.95 |
| | | 30/2007/IPTL | 3,867,553.50 | 0 | 3,867,553.50 |

| | | | | |
|---|---|---|---|---|
| SUPPLIMENTAL EWURA(AUGUST 2007) | 31/2007/IPTL | 36,303,927.74 | 0 | 36,303,927.74 |
| SUPPLIMENTAL EWURA(SEPTEMBER 2007) | 34/2007/IPTL | 36,303,927.74 | 0 | 36,303,927.74 |
| SUPPLIMENTAL CHARGE(SEPT. 2007) | 34/2007/IPTL | 4,882,720.00 | 0 | 4,882,720.00 |
| SUPPLIMENTAL EWURA(OCTOBER 2007) | 36/2007/IPTL | 36,303,927.74 | 0 | 38,303,927.74 |
| SUPPLIMENTAL CHARGE(OCTOBER 2007) | 37/2007/IPTL | 4,932,792.50 | 0 | 4,932,792.50 |
| | Subtotal | 1,256,264,073.91 | 0.00 | 1,255,264,073.91 |
| INETEREST CHARGES ON LATE PAYMENT | 28/2007/IPTL | 2,869,101,152.00 | 0 | 2,869,101,152.00 |
| | Subtotal | 2,869,101,152.00 | 0.00 | 2,869,101,152.00 |
| | | 31,100,512,231.31 | 21,865,778,914.00 | 52,966,291,145.31 |