UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X
                                  :

INDEPENDENT POWER TANZANIA LTD.,  :
                                  :

                Plaintiff,       :

                                  :

         - against -        :      07 CV 10366 (AKH)

                                  :

THE GOVERNMENT OF THE REPUBLIC  :
OF TANZANIA,                      :

                                  :

                Defendant.    :

                                  :
-------------------------------------------------------------X

## REPLY MEMORANDUM OF LAW IN
## FURTHER SUPPORT OF DEFENDANT'S
## <u>MOTION TO DISMISS THE COMPLAINT</u>

Joseph J. Saltarelli
HUNTON & WILLIAMS LLP
200 Park Avenue
New York, New York  10166
(212) 309-1000

*Attorneys for Defendant,*
*The Government of the*
*United Republic of Tanzania*

February 22, 2008

## Table of Contents

**Page**

Preliminary Statement..................................................................................................1

Argument ....................................................................................................................3

POINT I    THE COURT LACKS SUBJECT MATTER JURISDICTION BECAUSE
GOT HAS NOT WAIVED ITS SOVEREIGN IMMUNITY ...........................3

POINT II    THE COURT LACKS PERSONAL JURISDICTION OVER GOT .............11

A.    The Notice Provision in the Guarantee Does Not Constitute a "Special
Arrangement for Service" Between IPTL and GOT........................................11

B.    IPTL Is Not Entitled to Jurisdictional Discovery. ...........................................15

POINT III    ALTERNATIVELY, THE *FORUM NON CONVENIENS* DOCTRINE
SUPPORTS DISMISSAL OF IPTL'S ACTION ............................................16

Conclusion ................................................................................................................18

## <u>Table of Authorities</u>

<b><u>Page</u></b>

### <u>Cases</u>

<u>Argentine Republic v. Amerada Hess Shipping Corp.</u>,
    488 U.S. 428, 434 (1989)............................................................................................ 11

<u>Berces v. Debrecen Tartositoipari Kombinat</u>,
    94-cv-3381 (KMW), 1995 U.S. Dist. LEXIS 16052 (S.D.N.Y. Oct. 31, 1995)................ 15, 16

<u>Berdakin Consulado de La Republica de El Salvador</u>,
    912 F.Supp. 458 (C.D. Cal. 1995) ............................................................... 12 n.11, 13

<u>Bigio v. Coca-Cola Co.</u>,
    448 F.3d 176, 179 (2d Cir. 2006)............................................................................ 17

<u>Concord Reinsurance Co., Ltd. v. Caja Navional De Ahorro Y Seguro</u>,
    93-cv-6606 (JSM), 1994 WL 86401 (S.D.N.Y. March 16, 1994)............................................ 13

<u>First City, Texas-Houston, N.A. v. Rafidain Bank</u>,
    150 F.3d 172 (2d Cir. 1998).......................................................................... 15 n.14

<u>Frontera Resources Azerbaijan Corp. v. State Oil Co. of the Azerbaijan Republic</u>,
    479 F.Supp.2d 376 (S.D.N.Y. 2007)...................................................................... 14 n.13

<u>Hanil Bank v. PT. Bank Negara Indonesia</u>,
    148 F.3d 127 (2d Cir. 1998).......................................................................... 14 n. 13

<u>Kensington Intern. Ltd. v. Itoua</u>,
    505 F.3d 147 (2d Cir. 2007)................................................................................ 17

<u>Liberty Mut. Inc. v. N. Picco & Sons</u>,
    05-cv-217 (SCR), 2008 U.S. Dist. LEXIS 4915 (S.D.N.Y. Jan. 16, 2008)......................... 7 n.5

<u>Marlowe v. Argentine Naval Comm'n</u>,
    604 F.Supp. 702 (D.D.C. 1985) ...................................................................... 12, 13

<u>Martime Int'l Nominees Establishment v. The Republic of Guinea</u>,
    693 F.2d 1094 (D.C. Cir. 1982), <u>cert</u>. <u>denied</u> 464 U.S. 815 (1983)...................................... 9, 10

<u>McDonnell Douglas Fin. Corp. v. Pennsylvania Power & Light Co.</u>,
    858 F.2d 825 (2d Cir. 1988).................................................................................. 7

<u>Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.</u>,
    460 U.S. 1 (1983)............................................................................................ 6

ii

**Table of Authorities**
(continued)

Reiss v. Societe Centrale du Groupe des Assurances Nationales,
  235 F.3d 738 (2d Cir. 2000)................................................................................ 15 n.14

Saud v. PIA Investments Ltd.,
  07-cv-5603 (NRB), 2007 WL 4457441 (S.D.N.Y. Dec. 14 2007) .......................... 17

Space Sys./Loral, Inc. v. Yuzhnoye Design Office,
  164 F.Supp.2d 397 (S.D.N.Y. 2001)................................................................. 12, 13

Specht v. Netscape Communications Corp.,
  306 F.3d 17 (2d Cir. 2002)........................................................................................ 6

Texas Trading & Milling Corp. v. Federal Republic of Nigeria,
  647 F.2d 300 (2d Cir. 1981), cert. denied, 454 U.S. 1148 (1982) ................... 14 n.13

U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co., Ltd.,
  241 F.3d 135 (2d Cir. 2001)............................................................................ 14 n.13

Underwood v. United Republic of Tanzania,
  94-cv-902, 1995 WL 46383 (D.D.C. Jan. 27, 1995) ............................................. 13

**Statutes**

U.S. Const. art. VI, cl. 2....................................................................................... 8 n.7

22 U.S.C. § 1650a................................................................................................ 7, 10

28 U.S.C. § 1330.................................................................................................... 1, 11

28 U.S.C. § 1605...................................................................................................... *passim*

28 U.S.C. § 1608............................................................................................ 11, 12, 14

N.Y. C.P.L.R. §§ 5301 et seq................................................................................ 17

**Rules & Regulations**

Fed. R. Civ. P. 12(b) ................................................................................................ 1

22 C.F.R. § 93.2 ..................................................................................................... 11

**Table of Authorities**
**(continued)**

**Other Authorities**

Convention on the Settlement of Investment Disputes between States and Nationals of Other States, *done at* Washington, Mar. 18, 1965, 17 U.S.T. 1270, T.I.A.S No. 6090, 575 U.N.T.S. 159 (entered into force Oct. 14, 1966), reprinted in 4 I.L.M. 532 (1965). ....................*passim*

Bette E. Shifman, Note, *Maritime International Nominees Establishment v. Republic of Guinea: Effect on U.S. Jurisdiction of an Agreement by a Foreign Sovereign to Arbitrate Before the International Centre for the Settlement of Investment Disputes*, 16 GEO. WASH. J. INT'L L. & ECON. 451, 457 (1982)............................................................................................ 8, 9

BLACK'S LAW DICTIONARY (7th ed. 1999) ................................................................ 13

Defendant, The Government of the United Republic of Tanzania ("GOT"), by counsel, respectfully submits this Reply Memorandum of Law in further support of its motion to dismiss the complaint for lack of subject matter and personal jurisdiction.  Fed. R. Civ. P. 12(b)(1), (2); 28 U.S.C. §§ 1330(a), (b).

**Preliminary Statement**

Plaintiff Independent Power Tanzania Ltd. ("IPTL") seeks to simply wish away the mandatory arbitration clause in GOT's Guarantee.  IPTL does not, and cannot, deny that the clause requires mandatory arbitration, in London, before a tribunal constituted under the auspices of the International Centre for the Settlement of Investment Disputes ("ICSID"), of "*any dispute or difference* arising out of or in connection with" the Guarantee.  Thus, the single claim asserted in this case, for an alleged breach of the Guarantee, must be arbitrated in London, not litigated in New York.

IPTL tries to camouflage the necessity for mandatory ICSID arbitration by contending that its claim, arising out of TANESCO's alleged failure to make certain monthly capacity payments under the Power Purchase Agreement ("PPA"), is not subject to "dispute" by GOT. Rather, IPTL contends, GOT is precluded from disputing the claim, which accrued only in 2007, by virtue of a 2001 ICSID arbitration proceeding to which GOT was not a party, which did not involve a claim under GOT's Guarantee, and which did not, for obvious reasons, award IPTL any sum of money under the Guarantee based upon the 2007 capacity payments that are the subject of this suit.

IPTL devotes several pages of its opposition brief to quotes from the 2001 ICSID Award issued in the arbitration between IPTL and TANESCO.  IPTL Br. at 7-12.  It does so principally to argue that monthly capacity payments under the PPA are calculated on the basis of a financial

model that was approved as part of the 2001 Award and whose parameters are no longer subject to challenge.[1]  In a classic case of bootstrapping, IPTL goes on to contend that because the model is not subject to dispute, any invoices based on the model cannot be subject to dispute, and any obligation on GOT's part to pay such invoices when they are not paid by TANESCO is likewise not subject to dispute, thereby rendering inapplicable the Guarantee's mandatory arbitration clause.

IPTL's bootstrap rationale, however, cannot overcome the plain language of the Guarantee.  Regardless of whether IPTL believes GOT lacks (i) a legitimate basis to contest the monthly capacity invoices, or (ii) grounds to challenge that a proper demand for payment has been made under the terms of the Guarantee, GOT's denial of liability raises a "dispute or difference" that is subject to arbitration.[2]  First, GOT can raise any defense available to TANESCO, even if TANESCO itself has not asserted it.  See Guarantee ¶ 1.8 (" . . . the Guarantor shall have the benefit of all rights of set-off, counterclaim, reduction, or diminution of any obligations that are available to TANESCO, pursuant to the Power Purchase Agreement or that are otherwise directly related to the Project.").  Second, GOT can defend on the basis of conditions precedent to payment set out in the Guarantee, as well as other rights.  See Guarantee ¶ 1.5 ("Preliminary Recourse" provision setting forth conditions precedent to IPTL's "taking steps to enforce this Guarantee and demanding payment from the GOT"); Declaration of Sazi B. Salula, executed January 17, 2007, ¶¶ 9-11.  In short, GOT has the unequivocal right, in the

---

[1] IPTL's argument respecting the Invoice Dispute Notices from TANESCO, and specifically its contention that the 2001 ICSID Award is dispositive of TANESCO's equity argument, is erroneous because TANESCO's dispute is based on events occurring after issuance of the 2001 Award.  The merits of that dispute, however, are for ICSID to resolve.

[2] The PPA defines "Disputes" as "any dispute or disagreement of any kind."  PPA ¶ 1.1. Among other things, the Guarantee is restricted to amounts TANESCO is "obligated to pay." TANESCO has raised a dispute and is entitled to set off past payments made in excess of its liability, which defense along with others can be asserted by GOT.

context of an ICSID arbitration in London, to dispute IPTL's claim by interposing these and any other defenses available under the terms of Guarantee, the parties' related agreements, and Tanzanian law.

GOT has neither waived its right to arbitrate, nor its sovereign immunity with respect to this judicial proceeding, by virtue of ¶ 2.6 of the Guarantee. The juxtaposition of the parties' mandatory arbitration agreements in the PPA, Implementation Agreement ("IA") and Guarantee with GOT's limited waiver of sovereign immunity in the IA and Guarantee makes plain that, at most, GOT waived immunity from suit in the courts of the United States only for purposes of enforcing an ICSID arbitral award issued in IPTL's favor. As there is no clear and unambiguous waiver of GOT's sovereign immunity from this type of proceeding, as opposed to a proceeding to enforce an arbitral award, subject matter jurisdiction is lacking under the Foreign Sovereign Immunities Act ("FSIA") and IPTL's lawsuit must be dismissed.

## **Argument**

### **POINT I**

### **THE COURT LACKS SUBJECT MATTER JURISDICTION BECAUSE GOT HAS NOT WAIVED ITS SOVEREIGN IMMUNITY**

IPTL's Opposition makes clear that its sole basis for alleging subject matter jurisdiction in this case is § 1605(a)(1) of the FSIA, which provides for jurisdiction where a foreign state "has waived its immunity either explicitly or by implication." IPTL makes no implied waiver argument. Instead, it argues that GOT "clearly waived" its immunity to this suit in ¶ 2.6 of the Guarantee. In doing so, IPTL misconstrues ¶ 2.6 and ignores the parties' mandatory arbitration agreement, which is set forth in ¶ 7.2 of the Guarantee. As a matter of logic and law, a party's

waiver of sovereign immunity with respect to proceedings to enforce an arbitral award does not waive the party's right to arbitrate in the first instance.

IPTL is unable to cite a single decision that supports its argument that a waiver of sovereign immunity in an international agreement containing a mandatory ICSID arbitration clause waives immunity from a suit seeking a plenary judgment before the arbitration has taken place or an award has been issued. IPTL's argument leads to the conclusion that GOT's limited waiver of immunity with respect to enforcement of an ICSID arbitral award must be deemed a waiver of the mandatory arbitration agreement itself, an absurd result.

As predicted in GOT's opening brief, IPTL engages in sleight-of-hand reasoning in order to assert that GOT's waiver of immunity in ¶ 7.2 of the Guarantee allows the Court to exercise jurisdiction and enter judgment in this action, despite the lack of an arbitral award against GOT. IPTL acknowledges that "[t]o be sure, this is not an action to enforce the ICSID Award against Tanesco." IPTL Br. at 15. Equally sure is the fact that this is not a proceeding to enforce any arbitral award against GOT, which was not party to the 1999-2001 ICSID arbitration between IPTL and TANESCO and has never been the subject of any arbitration proceeding commenced by IPTL to enforce the Guarantee.

In an effort to circumvent the fact that no arbitration has been commenced against GOT with respect to the Guarantee payments that are the subject of the claim in this case, IPTL argues that its action is one "to enforce GOT's obligation to guarantee Tanesco's obligations, *which were defined by* the [2001] ICSID Award." Id. (emphasis added). The argument is disingenuous for a couple of reasons.

- 4 -

First, the focus of the 2001 ICSID Award was IPTL's wrongful inflation of the price of the Tegeta power plant,[3] and the Tribunal's reduction of the plant's cost from $150 million to approximately $121 million. The 2001 Award did not and could not have addressed the 2007 invoices that are the subject of IPTL's claim or GOT's obligations respecting those invoices.

Second, GOT's payment obligation under the Guarantee is not automatic regardless of whether TANESCO has a bona fide defense to payment of any particular invoice. GOT can refuse to pay if it disputes that any of the conditions precedent to its payment obligation under the Guarantee have been satisfied. Where, as here, GOT disputes its obligation to pay, then regardless of whether the amounts are disputed by TANESCO, IPTL must commence an ICSID arbitration against GOT in London, obtain an award, and reduce the award to judgment. IPTL cannot move to obtain judgment here and seize GOT's assets merely because it made a demand for payment under the Guarantee and claims that GOT has no valid defense to it. The 2001 Award in no way resolved these issues.

In sum, this case does not implicate ¶ 2.6 of the Guarantee, which, at most, waives sovereign immunity only with respect to proceedings to enforce an ICSID arbitral award properly rendered against GOT pursuant to ¶ 7.2 of the Guarantee. Paragraph 2.6 cannot as a matter of law be interpreted to abrogate GOT's absolute right to arbitrate any claim asserted against it under the Guarantee. Indeed, ¶¶ 2.6 and 7.2 of the Guarantee must be read alongside the ¶ 1.9 "Consent to Jurisdiction" provision, which plainly conveys the parties' intent that any

---

[3] IPTL's reliance on the recent controversy involving Richmond Development Company LLC, in an attempt to show GOT's alleged "contacts" with the United States, is ironic as similar corruption allegations were asserted against IPTL.

judicial proceeding between them would necessarily follow, not precede or negate, an ICSID arbitration proceeding[4]:

> Each Party hereby consents to the jurisdiction of the courts of London,
> England for any action filed by the Party to enforce any award or decision
> of any arbitrator(s) or expert(s) who were duly appointed under this
> Agreement to resolve any Dispute between the Parties. . . .

IPTL has not even attempted to explain how it is entitled to skip altogether the arbitration proceeding mandated under the Guarantee, and seek by way of this plenary lawsuit to obtain directly a U.S. money judgment based on its claim of breach of contract. IPTL cites no authority to support such an interpretation of the Guarantee's dispute resolution provisions. At bottom, IPTL's position amounts to nothing more than a unilateral declaration that arbitration is unnecessary because there is no valid defense to its claims and, hence, GOT should be ordered to pay and have its assets seized without further delay. IPTL is certainly free to press a claim against GOT, but it must do so in the arbitral forum mandated by the Guarantee as it is axiomatic that, once it is determined that a valid arbitration agreement exists, the arbitrability and viability of a particular issue or defense is generally a matter for the arbitrator. E.g., Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24- 25 (1983) ("any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense of arbitrabililty."); Specht v. Netscape Communications Corp., 306 F.3d 17, 35 (2d Cir.

---

[4] The PPA, IA and Guarantee were executed contemporaneously and are intended to function as integrated agreements. As such, they should be construed consistently to the extent possible. Each of these documents has a binding arbitration provision for resolution of "all disputes," and both the IA and Guarantee have provisions whereby GOT consents to jurisdiction in London, England to enforce any arbitral award in conjunction with its waiver of sovereign immunity with respect to such proceedings. In the face of this regime for dispute resolution, IPTL's proposed construction of ¶ 2.6 of the Guarantee would be tantamount to reading the arbitration provision out of the contract.

2002) ("arbitration is indicated unless it can be said 'with positive assurance' that an arbitration

clause is not susceptible to an interpretation that covers the asserted dispute") (citation omitted);

McDonnell Douglas Fin. Corp. v. Pennsylvania Power & Light Co., 858 F.2d 825, 832 (2d Cir.

1988) (stating that if arbitrators have jurisdiction over a matter, "any subsequent construction of

the contract and of the parties' rights and obligations under it" is for the arbitrators to decide

(citation omitted)).

Finally, IPTL's reliance upon the ICSID Convention (IPTL Br. at 14-15), is wholly

misplaced. As IPTL notes, IPTL Br. at 15, the enabling statute for the ICSID Convention, 22

U.S.C. § 1650a, provides for jurisdiction over actions seeking to enforce an ICSID award in the

United States. In the very next sentence, IPTL acknowledges that this is not such a proceeding.

Since neither TANESCO nor GOT has ever been the subject of an ICSID arbitration with respect

to the allegedly delinquent 2007 capacity payments, and no ICSID tribunal has declared GOT in

breach of its Guarantee, this action cannot be characterized as enforcement of an ICSID award.

As such, 22 U.S.C. § 1650a does not provide any basis for subject matter jurisdiction.[5]

---

[5] For similar reasons, Judge Robinson's decision in Liberty Mut. Inc. v. N. Picco & Sons, 05-cv-217 (SCR), 2008 U.S. Dist. LEXIS 4915 (S.D.N.Y. Jan. 16, 2008), is inapposite. Even assuming that GOT is bound by the approval of the "financial model" set forth in the Award issued in the 2001 arbitration between IPTL and TANESCO, the fact remains that no arbitral award has been entered against TANESCO pertaining to the 2007 capacity payments or against GOT determining its liability or quantifying the amount owed, if any, under the Guarantee. If IPTL were correct regarding its right to proceed against GOT, there would have been no need to even include an arbitration clause in the Guarantee.

Indeed, the ICSID Convention,[6] a multilateral treaty to which the United States is a party

and, thus, the "supreme Law of the Land,"[7] makes clear that, in light of the parties' agreement in

¶ 7.2 of the Guarantee, this Court lacks jurisdiction to hear IPTL's claim.  Under Article 26 of

the ICSID Convention, consent to ICSID arbitration is "deemed consent to such arbitration *to the*

*exclusion of any other remedy*." (emphasis added).  The "purpose of this provision is to protect

Contracting States and foreign private investors from being subjected to other forms of foreign or

international litigation."  See Bette E. Shifman, Note, *Maritime International Nominees*

*Establishment v. Republic of Guinea:  Effect on U.S. Jurisdiction of an Agreement by a Foreign*

*Sovereign to Arbitrate Before the International Centre for the Settlement of Investment Disputes*,

16 GEO. WASH. J. INT'L L. & ECON. 451, 457 (1982) (citation omitted) [hereinafter, "Note,

Jurisdiction and ICSID Arbitrations"].

Furthermore, Article 41 of the ICSID Convention provides that the arbitral tribunal

constituted under ICSID auspices itself determines whether it has jurisdiction to hear the dispute:

1.      The Tribunal shall be the judge of its own competence.

2.      Any objection by a party to the dispute that that dispute is not within the
jurisdiction of the Centre, or for other reasons is not within the competence of the Tribunal, shall
be considered by the Tribunal which shall determine whether to deal with it as a preliminary
question or join it to the merits of the dispute.

Insofar as this Court must apply the ICSID Convention as a matter of U.S. law, it should

conclude that it lacks jurisdiction either to hear IPTL's claim or to address its assertion that there

---

[6] Convention on the Settlement of Investment Disputes between States and Nationals of
Other States, *done at* Washington, Mar. 18, 1965, 17 U.S.T. 1270, T.I.A.S No. 6090, 575
U.N.T.S. 159 (entered into force Oct. 14, 1966), reprinted in 4 I.L.M. 532 (1965).  For the
convenience of the Court, a copy of the ICSID Convention is annexed to this Memorandum.

[7] U.S. Const. art. VI, cl. 2 (. . . all Treaties made, or which shall be made, under the
Authority of the United States, shall be the supreme Law of the Land; and the Judges in every
State shall be bound thereby, . . . .").

is no genuine "dispute" between the parties subject to mandatory ICSID arbitration.  See Note, Jurisdiction and ICSID Arbitrations, supra, at 459 (Article 41 "expressly provides that [ICSID] shall be the sole arbiter of its own jurisdiction.").[8]

In this regard, the D.C. Circuit Court of Appeals' decision in Martime Int'l Nominees Establishment v. The Republic of Guinea, 693 F.2d 1094 (D.C. Cir. 1982), cert. denied, 464 U.S. 815 (1983), is instructive.  In that case, the plaintiff company entered into a contract with Guinea containing an ICSID arbitration clause.  After a dispute arose, and after the plaintiff apparently tried but failed to initiate an ICSID arbitration, it filed a petition in United States District Court seeking to compel arbitration under the Federal Arbitration Act.  The district court granted the motion, and ordered arbitration before the American Arbitration Association ("AAA"), which subsequently issued, upon default, a $25 million award in plaintiff's favor.  The district court thereafter, and over Guinea's objection that it lacked jurisdiction, confirmed the award and entered judgment upon it.  Id. at 1095-1098.

The D.C. Circuit Court of Appeals reversed, holding that Guinea's agreement to arbitrate before ICSID (even assuming, unlike here, that the arbitration was to take place in Washington, D.C.) did not amount to an implied waiver of sovereign immunity under § 1605(a)(1) of the FSIA.  Id. at 1102-1103.[9]

_____

[8] Indeed, even the dispute raised by IPTL as to the scope of the 2001 ICSID Award is subject to review by ICSID.  See ICSID Convention, art. 50(1), (2) ("1. If any dispute shall arise between the parties as to the meaning or scope of an award, either party may request interpretation of the award by an application in writing addressed to the Secretary-General.  2. The request shall, if possible, be submitted to the Tribunal which rendered the award.  If this shall not be possible, a new Tribunal shall be constituted in accordance with Section 2 of this Chapter. . . .").
[9] The court of appeals also rejected an argument that jurisdiction could be exercised on the basis of the "commercial activities" exemption found at § 1605(a)(2), an analysis that is irrelevant here as IPTL is not relying on § 1605(a)(2).

- 9 -

Concededly, <u>Martime Int'l Nominees Establishment</u> involved only an "implied" waiver of sovereign immunity as the contract apparently did not contain an express waiver of immunity provision similar to the one that exists in the Guarantee.  But given GOT's and IPTL's explicit agreement in ¶ 7.2 to arbitrate "any dispute or difference" in London under ICSID auspices, the waiver of immunity clause in ¶ 2.6 can only be read as referring to proceedings to enforce an ICSID arbitral award.  Under U.S. law, the "pecuniary obligations imposed by such an award shall be enforced and shall be given the same full faith and credit as if the award were a final judgment of a court of general jurisdiction of one of the several States."  22 U.S.C. § 1650a(a); <u>see</u> ICSID Convention, art. 54(1) ("Each Contracting State shall recognize an award rendered pursuant to this Convention as binding and enforce the pecuniary obligations imposed by that award within its territories as if it were a final judgment of a court in that State.").

Notably, and consistent with GOT's view here, the State Department took the position in <u>Martime Int'l Nominees Establishment</u> that "agreements to arbitrate with ICSID do not contemplate the involvement of domestic courts, *at least not before a final ICSID decision is to be enforced*."  693 F.2d at 1103 (emphasis added).

Insofar as the parties' agreement to arbitrate "any dispute or difference" before ICSID demonstrates their intent to "exclu[de] any other remedy," ICSID Convention, Art. 26, it makes no sense to interpret ¶ 2.6 of the Guarantee as an express waiver of sovereign immunity from this lawsuit for purposes of § 1605(a)(1).  Because this Court lacks subject matter jurisdiction to hear IPTL's action, it must be dismissed.

**POINT II**

**THE COURT LACKS PERSONAL JURISDICTION OVER GOT**

IPTL does not dispute that the FSIA is the sole basis for obtaining personal jurisdiction over a foreign sovereign.  See Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 434 (1989).  Nor does IPTL dispute that personal jurisdiction over a foreign sovereign depends upon the applicability of one or more of the FSIA's exceptions to sovereign immunity, as well as service of process having been effected in strict compliance with 28 U.S.C. § 1608. See 28 U.S.C. § 1330(b) ("Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction under subsection (a) where service has been made under section 1608 of this title.").

This Court need not even reach the issue of personal jurisdiction because IPTL has failed to demonstrate the existence of a statutory exception to sovereign immunity, i.e., subject matter jurisdiction.  If it considers the issue, the Court should conclude that it lacks personal jurisdiction over GOT because IPTL failed to effect proper service under § 1608 of the FSIA.

**A.     The Notice Provision in the Guarantee Does Not Constitute
a "Special Arrangement for Service" Between IPTL and GOT.**

IPTL does not even try to defend its attempted service of process on GOT via personal delivery of a single copy of the Summons and Complaint (less the requisite notice of suit mandated by § 1608(a)(3) and 22 C.F.R. § 93.2) to the Tanzanian Embassy in Washington, D.C. As demonstrated in GOT's opening brief, IPTL's delivery to the Embassy plainly failed to comply with the provisions for service of process on a foreign state, set forth in § 1608(a)(3).

- 11 -

Instead, IPTL claims for the first time[10] that service of process was effected pursuant to a "special arrangement for service" between IPTL and GOT, as allowed by § 1608(a)(1). This "special arrangement for service," it turns out, is nothing more than the generic notice provision in the Guarantee, which on its face says nothing at all about service of process.

In support of its argument that the Guarantee's notice provision constitutes a "special arrangement for service" under 28 U.S.C. § 1608, IPTL cites Space Sys./Loral, Inc. v. Yuzhnoye Design Office, 164 F.Supp.2d 397 (S.D.N.Y. 2001) and Marlowe v. Argentine Naval Comm'n, 604 F.Supp. 702 (D.D.C. 1985). Both cases are distinguishable[11], however, as each involved notice provisions substantially broader than the one at issue here.

Space Sys./Loral, Inc. interpreted a notice provision governing "All notices and communications *between the parties*." Space Sys./Loral, Inc., 164 F.Supp. at 402 (emphasis supplied). Similarly, Marlowe construed a notice provision controlling "All notices, requests, demands, or other communications *to or upon the respective parties* hereto." Marlowe, 604 F.Supp. at 704 (emphasis supplied). Thus, both Space Sys./Loral, Inc. and Marlowe addressed notice provisions that explicitly applied to "[a]ll notices" either "between" or "to or upon" the parties.

In contrast here, the Guarantee contains no similarly broad language. Instead, ¶ 5.1 of the Guarantee *limits* the applicability of the "[a]ll notices" clause to those notices "*given or made hereunder*," i.e., under the Guarantee. See Guarantee ¶ 5.1 (emphasis added). As commonly

---

[10] In its Complaint, IPTL alleged vaguely, without reference to the specific manner of service authorized by the FSIA, that the Court could exercise personal jurisdiction over GOT because subject matter jurisdiction existed and "service of process has been made under 28 U.S.C. § 1608." Complaint ¶ 7.

[11] The court in Berdakin v. Consulado de La Republica de El Salvador, 912 F.Supp. 458, 466 (C.D. Cal. 1995), explicitly declined to follow Marlowe.

understood, "hereunder," means "[l]ater in *this document*" or "[i]n accordance with *this document*." BLACK'S LAW DICTIONARY 732 (7th ed. 1999) (emphasis added).

Thus, unlike the notice provisions in <u>Space Sys./Loral, Inc.</u> and <u>Marlowe</u>, the Guarantee's notice provision does not apply to "[a]ll notices" "between" or "to or upon" the parties, but is expressly limited to notices discussed in the Guarantee itself, such as demands for payment or notice to GOT that payment from TANESCO is past-due. <u>See</u> Guarantee ¶ 1.5.1. When faced with similar language, courts have distinguished or declined to follow <u>Marlowe</u> and its progeny. For instance, in <u>Underwood v. United Republic of Tanzania</u>, 94-cv-902, 1995 WL 46383 at *2 (D.D.C. Jan. 27, 1995), the Court found that GOT had not made a special arrangement for service when the contract at issue contained a notice provision limited to notices "required or permitted *herein*." (emphasis added). Similarly, in <u>Concord Reinsurance Co., Ltd. v. Caja Navional De Ahorro Y Seguro</u>, 93-cv-6606 (JSM), 1994 WL 86401 at *3 (S.D.N.Y. March 16, 1994), the Court held that an Argentine agency did not make a special arrangement for service through a provision regarding "all notices or communications *relating to this Agreement*." (emphasis added). And in <u>Berdakin v. Consulado de La Republica de El Salvador</u>, 912 F.Supp. 458, 466 (C.D. Cal. 1995), the Court found that El Salvador did not contract for a special arrangement for service when it agreed to a provision concerning notices supplied "under [the parties'] lease."

A similar reading of the Guarantee's notice provision is appropriate here. By its express language, the provision cannot literally apply to "[a]ll notices or other communications" between the parties, including service of process, because the Guarantee explicitly provides for a *different* method of serving legal process in connection with a judicial proceeding in London, England, brought, not coincidentally, "to enforce any award or decision of any arbitrator(s) or expert(s)

- 13 -

who were duly appointed under this Agreement to resolve any dispute between the Parties." Guarantee ¶ 1.9(a) ("The GOT appoints the Commercial Counsellor of [GOT] in London . . . to receive for and on its behalf service of process in such jurisdiction in any such enforcement proceeding."). While ¶ 1.9(a) does not constitute a "special arrangement" for service in this action, it does demonstrate that the parties knew how to draft a special arrangement for service of process when they desired to do so. It also demonstrates that the parties intended the language concerning "[a]ll notices . . . hereunder" to refer to notices provided for in the Guarantee, and not to constitute a "special arrangement for service" of process between IPTL and GOT.[12]

In sum, because IPTL did not properly serve GOT under § 1608(b)(3), and because the notice provision in the Guarantee is not a "special arrangement for service" under § 1608(a)(1), IPTL failed to properly serve GOT. For that reason, personal jurisdiction is lacking.[13]

---

[12] The Notices provision in Article 23 of the IA is similarly limited to notices to be given or made pursuant to the IA. Like the Guarantee, the IA has a special service arrangement in ¶ 24.9 for suits brought in England to enforce an arbitral award, which requires service of process to be made in a different manner than set forth in ¶ 23.1 for notices.

[13] IPTL, which alleges subject matter jurisdiction solely on the basis of the express waiver exemption set forth in § 1605(a)(1), claims "minimum contacts" are not required in the context of an intentional waiver of immunity. Insofar as IPTL has not demonstrated subject matter jurisdiction or proper service of process, the Court lacks personal jurisdiction over GOT and there is no need to examine whether GOT possesses constitutionally sufficient "minimum contacts" with the United States. In any event, IPTL's argument is limited to the express waiver context of § 1605(a)(1), which for the reasons stated above is not applicable here. In other contexts, however, it is worth noting that in <u>Texas Trading & Milling Corp. v. Federal Republic of Nigeria</u>, 647 F.2d 300, 308 (2d Cir. 1981), <u>cert. denied</u>, 454 U.S. 1148 (1982), the court stated that "*each finding* of personal jurisdiction under the FSIA requires, in addition, a due process scrutiny of the court's power to exercise its authority over a particular defendant." (emphasis added). IPTL omits the fact that <u>Texas Trading</u>'s due process analysis was upheld by the Second Circuit in 2001, in <u>U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co., Ltd.</u>, 241 F.3d 135, 152 (2d Cir. 2001). And while IPTL is correct that the court in <u>Frontera Resources Azerbaijan Corp. v. State Oil Co. of the Azerbaijan Republic</u>, 479 F.Supp.2d 376, 385 (S.D.N.Y. 2007) questioned the viability of the due process analysis based on *dicta* in <u>Hanil Bank v. PT. Bank Negara Indonesia</u>, 148 F.3d 127 (2d Cir. 1998), it applied <u>Texas Trading</u> after noting that, more

**B.    IPTL Is Not Entitled to Jurisdictional Discovery.**

IPTL's request for jurisdictional discovery should be denied.  GOT has made a "facial, not a factual attack" on IPTL's pleading of a jurisdictional basis for this suit.  In that context, jurisdictional discovery is unnecessary.  Berces v. Debrecen Tartositoipari Kombinat, 94-cv-3381 (KMW), 1995 U.S. Dist. LEXIS 16052, at *3 (S.D.N.Y. Oct. 31, 1995).  Insofar as neither party claims that the mandatory arbitration clause in the Guarantee is ambiguous, the clause, together with the waiver of sovereign immunity in ¶ 2.6, must be interpreted by the Court as a matter of law.  Proper interpretation of the two provisions in tandem leaves no doubt that GOT did not waive sovereign immunity with respect to an action seeking judgment directly upon the Guarantee, but, rather, at most waived immunity only with respect to proceedings to enforce an ICSID arbitral award.

Moreover, IPTL seeks discovery with respect to "GOT's commercial activities in the United States."  IPTL Br. at 26.  But IPTL does not plead jurisdiction based on the "commercial activities" exception in § 1605(a)(2); instead, it relies exclusively on an alleged explicit waiver of immunity and the concomitant exception found in § 1605(a)(1).[14]  Thus, allowing discovery

recently, in U.S. Titan, Inc., the decision IPTL ignores, the Second Circuit reaffirmed Texas Trading's holding.

[14] For this reason, the two decisions IPTL cites in support of its request for jurisdictional discovery are inapposite.  Both involved factual disputes concerning subject matter jurisdiction alleged on the basis of the "commercial activities" exception under § 1605(a)(2), not an express, contractual waiver of immunity under § 1605(a)(1).  See Reiss v. Societe Centrale du Groupe des Assurances Nationales, 235 F.3d 738, 747-48 (2d Cir. 2000) (allowing jurisdictional discovery to address "disputed factual matters" concerning alleged "commercial activities"); First City, Texas-Houston, N.A. v. Rafidain Bank, 150 F.3d 172, 176 (2d Cir. 1998) (holding that jurisdictional discovery of Central Bank of Iraq ("CBI") was necessary to address plaintiff's assertion that Rafidain Bank, which concededly had engaged in commercial activities creating subject matter jurisdiction under § 1605(a)(2), was alter ego of CBI such that its commercial activities could be attributed to CBI).

for the reason indicated by IPTL would frustrate the benefits of sovereign immunity recognized

in the FSIA, and amount to an impermissible "fishing expedition" without purpose.  Berces,

1995 U.S. Dist. LEXIS 16052, at *4 n.2 (citations omitted).  Certainly, IPTL has not articulated

how its proposed discovery "limited to GOT's commercial and financial dealings in the United

States" would help it establish that GOT expressly waived its sovereign immunity to this suit

pursuant to ¶ 2.6 of the Guarantee, an agreement executed in June 1995 and subject to routine

interpretation by the Court under general principles of contract law.

## POINT III

### ALTERNATIVELY, THE *FORUM NON CONVENIENS* DOCTRINE SUPPORTS DISMISSAL OF IPTL'S ACTION

Even if the Court were to conclude that it may properly exercise subject matter and

personal jurisdiction in this action, it may dismiss based on *forum non conveniens*.  As noted in

the GOT's opening brief, England is a significantly more appropriate forum.  The Guarantee

specifically provides for arbitration in England under English law, and for the jurisdiction of

English courts to enforce the arbitral decision.  Guarantee ¶¶ 1.9, 2.6, 7.2.[15]  IPTL does not

dispute that travel from Tanzania to England requires significantly less time and expense then a

trip to New York.  And, as this is a purely Tanzanian dispute between a Tanzanian corporation

and the Tanzanian government, which is governed by the substantive law of Tanzania, id. ¶ 7.1,

New York courts have no interest whatsoever in adjudicating it.  Certainly, IPTL has identified

none.  It is well-settled that a plaintiff's choice of forum is not entitled to deference where, as

here, the selected forum bears little, if any, relation to the parties' dispute.  See, e.g., Saud v. PIA

---

[15] Under ¶ 7.2 of the Guarantee, arbitration is to be conducted "in accordance with Article 21.2 of the Implementation Agreement," which, in turn, provides that "[t]he Law governing the procedure and administration of any arbitration instituted shall be the English Law."

Investments Ltd., 07-cv-5603 (NRB), 2007 WL 4457441, at *3 (S.D.N.Y. Dec. 14, 2007)
(plaintiff's choice of forum afforded "little deference" because he was a Saudi citizen suing
corporations with their principal place of business in Pakistan in a dispute whose only relation to
New York was that one of the defendants owned New York's Roosevelt Hotel, which would be
an asset appraised if plaintiff obtained his requested remedy).

        In response, IPTL argues only that New York "is a jurisdiction in which GOT has assets"
and that "GOT has certainly not stated that it has sufficient assets in England to satisfy any
judgment against it."  IPTL Br. at 26.  But IPTL's argument puts the cart before the horse.  This
litigation does not seek enforcement of a judgment or arbitral award against GOT, but involves
IPTL's attempt (in violation of the parties' mandatory arbitration clause) to obtain a money
judgment against GOT in the first instance.

        If, as it claims, IPTL is entitled to judgment against GOT without the necessity of an
arbitral proceeding, it should have no difficulty domesticating an English judgment in the courts
of the United States.  As the Second Circuit has recognized, "[t]he threshold for recognition of a
foreign judgment is not high."  Kensington Intern. Ltd. v. Itoua, 505 F.3d 147, 159 (2d Cir.
2007).  Indeed, New York law specifically provides for easy recognition of foreign country
judgments.  See N.Y. C.P.L.R. §§ 5301-5309.  Therefore, obtaining an English judgment would
not impede IPTL's possible rights to attach GOT assets potentially subject to such a remedy in
New York.  Consequently, IPTL has no "legitimate reason[]" to litigate the present dispute in
New York.  See Bigio v. Coca-Cola Co., 448 F.3d 176, 179 (2d Cir. 2006).

## **Conclusion**

For the reasons set forth above and in GOT's opening brief, GOT's motion to dismiss for lack of subject matter and personal jurisdiction should be granted.

Dated: New York, New York
      February 22, 2008

                Respectfully Submitted,

                HUNTON & WILLIAMS LLP

                By:  /s/ Joseph J. Saltarelli
                     Joseph J. Saltarelli
                     200 Park Avenue
                     New York, New York  10166
                     (212) 309-1000

                    - and -

                  John Jay Range
                  (to be admitted *pro hac vice*)
                  1900 K Street, N.W.
                  Washington, D.C.  20006
                  (202) 955-1500

                  *Attorneys for Defendant,*
                  *The Government of the*
                  *United Republic of Tanzania*

## DECLARATION OF SERVICE

Bradford C. Mulder, hereby declares under penalty of perjury pursuant to 28 U.S.C. § 1746.

I am Managing Clerk at the law firm of Hunton & Williams LLP, attorneys for Defendant The Government of the United Republic of Tanzania.

That on February 22, 2008, I served a true copy of the attached Reply Memorandum of Law in Further Support of Defendant's Motion to Dismiss the Complaint, on Plaintiff's counsel at the address listed below, by depositing the same in a duly enclosed and sealed wrapper, for Federal Express Next Day Overnight Service.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on  February 22, 2008.

/s/ Bradford C. Mulder
Bradford C. Mulder

TO:    Robert C. Sentner, Esq.
       NIXON PEABODY LLP
       437 Madison Avenue
       New York, New York  10022

       *Attorneys for Plaintiff*

# Convention On The Settlement Of Investment Disputes Between States And Nationals Of Other States International Centre For Settlement Of Investment Disputes, Washington 1965

copy @ www.lexmercatoria.org  *

* Generated by SiSU  www.jus.uio.no/sisu
  www.sisudoc.org

---

Generated by SiSU [ SiSU 0.64.1 of 2008w01/3 ] www.jus.uio.no/sisu

Copyright © 1997, current 2008 Ralph Amissah, All Rights Reserved.

SiSU is software for document structuring, publishing and search (with object citation numbering), www.sisudoc.org

SiSU is released under GPL 3 or later, <http://www.fsf.org/licenses/gpl.html>.

Document information:

*sourcefile* icsid.settlement.of.disputes.between.states.and.nationals.of.other.states.convention.washington.1965.sst

Generated by SiSU www.jus.uio.no/sisu

version information:   SiSU 0.64.1 of 2008w01/3

For alternative output formats of this document check:

<http://www.jus.uio.no/lm/icsid.settlement.of.disputes.between.states.and.nationals.of.other.states.convention.washington.1965/sisu_manifest.html>

# Contents

**Convention On The Settlement Of Investment Disputes Between States And Nationals Of Other States International Centre For Settlement Of Investment Disputes Submitted to Governments by the Executive Directors of the International Bank for Reconstruction and Development, Submitted: March 18, 1965, Washington Entered into Force: October 14, 1966** ........ 1

PREAMBLE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**CHAPTER I**                                                                 1

**SECTION 1: Establishment and Organization**                                 2

Article 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Article 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Article 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**SECTION 2: The Administrative Council**                                     2

Article 4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Article 5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Article 6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Article 7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Article 8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**SECTION 3: The Secretariat**                                                4

Article 9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Article 10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Article 11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

**SECTION 4: The Panels**                                                     4

Article 12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Article 13 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Article 14 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Article 15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Article 16 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

**SECTION 5: Financing the Centre**                                           5

Article 17 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Article 19 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Article 20 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Article 21 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Article 22 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Article 23 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Article 24 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

**CHAPTER II - Jurisdiction of tbe Centre**                                   7

**Contents**

Article 25 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Article 26 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Article 27 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**CHAPTER III - Conciliation**                                      **8**

**SECTION 1: Request for Conciliation**                             **8**

Article 28 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**SECTION 2: Constitution of the Conciliation Commission**         **8**

Article 29 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Article 30 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Article 31 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

**SECTION 3: Conciliation Proceedings**                            **9**

Article 32 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Article 33 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Article 34 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Article 35 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

**CHAPTER IV - Arbitration**                                       **10**

**SECTION 1: Request for Arbitration**                             **10**

Article 36 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

**SECTION 2; Constitution of the Tribunal**                        **10**

Article 37 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Article 38 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Article 39 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Article 40 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

**SECTION 3: Powers and Functions of the Tribunal**               **11**

Article 41 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Article 42 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Article 43 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Article 44 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Article 45 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Article 46 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Article 47 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**SECTION 4: The Award**                                           **13**

Article 48 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Article 49 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**SECTION 5: Interpretation, Revision and Annulment of the Award** **13**

Article 50 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Contents

Article 51 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    14
Article 52 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    14

**SECTION 6: Recognition and Enforcement of the Award**    **15**
Article 53 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    15
Article 54 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    15
Article 55 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    15

**CHAPTER V - Replacement and Disqualification of Conciliators and Arbitrators**    **16**
Article 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    16
Article 57 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    16
Article 58 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    16

**CHAPTER VI - Cost of Proceedings**    **16**
Article 59 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    16
Article 60 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    16
Article 61 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    17

**CHAPTER VII - Place of Proceedings**    **17**
Article 62 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    17
Article 63 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    17
Article 64 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    17

**CHAPTER IX - Amendment**    **18**
Article 65 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    18
Article 66 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    18

**CHAPTER X**    **18**
Article 67 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    18
Article 68 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    18
Article 69 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    18
Article 70 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    19
Article 71 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    19
Article 72 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    19
Article 73 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    19
*[Article 74]* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    19
Article 74  *[Article 75]* . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    19

**[Post Provisions]**    **20**
*[Post Clauses (If any: Signed; Witnessed; Done; Authentic Texts; and Deposited Clauses)]* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    20

**Document Information (metadata)**    **21**
Metadata . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    21

**Information on this document copy and an unofficial List of Some web related**

**Contents**

**information and sources**         **22**

Information on this document copy . . . . . . . . . . . . . . . . . . . . . . . . .  22

Links that may be of interest  . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

Convention On The Settlement Of Investment Disputes Between States And Nationals Of Other
States;br¿International Centre For Settlement Of Investment Disputes, Washington 1965

# CONVENTION ON THE SETTLEMENT OF INVESTMENT DISPUTES BETWEEN STATES AND NATIONALS OF OTHER STATES INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES SUBMITTED TO GOVERNMENTS BY THE EXECUTIVE DIRECTORS OF THE INTERNATIONAL BANK FOR RECONSTRUCTION AND DEVELOPMENT, SUBMITTED: MARCH 18, 1965, WASHINGTON ENTERED INTO FORCE: OCTOBER 14, 1966

## PREAMBLE

The Contracting States

Considering the need for international cooperation for economic development, and the role of private international investment therein;

Bearing in mind the possibility that from time to time disputes may arise in connection with such investment between Contracting States and nationals of other Contracting States;

Recognizing that while such disputes would usually be subject to national legal processes, international methods of settlement may be appropriate in certain cases;

Attaching particular importance to the availability of facilities for international conciliation or arbitration to which Contracting States and nationals of other Contracting States may submit such disputes if they so desire;

Desiring to establish such facilities under the auspices of the International Bank for Reconstruction and Development;

Recognizing that mutual consent by the parties to submit such disputes to conciliation or to arbitration through such facilities constitutes a binding agreement which requires in particular that due consideration be given to any recommendation of conciliators, and that any arbitral award be complied with; and

Declaring that no Contracting State shall by the mere fact of its ratification, acceptance or approval of this Convention and without its consent be deemed to be under any obligation to submit any particular dispute to conciliation or arbitration,

Have agreed as follows:

# CHAPTER I

International Centre for Settlement of Investment Disputes

Convention On The Settlement Of Investment Disputes Between States And Nationals Of Other
States¡br¿International Centre For Settlement Of Investment Disputes, Washington 1965

---

# SECTION 1: ESTABLISHMENT AND ORGANIZATION

**Article 1**

1. There is hereby established the International Centre for Settlement of Investment Disputes (hereinafter called the Centre).

2. The purpose of the Centre shall be to provide facilities for conciliation and arbitration of investment disputes between Contracting States and nationals of other Contracting States in accordance with the provisions of this Convention.

**Article 2**

The seat of the Centre shall be at the principal office for the International Bank for Reconstruction and Development (hereinafter called the Bank). The seat may be moved to another place by decision of the Administrative Council adopted by a majority of two-thirds of its members.

**Article 3**

The Centre shall have an Administrative Council and a Secretariat and shall maintain a Panel of Conciliators and a Panel of Arbitrators

# SECTION 2: THE ADMINISTRATIVE COUNCIL

**Article 4**

The Administrative Council shall be composed of one representative of each Contracting State. An alternate may act as representative in case of his principal's absence from a meeting or inability to act.

In the absence of a contrary designation, each governor and alternate of the Bank appointed by a Contracting State shall be ex officio its representative and its alternate respectively.

**Article 5**

The President of the Bank shall be ex officio Chairman of the Administrative Council (hereinafter called the Chairman) but shall have no vote. During his absence or inability to act and during any vacancy in the office of President of the Bank, the person for the time being acting as President shall act as Chairman of the Administrative Council.

**Article 6**

1. Without prejudice to the powers and functions vested in it by other provisions of this Convention, the Administrative Council shall

**Convention On The Settlement Of Investment Disputes Between States And Nationals Of Other States¡br¿International Centre For Settlement Of Investment Disputes, Washington 1965**

(a) adopt the administrative and Financial regulations of the Centre; 30

(b) adopt the rules of procedure for the institution of conciliation and arbitration proceedings; 31

(c) adopt the rules of procedure for conciliation and arbitration proceedings (hereinafter called the Conciliation Rules and the Arbitration Rules); 32

(d) approve arrangements with the Bank for the use of the Bank's administrative facilities and services; 33

(e) determine the conditions of service of the Secretary-General and of any Deputy Secretary-General.; 34

(f) adopt the annual budget of revenues and expenditures of the Centre; 35

(g) approve the annual report on the operation of the Centre. 36

The decisions referred to in sub-paragraphs (a), (b), (c) and (0 above shall be adopted by a majority of two-thirds of the members of the Administrative Council. 37

2. The Administrative Council may appoint such committees as it considers necessary. 38

3. The Administrative Council shall also exercise such other powers and perform such other functions as it shall determine to be necessary for the implementation of the provisions of the Convention. 39

## Article 7
40

1. The Administrative Council shall hold an annual meeting and such other meetings as may be determined by the Council, or convened by the Chairman, or convened by the Secretary-General at the request of not less than five members of the Council. 41

2. Each member of the Administrative Council shall have one vote and, except as otherwise herein provided, all matters before the Council shall be decided by a majority of the votes cast. 42

3. A quorum for any meeting of the Administrative Council shall be a majority of its members. 43

4. The Administrative Council may establish, by a majority of two-thirds of its members, a procedure whereby the Chairman may seek a vote of the Council without convening a meeting of the Council. The vote shall be considered valid only if the majority of the members of the Council cast their votes within the time limit fixed by the said procedure. 44

## Article 8
45

Members of the Administrative Council and the Chairman shall serve without remuneration from the Centre. 46

Convention On The Settlement Of Investment Disputes Between States And Nationals Of Other
States¡br¿International Centre For Settlement Of Investment Disputes, Washington 1965

## SECTION 3: THE SECRETARIAT                                47

### Article 9                                                 48

The Secretariat shall consist of a Secretary-General, one or more      49
Deputy Secretaries-General and staff,                                  50

### Article 10                                                51

1. The Secretary-General and any Deputy Secretary-General shall be elected by the Adminis-    52
trative Council by a majority of two-thirds of its members upon the nomination of the Chairman
for a term of service not exceeding six years and shall be eligible for re-election. After con-
sulting the members of the Administrative Council, the Chairman shall propose one or more
candidates for each such office.

2. The offices of Secretary-General and Deputy Secretary-General shall be incompatible with    53
the exercise of any political function. Neither the Secretary-General nor any Deputy Secretary-
General may hold any other employment or engage in any other occupation except with the
approval of the Administrative Council.

3. During the Secretary-General's absence or inability to act, and during any vacancy of the of-    54
fice of Secretary-General, the Deputy Secretary-General shall act as Secretary-General. If there
shall be more than one Deputy Secretary-General, the Administrative Council shall determine
in advance the order in which they shall act as Secretary-General.

### Article 11                                                55

The Secretary-General shall be the legal representative and the principal officer of the Centre    56
and shall be responsible for its administration, including the appointment of staff, in accordance
with the provisions of this Convention and the rules adopted by the Administrative Council. He
shall perform the function of registrar and shall have the power to authenticate arbitral awards
rendered pursuant to this Convention, and to certify copies thereof.

## SECTION 4: THE PANELS                                     57

### Article 12                                                58

The Panel of Conciliators and the Panel of Arbitrators shall each consist of qualified persons,    59
designated as hereinafter provided, who are willing to serve thereon.

### Article 13                                                60

1. Each Contracting State may designate to each Panel four persons who may but need not be    61
its nationals.

2. The Chairman may designate ten persons to each Panel: The persons so designated to a    62

Panel shall each have a, different nationality.

## Article 14

1. Persons designated to serve on the Panels shall be persons of high moral character and recognized competence in the Fields of law, commerce, industry or finance, who may be relied upon to exercise independent judgement. Competence in the Field of law shall be of particular importance in the case of persons on the Panel or Arbitrators.

2. The Chairman, in designating persons to serve on the Panels, shall in addition pay due regard to the importance of assuring representation on the Panels of the principal legal systems of the world and of the main forms of economic activity.

## Article 15

1. Panel members shall serve for renewable periods of six years.

2. In case of death or resignation of a member of a Panel, the authority which designated the member shall have the right to designate another person to serve for the remainder of that member's term.

3. Panel members shall continue in office until their successors have been designated.

## Article 16

1. A person may serve on both Panels.

2. If a person shall have been designated to serve on the same Panel by more than one Contracting State, or by one or more Contracting States and the Chairman, he shall be deemed to have been designated by the authority which First designated him or, if one such authority is the State or which he is a national, by that State.

3. All designations shall be notified to the Secretary-General and shall take effect from the date on which the notification is received.

## SECTION 5: FINANCING THE CENTRE

## Article 17

If the expenditure of the Centre cannot be met out of charges for the use of its facilities, or out of other receipts, the excess shall be borne by Contracting States which are members of the Bank in proportion to their respective subscriptions to the capital stock of the Bank, and by Contracting States which are not members of the Bank in accordance with rules adopted by the Administrative Council.

Section 6: Status, Immunities and Privileges

The Centre shall have full international legal personality. The legal capacity of the Centre shall

**Convention On The Settlement Of Investment Disputes Between States And Nationals Of Other States¡br¿International Centre For Settlement Of Investment Disputes, Washington 1965**

include the capacity

(a) to contract;                                                                                               79

(b) to acquire and dispose of movable and immovable property;                                                  80

(c) to institute legal proceedings                                                                             81

## Article 19                                                                                                  82

To enable the Centre to fulfil its functions, it shall enjoy in the territories of each Contracting            83
State the immunities and privileges set forth in this Section.

## Article 20                                                                                                  84

The Centre, its property and assets shall enjoy immunity from all legal process, except when                   85
the Centre waives this immunity.

## Article 21                                                                                                  86

The Chairman, the members of the Administrative Council, persons acting as conciliators or                     87
arbitrators or members of a Committee appointed pursuant to paragraph (3) of Article 52, and
the officers and employees of the Secretariat.

(a) shall enjoy immunity from legal process with respect to acts performed by them in the                      88
exercise of their functions, except when the Centre waives this immunity;

(b) not being local nationals, shall enjoy the same immunities from immigration restrictions,                  89
alien registration requirements and national service obligations, the same facilities as regards
exchange restrictions and the same treatment in respect of travelling facilities as are accorded by
Contracting States to the representatives, officials and employees of comparable rank of other
Contracting States.

## Article 22                                                                                                  90

The provisions of Article 21 shall apply to persons appearing in proceedings under this Con-                   91
vention as parties, agents, counsel, advocates, witnesses or experts; provided, however, that
sub-paragraph (b) thereof shall apply only in connection with their travel to and from, and their
stay at, the place where the proceedings are held.

## Article 23                                                                                                  92

1. The archives of the Centre shall be inviolable, wherever they may be.                                       93

2. With regard to its official communications, the Centre shall be accorded by each Contracting                94
State treatment not less favorable than that accorded to other international organizations.

Convention On The Settlement Of Investment Disputes Between States And Nationals Of Other
States¡br¿International Centre For Settlement Of Investment Disputes, Washington 1965

## Article 24                                                                                    95

1. The Centre, its assets, property and income, and its operations and transactions authorized    96
by this Convention shall be exempt from all taxation and customs duties. The Centre shall also
be exempt from liability for the collection or payment of any taxes or customs duties.

2. Except in the case of local nationals, no tax shall be levied on or in respect of expense      97
allowances paid by the Centre to the Chairman or members of the Administrative Council, or
on or in respect of salaries, expense allowances or other emoluments paid by the Centre to
officials or employees of the Secretariat.

3. No tax shall be levied on or in respect of fees or expense allowances received by persons act-  98
ing as conciliators, or arbitrators, or members of a Committee appointed pursuant to paragraph
(3) of Article 52, in proceedings under this Convention, if the sole jurisdictional basis for such
tax is the location of the Centre or the place where such proceedings are conducted or the place
where such fees or allowances are paid.

# CHAPTER II - JURISDICTION OF TBE CENTRE                                                          99

## Article 25                                                                                     100

1. The jurisdiction of the Centre shall extend to any legal dispute arising directly out of an    101
investment, between a Contracting State (or any constituent subdivision or agency of a Con-
tracting State designated to the Centre by that State) and a national of another Contracting
State, which the parties to the dispute consent in writing to submit to the Centre. When the
parties have given their consent, no party may withdraw its consent unilaterally.

2. "National of another Contracting State" means:                                                 102

(a) any natural person who had the nationality of a Contracting State other than the State party  103
to the dispute on the date on which the parties consented to submit such dispute to conciliation
or arbitration as well as on the date on which the request was registered pursuant to paragraph
(3) of Article 28 or paragraph (3) of Article 36, but does not include any person who on either
date also had the nationality of the Contracting State party to the dispute; and

(b) any juridical person which had the nationality of a Contracting State other than the State    104
party to the dispute on the date on which the parties consented to submit such dispute to con-
ciliation or arbitration and any juridical person which had the nationality of the Contracting
State party to the dispute on that date and which, because of foreign control, the parties have
agreed should be treated as a national of another Contracting State for the purposes of this
Convention.

3. Consent by a constituent subdivision or agency of a Contracting State shall require the ap-    105
proval of that State unless that State notifies the Centre that no such approval is required.

4. Any Contracting State may, at the time of ratification, acceptance or approval of this Con-     106
vention or at any time thereafter, notify the Centre of the class or classes of disputes which it
would or would not consider submitting to the jurisdiction of the Centre. The Secretary-General

shall forthwith transmit such notification to all Contracting States. Such notification shall not
constitute the consent required by paragraph (1).

### Article 26                                                                                            107

 Consent of the parties to arbitration under this Convention shall, unless otherwise stated, be      108
deemed consent to such arbitration to the exclusion of any other remedy. A Contracting State
may require the exhaustion of local administrative or judicial remedies as a condition of its
consent to arbitration under this Convention.

### Article 27                                                                                            109

 1. No Contracting State shall give diplomatic protection, or bring an international claim, in        110
respect of a dispute which one of its nationals and another Contracting State shall have con-
sented to submit or shall have submitted to arbitration under this Convention, unless such other
Contracting State shall have failed to abide by and comply with the award rendered in such
dispute.

 2. Diplomatic protection, for the purposes of paragraph (1), shall not include informal diplo-      111
matic exchanges for the sole purpose of facilitating a settlement of the dispute.

# CHAPTER III - CONCILIATION                                                                              112

## SECTION 1: REQUEST FOR CONCILIATION                                                                    113

### Article 28                                                                                            114

 1. Any Contracting State or any national of a Contracting State wishing to institute conciliation   115
proceedings shall address a request to that effect in writing to the Secretary-General who shall
send a copy of the request to the other party.

 2. The request shall contain information concerning the issues in dispute, the identity of the par-  116
ties and their consent to conciliation in accordance with the rules of procedure for the institution
of conciliation and arbitration proceedings.

 3. The Secretary-General shall register the request unless he finds, on the basis of the informa-    117
tion contained in the request, that the dispute is manifestly outside the jurisdiction of the Centre.
He shall forthwith notify the parties of registration or refusal to register.

## SECTION 2: CONSTITUTION OF THE CONCILIATION COMMISSION                                                 118

### Article 29                                                                                            119

 1. The Conciliation Commission (hereinafter called the Commission) shall be constituted as          120
soon as possible after registration of a request pursuant to Article 28.

**Convention On The Settlement Of Investment Disputes Between States And Nationals Of Other States¡br¿International Centre For Settlement Of Investment Disputes, Washington 1965**

2. (a) The Commission shall consist of a sole conciliator or any uneven number of conciliators appointed as the parties shall agree. 121

(b) Where the parties do not agree upon the number of conciliators and the method of their appointment, the Commission shall consist of three conciliators, one conciliator appointed by each party and the third, who shall be the president of the Commission, appointed by agreement of the parties. 122

### Article 30 123

If the Commission shall not have been constituted within 90 days after notice of registration of the request has been dispatched by the Secretary-General in accordance with paragraph (3) of Article 28, or such other period as the parties may agree, the Chairman shall, at the request of either party and after consulting both parties as far as possible, appoint the conciliator or conciliators not yet appointed. 124

### Article 31 125

1. Conciliators may be appointed from outside the Panel of Conciliators, except in the case of appointments by the Chairman pursuant to Article 30. 126

2. Conciliators appointed from outside the Panel of Conciliators shall possess the qualities stated in paragraph (1) of Article 14. 127

## SECTION 3: CONCILIATION PROCEEDINGS 128

### Article 32 129

1. The Commission shall be the judge of its own competence. 130

2. Any objection by a party to the dispute that the dispute is not within the jurisdiction of the Centre, or for other reasons is not within the competence of the Commission, shall be considered by the Commission which shall determine whether to deal with it as a preliminary question or to join it to the merits of the dispute. 131

### Article 33 132

Any conciliation proceeding shall be conducted in accordance with the provisions of this Section and, except as parties otherwise agree, in accordance with the Conciliation Rules in effect on the date on which the parties consented to conciliation. If any question of procedure arises which is not covered by this Section or the Conciliation Rules or any rules agreed by the parties, the Commission shall decide the question. 133

### Article 34 134

1. It shall be the duty of the Commission to clarify the issues in dispute between the parties and 135

to endeavor to bring about agreement between them upon mutually acceptable terms. To that end, the Commission may at any stage of the proceedings and from time to time recommend terms of settlement to the parties. The parties shall cooperate in good faith with the Commission in order to enable the Commission to carry out its functions, and shall give their most serious consideration to its recommendations.

If the parties reach agreement, the Commission shall draw up a report noting the issues in dispute and recording that the parties have reached agreement. If, at any stage of the proceedings, it appears to the Commission that there is no likelihood of agreement between the parties, it shall close the proceedings and shall draw up a report noting the

submission of the dispute and recording the failure of the parties to reach agreement. If one party fails to appear or participate in the proceedings, the Commission shall close the proceedings and shall draw up a report noting that party's failure to appear or participate.

## Article 35

Except as the parties to the dispute shall otherwise agree, neither party to a conciliation proceeding shall be entitled in any other proceeding, whether before arbitrators or in a court of law or otherwise, to invoke or rely on any views expressed or statements or admissions or offers of settlement made by the other party in the conciliation proceedings, or the report or any recommendations made by the Commission.

# CHAPTER IV - ARBITRATION

## SECTION 1: REQUEST FOR ARBITRATION

### Article 36

1. Any Contracting State or any national of a Contracting State wishing to institute arbitration proceedings shall address a request to that effect in writing to the Secretary-General who shall send a copy of the request to the other party

2. The request shall contain information concerning the issues in dispute, the identity of the parties and their consent to arbitration in accordance with the rules of procedure for the institution of conciliation and arbitration proceedings.

3. The Secretary-General shall register the request unless he finds, on the basis of the information contained in the request, that the dispute is manifestly outside the jurisdiction of the Centre. He shall forthwith notify the parties of registration or refusal to register.

## SECTION 2; CONSTITUTION OF THE TRIBUNAL

### Article 37

1. The Arbitral Tribunal (hereinafter called the Tribunal) shall be constituted as soon as possible

**Convention On The Settlement Of Investment Disputes Between States And Nationals Of Other States¡br¿International Centre For Settlement Of Investment Disputes, Washington 1965**

after registration of a request pursuant to Article 36.

2. (a) The Tribunal shall consist of a sole arbitrator or any uneven number of arbitrators appointed as the parties shall agree. 149

(b) Where the parties do not agree upon the number of arbitrators and the method of their appointment, the Tribunal shall consist of three arbitrators, one arbitrator appointed by each party and the third, who shall be the president of the Tribunal, appointed by agreement of the parties. 150

## Article 38 151

If the Tribunal shall not have been constituted within 90 days after notice of registration of the request has been dispatched by the Secretary-General in accordance with paragraph (3) of Article 36, or such other period as the parties may agree, the Chairman shall, at the request of either party and after consulting both parties as far as possible, appoint the arbitrator or arbitrators not yet appointed. Arbitrators appointed by the Chairman pursuant to this Article shall not be nationals of the Contracting State party to the dispute or of the Contracting State whose national is a party to the dispute. 152

## Article 39 153

The majority of the arbitrators shall be nationals of States other than the Contracting State party to the dispute and the Contracting State whose national is a party to the dispute; provided, however, that the foregoing provisions of this Article shall not apply if the sole arbitrator or each individual member of the Tribunal has been appointed by agreement of the parties. 154

## Article 40 155

1. Arbitrators may be appointed from outside the Panel of Arbitrators, except in the case of appointments by the Chairman pursuant to Article 38. 156

2. Arbitrators appointed from outside the Panel of Arbitrators shall possess the qualities stated in paragraph (1) of Article 14. 157

## SECTION 3: POWERS AND FUNCTIONS OF THE TRIBUNAL 158

### Article 41 159

1. The Tribunal shall be the judge of its own competence. 160

2. Any objection by a party to the dispute that that dispute is not within the jurisdiction of the Centre, or for other reasons is not within the competence of the Tribunal, shall be considered by the Tribunal which shall determine whether to deal with it as a preliminary question or to join it to the merits of the dispute. 161

## Article 42

1. The Tribunal shall decide a dispute in accordance with such rules of law as may be agreed by the parties. In the absence of such agreement, the Tribunal shall apply the law of the Contracting State party to the dispute (including its rules on the conflict of laws) and such rules of international law as may be applicable.

2. The Tribunal may not bring in a Finding of non liquet on the ground of silence or obscurity of the law.

3. The provisions of paragraphs (1) and (2) shall not prejudice the power of the Tribunal to decide a dispute ex aequo et bono if the parties so agree.

## Article 43

1. Except as the parties otherwise agree, the Tribunal may, if it deems it necessary at any stage of the proceedings;

(a) call upon the parties to produce documents or other evidence, and

(b) visit the scene connected with the dispute, and conduct such inquiries there as it may deem appropriate.

## Article 44

Any arbitration proceeding shall be conducted in accordance with the provisions of this Section and, except as the parties otherwise agree, in accordance with the Arbitration Rules in effect on the date on which the parties consented to arbitration. If any question of procedure arises which is not covered by this Section or the Arbitration Rules or any rules agreed by the parties, the Tribunal shall decide the question.

## Article 45

1. Failure of a party to appear or to present his case shall not be deemed an admission of the other party's assertions.

2. If a party fails to appear or to present his case at any stage of the proceedings the other party may request the Tribunal to deal with the questions submitted to it and to render an award. Before rendering an award, the Tribunal shall notify, and grant a period of grace to, the party failing to appear or to present its case, unless it is satisfied that that party does not intend to do so.

## Article 46

Except as the parties otherwise agree, the Tribunal shall, if requested by a party, determine any incidental or additional claims or counter-claims arising directly out of the subject-matter of the dispute provided that they are within the scope of the consent of the parties and are otherwise within the jurisdiction of the Centre.

Convention On The Settlement Of Investment Disputes Between States And Nationals Of Other
States¡br¿International Centre For Settlement Of Investment Disputes, Washington 1965

**Article 47**                                                                                                          177

Except as the parties otherwise agree, the Tribunal may, if it considers that the circumstances so     178
require, recommend any provisional measures which should be taken to preserve the respective
rights of either party.

## SECTION 4: THE AWARD                                                                                  179

### Article 48                                                                                           180

1. The Tribunal shall decide questions by a majority of the votes of all its members.                  181

2. The award of the Tribunal shall be in writing and shall be signed by the members of the             182
Tribunal who voted for it.

3. The award shall deal with every question submitted to the Tribunal, and shall state the reasons     183
upon which it is based.

4. Any member of the Tribunal may attach his individual opinion to the award, whether he               184
dissents from the majority or not, or a statement of his dissent.

5. The Centre shall not publish the award without the consent of the parties.                          185

### Article 49                                                                                           186

1. The Secretary-General shall promptly dispatch certified copies of the award to the parties.         187
The award shall be deemed to have been rendered on the date on which the certified copies were
dispatched.

2. The Tribunal upon the request of a party made within 45 days after the date on which the            188
award was rendered may after notice to the other party decide any question which it had omitted
to decide in the award, and shall rectify any clerical, arithmetical or similar error in the award.
Its decision shall become part of the award and shall be notified to the parties in the same
manner as the award. The periods of time provided for under paragraph (2) of Article 51 and
paragraph (2) of Article $2 shall run from the date on which the decision was rendered.

## SECTION 5: INTERPRETATION, REVISION AND ANNULMENT OF THE                                              189
AWARD

### Article 50                                                                                           190

1. If any dispute shall arise between the parties as to the meaning or scope of an award, either       191
party may request interpretation of the award by an application in writing addressed to the
Secretary-General.

2. The request shall, if possible, be submitted to the Tribunal which rendered the award. If this      192
shall not be possible, a new Tribunal shall be constituted in accordance with Section 2 of this

Chapter. The Tribunal may, if it considers that the circumstances so require, stay enforcement of the award pending its decision.

## Article 51

1. Either party may request revision of the award by an application in writing addressed to the Secretary-General on the ground of discovery of some fact of such a nature as decisively to affect the award, provided that when the award was rendered that fact was unknown to the Tribunal and to the applicant and that the applicant's ignorance of that fact was not due to negligence.

2. The application shall be made within 90 days after the discovery of such fact and in any event within three years after the date on which the award was rendered.

The request shall, if possible, be submitted to the Tribunal which rendered the award. If this shall not be possible, a new Tribunal shall be constituted in accordance with Section 2 of this Chapter.

4. The Tribunal may, if it considers that the circumstances so require, stay enforcement of the award pending its decision. If the applicant requests a stay of enforcement of the award in his application, enforcement shall be stayed provisionally until the Tribunal rules on such request.

## Article 52

1 Either party may request annulment of the award by an application in writing addressed to the Secretary-General on one or more of the following grounds:

(a) that the Tribunal was not properly constituted;

(b) that the Tribunal has manifestly exceeded its powers;

(c) that there was corruption on the part of a member of the Tribunal;

(d) that there has been a serious departure from a fundamental rule of procedure; or

(e) that the award has failed to state the reasons on which it is based.

2. The application shall be made within 120 days after the date on which the award was rendered except that when annulment is requested on the ground of corruption such application shall be made within 120 days after discovery of the corruption and in any event within three years after the date on which the award was rendered.

3. On receipt of the request the Chairman shall forthwith appoint from the Panel of Arbitrators an ad hoc Committee of three persons. None of the members of the Committee shall have been a member of the Tribunal which rendered the award, shall be of the same nationality as any such member, shall be a national of the State party to the dispute or of the State whose national is a party to the dispute, shall have been designated to the Panel of Arbitrators by either of those States, or shall have acted as a conciliator in the same dispute. The Committee shall have the authority to annul the award or any part thereof on any of the grounds set forth in paragraph (1).

4. The provisions of Articles 41-45, 48, 49, 53 and 54, and of Chapters VI and VII shall apply mutatis mutandis to proceedings before the Committee. 207

5. The Committee may, if it considers that the circumstances so require, stay enforcement of the award pending its decision. If the applicant requests a stay of enforcement of the award in his application, enforcement shall be stayed provisionally until the Committee rules on such request. 208

6. If the award is annulled the dispute shall, at the request of either party, be submitted to a new Tribunal constituted in accordance with Section 2 of this Chapter. 209

## SECTION 6: RECOGNITION AND ENFORCEMENT OF THE AWARD 210

### Article 53 211

1. The award shall be binding on the parties and shall not be subject to any appeal or to any other remedy except those provided for in this Convention. Each party shall abide by and comply with the terms of the award except to the extent that enforcement shall have been stayed pursuant to the relevant provisions of this Convention. 212

2. For the purposes of this Section, "award" shall include any decision interpreting, revising or annulling such award pursuant to Articles 50, 51 or 52. 213

### Article 54 214

1. Each Contracting State shall recognize an award rendered pursuant to this Convention as binding and enforce the pecuniary obligations imposed by that award within its territories as if it were a final judgment of a court in that State. A Contracting State with a federal constitution may enforce such an award in or through its federal courts and may provide that such courts shall treat the award as if it were a final judgement of the courts of a constituent state. 215

2. A party seeking recognition or enforcement in the territories of a Contracting State shall furnish to a competent court or other authority which such State shall have designated for this purpose a copy of the award certified by the Secretary-General. Each Contracting State shall notify the Secretary-General of the designation of the competent court or other authority for this purpose and of any subsequent change in such designation. 216

3- Execution of the award shall be governed by the laws concerning the execution of judgments in force in the State in whose territories such execution is sought. 217

### Article 55 218

Nothing in Article 54 shall be construed as derogating from the law in force in any Contracting State relating to immunity of that State or of any foreign State from execution. 219

# CHAPTER V - REPLACEMENT AND DISQUALIFICATION OF CONCILIATORS AND ARBITRATORS

### Article 56

1. After a Commission or a Tribunal has been constituted and proceedings have begun, its composition shall remain unchanged; provided, however, that if a conciliator or an arbitrator should die, become incapacitated, or resign, the resulting vacancy shall be filled in accordance with the provisions of Section 2 of Chapter III or Section 2 of Chapter IV.

2. A member of a Commission or Tribunal shall continue to serve in that capacity notwithstanding that he shall have ceased to be a member of the Panel.

3. If a conciliator or arbitrator appointed by a party shall have resigned without the consent of the Commission or Tribunal of which he was a member, the Chairman shall appoint a person from the appropriate Panel to fill the resulting vacancy.

### Article 57

A party may propose to a Commission or Tribunal the disqualification of any of its members on account of any fact indicating a manifest lack of the qualities required by paragraph (1) of Article 14. A party to arbitration proceedings may, in addition, propose the disqualification of an arbitrator on the ground that he was ineligible for appointment to the Tribunal under Section 2 of Chapter IV.

### Article 58

The decision on any proposal to disqualify a conciliator or arbitrator shall be taken by the other members of the Commission or Tribunal as the case may be, provided that where those members are equally divided, or in the case of a proposal to disqualify a sole conciliator or arbitrator, or a majority of the conciliators or arbitrators, the Chairman shall take that decision. If it is decided that the proposal well-founded the conciliator or arbitrator to whom the decision relates shall be replaced in accordance with the provisions of Section 2 of Chapter III or Section 2 of Chapter IV.

# CHAPTER VI - COST OF PROCEEDINGS

### Article 59

The charges payable by the parties for the use of the facilities of the Centre shall be determined by the Secretary-General in accordance with the regulations adopted by the Administrative Council.

### Article 60

1. Each Commission and each Tribunal shall determine the fees and expenses of its members

within limits established from time to time by the Administrative Council and after consultation with the Secretary-General.

2. Nothing in paragraph (1) of this Article shall preclude the parties from agreeing in advance with the Commission or Tribunal concerned upon the fees and expenses of its members. [234]

## Article 61 [235]

1. In the case of conciliation proceedings the fees and expenses of members of the Commission as well as the charges for the use of the facilities of the Centre, shall be borne equally by the parties. Each party shall bear any other expenses it incurs in connection with the proceedings. [236]

2. In the case of arbitration proceedings the Tribunal shall, except as the parties otherwise agree, assess the expenses incurred by the parties in connection with the proceedings, and shall decide how and by whom those expenses, the fees and expenses of the members of the Tribunal and the charges for the use of the facilities of the Centre shall be paid. Such decision shall form part of the award. [237]

# CHAPTER VII - PLACE OF PROCEEDINGS [238]

## Article 62 [239]

Conciliation and arbitration proceedings shall be held at the seat of the Centre except as hereinafter provided. [240]

## Article 63 [241]

Conciliation and arbitration proceedings may be held, if the parties so agree, [242]

(a) at the seat of the Permanent Court of Arbitration or of any other appropriate institution, whether private or public, with which the Centre may make arrangements for that purpose; or [243]

(b) at any other place approved by the Commission or Tribunal after consultation with the Secretary-General. [244]

CHAPTERV VIII - Disputes between Contracting States [245]

## Article 64 [246]

Any dispute arising between Contracting States concerning the interpretation or application of this Convention which is not settled by negotiation shall be referred to the International Court of Justice by the application of any party to such dispute, unless the States concerned agree to another method of settlement. [247]

# CHAPTER IX - Amendment

248

### Article 65

249

Any Contracting State may propose amendment of this Convention. The text of a proposed amendment shall be communicated to the Secretary-General not less than 90 days prior to the meeting of the Administrative Council at which such amendment is to be considered and shall forthwith be transmitted by him to all the members of the Administrative Council.

250

### Article 66

251

If the Administrative Council shall so decide by a majority of two-thirds of its members, the proposed amendment shall be Circulated to all Contracting States for ratification, acceptance or approval. Each amendment shall enter into force 30 days after dispatch by the depository of the Convention of a notification to Contracting States that all Contracting States have ratified, accepted or approved the amendment.

252

# CHAPTER X

253

Final Provisions

254

### Article 67

255

This Convention shall be open for signature on behalf of States members of the Bank. It shall also be open for signature on behalf of any other State which is a party to the Statute of the International Court of Justice and which the Administrative Council, by a vote of two-thirds of its members, shall have invited to sign the Convention.

256

### Article 68

257

1. This Convention shall be subject to ratification, acceptance or approval by the signatory States in accordance with their respective constitutional procedures.

258

2. This Convention shall enter into force 30 days after the date of deposit of the twentieth instrument of ratification, acceptance or approval. It shall enter into force for each State which subsequently deposits its instrument of ratification, acceptance or approval 30 days after the date of such deposit.

259

### Article 69

260

Each Contracting State shall take such legislative or other measures as may be necessary for making the provisions of this Convention effective in its territories.

261

## Article 70

262

This Convention shall apply to all territories for whose international relations a Contracting State is responsible, except those which are excluded by such State by written notice to the depository of this Convention either at the time of ratification, acceptance or approval or subsequently.

263

## Article 71

264

Any Contracting State may denounce this Convention by written notice to the depositary of this Convention. The denunciation shall take effect six months after receipt of such notice.

265

## Article 72

266

Notice by Contracting State pursuant to Articles 70 or 71 shall not affect the rights or obligations under this Convention of that State or of any of its constituent subdivisions or agencies or of any national of that State arising out of consent to the jurisdiction of the Centre given by one of them before such notice was received by the depositary.

267

## Article 73

268

Instruments of ratification, acceptance or approval of this Convention and of amendments thereto shall be deposited with the Bank which shall act as the depositary of this Convention. The depositary shall transmit certified copies of this Convention to States members of the Bank and to any other State invited to sign the Convention.

269

## [Article 74]

The depositary shall register this Convention with the Secretariat of the United Nations in accordance with Article 102 of the Charter of the United Nations and the Regulations thereunder adopted by the General Assembly.

## Article 74 [Article 75]

270

The depositary shall notify all signatory States of the following:

271

(a) signatures in accordance with Article 67;

272

(b) deposits of instruments of ratification, acceptance and approval in accordance with Article 73;

273

(c) the date on which this Convention enters into force in accordance with Article 68;

274

(d) exclusions from territorial application pursuant to Article 70;

275

(e) the date on which any amendment of this Convention enters into force in accordance with Article 66; and

276

**Convention On The Settlement Of Investment Disputes Between States And Nationals Of Other States;br¿International Centre For Settlement Of Investment Disputes, Washington 1965**

(f) denunciations in accordance with Article 71.    277

## *[Post Provisions]*

*[Post Clauses (If any: Signed; Witnessed; Done; Authentic Texts; and Deposited Clauses)]*

DONE at Washington, in the English, French and Spanish languages, all three texts being    278
equally authentic, in a single copy which shall remain deposited in the archives of the Interna-
tional Bank for Reconstruction and Development, which has indicated by its signature below
its agreement to fulfil the functions with which it is charged under this Convention.